**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Paul Schroth Wolfe, Yorkville Investment I, LLC, a Delaware limited liability company, Green Sapphire Holdings, Inc., a Delaware corporation, Alpha Carta, Ltd., a foreign corporation, Breakers Beach Club, Ltd., a foreign corporation, NorthSea, LLC, a Wyoming limited liability company, and Prairie Private Trust Company Ltd., a Cayman Island company, | Case No.: 24-cv-01538<br><br>**JURY TRIAL DEMANDED** |
|           Plaintiffs, | |
|    v. | |
| Steven E. Looper, Paul Schlieve a/k/a Paul Whinnery a/k/a Paul Schmidt, Cyber App Solutions Corp. f/k/a Proton Green, LLC, a Nevada corporation, Proton Green, LLC, a Wyoming limited liability company, Robert G. Brownell a/k/a Robert Bigelow, BNW Family Office, LLC, a Delaware limited liability company, Nathan Smith, Charles Mack, Dallas Salazar, Robert J. Brownell, Sasaginnigak, LLC f/k/a Overall Builders, LLC, a Texas limited liability company, Global Partners, LLC, a Delaware limited liability company; and John Doe(s) Unidentified Co-Conspirator(s), | |
|           Defendants. | |

**Second Amended Complaint**

Plaintiffs Paul Schroth Wolfe ("Wolfe"), Yorkville Investment I, LLC, a

Delaware limited liability company, Green Sapphire Holdings, Inc., a

Delaware corporation, Alpha Carta, Ltd., a foreign corporation, Breakers

Beach Club, Ltd., a foreign corporation, NorthSea, LLC, a Wyoming

limited liability company, Prairie Private Trust Company, Ltd. a foreign

corporation, and by and through their attorneys, Patterson Law Firm,

LLC, and for their Second Amended Complaint against Defendants

Steven E. Looper ("Looper"), Paul Schlieve a/k/a Paul Whinnery a/k/a

Paul Schmidt ("Schlieve"), Robert G. Brownell a/k/a Robert Bigelow,

BNW Family Office, LLC, a Delaware limited liability company, Cyber App

Solutions Corp., a Nevada corporation, Proton Green, LLC, a Wyoming

limited liability corporation, Nathan Smith, Charles Mack, Dallas

Salazar, Robert J. Brownell, Sasaginnigak, LLC, f/k/a Overall Builders,

LLC, a Texas limited liability company, Global Capital Partners, LLC, a

Delaware LLC, and John Doe(s) Unidentified Co-Conspirator(s) ("Doe"),

state as follows:

1. Beginning on or about February 2024, Plaintiffs discovered a series of

fraudulent schemes in which Defendants Robert G. Brownell, Nathan

Smith,  Steven Looper, Charles Mack, Dallas Salazar, and Paul Schlieve,

as well as their related entities and others working at their behest,

conspired to systematically loot money and property of plaintiffs by

2

means of fraud, breach of fiduciary duty, abuse of process, identity theft, fictitious sales, fictitious lawsuits, and other wrongful conduct.

2.  By these schemes, the defendants (a) created a purchase contract with a fake purchaser; (b) falsified an asbestos report related to this property; (c) filed a fictitious lawsuit falsely alleging sex crimes filed with the Illinois Circuit Court; (d) published their fictitious Complaint on multiple websites with the intent to weaponize the Illinois judicial system; (e) set up a false claim for control of two parcels of real estate located in St. Barth's; and (f) set up false loans or loans whose proceeds were received by one or more of the defendants.

3.  This is an integrated, ongoing scheme orchestrated by ex-convicts, officers terminated for misconduct, and their allies working in concert for a common purpose.

**Plaintiffs**

4.  Plaintiff Wolfe is an experienced financial services professional and citizen of DuPage County, Illinois, with a decades-long professional association with Co-Plaintiffs.

5.  Plaintiff Yorkville Investment I, LLC, is a Delaware limited liability company with its principal place of business in Wheaton, Illinois. It is owned by the Prairie II Trust, a Cayman Islands Trust. Its beneficiaries are the same as the beneficiaries of the Petro Carta Trust. Plaintiff Prairie Private Trust Company, Ltd is the Trustee of the Prairie II Trust.

3

6. Plaintiff Green Sapphire Holdings, Inc. ("Green Sapphire") is a Delaware corporation with its principal place of business in Delaware. It was organized for the purpose of investing money and acquiring property for the ultimate benefit of the beneficiaries of the Petro Carta Trust.

7. Plaintiff NorthSea, LLC, a Wyoming LLC, is the Trustee of the Petro Carta Trust. The Petro Carta Trust[1] is an express trust organized and existing under the laws of the State of Wyoming. The beneficiaries of the Petro Carta Trust are four U.S. citizens—a family consisting of a 54-year-old woman and her three children. As of January 1, 2023, NorthSea, LLC had two directors: Ryan Cicoski and Mark Azzopardi.

8. As of January 1, 2023, Green Sapphire had two directors--Paul Wolfe and Ryan Cicoski. Nathan Smith was removed as a Director of Green Sapphire Holdings, Inc. in August, 2021 and replaced by Ryan Cicoski. On information and belief that was about the time when Ryan Cicoski discovered Nathan Smith's self-dealing and other misconduct.

9. As of January 1, 2023, Green Sapphire was the owner of all but one of the shares of Access Management, S.A., a French corporation headquartered in the Territorial Collectivity of St. Barthelemy ("St. Barth's").

10. Access Management, S.A., is the sole owner and record titleholder of two parcels of real estate located in St. Barth's, more particularly

---

[1] Petro Carta Trust is, at times, mistakenly referred to interchangeably as "Petra Carta Trust" in certain documents and instruments. All references to "Petra Carta Trust" refer to the Petro Carta Trust described herein.

described as the AE 314 plot of 12,760 m2 in Colombier and the AI 220 plot of 2,676 M2 in Saint-Jean (the "St. Barth's Property"). The estimated fair market value of the St. Barth's Property is approximately $30 million.

11. Plaintiff Alpha Carta, Ltd., is a Cayman Islands corporation with its principal place of business in Georgetown, Grand Cayman, Cayman Islands, owned by the Alpha Carta Trust. It invests money and manages the property of the Alpha Carta Trust. The Alpha Carta Trust is an express trust organized and existing under the laws of the Cayman Islands to hold legal title to property separately from equitable title and to achieve related estate planning purposes for the benefit of its ultimate beneficial owner ("UBO"). Prairie Private Trust Company, Ltd. is the trustee of the Alpha Carta Trust. It is a Cayman Islands Company with its principal place of business in Georgetown, Grand Cayman, Cayman Islands.

12. Plaintiff Breakers Beach Club, Ltd. ("Breakers") is a Cayman Island company formed as a single purpose entity to hold title to certain real property located in Grand Cayman, Cayman Islands. Alpha Carta, Ltd owns 100% of the shares of Breakers. Breakers is the sole owner and record titleholder of four parcels of beachfront real property located in Grand Cayman, Cayman Islands, more particularly described as Breakers Block 56B, Parcels 14, 15, 16, and 17, totaling approximately 10 acres (the "Breaker's Property"). The current estimated fair market value of the Breakers Property is approximately $12.5 million.

**Defendants**

13. Defendant Looper is a convicted felon and citizen of Texas residing in Travis County. As of October 1, 2022, Steve Looper was the CEO of Proton Green, LLC f/k/a Plateau Carbon, LLC ("Proton Green"), a Wyoming limited liability company. Proton Green engaged in a reverse merger and share exchange on or about July 17, 2023, from which the surviving entity was Defendant Cyber App Solutions Corp., a Nevada corporation.

14. Notwithstanding the purported reverse merger, Proton Green has continued to hold itself out as a separate entity. As a result, claims are brought both against Cyber App Solutions Corp., as successor by merger to Proton Green, and Proton Green, to the extent it remains an existing entity. Proton and Cyber are collectively referred to as "Cyber."

15. On information and belief, Cyber's principal place of business is in Houston, Texas.

16. Defendant Robert G. Brownell, a/k/a Robert Bigelow ("Brownell"), is a convicted felon and a citizen and resident of Travis County, Texas. In 2015, his twenty-year prison sentence for masterminding a complex embezzlement and phony invoice scheme was reduced to ten years because he informed on other inmates, with the sentencing Judge opining that he was a changed man. The schemes alleged here, however, are strikingly similar to Brownell's prior criminal misconduct.

17. Brownell represented that he spoke for and helped manage the affairs of the BNW Family Office, LLC, and stated, falsely upon information and belief, that this "Family Office" organized as a Delaware limited liability company was capitalized, owned, and guided by his brother, a highly respected and wealthy attorney. BNW Family Office, LLC provided consulting services initially under an oral agreement with Alpha Carta, Ltd., in connection with the management of property owned by entities in the Family Office Trust Structure (defined below) that were owned or controlled by Alpha Carta, Ltd. He performed his early duties well. It is clear in retrospect that for whatever reason, Brownell reverted to the type of frauds for which he went to prison. He diverted money from the entities for his own benefit or to the detriment of the entities. He falsified records. He bypassed personnel who might have noticed irregularities or opposed transactions in which he was interested. He directed actions without approval from proper authorities: the directors, trustees, and officers of the entities. He concealed key facts about finances, negotiations, and transactions. He conspired with other felons and wrongdoers to damage these entities and affiliated parties in the ways set forth below, with additional investigations ongoing.

18. Defendant BNW Family Office, LLC, is a Delaware limited liability company. While Brownell represented to plaintiffs that his brother owned or helped control this LLC, now plaintiffs believe that it is owned and controlled by Defendant Robert G. Brownell.

7

19. BNW also served as an independent contractor for 60 Degrees Group SECZ, Ltd. ("60 Degrees") under Defendant Nathan Smith as CFO until January 2022, and thereafter for Ryan Cicoski as director. 60 Degrees is a Cayman Islands corporation that provided administrative services to the entities owned or controlled by the Alpha Carta Trust, Alpha Carta, Ltd., the Petro Carta Trust, NorthSea, LLC, Green Sapphire Holdings, Inc., Prairie II Trust and their affiliates (collectively, the "Family Office Trust Structure").

20. In late 2023, Brownell procured a written consulting agreement signed between Alpha Carta and the BNW Family Office, LLC. The BNW Family Office, LLC abruptly terminated its consulting engagement just as these frauds were being investigated, on or about February 8, 2024. Collectively, Robert G. Brownell and BNW Family Office, LLC, will hereafter be referred to as Brownell.

21. Defendant Schlieve is a convicted felon and citizen of Texas residing in Williamson County. He met Defendant Brownell in prison and has thereafter worked closely with him in connection with Brownell's consulting engagement with 60 Degrees and Alpha Carta, Ltd., doing business through a variety of entities or alter egos, including but not limited to an entity named The Katunigan Company. On information and belief, The Katunigan Company is a Texas corporation.

22. Defendant Sasaginnigak, LLC f/k/a Overall Builders, LLC, (hereinafter "Overall Builders") is a Texas limited liability company. Upon

8

information and belief, the members of Overall Builders are Paul Schlieve and Robert G. Brownell.

23. Defendant Global Capital Partners, LLC is a Delaware limited liability company whose members, on information and belief, are Dustin Springett and Tailwind, Ltd.

24. Defendant Nathan Smith is a citizen of the United States, residing in Georgetown, Grand Cayman, Cayman Islands. He was a Director of plaintiff Prairie Private Trust Company, Ltd. in its capacity as the trustee of the Alpha Carta Trust, and a director of Green Sapphire until August, 2021, and the sole director of the entity which managed Yorkville Investment I, LLC, the sole director of Breakers, and the sole director of 60 Degrees Group SEZC, Ltd. ("60 Degrees"), and its Chief Financial Officer until January, 2022. He now owns and runs Rockwater Capital, Ltd.

25. Smith's employment with 60 Degrees was terminated and he was removed as a director from all of the entities in the Family Office Trust Structure for systematic self-dealing, breach of trust, and financial misconduct on or about December 31st, 2021.

26. Defendant Robert J. Brownell is a citizen of Cook County, Illinois and the son of Defendant Robert G. Brownell.

27. Defendant Charles Mack is an attorney licensed by the state of Illinois. He was consulted about legal issues by the BNW Family Office, Ryan Cicoski, and others, but at all times Mack was working for the best

interests of Brownell, the BNW Family Office, Schlieve, Smith, and other wrongdoers. He falsely represented the status of negotiations, drafted documents to aid wrongdoers, obtained signatures that he knew or should have known were inadequate to authorize transactions, and recorded documents without authorization. He took direction from Brownell. He had his office in the same building as Brownell's office in Northbrook, Illinois. He submitted his invoices to Brownell. Brownell paid him and then through the complex bundling of invoices, obtained reimbursement from Terra Carta Partners, LLC or related entities, sometimes by siphoning funds without authorization from his IOLTA account.

28. Defendant Dallas Salazar is a citizen of Kendall County, Texas.

29. Plaintiff currently cannot identify the name(s) and address(es) of the Doe Defendant(s). The Doe Defendant(s)name and address can be obtained through discovery.

## Jurisdiction and Venue

30. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

31. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the events or omissions giving rise to the claims that are the subject of this Complaint occurred in the Northern District of Illinois.

## Hale Street

32. Plaintiff Yorkville Investment I, LLC ("Yorkville") holds title to real property commonly known as 120 North Hale Street, Wheaton, Illinois 60187 (the "Hale Property"). Mr. Russell Scott Armstrong ("Scott Armstrong"), a close friend of Paul Wolfe, held a 52.99% equity interest in the Hale Property.

33. In September 2022, Defendant Robert G. Brownell, with the knowing assistance of Defendant Charles Mack, set up a fictitious purchaser, submitted fictitious reports, and engineered a fictitious termination of a purchase of the Hale Property and then, having infuriated Armstrong, who demanded to be bought out, had Armstrong's shares purchased at an inflated price.

34. On or about September 23, 2022, Brownell wrote to Ryan Cicoski, the director of Yorkville, and represented that "Kissa Capital, LLC" ("Kissa") would be making an offer to purchase the Hale Property within the week, which would include a three-day period to review and accept; that Kissa was a real estate investment entity for the law firm of Hunton, Andrews, Kurth, 200 Park Avenue, New York, NY ("HAK"); that HAK employed his brother, F. William Brownell; and that HAK had pension fund money to invest. He had frequently in the past invoked his brother's name and HAK as backers/owners/participants in the BNW Family Office, LLC, representing that it was worth hundreds of millions of dollars.

35. In late September 2022, Brownell intentionally misrepresented to Ryan Cicoski and Scott Armstrong that a "Real Estate Purchase and Sale Agreement" ("PSA") was submitted by Kissa. This Purchase Agreement provided for a purchase price of $5 million, with an earnest money deposit of $50,000. The PSA was ostensibly signed by Joseph Filberto.

36. On information and belief, Brownell forged the signature of Joseph Filberto.

37. The PSA stated all notices, demands, requests, and other communications related to the PSA were to be sent to Kissa Capital, LLC, 1775 York Avenue, New York, NY, "Attn.: Joseph Filberto," with a copy to the law firm of Hunton, Andrews, Kurth ("HAK"), 200 Park Avenue, New York, NY, "Attn.: Brett Gross." Upon information and belief, Gross is the co-chair of HAK's real estate practice group.

38. On or about October 4, 2022, Ryan Cicoski, who had replaced Defendant Nathan Smith acting as Manager of Yorkville as of January, 2022, executed the PSA.

39. Defendants Mack and Brownell afterward represented to Cicoski that Kissa had signed the PSA and had a genuine interest in purchasing the Hale Property.

40. Defendant Mack wrote to Yorkville attaching a "critical dates memorandum" relating to the alleged transaction outlining key dates for due diligence and closing, including but not limited to:

       a. A Contract date of October 4, 2022;

b. An "earnest money" deposit date of October 7, 2022;

c. Due diligence expiration date of November 18, 2022; and

d. Closing date of January 2, 2023.

41. On or about October 26, 2022, Defendant Mack wrote to Armstrong and represented that there was a PSA, that it provided for one due diligence period of 45 days, with that period expiring November 18, 2022, and a closing date forty-five days thereafter, on January 2, 2023.

42. On January 2, 2023, however, Defendant Brownell wrote to Armstrong and represented that he had received an urgent letter from Kissa just prior to close of business, stating that Kissa had found "lead-based paint, asbestos, and mold, in addition to the repair of the ceiling . . .," and threatening to terminate the contract unless Yorkville gave Kissa an extension to finalize their estimates on correcting these alleged issues. Brownell forwarded this letter to Armstrong, ostensibly written on Kissa stationary, listing the 1775 York Avenue Address, and "signed" by "Joseph Filberto."

43. The Letter attached a supposed building inspection report performed by "Weber Group Management, Inc.," ("Weber") purportedly retained by Kissa to perform a limited NESHAPS inspection of the Hale Property (the "Report").

44. The Report indicated that inspector Michael Di Canio performed the asbestos inspection for the Hale Property, and his inspection allegedly

revealed asbestos-containing building materials throughout the building and was submitted by asbestos inspector Michael D. Herman.

45. Weber allegedly performed an additional lead-based paint inspection, submitting a report by Drake Ottley, licensed lead inspector, on or about December 27, 2022, addressed to "Brett Gross, Kissa Capital, LLC" at HAK's 200 Park Avenue, New York, NY address.

46. The next day, on or about December 28, 2022, Weber purportedly submitted a mold report, also addressed to Gross.

47. On or about January 10, 2023, Kissa purportedly wrote a letter to Defendant Mack indicating that it had completed its inspection including the estimated cost of remediation. In that letter, Kissa reportedly stated, "Now that we have a cost estimate of the rehab and remediation the number is far more substantial than we originally estimated . . . Kissa Capital, LLC is terminating the Agreement and requesting a return of the earnest money deposit . . . Kissa Capital, LLC would consider purchasing the Property in its current condition for an amount equal to $4,000,000." This ended the "correspondence."

48. All communications between "Kissa" and Yorkville regarding the proposed "sale" of the Hale Property were relayed to Yorkville through either Defendants Mack or Brownell.

49. To date, Yorkville's investigation, which is ongoing, has been unable to determine whether, from whom, or how the earnest money payment of $50,000.00 from Kissa was deposited or, if deposited, its source and

14

ultimate destination. Despite repeated requests, defendant Mack has failed to supply the relevant information, although he has repeatedly promised to do so at some future unstated date when he finds the time.

50. The "Kissa" Letter of January 10, 2023, attached an estimate for asbestos remediation dated August 13, 2022, with a purported expiration date of August 27, 2022, addressed to Yorkville from Robert J. Brownell—Robert G. Brownell's son—of "Overall Builders, LLC."

51. Therefore, the purported August 2022 remediation estimate was generated over four months before Kissa's alleged inspection, and several weeks before Robert G. Brownell introduced Kissa to Yorkville as a potential buyer for the Hale Property.

52. The Overall Builders report estimated remediation of asbestos, lead-based paint, and mold would cost $342,000.00.

53. Overall Builders's registered agent is "Gammon Analytics, LLC." Its managing member is, upon information and belief, Defendant Schlieve.

54. Gammon Analytics, upon information and belief, is a subsidiary of "The Katunigan Company," a Texas corporation, the President, Secretary, and Director of which is Defendant Schlieve.

55. Upon information and belief, Robert G. Brownell is likewise associated with Overall Builders as an employee or agent of Overall Builders.

15

56. Yorkville investigated Kissa. It is a Delaware limited liability company controlled by a broker identified as Ariel Imas, Kissa's managing member.

57. Mr. Imas previously lived at the 1775 York Avenue address provided in the PSA, but no longer resided there as of February 2024.

58. Mr. Imas organized Kissa as a holding company for another corporation he co-founded, and Kissa was only involved in one previous real estate transaction involving a residence in Florida.

59. Mr. Imas has never heard of Joseph Filberto, and reported that Kissa has no employees, and he is its sole member.

60. Mr. Imas has never heard of Brett Gross or Robert Brownell a/k/a Robert Bigelow.

61. Kissa was never represented by HAK in connection with the PSA.

62. Therefore, on information and belief, the signature of Joseph Filberto on the PSA, January 2, 2023, Letter, and all communications with "Joseph Filberto" were forged by Robert G. Brownell or at his direction with the actual intent to steal the identity of Kissa in furtherance of a scheme to defraud Yorkville and Scott Armstrong.

63. Yorkville similarly investigated "Weber Group Management, Inc.'s" inspection of the Hale Property.

64. Michael D. Herman, the asbestos inspector with Weber who purportedly submitted the December 2022 Report, informed Yorkville

that the report provided by "Kissa" via Mack and Brownell had been significantly altered from the report Herman prepared.

65. The correct report Herman prepared found "NO Accessible ACM [asbestos-containing materials] Was Found Observed in The Building" in any of the materials tested.

66. While Herman's inspection also uncovered some lead paint in a stairwell of the Hale Property, his correct report opined that it did not require remediation.

67. Herman stated that he had been retained by Robert Brownell—upon information and belief, Defendant Robert J. Brownell—to perform an asbestos and lead paint inspection at the Hale Property, though he was not asked to perform remediation if necessary.

68. After 'Kissa" allegedly terminated the PSA, Armstrong was furious and demanded that he be bought out of his interest in Yorkville.

69. Brownell, Mack, and as yet unknown John Does then pivoted to a scheme to engineer a deal that obligated Yorkville to purchase Armstrong's equity for an amount greater than the value of his equity interest.

70. Under the agreement engineered by Brownell, Mack, and as yet unknown John Does, Yorkville was obligated to pay Scott Armstrong $1,258,341 plus accrued but unpaid interest that is due and payable on May 1, 2024. See Stock Purchase Agreement, a true and correct copy of which is attached hereto as **Exhibit A**.

17

71. But for the misrepresentations, forgeries, and other deceits, Yorkville would never have incurred the contractual obligation to buy out Armstrong's equity interest for a price of $1,258,341.

72. But for the phony PSA, if Armstrong had demanded to be bought out and if plaintiff had acquiesced in this request, the buyout price would not have been based on the $5 million purchase price payable under the phony PSA, and the buyout price would have been at least $600,000 less.

**The 2022 Complaint & Websites**

73. In furtherance of the overall fraudulent schemes Defendants conspired to enact upon Plaintiffs as described herein, in August of 2022, an anonymous party (the "Complainant") using the alias "Susan Essex" filed a complaint against Plaintiff Wolfe in DuPage County, Illinois (the "2022 Complaint"), raising a series of scurrilous, denigrating, and disparaging allegations regarding Plaintiff Wolfe, including that he engaged in criminal activity and adultery.

74. After filing the 2022 Complaint, the Complainant made no efforts to serve—or even notify—Plaintiff Wolfe of the case brought against him, nor did "she" make any other efforts to otherwise litigate the case.

75. On or about October 31, 2022, the case was dismissed for want of prosecution. At no point thereafter did the Complainant seek to reinstate the matter. In other words, the Complainant was not even interested in appearing before the Court regarding their case. In essence, the

18

Complainant filed the false 2022 Complaint, which was devoid of substance other than spurious and scandalous allegations, and immediately abandoned the claim.

76. Even though this case was entirely obscure, having undergone no responsive pleadings, discovery, motions practice, or even initial case management, during October of 2023, an anonymous party obtained and published the 2022 Complaint in this case on their First Website, which was registered on September 11, 2023, and is dedicated entirely to "doxing," defaming, and otherwise harassing Plaintiff Wolfe and his colleagues.

77. Upon further investigation, the address the Complainant listed on the 2022 Complaint is a women's shelter without permanent residents, no response to communications was received from the email address listed on the 2022 Complaint, and the phone number is fictitious or otherwise disconnected.

78. Given the foregoing, upon information and belief, "Susan Essex" is an assumed name under which the responsible individual filed the 2022 Complaint.

79. Pursuant to information produced by the registrars of the First Website and the email address used to file the 2022 Complaint, the same Internet Protocol (IP) Address was used to access/maintain the First Website and to access the email account from which the responsible individual(s) filed the 2022 Complaint.

80. Likewise, pursuant information produced by the registrars of the First Website and the email address used to file the 2022 Complaint, the same phone number was used to register both the First Website and the email account from which the responsible individual(s) filed the 2022 Complaint.

81. Given the foregoing, upon information and belief, the individual(s) responsible for filing the 2022 Complaint are one and the same as the individual(s) responsible for creating and/or posting on the aforesaid First Website; the 2022 Complaint was filed under false pretenses, in bad faith, without basis in fact whatsoever, as fodder by which the individual(s) responsible might disparage Plaintiff Wolfe and the performance of his duties with the Family Office Trust Structure on their First Website.

82. The entry on the First Website dedicated to republishing the 2022 Complaint had generated 20 "comments" as of December 2023.

83. Upon information and belief, given Plaintiff Wolfe's status as a generally obscure private citizen rather than a public figure, and the anonymous nature of the "comments" on the First Website, the aforesaid "comments" were generated by the individual(s) responsible for filing and republishing the 2022 Complaint.

84. The entry on the First Website dedicated to republishing the 2022 Complaint contained personally identifiable information regarding

Plaintiff Wolfe without his consent, including his name, telephone number, home address, and employment information.

85. The entry on the First Website dedicated to republishing the 2022 Complaint encouraged the general public to stalk, harass, and harm Plaintiff Wolfe, variously encouraging the public to call his phone number and contact him at his home.

86. Furthermore, the entry on the Website dedicated to republishing the 2022 Complaint contained extensive inflammatory language and accusations against Wolfe, intended and likely to cause rash and unwarranted action against him including harassment, stalking, and bodily injury to Plaintiff Wolfe and his family.

87. After discovering the First Website and the 2022 Complaint published thereon, Plaintiff Wolfe immediately moved to vacate the dismissal entered on October 31, 2022, and sought to have the case sealed to prevent the further dissemination of the 2022 Complaint.

88. Because of the false, vile, scurrilous, defamatory, disparaging, and doxing allegations and website comments, on November 27, 2023, the Court granted Plaintiff Wolfe's Motion to Vacate the dismissal entered on October 31, 2022, ordered the case sealed, and set the matter for status of Defendants' answer to the 2022 Complaint on January 3, 2024. *See* Order dated November 27, 2023, a true and correct copy of which is attached hereto as **Exhibit B**.

89. The Complainant received notice of the November 27, 2023, Order via email—delivered to the account used to file the 2022 Complaint—on November 29, 2023. *See* Email from Christine Marte to Plaintiff, a true and correct copy of which is attached hereto as **Exhibit C**. Still, "Essex" failed to appear and the case was again dismissed.

90. The individual(s) responsible for maintaining/accessing the email account used to file the 2022 Complaint logged in to the email account at 11:57 P.M. on November 29, 2023, as well as on 14 occasions thereafter.

91. Thereafter, on or about January 9, 2024—6 weeks after the Court ordered the entire 2022 case sealed—an anonymous party created a second website (the "Second Website," collectively, the "Websites"), hosted out of Lithuania, dedicated to republishing the 2022 Complaint.

92. On or about that same date, the individual(s) responsible for maintaining the content of the First Website removed the 2022 Complaint from the First Website.

93. The Second Website was apparently created to be "linked" and published on the First Website, where it is currently republished and appears.

94. Given the foregoing, upon information and belief,

a. the individual(s) responsible for creating the First Website and republishing the 2022 Complaint thereon received notice of the developments in the 2022 case, despite its status as being sealed;

    b.   the individual(s) responsible for filing the 2022 Complaint are one and the same as the individual(s) responsible for creating and/or posting on both Websites; and

    c.   the individual(s) responsible for creating the Websites republished the 2022 Complaint on the Second Website in an effort to remove themselves from the jurisdictional reach of the Court.

95. The Second Website, as of the date of this filing, includes 21 false, defamatory, and disparaging "comments."

96. In addition, the Second Website flagrantly and egregiously misappropriates Plaintiff Wolfe's name and likeness for its own use and benefit. Specifically, the Second Website misappropriates Plaintiff Wolfe's name and likeness solely to further the responsible individual(s)' apparent vendetta or animosity against Plaintiff and the Family Office Trust Structure.

97. Pursuant to a subpoena from Wolfe, on or about February 2, 2024, the First Website's registrar—Newfold Digital, Inc. ("Newfold")—produced documents to Wolfe related to the identity of the individual(s) responsible for creating and maintaining the First Website.

98. The production from Newfold revealed the First Website was registered by an individual purportedly named "David Xanthan."

99. Plaintiffs are unaware of an individual named "David Xanthan," and subsequent investigation has revealed no individual by the name of "David Xanthan."

100. Upon information and belief, "David Xanthan" is yet another alias under which the responsible individual(s) have sought to conceal their misdeeds.

101. However, the production from Newfold also revealed the First Website was registered under a mailing address of 4531 Park Lane, Dallas, TX 75220.

102. Subsequent investigation revealed that 4531 Park Lane, until January 10, 2023, was the residence of Defendant Steven E. Looper— whose company is indebted to Alpha Carta, Ltd., for over $20 million as described herein.

103. Therefore, upon information and belief, Defendant Steven E. Looper is one of the individuals responsible for creating, maintaining, and publishing the content on the Websites and one of the individuals responsible for filing the 2022 Complaint.

104. Upon information and belief, Defendant Steven E. Looper participated in the creation, maintenance, and publication of the content on the Websites, as well as the filing of the 2022 Complaint, in an effort to discredit, defame, and disparage Plaintiffs in furtherance of the fraudulent schemes he and his co-conspirators enacted as alleged above.

105. Likewise, documents provided by Google, LLC—the registrar and host of the email address used to file the 2022 Complaint—revealed a recovery email address associated with the email address used to file the 2022 Complaint that apparently belongs to Defendant Paul Schlieve.

24

106.    The recovery email address given to create the account from which the 2022 Complaint was identified as PLSchlieve@gmail.com.

107.    Paul Schlieve is an individual with whom both Plaintiff Wolfe and Defendant Looper are acquainted.

108.    Following his incarceration, Defendant Schlieve was employed as a legal assistant at the firm of Clayborne, Sabo and Wagner in Bellville, Illinois.

109.    Given the foregoing, Defendant Schlieve is sufficiently knowledgeable regarding pleadings to have drafted or significantly aided in drafting the 2022 Complaint.

110.    While incarcerated, Defendant Schlieve met Robert G. Brownell. During 2016, Defendant Schlieve and Robert G. Brownell began providing limited "litigation consulting" services to an entity affiliated with one of the Plaintiffs.

111.    On or about July 3, 2023, Plaintiff Wolfe received an anonymous letter threatening Plaintiff Wolfe in connection with a corporate transaction with which Plaintiff Wolfe and his employer were associated (the "Letter").

112.    The Letter echoed baseless accusations similar to those expressed by the individual(s) creating the Websites, including but not limited to allegations Plaintiff Wolfe:

a.    "personally caused [the Corporation] to conduct its operations contrary to affirmative statements in the offering materials;"

b.  "personally withheld material information from the Board of Directors, which, had they known the information, would have prevented the failure of [the Corporation] . . .;" and

c.  "made material false statements to the Board of Directors, who relied on [Plaintiff's] false statements in repeating those material false statements to investors."

113.    Given the foregoing, upon information and belief, the individual(s) responsible for sending the Letter are one and the same as the individual(s) responsible for filing the 2022 Complaint and publishing the Websites.

114.    The responsible individual(s) sent the Letter from a post office located in Drexel, North Carolina.

115.    Defendant Schlieve is or was the managing member of Overall Builders, the company responsible for generating the fraudulent asbestos report discussed above, which is also registered to do business in North Carolina.

116.    Overall Builders has a registered address in North Carolina of 3402 Deal Avenue, Valdese, NC—located only four miles from the post office from which the Letter was sent.

117.    Given the foregoing, upon information and belief, Defendant Schlieve performed the actions described above at the behest of Robert G. Brownell, his confederate, in furtherance of the overarching fraudulent schemes enacted by Brownell and his co-conspirators as alleged herein.

118.    In addition to seeking to damage Plaintiff Wolfe personally and thereby attack his fitness to serve as a Trustee and/or Director of entities in the Family Office Trust Structure through the 2022 Complaint and Websites' publication, Defendants acted in a broader effort to intentionally harm Plaintiffs and other people associated with the Family Office Trust Structure in their abilities to work as financial professionals and to depress the value of property the Family Office Trust Structure owned.

119.    Defendants filed the 2022 Complaint and published the Websites in a concerted effort to damage Plaintiff Wolfe and his co-Plaintiffs' reputation and business relationships, including but not limited to their reputation and relationships with banks and other lenders, in order to artificially create adverse market conditions and attack Plaintiff Wolfe's fitness to serve as Trustee and/or Director of the Family Office Trust Structure's related entities, and to perpetuate the fraud described above.

120.    Defendants engaged in a conspiracy to create the impression that Wolfe was unfit to serve within the Family Office Trust Structure, in order to enrich themselves through the above-described misconduct. This was inextricably included in their fraud schemes alleged above to prevent Wolfe's interference therewith by causing him to be removed as Trustee and/or Director within the Family Office Trust Structure or be otherwise bypassed. It also hampered Plaintiffs' ability to investigate, discover, and rectify Defendants' misconduct.

121.    As part of his professional relationship with Plaintiffs, Defendant Schlieve served as the administrator of the website and corporate email account of an entity known as Terra Carta Partners, LLC.

122.    Terra Carta Partners, LLC, is an entity related to the property subjected to the larger fraud schemes against Plaintiffs described herein.

123.    As of the date of this filing, the website for Terra Carta Partners, LLC has been removed from the web, and Plaintiff Wolfe's access to his email account associated with Terra Carta Partners has been revoked.

124.    Given Defendant Schlieve's role as administrator of the Terra Carta website and email accounts, and his control thereof, upon information and belief, Defendant Schlieve has removed the Terra Carta website and revoked Plaintiff Wolfe's email access in an ongoing attempt to destroy evidence and obscure Defendants' involvement in the conduct alleged herein.

125.    As the allegations in the 2022 Complaint published on the Websites are not only baseless and untrue, but also particularly scandalous, offensive, and outrageous, Plaintiff Wolfe has experienced, and continues to experience, damage to his reputation and mental well-being as a result of the 2022 Complaint's subsequent publication. Moreover, the website participants' engagement in doxing and incitement of doxing represents a danger to Plaintiff Wolfe and his immediate family.

**Green Sapphire**

126.    In or before December 2022, Brownell, Mack, Smith, and Springett concocted a loan to own scheme to have Green Sapphire allegedly borrow money it could not repay, pledging all stock in Access Management, SA, a company it owned, which in turn owned the St. Barth's Property. Using the name Bigelow and falsely claiming to represent Green Sapphire and because Access Management was a company subject to French law, Brownell engaged French counsel to determine how to prepare a stock pledge and how to foreclose on it. Despite having been terminated, Defendant Smith nevertheless actively communicated with Brownell and Mack and conspired with them and others to infiltrate the Family Office Trust Structure and steal the St. Barth's Property.

127.    Unhappy with the formalities required under French law for such a pledge, and with the borrower-friendly procedures to foreclose on such a pledge, Brownell, in consultation with Mack, Smith, and John Does, then asked Ryan Cicoski, Green Sapphire's General Counsel, to convert Access Management to a Florida corporation. Brownell and John Does falsely claimed that a liquidity crisis necessitated the loan. On February 3, 2023, Defendant Charles Mack filed with the Florida Secretary of State "Articles of Domestication" which purport to transform Access Management, SA into Access Management, S.A.S., a Florida corporation.

*See* Articles of Domestication ("Domestication"), a true and correct copy of which is attached as **Exhibit D**.

128.     On or about the same day, Mack drafted and Cicoski, at the request of Mack, Brownell, or John Does, executed a "Loan and Security Agreement" on behalf of Green Sapphire with an entity known as "Global Capital Partners, LLC (the "Global Capital Loan"), a true and correct copy of which is attached as **Exhibit E**.

129.     Neither the Domestication nor the Global Capital Loan were authorized by two directors of Green Sapphire. Cicoski signed both documents without notice to or consent of Paul Wolfe, the other Director of Green Sapphire, or notice to the Trustee or the UBOs of the Petro Carta Trust. Under the bylaws of Green Sapphire, the absence of the approval of both directors made the execution of the Domestication and the Global Capital Loan *ultra vires.*

130.     Under the loan agreement, Global Capital Partners, LLC agreed to loan Green Sapphire $10 million for 120 days with interest at the rate of 30% per annum, Green Sapphire agreed to borrow $10 million and grant a security interest in its interest in certain shares of shares of Access Management, SA, a French corporation ("French Access")—record titleholder of the St. Barth's Property—or 100% of the shares of stock of Access Management S.A.S., Inc., the Florida corporation ("Florida Access"), give a mortgage on the St. Barth's Property, and to have Brownell and Petro Carta Trust guaranty the loan.

131.    To date, Ryan Cicoski and Global Capital Partners, LLC have been unable or unwilling to produce the fully executed Stock Pledge Agreement identified in the Loan and Security Agreement. Plaintiffs have been unable to obtain a copy of it from any other source. No Stock Pledge Agreement relating to the shares of Access Management, SA has been recorded in St. Barth's in the manner required by French law. On information and belief, Mack, an Illinois attorney operating in Illinois, prepared and arranged from Illinois a filing of a UCC-1 financing statement with the Secretary of States for Delaware and Florida purporting to perfect a UCC Article 9 security interest in the shares of Access Management S.A.S. Inc. in favor of Global Capital Partners, LLC, but no document that actually creates a security interest in any such shares has been located, despite requests to Mack.

132.    The term and interest rate under the Loan and Security Agreement was unreasonable and unconscionable given that payment of the $10 million debt was secured by guarantees of Petro Carta Trust and Brownell and, if the pledged stock agreement and the related transactions are valid and legally enforceable, by a security interest on shares of a corporation that holds title to real estate with a value of $30 million.

133.    Under the Loan and Security Agreement, the proceeds of the $10 million loan to Green Sapphire were scheduled to be disbursed to Green Sapphire in two tranches—the first tranche of $3 million was to occur on

31

January 31, 2023, and the second tranche in the amount of $7 million

"as soon as possible shortly thereafter," following the Lender's receipt of

an opinion of French counsel. No opinion of French counsel was ever

obtained.

134.     Neither Green Sapphire nor any of its related entities ever

received any portion of the $10 million loan that Global Capital Partners,

LLC "agreed" to make in connection with the Global Capital Loan.

135.     On information and belief, and based on Mack's assertions, if

any funds belonging to Global Capital Partners, LLC were transferred to

anyone, they were transferred to Chase Bank in Illinois for credit to the

IOLTA account held in the name of defendant Charles Mack's IOLTA

Trust Account.

136.     Upon information and belief, this was done by direction of

Brownell, Smith, Springett, or John Does, and then some of all of the

funds were transferred to or for the benefit of the BNW Family Office,

LLC, by Mack.

137.     Despite repeated requests, Mack has refused to produce the

IOLTA account statement, the wire transfer confirmations, emails or any

other documents that could confirm that $10 million was ever delivered

to any one by Global Capital Partners, LLC in connection with the Global

Capital Loan and would identify the transferees of any subsequent

transfers of any funds Mack received from Global Capital Partners, LLC.

138.   No one aside from Brownell, Mack, Smith, Springett, and John Does was aware of whether any money was actually disbursed by Global Capital Partners, LLC pursuant to the Global Capital Loan and, if so, to whom any such funds were delivered. For these reasons, plus the fact that no $10 million loan was ever recorded on the books and records of Green Sapphire and the lack of any evidence that any such loan was ever made, Green Sapphire did not repay any such loan on the claimed June 4, 2023, maturity date.

139.   In November 2023, Cicoski drafted a "Written Action of Sole Shareholder" purporting to remove Paul Wolfe as co-Director of Green Sapphire, without informing Wolfe, and presented it to Mark Azzopardi, manager of NorthSea, LLC—the Trustee of Petro Carta—as an "urgent" document requiring his signature immediately. Azzopardi signed it, believing it necessary and proper, so Wolfe was removed as co-Director of Green Sapphire. Wolfe had discharged his duties faithfully and well. He had given no cause for his removal. As set forth above, however, he had been the subject of vicious, vile, and false accusations posted on a website Defendants created for that purpose.

140.   Because of representations and directions of Brownell and John Does, Mack was unwilling to oppose Global Capital Partners, LLC's attempts to enforce the stock pledge agreement, and did not notify Mark Azzopardi, Paul Wolfe, or any of the UBOs of the Petro Carta Trust that Global Capital Partners, LLC was claiming ownership of 100% of the

shares of Access Management, S.A.S., Inc., in purported satisfaction of the "debt" that Global Capital Partners, LLC alleged that Green Sapphire owed it.

141.    On or about December 15, 2023, Global Capital Partners, LLC, on direction of Springett, filed a document with the Florida Secretary of State entitled "Amended Articles of Incorporation" that identify Dustin Springett as the sole director of Access Management S.A.S, Inc. and state that it—not Green Sapphire—was the owner of 100% of its shares.

142.    On information and belief, agents or brokers engaged by Global Capital, Smith, Springett, and John Does have been marketing the St. Barth's property and plan to sell it.

143.    The St. Barth's lawyer engaged by Robert "Bigelow" is currently demanding payment of 61,000 Euros from Green Sapphire based on an Engagement Letter that "Bigelow" signed, fraudulently holding himself out as a representative of Green Sapphire.

**Loan Fraud Involving Proton Green/Cyber**

144.    A certain Forbearance Agreement dated June 20, 2023 ("Forbearance Agreement"), obligated Alpha Carta, Ltd. to forbear from exercising its rights and remedies against Proton Green, LLC under three promissory notes issued by Proton Green, LLC ("Notes') as long as Proton Green paid $3 million to Alpha Carta, Ltd. on July 7, 2023, executed and delivered a Deed In Lieu of Foreclosure, and paid $2 million per month each month starting August 7, 2023 until the total debt of $25.2 million

evidenced by the Notes was paid in full in cash. *See* Forbearance Agreement, a true and correct copy of which is attached hereto as **Exhibit F.** Payment of the debts evidenced by the Notes was secured by a first priority lien on real property (St. John's Field, from which Proton Green hoped to extract Helium) located in Apache County, Arizona with a fair market value in excess of $25 million.

145. This Forbearance Agreement followed a series of events by which the Notes were dishonored. In April 2022, after Proton Green dishonored the Notes, Alpha Carta, Ltd. investigated the reasons why, and discovered that defendant Looper, the CEO and Managing Member of Proton Green, was a convicted felon, undisclosed to its investors. On the day Looper was confronted with this fact, he dissolved Proton Green, but the next month set up a new LLC under the old name, all without the knowledge of his non-insider investors.

146. As of May 1, 2023, a notice of default was served. On June 20, 2023, Alpha Carta, Ltd., and Proton Green then entered into the Forbearance Agreement. One condition of the Forbearance Agreement was that Looper would reinstate the original Proton Green and Proton Green would execute and deliver a Deed In Lieu of Foreclosure. This Deed in Lieu of Foreclosure would have enabled Alpha Carta, Ltd. to take full ownership of Proton Green's St. John Field in satisfaction of some or all of the debts evidenced by the Notes in the event that Proton Green breached the Forbearance Agreement. On information and belief, the

Deed in Lieu of Foreclosure was never delivered. In 2023 defendant Mack represented that he had possession of the Deed In Lieu of Foreclosure executed and delivered by Proton Green, but he has refused to provide it.

147.    On information and belief, Proton Green, LLC f/k/a/ Plateau Carbon, LLC was reinstated in July 2023. On or about July 23, 2023, a reverse merger and share exchange occurred between Proton Green and Cyber App Solutions Corp., in which Cyber was the surviving entity, with the equity security interest holders, assets, and obligations of Proton Green, LLC f/k/a Plateau Carbon, LLC.

148.    However, as described above, notwithstanding the purported reverse merger, Proton Green has at times continued to hold itself out as an entity.

149.    Defendant Looper and defendant Smith had equity interests in Plateau Carbon, LLC, Proton Green, LLC and Cyber App Solutions Corp. that became the basis for Rockwell Capital, Ltd.'s claim of millions of dollars of "assets under management," that were used to entice additional investors to purchase shares of Rockwell Capital, Ltd.

150.    Defendant Nathan Smith had actual knowledge that Plaintiff Breakers had borrowed $4 million in 2021 ("the 2021 loan") from lenders David Holden and Mark Matthews ("Lenders"), each a resident of Cayman Islands and each an associate of Smith. The 2021 loan agreement, signed by Smith as the sole director of Breakers, contained a reasonable interest rate of 12%, later adjusted to 12.5% per annum. Payment of the

36

debt was guaranteed by Alpha Carta, Ltd., the sole shareholder of Breakers. Alpha Carta, Ltd.'s guaranty was expressly approved by the trustees of the Alpha Carta Trust and supported by appropriate resolutions of Alpha Carta, Alpha Carta Trust, and signed by Smith, as one of two directors of Prairie Private Trust Company, Ltd., in its capacity as the trustee of the Alpha Carta Trust. Notice was given to the UBO of the Alpha Carta Trust. The Loan Agreement gave the Lenders an explanation of how the loan proceeds would be used and how Breakers and Alpha Carta, Ltd. received value in consideration for the loan. The loan proceeds were delivered in accordance with the terms of the loan agreement and the loan obligation was recorded in the books of Breakers.

151.    In August 2022, Nathan Smith's replacement as the CFO of 60 Degrees told the Lenders that Smith's employment and affiliation with Breakers and Alpha Carta, Ltd., had terminated.

152.    The 2021 loan was paid in full on July 5, 2023.

153.    Proton Green failed to make the $3 million payment that was due under the Forbearance Agreement on July 7, 2023. The next day, on July 8, 2023, Smith asked the Lenders for another loan to Breakers and promised that Green Sapphire instead of Alpha Carta, Ltd., would guarantee it, that it would bear interest at 30% per annum, with a 40% default rate, and would mature on October 31, 2023, with the borrower having the right to one 90-day extension (the "2023 Loan").

37

154.     Smith represented that he had a Green Sapphire management account bank statement, which was confidential information that should not have been retained by him after his termination, much less disclosed without authorization. Smith also represented that Green Sapphire owned the St. Barth's Property worth $12.5 million. Smith requested a 1% fee to be paid by the borrower.

155.     Smith represented to the Lenders and to Alpha Carta, Ltd.'s representative in July 2023 that the funds to repay the loan would come from the proceeds of a pending $96 million sale of approximately 330 acres of real estate located near Austin, Texas that Green Sapphire owned and was scheduled to close on October 6, 2023; that he knew the Puchasers; and that they were legitimate buyers. Alpha Carta, Ltd. representatives that were not part of the conspiracy and fraudulent conduct related herein relied on these representations in deciding to enter the transaction, and defendants Brownell, Mack, and John Does knew this representation was false but intentionally prompted other Alpha Carta, Ltd. personnel to believe it.

156.     The "Purchaser" Smith referred to, TRT Capital Group, LLC. ("TRT") is fictitious. There was a TRT formed in Delaware in March 2023, but it was later dissolved. The person named "William White" (by coincidence or choice the name of the villain in *Casino Royale*) who ostensibly signed the Purchase Agreement on behalf of TRT, is, if anyone, a resident of a hospice in Delaware. The address given in the Purchase

Agreement for the fictitious TRT is the same address for Global Capital Partners, LLC, the supposed "Lender" in the "Loan and Security Agreement" between Green Sapphire and Global Capital Partners, LLC, referenced in above paragraphs 127-144.

157.     Cicoski executed (a) the loan agreement for the 2023 Loan as the sole director of Breaker without notice to Paul Wolfe, the other Director of Prairie Private Trust Company, trustee of Alpha Carta Trust, or the UBO, and (b) the Deed of Guarantee as one of two director of Green Sapphire as Guarantor, again without notice to or consent of Wolfe, then still the co-director of Green Sapphire, or any UBO. *See* 2023 Loan Agreement and Deed of Guarantee, true and correct copies of which are attached hereto as **Exhibits G and H**, respectively.

158.     At the time of the 2023 Loan and Deed of Guarantee, Green Sapphire's corporate bylaws required approval by a majority of the board of directors of (1) any guarantee of indebtedness in excess of $500,000.00, (2) any encumbrance on or security interest in any asset of Green Sapphire or its subsidiaries, and (3) any commitment that could result in payment of over $50,000.00 without approval of all members of Green Sapphire's executive committee.

159.     In August of 2023, the executive committee of Green Sapphire consisted of Cicoski and Wolfe.

160.     Cicoski did not seek, and Wolfe did not grant, approval for the execution of the 2023 Loan by Breakers or the Deed of Guarantee on

39

behalf of Green Sapphire. Had Wolfe been asked, he would not have approved either the 2023 Loan or its guaranty, and Brownell and Smith knew this.

161.    In early August, 2023, Smith delivered "wire instructions" to the Lenders instructing them to have the loan proceeds delivered to Charles Mack's IOLTA Account. Smith lacked authority from Breakers to issue these wire instructions or, on information and belief, they were provided by him based on the instructions from Brownell or a John Doe defendant. Mack lacked authority to accept delivery of any funds that were ostensibly being "loaned" to Breakers.

162.    On information and belief, or about August 19th, 2023, the Lenders issued a wire transfer payment order directing CIBC to electronically transfer immediately available funds in the amount of $2,900,000.00 to Mack's IOLTA account, knowing that the proceeds were not going to be used solely for the purpose of providing working capital to Breakers as stated in the Loan Agreement. On information and belief, the funds in the amount of $2.9 million were credited to the IOLTA Account held in the name of Charles Mack on August 19, 2023.

163.    Mack has thus far refused repeated requests to provide all the documents and bank records related to this transaction. But he admitted that on August 23rd, 2023, he issued a $2 million wire transfer payment order to Chase Bank directing it to transfer immediately available funds in the amount of $2 million to CIBC in the Cayman Islands for credit to

40

the account of Alpha Carta, Ltd., describing its purpose as a "loan payment" from Cyber to Alpha Carta, Ltd.'s CIBC account in Grand Cayman. *See* Wire Transfer Report, a true and correct copy of which is attached hereto as **Exhibit I**.

164. Without providing the relevant records, Mack nevertheless has represented that he disbursed:

    a. $7,231.11 for legal fees;

    b. $750,00.00 to Defendant Dallas Salazar; and

    c. $142,768.89 to Global Capital Partners, LLC.

165. There is no legitimate business purpose, reasonable basis, or rationale for the transfer of the $750,000.00 Charles Mack made to Dallas Salazar or the $142,768.89 to Global Capital Partners, and the purpose of the alleged transfer of $7,231.11 to an unidentified person ostensibly for "legal fees" is under investigation.

166. The 2023 Loan included none of the earmarks of legitimacy that the 2021 Loan exhibited, including but not limited to the following:

    a. The proceeds of the 2023 Loan were electronically transferred by CIBC in the Cayman Islands to Chase Bank in the United States for credit to Mack IOLTA account—a third-party non-borrower who was not involved in the 2021 Loan— without any prior written direction from Breakers.

b.     The interest rate on the 2023 Loan was exorbitant and was far higher than market rates as opposed to the commercially reasonable rate of the 2021 Loan;

c.     No formal authentic corporate resolutions were provided;

d.     Green Sapphire "guaranteed" the 2023 Loan despite lacking a formal relationship with Breakers or ownership of any interest in the real property owned by Breakers, thereby deriving no benefit from the 2023 Loan;

e.     Smith informed the Lenders that the proceeds of the 2023 Loan would not be used for Breakers even though the Loan Agreement expressly provided that the proceeds would be used only for working capital for Breakers "and for no other purpose," whereas the proceeds of the 2021 Loan were used for the purposes that were was clearly stated in the Loan Agreement.

f.     The existence of any debt obligation and receipt of any proceeds of the 2023 Loan were not recorded on the financial books of Breakers, Green Sapphire, or any of their related entities; and

g.     The proceeds of the 2023 Loan were not received by Breakers and were not used for the benefit of Breakers, Green Sapphire, or any of their related entities, but were, on information and belief, misappropriated by Defendants Nathan Smith, Cyber, Rockwell, Salazar, Global Capital Partners, LLC and Looper, for their own benefit.

42

167.    After the reverse merger, Cyber breached the Forbearance Agreement by failing to make the $2 million payment due on September 7, 2023.

168.    On or about September 20, 2023, one or more of the John Doe Defendants proposed a modification to the parties' Forbearance Agreement. Alpha Carta, Ltd.'s sole director was presented with a proposed draft loan settlement agreement between "Proton Green, LLC" (not Cyber App Solutions Corp.) and Alpha Carta dated as of "September ___, 2023" under which "Proton Green, LLC" (not Cyber App Solutions Corp.) would promise to pay an additional $5 million in cash, to grant a 5% overriding royalty interest in revenues derived from Helium production on its leaseholds up to $16 million, and to promise for a second time to execute and deliver a deed in lieu of foreclosure in recordable form with respect to existing leases then encumbered by the "Leasehold Deed of Trust" held by Alpha Carta, Ltd. *See* Draft Loan Settlement Agreement, a true and correct copy of which is attached hereto as **Exhibit J**. In exchange, Alpha Carta, Ltd. would agree to release the "Leasehold Deed of Trust" it held on Cyber's valuable leaseholds of St. John's Field in Apache County, Arizona, forego payment of the remainder of the debt evidenced by the Notes that were the subject matter of the Forbearance Agreement, and grant a mutual release of all claims. In the event of "Proton Green, LLC's" default under the proposed Loan Settlement Agreement, Alpha Carta's obligation to release any

claims or the Leasehold Mortgage would be suspended, and Alpha Carta, Ltd. would be entitled to exercise of all remedies available by law under the Notes, the Forbearance Agreement, and by law.

169.    While Alpha Carta, Ltd.'s sole director was given a draft copy of the proposed Loan Settlement Agreement on September 20, 2023, he was informed that neither party had agreed to it, and Alpha Carta, Ltd. lacks an executed copy of any such "Loan Settlement Agreement." To date, Ryan Cicoski and Mack have been unwilling or unable to provide a fully executed version of this agreement or any other settlement agreement between Alpha Carta, Ltd. and Proton Green, LLC or Cyber App Solutions Corp. Cyber has refused to provide it despite requests for it and despite its oral assertion to Alpha Carta, Ltd. representative Paul Wolfe on February 8, 2024, that it owes no money to Alpha Carta, Ltd., because all matters between the parties were settled.

170.    On information and belief, if there were any valid loan settlement agreement between Cyber and Alpha Carta, Ltd., it was breached before November 2, 2023, by Proton Green, LLC and/or Cyber App Solutions Corp. because Alpha Carta, Ltd. has not received the $5 million cash, any overriding royalty revenue, or any deed in lieu of foreclosure.

171.    In the alternative, if there were no signed settlement agreement, Cyber owes the full amount of the debt, now in excess of $30 million that is evidenced by the Notes.

44

172.    Furthermore, Cyber falsely recorded a Deed of Release and Reconveyance to discharge the "Leasehold Deed of Trust" that it had previously granted to secure payment of the Notes referenced in the Forbearance Agreement. The "Deed of Release and Reconveyance" was signed in anticipation of and contingent upon the formation of a final, definitive loan settlement agreement. No one from Alpha Carta, Ltd., authorized the Deed of Release and Reconveyance to be delivered or recorded until and unless a final settlement agreement was executed by both parties and then delivered to Alpha Carta, Ltd.

173.    As of February 2024, Defendants Brownell, Mack, and Schlieve represented to other Alpha Carta Ltd. representatives and its UBO that debts in the total amount of more than $24 million were still owed by Cyber. In the alternative, this shows either that (a) no loan settlement agreement replaced the Forbearance Agreement (also making the recordation of the "Deed of Release" a fraud of Cyber or any party that recorded it), or (b) that Brownell, Schlieve, Mack, Looper and their John Doe coconspirators concealed a settlement and the subsequent recording of the Deed of Release in November 2023 from Alpha Carta Ltd and its UBO.

174.    Cyber reports that it reached a Loan Settlement Agreement with Alpha Carta, Ltd. to settle the Notes for $8 million on July 31, 2023, months before the September 20, 2023 *proposal* that was not executed or agreed to. It claimed that it paid $2 million to Alpha Carta Ltd in August

45

2023 and in November 2023 it paid the remaining $6 million due under the terms of the Loan Settlement Agreement that was allegedly formed on July 31, 2023, recognizing a gain from the alleged forgiveness of debt of almost $18 million. Alpha Carta Ltd. lacks any such Loan Settlement Agreement. Alpha Carta Ltd. believes to the contrary that the negotiations were unsettled as of September 2023, and Alpha Carta, Ltd. has not received $8 million from Cyber. If John Does executed such a Loan Settlement Agreement, they did so fraudulently, and Alpha Carta, Ltd., has sustained damages of at least $18 million.

### Count I – Fraud
### Yorkville Investment I, LLC v. Robert G. Brownell

175. Plaintiff hereby adopts and incorporates the preceding paragraphs 1-174 as if fully restated herein.

176. Robert G. Brownell knowingly made numerous false statements to Yorkville Investment I, LLC including, but not limited to, the following:

    a. That Kissa was a potential buyer of the Hale Property;

    b. That Weber Group Management reported asbestos, lead-based paint, and mold requiring remediation at the Hale Property; and,

    c. That remediation of the alleged asbestos at the Hale Property would cost nearly $400,000.00.

177. Robert G. Brownell made these intentional misrepresentations of fact with the intent to induce Yorkville to act in reliance on the truth of the matters asserted (a) in an effort to deprive Yorkville Investment I, LLC of its assets and resources, (b) as part of his overall effort to create a

problematic debt obligation for Plaintiff Yorkville, and (c) generate additional controversy that could be publicized on the website in order to injure Yorkville and its affiliated entities in the Family Office Trust Structure.

178. Yorkville Investment I, LLC reasonably relied on Robert G. Brownell's intentional misrepresentations of material fact, including but not limited to the misrepresentation that Kissa had executed the PSA and was ready, willing and able to purchase the Hale Property for a price of $5 million as set forth in the PSA.

179. As a result of its reliance on intentional misrepresentations of material facts by Brownell, Yorkville Investment I, LLC was damaged through incurring expenses on the fabricated Kissa purchase and through incurring a debt obligation under the agreement to buy out Armstrong's equity interest in the Hale Property at an overly inflated price which is due and payable on May 1, 2024.

180. The foregoing actions of Defendant were and continue to be willful, wanton, intentional, reckless, and/or done in bad faith in violation of Plaintiff's rights.

181. As a direct and proximate result of Defendant Brownell's intentional misrepresentations of material facts, Plaintiff Yorkville has suffered and continues to suffer damages in an amount to be determined at trial.

WHEREFORE, Plaintiff Yorkville Investment I, LLC, hereby prays for judgment in its favor and against Defendant Robert G. Brownell in an amount in excess of $75,000.00 (Seventy-Five Thousand Dollars) together with appropriate punitive damages, costs, interest, and any other such relief as this Court deems just and equitable.

### Count II – Aiding and Abetting Fraud
### Yorkville Investment I, LLC v. Charles Mack, Paul Schlieve, Sasaginnigak, LLC f/k/a Overall Builders, LLC & Robert J. Brownell

182.    Plaintiff hereby adopts and incorporates the preceding paragraphs 1-174 as if fully restated herein.

183.    At all relevant times herein, Defendants Paul Schlieve, Overall Builders, and Robert J. Brownell had actual knowledge that Robert G. Brownell had misrepresented or was intending to misrepresent material facts about the intended purchase of the Hale Property by Kissa, the pretextual asbestos-related property defect status, remediation needs and asbestos remediation costs to Plaintiff Yorkville.

184.    Defendant Charles Mack knew that the documents concerning the property defects and remediation submitted were fraudulent or he was willfully blind to the fact that the Kissa Purchase Agreement and the documents concerning the property defects and remediation that were submitted to Yorkville were fabricated and fraudulent, and he substantially assisted in the fraud committed by Robert G. Brownell by transmitting such documents and sending the "critical dates" email.

48

185.    Defendants Paul Schlieve, Overall Builders, Charles Mack and Robert J. Brownell substantially assisted in Robert G. Brownell's fraud and the creation of the artifice of the fictitious purchase of the Hale Property by Kissa to Yorkville Investment I, LLC and their substantial assistance directly and proximately caused Plaintiff Yorkville to suffer the damages alleged above, such that they are jointly and severally liable, with Brownell for the damages caused by the fraud described in the foregoing paragraphs.

186.    Defendants Charles Mack, Paul Schlieve, Overall Builders, and Robert J. Brownell's knowing and substantial assistance of Robert G. Brownell's fraud was vexatious and intentionally and deliberately harmful to Plaintiff.

WHEREFORE, Plaintiff Yorkville Investment I, LLC respectfully request this Court enter judgment against Defendants Charles Mack, Paul Schlieve, Sasaginnigak, LLC f/k/a Overall Builders, LLC and Robert J. Brownell, in an amount in excess of $75,000.00 (Seventy-Five Thousand Dollars) together with appropriate injunctive relief, punitive damages, costs, interest, and award such other relief as this Court deems fair and just.

### Count III – Conspiracy to Commit Fraud
### Yorkville Investment I, LLC v. Robert G. Brownell, Charles Mack, Paul Schlieve, Sasaginnigak, LLC f/k/a Overall Builders, LLC and Robert J. Brownell

187.    Plaintiff adopts and incorporates the preceding paragraphs 1-174 as if fully restated herein.

49

188.    Defendants Robert G. Brownell, Charles Mack, Paul Schlieve, Overall Builders, and Robert J. Brownell knowingly and voluntarily entered into a scheme and agreement to engage in a combination of unlawful acts and misconduct, as described herein, including, among other acts and omissions, fraudulent conduct regarding the Hale Property owned by Plaintiff.

189.    The intent and purpose of the conspiracy, and the underlying combination of unlawful acts and misconduct committed by the Defendants, was to sow division between the shareholders of Plaintiff and thereafter, drive down the perceived market price of the Hale Property for their own subsequent purchase and caused Yorkville to take on additional debt obligations that were designed to generate litigation that would be publicized on the Websites and cause additional reputational injury to Paul Wolfe, Yorkville and all of the entities in the Family Office Trust Structure.

190.    All Defendants had a financial motive and incentive to accomplish the foregoing conspiracy.

191.    The Defendants understood and accepted the foregoing scheme, and each agreed to do his respective part, as described herein, to further and accomplish the foregoing objectives.

192.    By entering into this conspiracy, the Defendants permitted, encouraged, and induced all of the unlawful acts and misconduct as described herein.

193. Defendants committed numerous overt acts in furtherance of their conspiracy, including but not limited to the creation and delivery of the fictitious Purchase and Sale Agreement ostensibly signed by Kissa to Yorkville for signature in early October 2022 by Ryan Cicoski as its manager and the subsequent fabrication of the counterfeit report stating that there was hazardous asbestos present in the Hale Property which needed to be remediated in accordance with the fraudulent remediation contract.

194. As a direct and proximate result of the Defendants' unlawful conduct, Plaintiff has sustained substantial damages.

WHEREFORE, Plaintiff Yorkville Investment I, LLC, respectfully request this Court enter judgment against Defendants Robert G. Brownell, Charles Mack, Paul Schlieve, Sasaginnigak, LLC f/k/a Overall Builders, LLC and Robert J. Brownell jointly and severally in an amount in excess of $75,000.00 (Seventy-Five Thousand Dollars) together with appropriate injunctive relief, punitive damages, costs, interest, and award such other relief as this Court deems fair and just.

### Count IV – Abuse of Process
### Wolfe v. Robert G. Brownell, Schlieve, Looper, & Does

195. Plaintiff adopts and incorporates the preceding paragraphs 1-174 as if fully restated herein.

196. Defendants had an ulterior purpose or motive for filing the 2022 Complaint, including to "dox," humiliate, intimidate, and/or extort Plaintiff Wolfe, damage him professionally, and thereby give pretext for

his removal from certain entities within the Family Office Trust

Structure, rather than pursue a legitimate breach of contract action

against him, as evidenced by, without limitation:

    a.   the particularly scandalous and obscene nature of the allegations therein;

    b.   Defendants' filing of the 2022 Complaint under an assumed name containing allegations they knew to be false;

    c.   Defendants' use of false contact information in filing the 2022 Complaint;

    d.   Defendants' complete disinterest and lack of diligence in pursuing the claim;

    e.   Defendants' participation in the related conspiracy, breaches of fiduciary duties, and fraud described herein; and

    f.   Defendants' republication—including republication on the Second Website in blatant violation of a court order—of the 2022 Complaint on Websites dedicated to harassing and "doxing" Plaintiff.

197.    Defendants filed the 2022 Complaint for a purpose not proper in

the regular prosecution of a breach of contract action, but rather for

subsequent re-publication on the Websites in order to cause Plaintiff to

experience severe hardship and damage to his reputation and

employment, far beyond the purview of the legal process.

198.    Indeed, the Court and its processes themselves have been abused

as the means through which Defendants sought to effect character

assassination and defamation with extreme malice, prejudice, and

hardship against Plaintiff Wolfe.

199.    As a direct and proximate result of Defendants' abuse of process, Plaintiff has suffered, and will continue to suffer, damages in an amount to be proven at trial.

WHEREFORE, Plaintiff Paul Schroth Wolfe hereby prays for judgment in his favor and against Defendants Steven Looper, Robert G. Brownell, Paul Schlieve, and John Does, unidentified co-conspirators, in an amount in excess of $75,000.00 (Seventy-Five Thousand Dollars) together with appropriate injunctive relief, punitive damages, costs, interest, and any other such relief as this Court deems just and equitable.

### Count V – Malicious Prosecution
### Wolfe v. Robert G. Brownell, Schlieve, Looper, & Does

200.    Plaintiff adopts and incorporates the preceding paragraphs 1-174 as if fully restated herein.

201.    Defendants instituted the 2022 Complaint as alleged herein and as evidenced by their publication of the 2022 Complaint—which was entirely obscure and had not even been served on Plaintiff Wolfe, let alone litigated in any fashion—on the First Website, receipt of notice regarding developments in the sealed 2022 case and subsequent removal from the First Website and republication on the Second Website in response.

202.    Defendants lacked probable cause for the institution of the 2022 Complaint as alleged herein and as evidenced by the fact Defendants filed the 2022 Complaint under a false name containing allegations that

were not well-ground in fact or warranted by existing law that they knew to be false, Defendants' use of false contact information in filing the 2022 Complaint with the court, Defendants' demonstrated lack of interest and intent to actually prosecute the claim alleged in the Complaint they filed with this court, and Defendants' creation of the Websites and republication of the 2022 Complaint on the Websites.

203.    Defendants acted with malice in instituting the 2022 Complaint as alleged herein and as evidenced by the fact Defendants immediately abandoned the claim and subsequently republished the 2022 Complaint on the First Website dedicated to doxing, defaming, and harassing Plaintiff and his colleagues, removal of the 2022 Complaint on the First Website in response to the Court's Order sealing the 2022 case, and subsequent registration of the Second Website in Lithuania and republishing of the 2022 Complaint thereon in direct, knowing, and contumacious violation of the Court's November 27, 2023 Order sealing the case.

204.    The 2022 case terminated in Plaintiff's favor when it was dismissed on January 3, 2024.

205.    As a direct and proximate result of Defendants' malicious prosecution, Plaintiff has suffered special injury well beyond the common incident of most lawsuits in that Defendants did not institute the 2022 Complaint for the good faith purpose of resolving a legal dispute or obtaining damages, but rather sought and succeeded to enact a direct

interference with Plaintiff's person and livelihood in furtherance of the conspiracy, breaches of fiduciary duties, and fraud described herein.

WHEREFORE, Plaintiff Paul Schroth Wolfe hereby prays for judgment in his favor and against Defendants Steven Looper, Robert G. Brownell, Paul Schlieve, and John Does, unidentified co-conspirators, in an amount in excess of $75,000.00 (Seventy-Five Thousand Dollars) together with appropriate injunctive relief, punitive damages, costs, interest, and any other such relief as this Court deems just and equitable.

### Count VI – Defamation
### Wolfe v. Robert G. Brownell, Schlieve, Looper, & Does

206.    Plaintiff adopts and incorporates the preceding paragraphs 1-174 as if fully restated herein.

207.    Defendants' malicious and intentional defamation of Plaintiff through the filing, publication and transmission of the 2022 Complaint and accusations on the Websites constitute defamation *per se* as they impute with Plaintiff the commission of adultery, the commission of a crime, and an inability to perform and/or want of integrity in the discharge of his employment duties.

208.    Defendants made the foregoing defamatory statements with knowledge of their falsity and with actual malice so as to justify an award of punitive damages given that, as the individuals filing the 2022 Complaint, Defendants knew Plaintiff had never interacted with "Susan Essex" and has certainly never engaged in the conduct Defendants

55

allege, in furtherance of the conspiracy, breaches of fiduciary duties, and fraud described herein.

WHEREFORE, Plaintiff Paul Schroth Wolfe hereby prays for judgment in his favor and against Defendants Steven Looper, Robert G. Brownell, Paul Schlieve, and John Does, unidentified co-conspirators, in an amount in excess of $75,000.00 (Seventy-Five Thousand Dollars) together with appropriate injunctive relief, punitive damages, costs, interest, and any other such relief as this Court deems just and equitable.

### Count VII – Disparagement
### Wolfe v. Robert G. Brownell, Schlieve, Looper, & Does

209.    Plaintiff adopts and incorporates the preceding paragraphs 1-174 as if fully restated herein.

210.    Defendants published false and demeaning statements regarding the quality of Plaintiff's professional services on the Websites, in furtherance of the conspiracy, breaches of fiduciary duties, and fraud as alleged herein.

211.    Upon information and belief, Defendants made the aforesaid false and demeaning statements in an effort to influence the public visiting the Websites not to engage Plaintiff's professional services due to Plaintiff's alleged lack of professional competency and integrity and to create a false crisis of solvency and marketability relating to Plaintiffs, in order to damage Plaintiff and the entities in the Family Office Trust Structure.

212.    Defendants made the aforesaid false and demeaning statements with malice as evidenced by the fact Defendants have no known connection to or experience with the transactions Defendants disparaged, but rather in furtherance of the conspiracy, breaches of fiduciary duties, and fraud described herein, and therefore made the statements with, at minimum, conscious disregard of whether the statements were true or false.

213.    As a direct and proximate result of Defendants' disparagement, Plaintiff Wolfe has suffered, and will continue to suffer, damages in an amount to be proven at trial.

WHEREFORE, Plaintiff Paul Schroth Wolfe hereby prays for judgment in his favor and against Defendants Steven Looper, Robert G. Brownell, Paul Schlieve, and John Does, unidentified co-conspirators, in an amount in excess of $75,000.00 (Seventy-Five Thousand Dollars) together with appropriate injunctive relief, punitive damages, costs, interest, and any other such relief as this Court deems just and equitable.

**Count VIII – Invasion of Privacy; Public Disclosure of Private Facts**
**Wolfe v. Robert G. Brownell, Schlieve, Looper, & Does**

214.    Plaintiff adopts and incorporates the preceding paragraphs 1-174 as if fully restated herein.

215.    Defendants gave publicity to private facts concerning Plaintiff Wolfe by, inter alia, publishing Plaintiff Wolfe's address and telephone number on the First Website.

57

216.    The facts Defendants published on the First Website were private and not public facts regarding Plaintiff Wolfe.

217.    The publication of the private facts regarding Plaintiff Wolfe as alleged herein would be highly offensive to a reasonable person in that they were disclosed in a context in which Defendants encouraged the public to use the facts to "dox," harass, and harm Plaintiff Wolfe and his family.

218.    As a direct and proximate result of Defendants' invasion of privacy, Plaintiff Wolfe has suffered, and will continue to suffer, damages in an amount to be proven at trial.

WHEREFORE, Plaintiff Paul Schroth Wolfe hereby prays for judgment in his favor and against Defendants Steven Looper, Robert G. Brownell, Paul Schlieve, and John Does, unidentified co-conspirators, in an amount in excess of $75,000.00 (Seventy-Five Thousand Dollars) together with appropriate injunctive relief, punitive damages, costs, interest, and any other such relief as this Court deems just and equitable.

### Count IX – False Light
### Wolfe v. Robert G. Brownell, Schlieve, Looper, & Does

219.    Plaintiff adopts and incorporates the preceding paragraphs 1-174 as if fully restated herein.

220.    Defendants placed Plaintiff in a false light before the public when they knowingly advanced false accusations against him via the 2022 Complaint and subsequent publication on the Websites as alleged

herein, including but not limited to accusations that Plaintiff is an adulterer and a criminal.

221.    Defendants' statements were made to the public at large given the Websites are freely accessible to every individual with internet access throughout the world as is the 2022 Complaint itself and the accusations therein.

222.    The false light in which Defendants placed Plaintiff is highly offensive to a reasonable person given the allegations specifically accuse Plaintiff of "preying" on and "stalking" vulnerable individuals for sexual services, of being a danger to the community, of unethical and immoral conduct regarding his employment, of adultery, and of criminal conduct.

223.    As alleged herein, Defendants filed the 2022 Complaint and republished the same, along with the accusations on the Websites, with actual knowledge that the statements were false and actual malice given Defendants filed the 2022 Complaint under a false name, knew Plaintiff has never interacted with "Susan Essex" and has certainly never engaged in the conduct Defendant alleged.

WHEREFORE, Plaintiff Paul Schroth Wolfe hereby prays for judgment in his favor and against Defendants Steven Looper, Robert G. Brownell, Paul Schlieve, and John Does, unidentified co-conspirators, in an amount in excess of $75,000.00 (Seventy-Five Thousand Dollars) together with appropriate injunctive relief, punitive damages, costs,

interest, and any other such relief as this Court deems just and equitable.

## Count X – Violation of the Illinois Right of Publicity Act
### Wolfe v. Robert G. Brownell, Schlieve, Looper, & Does

224.    Plaintiff adopts and incorporates the preceding paragraphs 1-174 as if fully restated herein.

225.    Defendants' unauthorized use of Plaintiff's identity for commercial purposes is a violation of the Illinois Right of Publicity Act, 765 ILCS 1075/1-60.

226.    Specifically, Defendants made use of Plaintiff's identity including but not limited to the use of his name in the Second Website in connection with Plaintiff's sale of services in an effort to damage Plaintiff and the Plaintiff entities and in an effort to harm Plaintiffs' business relationships/reputation, including but not limited to his relationships and reputation with banks and other lenders, in, upon information and belief, an overarching scheme to defraud and convert funds and other property from the entities in the Family Office Trust Structure.

227.    Defendants' use of Plaintiff's identity was unauthorized because Defendants did not obtain Plaintiff's consent to use of his identity in connection with the domain name of the Second Website. In fact, Defendants actively sought to conceal their involvement in the Websites' publication.

228.    Defendants' use of Plaintiff's identity was willful because they used Plaintiff's identity intentionally and with knowledge that its use was

not authorized. In fact, Defendants' entire purpose in filing the 2022 Complaint and publishing the Websites was to damage Plaintiff for their own gain.

229.    Plaintiff has been damaged by Defendants' unauthorized use of Plaintiff's identity.

WHEREFORE, Plaintiff Paul Schroth Wolfe hereby prays for judgment in his favor and against Defendants Steven Looper, Robert G. Brownell, Paul Schlieve, and John Does, unidentified co-conspirators, in an amount in excess of $75,000.00 (Seventy-Five Thousand Dollars) together with appropriate injunctive relief, punitive damages, costs, interest, and any other such relief as this Court deems just and equitable.

### Count XI – Violation of 15 U.S.C. § 1125(d)(1); Cyberpiracy
### Wolfe v. Robert G. Brownell, Schlieve, Looper, & Does

230.    Plaintiff adopts and incorporates the preceding paragraphs 1-174 as if fully restated herein.

231.    Defendants have a bad faith intent to profit from the illicit use of Plaintiff's name in the Second Website as demonstrated by:

a.    Plaintiff's trademark and intellectual property rights in the use of his personal name in the Second Website;

b.    The use of Plaintiff's legal name in the domain of the Second Website;

c.    Defendants' lack of any bona fide noncommercial use of Plaintiff's name in the Second Website;

d.    Defendants' demonstrated intent in use of Plaintiff's name to harm the goodwill represented by Plaintiff's name both for Defendants'

own commercial gain and with the intent to tarnish and disparage Plaintiff's name; and

e.    Defendants' provision of material and misleading false contact information when registering the domain name, as alleged herein.

232.    Defendants' registration, trafficking in, and use of Plaintiff's personal name, which is protected as a mark under 15 U.S.C. § 1125, in the domain name of the Second Website therefore constitutes a violation of 15 U.S.C. § 1125(d)(1).

WHEREFORE, Plaintiff Paul Schroth Wolfe hereby prays for judgment in his favor and against Defendants Steven Looper, Robert G. Brownell, Paul Schlieve, and John Does, unidentified co-conspirators, in an amount in excess of $75,000.00 (Seventy-Five Thousand Dollars) together with appropriate injunctive relief, punitive damages, costs, interest, and any other such relief as this Court deems just and equitable.

## Count XII – Breach of Fiduciary Duty
### Breakers, Green Sapphire, Alpha Carta, Ltd., Prairie Private Trust Company and NorthSea, LLC v. Smith

233.    Plaintiffs hereby adopt and incorporate the preceding paragraphs 1-174 as if fully restated herein.

234.    As former director of Breakers, Green Sapphire, Alpha Carta, Ltd., Prairie Private Trust Company, Ltd. in its capacity as Trustee of the Alpha Carta Trust, and NorthSea, LLC in its capacity as the Trustee of the Petro Carta Trust (collectively, the "Family Office Trust Entities"), Defendant Smith owed a fiduciary duty to the Family Office Trust

Entities requiring Defendant to not use information learned in the course and scope of his tenure as a director of the Trustee of the Alpha Carta Trust, his tenure and a director of the Trustee of the Petro Carta Trust, his tenure as a director of a number of the Family Office Trust Entities, including but not limited to Breakers, Green Sapphire and Alpha Carta, Ltd., and his tenure as the CFO of 60 Degrees, for his personal gain or to disclose any such information, including the nature, value and locations of any assets held by any of the Family Trust Entities, to any third person such as Mark Matthews or David Holden.

235.    Defendant wrongfully used and disclosed confidential information concerning the assets owned by Family Office Trust Entities, their management structure, internal controls, bank accounts, capital structure and financial affairs for his own pecuniary interests and to unjustly enrich himself and Rockwater Capital by attempting to broker a $2.9 million loan to an entity that was owned, indirectly, by the Alpha Carta Trust for whom Smith had been a director of its corporate trustee, Prairie Private Trust Company until December 31, 2021.

236.    Defendant wrongfully used and disclosed confidential information concerning the nature, value and location of assets owned by Green Sapphire and related Family Office Trust Entities, their management structure, internal controls, bank accounts, capital structure and financial affairs for his own pecuniary interests and to unjustly enrich himself and /or Rockwater Capital by arranging a fictitious $10 million

loan by Global Capital Partners, LLC to Green Sapphire and attempting to broker a $2.9 million loan to Breakers, payment of which would ostensibly be guaranteed by Green Sapphire, which was owned, indirectly, by the Petro Carta Trust for whom Smith had been a director of its corporate trustee, NorthSea, LLC until December 31, 2021.

237.    Defendant was obligated by his aforesaid fiduciary duties of loyalty to refrain from acting in his own self-interest to the detriment of the Family Office Trust Entities or acting in any way to materially damage the property held by the trustees of the Alpha Carta Trust, the Petro Carta Trust and the Prairie II Trust for the benefit of the UBOs.

238.    Defendant breached these duties by, without limitation:

a.    Sharing confidential financial information concerning property owned by Green Sapphire with the Lenders without authorization;

b.    Causing Breakers and Green Sapphire to purportedly enter into the fraudulent 2023 Breakers loan and deed of guarantee without authorization, using his confidential information concerning the Family Office Trust Entities to fabricate the false appearance of authorization;

c.    Causing the funds transferred by the Lenders in connection with the 2023 Loan to be sent to his co-conspirator(s) rather than Alpha Carta, Ltd. as was done with the 2021 Loan, depriving Breakers of any value in connection with the 2023 Loan;

d.    Engineering the 2023 Loan using confidential information to obtain a fee for himself; and,

64

e. Engineering the fictitious $10 million loan from Global Capital Partners, LLC to Green Sapphire and the related Stock Pledge Agreement by which Green Sapphire ostensibly granted a security interest in shares of stock in a Florida corporation named Access Management S.A.S., Inc. by which Global Capital Partners, LLC claims to take full ownership of those shares by means of fraud.

239. Upon information and belief, Defendant committed these breaches of fiduciary duty and defalcation in a fiduciary capacity in his own self-interest to impermissibly enrich himself and his co-conspirators at the expense of the trustees of the Alpha Carta Trust, the Petro Carta Trust and one or more Family Office Trust Entities, including Breakers, Green Sapphire and Alpha Carta, Ltd.

240. The foregoing breaches of fiduciary duty were and continue to be willful, wanton, intentional, reckless, and/or done in bad faith in violation of Plaintiffs' rights.

241. As a direct and proximate result of Defendant's breaches, the trustee of the Alpha Carta Trust and the Petro Carta Trust, and the Family Office Trust Entities identified above have suffered and continue to suffer damages in an amount to be determined at trial.

WHEREFORE, Plaintiffs Breakers Beach Club, Ltd., Green Sapphire Holdings, Inc., Alpha Carta, Ltd. and Prairie Private Trust Company in its capacity as trustee of the Alpha Carta Trust and NorthSea, LLC in its capacity as the trustee of the Petro Carta Trust respectfully request this

Court enter judgment against Defendant Nathan Smith for damages in
an amount greater than Seventy-Five Thousand Dollars ($75,000.00)
plus punitive damages, costs and fees of this suit, impose a constructive
trust against all ill-gotten gains obtained by Smith, and award such
other relief as this Court deems fair and just.

### Count XIII – Conspiracy to Breach Fiduciary Duty
**Breakers, Green Sapphire, Alpha Carta, Ltd., Prairie Private Trust Company
and NorthSea, LLC v. Robert G. Brownell, Nathan Smith, & Charles Mack**

242.    Plaintiffs adopt and incorporate the preceding paragraphs 1-174
as if fully restated herein.

243.    Defendants Robert G. Brownell, Nathan Smith, and Charles Mack
knowingly and voluntarily entered into a scheme and agreement to
engage in a combination of unlawful acts and misconduct, as described
herein, including, among other acts and omissions, breach of fiduciary
duties and aiding and abetting breach of fiduciary duties.

244.    The intent and purpose of the conspiracy, and the underlying
combination of unlawful acts and misconduct committed by the
Defendants, was to purportedly cause Breakers to obtain a loan, obtain
the $2.9 million proceeds of the 2023 Breakers loan in order to illicitly
paydown the debt Proton Green owed to Alpha Carta, Ltd., discharge to
the Leasehold Mortgage/Deed of Trust on St. John's Field and,
thereafter, obtain ownership of the Breakers Property and a windfall gain
on securities issued by Proton Green or Cyber App Solutions Corp. for

themselves and one or more John Doe Defendants who identity is currently unknown to the Plaintiffs.

245.    All Defendants had a financial motive and incentive to accomplish the foregoing conspiracy.

246.    The Defendants understood and accepted the foregoing scheme, and each agreed to do his respective part, as described herein, to further and accomplish the foregoing objectives.

247.    By entering into this conspiracy, the Defendants permitted, encouraged, and induced all of the unlawful acts and misconduct as described herein.

248.    The parties engaged in numerous overt acts in furtherance of the conspiracy including, but not limited to, the use of confidential knowledge to bypass controls in place in the Family Office Trust Structure, causing $2.9 million to be transferred to Charles Mack's trust account without obtaining necessary approvals, causing $2 million to be transferred on July 24, 2023 to CIBC for credit to Alpha Carta, Ltd.'s account which was falsely described as "Loan payment," and taking fees for the various co-conspirators.

249.    As a direct and proximate result of the Defendants' unlawful conduct, Breakers, Alpha Carta, Green Sapphire, Prairie Private Trust Company, Ltd., and NorthSea, LLC have sustained substantial damages.

WHEREFORE, Plaintiffs Breakers Beach Club, Ltd., Alpha Carta, Ltd., Green Sapphire Holdings, Inc., Prairie Private Trust Company, Ltd.,

and NorthSea, LLC, respectfully request this Court enter judgment against Defendants Robert G. Brownell, Nathan Smith, and Charles Mack in an amount in excess of $75,000.00 (Seventy-Five Thousand Dollars) together with appropriate injunctive relief, punitive damages, costs, interest, impose a constructive trust against all ill-gotten gains obtained by Brownell, Smith and Mack, and award such other relief as this Court deems fair and just.

### Count XIV – Conspiracy to Commit Fraud Regarding the 2023 Breakers Loan
### Breakers and Alpha Carta, Ltd. v. Proton Green, Steven Looper, Robert G. Brownell, Nathan Smith, Cyber App Solutions Corp., Charles Mack, & Dallas Salazar

250.    Plaintiffs adopt and incorporate the preceding paragraphs 1-174 as if fully restated herein.

251.    Defendants Proton Green and Cyber App Solution Corp., by and through their agent Steven Looper, Steven Looper, individually, Robert G. Brownell, Nathan Smith, individually, Charles Mack, and Dallas Salazar knowingly and voluntarily entered into a scheme and agreement to engage in a combination of unlawful acts and misconduct, as described herein.

252.    The intent and purpose of the conspiracy, and the underlying combination of unlawful acts and misconduct committed by the Defendants, was to misappropriate the funds in the amount of $2.9 million that the Lenders wired to Chase Bank for credit to Charles Mack's IOLTA account and ultimately create the fraudulent impression of

paying down Proton Green's debt to Plaintiffs, to reduce the amount owed by Proton Green/Cyber (thereby increasing the value and reducing to liabilities of Proton Green/Cyber), avoid any action against Proton Green/Cyber as well as induce Alpha Carta, Ltd. to enter into settlement negotiations.

253.    The parties engaged in numerous overt acts in furtherance of the conspiracy including, but not limited to, causing $2 million to be transferred on July 24, 2023 to CIBC for credit to Alpha Carta, Ltd.'s account which was falsely described as "Loan Payment," falsely claiming that Proton Green/Cyber paid the $2 million, falsely describing the Loan Settlement Agreement in the 10Q that Cyber App Solutions Corp. filed with the SEC on Feb. 15, 2024 and taking fees for the various co-conspirators.

254.    All Defendants had a financial motive and incentive to accomplish the foregoing conspiracy.

255.    The Defendants understood and accepted the foregoing scheme, and each agreed to do his respective part, as described herein, to further and accomplish the foregoing objectives.

256.    By entering into this conspiracy, the Defendants permitted, encouraged, and induced all of the unlawful acts and misconduct as described herein.

257.    As a direct and proximate result of the Defendants' unlawful conduct, Breakers and Alpha Carta, Ltd. have sustained damage through

the contingent liability that Breakers has to the Lenders in the event it is found, after expensive and resource consuming litigation, to be liable to repay the Lenders $2.9 million plus interest and attorneys' fees, the impairment of Alpha Carta, Ltd.'s lien on the St. John's Field that secures payment of the debt evidenced by the three Proton Green Notes, attorneys' fees both to obtain a judgment against the Lenders declaring the 2023 Breakers loan void and declaring the there was no valid and enforceable "Loan Settlement Agreement " between Alpha Carta, Ltd., and Cyber App Solutions Corp. or Proton Green, LLC, or Deed of Release.

WHEREFORE, Plaintiffs Breakers Beach Club, Ltd. and Alpha Carta, Ltd. respectfully request this Court enter judgment against Defendants Proton Green, Cyber App Solution Corp., Steven Looper, Robert G. Brownell, Nathan Smith, Charles Mack, and Dallas Salazar, in an amount in excess of $75,000.00 (Seventy-Five Thousand Dollars), punitive damages, costs, interest, impose a constructive trust against all ill-gotten gains obtained by Proton Green, Looper, Brownell, Smith, Mack and Salazar, and award such other relief as this Court deems fair and just.

### Count XV –Rescission
### Alpha Carta, Ltd. v. Proton Green and Cyber App Solutions Corp.

258.    Plaintiffs adopt and incorporate the preceding paragraphs 1-174 as if fully restated herein.

259.    Proton Green and Cyber App Solutions Corp., through their agent Steven Looper, and in concert with Nathan Smith, Charles Mack, and

Robert G. Brownell, engaged in a scheme to make it appear as though funds had been paid to Alpha Carta, Ltd. from Proton Green when in fact they had been purportedly borrowed from another entity.

260.     Cyber has now publicly claimed that a valid signed settlement agreement dated as of July 31, 2024, relieves it from the millions of dollars in liability it owed to Alpha Carta, Ltd.

261.     Alpha Carta, Ltd. has no signed copy of any such agreement, and Proton Green has refused to provide it.

262.     However, such settlement agreement, provided it exists, must be rescinded as it was procured through fraud.

263.     Additionally, any such settlement agreement was the result of a unilateral mistake by Alpha Carta, Ltd. that Proton Green had paid the amount due under the terms of any such settlement.

264.     This mistake was caused through the misrepresentations and misdeeds of Proton Green (and its felon CEO) and one or more of the Defendants, including Robert G. Brownell, Nathan Smith, Charles Mack, and Dallas Salazar.

265.     Any settlement, as well as the Deed of Release and Reconveyance signed by Alpha Carta, Ltd. in conjunction with such settlement, must be rescinded.

   WHEREFORE, Plaintiff Alpha Carta, Ltd. prays for judgment in its favor and against Defendants Proton Green and Cyber App Solutions Corp. for a judgment rescinding any settlement agreement discharging

Defendants' indebtedness to Alpha Carta, Ltd. and the Deed of Release and Reconveyance are void, injunctive relief, and any other such relief as this Court deems just and equitable.

**Count XVI – Breach of Contract**
**Alpha Carta, Ltd. v. Proton Green and Cyber App Solutions Corp.**

266.     Plaintiffs hereby adopt and incorporate the preceding paragraphs 1-174 as if fully restated herein.

267.     In or about July 2022, Alpha Carta, Ltd. purchased a promissory note in the original principal amount of $3,513,469 (the "Kip's Bay Note") that Proton Green had issued to Kip's Bay Select L.P. in consideration for a loan, payment of which was secured by a first priority lien on all the assets of Proton Green including a Leasehold interest on real property located in Apache County, Arizona in which there were substantial reserves of Helium.

268.     As of May 1, 2023, Alpha Carta, Ltd. held the Kip's Bay Note, as well as two other promissory notes made by Proton Green payable to Alpha Carta, Ltd. (collectively, the "Proton Green Notes"). *See* Proton Green Notes, true and correct copies of which are attached hereto as **Exhibits K-M,** respectively.

269.     In April 2022, Proton Green failed to pay the debts evidenced by the Proton Green Notes as agreed.

270.     On or about June 20, 2023, Proton Green entered into a Forbearance Agreement with Alpha Carta, Ltd. (the "Forbearance Agreement"), by which Proton Green agreed to make certain payments to

Alpha Carta, Ltd. in order to fulfill its obligations to the same pursuant to the Kip's Bay Note and other Promissory Notes Proton Green executed in favor of Alpha Carta. *See* Ex. F.

271.     The terms of the Forbearance Agreement obligated Proton Green to pay $3 million to Alpha Carta, Ltd. on July 7, 2023 and $2 million a month on the seventh (7th) day of each month thereafter until the total debt of approximately $25.2 million Proton Green owed to Alpha Carta, Ltd. as of June 20, 2023, was paid in full. *Id.*

272.     However, Proton Green/Cyber have failed or refused to abide by the terms of the Forbearance Agreement and the Proton Green Notes, including but not limited to the obligation to immediately execute and deliver a Deed in Lieu of Foreclosure in recordable form acceptable to Alpha Carta, Ltd., such that Proton Green/Cyber's debt to Alpha Carta, Ltd., in an amount in excess of $25 million is currently unpaid, due and owing.

273.     Cyber is liable for the obligations of Proton Green as a result of the reverse merger.

274.     The Forbearance Agreement and Proton Green Notes are valid contracts.

275.     The Forbearance Agreement required Defendant to pay $3 million to Alpha Carta, Ltd. in July 2023 and $2 million a month each month thereafter until the total debt of approximately $25.2 million Proton

Green/Cyber owed to Alpha Carta, Ltd. as of June 20, 2023, was paid in full. *Id.*

276.    Despite the express requirements of the Forbearance Agreement, Defendants breached the Forbearance Agreement in failing or refusing to pay Plaintiff $2 million on September 7, 2023, as required by the terms of to the Forbearance Agreement and failing and refusing to execute and deliver the required Deed In Lieu of Foreclosure.

277.    Defendants also breached the Proton Green Notes by failing to pay the debt evidenced by the Notes, the exact amount of such debt to be determined at trial.

278.    The failure to pay and the failure to execute and deliver the promised Deed In Lieu of Foreclosure are each a material breach of the express terms of the Forbearance Agreement and Proton Green Notes.

279.    Plaintiff has performed or has substantially performed all its obligations under the Forbearance Agreement and Proton Green Notes.

280.    As a result of Defendants' breaches, Plaintiff has been harmed.

WHEREFORE, Plaintiff Alpha Carta, Ltd. hereby prays for judgment in its favor and against Defendants Proton Green and Cyber App Solutions Corp. in an amount in excess of $75,000.00 (Seventy-Five Thousand Dollars), costs, interest, and an Order commanding Cyber App Solutions Corp. to execute and deliver a recordable Deed in Lieu of Foreclosure in a form acceptable to Alpha Carta, Ltd., together with any other further relief as this Court deems just and equitable.

**Count XVII –Declaratory Judgment**
**Alpha Carta, Ltd. v. Proton Green and Cyber App. Solutions Corp.**

281.     Plaintiffs adopt and incorporate the preceding paragraphs 1-174 as if fully restated herein.

282.     Proton Green and Cyber App Solutions Corp., through their agent Steven Looper, and in concert with Nathan Smith, Charles Mack, and Robert G. Brownell, engaged in a scheme to make it appear as though funds had been paid to Alpha Carta, Ltd. from Proton Green/Cyber when in fact they had been purportedly borrowed from another entity.

283.     Cyber has now publicly claimed that a valid signed settlement agreement dated as of July 31, 2023, relieves it from the obligation to pay the, at minimum, $18 million of additional debt that was due and owing under the Notes as of July 31, 2023.

284.     Alpha Carta, Ltd. has no signed copy of any such agreement, and Proton Green has refused to provide it.

285.     However, such settlement agreement, provided it exists, is void as it was procured through fraud.

286.     Additionally, any such agreement, as well as the Deed of Release and Reconveyance executed in connection therewith, was not authorized to be delivered to Proton Green and Cyber absent the occurrence of a condition precedent which did not occur.

287.     Any settlement, as well as the Deed of Release and Reconveyance signed by Alpha Carta, Ltd. in conjunction with such settlement, must be declared void.

288.    An actual controversy exists between the parties, as Defendants contend the settlement and Deed of Release and Reconveyance are valid, which assertion Plaintiff denies.

289.    The resolution of this issue is appropriate and would terminate, in whole or in part, the controversy giving rise to this proceeding.

WHEREFORE, Plaintiff Alpha Carta, Ltd. prays for judgment in its favor and against Defendants Proton Green and Cyber App Solutions Corp. for a declaration that any settlement agreement discharging Proton Green's indebtedness to Alpha Carta, Ltd. and the Deed of Release and Reconveyance are void, injunctive relief, and any other such relief as this Court deems just and equitable.

### Count XVIII –Declaratory Judgment
### Green Sapphire v. Global Capital Partners

290.    Plaintiff adopts and incorporates the preceding paragraphs 1-174 as if fully restated herein.

291.    Global Capital Partners purported to enter into a Loan and Security Agreement with Green Sapphire.

292.    The loan agreement, as well as any accompanying pledge or other documents, were not property authorized by Green Sapphire and are therefore void.

293.    There was no loan made pursuant to the loan agreement and the loan agreement is void as Green Sapphire did not receive any consideration.

294.    Any loan that may have been made under the loan agreement is void as it is the product of a fraudulent scheme.

295.    The attempted domestication of Access Management and the attempted acquisition of the shares of Florida Access are also null and void, as they are the product of fraud and the fictitious loan agreement and stock pledge agreement.

296.    The loan agreement, as well as any accompanying pledge, Articles of Domestication, UCC-1 Financing Statements and other documents, must be declared void.

297.    An actual controversy exists between the parties, as Defendant contends the Loan and Security Agreement between Global Capital Partners, LLC and Green Sapphire is valid, that funds in the amount $10 million were actually delivered by Global Capital Partners, LLC to Green Sapphire, that the filing of the Articles of Domestication was duly authorized and that the Stock Pledge Agreement which purports to grant a security interest in Green Sapphire's interest, if any, in shares of the Florida corporation named Access Management S.A.S., Inc. was valid and enforceable, all of which Plaintiff denies.

298.    The resolution of this issue is appropriate and would terminate, in whole or in part, the controversy giving rise to this proceeding.

WHEREFORE, Plaintiff Green Sapphire prays for judgment in their favor and against Defendant for a declaration that there never was any $10 million loan made by Global Capital Partners to Green Sapphire, and

that the Articles of Domestication filed with the Florida Secretary of State were not authorized and are not valid and that any related Stock Pledge Agreement and related documents, including all UCC-1 financing statements are void ab initio, for injunctive relief, and any other such relief as this Court deems just and equitable.

**Count XIX – Breach of Contract**
**Alpha Carta, Ltd. v. BNW Family Office**

299.    Plaintiff hereby adopts and incorporates the preceding paragraphs 1-174 as if fully restated herein.

300.    Alpha Carta, Ltd. and BNW Family Office entered into a Professional Services Agreement with a term of January 1, 2023, through December 31, 2023, to "provide investment advisory and support services." *See* Professional Services Agreement, a true and correct copy of which is attached hereto as **Exhibit N.**

301.    The agreement is a valid contract.

302.    BNW agreed to "exercise the highest degree of professionalism" in the exercise of projects assigned pursuant to the Professional Services Agreement. *Id.,* ¶1.

303.    BNW acted through Robert G. Brownell who, for all actions referenced in this count, was acting in the course and scope of his relationship with BNW.

304.    The agreement provided that the "Contractor is not the agent of the Company and is not authorized to make any representation, contract, or commitment on behalf of the Company." *Id.,* ¶3.

305.    The agreement provides that BNW will not use any proprietary information, which includes financial information, investment and fund strategies, business plans, and suppliers and customers, among others, "in any manner or for any purpose not expressly set forth in this Agreement."

306.    The agreement provides that there is "no other existing contract or duty on Contractor's part that would conflict with or would be inconsistent with this Agreement, unless a copy of such contract or a description of such duty is attached to this Agreement as Exhibit B." *Id.,* ¶4.3.

307.    The scope of BNW's authorization, acting through Robert G. Brownell, to act as an independent contractor, did not extend to taking any action on behalf of Green Sapphire or taking any actions adverse to Alpha Carta, Ltd., which is the largest creditor of Green Sapphire.

308.    Robert G. Brownell fraudulently held himself out a purported authorized signatory of Green Sapphire, executed an engagement agreement under a fictitious name by which Brownell and Mack hired French counsel to advise them on how to obtain an enforceable Stock Pledge Agreement and then enforce a security interest against Green Sapphire's shares in Access Management.

309.    This action was directly contrary to the interests of Alpha Carta, Ltd. and was outside the scope of BNW and Brownell's authority under the above-referenced Professional Services Agreement.

79

310.     BNW's actions by which it orchestrated Green Sapphire's purported pledge of shares and the attempted domestication of Access Management SA as a Florida corporation, including arranging the fictitious Loan and Security Agreement that it directed Charles Mack to draft, and the fictitious Stock Pledge Agreement that it directed Charles Mack to draft for the purpose of creating the false impression that Green Sapphire had granted a security interest in its interest in shares of Access Management S.A.S., Inc. to Global Capital Partners, LLC and the mortgage in favor of BNW Family Office, LLC that Brownell recorded against the St. Barth's Property, were an undisclosed conflict of interest as BNW the actions which purported to impair the value of Green Sapphire's assets was contrary to the best interest of and Alpha Carta, Ltd., and was a slander of title to the St. Barth's Property and resulted in BNW to obtain an interest in the St. Barth's Property to the detriment of Alpha Carta, Ltd. as the largest creditor of Green Sapphire.

311.     BNW's actions, through Robert G. Brownell, regarding Proton Green and Cyber constitute a breach of the contract.

312.     Brownell's actions throughout this Complaint constituted a breach of the contract.

313.     Throughout the course of performance of the contract, BNW acted contrary to the best interests of Alpha Carta, Ltd. in trying to devalue the property owned by Alpha Carta, Ltd. so that it could fraudulently acquire

or knowingly and substantially assist others in fraudulently acquiring property owned directly or indirectly by Alpha Carta, Ltd.

314.    Throughout the contract, BNW engaged in an impermissible conflict by acting for its best interest and contrary to the best interests of Alpha Carta, Ltd.

315.    Throughout the contract, BNW used proprietary information to unjustly enrich itself to the detriment of Alpha Carta, Ltd.

316.    Throughout the contract, BNW failed to "exercise the highest degree of professionalism" in the exercise of projects assigned pursuant to the Professional Services Agreement by taking action directly contrary to the best interests of Alpha Carta, Ltd.

317.    Alpha Carta, Ltd. performed its obligations under the contract to the extent not excused by the prior material breach by BNW.

318.    With the intent to defraud Alpha Carta, BNW submitted fictitious or inflated invoices to Alpha Carta, Ltd. or to Terra Carta Partners, LLC in connection with the Professional Services Agreement.

319.    Alpha Carta, Ltd. directly or indirectly paid BMW thousands of dollars on account of fictitious or inflated invoices that BNW submitted to Alpha Carta, Ltd. or Terra Partners, LLC.

320.    Alpha Carta, Ltd. has been damaged by the breach, by paying fictitious or inflated invoices submitted by BNW and by incurring attorney fees needed to attempt to quiet title to the St. Barth's Property and un-do the impairments to Alpha Carta, Ltd.'s assets, including but

not limited to its interests as the sole shareholder of Breakers and recover the amounts improperly paid by Alpha Carta, Ltd. or Terra Carta Partners, LLC to or for the benefit of BNW, by obligations unnecessarily incurred which would not have been incurred but for the actions of BNW, and as otherwise stated in this Complaint.

WHEREFORE, Plaintiff Alpha Carta, Ltd., hereby prays for judgment in its favor and against Defendant BNW Family Office, LLC in an amount in excess of $75,000.00 (Seventy-Five Thousand Dollars), costs, interest, and any other such relief as this Court deems just and equitable.

Dated: July 2, 2024             Respectfully submitted,

/s/Thomas E. Patterson
Thomas E. Patterson
Garret von Schaumberg
Patterson Law Firm, LLC
200 W. Monroe St., Suite 2025
Chicago, Illinois 60606
Tel.  312-223-1699/Fax 312-223-8549
tpatterson@pattersonlawfirm.com
gvonschaumburg@pattersonlawfirm.com
*Attorney for Plaintiffs*

## PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (this "Agreement") is made and entered into as of May 1, 2023 ("Effective Date"), by and between Yorkville Investment I LLC ("Buyer") and Scott Armstrong and Barbara Guss (collectively, "Seller").

## RECITALS

A.      Seller is the owner of a fifty-two and ninety-nine hundredths percent (52.99%) interest in 120 North Hale Street, Wheaton, Illinois (the "Property").

B.      Buyer is the owner of a forty-seven and one hundredth percent (47.01%) interest in the Property.

C.      Buyer is familiar with the assets and operation of the Property.

D.      Subject to the terms and conditions of this Agreement, Seller will sell, transfer and assign all right title and interest in and to the Property consisting of a fifty-two and ninety-nine hundredths percent (52.99%) interest (the "Sale Interests") to Buyer.

E.      Buyer is willing to accept the assignment from Seller of the Sale Interests, subject to the terms and conditions of this Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and obligations contained herein, the sufficiency of which is acknowledged by the parties, Buyer and Seller agree as follows:

1.      <u>Sale of the Sale Interests</u>.

(a) Subject to the terms and conditions contained herein, Seller agrees to sell, transfer and assign, and Buyer agrees to accept all right, title and interest of Seller in and to the Sale Interests at the Closing (as defined below) for an amount equal to One Million Two Hundred Fifty-Eight Thousand Three Hundred Forty-One and 00/100 Dollars ($1,258,341.00) (the "Purchase Price").

(b) Concurrently with the execution of this Agreement, Buyer shall pay to Seller an amount equal to One Hundred Thousand and 00/100 Dollars ($100,000.00).

(c) On the Fifteenth (15th) of each calendar month thereafter until the payment in full, Buyer shall pay to Seller an amount equal to the interest on the then outstanding balance of the Purchase Price at the rate of Wall Street Journal Prime Rate plus one percent, from time to time.

(d) On or before May 1, 2024, Buyer shall pay the balance of the Purchase Price and any accrued and unpaid interest.

DocuSign Envelope ID: 0EF6B7D5-7CBD-4F89-8C60-65EBBAA3EBA0

(e) From time to time, Buyer may pay any amount towards the outstanding balance with written notice to Seller.

(f) For the avoidance of doubt, Buyer is acquiring the issued and outstanding Sale Interests subject to any outstanding liabilities encumbering the Property.

2. <u>Closing</u>.

(a) On May 1, 2023 ("Closing Date"), Seller shall transfer the Sale Interests free and clear of all liens, pledges, encumbrances, charges or claims of every kind or nature, to Buyer.

(b) Seller shall deliver the Assignment, attached as Exhibit A, effective as of the Closing Date.

3. <u>Representations and Warranties of Seller</u>. Seller hereby represents and warrants to Buyer as follows:

(a) <u>Ownership</u>. Seller is the owner of the Sale Interests, beneficially and of record, free and clear of any liens and encumbrances. Upon delivery to Buyer of the assignment and payment therefore, Buyer shall acquire good and valid title to such interests free and clear of all liens and encumbrances.

(b) <u>Reliance on Own Advisors</u>. Seller has relied completely on the advice of, or has consulted with, its own tax, investment, legal or other advisors and has not relied on the Buyer or any of its respective affiliates, officers, directors, attorneys, accountants or any affiliates of any thereof.

(c) <u>Capability to Evaluate</u>. Seller has such knowledge and experience in financial and business matters so as to enable it to utilize the information made available to it in connection with this Agreement in order to evaluate the merits and risks of selling the interests, which are substantial.

(d) <u>Due Diligence</u>. In making the decision to sell, Seller has received and had an opportunity to review the books and records, including financial statements and such other information as deemed necessary and has had full access to all the information Seller considers necessary or appropriate to make an informed decision to sell.

(e) <u>Investment Experience; Fend for Self</u>. Seller is able to fend for himself in the transactions contemplated by this Agreement.

(f) <u>Legal Proceedings; Governmental Orders</u>. There are no suits, actions, causes of action or legal proceedings ("Action") pending or, to Seller's knowledge, threatened (a) affecting Seller; or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action. There are no outstanding governmental orders and no unsatisfied judgments, penalties or awards against or affecting Seller.

(g)     Taxes.  Seller has duly and timely filed all tax returns and reports required to be filed by the Seller prior to the date of this Agreement.

(h)     Authority.  Seller has full power and authority to execute, deliver and perform its obligations under this Agreement and each of the documents to be executed and delivered by it in connection herewith.  Seller has duly executed and delivered this Agreement and each of the documents to be executed and delivered by it in connection herewith, and each constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its respective terms, except as enforceability may be limited by bankruptcy, similar laws relating to debtor relief and general principles of equity.

(i)     No Conflicts.  The execution, delivery and performance of this Agreement and each of documents to be executed and delivered by Seller in connection herewith does not and will not: (a) conflict with or violate any applicable law or any order to which Seller is subject; or (b) result in the breach of, or constitute a default under, or give to others any rights of termination, amendment, acceleration or cancellation of, any contract to which Seller is a party.

(j)     Consents.  No consent of, or declaration, registration or filing with, or notification to, any governmental authority or any other person is required in connection with the execution, delivery and performance of this Agreement and each of the documents to be executed and delivered by Seller in connection herewith, or the consummation of this Agreement.

4.     Representations and Warranties of Buyer.  Buyer hereby represents and warrants to Seller as follows:

(a)     Reliance on Own Advisors.  Buyer has relied completely on the advice of, or has consulted with, its own tax, investment, legal or other advisors and has not relied on the Seller or any of its respective affiliates, officers, directors, attorneys, accountants or any affiliates of any thereof.

(b)     Capability to Evaluate.  Buyer has such knowledge and experience in financial and business matters so as to enable it to utilize the information made available to it in connection with this Agreement in order to evaluate the merits and risks of purchasing the interests, which are substantial.

(c)     Due Diligence.  In making the decision to purchase, Buyer has received and had an opportunity to review and inspect the books and records, including financial statements and such other information as deemed necessary and has had full access to all the information Buyer considers necessary or appropriate to make an informed decision to purchase.

(d)     Investment Experience; Fend for Self.  Buyer is able to fend for itself in the transactions contemplated by this Agreement.

(e)     Legal Proceedings; Governmental Orders.  There is no Action pending or, to Buyer's knowledge, threatened (a) affecting Buyer; or (b) that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.  No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

3

DocuSign Envelope ID: 0EF6B7DE-7CBD-4F09-9C60-65EBRAA3EBA0

There are no outstanding governmental orders and no unsatisfied judgments, penalties or awards against or affecting Buyer.

(f) <u>Taxes.</u> Buyer has duly and timely filed all tax returns and reports required to be filed by the Buyer prior to the date of this Agreement.

(g) <u>Authority</u>. Buyer has full power and authority to execute, deliver and perform its obligations under this Agreement and each of the documents to be executed and delivered by it in connection herewith. Buyer has duly executed and delivered this Agreement and each of the documents to be executed and delivered by it in connection herewith, and each constitutes the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its respective terms, except as enforceability may be limited by bankruptcy, similar laws relating to debtor relief and general principles of equity.

(h) <u>No Conflicts</u>. The execution, delivery and performance of this Agreement and each of documents to be executed and delivered by Buyer in connection herewith does not and will not: (a) conflict with or violate any applicable law or any order to which Buyer is subject; or (b) result in the breach of, or constitute a default under, or give to others any rights of termination, amendment, acceleration or cancellation of, any contract to which Buyer is a party.

(i) <u>Consents</u>. No consent of, or declaration, registration or filing with, or notification to, any governmental authority or any other person is required in connection with the execution, delivery and performance of this Agreement and each of the documents to be executed and delivered by Buyer in connection herewith, or the consummation of this Agreement.

5. <u>Disclaimer of Representations and Warranties</u>.

*"As is" Condition*. BUYER HEREBY EXPRESSLY ACKNOWLEDGES AND AGREES THAT BUYER WILL HAVE AS OF CLOSING, THOROUGHLY INSPECTED AND EXAMINED THE BOOKS AND RECORDS, AND ANY OTHER MATERIALS, DOCUMENTS OR INVESTIGATIONS, AND THE PHYSICAL CONDITION OF THE PROPERTY TO THE EXTENT DEEMED NECESSARY BY BUYER, IN ORDER TO ENABLE BUYER TO EVALUATE THE PURCHASE OF THE SALE INTERESTS. BUYER FURTHER ACKNOWLEDGES AND AGREES THAT EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS AGREEMENT, BUYER IS RELYING SOLELY UPON THE INSPECTION, EXAMINATION AND EVALUATION PERFORMED BY BUYER, AND THAT BUYER IS PURCHASING, AND AT CLOSING WILL ACCEPT, THE SALE INTERESTS ON AN "AS IS", "WHERE IS" AND "WITH ALL FAULTS" BASIS, WITHOUT REPRESENTATIONS, WARRANTIES AND OR COVENANTS, EXPRESS OR IMPLIED OF ANY KIND OR NATURE, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS AGREEMENT.

Seller hereby disclaims any and all representations and warranties, express or implied, except as expressly stated herein. Buyer shall accept, in full satisfaction of the obligations of Seller under this Agreement, the Assignment.

4

DocuSign Envelope ID: 0EF6B7D5-7CBD-4F09-8C60-65EBBAA3EBA0

6.  <u>Indemnification</u>.

(a)     Seller hereby covenants and agrees to indemnify, save, defend, hold harmless, discharge, and release the Buyer, and its successors and assigns from and against any and all payments, charges, judgments, assessments, liabilities, obligations, claims, demands, actions, losses, damages, penalties, interest or fines, and any and all costs and expenses paid or incurred, including attorney fees, costs, fees of experts and any legal or other expenses reasonably incurred in connection therewith (collectively, the "<u>Liabilities</u>"), arising from, based upon, related to or associated with and to the extent caused by (i) any breach of any representation or warranty of the Seller contained in this Agreement; (ii) any failure of Seller to perform or observe any term, condition or covenant contained in this Agreement; (iii) any liability related to or involving any indebtedness of Seller for the Property (iv) any liability related to or involving the Property arising, resulting or incurred from any event that occurred on or prior to the Closing Date; and (v) any and all tax liabilities with respect to the Property arising, resulting or incurred on or prior to the Closing Date.

(b)     Buyer hereby covenants and agrees to indemnify, save, defend, hold harmless, discharge, and release the Seller, and its successors and assigns from and against any and all Liabilities arising from, based upon, related to or associated with and to the extent caused by (i) any breach of any representation or warranty of the Buyer contained in this Agreement; (ii) any failure of the Buyer to perform or observe any term, condition or covenant contained in this Agreement; (iii) any liability related to or involving any indebtedness of the Buyer for the Property; (iv) any liability related to or involving the Property arising, resulting or incurred from any event that occurred after the Closing Date; and (v) any and all tax liabilities with respect to the Property arising, resulting or incurred after the Closing Date.

7.  <u>Miscellaneous</u>.

(a)     Without the prior written consent of the other party, no party to this Agreement may assign its rights or obligations under this Agreement.  The terms and conditions of this Agreement shall inure to the benefit of, and be binding upon, the respective successors and permitted assigns of the parties hereto.

(b)     All notices, requests, demands or other communications hereunder shall be in writing and shall be deemed to have been duly given, if delivered in person or by certified mail, return receipt requested, postage prepaid to the addresses set forth below.  Any party may from time to time, by written notice to the other party, designate a different address, which shall be substituted for the one specified below for such party.  If any notice or other document is sent by certified mail, return receipt requested, postage prepaid, properly addressed as aforementioned, the same shall be deemed served or delivered three (3) business days after mailing thereof.

If to the Seller:     448 West Seminary, Wheaton, Illinois 60187

If to Buyer:     1007 N Orange Street, Wilmington, Delaware 19801

(c)     Any waiver of the provisions of this Agreement or of a party's rights or remedies under this Agreement must be in writing to be effective.  Failure, neglect, or delay by a party to

enforce the provisions of this Agreement or its rights or remedies at any time, will not be construed as a waiver of such party's rights under this Agreement and will not in any way affect the validity of the whole or any part of this Agreement or prejudice such party's right to take subsequent action. No exercise or enforcement by either party of any right or remedy under this Agreement will preclude the enforcement by such party of any other right or remedy under this Agreement or that such party is entitled to enforce.

(d)    This Agreement contains the entire agreement of the parties with respect to the subject matter of this Agreement and supersedes all previous communications, representations, understandings, and agreements, either oral or written, between the parties with respect to said subject matter. This Agreement may not be amended, except by a writing signed by all parties.

(e)    This Agreement will be interpreted and construed in accordance with the laws of the State of Illinois, without regard to those principles (statutory or otherwise) pertaining to choice of law. The prevailing party in any such dispute shall be entitled to be awarded all court costs and expenses and reasonable attorneys' fees and expenses incurred in connection with such dispute. If no party prevails entirely, the presiding adjudicator shall award costs, expenses and reasonable attorneys' fees and expenses in accordance with the disposition of the matter.

(f)    For purposes of interpreting this Agreement, whenever the context requires, the singular number will include the plural, and vice versa; the masculine gender will include the feminine and neuter genders; the feminine gender will include the masculine and neuter genders; and the neuter gender will include the masculine and feminine genders. Any rule of construction to the effect that ambiguities are to be resolved against the drafting party will not be applied in the construction or interpretation of this Agreement. As used in this Agreement, the words "include" and "including" and variations thereof, will not be deemed to be terms of limitation, but rather will be deemed to be followed by the words "without limitation." Any reference herein to "the parties" means the entities that are parties to this Agreement; any reference to a "third party" means a person or an entity that is not a party to this Agreement.

(g)    This Agreement and any amendment hereof may be executed in counterparts and delivered by PDF, facsimile or other electronic media, each of which so executed will be deemed to be an original and such counterparts together will constitute one and the same agreement.

(h)    The preamble and recitals set forth at the beginning of this Agreement are hereby incorporated into the terms and conditions of this Agreement.

(i)    Each party shall do all such acts and shall execute and deliver to the other all such certificates, instruments, assignments and other documents and shall do and perform or cause to be done all matters and such other things necessary or expedient to be done as either party may reasonably request from time to time in order to give full effect to this Agreement.

(j)    The parties have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

(k)     Each party shall pay all of its costs and expenses arising out of this transaction, including, without limitation, any transfer taxes, the cost of UCC searches and attorney fees

9.     <u>Default</u>.  If Buyer (a) defaults by failing to pay when due any single installment or payment required to be made to Seller under the terms of this Agreement; or (b) defaults in the performance of any other covenant or agreement hereof and such default is not cured by Buyer within thirty (30) days after written notice to Buyer (unless the default involves a dangerous condition which shall be cured immediately), Seller may treat such a default as a breach of this Agreement and Seller shall have any one or more of the following remedies in addition to all other rights and remedies provided at law or in equity: (i) maintain an action for any unpaid installments; or (ii) declare the entire balance due and maintain an action for such amount.

Buyer shall pay all reasonable attorneys' fees and costs incurred by Seller in enforcing the terms and provisions of this Agreement.

All rights and remedies given to Seller shall be distinct, separate and cumulative, and the use of one or more thereof shall not exclude or waive any other right or remedy allowed by law, unless specifically waived in this Agreement.

[ Signature Page Immediately Follows ]

DocuSign Envelope ID: 0EF6B7DE-7CBD-4F0D-9C60-65EBBAA3EBA0

IN WITNESS WHEREOF, Seller and Buyer have duly executed this Purchase and Sale Agreement as of the date first above written.

Buyer:
Yorkville Investment I LLC

_____

Name: Ryan Cicoski
Its; manager

Seller:

_____
Name: Scott Armstrong

**<u>Assignment of Interest</u>**

[See Attached Page Immediately Following]

DocuSign Envelope ID: 0EF6B7D5-7CBD-4F0D-8C60-65EBBAA3EBA0

## ASSIGNMENT OF INTEREST

Pursuant and subject to that certain Purchase and Sale Agreement (the "Agreement") dated as of _____, 20___, by and between _____ ("Assignor") and _____ ("Assignee"), Assignor hereby assigns to Assignee all of its right, title and interest in and to its _____ percent (____%) interest in 120 North Hale Street, Wheaton, Illinois ("Property") ON AN "AS IS", "WHERE IS" AND "WITH ALL FAULTS" BASIS, WITHOUT REPRESENTATIONS, WARRANTIES AND OR COVENANTS, EXPRESS OR IMPLIED OF ANY KIND OR NATURE, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THE AGREEMENT.

Assignor hereby disclaims any and all representations and warranties, express or implied, except as expressly stated in the Agreement.

Dated as of _____, 20___.

_____

_____

## ACCEPTANCE

Assignee accepts all of the right, title and interest of the interest in the Property as assigned as of the date set forth below.

Dated: as of _____ _____, 20__

_____

_____

10

**EXHIBIT B**

# EXHIBIT 1

ACTION ORDER                                                                                              2022LA000692-80

**STATE OF ILLINOIS**

**UNITED STATES OF AMERICA**
**IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT**

**COUNTY OF DU PAGE**

SUSAN ESSEX

Plaintiff

-VS-

PAUL SCHROTH WOLFE

Defendant

2022LA000692
CASE NUMBER

# FILED

**23 Nov 27   AM 10: 32**

*Candice Adams*

CLERK OF THE
18TH JUDICIAL CIRCUIT
DUPAGE COUNTY, ILLINOIS

**ACTION ORDER**

This matter having come before the Court, the Court having jurisdiction and being fully advised in the premises:

**IT IS HEREBY ORDERED** as follows:

The case is continued to 01/03/2024 in 2020 at 09:00 AM for STATUS.

The Order entered on 10/31/22-DWP is hereby vacated.

Defendant's Motion to Vacate the DWP entered on 10/31/22 is hereby granted and vacated.

Defendant's Motion to Seal the Entire Case is hereby granted for the reasons stated on the record and the Clerk's Office is directed to seal the entire case.

Defendant's counsel to provide plaintiff a copy of this order where notice of the motion was made.

Plaintiff to appear at the next status or possibly be subject to having this case dismissed for want of prosecution.

Defendant to advise on whether filing an answer to the complaint by next status.

Submitted by: JUDGE ANGELO J KAPPAS
DuPage Attorney Number:                    ☐ PRO SE
Attorney for:

*File Date: 11/27/2023*

JUDGE ANGELO J KAPPAS
Validation ID : DP-11272023-1032-58879

Date: 11/27/2023

**EXHIBIT C**

# EXHIBIT 2

**Garrett Von Schaumburg**

| | |
|---|---|
| **From:** | Christine Marte |
| **Sent:** | Wednesday, November 29, 2023 1:37 PM |
| **To:** | Susanessex21@gmail.com |
| **Cc:** | Thomas Patterson; Garrett Von Schaumburg |
| **Subject:** | Wolfe adv. Essex Case# 2022-LA-692 - November 27, 2023 Order |
| **Attachments:** | 2023.11.29 Proof of Service of 11-27 Order.pdf; 2023.11.27 Order.pdf |

Good afternoon,

Please see attached Order entered on November 27, 2023, in the above referenced matter. Thank you.

Sincerely,

Christine Marte
Paralegal



200 W. Monroe, Suite 2025
Chicago, Illinois 60606
Dir (312) 750-1816 • Tel (312) 223.1699 ext. 117 • Fax (312) 223.8549
**email** | **website**

CONFIDENTIALITY NOTICE:
This electronic communication and any attached files contain information intended for the exclusive use of the individual or entity to whom it is addressed and may contain information that is proprietary, privileged, confidential and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any viewing, copying, disclosure or distribution of this information is prohibited and may be subject to legal restriction or sanction. Please notify the sender, by electronic mail or telephone, of any unintended recipients and delete the original message without making any copies.  E-mails are susceptible to change.  The Patterson Law Firm, LLC does not guarantee that the integrity of this communication has been maintained or that this communication is free of misuses, interceptions or interference.

**EXHIBIT D**

P230000008760

_____
(Requestor's Name)

_____
(Address)

_____
(Address)

_____
(City/State/Zip/Phone #)

☐ PICK-UP   ☐ WAIT   ☐ MAIL

_____
(Business Entity Name)

_____
(Document Number)

___ ed Copies _____   Certificates of Status _____

___ c al Instructions to Filing Officer:

Office Use Only



200398250602

02/06/23--01001--002   **137.50

FILED   RECEIVED

23 FEB -3   AM 10: 1   2023 FEB -3   PM 2: 13
SECRETARY OF STATE
TALLAHASSEE, FLORIDA

COVER LETTER

Department of State

Division of Corporations

P.O. Box 6327

Tallahassee, FL 32314

SUBJECT: Access Management S.A.S. Inc.

Enclosed is an original and one (1) copy of the Articles of Domestication and a check:

FEES:

| | |
|---|---|
| Certificate of Domestication | $ 50.00 |
| Articles of Incorporation and Certified Copy | $ 78.75 |
| Total filing fee | $128.75 |

OPTIONAL:

| | |
|---|---|
| Certificate of Status | $ 8.75 |

From: Charles Mack

Name (printed or typed)

1363 Shermer Rd., Suite 210

Address

Northbrook, IL 60062

City, State & Zip

847-239-7212

Daytime Telephone Number

charles@mlgcounsel.net

E-mail address: (to be used for future annual report notification)

INHS53 (3/20)

Articles of Domestication
Foreign Corporation Domesticating to Florida

The undersigned, Ryan Cicoski                    Director
                    (Name)                        (Title)

of Access Management S.AS.                         , a foreign
corporation, in accordance with s. 607.11922, Florida Statutes, submit these Articles of
Domestication.

1. Then name of the domesticating corporation is Access Management S.A.S.
                                                  (Foreign Corporation)

   March 4, 2022 .

2. The jurisdiction and date of its formation is St. Bartholomew  Guadalupe

3. The name of the domesticated corporation is Access Management S.A.S. Inc.



4. The jurisdiction of formation of the domesticated corporation is **Florida**

5. The domestication corporation is a foreign corporation and the domestication was
   approved in accordance with its organic law.

6. Attached are Florida Articles of Incorporation to complete the domestication
   requirements pursuant to s.607.0202, F.S.

I certify I am authorized to sign these Articles of Domestication on behalf of the corporation.

Ryan C. Cicoski  Digitally signed by Ryan C. Cicoski
                 Date: 2023.02.02 15:48:37 -05'00'

(Authorized Signature)

23 FEB -3 AM 10: 17
SECRETARY OF STATE
TALLAHASSEE. FLORIDA
FILED

## ARTICLES OF INCORPORATION
*IN COMPLIANCE WITH CHAPTER 607, F.S.*

## ARTICLE I     NAME
*THE NAME OF THE CORPORATION SHALL BE:*

Access Management S.AS. Inc.

## ARTICLE II     PRINCIPAL OFFICE
*THE PRINCIPAL PLACE OF BUSINESS/MAILING ADDRESS IS:*

Principal Address

1007 N. Orange St.

Wilmington, DE 19801

Mailing Address

Same as principal address

## ARTICLE III     PURPOSE
*THE PURPOSE FOR WHICH THE CORPORATION IS ORGANIZED:*
Any lawful purpose permitted under the Florida Business Corporation act

## ARTICLE IV     SHARES
*THE NUMBER OF SHARES OF STOCK IS:* 1,000

## ARTICLE VI     REGISTERED AGENT AND STREET ADDRESS
*THE **NAME AND FLORIDA STREET ADDRESS** (P.O. BOX **NOT** ACCEPTABLE) OF THE REGISTERED AGENT IS:*

Registered Agents Inc

7901 4th Street N, Ste 300

St. Petersburg, FL 33702

HAVING BEEN NAMED AS REGISTERED AGENT AND TO ACCEPT SERVICE OF PROCESS FOR THE ABOVE STATED CORPORATION AT THE PLACE DESIGNATED IN THIS CERTIFICATE, I AM FAMILIAR WITH AND ACCEPT THE APPOINTMENT AS REGISTERED AGENT AND AGREE TO ACT IN THIS CAPACITY.

Bill Havre, Assistant Secretary

Signature/Registered Agent

February 2, 2023

Date

FILED
23 FEB -3 AM 10: 17
SECRETARY OF STATE
TALAHASSEE, FLORIDA

### *ARTICLE V   DIRECTORS AND/OR OFFICERS*

*THE NAME(S) AND ADDRESS(ES) AND SPECIFIC TITLES:*

Name & Title: Ryan Cicoski, Director

Address: 1007 N. Orange St.

Wilmington, DE 19801

Name & Title: Ryan Cicoski, Pres.

Address: 1007 N. Orange St.

Wilmington, DE 19801

Name & Title:

Address:

Name & Title:

Address:

Name & Title:

Address:

Name & Title:

Address:

Name & Title:

Address:

Name & Title:

Address:

**I submit this document and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155.F.S.**

Ryan C. Cicoski  Digitally signed by Ryan C. Cicoski  Date: 2023.02.02 15:48:51 -05'00'

Signature/Authorized Person

2 February, 2023

Date

23 FEB -3 AM 10: 17
SECRETARY OF STATE
TALLAHASSEE. FLORIDA

FILED

**EXHIBIT E**

# LOAN AND SECURITY AGREEMENT

By and Between

Green Sapphire Holdings Inc., a Delaware corporation,
as Borrower and

Global Capital Partners LLC, a Delaware limited liability company,
as Lender,

| | |
|---|---|
| Dated: | As of February 2, 2023 |
| Loan No.: | 2023-1001 |

## LOAN TERMS

| | |
|---|---|
| Note Date: | As of February 2, 2023 |
| Borrower: | Green Sapphire Holdings Inc., a Delaware corporation |
| Borrower Address: | 1007 Orange Street, Wilmington, Delaware 19801 |
| Original Principal Amount: | $10,000,000.00 to be disbursed in two tranches: (i) First Tranche on January 31, 2023 and (ii) Second Tranche as soon as possible shortly thereafter |
| Applicable Interest Rate: | Ten Percent (10%) for 120 days |
| Maturity Date: | June 2, 2023 |

## FINANCIAL REPORTING

| **Due** | **Reporting** |
|---|---|
| Quarterly | Operating Statements |
| | Balance Sheet |

## GUARANTOR

| | |
|---|---|
| Guarantor | The Petro Carta Trust dated October 27, 2014 |
| | BNW Family Office, LLC |

# TABLE OF CONTENTS

Article 1.    DEFINITIONS.................................................................................................. 1
    Section 1.1   Definitions............................................................................................... 1

Article 2.    LOAN TERMS ................................................................................................ 7
    Section 2.1   Agreement to Borrow and Lend .............................................................. 7
    Section 2.2   Payments, Maturity, Fees....................................................................... 7
    Section 2.3   Interest Rate ........................................................................................... 7
    Section 254   Usury Laws .............................................................................................. 8

Article 3.    SECURITY INTEREST .................................................................................. 8
    Section 3.1   Grant of Security Interest........................................................................ 8
    Section 3.2   Delivery of Certificates, Instruments; Financing Statement.................... 9
    Section 3.3   Release of Security Interest .................................................................... 9
    Section 3.4   Borrower Remains Liable ........................................................................ 9

Article 4.    REPRESENTATIONS AND WARRANTIES OF BORROWER....................... 10
    Section 4.1   Legal Status and Authority .................................................................... 10
    Section 4.2   Status of Borrower ................................................................................. 10
    Section 4.3   Validity of Documents............................................................................ 11
    Section 4.4   Litigation ................................................................................................ 11
    Section 4.5   Financial Condition................................................................................ 11
    Section 4.6   Business Purposes ................................................................................ 11
    Section 4.7   Taxes ..................................................................................................... 11
    Section 4.8   Title to Properties................................................................................... 12
    Section 4.9   Compliance with Law ............................................................................ 12
    Section 4.19  Perfection .............................................................................................. 12
    Section 4.11  Intellectual Property ............................................................................. 12
    Section 4.12  Environmental Representations and Warranties .................................... 12
    Section 4.13  No Change in Facts or Circumstances ................................................. 12
    Section 4.14  Disclosure ............................................................................................ 13
    Section 4.14  Legal Status of Subsidiary .................................................................. 13
    Section 4.16  Subsidiary Assets ................................................................................ 13
    Section 4.17  Third Party Representations .................................................................. 13

Article 5.    BORROWER COVENANTS ........................................................................... 13
    Section 5.1   Maintenance of Collateral...................................................................... 13
    Section 5.2   Rights of Borrower ................................................................................. 14
    Section 5.3   Business Conducted .............................................................................. 14
    Section 5.4   Payment of Taxes, etc .......................................................................... 14
    Section 5.5   Payment of Leasehold Obligations ........................................................ 15
    Section 5.6   Compliance With Laws.......................................................................... 15
    Section 5.7   Books and Records ............................................................................... 16
    Section 5.8   Performance of Other Agreements ........................................................ 17
    Section 5.9   Insurance ............................................................................................... 17

i

Section 5.10    Access to Property ................................................................. 17
Section 5.11    Litigation ............................................................................... 18
Section 5.12    Dividends, Distributions and Management Fees .................... 18
Section 5.13    Single Purpose Entity/Separateness ...................................... 18
Section 5.14    Change of Name, Identity or Structure .................................. 19
Section 5.15    Business and Operations ........................................................ 19
Section 5.16    Environmental Covenants ...................................................... 19

Article 6.      TRANSFERS ........................................................................ 20
Section 6.1     Transfers by Borrower ........................................................... 20

Article 7.      DEFAULTS; REMEDIES ...................................................... 21
Section 7.1     Defaults ................................................................................. 21
Section 7.2     Right of Enforcement ............................................................ 22
Section 7.3     Rights of Sale ........................................................................ 22
Section 7.4     Miscellaneous Rights of Lender ............................................ 23
Section 7.5     Right to Cure Defaults ........................................................... 23
Section 7.6     Appointment of Lender Borrower's Lawful Attorney ............ 24

Article 8.      INDEMNITY .......................................................................... 24
Section 8.1     Indemnity ............................................................................... 24

Article 9.      WAIVERS ............................................................................... 24
Section 9.1     Marshalling and Other Matters .............................................. 24
Section 9.2     Waiver of Notice ................................................................... 25
Section 9.3     Waiver of Statute of Limitations ........................................... 25
Section 9.4     Modification, Waiver in Writing ........................................... 25
Section 9.5     Delay Not a Waiver ............................................................... 25
Section 9.6     Waiver of Trial by Jury ......................................................... 25
Section 9.7     Waiver of Counterclaim ........................................................ 26
Section 9.8     Waiver of Defense to Subrogation ......................................... 26

Article 10.     GENERAL PROVISIONS ...................................................... 26
Section 7.01 Tax Indemnity .......................................................................... 26
Section 7.01 Tax Indemnity .......................................................................... 27

Article 10.     GENERAL PROVISIONS ...................................................... 28
Section 10.1    Notices ................................................................................... 28
Section 10.2    Expenses ................................................................................ 29
Section 10.3    Entire Agreement, Amendments and Waivers ....................... 29
Section 10.4    Further Assurances ................................................................ 29
Section 10.5    No Third Party Benefits ........................................................ 30
Section 10.6    Assigns .................................................................................. 30
Section 10.6    Assigns .................................................................................. 30
Section 10.7    Counterparts .......................................................................... 31
Section 10.8    Governing Law ...................................................................... 31
Section 10.9    Time of the Essence ............................................................... 31

Section 10.10    Severability .................................................................................. 31
Section 10.11    JURISDICTION AND VENUE................................................... 31
Section 10.12    Acknowledgments....................................................................... 32
Section 10.13    Conflicts...................................................................................... 32

## LOAN AND SECURITY AGREEMENT

This Loan and Security Agreement (the "Agreement") is made as of February 2, 2023, by and among Green Sapphire Holdings Inc., a Delaware corporation, having an address at 1007 Orange Street, Wilmington, Delaware 19801 ("Borrower"; Organization No.: 4267001), and Global Capital Partners LLC, a Delaware limited liability company, having an address at 16192 Coastal Highway, Lewes, Delaware 19958.

In consideration of the mutual representations, warranties, covenants and agreements contained in this Agreement, the sufficiency of which is hereby acknowledged, the parties agree as follows:

## Article 1. - DEFINITIONS

Section 1.1    DEFINITIONS.

For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"Affiliate" shall mean, as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by or is under common control with such Person or is a director or officer of such Person or of an Affiliate of such Person. Control shall mean the power, directly or indirectly, to direct or cause the direction of the management or business of a Person by ownership, contract or otherwise.

"Applicable Laws" shall mean all existing and future federal, state and local laws, ordinances, governmental rules and regulations or court orders affecting or which may be interpreted to affect the Borrower.

"Bankruptcy Code" shall mean the United States Bankruptcy Code, 11 U.S.C. §101 *et seq.*,

"Business Day" shall mean a day on which Lender is open for the conduct of substantially all of its banking business at its office in the city in which the Note is payable (excluding Saturdays and Sundays).

"Casualty" shall mean damage or destruction by fire, earthquake, wind or other casualty.

"Collateral" shall have the meaning set forth in Article 3.

"Debt" shall mean the outstanding principal amount set forth in, and evidenced by, this Agreement and the Note together with all interest accrued and unpaid thereon and all other sums due to Lender in respect of the Loan evidenced by the Note, this Agreement or any other Loan Document.

"Default" shall mean the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would be an Event of Default.

"Default Rate" shall have the meaning set forth in the Note.

"Environmental Law" shall mean any present and future federal, state and local laws, statutes, ordinances, rules, regulations and the like, as well as common law, relating to protection of human health or the environment, relating to Hazardous Substances, relating to liability for or costs of Remediation or prevention of Releases of Hazardous Substances or relating to liability for or costs of other actual or threatened danger to human health or the environment; including, but not limited to, the following statutes, as amended, any successor thereto, and any regulations promulgated pursuant thereto, and any state or local statutes, ordinances, rules, regulations and the like addressing similar issues: the Comprehensive Environmental Response, Compensation and Liability Act; the Emergency Planning and Community Right-to-Know Act; the Hazardous Substances Transportation Act; the Resource Conservation and Recovery Act (including, without limitation, Subtitle I relating to underground storage tanks); the Solid Waste Disposal Act; the Clean Water Act; the Clean Air Act; the Toxic Substances Control Act; the Safe Drinking Water Act; the Occupational Safety and Health Act; the Federal Water Pollution Control Act; the Federal Insecticide, Fungicide and Rodenticide Act; the Endangered Species Act; the National Environmental Policy Act; the River and Harbors Appropriation Act and the Residential Lead-Based Paint Hazard Reduction Act.

"Environmental Liens" shall mean any lien or encumbrance imposed pursuant to any Environmental Law, whether due to the act or omission of Borrower or any other Person.

"Event of Default" shall have the meaning set forth in Section 7 of this Agreement.

"Excluded Taxes" shall mean any of the following taxes imposed on or with respect to the Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder or any other Loan Document, or required to be withheld or deducted from a payment to any such recipient, (a) income, net profits, or capital taxes imposed on or measured by net income, and franchise taxes imposed by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or conducts business, in which its principal office is located or in which its applicable lending office is located; and (b) any branch profits taxes or any similar tax imposed by the jurisdiction where the Borrower is located.

"French/St. Barthelemy Counsel to Lender" shall mean, Pierre Kirscher of SELAS St-BARTHLAW, the legal counsel of the Lender advising the Lender under French and St. Bartholomew laws.

"First Tranche" shall mean the first drawdown under this Loan in an amount of at least Three Million United States Dollars ($3,000,000).

"Fiscal Year" shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during the term of the Loan.

"GAAP" shall mean generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

"Governmental Authority" shall mean any court, board, agency, department, commission, office or other authority of any nature whatsoever for any governmental unit (federal, state, county, municipal, city, town, special district or otherwise) whether now or hereafter in existence.

2

"Guarantor" shall mean The Petro Carta Trust dated October 27, 2014 and BNW Family Office LLC, a Delaware limited liability company.

"Guaranty" shall mean that certain Guaranty of Payment to be issued by each of the Guarantors substantially in the form attached hereto as Exhibit B.

"Hazardous Substance(s)" shall mean any and all substances (whether solid, liquid or gas) defined, listed, or otherwise classified as pollutants, hazardous wastes, hazardous substances, hazardous materials, extremely hazardous wastes, contaminant or toxic substance or words of similar meaning or regulatory effect under any present or future Environmental Laws or that may have a negative impact on human health or the environment, including, without limitation, petroleum and petroleum products, asbestos and asbestos-containing materials, polychlorinated biphenyls, lead, materials containing lead based paint, mold or fungus which may pose a risk to human health or the environment, radon, radioactive materials, flammables and explosives.

"Indemnified Persons" shall mean: (a) Lender; (b) any prior owner or holder of the Loan; (c) any subsequent owner or holder of the Loan; (d) any receiver or other fiduciary appointed in a foreclosure or other bankruptcy, insolvency, reorganization, conservatorship or other relief with respect to debts or similar proceeding; (e) any officers, directors, shareholders, partners, members, employees, agents, servants, representatives, contractors, subcontractors, affiliates or subsidiaries of any and all of the foregoing; and (f) the heirs, legal representatives, successors and assigns of any and all of the foregoing (including, without limitation, any successors by merger, consolidation or acquisition of all or a substantial portion of the Indemnified Person's assets and business), in all cases whether during the term of the Loan or as part of or following a foreclosure.

"Indemnified Taxes" shall mean (a) Taxes other than Excluded Taxes; and (b) to the extent not otherwise described in the foregoing Clause (a), Other Taxes. For clarity, "Indemnified Taxes" shall include without limitation any U.S. federal withholding Tax which is imposed on amounts payable to or for the account of Lender under this Agreement or any other Loan Document.

"Internal Revenue Code" or "Code" shall mean the Internal Revenue Code of 1986, 26 U.S.C. §1 *et seq.*, as amended, as it may be further amended from time to time, and any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"Legal Opinion of French/St. Barthelemy Counsel" shall mean the legal opinion or advice of French/St. Barthelemy counsel to the Lender confirming the validity of the Pledge and the perfection of the first priority mortgage on the Properties.

"Legal Opinion of U.S. Counsel" shall mean the legal opinion or advice of U.S. Counsel to the Lender confirming the validity of this Agreement, the Note and the other Loan Documents governed by Delaware law.

"Legal Requirements" shall mean all obligations imposed by all statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting the Borrower, whether now or hereafter enacted and in force, and all permits, licenses, authorizations and regulations relating thereto.

3

"Lien" shall mean any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting Borrower, the Collateral, any portion thereof or any interest therein, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

"Loan" shall mean the loan made by Lender to Borrower pursuant to this Agreement.

"Loan Amount" shall mean an amount equal to Ten Million and 00/00 Dollars ($10,000,000.00).

"Loan Documents" shall mean, collectively, this Agreement, the Note, the Guaranty, the Pledge and any and all other documents, agreements and certificates executed and/or delivered in connection with the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Loan to Value Ratio" shall mean the ratio, expressed as a percentage of (i) the actual outstanding aggregate amount of the Loan at the time of calculation to (ii) the appraised value of the Property based upon an updated appraisal at the time of calculation.

"Losses" shall mean any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, fines, penalties, charges, fees, judgments, awards, amounts paid in settlement of whatever kind or nature (including but not limited to legal fees and other costs of defense).

"Material Adverse Effect" shall mean any event or condition, alone or when taken with other events or conditions or conditions existing or occurring concurrently with such event or condition has or is reasonably expected to have a detrimental effect on:

(a)     the business, operations, conditions (financial or otherwise), assets, liabilities, prospects or properties of Borrower;

(b)     the validity or enforceability of this Agreement or any other Loan Document;

(c)     the ability of Borrower to pay or perform the obligations;

(d)     the Collateral, the liens of Lender in and to the Collateral or the priority of Lender's liens, or

(e)     the ability of Lender to enforce its rights and remedies under this Agreement.

"Maturity Date" shall mean June 2, 2023.

"Note" shall mean that certain promissory note of even date herewith in the principal amount of Ten Million and 00/00 Dollars ($10,000,000.00), made by Borrower in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, substantially in the form attached hereto as Exhibit A.

4

"Obligations" shall mean:

(a)     payment of the indebtedness from Borrower to Lender and all other liabilities and obligations of every kind or nature whatsoever of Borrower to Lender;

(b)     the payment of all amounts advanced by Lender to preserve and protect the Collateral and defend its rights in the Collateral; and

(c)     observance and performance of all of Borrower's other obligations to perform acts or refrain from taking any action under this Agreement, the Note and the other Loan Documents.

"Organizational Documents" shall mean the charter, articles of incorporation and bylaws and any other agreements affecting the rights, limitations, preferences or obligations of an owner with respect to the entity.

"Other Taxes" shall mean any and all present or future stamp, recording, filing, documentary or similar taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or performance under or otherwise with respect to, this Agreement or any other Loan Document.

"Permitted Liens" shall mean collectively:

(a)     the Lien and security interests created by the Loan Documents;

(b)     Liens, if any, for Taxes imposed by any Governmental Authority not yet due or delinquent.

"Person" shall mean any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"Pledge" shall mean that certain Pledge Agreement between the Borrower and the Lender providing for a pledge of the Pledged Interests under French Law, substantially in the form attached hereto as Exhibit C.

"Pledged Interests" shall mean the shares of stock of Access Management, SAS.

"Property" or "Properties" shall mean two real estate properties owned by Access Management, SAS, in the island of St. Barthelemy, the Caribbean, including one villa and land in Plot AE 314 in Colombier and the land parcel in Plot AI 220 in Saint-Jean, identified in more detail in Exhibit D.

"Release" of any Hazardous Substance shall mean any release, deposit, discharge, emission, leaking, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other movement of Hazardous Substances.

"Remediation" shall mean:

(a)     any response, remedial, removal, or corrective action, any activity to cleanup, detoxify, decontaminate, contain or otherwise remediate any Hazardous Substance;

(b)     any actions to prevent, cure or mitigate any Release of any Hazardous Substance;

(c)     any action to comply with any Environmental Laws or with any permits issued pursuant thereto; or

(d)     any inspection, investigation, study, monitoring, assessment, audit, sampling and testing, laboratory or other analysis, or evaluation relating to any Hazardous Substances.

"Scheduled Payment Date" shall have the meaning set forth in the Note.

"Second Tranche" shall mean the second and final drawdown under this Loan in an amount of at up to Seven Million United States Dollars ($7,000,000).

"Subsidiary" shall mean Access Management SAS, an entity wholly owned by Borrower and organized under French law.

"Taxes" shall mean any and all present or future income, stamp, property, and/or other taxes, levies, imposts, duties, deductions, charges, fees or withholdings imposed, levied, withheld or assessed by any Governmental Authority, together with any interest, additions to tax or penalties imposed thereon and with respect thereto.

"Transfer" shall mean any direct or indirect sale, conveyance, mortgaging, grant, alienation, encumbrance, pledge, assignment or other transfer of the shares of stock, membership or limited liability company interests, or partnership interests of Borrower or any part thereof, or interest therein, or agreement to do any of the foregoing, whether voluntary or involuntary, and shall be deemed to include:

(a)     an installment sales agreement wherein Borrower agrees to sell for a price to be paid in installments;

(b)     if Borrower or any general partner or managing member (or if no managing member, any member or non-member manager) of Borrower is a corporation, any merger or consolidation, the voluntary or involuntary sale, conveyance, transfer or pledge of such corporation's stock (or the stock of any corporation directly or indirectly controlling such corporation by operation of law or otherwise) or the creation or issuance of new stock such that, in any such event, an aggregate of more than forty-nine percent (49%) of such corporation's stock shall be transferred, whether in one or a series of transactions;

(c)     if Borrower or any general partner or managing member (or if no managing member, any member or non-member manager) of Borrower is a limited or general partnership or joint venture, any merger or consolidation, the change, removal, resignation or addition of a general partner or joint venturer or the transfer or pledge of the partnership interest of any general partner or joint venturer or any profits or proceeds relating to such partnership or joint venture interest;

6

(d)    if Borrower or any general partner or managing member of Borrower is a limited liability company with a managing member, any merger or consolidation, the change, removal, resignation or addition of a managing member or the transfer of the membership interest of a managing member or any profits or proceeds relating to such managing membership interest or the transfer, change, removal, resignation or addition of any member such that an aggregate of more than forty-nine percent (49%) of the membership interests in such limited liability company shall be transferred, whether in one or a series of transactions; and

(e)    if Borrower or any general partner or managing member of Borrower is a limited liability company without a managing member, any merger or consolidation, the change, removal, resignation or addition of any non-member manager whatsoever, or the transfer, change, removal, resignation or addition of any member such that an aggregate of more than forty-nine percent (49%) of the membership interests in such limited liability company shall be transferred, whether in one or a series of transactions.

"UCC" or "Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect in the State of Delaware.

"U.S. Counsel to Lender" shall mean, Nelson Mullins, legal counsel to the Lender advising the Lender on Delaware law aspects of the Loan Documents governed by Delaware law.

## Article 2. - LOAN TERMS

Section 2.1    **AGREEMENT TO BORROW AND LEND**.

(a)    Borrower agrees to borrow from Lender and Lender agrees to lend to Borrower an amount equal to the Loan Amount in two tranches, the First Tranche to occur on January 31, 2023 and the Second Tranche to occur as soon as possible shortly thereafter, on the terms of and subject to the conditions of the Loan Documents including, without limitation Lender receiving the Legal Opinion of French/St. Barthelemy Counsel and the Legal Opinion of U.S. Counsel.

(b)    The Loan Amount shall be used by Borrower for refinancing maturing debt of the Borrower, general working capital and financing expenses.

Section 2.2    **PAYMENTS, MATURITY**.

(a)    Payments, Generally.  Payments of principal and interest shall be due and payable by Borrower to Lender as provided in the Note.  The outstanding principal balance and all accrued and unpaid interest and any other amounts due under the Loan Documents shall be due and payable on the Maturity Date, if not sooner paid.

(b)    Prepayments.  During the term, the Loan may be repaid or prepaid, in whole but not in part, at any time and from time to time in strict accordance with the terms of the Note.

Section 2.3    **INTEREST RATE**.

(a)    Interest Rate.  The Loan shall bear interest at a rate of Ten Percent (10%) for One Hundred and Twenty (120) days as set forth in the Note.  Interest shall be calculated on the basis of a 360-day year for the actual days elapsed.

(b)     Default Rate.  In the event that, and for so long as, any Event of Default shall have occurred, and to the extent permitted by law, all accrued and unpaid interest, the outstanding principal balance and any other amounts due under the Loan Documents shall accrue interest at the Default Rate, calculated from the date such payment was due without any grace or cure periods contained herein.

(c)     Late Payment.  If Borrower fails to pay any installment of interest or principal within five (5) days from the date when due, Borrower shall pay a late charge as provided in the Note.

Section 2.4     **USURY LAWS**.  It is the intention of Borrower and Lender to conform strictly to usury and similar laws relating to interest which may from time to time be in force, and all agreements between Lender and Borrower, whether now existing or hereafter arising and whether oral or written, are hereby expressly limited so that in no contingency or event whatsoever, whether by acceleration of maturity hereof or otherwise, shall the amount paid or agreed to be paid in the aggregate to Lender as interest under the Loan Documents, or in any other document evidencing, securing or pertaining to the Debt, exceed the maximum permissible amount under applicable usury or such other laws (the "Maximum Amount").  If from any possible construction of any document, interest would otherwise be payable under any Loan Document in excess of the Maximum Amount, or in the event for any reason whatsoever any payment by or act of Borrower pursuant to the terms or requirements of any Loan Document shall result in the payment of interest which would exceed the Maximum Amount, then any such construction shall be subject to the provisions of this Section, and ipso facto such document shall be automatically reformed, without the necessity of the execution of any amendment or new document, so that the obligation of Borrower to pay interest or perform such act or requirement shall be reduced to the limit authorized under Applicable Laws, and in no event shall Borrower be obligated to pay any interest, perform any act, or be bound by any requirement which would result in the payment of interest in excess of the Maximum Amount.  Any amount received by Lender in excess of the Maximum Amount shall, without further agreement or notice between or by any party hereto, be deemed applied to reduce the principal amount of the Note immediately upon receipt of such moneys by Lender, with the same force and effect as though Borrower had specifically designated such sums to be applied to principal prepayment.  The provisions of this Section shall supersede any inconsistent provision of this Agreement or any other Loan Document.

### Article 3. - SECURITY INTEREST

Section 3.1     **GRANT OF SECURITY INTEREST**.  As security for (i) all indebtedness, obligations and liabilities of Borrower to Lender arising under, or in connection with, the Loan and the Loan Agreement, whether now existing or hereafter arising; (ii) all obligations and liabilities of Borrower to Lender arising under or in connection with this Agreement, whether now existing or hereafter arising; (iii) any and all sums paid by Lender in order to preserve the Collateral or its security interest therein; (iv) in the event of any proceeding for the collection or enforcement of any indebtedness, obligations or liabilities of Borrower referred to in clause (i), the expenses of retaking, holding, collection, preparing for sale, selling or otherwise disposing of or realizing on the Collateral, or of any exercise by Lender of its rights or remedies under this Agreement, together with attorneys' fees and expenses and court costs; and (v) all indemnity obligations of Borrower to Lender pursuant to this Agreement (collectively the "Obligations"), Borrower grants Lender a continuing first-priority security interest in, lien on and right of set-off against, and assigns to Lender as security, all of Borrower's right, title and interest in, to and under the following property

and interests in property, whether now owned or hereafter acquired or existing and wherever located, (collectively, the "Collateral"):

(a)     all of Borrower's right, title and interest in and to the Pledged Interests, and the certificates representing the Pledged Interests;

(b)     any and all rights and remedies of Borrower under the Organizational Documents, including the right to enforce any and all representations, warranties, covenants, obligations, agreements and indemnities of any party thereto made to or for the benefit of, or that otherwise inure to the benefit of, Borrower;

(c)     All books and records (including credit files, computer programs, printouts and other computer materials and records) of Borrower pertaining to any of the foregoing; and

(d)     Borrower's right, title and interest in and to the profits and losses of Borrower and Borrower's right as a shareholder of Subsidiary to receive dividends or distributions of Subsidiary's assets, upon complete or partial liquidation or otherwise.

Section 3.2     **DELIVERY OF CERTIFICATES, INSTRUMENTS; FINANCING STATEMENT**.

(a)     Concurrently with this Agreement, Borrower shall deliver to Lender all original certificates, instruments and other documents evidencing or representing the Collateral accompanied by duly executed instruments of transfer in blank.

(b)     Borrower authorizes Lender to file any financing statement or financing statement amendment required by Lender to establish or maintain the validity, perfection and priority of the security interest granted herein.

(c)     From time to time, Lender may, but is not required to, perform any agreement or obligation of Borrower hereunder which Borrower shall fail to perform and take any action Lender deems necessary for the maintenance and preservation of any of its Collateral or its security interest.

Section 3.3     **RELEASE OF SECURITY INTEREST**     At such time as (a) the Loan has been paid in full, (b) all the Obligations have been satisfied, and (c) the Loan Agreement shall have been terminated, Lender shall take all steps necessary to release the security interest in the Collateral granted hereunder, free and clear of any lien created hereunder in favor of Lender. Upon such termination, at the cost and expense of Borrower, Lender shall execute a satisfaction of this Agreement and such instruments, documents or agreements as are necessary or desirable to terminate, discharge and remove of record any documents constituting public notice of this Agreement and the security interests and assignment granted hereunder and shall deliver or cause to be delivered to Borrower the certificate(s) representing the Pledged Interests.

Section 3.4     **BORROWER REMAINS LIABLE.**     Anything herein to the contrary notwithstanding, (a) Borrower shall remain liable under Organizational Documents to the extent set forth therein to perform all of its respective duties and obligations thereunder to the same extent as if this Agreement had not been executed; (b) the exercise by Lender of any of the rights hereunder shall not release any Borrower from any of its duties or obligations under the Organizational Documents; and (c) Lender shall not have any obligation or liability under the Organizational Documents by reason of this Agreement, nor shall Lender be obligated to perform any of the obligations or duties of Borrower thereunder or to take any action to collect or enforce

any claim for payment assigned hereunder; provided that Lender and any other transferee of the Collateral shall take the same subject to the Organizational Documents.

Section 3.5    **ADDITIONAL COLLATERAL**    As additional collateral for the payment of any and all indebtedness and obligations of Borrower, Borrower shall cause Subsidiary to mortgage, grant, bargain, pledge, assign, warrant, transfer and convey to Lender, and grant a security interest to Lender in all right, title and interest of Subsidiary in and to the Property.  Within thirty (30) days of the date of this Agreement, Borrower shall have such first lien mortgage properly recorded or registered in the records of St. Barthelemy and provide a copy of such recorded or mortgage and any attestations or affirmations as may be reasonably required by Lender affirming the first lien position of the mortgage on the Property and due and proper execution of all related documents.

## Article 4. - REPRESENTATIONS AND WARRANTIES OF BORROWER

To induce Lender to make the Loan and to enter into this Agreement, Borrower hereby represents and warrants to Lender:

Section 4.1    **LEGAL STATUS AND AUTHORITY**.  Borrower:

(a)    is duly organized, validly existing and in good standing under the laws of its state of organization or incorporation;

(b)    is duly qualified to transact business and is in good standing in each jurisdiction in which the character of the properties owned or leased by Borrower or the nature of its business makes such qualification necessary;

(c)    has all necessary approvals, governmental and otherwise, and full power and authority to carry on its business as now conducted and proposed to be conducted; and

(d)    has full power, authority and legal right to execute the Loan Documents, and to grant, bargain, sell, pledge, assign, warrant, transfer and convey the Collateral pursuant to the terms hereof and to keep and observe all of the terms of the Loan Documents on Borrower's part to be performed.

Section 4.2    **STATUS OF BORROWER**.

(a)    Borrower's exact legal name and organizational identification number, if any, assigned by the state of incorporation or organization is correctly set forth on the first page of this Agreement, other Loan Documents and on any UCC-1 Financing Statements filed in connection with the Loan.  Borrower is an organization of the type specified and is incorporated in or organized under the laws of the state specified on the first page of this Agreement.  Borrower's principal place of business and the place where Borrower keeps its books and records, has been for the preceding four months (or, if less, the entire period of the existence of Borrower) is the address of Borrower set forth on the first page of this Agreement.

(b)    Borrower is not directly engaged in any joint venture or partnership with any other Person.

10

Section 4.3 **VALIDITY OF DOCUMENTS**.

(a) The execution, delivery and performance of the Loan Documents and the borrowing evidenced by the Note: (i) are within the power of Borrower; (ii) have been authorized by all requisite action; (iii) have received all necessary approvals and consents, corporate, governmental or otherwise; (iv) will not violate, conflict with, result in a breach of or constitute (with notice or lapse of time, or both) a default under any provision of law, any order or judgment of any court or governmental authority, or any indenture, agreement or other instrument to which Borrower is a party or by which it or any of its assets is or may be bound or affected; (v) will not result in the creation or imposition of any lien, charge or encumbrance whatsoever upon any of its assets, except the lien and security interest created hereby; and (vi) will not require any authorization or license from, or any filing with, any Governmental Authority or other body (except for Uniform Commercial Code filings relating to the security interest created hereby).

(b) The Loan Documents constitute the legal, valid and binding obligations of Borrower, enforceable against Borrower in accordance with their respective terms, except as may be limited by: (i) bankruptcy, insolvency or other similar laws affecting the rights of creditors generally; and (ii) general principles of equity (regardless of whether considered in a proceeding in equity or at law).

Section 4.4 **LITIGATION**. There is no material action, suit or proceeding, judicial, administrative or otherwise (including any condemnation or similar proceeding), pending or, to the best of Borrower's knowledge, threatened or contemplated against, or affecting, Borrower, Borrower's business or any Guarantor, except Other than that certain litigation regarding Indigo Ridge Development Partners LLC and initiated by the filing by Sagita 1601, LLC on August 28, 2019 of an Original Petition in the 368th District Court of Williamson County, Texas, in Cause No. 19-1310-C368 (the "Indigo Ridge Litigation").

Section 4.5 **FINANCIAL CONDITION**. Borrower:

(a) is solvent, and no bankruptcy, reorganization, insolvency or similar proceeding under any state or federal law with respect to Borrower has been initiated or threatened; and

(b) has received reasonably equivalent value for the granting of the Loan.

Section 4.6 **BUSINESS PURPOSES**. The proceeds of the Loan will be used by Borrower solely for business purposes and not for personal, family, household or agricultural purposes. No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or by the terms and conditions of the Loan Documents.

Section 4.7 **TAXES**. Borrower and any Guarantor have filed all federal, state, county, municipal, and city income and other Tax returns required to have been filed by them and have paid all Taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by them. Neither Borrower nor any Guarantor knows of any basis for any additional assessment in respect of any such Taxes and related liabilities for prior years.

Section 4.8 **TITLE TO PROPERTIES**.

(a)    Borrower has good and marketable title to its properties and assets, including the Collateral, and the properties and assets reflected in the financial statements are not subject to any Liens other than the Permitted Liens. Borrower has not agreed or consented to cause any of its properties or assets (whether now owned or in the future acquired) to be subject to any Liens other than the Permitted Liens.

(b)    Borrower is the sole owner of all of the Collateral, beneficially and of record, free and clear of any liens other than the liens created hereunder. The Collateral is not subject to any option to purchase or similar rights of any kind or any voting trust, lock-up agreement or similar arrangement.

(c)    Borrower shall defend its title to the Collateral against all claims of all persons.

Section 4.9    **COMPLIANCE WITH LAW**. Borrower is not in violation of any Legal Requirements which could have a Material Adverse Effect on Borrower. Borrower has obtained all licenses, permits, franchises and other governmental authorization necessary for the ownership of its properties and assets, including the Collateral, and the conduct of its business.

Section 4.10    **PERFECTION**..    Upon (a) the execution and delivery of this Agreement, (b) the delivery of the certificates evidencing the Borrower's interests in the Subsidiary, and (c) the filing of a UCC-1 financing statement against Borrower and naming Lender as the secured party in the office of the Secretary of State of the Borrower's state of incorporation or organization, Lender will have a valid, perfected, continuing, first-priority security interest in the Collateral.

Section 4.11    **INTELLECTUAL PROPERTY**. All patents, trademarks, service marks, copyrights, design rights, tradenames, assumed names, trade secrets and licenses owned or utilized by Borrower are valid and have been duly filed with all appropriate Governmental Authorities and Borrower is not aware of any objection or challenge to their validity.

Section 4.12    **ENVIRONMENTAL    REPRESENTATIONS    AND    WARRANTIES**. Borrower represents and warrants, that:

(a)    there is no past or present non-compliance with Environmental Laws, or with permits issued pursuant thereto; and

(b)    Borrower does not know of, and has not received, any written or oral notice or other communication from any Person relating to Hazardous Substances or Remediation thereof, of possible liability of any Person pursuant to any Environmental Law, other environmental conditions, or any actual or potential administrative or judicial proceedings in connection with any of the foregoing.

Section 4.13    **NO CHANGE IN FACTS OR CIRCUMSTANCES**. All information in the application for the Loan submitted to Lender and in all financial statements, reports, certificates and other documents submitted in connection with the loan application or in satisfaction of the terms thereof, are accurate, complete and correct in all material respects. There has been no adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise materially misleading.

Section 4.14 **DISCLOSURE**. Borrower has disclosed to Lender all material facts and has not failed to disclose any material fact that could cause any representation or warranty made herein to be materially misleading or have a Material Adverse Effect on Borrower or Borrower's business.

Section 4.15 **LEGAL STATUS OF SUBSIDIARY**. Subsidiary:

(a)     is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization or incorporation;

(b)     is duly qualified to transact business and is in good standing in each jurisdiction in which the character of the properties owned or leased by Borrower or the nature of its business makes such qualification necessary; and

(c)     has all necessary approvals, governmental and otherwise, and full power and authority to carry on its business as now conducted and proposed to be conducted

Section 4.16 **SUBSIDIARY ASSETS**

(a)     Subsidiary has good and marketable title to its Property and assets and are not subject to any Liens other than the Permitted Liens. Subsidiary has not agreed or consented to cause any of its Property or assets (whether now owned or in the future acquired) to be subject to any Liens other than the Permitted Liens.

(b)     Subsidiary is the sole owner of all of the Property, beneficially and of record, free and clear of any liens other than the liens created hereunder.

Section 4.17 **THIRD PARTY REPRESENTATIONS**. Each of the representations and the warranties made by each Guarantor herein or in any of the other Loan Documents is true and correct in all material respects.

Borrower recognizes and acknowledges that in accepting the Loan Documents, Lender is expressly and primarily relying on the truth and accuracy of the warranties and representations set forth in this Article 4 without any obligation to investigate and notwithstanding any investigation by Lender; that such reliance existed on the part of Lender prior to the date hereof; that the warranties and representations are a material inducement to Lender in accepting the Loan Documents; and that Lender would not be willing to make the Loan in the absence of the warranties and representations as set forth in this Article 4.

### Article 5. - BORROWER COVENANTS

Section 5.1 **MAINTENANCE OF COLLATERAL**.

(a)     Borrower shall not create, permit or suffer to exist, and will defend the Collateral against and take such other action as is necessary to remove, any lien on the Collateral.

(b)     Borrower shall safeguard and protect all Collateral and shall not allow any material default for which it is responsible to occur under any Collateral, and shall fully perform or cause to be performed when due all of its respective obligations under the Collateral

(c)     Borrower shall not permit the merger or consolidation of the Subsidiary or the issuance of additional shares, options, warrants or convertible obligations or notes with respect to the Subsidiary.

(d)     Borrower shall not, without the written consent of Lender, which consent shall be granted or withheld in Lender's sole discretion sell, assign, pledge, grant any lien on, transfer, dispose of or otherwise encumber the Collateral or any part thereof, including, without limitation, entering into any lock-up, voting trust or any other arrangement with respect to the Collateral that adversely affects the interests of the Lender, as determined by the Lender in Lender's sole discretion.

(e)     Borrower shall not, without the written consent of Lender, which consent shall be granted or withheld in Lender's sole discretion cause the Subsidiary to (I) sell, lease assign, pledge, grant any lien on, transfer, dispose of or otherwise encumber the Property owned by the Subsidiary or any part thereof, (II) alter, amend or otherwise change the zoning, classification or designation for use of the Property owned by the Subsidiary or any part thereof or (III) develop or construct any structure on the Property owned by the Subsidiary or any part thereof.

(f)     Borrower shall obtain (at its sole cost) updated appraisal reports for each of the Properties from an independent third-party appraisal firm in St. Barthelemy, including a reliance letter authorizing the Lender to rely on such appraisal reports, and deliver such reports and reliance letters to the Borrower as soon as possible after the First Tranche but in no event later than forty-five (45) days thereafter. If the Loan to Value Ratio is below forty percent (40%), the Borrower shall be required to give additional collateral to secure the Loan in the form acceptable to the Lender in its sole discretion.

Section 5.2     **RIGHTS OF BORROWER**.     Unless an Event of Default either (i) has occurred or (ii) as a result of the exercise or taking of any action or after giving effect to a distribution will occur, Borrower shall be entitled to (a) exercise any and all voting and other consensual rights pertaining to the Collateral or any part thereof for any purpose not inconsistent with the terms of this Agreement, provided that Borrower shall not exercise or refrain from exercising any such right if such action would have a Material Adverse Effect on the value of the Collateral or the benefits of this Agreement and (b) receive and use, free and clear of any lien created hereby or any security interest granted by Borrower to Lender hereunder, for any purpose any distributions actually made, and any allocations actually made, with respect to the Collateral (whether as a distribution of net cash flow or otherwise), provided that distributions payable other than in cash shall be delivered to Lender and shall be additional security for the Loan.

Section 5.3     **BUSINESS CONDUCTED**.     Borrower shall and shall cause Subsidiary to continue in the business currently conducted by it using its best efforts to maintain its customers and goodwill. Borrower shall and shall cause Subsidiary to not, directly or indirectly, engage in any line of business substantially different from the line of business conducted by Borrower or Subsidiary as of the date of this Agreement. Borrower shall cause Subsidiary to change its domicile to Florida, United States of America prior to granting the mortgages on the Properties in a manner reasonable satisfactory to French/St. Barthelemy Counsel to Lender and U.S. Counsel to Lender.

Section 5.4     **PAYMENT OF TAXES, ETC.**

(a)     Borrower shall promptly pay all Taxes when due and furnish to Lender upon request receipted bills of the appropriate taxing authority or other documentation reasonably satisfactory to Lender evidencing the payment thereof. Borrower shall not suffer and shall promptly cause to be paid and discharged any lien or charge whatsoever which may be or become a lien or charge against the Collateral.

(b)     After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any of the Taxes or any claims or judgments of mechanics, materialmen, suppliers or vendors or any lien therefor, provided that:

(i)     no Event of Default has occurred and is continuing hereunder or under any of the other Loan Documents;

(ii)    Borrower is not prohibited from doing so under the provisions of any other agreement affecting Borrower;

(iii)   such proceeding shall suspend the collection of the disputed amount from Borrower (and Borrower shall furnish such security as may be required in the proceeding for such purpose), or Borrower shall have bonded over or paid all of the disputed amount under protest;

(iv)    the Collateral will not be in danger of being sold, forfeited, terminated, canceled or lost; and

(v)     Borrower shall have deposited with Lender adequate reserves for the payment of the disputed amount, together with all interest and penalties thereon, unless Borrower has bonded over or paid all of the disputed amount under protest.

Section 5.5    **PAYMENT OF LEASEHOLD OBLIGATIONS**. Borrower shall at all times pay when due, its rental obligations under all leases which it is a tenant or lessee and shall comply in all material respects with all other terms of any lease and keep them in full force and effect.

Section 5.6    **COMPLIANCE WITH LAWS**. Borrower shall and shall cause Subsidiary to promptly comply with all Legal Requirements. Borrower shall give prompt notice to Lender of the receipt by Borrower of any notice related to a violation of any Legal Requirements and of the commencement of any proceedings or investigations which relate to compliance with Legal Requirements.

Borrower shall have the right, after prior written notice to Lender, to contest by appropriate legal proceedings diligently conducted in good faith, without cost or expense to Lender, the validity or application of any Legal Requirements and to suspend compliance therewith if permitted under Legal Requirements, provided:

(i)     failure to comply therewith may not subject Borrower or Lender to any civil or criminal liability;

15

      (ii)     prior to and during such contest, Borrower shall furnish to Lender security reasonably satisfactory to Lender against loss or injury by reason of such contest or non-compliance with such Legal Requirements;

      (iii)    no Event of Default shall exist during such proceedings, and such contest shall not otherwise violate any of the provisions of any of the Loan Documents; and

      (iv)    such contest shall not subject the Collateral to any lien or encumbrance the enforcement of which is not suspended by such contest or otherwise affect the priority of the lien of Lender.

Section 5.7    **BOOKS AND RECORDS**.

(a)    Borrower and Guarantor, shall keep adequate books and records of account in accordance with GAAP or in accordance with other methods acceptable to Lender in its sole discretion, consistently applied and shall furnish to Lender the following, which shall be prepared, dated and certified by Borrower (or by Guarantor, to the extent such items relate to Guarantor) as true, correct and complete in the form required by Lender, unless otherwise specified below:

      (i)     quarterly operating statements of the Borrower, detailing the revenues received, the expenses incurred and the net operating income before and after debt service (principal and interest) and containing appropriate year to date information, within thirty (30) days after the end of each fiscal quarter;

      (ii)    quarterly balance sheets of Borrower within thirty (30) days after the end of each fiscal quarter;

      (iii)    an annual operating statement of the Borrower detailing the total revenues received, total expenses incurred, total cost of all capital improvements, total debt service and total cash flow, prepared, dated and certified by independent certified public accountants acceptable to Lender within ninety (90) days after the close of each fiscal year of Borrower;

      (iv)    an annual balance sheet and profit and loss statement of Borrower and any Guarantors within ninety (90) days after the close of each fiscal year of Borrower and Guarantors prepared, dated and certified by independent certified public accountants acceptable to Lender, as the case may be; and

      (v)    such other financial statements, and such other information and reports as may, from time to time, be required by Lender.

(b)    Borrower and any Guarantor shall furnish Lender with such other additional financial or management information (including State and Federal Tax returns) as may, from time to time, be reasonably required by Lender in form and substance satisfactory to Lender, in reasonable detail and certified by Borrower as true, correct and complete.

16

(c)     Following the occurrence of an Event of Default, or if Lender has reason to believe that any item furnished under this Section is materially inaccurate or misleading, Lender shall have the right, but not the obligation, to obtain any of the financial statements and other items required to be provided under this Section by means of an audit by an independent certified public accountant selected by Lender, in which event Borrower agrees to pay, or to reimburse Lender for, any expense of such audit and further agrees to provide all necessary information to said accountant and otherwise to cooperate in the performance of such audit.

Section 5.8     **PERFORMANCE OF OTHER AGREEMENTS**.  Borrower shall observe and perform each and every term to be observed or performed by Borrower pursuant to the terms of any agreement or instrument affecting or pertaining to Borrower or the Collateral or given by Borrower to Lender for the purpose of further securing an Obligation and any amendments, modifications or changes thereto.

Section 5.9     **INSURANCE**.  (a)  Borrower shall and shall cause Subsidiary to maintain or cause to be maintained insurance with respect to its business and properties in such amounts, deductibles and coverages as Lender shall reasonably require, including without limitation:

(i)      insurance against loss or damage by Casualty;

(ii)     commercial general liability insurance;

(iii)    business interruption insurance;

(iv)     product liability;

(v)      bond against larceny or embezzlement; and

(vi)     worker's compensation insurance.

All insurance policies shall be issued by financially responsible insurers.  Borrower shall furnish Lender with copies of all policies and renewals of such policies at least thirty (30) days prior to any expiration date and appropriate loss payable endorsements in form and substance satisfactory to Lender naming Lender as a co-insured and loss-payee as its interests may appear.  All insurance policies shall contain a provision that such policies may not be cancelled or amended or failed to be renewed without at least thirty (30) days prior written notice to Lender.

(b)     If any of the Collateral shall be damaged or destroyed, in whole or in part, by Casualty, Borrower shall give prompt notice of such damage to Lender and shall promptly commence and diligently prosecute the proof of loss and the replacement, restoration or repair of any of the Collateral so damaged or destroyed.  Borrower shall pay all costs of replacing, restoring or repairing any Collateral so damaged or destroyed, whether or not such costs are covered by insurance.  Lender may but shall not be obligated to make proof of loss if not made promptly by Borrower.  Borrower shall adjust all claims for insurance proceeds in consultation with, and approval of, Lender; provided, however, if an Event of Default has occurred and is continuing, Lender shall have the exclusive right to participate in the adjustment of all claims for insurance proceeds.

Section 5.10    **ACCESS TO PROPERTY**.  Borrower shall permit Lender, its agents and representatives to inspect the Collateral and the Property of Subsidiary at reasonable hours

17

upon reasonable advance notice and shall provide Lender, its agents and representatives all documents relating to the Collateral or the Property of the Subsidiary as reasonably requested by Lender.

Section 5.11 **LITIGATION**. Borrower shall give prompt notice of any litigation or governmental proceeding pending or threatened against Borrower, Subsidiary or Guarantor which might materially adversely affect Borrower's, Subsidiary's or Guarantor's condition, financial or otherwise, or the Collateral, in excess of Twenty-Five Thousand and 00/100 Dollars ($25,000.00).

Section 5.12 **DIVIDENDS, DISTRIBUTIONS AND MANAGEMENT FEES**. Except with the express written consent of Lender, Borrower shall not:

(a) declare or pay any dividends or other distributions with respect to, purchase, redeem or otherwise acquire for value any of its outstanding stock, partnership interests or membership interests or return any capital of its shareholders, partners, members or managers. Notwithstanding the foregoing, provided that an Event of Default does not exist or after giving effect to the dividend or distribution will exist, Borrower may make a dividend or distribution in an amount not to exceed the amount either of the federal and state income Taxes due and owing by the shareholders of Borrower, if it is an S corporation as defined in the Code, the partners or the members for the most recently ended fiscal year or for estimated federal and state income Taxes for the current fiscal year due and owing by the shareholders, partners or members of Borrower; and

(b) pay management fees or fees of a similar nature to any Guarantor or person affiliated with Guarantor.

Section 5.13 **SINGLE PURPOSE ENTITY/SEPARATENESS**. Until the Debt has been paid in full, Borrower has not and will not:

(a) merge into or consolidate with any Person, or dissolve, terminate, liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure;

(b) create or own any new subsidiary;

(c) commingle its assets with the assets of any other Person;

(d) establish any new credit facilities, engage in any debt restructure, or accelerate payment of any existing debt;

(e) enter into any contract or agreement with any general partner, member, shareholder, principal, guarantor of the obligations of Borrower, or any Affiliate of the foregoing, except upon terms and conditions that are intrinsically fair, commercially reasonable and substantially similar to those that would be available on an arm's-length basis with unaffiliated third parties;

(f) assume or guaranty the debts of any other Person, hold itself out to be responsible for the debts of any other Person, or otherwise pledge its assets for the benefit of any other Person or hold out its credit as being available to satisfy the obligations of any other Person; and

18

(g)     make any loans or advances to any Person.

Section 5.14     **CHANGE OF NAME, IDENTITY OR STRUCTURE**.

Borrower shall not change or permit to be changed:

(a)     Borrower's name;

(b)     Borrower's identity (including its trade name or names);

(c)     Borrower's principal place of business set forth on the first page of this Agreement;

(d)     the corporate, partnership, limited liability company or other organizational structure of Borrower;

(e)     Borrower's state of incorporation or organization;

(f)     Borrower's organizational identification number; or

(g)     Borrower's management, officers or board of directors,

without in each case notifying Lender of such change in writing at least thirty (30) days prior to the effective date of such change and, in the case of a change in Borrower's structure or management officers or board of directors, without first obtaining the prior written consent of Lender. Borrower authorizes Lender to file any financing statement or financing statement amendment required by Lender to establish or maintain the validity, perfection and priority of the security interest granted herein. At the request of Lender, Borrower shall execute a certificate in form satisfactory to Lender listing the trade names under which Borrower intends to operate and representing and warranting that Borrower does business under no other trade name. If Borrower does not now have an organizational identification number and later obtains one, or if the organizational identification number assigned to Borrower subsequently changes, Borrower shall promptly notify Lender of such organizational identification number or change.

Section 5.15     **BUSINESS AND OPERATIONS**. Borrower will qualify to do business and will remain in good standing under the laws of each state as and to the extent the same are required for the ownership, maintenance, management and operation of is business.

Section 5.16     **ENVIRONMENTAL COVENANTS**. Borrower covenants and agrees that:

(a)     all uses and operations by Borrower, shall be in compliance with all Environmental Laws and permits issued pursuant thereto;

(b)     there shall be no Hazardous Substances in, on, or under any Property of the Borrower, except those that are both:

(i)     in compliance with all Environmental Laws and, if required, with permits issued pursuant thereto; and

(ii)     fully disclosed to Lender in writing or are used by Borrower in the ordinary course of their business.

19

(c)     Borrower shall, at its sole cost and expense, perform any environmental site assessment or other investigation of environmental conditions, pursuant to any reasonable written request of Lender if Lender has reason to suspect that a Release of a Hazardous Substance might have occurred (including, without limitation, sampling, testing and analysis of soil, water, air, building materials and other materials and substances whether solid, liquid or gas), and share with Lender the reports and other results thereof, and Lender and other Indemnified Parties shall be entitled to rely on such reports and other results thereof;

(d)     Borrower shall, at its sole cost and expense, comply with all reasonable written requests of Lender to:

      (i)     reasonably effectuate Remediation of any condition (including, without limitation, a Release of a Hazardous Substance);

      (ii)     comply with any Environmental Law;

      (iii)     comply with any directive from any Governmental Authority; and

      (iv)     take any other reasonable action necessary or appropriate for protection of human health or the environment.

(e)     Borrower shall not do any act that materially increases the dangers to human health or the environment, poses an unreasonable risk of harm to any Person, impairs or may impair the value of the Collateral, is contrary to any requirement of any insurer, constitutes a public or private nuisance or constitutes waste; and

(f)     Borrower immediately upon becoming aware of the same shall notify Lender in writing of:

      (i)     any presence or Releases or threatened Releases of Hazardous Substances;

      (ii)     any non-compliance with any Environmental Laws related in any way to Borrower's properties;

      (iii)     any required or proposed Remediation of environmental conditions; and

      (iv)     any written or oral notice or other communication of which Borrower becomes aware from any source whatsoever (including, without limitation, a governmental entity) relating in any way to Hazardous Substances or Remediation thereof, possible liability of any Person pursuant to any Environmental Law, other environmental conditions, or any actual or potential administrative or judicial proceedings.

### Article 6. - TRANSFERS

Section 6.1     **TRANSFERS BY BORROWER**.

Except with the prior written consent of Lender, which may be withheld or denied in Lender's sole discretion, Borrower shall not permit any Transfer.

## Article 7. - DEFAULTS; REMEDIES

Section 7.1 **DEFAULTS**. The occurrence of one or more of the following events shall be an event of default ("Event of Default"):

(a) If any portion of the Debt is not paid when due;

(b) If any other Obligation is not performed in accordance with the terms and conditions of this Agreement and the other Loan Documents;

(c) The occurrence of a transfer prohibited by this Agreement;

(d) If any representation or warranty contained herein or in any other Loan Document or if any of the information contained in any documentation provided to Lender by Borrower in conjunction with the Loan shall not be true and accurate in all material respects as of the date made;

(e) If there shall occur a Material Adverse Change in the financial condition or in the business of Borrower or if Lender in good faith deems itself insecure as a result of acts or events bearing upon the financial condition of Borrower.

(f) If any one or more of Borrower or Guarantor shall:

(i) file a voluntary petition in bankruptcy or for relief under the Bankruptcy Act or any similar state or federal law;

(ii) file a pleading in any proceeding admitting insolvency;

(iii) not have vacated within sixty (60) days after the filing against Borrower or Guarantor of any involuntary proceeding under the Bankruptcy Act or similar state or federal law;

(iv) have a substantial part of any one or more of their assets attached, seized, subjected to a writ or distress warrant, or levied upon, unless such attachment, seizure, writ, warrant or levy is vacated within sixty (60) days;

(v) make an assignment for the benefit of creditors or shall consent to the appointment of a receiver or trustee or liquidator of all or a major part of its property; or

(vi) not have vacated any order appointing a receiver, trustee or of any Borrower or Guarantor or all or a major part of any such person's property.

(g) If a notice of lien, levy or assignment is filed or recorded with respect to all or any of the assets of Borrower by the United States government or any department, agency or instrumentality thereof or by any state, county, municipal or other governmental agency, or if any

Taxes or debts owing at any time or times hereafter to any one of them becomes a lien or encumbrances upon any of Borrower's assets and any of the foregoing is not released, bonded or otherwise secured to Lender's reasonable satisfaction within sixty (60) days after the same becomes a lien or encumbrance;

(h)     If Borrower shall continue to be in default under any other term, covenant or condition of this Agreement not specified above, for thirty (30) days after notice to Borrower from Lender, provided however, if such default cannot reasonably be cured within such thirty (30) day period and Borrower shall have commenced to cure such default within the thirty day (30) period and Borrower shall thereafter diligently and expeditiously proceed to cure for such additional time as is reasonably necessary but not to exceed sixty (60) days.

Section 7.2    **RIGHT OF ENFORCEMENT**.  Upon the occurrence of an Event of Default, Lender shall have and may exercise any and all rights of enforcement and remedies afforded to Lender pursuant to this Agreement, the Note, and the other Loan Documents, together with any and all other rights and remedies otherwise provided and available to Lender by law or equity, including without limitation:

(a)     terminate the Loan, whereupon all outstanding obligations shall become immediately due and payable;

(b)     setoff or apply any property of Borrower held by Lender to reduce the outstanding obligation;

(c)     notify or cause Borrower to notify, at its sole cost and expense, any or all of the Account Debtors that the Accounts have been assigned to Lender and that all future payments on the Accounts should be paid directly and solely to Lender as directed;

(d)     exercise any and all rights of enforcement and remedies available under the UCC either as of the date of this Agreement or as of any Event of Default, and in conjunction with, in addition to, or substitution for those rights, Lender may, in its absolute discretion:

(i)     enter upon any premises of Borrower to take possession of, assemble and collect and carry away the Collateral; and/or

(ii)     require Borrower at Borrower's sole cost to assemble the Collateral and make it available at a place Lender designates which is convenient to allow Lender to take possession or dispose of the Collateral; and/or

(iii)     waive any Event of Default or remedy any Event of Default in any reasonable manner, without waiving its rights and remedies upon such Event of Default and without waiving any other prior or subsequent Event of Default.

Lender shall not be liable for failure to assemble and collect the Collateral or any part thereof or to enforce any rights hereunder or under any agreement relating to the Collateral, or for any act or omission on the part of Lender, its officers, agents or employees, except willful misconduct.

Section 7.3    **RIGHTS OF SALE**.  Borrower agrees that if an Event of Default occurs under this Agreement, Lender may, at its option, sell and dispose of the Collateral at one

22

or more public or private sales upon giving Borrower not less than ten (10) days' written notice of the time and place of each such public sale or the time, place, terms and conditions of each such private sale, which notice or notices Borrower hereby agrees are commercially reasonable within the meaning of the UCC. Lender, or any other party which is the highest bidder, shall have the right to purchase the Collateral being offered at any public sale free from any right of redemption, if any, in Borrower, which right of redemption is hereby expressly waived. Lender as highest bidder at any public sale may apply any unpaid portion of the Debt on account of or in full satisfaction of the purchase price. Lender, if it is not the purchaser, shall have the right to apply the net proceeds of any such public or private sale (after paying all of its reasonable costs and expenses of every kind and nature incidental thereto including, without limitation, attorney's fees and legal expenses and expenses incidental to preparing for sale, selling and the like), to payment of the Debt. Only after so applying such net proceeds and after the payment by Lender of any other sums required to be paid pursuant to any existing or future provision of law including, without limitation, the UCC, shall Lender be obligated to account to Borrower for the surplus, if any, resulting from any public or private sale. If any deficiency on the Debt shall remain after all of the Collateral has been disposed of at such public or private sale or sales and after applying the net proceeds of each such sale as provided in this Section 7.3, Borrower shall pay such deficiency to Lender.

Section 7.4    **MISCELLANEOUS RIGHTS OF LENDER**.

(a)    Borrower hereby waives any and all legal requirements that Lender institute any action or proceeding at law or in equity against Borrower or exhaust its remedies in respect of any other security held by Lender as a condition precedent to exercising its rights and remedies as to the Collateral pursuant to the provisions of this Agreement. Borrower waives any defenses caused by reason of any disability or other defense of any person, or by reason of the cessation from any cause whatsoever of the liability of any other person. Borrower authorizes Lender, without notice or demand and without affecting Borrower's liability or Lender's rights hereunder or on the Debt, from time to time: (i) to take and hold security other than the Collateral for the payment of the Debt or any part thereof, and exchange, enforce, waive and release the Collateral, or any part thereof or any rights, remedies, securities or liens of Borrower with respect to the Collateral, or any such other security; (ii) to apply the Collateral or any other security and direct the order or manner of sale thereof as Lender in its discretion may determine; and (iii) to endorse Borrower's name to any notes, checks, drafts, bills of exchange, commercial paper or other instruments.

(b)    Lender may proceed against all or a portion of the Collateral. All rights and remedies under this Agreement or otherwise available to law or equity may be pursued concurrently or otherwise at such time and in such order as Lender may determine in its sole discretion without impairing or otherwise affecting the other rights and remedies of Lender.

Section 7.5    **RIGHT TO CURE DEFAULTS**. Upon the occurrence of any Event of Default or if Borrower fails to make any payment or to do any act as herein provided, Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder, make or do the same in such manner and to such extent as Lender may deem necessary to protect the security hereof, including without limitation: (a) obtain insurance covering any part of the Collateral; (b) discharge any Taxes, liens or other encumbrances at any time levied or placed on any Collateral in violation of this Agreement; and (c) pay for the preservation and maintenance of any Collateral. Lender is authorized to appear in, defend, or bring any action or proceeding to protect its interest in the

23

Collateral or to foreclose or collect the Loan, and the cost and expense thereof (including reasonable attorneys' fees to the extent permitted by law), with interest at the Default Rate, shall constitute a portion of the Loan and be secured by this Agreement and shall be due and payable to Lender upon demand. All such costs and expenses incurred by Lender in remedying such Event of Default or such failed payment or act or in appearing in, defending, or bringing any such action or proceeding shall bear interest at the Default Rate, for the period from that the incurrence of such cost or expense by Lender to the date of payment to Lender.

Section 7.6 **APPOINTMENT OF LENDER AS BORROWER'S LAWFUL ATTORNEY**. Upon the occurrence and during the continuance of an Event of Default, Borrower irrevocably designates, makes, constitutes and appoints Lender (and all Persons designated by Lender) as its true and lawful attorney (and agent-in-fact) to take the following actions: (a) at such time or times hereafter as Lender or its agent in its sole discretion may determine, in Borrower's or Lender's name, to endorse Borrower's name on any checks, notes, drafts, instruments, documents or any other payment relating to the Collateral and/or proceeds of the Collateral which come into the possession of Lender or come under Lender's control; (b) to the extent permitted by applicable law, to sign Borrower's name on any documents (including financing statements and continuations thereof) necessary or desirable for the purpose of maintaining or achieving the perfection of a security interest in the Collateral; (c) to the extent permitted by law, to sign Borrower's name to any document necessary or appropriate in order to permit Lender to fully exercise its rights and remedies; and (d) at such time or times hereafter as Lender or its agent in their sole discretion may determine in Borrower's or Lender's name to exercise any voting rights or other rights of consent or approval. The power of attorney granted under this Section, and any other power of attorney granted under this Agreement, shall be irrevocable and coupled with an interest.

## Article 8. - INDEMNITY

Section 8.1 **INDEMNITY**. Borrower hereby indemnifies the Indemnified Persons against, and agrees to hold each such Indemnified Person harmless from, any and all losses, claims, damages and liabilities, including claims brought by Borrower, any member, manager agent, representative or employee of Borrower, any Guarantor, or any other Person, and expenses relating to such claims, including reasonable counsel fees and expenses, incurred by such Indemnified Person arising out of any claim, litigation, investigation or proceeding (whether or not such Indemnified Person is a party thereto) relating to any transactions, services or matters that are the subject of this Agreement or the other Loan Documents; provided, however, that such indemnity shall not apply to any such losses, claims, damages, or liabilities or related expenses determined by a court of competent jurisdiction to have arisen from the gross negligence or willful misconduct of such Indemnified Person. The agreements of Borrower in this Section shall be in addition to any liability that Borrower may otherwise have under other provision of this Agreement and/or applicable law or in equity. All amounts due under this Section shall be payable as incurred upon written demand therefor.

## Article 9. - WAIVERS

Section 9.1 **MARSHALLING AND OTHER MATTERS**. Borrower hereby waives, to the fullest extent permitted by law, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Collateral or any part thereof or any interest therein. Further, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure on behalf of Borrower, and on behalf of each and every person acquiring any

interest in or title to the Collateral or any portion subsequent to the date of this Agreement and on behalf of all persons to the extent permitted by applicable law.

Section 9.2 **WAIVER OF NOTICE**. Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement specifically and expressly provides for the giving of notice by Lender to Borrower and except with respect to matters for which Lender is required by Applicable Laws to give notice, and Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Agreement does not specifically and expressly provide for the giving of notice by Lender to Borrower.

Section 9.3 **WAIVER OF STATUTE OF LIMITATIONS**. To the fullest extent permitted by law, Borrower hereby expressly waives and releases the pleading of any statute of limitations as a defense to payment of the Debt or performance of its other Obligations.

Section 9.4 **MODIFICATION, WAIVER IN WRITING**. No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, or of the Note, or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on Borrower, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

Section 9.5 **DELAY NOT A WAIVER**. Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege under this Agreement, the Note or under any other Loan Document, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege. In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, the Note or any other Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, the Note or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

Section 9.6 **WAIVER OF TRIAL BY JURY**. **BORROWER AND LENDER EACH AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND LENDER AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH OF LENDER AND BORROWER IS AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER AND LENDER.**

Section 9.7 **WAIVER OF COUNTERCLAIM**. Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents.

Section 9.8 **WAIVER OF DEFENSE TO SUBROGATION**. Borrower hereby waives the right to assert any defense or counterclaim against any Guarantor to its right to collect or recover from Borrower under a right of subrogation or similar right however denominated, in any action or proceeding brought against it by Guarantor.

### Article 10. - CERTAIN TAX PROVISIONS

Section 10.1 **TAX INDEMNITY**.

(a)     Any and all payments by or on account of any obligation of the Borrower hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Taxes; provided, however, that if the Borrower is required by applicable law (as determined based on the written opinion of legal counsel to Borrower) to deduct or withhold any Taxes from such payments, then the following provisions shall apply:

(i)     If such Tax is an Indemnified Tax, then the amount payable by the Borrower shall be increased so that after making all required deductions or withholdings (including deductions or withholdings applicable to additional amounts payable under this Section), the Lender receives an amount equal to the amount it would have received had no such deductions or withholdings been made; and

(ii)    The Borrower shall make such deductions and timely pay and remit the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)     In addition, the Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)     Without limiting the other provisions of this Agreement, the Borrower shall indemnify the Lender, within ten (10) days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including without limitation Indemnified Taxes or Other Taxes imposed on or attributable to amounts payable hereunder) paid by the Lender on or with respect to an amount payable by the Borrower under or in respect of this Agreement or under any other Loan Document together with any penalties, interest and reasonable expenses arising in connection therewith and with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate from the Lender as to the amount of such payment or liability delivered to the Borrower shall be conclusive absent manifest error.

(d)     Promptly after any payment of Indemnified Taxes or Other Taxes by the Borrower to a Governmental Authority (but in any event within twenty (20) days after the date of such payment), the Borrower shall deliver to the Lender the original or certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the relevant return reporting such payment, or other evidence of such payment reasonably satisfactory to the Lender.

(e)     If the Lender determines, in its reasonable discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section, it shall pay and remit such refunded amount (or the amount of any credit in lieu of refund) to the Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section with respect to the Taxes or Other Taxes giving rise to such refund (or credit in lieu of refund)), net of all out-of-pocket expenses of the Lender, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund (or credit in lieu of refund)); provided that the Borrower, upon the written request of the Lender, agrees to repay the amount paid over to the Borrower (plus any interest, penalties or other charges imposed by the relevant Governmental Authority) to the Lender in the event the Lender is required to repay such refund (or credit in lieu of refund) to such Governmental Authority. Notwithstanding the foregoing, the Lender shall not be required to make available to the Borrower or any other person or entity the Lender's Tax returns or any other information relating to its Taxes that it deems confidential.

Section 10.2   **ADDITIONAL DELIVERIES**.

(a)     Certain Closing Deliveries. Concurrently with the execution and delivery of this Agreement, the Lender has delivered to the Borrower (a) a duly executed U.S. Tax Compliance Certificate; and (b) a duly executed Form W-8BEN-E, Certificate of Status of Beneficial Owner for United States Tax Withholding and Reporting (Entities) (the foregoing collectively, the "Lender's Closing Certificates").

(b)     Certain Deliveries after Closing. To the extent necessary or expedient to establish or memorialize any entitlement of Lender to an exemption from, or reduction in the rate of, the imposition, deduction or withholding of any Indemnified Taxes with respect to payments hereunder or under any other Loan Document, Lender shall deliver to the Borrower, at the time or times reasonably requested by the Borrower, such properly completed and duly executed documentation as will permit such payments to be made without imposition, deduction or withholding of such Indemnified Taxes or at a reduced rate. Notwithstanding anything to the contrary in the preceding sentence, however, the completion, execution and delivery of such documentation (other than such documentation set forth in Paragraphs (i) through (iv) below) shall not be required if in the Lender's reasonable judgment the completion, execution or delivery of such documentation would materially prejudice the legal or commercial position of the Lender or subject the Lender to any material unreimbursed cost or expense. Without limiting the foregoing, to the extent that Lender is legally entitled to do so, Lender shall deliver to the Borrower, whichever of the following is applicable in connection with any change in the information set forth in the Lender's Closing Certificates:

(i)     Executed copies of a current Form W-8BEN-E and a current U.S. Tax Compliance Certificate (certifying that Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of Sections 871(h)(3)(B) of the Code, or (C) a "controlled foreign corporation" related to the Borrower described in Section 881(c)(3)(C) of the Code (a "US Tax Compliance Certificate");

(ii)    If claiming the benefits of an income Tax treaty to which the United States is a party, an executed copy of (A) Form W-8BEN or Form

27

W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such treaty for payments of interest under any Loan Document; and (B) Form W-8BEN or Form W-8BEN-E establishing an exemption from, or reduction of, US federal withholding Tax pursuant to the "business profits" or "other income" article of such Tax treaty for any other applicable payments under any Loan Document;

(iii) An executed copy of Form W-8ECI, Certificate of Foreign Person's Claim That Income Is Effectively Connected with the Conduct of a Trade or Business in the United States;

(iv) If no longer the beneficial owner of a payment received under any of the Loan Documents, an executed copy of Form W-8IMY, accompanied by IRS Form W-8ECI, Form W-8BEN, or Form W-BEN-E, a U.S. Tax Compliance Certificate, Form W-9, or other certification forms from each beneficial owner, as applicable; provided that if the Lender becomes a partnership and one or more direct or indirect partners of Lender are claiming the portfolio interest exemption, Lender may provide on behalf of each such direct or indirect partner a certificate to the effect that (A) neither the Lender nor its direct or indirect partners is a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) none of its direct or indirect partners is a "10 percent shareholder" of the Borrower within the meaning of Sections 871(h)(3)(B) and 881(c)(3)(B) of the Code, and (C) none of its direct or indirect partners is a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code; or

(v) Executed copies of any other form required by applicable law to claim an exemption from or a reduction in U.S. withholding Tax duly completed together with such additional documentation as may be required by applicable law to permit the Borrower to determine the withholding or deduction required to be made.

Section 10.3  The provisions of this Article 10 shall survive indefinitely after the execution, delivery, and performance of this Agreement and the repayment of the Loan and the performance of all the Borrower's and its affiliates' obligations under the Loan Documents.

## Article 11. - GENERAL PROVISIONS

Section 11.1  **NOTICES**. Any notice, demand or other communication which any part hereto may desire or may be required to give to any other party under this Agreement or the other Loan Documents shall be in writing, and shall be deemed given: (a) if and when personally delivered; (b) upon receipt if sent by any nationally recognized overnight courier addressed to a party at its address set forth below; or (c) upon receipt if deposited in United States certified mail, postage prepaid, or at such other place as such party may have designated to all other parties by notice in writing in accordance with this Section:

| If to Borrower: | Green Sapphire Holdings Inc.<br>1007 Orange Street<br>Wilmington DE 19801<br><br>Email: Rcicoski@60deg.com |
|---|---|
| with a copy to: | Mack Law Group<br>1363 Shermer Road, Suite 210<br>Northbrook Illinois 60062<br>Telephone: 847.239.7212<br>Email: Charles@mlgcounsel.net<br>Attention: Charles Mack, Esq. |
| If to Lender: | Global Capital Partners LLC<br>16192 Coastal Highway, Lewes, Delaware 19958 |
| with a copy to: | Nelson Mullins<br>2 S. Biscayne Blvd., 21st floor<br>Miami, FL 33131<br>E-mail: jackson.hwu@nelsonmullins.com<br>Attention: Jackson Hwu, Esq. |

Except as otherwise specifically required herein, notice of the exercise of any right or option granted to Lender by this Agreement is not required to be given. Failure to deliver copies of notice shall not render the notice invalid.

Section 11.2 **EXPENSES**. The Borrower shall be liable for payment of all reasonable costs incurred by Lender in connection with making the Loan, the preparation, execution and delivery of this Agreement and the other Loan Documents, the enforcement of the Loan Documents and Lender's rights and remedies thereunder, including, without limitation, reasonable attorneys' fees and costs, and consultants' fees and costs, recording fees, title insurance premiums, environmental assessment fees and appraisal fees, all transactional fees, legal and other professional fees incurred by the Lender or the Agent including, without limitation, formation costs and expenses for the Lender and related entities as required to effect this Loan, legal fees of U.S. Counsel to the Lender, legal fees of French/St. Barthelemy Counsel to the Lender, including any expenses incurred to file the UCC-1 and any other filings in connection with the Pledge, as well as any fees and expenses charged or incurred by the Notaire in St. Barthelemy to register the mortgages on the Properties.

Section 11.3 **ENTIRE AGREEMENT, AMENDMENTS AND WAIVERS**. This Agreement and the other Loan Documents contain the entire agreement and understanding of the parties hereto with respect to the subject matter hereof and may not be amended, modified or discharged, nor may any of their terms be waived, except by an instrument in writing signed by the party to be bound thereby.

Section 11.4 **FURTHER ASSURANCES**. Borrower will, at the cost of Borrower, and without expense to Lender, do, execute, acknowledge and deliver all and every further acts,

29

deeds, conveyances, deeds of trust, mortgages, assignments, security agreements, control agreements, notices of assignments, transfers and assurances, financing statements, and other documents or instruments as Lender shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring, and confirming unto Lender the Property and rights hereby mortgaged, deeded, granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Agreement or for filing, registering or recording, or for complying with all Legal Requirements. Borrower, on demand, will execute and deliver, and in the event it shall fail to so execute and deliver, hereby authorizes Lender to execute in the name of Borrower or without the signature of Borrower to the extent Lender may lawfully do so, one or more financing statements and financing statement amendments to evidence more effectively, perfect and maintain the priority of the security interest of Lender in the Collateral. Borrower grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lender at law and in equity, including without limitation, such rights and remedies available to Lender pursuant to this Section 11.4.

Section 11.5 **NO THIRD PARTY BENEFITS; BINDING EFFECT**. Except for those persons and entities expressly entitled to indemnification under this Agreement, who shall be beneficiaries of and shall have the right to enforce such indemnity, this Agreement is for the sole and exclusive benefit of the parties hereto and their respective permitted successors and permitted assigns, and no third party is intended to or shall have any rights hereunder. The terms and provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and successors assigns.

Section 11.6 **ASSIGNMENT BY BORROWER**. Borrower shall not assign any of its rights or delegate any of its obligations under this Agreement, the Note, or any other Loan Document.

Section 11.7 **ASSIGNMENT BY LENDER**.

(a) It is the parties' intent that all payments of interest and of any original issue discount (each such term withing the meaning of Section 881 of the Code) under this Agreement and the other Loan Documents to Lender shall qualify for and meet the withholding exemption for portfolio interest under Section 881(c) of the Code. In furtherance thereof, the Borrower shall establish and maintain in its books and records a register (the "Loan Register"), which shall (i) identify the Lender as the sole holder of the Loan and Note as of the date of execution hereof; (ii) set forth any subsequent assignments and transfers of any interest in the Loan and Note made in accordance with this Section 11.7; and (iii) itemize the then-current owners of the Loan effective upon the consummation of any such assignment and transfer. The Loan Register as of the date of execution of this Agreement is attached hereto as Exhibit A. The Borrower shall provide a copy of the Loan Register to the Lender as the Lender may request in writing from time to time.

(b) The parties hereby agree that Lender's rights, entitlements, and interests under this Agreement and the other Loan Documents, including without limitation the right to receive payments of principal and interest hereunder, may be assigned and transferred only through a book entry made in the Loan Register by the Borrower. In the event that the Lender proposes to assign or transfer all or any part of its interest in the Loan, the Lender shall give at least ten (10) days advance written notice thereof to the Borrower, specifying the interest to be assigned and

transferred (the "Subject Transfer"). The Lender shall include with any such notice: (i) executed copies of all of the instruments of assignment and other documents by which the Lender shall effectuate the assignment and transfer; (ii) a certified copy of the articles of incorporation or other constitutive document(s) of the assignee, or a copy of the passport of any individual assignee; and (iii) such documents and instruments described in Section 10.2(b)(i) – (v) with respect to the assignee as may pertain thereto. The Lender shall deliver or cause to be delivered to the Borrower such additional documents and information as reasonably and promptly requested by the Borrower in order to identify the identity and tax residence of the assignee as the prospective owner of the interest in the Loan to be assigned and transferred. After the completion of such delivery(ies), upon the consummation of the Subject Transfer, the Borrower shall update the Loan Register to reflect the assignment and transfer of the Subject Interest and the then-current ownership of all interests in the Loan. Any asserted or purported assignment or transfer by the Lender of any interest in the Loan which does not conform to this Section 11.7 shall be null and void *ab initio*.

(c) It is the parties' intent that the Loan and the obligations thereunder shall be in "registered form" (within the meaning of Section 881(c) of the Code) at all times. The Borrower and the Lender shall cooperate promptly with any written requests either may make in connection with the review, maintenance, and revision of the Loan Register as may be reasonably necessary or expedient to establish and maintain the Loan and the obligations thereunder in such registered form. The Loan and the obligations thereunder shall not be convertible into or converted to an unregistered form.

Section 11.8 **COUNTERPARTS**. This Agreement and any document or instrument executed pursuant thereto may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 11.9 **GOVERNING LAW**. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, in which the transactions contemplated herein were negotiated, the Note and other Loan Documents were executed and delivered, and where the principal offices of Lender are located.

Section 11.10 **TIME OF THE ESSENCE**. Time is of the essence of this Agreement.

Section 11.11 **SEVERABILITY**. If any provision of this Agreement shall be judicially or administratively held invalid or unenforceable for any reason, such holding shall not be deemed to affect, alter, modify or impair in any way any other provision hereof.

Section 11.12 **JURISDICTION AND VENUE. BORROWER AND ANY GUARANTOR HEREBY AGREE THAT ALL ACTIONS OR PROCEEDINGS INITIATED BY BORROWER OR ANY GUARANTOR AND ARISING DIRECTLY OR INDIRECTLY OUT OF THIS AGREEMENT SHALL BE LITIGATED IN THE SUPERIOR COURT OF NEW CASTLE COUNTY, DELAWARE, OR, THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE OR, IF LENDER INITIATES SUCH ACTION, ANY COURT IN WHICH LENDER SHALL INITIATE SUCH ACTION AND WHICH HAS JURISDICTION. BORROWER AND ANY GUARANTOR HEREBY EXPRESSLY SUBMIT AND CONSENT IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR PROCEEDING COMMENCED BY LENDER IN ANY OF SUCH COURTS, AND HEREBY WAIVE PERSONAL SERVICE OF THE SUMMONS AND COMPLAINT, OR OTHER PROCESS OR PAPERS ISSUED HEREIN, AND AGREE THAT SERVICE OF SUCH SUMMONS AND COMPLAINT OR**

31

**OTHER PROCESS OR PAPERS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO BORROWER AND ANY GUARANTOR AT THE ADDRESS TO WHICH NOTICES ARE TO BE SENT PURSUANT TO THIS AGREEMENT. BORROWER AND ANY GUARANTOR WAIVE ANY CLAIM THAT THE SUPERIOR COURT OF NEW CASTLE COUNTY, DELAWARE, OR THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE IS AN INCONVENIENT FORUM OR AN IMPROPER FORUM BASED ON LACK OF VENUE. SHOULD BORROWER OR ANY GUARANTOR, AFTER BEING SO SERVED, FAIL TO APPEAR OR ANSWER TO ANY SUMMONS, COMPLAINT, PROCESS OR PAPERS SO SERVED WITHIN THE NUMBER OF DAYS PRESCRIBED BY LAW AFTER THE MAILING THEREOF, BORROWER AND ANY GUARANTOR SHALL BE DEEMED IN DEFAULT AND AN ORDER AND/OR JUDGMENT MAY BE ENTERED BY LENDER AGAINST BORROWER AND/OR ANY GUARANTOR AS DEMANDED OR PRAYED FOR IN SUCH SUMMONS, COMPLAINT, PROCESS OR PAPERS. THE EXCLUSIVE CHOICE OF FORUM FOR BORROWER SET FORTH IN THIS PARAGRAPH SHALL NOT BE DEEMED TO PRECLUDE THE ENFORCEMENT, BY LENDER, OF ANY JUDGMENT OBTAINED IN ANY OTHER FORUM OR THE TAKING, BY LENDER, OF ANY ACTION TO ENFORCE THE SAME IN ANY OTHER APPROPRIATE JURISDICTION, BORROWER HEREBY WAIVE THE RIGHT, IF ANY, TO COLLATERALLY ATTACK ANY SUCH JUDGMENT OR ACTION.**

Section 11.13 **ACKNOWLEDGMENTS**. Borrower hereby acknowledges that (a) it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents; (b) neither Lender nor anyone associated with Lender has any fiduciary relationship with or fiduciary duty to Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between Lender, and Borrower, in connection herewith or therewith is solely that of debtor and creditor; and (c) no joint venture or partnership is created hereby or by the other Loan Documents or otherwise exists by virtue of the transaction contemplated hereby among the parties.

Section 11.14 **CONFLICTS**. In the event of any conflict between the terms of this Agreement and the terms of any of the other Loan Documents, the terms of this Agreement shall control.

[ SIGNATURE PAGE IMMEDIATELY FOLLOWS]

**IN WITNESS WHEREOF**, Borrower and Lender have caused this Loan and Security Agreement to be duly signed and delivered as of the day and year first above written.

**BORROWER:**

Green Sapphire Holdings Inc., a Delaware corporation

By: _Ryan C. Li_____
Name: RYAN C. CZCOSTZ
Its: DIRECTOR

**LENDER:**

Global Capital Partners LLC, a Delaware limited liability company

By: _____
Name:
Its:

33

Acknowledgement

Access Management SAS acknowledges that the pledge of shares is permitted in accordance with the provisions of the charter document and acknowledges the pledge by Green Sapphire Holdings Inc. and Lender's security interest in the Collateral consisting of all of the shares of Access Management SAS and its rights with respect thereto described in this Agreement.

Access Management SAS represents and warrants that Access Management SAS owns the Property and that such Property owned by Access Management SAS is owned free and clear of any and all liens, charges or encumbrances.

Access Management SAS

By:_____
Name: _____
Its: _____

**Exhibit A**

**Form of Note**

(see attached)

**Exhibit B**

**Form of Guaranty**

(see attached)

## Exhibit C

### Form of Pledge

(see attached)

## Exhibit D

### Description of Properties

1) One villa and land in St. Barthelemy commonly known as Villa Mona, located at the AE 314 plot of 12,760 m2 in Colombier on the island of SAINT BARTHELEMY (97133).

2) The AI 220 plot of 2,676 m2 located in Saint-Jean on the island of SAINT BARTHELEMY (97133).

**EXHIBIT F**

Forbearance Agreement


This Forbearance Agreement ("Agreement ") is made as of June 20, 2023 by and between Alpha Carta, Ltd.  and Proton Green LLC as follows:

Reference is made to  (i) Second Amended and Restated Promissory Convertible Note, dated as of February 18, 2022, made by Proton Green LLC (the "**Company**") in favor of Kips Bay Select LP in the principal amount of $3,513,469.00 (as amended and as assigned to Alpha Carta, Ltd., the "**Kips Bay Note**"), which amended and restated the Amended and Restated Promissory Convertible Note, dated as of December 23, 2021, made by the Company in favor of Kips Bay Select LP in the principal amount of $3,513,469.00, which amended and restated the Promissory Convertible Note, dated as of September 21, 2021, made by the Company in favor of Kips Bay Select LP in the principal amount of $2,692,308.00; (ii) the Amended and Restated Promissory Convertible Note, dated as of February 18, 2022, made by the Company in favor of Alpha Carta, Ltd. ("**Alpha Carta**") in the principal amount of $1,846,153.84, (as amended, the "**December Note**"), which amended and restated the Promissory Convertible Note, dated as of December 23, 2021, made by the Company in favor of Alpha Carta in the principal amount of $1,846,153.84; and (iii) the Amended and Restated Promissory Convertible Note, dated as of February 18, 2022, made by the Company in favor of Alpha Carta in the principal amount of $4,307,692.31 (as amended, the "**January Note**"), which amended and restated the  Promissory Convertible Note, dated as of January 11, 2022, made by the Company in favor of Alpha Carta in the principal amount of $4,307,692.31 (all of such notes collectively, as amended, the "**Notes**") and secured by that certain Leasehold Deed of Trust and Fixture Filing dated as of ____, 2021 and recorded as document number 2021 – 006949 with the Recorder of Deeds of Apache County, Arizona on August 9, 2021 and rerecorded dated January 30, 2022 as document number 2022 – 01394 on February 22, 2022 ("Leasehold Deed of Trust") and that certain Security Agreement dated as of December 23, 2021 ("Security Agreement"), as amened by that certain Amendment Agreement, dated as of April 7, 2022, by and among Kips Bay Select LP, Alpha Carta and the Company (the "**Second Amendment**"), and that certain Letter from Alpha Carta to the Company dated February 1, 2023 and as agreed to in an Affidavit Regarding Loan Documents, dated February 1, 2023, by the Company ("Affidavit") .

Capitalized terms used herein without definition shall have the meanings assigned to them in the Notes or the other Security Documents as defined therein.  The Notes, Leasehold Deed of Trust, Security Agreement, Security Documents, Securities Purchase Agreements and other Transaction Documents, along with any amendments thereto, are referred to as the Loan Documents.

The Company acknowledged defaults or Events of Default as set forth in the Affidavit.

As of today's date, the Company has not paid the Notes in full or satisfied or remedied any of the conditions in the Affidavit.

Company irrevocably acknowledges and agrees that the following defaults or Events of Default occurred under the Loan Documents; Failure to pay the Loan in full at the Maturity Date and dissolution of the Company.

Subject to the satisfaction of the conditions set forth below, notwithstanding anything to the contrary in the Notes and any other of the Security Documents, and subject to the terms and conditions hereof, Alpha Carta shall forbear from exercising any of its rights and remedies under the Notes, the other Security Documents, the Loan Documents and applicable law (including without limitation under the Uniform Commercial Code) as follows:

(a)  Payments.  The Company shall make the following payments:

  (1) On or before July 7, 2023, an amount equal to Three Million and 00/100 Dollars ($3,000,000.00); and
  (2) On the seventh day of each calendat month thereafter, an amount equal to Two Million and 00/100 Dollars ($2,000,000.00) until the Notes are paid in full,.

  All payments shall be applied first to expenses, including attorneys fees, Consultants (as hereinafter defined) and other fees, and expenses incurred by Alpha Carta in connection with the Loan, this Agreement or preserving or protecting the Collateral, second to ourstanding fees due under the Loan Documents, third, to accrued and unpaid interest due under the Loan Documents at the interest rate as stated threrein and fourth, to the then outstanding principal amount.

  If any portion of the debt is not paid prior to the tenth day following the date when due shall be an event of default ("Event of Default").

(b)  Notice of Materal Adverse Change.  As required under the Loan Documents, Company shall provide written notice of any material adverse change to the business, the leases, or the financial condition of the Company within two (2) days of the occurrence of any such event.

(c)  In addition to the reporting required under the Loan Documents, Company shall provide to Alpha Carta the following reports:

  (1) volume production reports from each well at the property on a weekly basis by Wednesday of the following week
  (2) Accounts Receivable schedule on a monthly basis within ten (10) days of the end of each calendar month
  (3) report of payment of royalties, working interest or volume production payments made with each party and the amount so specified on a monthly basis within ten (10) days of the end of each calendar month
  (4) income statement on a monthly basis within ten (10) days of the end of each calendar month

(d)  On or before July 7, 2023, Company shall deliver to Alpha Carta (a) evidence reasonably satisfactory to Alpha Carta that the Company is in existence and good standing in Wyoming and continues to hold good title to the Collateral, along with copies of the Company's organizational documents (including articles of organization and operating

agreement) or (b) a plan, reasonably satisfactory to Alpha Carta, for promptly bringing the Company into existence and good standing in Wyoming and for holding good title to the assets of the Company

(e) On or before July 20, 2023, Company shall deliver to Alpha Carta a deed in lieu of foreclosure in recordable form and satisfactory to Alpha Carta, in its sole discretion, with respect to the leases encumbered by that certain Leasehold Deed of Trust.

A default under the Loan Documents shall occur immediately if Company breaches, or defaults in the performance of, any of the provisions or obligations of this Agreement. Upon the occurrence of a default, the agreement of the Alpha Carta to forbear pursuant to the terms hereof shall immediately terminate without notice to the Company, and Alpha Carta shall be free to exercise immediately, without notice to the Company, any and all rights and remedies against the Company provided under the Loan Agreement, the other Loan Documents and applicable law. In addition, Company waives presentment, demand, notice of default or any other notice of any kind.

Alpha Carta hereby reserves all rights and remedies available to it at law or equity, including without limitation pursuant to Article IV of the Leasehold Deed of Trust or pursuant to the Notes or any other Security Documents, including, but not limited to (a) taking such steps as may be appropriate to foreclose the lien created by the Leasehold Deed of Trust to secure payment or performance of all or any part of the obligations under the Loan Documents, (b) reducing any claim against Company to judgment to the fullest extent permitted by the Loan Documents or (c) exercising any and all other rights or remedies afforded by the Notes, Leasehold Deed of Trust, Security Agreement or the other Loan Documents, or at law or in equity or otherwise, including without limitation, seeking the appointment of a receiver.

In addition to any other rights and remedies available to Alpha Carta under the Loan Documents or applicable law upon the occurrence of a default hereunder or under the Loan Documents, Company agrees, acknowledges, consents and stipulates that the occurrence of the default constitutes and provides the requisite cause under any applicable law, including the laws of State of Arizona, justifying the immediate recordation of the deed in lieu of foreclosure. Company further stipulates and agrees that upon the occurrence of a default, it waives and is estopped from asserting any defenses to the immediate recordation of the deed in lieu of foreclosure.

In addition to any other rights and remedies available to Alpha Carta under the Loan Documents or applicable law upon the occurrence of a default hereunder, Company agrees, acknowledges, consents and stipulates that the occurrence of the default constitutes and provides the requisite cause under any applicable law, including the laws of State of Arizona, justifying the immediate appointment of a receiver to, among other things, manage the business and affairs of Company. Company further stipulates and agrees that upon the occurrence of a default, it waives and is estopped from asserting any defenses to the immediate appointment of a receiver.

Notwithstanding anything to the contrary in this Agreement, the Loan Documents or applicable law, if any payment made to, or other amount of value received by, Alpha Carta on

account of the Obligations or Indebtedness is avoided, rescinded, set aside, or must otherwise be returned by Alpha Carta, or a demand for any of the foregoing is made, whether in a case under the Bankruptcy Code, or a similar proceeding under any otherwise applicable law, the indebtedness or obligations intended to be repaid or satisfied thereby shall be reinstated (the "Reinstated Amount"), along with any liens or mortgages securing such Reinstated Amount, without any further action by any Party and shall be enforceable against each of the Companys and the Collateral.

Company waives, to the fullest extent permitted by law, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Property or any part thereof or any interest therein. Further, Company hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure on behalf of Company, and on behalf of each and every person acquiring any interest in or title to the Property subsequent to the date of this Agreement and on behalf of all persons to the extent permitted by applicable law.

Company waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Alpha Carta or its agents.

Company waives and relinquishes to the fullest extent permitted by law, any and all rights to assert any claim or otherwise contest, oppose, impair, limit or file any pleading in opposition to and is estopped from contesting any action brought by Alpha Carta to exercise any of its rights or remedies unser the Loan Documents.

Company acknowledges that as a consequence of the existing defaults and the terms of the Loan Documents and this Agreement, Alpha Carta is entitled to enforce its remedies with regard to the Collateral under Article 9 of the UCC or otherwise without notice to Company, such notice having been waived and relinquished. Company consents to Alpha Carta's acceptance of the Collateral in full or partial satisfaction of the Indebtedness, as determined by Alpha Carta pursuant to a writing Alpha Carta delivers to Company, with the amount of the indebtedness satisfied to be determined by Alpha Carta at the time of acceptance.

Company will cooperate fully with representatives of any consultant, financial advisor or similar entity or person (a "Consultant") engaged by Alpha Carta to assess and address matters germane to Company's performance under the Loan Documents, including, without limitation, any business operations. Companys further agree that they shall pay the fees and expenses of any Consultant.

In the event of the filing of any petition for bankruptcy relief filed by or against Company (a "Bankruptcy Filing"), Company consents to the entry of an order granting Alpha Carta relief from the automatic stay of Section 362 of the Bankruptcy Code and shall not assert or request any other party to assert that the automatic stay provided by Section 362 of the Bankruptcy Code shall operate or be interpreted to stay, interdict, condition, reduce, or inhibit the ability of Alpha Carta to enforce any rights it has under the Loan Documents or any other rights Alpha Carta has against Company or against any property owned by any Company. Without limiting the generality of the

foregoing, Company acknowledges and agrees, and is estopped from contesting, that cause for relief from the automatic stay shall exist if Company is subject to a Bankruptcy Filing.

Company, on its own behalf and on behalf of its respective representatives, partners, agents, employees, servants, officers, directors, shareholders, subsidiary, affiliated and related companies, heirs, successors and assigns (collectively, the "Borrowing Group") hereby releases and forever discharges Alpha Carta, and its officers, directors, subsidiary, affiliated and related companies, agents, consultants, attorneys, servants, employees, shareholders, representatives, successors and assigns (collectively, the "Alpha Carta Group") of and from all manner of actions, cause and causes of action, suits, debts, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, obligations, liabilities, costs, expenses, losses, damages, judgments, executions, claims and demands of whatsoever kind or nature, in law or in equity, whether known or unknown, concealed or hidden, foreseen, or unforeseen, contingent or actual, liquidated or unliquidated, arising out of or relating to any of the Loan Documents, the transactions relating thereto, this Agreement, the transactions contemplated in this Agreement, and/or any financial accommodations extended or denied by Alpha Carta to Companys, that any of the Borrowing Group, jointly or severally, have had, now have or hereafter can, shall or may have against the Alpha Carta Group, directly or indirectly, through the date hereof. Company acknowledges and agrees that Alpha Carta is specifically relying upon the representations, warranties, covenants and agreements contained herein and that such representations, warranties, covenants and agreements constitute a material inducement to Alpha Carta entering into this Agreement and the transactions contemplated herein. Company represents and warrants to Alpha Carta and the Alpha Carta Group that the Borrowing Group has not assigned, conveyed or otherwise transferred, either directly or indirectly, in whole or in part, any of the claims against the Alpha Carta Group to be released herein.

Company agrees to indemnify and hold each entity in the Alpha Carta Group harmless with respect to any and all liabilities, claims, obligations, losses, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever incurred by each entity in the Alpha Carta Group, or any of them, whether direct, indirect or consequential, as a result of or arising from or relating to any proceeding, whether threatened or initiated, asserting any claim for legal or equitable remedy under any statutes, regulations or common law principles arising from or in connection with the negotiation, preparation, execution, delivery, performance, administration and enforcement of the Loan Documents, this Agreement or any other document executed in connection herewith. The foregoing indemnity shall survive the payment in full of the obligations owed to Alpha Carta and the termination of this Agreement and the Loan Documents.

Company irrevocably (i) consents to this Agreement; (ii) ratifies, reaffirms and acknowledges full liability for all of the obligations under the Loan Documents ("Obligations"), including the amount of the indebtedness, the respective payments and performance obligations, contingent or otherwise, under the Loan Documents and any subordination agreements and intercreditor agreements relating to the indebtedness or the obligations; (iii) ratifies and reaffirms and acknowledges full liability and enforceability for all security interests, mortgages, and liens granted for the benefit of Alpha Carta and confirms and agrees that such security interests, mortgages, and liens hereafter secure all of the Obligations and the full amount of the indebtedness,

(iv) acknowledges and agrees that except as set forth herein, each of the Loan Documents remains in full force and effect and is hereby ratified and reaffirmed, (v) reaffirms, remakes as true as of the date hereof and ratifies each of the representations, warranties and covenants in the Loan Documents, (vi) acknowledges and agrees that it has no setoffs, defenses, crossclaims, demands, counterclaims or rights that can be asserted to or, if asserted would, impair or otherwise limit or reduce Alpha Carta's rights under the Loan Documents or to seek affirmative relief or damages against Alpha Carta, (vii) acknowledges and agrees that in entering into this Agreement it is not relying upon any statement, representation or action of Alpha Carta or its agents, (viii) acknowledges and agrees that Alpha Carta has a duly perfected first priority security interest in and lien upon all of the Collateral; (ix) agrees, covenants and acknowledges that, except as expressly set forth herein, the execution of this Agreement shall not operate as a waiver or modification of any right, power or remedy of Alpha Carta, constitute a waiver of any defaults or other provision of any of the Loan Documents or serve to effect a novation of any Obligations owed to Alpha Carta or any Loan Document; and (x) acknowledges that any obligations of Alpha Carta under this Agreement are in the nature of a conditional forbearance only, and that Alpha Carta has made no agreement or commitment to provide additional forbearance, to modify further or to extend the Loan Documents.

**WAIVER OF JURY TRIAL. EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT IT MIGHT HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR CLAIM OF ANY NATURE RELATING TO THIS AGREEMENT, THE LOAN AGREEMENT, ANY OF THE LOAN DOCUMENTS OR ANY TRANSACTION CONTEMPLATED IN ANY OF SUCH DOCUMENTS. EACH OF THE PARTIES ACKNOWLEDGES AND AGREES THAT THE FOREGOING WAIVER IS KNOWING AND VOLUNTARY.**

Company acknowledges that: (a) it has been represented by counsel of their own choosing throughout the negotiation, preparation and execution of this Agreement; (b) it has exercised independent judgment with respect the negotiation, preparation and execution of this Agreement, and the consummation of the transactions contemplated hereby; and (c) it has not relied upon Alpha Carta or on counsel for Alpha Carta for any advice with respect to the negotiation, preparation or execution of this Agreement; any principle of contract construction which favors or disfavors the party whose attorneys have drafted a contract or a provision thereof shall not be applied to this Agreement.

This Agreement, the Loan Agreement and the Loan Documents contain the final, complete and exclusive expression of the understandings by and between the Company and the Alpha Carta with respect to the subject matter of this Agreement.

Company acknowledges and agrees that the benefits to it as a result of this Agreement are substantial and of great value and that such benefits are new and are sufficient and reasonably equivalent consideration for each and every one of their respective obligations and agreements under this Agreement.

Company shall promptly execute and/ordeliver any other agreements or documents and take such other actions Alpha Carta deems necessary, in the exercise of its sole discretion, to achieve the objectives of this Agreement.

Company acknowledges that Alpha Carta has acted at all times only as a creditor to Company within the normal and usual scope of the activities normally undertaken by a creditor and in no event has Alpha Carta attempted to exercise any control over Company or its business or affairs. Company acknowledges and agrees that at no time shall Alpha Carta owe any fiduciary or other enhanced duty to Company and Company disavows the existence of creation of a fiduciary or enhanced duty, particularly when Alpha Carta is exercising any of the rights granted pursuant to this Agreement or the Loan Documents.

This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each complete set of which, when so executed and delivered by the parties, constituting an original but all such counterparts together constituting but one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or electronic transmission shall be effective as delivery of a manually executed counterpart. Any party so executing this Agreement by facsimile shall promptly deliver a manually executed counterpart, provided that any failure to do so shall not affect the validity of the counterpart executed by facsimile transmission.

In witness whereof, the undersigned have executed this Forbearance Agreement as of the date first above written

**Alpha Carta, Ltd.**

By:_____
Name:_____
Title:_____


**Proton Green LLC**

By: *Steven E. Looper*
Name:_____ Steven E. Looper _____
Title:_____ Managing Member _____

- 7 -

**EXHIBIT G**

Dated  August 15, 2023

(1) BREAKERS BEACH CLUB LTD.
(2) THE LENDERS LISTED IN THE SCHEDULE
(3) GREEN SAPPHIRE HOLDINGS, INC.


LOAN AGREEMENT

THIS AGREEMENT is dated August 15, 2023

PARTIES

(1) BREAKERS BEACH CLUB LTD., a company incorporated under the laws of the Cayman Islands, of c/o Cayman Management Ltd., Governors Square, 2nd Floor, 23 Lime Tree Bay Avenue, PO Box 1569, Grand Cayman KY1-1110, Cayman Islands (Borrower);

(2) THE LENDERS LISTED IN THE SCHEDULE (Lenders and each a Lender); and

(3) GREEN SAPPHIRE HOLDINGS, INC., a Delaware limited liability company, 1007 North Orange, Wilmington, DE 19801 (Guarantor).

BACKGROUND

(A) The Lenders have agreed to provide the Borrower with a secured term loan facility of Two Million Nine Hundred Thousand and 00/100 US Dollars (US$2,900,000) ("Principal Sum") upon the terms and conditions of this Agreement.

AGREED TERMS

1. DEFINITIONS AND INTERPRETATION

1.1 The following definitions apply in this Agreement, unless the contrary intention appears:

Business Day: any day other than a Saturday, Sunday or public holiday in the Cayman Islands.

Commitment: the loan commitment of the relevant Lender set out in the Schedule.

Control: in relation to the Borrower or the Guarantor, means the power of a person to secure that the affairs of the Borrower or the Guarantor (as applicable) are conducted in accordance with that persons wishes:

> (a) by means of the holding of shares, or the possession of voting power, in or in relation to that or any other body corporate; or
> (b) as a result of any powers conferred by the articles of association or any other document regulating that or any other body corporate,

and a Change of Control occurs if a person who controls the Borrower or Guarantor ceases to do so or if another person acquires Control of the Borrower or Guarantor (as applicable).

Event of Default: any event or circumstance listed in clause 10.1.

Facility: the term loan facilities made available under this Agreement.

Finance Document: this Agreement, the Security Documents and any other document designated as such by the Lenders, and the Borrower.

Guarantee: The Deed of Guarantee between the Guarantor and the Lender in respect of this Loan

Indebtedness: any obligation to pay or repay money, present or future, whether actual or contingent, sole or joint and any guarantee or indemnity of any of those obligations.

Legal Charge: the first legal spread charge dated [ _____ ] and registered as no. [ _____ ] at the Cayman Islands Land Registry in respect of the Property and made between the Borrower, as chargor, and the Lenders, as the chargee.

Loan: the principal amount of the loan made or to be made by the applicable Lender to the Borrower under this Agreement or (as the context requires) the principal amount outstanding for the time being of that loan (and the expression Loans shall be construed accordingly).

Minimum Interest Charge: the amount equal to the Interest on the full amount of the Loan that would have accrued under this Agreement had the Loan been outstanding in full for the Minimum Interest Period.

Minimum Interest Period: Three calendar months from and including the date hereof.

Potential Event of Default: any event or circumstance specified in clause 10.1 that would, on the giving of notice, expiry of any grace period or making of any determination under the applicable Finance Document, or satisfaction of any other condition (or any combination thereof), become an Event of Default.

Property: all that property registered at the Cayman Islands Land Registry as Breakers Registration Section, Block 56B, Parcels 14, 15, 16 & 17 (inclusive) as highlighted on the plan attached to this Loan Agreement at Schedule 2.

Repayment Date: the date that is the earlier of (a) October 31, 2023, (b) the date that the Guarantor sells certain property in St. Barth's as defined in Schedule 3 or (c) the date that an affiliate of Borrower sells certain property in Cedar Park, Texas as defined in Schedule 3.

Security: any mortgage, charge (whether fixed or floating, legal or equitable), pledge, lien, assignment by way of security or other security Interest securing any obligation of any person or any other agreement or arrangement having a similar effect.

Security Documents: the Legal Charge and the Guarantee.

Secured Obligations: means the Loan and any Indebtedness from time to time outstanding owed by the Borrower and Guarantor to the Lenders.

1.2 A reference to a statute, statutory provision or subordinate legislation is a reference to it as it is in force for the time being, taking account of any amendment or re-enactment or extension and

includes any former statute, statutory provision or subordinate legislation that it amends or re-enacts clause and paragraph headings shall not affect the interpretation of this Agreement.

1.3 A reference to a person shall include a reference to an individual, firm, company, corporation, unincorporated body of persons, or any state or any agency of any person.

1.4 A reference to a Finance Document (or any provision of it) or any other document shall be construed as a reference to that provision or that document as it is in force for the time being and as amended, varied or supplemented in accordance with its terms or the agreement of the relevant parties.

1.5 A reference to an amendment includes a novation, re-enactment, supplement or variation (and amended shall be construed accordingly).

1.6 References to clauses are to the clauses of this Agreement.

1.7 References to the Borrower, the Lenders and the Guarantor shall include their respective successors, permitted transferees and permitted assigns.

1.8 A reference to continuing in relation to an Event of Default means an Event of Default that has not been remedied or waived.

## 2. THE FACILITY

Each Lender grants to the Borrower a secured term loan facility of a total principal amount not exceeding that Lender's Commitment on the terms, and subject to the conditions, of this Agreement, which shall be advanced to and drawn by the Borrower in full on the date hereof.

## 3. PURPOSE

3.1 The Borrower shall use all money borrowed under this Agreement for the following purposes (and for no other purpose):

   (i) working capital; and

   (ii) the fees and expenses of the Lender under the Finance Documents.

3.2 The Lenders are not obliged to monitor or verify how any amount advanced under this Agreement is used.

3.3 The Lenders shall be entitled to withhold from the drawdown and apply any amounts referred to in clause 3.1(ii) for the purposes therein mentioned.

3.4 The Lenders and the Borrower are not obliged to obtain the Guarantor's written consent to any drawdown of the Loan (or part thereof).

## 4. INTEREST

4.1 The Borrower shall pay Interest on the Principal Sum at the rates(s) per annum shown in the Schedule.

4.2 Interest shall accrue daily and will be paid on the Repayment Date. In the event of an extension of the term of the loan, the Interest shall still be payable on the Repayment date notwithstanding the extension granted by the Lenders.

4.3 If the Borrower fails to make any payment due under a Finance Document on the due date for payment, Interest on the unpaid amount shall accrue daily, from the date of nonpayment to the date of actual payment (both before and after judgment), at the rate equal to 40% per annum.

## 5. COSTS

5.1 The Borrower shall pay on demand all costs and expenses that any Lender incurs in connection with the negotiation and preparation, execution, amendment, extension, alteration, preservation and enforcement of the Loans and/or the Finance Documents.

5.2 The Borrower shall pay any stamp, documentary and other similar duties and taxes and registration fees to which the Finance Documents may be subject, or give rise and shall indemnify the Lenders against any losses or liabilities that they may incur as a result of any delay or omission by the Borrower in paying any such duties or taxes.

5.3 The Borrower shall pay an arrangement fee equal to one percent (1%) of the Loan Amount. The arrangement fee shall be deemed earned as of the date of this Agreement and shall be paid at the Repayment Date to the Lenders.

## 6. REPAYMENT

6.1 Subject to the provisions of this Agreement, the Borrower shall repay the Loans on the Repayment Date, together with all unpaid Interest accrued up to the Repayment Date.

6.2 The Borrower may at any time prepay the whole of any Loan (but not part) plus, subject to clause 6.3, all Interest accrued up to the date of repayment.

6.3 The parties agree that the aggregate minimum amount of Interest payable under this Agreement is the Minimum Interest Charge. If any Loan is repaid or prepaid by the Borrower (whether on a voluntary or mandatory basis) in circumstances where the Interest paid or payable by the Borrower would be less than the Minimum Interest Charge, the Borrower shall immediately pay to the Lender the difference between the Minimum Interest Charge and the amount of Interest paid.

## 7. PAYMENTS

7.1 All payments made by the Borrower under the Finance Documents shall be in US Dollars and in immediately available cleared funds to the Lenders, to such account(s) as the Lenders may reasonably specify.

7.2 If any payment becomes due on a day that is not a Business Day, the due date of such payment will be extended to the next succeeding Business Day, or, if that Business Day falls in the following calendar month, such due date shall be the immediately preceding Business Day.

7.3 All payments made by the Borrower under the Finance Documents shall be made in full, without set-off, counterclaim or condition, and free and clear of, and without any deduction or withholding, provided that, if the Borrower is required by law or regulation to make such deduction or withholding, it shall:

(a) ensure that the deduction or withholding does not exceed the minimum amount legally required;

(b) pay to the relevant taxation or other authorities, as appropriate, the full amount of the deduction or withholding;

(c) furnish to the Lenders, within the period for payment permitted by the relevant law, either:

(i) an official receipt of the relevant taxation authorities concerned on payment to them of amounts so deducted or withheld; or

(ii) if such receipts are not issued by the taxation authorities concerned on payment to them of amounts so deducted or withheld, a certificate of deduction or equivalent evidence of the relevant deduction or withholding; and

(d) pay to the Lenders such additional amount as is necessary to ensure that the net full amount received by such person after the required deduction or withholding is equal to the amount that such person would have received had no such deduction or withholding been made.

## 8. REPRESENTATIONS AND WARRANTIES

8.1 The Borrower and Guarantor represent and warrant to the Lenders on the date of this Agreement:

(a) It:

(i) is a duly incorporated limited liability company validly existing under the laws of its jurisdiction of incorporation; and

(ii) has the power to own its assets and carry on its business as it is being conducted.

(b) It has the power to enter into, deliver and perform, and has taken all necessary action to authorise its entry into, delivery and performance of, the Finance Documents to which it is a party and the transactions contemplated by them.

(c) No limit on its powers will be exceeded as a result of the borrowing or grant of security contemplated by the Finance Documents to which it is a party.

(d) The entry into, and performance by it, of, and the transactions contemplated by, the Finance Documents to which it is a party, do not and will not contravene or conflict with:

(i)      its constitutional documents;

(ii)     any agreement or instrument binding on it or its assets or constitute a default or termination event (however described) under any such agreement or instrument; or

(iii)    any law or regulation or judicial or official order, applicable to it.

(e) It has taken all necessary action and obtained all required authorisations to enable it to enter into, exercise its rights and comply with its obligations in the Finance Documents to which it is a party and to make them admissible in evidence in its jurisdiction of incorporation. All such authorisations are in full force and effect.

(f) Its obligations under the Finance Documents to which it is a party are legal, valid, binding and enforceable in accordance with their terms.

(g) No Event of Default or Potential Event of Default has occurred or is continuing or is reasonably likely to result from making the Loan or the entry into, the performance of, or any transaction contemplated by the Finance Documents.

(h) No other event or circumstance is outstanding which constitutes (or, with the expiry of a grace period, the giving of notice, the making of any determination or any combination thereof, would constitute) a default or termination event (howsoever described) under any other agreement or instrument which is binding on the Borrower or to which any of its assets is subject which has or is reasonably likely to have a material adverse effect on its business, assets or condition or ability to perform its obligations under the Finance Documents to which it is a party.

(i) No litigation, arbitration or administrative proceedings are taking place, pending or, to the Borrower's knowledge, threatened against it, any of its directors or any of its assets, which, if adversely determined, might reasonably be expected to have a material adverse effect on its business, assets or condition, or its ability to perform its obligations under the Finance Documents to which it is a party.

(j) The Borrower has disclosed to the Lenders before the date of this Agreement all information relating to it and the transaction that is material to be known by a lender (in

the context of a loan for a similar amount and on terms similar to the Facility) and the information is accurate in all material respects.

(k) The information, in written or electronic format, supplied by the Borrower (or on its behalf) to the Lenders (or on their behalf) in connection with the Facility and the Finance Documents was, at the time it was supplied or at the date it was stated to be given (as the case may be):

    (i)    if it was factual information, complete, true and accurate in all material respects;

    (ii)    if it was a financial projection or forecast, prepared on the basis of recent historical information and on the basis of reasonable assumptions and was fair and made on reasonable grounds;

    (iii)    if it was an opinion or intention, made after careful consideration and was fair and made on reasonable grounds;

    (iv)    not misleading in any material respect, nor rendered misleading by a failure to disclose other information, except to the extent that it was amended, superseded or updated by more recent information supplied by the Borrower (or on its behalf) to the Lenders (or on their behalf).

(l) The Security Documents create valid, legally binding and enforceable Security for the obligations expressed to be secured by them.

(m) The Borrower has not entered into any agreement (whether written or verbal, express or implied) to dispose of any of the Property.

(n) The Borrower has good and marketable title to the Property, free and clear of any encumbrances that would have a material adverse effect on the value of the Property, the intended use of the Property, and/or the ability of the Borrower or the Guarantor to comply with its or their obligations under the applicable Finance Documents.

8.2 Each of the representations and warranties in this clause 8 is deemed to be repeated by the Borrower on each date immediately succeeding the date on which Interest is paid under this Agreement in accordance with clause 4.2, by reference to the facts and circumstances existing on each such date.

9. COVENANTS

9.1 The Borrower covenants with the Lenders that, as from the date of this Agreement until all its liabilities under the Finance Documents have been discharged:

(a) It will deliver to the Lenders:

(i)     promptly, all notices or other documents dispatched by the Borrower to its shareholders (or any class of them) or to its creditors generally; and

(ii)    promptly such financial or other information as the Lenders may, from time to time, reasonably request relating to the Borrower or its business.

(b) The Borrower will promptly, after becoming aware of them, notify the Lenders of any litigation, arbitration or administrative proceedings or claim of the kind described in clause 8.1(i).

(c) The Borrower will promptly obtain alt consents or authorisations necessary or desirable (and do all that is needed to maintain them in full force and effect) under any law or regulation to enable it to perform its obligations under the Finance Documents to which it is a party and to ensure the legality, validity, enforceability and admissibility in evidence of the Finance Documents in its jurisdiction of incorporation.

(d) The Borrower will procure that any of its unsecured and unsubordinated obligations and liabilities under the Finance Documents rank, and will rank, at least pari passu in right and priority of payments with all its other unsecured and unsubordinated obligations and liabilities, present or future, actual or contingent, except for those obligations and liabilities mandatorily preferred by law of general application to companies.

(e) The Borrower will comply, in all respects, with all laws, if failure to do so has or is reasonably likely to have a material adverse effect on its business, assets or condition, or its ability to perform its obligations under the Finance Documents to which it is a party.

(f) They will promptly notify the Lenders of any Potential Event of Default or Event of Default (and the steps, if any, being taken to remedy it) promptly on becoming aware of its occurrence.

(g) The Borrower will carry on and conduct its business in a proper and efficient manner and will not make any substantial change to the general nature or scope of its business as carried on at the date of this Agreement.

(h) The Borrower will not without the prior consent of the Lenders:

(i)     create, or permit to subsist, any Security on or over any of its assets;

(ii)    sell, transfer or otherwise dispose of any of its assets on terms whereby such assets are or may be leased to or re-acquired or acquired by it;

(iii)   sell, transfer or otherwise dispose of any of its receivables on recourse terms;

(iv)    enter into any arrangement under which money or the benefit of a bank or other account may be applied, set-off or made subject to a combination of accounts;

(v) enter into any other preferential arrangement having a similar effect, in circumstances where the arrangement or transaction is entered into primarily as a method of raising finance or of financing the acquisition of an asset.

(i) The Borrower will not without the prior consent of the Lenders, sell, assign, lease, transfer or otherwise dispose of in any manner (or purport to do so) all or any part of, or any Interest in, its assets other than:

(i) trading stock in the ordinary course of its business; and

(ii) assets exchanged for other assets comparable or superior as to type, value and quality,

(j) The Borrower will not, without the prior consent of the Lender, incur or permit to subsist, any Indebtedness.

(k) Any obligations of the Borrower owed to any other person, including but not limited to its shareholders, directors or the Guarantor, shall be subordinated in favour of the Borrower's obligations to the Lenders.

## 10. EVENTS OF DEFAULT

10.1 Each of the events or circumstances set out in this clause 10 is an Event of Default.

(a) Any person (other than a Lender) fails to pay any sum payable by it under any Finance Document, unless its failure to pay is caused solely by an administrative error or technical problem and payment is made within three Business Days of its due date.

(b) Any person (other than a Lender) fails (other than by failing to pay), to comply with any provision of any Finance Document and (if the Lender considers, acting reasonably, that the default is capable of remedy), such default is not remedied within 10 Business Days of the earlier of:

(i) the Lender notifying such person of the default and the remedy required; and

(ii) such person becoming aware of the default.

(c) Any representation, warranty or statement made, repeated or deemed made by any person (other than a Lender) in, or pursuant to, any Finance Document is (or proves to have been) incomplete, untrue, incorrect or misleading in any material respect when made, repeated or deemed made.

(d) If:

(i)      any Indebtedness of the Borrower is not paid when due or within any originally applicable grace period; or

(ii)    any Indebtedness of the Borrower becomes due, or capable or being declared due and payable prior to its stated maturity by reason of an event of default (howsoever described);

(iii)   any commitment for Indebtedness of the Borrower is cancelled or suspended by a creditor of the Borrower by reason of an event of default (howsoever described); or

(iv)   any creditor of the Borrower becomes entitled to declare any Indebtedness due and payable prior to its stated maturity by reason of an event of default (howsoever described).

(e) The Borrower stops or suspends payment of any of its debts, or is unable to, or admits its inability to, pay its debts as they fall due.

(f) The value of the Borrower's assets is less than its liabilities (taking into account contingent and prospective liabilities).

(g) The Borrower commences negotiations, or enters into any composition, compromise, assignment or arrangement with one or more of its creditors with a view to rescheduling any of its Indebtedness (because of actual or anticipated financial difficulties).

(h) Any action, proceedings, procedure or step is taken for:

(i)      the suspension of payments, a moratorium of any Indebtedness, winding up, dissolution, administration or reorganisation (using a voluntary arrangement, scheme of arrangement or otherwise) of the Borrower; or

(ii)    the composition, compromise, assignment or arrangement with any creditor; or

(iii)   the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of the Borrower or any of its assets; or

(iv)   the enforcement of any Security over the Property.

(i) Any event occurs in relation to the Borrower similar to those in clause 10.1(e) to clause 10.1(i) (inclusive) under the laws of any applicable jurisdiction.

(j) A distress, attachment, execution, expropriation, sequestration or another analogous legal process is levied, enforced or sued out on, or against, the Borrower's assets or the Property and is not discharged or stayed within 21 days.

(k) Any provision of any Finance Document is or becomes, for any reason, invalid, unlawful, unenforceable, terminated, disputed or ceases to be effective or to have full force and effect.

(l) Any person (other than a Lender) repudiates or evidences an intention to repudiate any Finance Document.

(m) The Borrower suspends or ceases to carry on (or threatens to suspend or cease to carry on) all or a substantial part of its business.

(n) There is a Change of Control of the Borrower or the Guarantor without the prior written consent of the Lenders.

(o) Any event occurs (or circumstances exist) which, in the opinion of the Lenders, has or is likely to materially and adversely affect the ability of any person (other than a Lender) to perform all or any of its obligations (whether actual or contingent) under, or otherwise comply with the terms of any Finance Document.

10.2 At any time after an Event of Default has occurred which is continuing, the Lender may, by notice to the Borrower:

(a) cancel all outstanding obligations of the Lenders (or any of them) under this Agreement whereupon they shall immediately be cancelled; and/or

(b) declare that the Loan (and all accrued Interest and all other amounts outstanding under the Finance Documents and, without double counting, the Minimum Interest Charge), whether in whole or in part, is immediately due and payable, whereupon they shall become immediately due and payable; and/or

(c) declare that the Loan (whether in whole or in part) be payable on demand, whereupon it shall become immediately payable on demand to the Lenders; and/or

(d) declare the Security Documents to be enforceable.

11. SET-OFF

11.1 The Lenders may at any time set off any liability of the Borrower to the Lenders against any liability of the Lenders to the Borrower, whether either liability is present or future, liquidated or unliquidated, and whether or not either liability arises under any Finance Document. If the liabilities to be set off are expressed in different currencies, the Lenders may convert either liability at a market rate of exchange for the purpose of setoff. Any exercise by the Lenders of

their rights under this clause 11.1 shall not limit or affect any other rights or remedies available to it under the Finance Documents or otherwise.

11.2 The Lenders are not obliged to exercise any of their rights under clause 11.1, but if the rights are exercised, such person shall promptly notify the Borrower of the set-off that has been made.

## 12. CALCULATIONS, ACCOUNTS AND CERTIFICATES

12.1 Any Interest, commission or fee under any Finance Document shall accrue on a day-to-day basis, calculated according to the number of actual days elapsed and a year of 365 days.

12.2 If the Lender issues any certificate, determination or notification of a rate or any amount payable under a Finance Document, it shall be (in the absence of manifest error) conclusive evidence of the matter to which it relates.

## 13. AMENDMENTS, WAIVERS AND CONSENTS AND REMEDIES

13.1 No amendment of any Finance Document shall be effective unless it is in writing and signed by, or on behalf of, each party to it (or its authorised representative).

13.2 A waiver of any right or remedy under any Finance Document or by law, or any consent given under any Finance Document, is only effective if given in writing by the waiving or consenting party and shall not be deemed a waiver of any other breach or default. It only applies in the circumstances for which it is given and shall not prevent the party giving it from subsequently relying on the relevant provision.

13.3 A failure or delay by a party to exercise any right or remedy provided under any Finance Document or by law shall not constitute a waiver of that or any other right or remedy, prevent or restrict any further exercise of that or any other right or remedy or constitute an election to affirm any Finance Document. No single or partial exercise of any right or remedy provided under any Finance Document or by law shall prevent or restrict the further exercise of that or any other right or remedy. No election to affirm any Finance Document by the Lenders shall be effective unless it is in writing.

13.4 The rights and remedies provided under the Finance Documents are cumulative and are in addition to, and not exclusive of, any rights and remedies provided by law.

## 14. SEVERANCE

If any provision (or part of a provision) of any Finance Document is or becomes invalid, illegal or unenforceable, it shall be deemed modified to the minimum extent necessary to make it valid, legal and enforceable. If such modification is not possible, the relevant provision (or part of a provision) shall be deemed deleted. Any modification to or deletion of a provision (or part of a provision) under this clause shall not affect the legality, validity and enforceability of the rest of the Finance Documents.

## 15. ASSIGNMENT AND TRANSFER

15.1 The Lenders may assign any of their rights under the Finance Documents or transfer all of their rights or obligations by novation.

15.2 The Borrower may not assign any of its rights or transfer any of its rights or obligations under any Finance Document to which it is a party.

## 16. COUNTERPARTS

16.1 This Agreement may be executed in counterparts (whether in the form of a duplicate, photocopy or facsimile of the original) and each such counterpart shall be deemed to be an original; and all such counterparts when taken together shall be deemed to constitute one and the same instrument. When properly executed and exchanged, such counterparts shall evidence a mutually binding contract in accordance with the terms and conditions set forth in that agreement. Signed counterparts may be delivered by scanned PDF image via electronic mail.

## 17. INDEMNITY

17.1 The Borrower shall, on demand, indemnify each of the Lenders against any cost, loss or liability incurred by it as a result of:

  (a)  the occurrence of any Event of Default; and/or

  (b)  a failure by the Borrower to pay any amount due under a Finance Document on its due date.

17.2 The Borrower shall promptly indemnify each of the Lenders, and each officer or employee of any Lender, against any cost, loss or liability reasonably incurred by that Lender, officer or employee (as the case may be) in connection with or arising out of this Agreement, unless such cost, loss or liability is caused by the gross negligence, fraud or willful default of that Lender, employee or officer (as the case may be).

## 18. FURTHER ASSURANCE

18.1 The Borrower shall (and shall procure that the Guarantor shall) promptly do all such acts or execute all such documents (including assignments, transfers, mortgages, charges, notices and instructions) as the Lender may reasonably specify (and in such form as the Lender may reasonably require):

  (a)  to perfect the Security created or intended to be created under or evidenced by the Security Documents (which may include the execution of a mortgage, charge, assignment or other Security over all or any of the assets which are, or are intended to be, the subject of the Security Documents) or for the exercise of any rights, powers and remedies of any

Lender, or the Borrower (as the case may be) provided by or pursuant to the Finance Documents or by law;

(b) to confer on the Lenders Security over any property and assets of the Borrower located in any jurisdiction equivalent or similar to the Security intended to be created by the Borrower under the Security Documents; and/or

(c) following an Event of Default which is continuing, to facilitate the realisation of the assets which are, or which are intended to be, the subject of the Security Documents.

The Borrower shall (and shall procure that the Guarantor shall) take all such action as is available to it (or the Guarantor) (including making all filings and registrations) as may be necessary for the purpose of the creation, perfection, protection or maintenance of any Security conferred or intended to be conferred on the Lenders by or pursuant to the Finance Documents.

19. GUARANTOR

19.1 The Guarantors Liability under the Loan is unlimited and shall not be reduced, discharged or otherwise adversely affected by:

(a) any time or indulgence granted by the Lenders to the Borrower;

(b) any delay or forbearance by the Lender in enforcing any payment or the observance or performance of any of the Borrower's covenants of this Agreement or in making any demand in respect of any of them;

(c) the Lenders exercising any right or remedy against the Borrowers for any failure to pay the Loan or to observe or perform the Borrower's covenants under this Agreement;

(d) the Lenders taking any action or refraining from taking any action in connection with any other security held by the Lenders in respect of the Loan including the release of any such security;

(e) any legal limitation or disability on the Borrower or any invalidity or irregularity of any of the Borrower's covenants or any unenforceability of any of them against the Borrower;

(f) the Borrower being dissolved, or being struck off the register of companies or otherwise ceasing to exist; or

(g) any other act or omission except an express written release by deed of the Guarantor by the Lenders.

19.2 Any sum payable by the Guarantor must be paid without any set-off or counterclaim, deduction or withholding (other than any deduction or withholding of tax as required by law) against the Lenders.

## 20. OBLIGATIONS OF THE LENDERS

The obligations of the Lenders under this Agreement shall be several.

## 21. NOTICES

21.1 Any notice, demand, consent, agreement or other communication (Notice) made under or in connection with this Agreement must be in writing and, unless otherwise stated, may be given in person, by prepaid mail, or by electronic mail.

21.2 The contact details of each party to this Agreement for all communications in connection with this Agreement are as set out below.

GUARANTOR
1007 N Orange St #65
C/O Terra Carta Partners, LLC
Wilmington DE 19801
Email: rcicoski@terracartapartners.com

BORROWER
c/o Cayman Management Ltd.
Governors Square, 2nd Floor
23 Lime Tree Bay Avenue
PO Box 156
Grand Cayman KY1-1110
Cayman Islands

LENDERS
Address: See Schedule
Email: See Schedule
Attention: See Schedule

21.3 Notice shall be deemed to have been duly given or made as follows:

(a) if personally delivered upon delivery at the address of the relevant party;

(b) if sent by mail, five Business Days after the date of posting; and

(c) if sent by electronic mail when actually received by the intended recipient in readable form;

provided that if, in accordance with the above provision, any such notice, demand or other communication would otherwise be deemed to be given or made after 5.00 p.m. in the Cayman Islands, such notice, demand or other communication shall be deemed to be given or made at 9.00 a.m. in the Cayman Islands on the next Business Day.

21.4 A party may notify any other party to this Agreement of a change to its name, relevant addressee or address (including email address) for the purposes of this clause provided that such notification shall only be effective:

    (a)  on the date specified in the notification as the date on which the change is to take place; or

    (b)  if no date is specified or the date specified is less than five Business Days after the date on which notice is given, the date falling five Business Days after notice of any such change has been given.

21.5 Where a party nominates a particular department or officer to receive a communication, a communication will not be effective if it fails to specify that department or officer.

21.6 This clause does not apply to the service of any proceedings or other documents in any legal action.

## 22. GOVERNING LAW AND JURISDICTION

22.1 This Agreement shall be governed and construed in all respects by Cayman Islands law.

22.2 Any dispute arising under or in connection with this Agreement shall be subject to the exclusive jurisdiction of the Cayman Islands courts to which the parties to this Agreement hereby submit.

## 23. RATIFICATION OF LEGAL CHARGE AND COLLATERAL.

23.1 All of the terms, provisions, covenants, representations and warranties contained in the Legal Charge are ratified and affirmed by Borrower in all respect and shall remain in full force and effect as modified by this Agreement.

23.2 Any property or rights to or Interest in property granted as security in the Legal Charge shall remain as security for the Loan and the obligation of the Borrower.

## 24. LOAN EXTENSION

24.1    Provided that the Borrower is not in default under the terms of this Agreement, the Borrower may extend the Repayment Date to January 31, 2024 on the following terms and conditions:

    (a)  the Borrower pays to the Lender the accrued and unpaid Interest due on the Principal Sum through and up until the initial Repayment Date; and

    (b)  the Borrower pays to the Lender the Interest for the period from the Repayment Date through and including January 31, 2024.

24.2   the Borrower shall provide to Lender written notice of the extension of the Repayment Date not less than ten (10) days prior to the initial Repayment Date.

IN WITNESS WHEREOF the parties have duly executed this Agreement on the date stated at the beginning of it.

**Borrower**

BREAKERS BEACH CLUB LTD., a company incorporated under the laws of the Cayman Islands

By: _____

Name: Ryan Cicoski

Its: Director

**Guarantor**

GREEN SAPPHIRE HOLDINGS, INC., a Delaware limited liability company

By: _____

Name: Ryan Cicoski

Its: Director

**Lender**

_____

Mark Matthews


_____

David Holden

Schedule 1 – The Lenders

| Name | Address | Loan Amount | Interest Rate |
|---|---|---|---|
| Mark Matthews | thematthews11me.com<br>P.O. Box 309,<br>Grand Cayman KY1-1104<br>Cayman Islands | $1,450,000 | 30% per annum |
| David Holden | dnh4private@gmail.com<br>PO Box 30623<br>Grand Cayman KY1-1203<br>Cayman Islands | $1,450,000 | 30% per annum |

Schedule 2 – Land Plan



Schedule 3 – St Barth's and Cedar Park, TX Property Descriptions

**DEED OF GUARANTEE**

THIS DEED OF GUARANTEE is made the ......**17**...... day of ......Au g ust......2023

**EXHIBIT H**

BETWEEN:   **GREEN SAPPHIRE HOLDINGS, INC.**
OF:    a Delaware limited liability company, 1007 North Orange, Wilmington, DE 19801
(hereinafter called the undersigned
OF THE ONE PART

AND:    **MARK MATTHEWS & DAVID HOLDEN**
OF:    P.O. Box 309, Grand Cayman KY1-1104, Cayman Islands and PO Box 30623, Grand Cayman KY1-1203, Cayman Islands
(hereinafter called "the Lenders" which expression shall include the Lender's successors in title and assigns)
OF THE OTHER PART

NOW THIS DEED WITNESSETH as follows:

1.   (A)   In consideration of the Lenders agreeing to deal with, giving time credit and/or loan facilities and accommodation to:

**BREAKERS BEACH CLUB LTD**

Hereinafter called "the Borrower" the undersigned and each of them jointly and severally if more than one hereby guarantees unconditionally and irrevocably to the Lenders as a principal obligor and not merely as surety the due and punctual payment of all debts and liabilities present and future, direct or indirect, absolute or contingent matured or not and of each and every liability of the Borrower of whatsoever nature howsoever the same be or may have been incurred and whether the same is presently existing or may hereafter be incurred by the Borrower with the Lenders or remaining unpaid by the Borrower to the Lenders, whether arising anywhere within or outside the country where this guarantee is executed and whether the Borrower be bound alone or with another or others and whether as principal or surety.

Provided always that the liability of the undersigned hereunder shall be unlimited

   (B)   The undersigned's liability under this Guarantee shall include all and any interest accrued or accruing thereon (both before as well as after judgment) at such rate or rates as the Lenders may in its absolute discretion determine from time to time and all and any charges together with all costs and expenses recoverable from the Borrower and all costs and expenses incurred by the Lenders in enforcement of this Guarantee and where the undersigned's liability is limited such limitation shall be exclusive of any sums included under this clause.

2.   And the undersigned and each of them jointly and severally if more than one hereby agrees with the Lenders as follows:

   (A)   The undersigned hereby undertakes to keep the Lenders fully and effectually indemnified against all losses, damages, costs, claims, and expenses arising out of or in connection with any failure on the part of the Borrower to pay any of the sums aforesaid as and when the same shall fall to he paid or perform any of the obligations to he performed in pursuance of the terms of the facilities extended to the Borrower.

   (B)   This Guarantee shall cover any number of transactions and any part or parts thereof and the Lenders shall be entitled but shall not be bound to apply any moneys obtainable from any other source in reduction of the Borrower's liability before making any call or demand on the undersigned to satisfy any liability of the Borrower to the Lenders arising or accruing as aforesaid.

   (C)   The liability of the undersigned to make any payment under this Guarantee shall arise upon the Lenders giving notice in writing to the undersigned demanding payment. Any notice or demand to be given or served on the undersigned shall be in writing and maybe given and served by personal service or may be posted and if posted shall be deemed to have been sufficiently given to the undersigned by the Lenders sending the same to the address herein written or to the last known address of the undersigned and shall be effectual notwithstanding any change of address and such demand shall be deemed to be received by the undersigned twenty four hours after posting thereof and in proving such service it shall be sufficient to prove that the letter containing the demand was properly addressed and put into the Post Office. Where more than one party has signed this Guarantee a demand on them all sent to the address of any one of them shall be deemed to have been received by each of them.

   (D)   The Lenders may grant extensions, renewals, time, releases and discharges or grant or refuse further credit to and grant any other indulgences whatsoever to the Borrower or to any other person, persons, partnerships, or corporation liable to the Lenders on or in respect of any liability hereby guaranteed and may accept compositions from and may otherwise deal with the Borrower and with any such other person, persons, partnerships or corporation liable to the Lenders on or in respect of any liability hereby guaranteed and may accept compositions from and may otherwise deal with the Borrower and with any such other person, persons, partnerships or corporation, as the Lenders may think expedient, and may give up or modify or abstain from perfecting or taking advantage of any securities or contracts held by it as collateral and may realise the said securities in such manner as the Lenders may think expedient, all without obtaining the consent of the undersigned and without giving notice to the undersigned..

Provided always that such actions on the part of the Lenders or any neglect omission or forbearance on the part of the Lenders to take advantage of any of its rights under the Guarantee shall not be deemed to operate as a general waiver of its rights hereunder nor shall in any way release, affect, prejudice or limit the liability of the undersigned hereunder, and this Guarantee shall remain in full force and effect until all outstanding debts and liabilities together with any interest and all other monies payable by the Borrower shall have been paid by the Borrower.

   (E)   This Guarantee shall be a continuing guarantee and shall cover all debts and liabilities owed to the Lenders by the Borrower and it shall apply to and secure any ultimate balance due or remaining unpaid to the Lenders.

Notwithstanding the death insolvency bankruptcy or winding up of the Borrower the liability of the undersigned under this Guarantee shall be deemed to continue until the same has been actually paid.

   (F)   The Lenders shall not be bound to exhaust its recourse against the Borrower or others or any securities it may at any time hold before being entitled to payment from the undersigned of the outstanding debts or liabilities due hereunder.

   (G)   (i)   Upon default in payment of any debt or liability owing by the Borrower to the Lenders at any time, the Lenders may treat the whole of the indebtedness hereby secured as due and payable and may forthwith collect from the undersigned the total amount hereby guaranteed and may apply the sum so collected upon the Borrower's debt or may place it to the credit of a special account.

     (ii)   The undersigned agrees that an admission by the Borrower as to the amount of the liability of the Borrower to the Lenders or, in the absence of an admission by the Borrower, any amount stated by the Lenders or a judgment determining such amount obtained by the Lenders against the Borrower shall be conclusive proof as against the undersigned as to the amount of such liability.

The Lenders is also to be at liberty at any time and from time to time at the Lenders' absolute discretion to release discharge compound with or otherwise vary or agree to vary the liability of any one or more of the undersigned under this Guarantee or make any other arrangements with any one or more of the undersigned and no such release discharge composition variation agreement or arrangement shall prejudice or in any way affect the Lenders' rights or remedies against the other or others of the undersigned.

   (H)   All debts and liabilities present and future of the Borrower to the undersigned or any of them (if more than one) are hereby postponed to the debts and liabilities of the Borrower to the Lenders during the continuance of this Guarantee, and all moneys

received by the undersigned or any of them (if more than one) from the Borrower shall be deemed to be held in trust for the Lenders and forthwith upon receipt, shall be paid over to the Lenders without in any way limiting or lessening the liability of the undersigned under this Guarantee, and this assignment and postponement is independent of the said Guarantee and shall remain in full effect notwithstanding that the liability of the undersigned or any of them under the said Guarantee may be extinct.

(I)    This Guarantee shall be in addition to and without prejudice to any other securities, negotiable or otherwise, which the Lenders may now or hereafter possess in respect of the debts and liabilities hereby secured or intended so to be, and the Lenders shall be under no obligation to marshal in favour of the undersigned any such securities or any of the funds or assets which the Lenders may be entitled to receive or have a claim upon. All dividends, compositions and moneys received by the Lenders from any other person or persons or estate capable of being applied by the Lenders in reduction of the indebtedness of the Borrower, shall be regarded for all purposes as payments in gross, and the undersigned shall not be entitled to participate except to the surplus (if any) remaining after satisfaction of the ultimate balance due to the Lenders.

(J)    This Guarantee shall not be affected by the death or loss or diminution of capacity of the undersigned or any of them if more than one, or where the Borrower is a partnership by any change in the name of the Borrower or in the membership of the Borrower's firm through the death or retirement of one or more partners or the introduction of a new partner or partners or otherwise or, where the Borrower is a corporation, by any change or changes in the name, objects, capital structure, stock or constitution of the Borrower, or by the acquisition of the Borrower's business by a corporation or by the Borrower's business being amalgamated with a corporation but shall notwithstanding the happening of any such event or similar event continue to apply to all the debts and liabilities outstanding hereunder whether theretofore or thereafter incurred or arising and in this instrument the word "Borrower" shall include every such firm and corporation and, in any case, the provisions hereof shall be applicable to all transactions occurring and all debts and liabilities incurred as well as before as after any such change or changes, and the Lenders shall not be concerned to see or enquire into the powers of the Borrower or members, partners, directors, or any agents acting or purporting to act on behalf of the Borrower, and this Guarantee shall apply to all debts and liabilities created by the Borrower, or by any members, partners, directors or agents thereof, in professed exercise of their powers or authority, notwithstanding any irregularity, defect or informality and notwithstanding that the creation of such indebtedness may wholly or partly be beyond the powers of the Borrower.

(K)    (i)    No assurance security or payment which may be avoided under any enactment from time to time in force relating to insolvency bankruptcy or liquidation of companies and no release settlement discharge arrangement which may have been given or made on the faith of such assurance security or payment shall prejudice or affect the Lenders' right to recover from the undersigned to the full extent of this Guarantee as if such assurance security payment release settlement discharge arrangement (as the case may be) had never been granted given or made: and any such release settlement discharge or arrangement shall as between the Lenders and the undersigned be deemed to have been given or made upon the express condition that it shall become wholly void and of no effect if the assurance security or payment on the faith of which it was made shall at any time thereafter be avoided under any enactment relating to insolvency bankruptcy or liquidation of companies.

    (ii)    Where any security is held by the Lenders for the liability of the undersigned the Lenders shall be at liberty at its absolute discretion to retain as security for a period of seven months after the repayment of all sums that are or may become due to the Lenders from the Borrower notwithstanding any release settlement discharge or arrangement given or made by the Lenders on or as a consequence of such repayments and if at any time within the period of six months after such repayment either insolvency proceedings shall be commenced or a bankruptcy petition shall be presented against the Borrower or a petition shall be presented to a competent Court for an order for the winding-up of the Borrower or the Borrower (being a Company) shall commence to be wound up voluntarily the Lenders shall be at liberty and notwithstanding as before mentioned to continue to retain such security or any part thereof for and during such further period as the Lenders in its absolute discretion shall determine.

(L)    This Guarantee and agreement shall be operative and binding upon every signatory thereof notwithstanding the non-execution thereof by any other proposed signatory or signatories, and possession of this instrument by the Lenders shall be conclusive evidence against the undersigned and each of them that this instrument was not delivered in escrow or pursuant to any agreement that it should not be effective until any conditions precedent or subsequent had been complied with, unless at the time of receipt of this Guarantee by the Lenders each signatory thereof obtains from the Lenders a letter setting out the terms and conditions under which this Guarantee was delivered and the conditions, if any, to be observed before it becomes effective.

(M)    The Guarantee shall not be considered as wholly or partially satisfied by the payment or liquidation at any time or times of any sum or sums of money for the time being due or remaining unpaid to the Lenders, and all dividends, compositions proceeds, or security valued and payments received by the Lenders from the Borrower or from others or from estates shall be regarded for all purposes as payments in gross without any right on the part of the undersigned to claim in reduction of the liability under this Guarantee the benefit of any such dividends, compositions, proceeds or payments or any securities held by the Lenders or proceeds thereof, and the undersigned shall have no right to be subrogated in any rights of the Lenders until the Lenders shall have received payment in full of the debts and liabilities secured hereunder.

(N)    This Guarantee covers all agreements between the parties hereto relative to this Guarantee and assignment and postponement, and none of the parties shall be bound by any representation or promise made by any person relative thereto which is not embodied herein.

(O)    This Guarantee and agreement shall extend to and inure to the benefit of the Lenders and its successors and assigns, and every reference herein to the undersigned or to each of them or to any of them, is a reference to and shall be construed as including the undersigned and the heirs, executors, administrators, legal representatives, successors and assigns of the undersigned or of each of them or of any of them, as the case may be, to and upon all of whom this Guarantee and agreement shall extend and be binding.

(P)    This Guarantee is in addition to and not in substitution for any other guarantee, by whomsoever given, at any time held by the Lenders, and any present or future obligation to the Lenders incurred or arising otherwise than under a guarantee, of the undersigned or any of them or of any other obligant, whether bound with or apart from the Borrower, excepting any guarantee surrendered for cancellation on delivery of this instrument.

(Q)    The terms conditions and effect of this Guarantee shall be subject to and construed in accordance with the Laws of the Cayman Islands for the time being in force and the Cayman Islands shall be the forum for the enforcement thereof but without prejudice to any rights the Lenders may have to follow the assets of the undersigned or any of them (if more than one) wherever such assets may be situate.

(R)    This Guarantee is and at all times shall remain the property of the Lenders.

We acknowledge receipt of a copy of this Guarantee which we have read and understood before executing it.

IN WITNESS WHEREOF the parties hereto have hereunto affixed their hands and Seal the day and year first above written.

SIGNED SEALED and DELIVERED as a Deed
On behalf of **MARK MATTHEWS & DAVID HOLDEN**
In the presence of:

.................................................
M Matthews

.................................................
D Holden

*Sarah Parchment*
Name of witness

*Parchment*
Signature of witness

SIGNED SEALED and DELIVERED as a Deed
On behalf of **GREEN SAPPHIRE HOLDINGS, INC.**
In the presence of:

.................................................
Ryan Cicoski - Director/Authorised Signatory

.................................................
Name of witness

.................................................
Signature of witness

**DEED OF GUARANTEE**

THIS DEED OF GUARANTEE is made the ......17...... day of .....August.....2023

BETWEEN:   **GREEN SAPPHIRE HOLDINGS, INC.**
OF:          a Delaware limited liability company, 1007 North Orange, Wilmington, DE 19801
          (hereinafter called the undersigned
          OF THE ONE PART

AND:     **MARK MATTHEWS & DAVID HOLDEN**
OF:          P.O. Box 309, Grand Cayman KY1-1104, Cayman Islands and PO Box 30623, Grand Cayman KY1-1203, Cayman Islands
          (hereinafter called "the Lenders" which expression shall include the Lender's successors in title and assigns)
          OF THE OTHER PART

NOW THIS DEED WITNESSETH as follows:

1.  (A)   In consideration of the Lenders agreeing to deal with, giving time credit and/or loan facilities and accommodation to:

        **BREAKERS BEACH CLUB LTD**

        Hereinafter called "the Borrower" the undersigned and each of them jointly and severally if more than one hereby guarantees unconditionally and irrevocably the Lenders as a principal obligor and not merely as surety the due and punctual payment of all debts and liabilities present and future, direct or indirect, absolute or contingent matured or not and of each and every liability of the Borrower of whatsoever nature howsoever the same be or may have been incurred and whether the same is presently existing or may hereafter be incurred by the Borrower with the Lenders or remaining unpaid by the Borrower to the Lenders, whether arising anywhere within or outside the country where this guarantee is executed and whether the Borrower be bound alone or with another or others and whether as principal or surety.

        Provided always that the liability of the undersigned hereunder shall be unlimited

    (B)   The undersigned's liability under this Guarantee shall include all and any interest accrued or accruing thereon (both before as well as after judgment) at such rate or rates as the Lenders may in its absolute discretion determine from time to time and all and any charges together with all costs and expenses recoverable from the Borrower and all costs and expenses incurred by the Lenders in enforcement of this Guarantee and where the undersigned's liability is limited such limitation shall be exclusive of any sums included under this clause.

2.       And the undersigned and each of them jointly and severally if more than one hereby agrees with the Lenders as follows:

    (A)   The undersigned hereby undertakes to keep the Lenders fully and effectualy indemnified against all losses, damages, costs, claims, and expenses arising out of or in connection with any failure on the part of the Borrower to pay any of the sums aforesaid as and when the same shall fall to he paid or perform any of the obligations to he performed in pursuance of the terms of the facilities extended to the Borrower.

    (B)   This Guarantee shall cover any number of transactions and any part or parts thereof and the Lenders shall be entitled but shall not be bound to apply any moneys obtainable from any other source in reduction of the Borrower's liability before making any call or demand on the undersigned to satisfy any liability of the Borrower to the Lenders arising or accruing as aforesaid.

    (C)   The liability of the undersigned to make any payment under this Guarantee shall arise upon the Lenders giving notice in writing to the undersigned demanding payment. Any notice or demand to be given or served on the undersigned shall be in writing and maybe given and served by personal service or may be posted and if posted shall be deemed to have been sufficiently given to the undersigned by the Lenders sending the same to the address herein written or to the last known address of the undersigned and shall he effectual notwithstanding any change of address and such demand shall be deemed to be received by the undersigned twenty four hours after posting thereof and in proving such service it shell be sufficient to prove that the letter containing the demand was properly addressed and put into the Post Office. Where more than one party has signed this Guarantee a demand on them all sent to the address of any one of them shall be deemed to have been received by each of them.

    (D)   The Lenders may grant extensions, renewals, time, releases and discharges or grant or refuse further credit to and grant any other indulgences whatsoever to the Borrower or to any other person, persons, partnerships, or corporation liable to the Lenders on or in respect of any liability hereby guaranteed and may accept compositions from and may otherwise deal with the Borrower and with any such other person, persons, partnerships or corporation liable to the Lenders on or in respect of any liability hereby guaranteed and may accept compositions from and may otherwise deal with the Borrower and with any such other person, persons, partnerships or corporation, as the Lenders may think expedient, and may give up or modify or abstain from perfecting or taking advantage of any securities or contracts held by it as collateral and may realise the said securities in such manner as the Lenders may think expedient, all without obtaining the consent of the undersigned and without giving notice to the undersigned..

        Provided always that such actions on the part of the Lenders or any neglect omission or forbearance on the part of the Lenders to take advantage of or enforce any of its rights under the Guarantee shall not be deemed to operate as a general waiver of its rights hereunder nor shall in any way release, affect, prejudice or limit the liability of the undersigned hereunder, and this Guarantee shall remain in full force and effect until all outstanding debts and liabilities together with any interest and all other monies payable by the Borrower shall have been paid by the Borrower.

    (E)   This Guarantee shall be a continuing guarantee and shall cover all debts and liabilities owed to the Lenders by the Borrower and it shall apply to and secure any ultimate balance due or remaining unpaid to the Lenders.

        Notwithstanding the death insolvency bankruptcy or winding up of the Borrower the liability of the undersigned under this Guarantee shall be deemed to continue until the same has been actually paid.

    (F)   The Lenders shall not be bound to exhaust its recourse against the Borrower or others or any securities it may at any time hold before being entitled to payment from the undersigned of the outstanding debts or liabilities due hereunder.

    (G)   (i)   Upon default in payment of any debt or liability owing by the Borrower to the Lenders at any time, the Lenders may treat the whole of the indebtedness hereby secured as due and payable and may forthwith collect from the undersigned the total amount hereby guaranteed and may apply the sum so collected upon the Borrower's debt or may place it to the credit of a special account.

          (ii)   The undersigned agrees that an admission by the Borrower as to the amount of the liability of the Borrower to the Lenders or, in the absence of an admission by the Borrower, any amount stated by the Lenders or a judgment determining such amount obtained by the Lenders against the Borrower shall be conclusive proof as against the undersigned as to the amount of such liability.

        The Lenders is also to be at liberty at any time and from time to time at the Lenders' absolute discretion to release discharge compound with or otherwise vary or agree to vary the liability of any one or more of the undersigned under this Guarantee or make any other arrangements with any one or more of the undersigned and no such release discharge composition variation agreement or arrangement shall prejudice or in any way affect the Lenders' rights or remedies against the other or others of the undersigned.

RCC

**Deed of Guarantee** <span style="float:right">Page 2</span>

(H)    All debts and liabilities present and future of the Borrower to the undersigned or any of them (if more than one) are hereby postponed to the debts and liabilities of the Borrower to the Lenders during the continuance of this Guarantee, and all moneys received by the undersigned or any of them (if more than one) from the Borrower shall be deemed to be held in trust for the Lenders and forthwith upon receipt, shall be paid over to the Lenders without in any way limiting or lessening the liability of the undersigned under this Guarantee, and this assignment and postponement is independent of the said Guarantee and shall remain in full effect notwithstanding that the liability of the undersigned or any of them under the said Guarantee may be extinct.

(I)    This Guarantee shall be in addition to and without prejudice to any other securities, negotiable or otherwise, which the Lenders may now or hereafter possess in respect of the debts and liabilities hereby secured or intended so to be, and the Lenders shall be under no obligation to marshal in favour of the undersigned any such securities or any of the funds or assets which the Lenders maybe entitled to receive or have a claim upon. All dividends, compositions and moneys received by the Lenders from any other person or persons or estate capable of being applied by the Lenders in reduction of the indebtedness of the Borrower, shall be regarded for all purposes as payments in gross, and the undersigned shall not be entitled to participate except to the surplus (if any) remaining after satisfaction of the ultimate balance due to the Lenders.

(J)    This Guarantee shall not be affected by the death or loss or diminution of capacity of the undersigned or any of them if more than one, or where the Borrower is a partnership by any change in the name of the Borrower or in the membership of the Borrower's firm through the death or retirement of one or more partners or the introduction of a new partner or partners or otherwise or, where the Borrower is a corporation, by any change or changes in the name, objects, capital structure, stock or constitution of the Borrower, or by the acquisition of the Borrower's business by a corporation or by the Borrower's business being amalgamated with a corporation but shall notwithstanding the happening of any such event or similar event continue to apply to all the debts and liabilities outstanding hereunder whether theretofore or thereafter incurred or arising and in this instrument the word "Borrower" shall include every such firm and corporation and, in any case, the provisions hereof shall be applicable to all transactions occurring and all debts and liabilities incurred as well as before as after any such change or changes, and the Lenders shall not be concerned to see or enquire into the powers of the Borrower or members, partners, directors, or any agents acting or purporting to act on behalf of the Borrower, and this Guarantee shall apply to all debts and liabilities created by the Borrower, or by any members, partners, directors or agents thereof, in professed exercise of their powers or authority, notwithstanding any irregularity, defect or informality and notwithstanding that the creation of such indebtedness may wholly or partly be beyond the powers of the Borrower.

(K)   (i)    No assurance security or payment which may be avoided under any enactment from time to time relating to insolvency bankruptcy or liquidation of companies and no release settlement discharge arrangement which may have been given or made on the faith of such assurance security or payment shall prejudice or affect the Lenders' right to recover from the undersigned to the full extent of this Guarantee as if such assurance security payment release settlement discharge arrangement (as the case may be) had never been granted given or made: and any such release settlement discharge or arrangement shall as between the Lenders and the undersigned be deemed to have been given or made upon the express condition that it shall become wholly void and of no effect if the assurance security or payment on the faith of which it was made shall at any time thereafter be avoided under any enactment relating to insolvency bankruptcy or liquidation of companies.

      (ii)    Where any security is held by the Lenders for the liability of the undersigned the Lenders shall be at liberty at its absolute discretion to retain as security for a period of seven months after the repayment of all sums that are or may become due to the Lenders from the Borrower notwithstanding any release settlement discharge or arrangement given or made by the Lenders on or as a consequence of such repayments and if at any time within the period of six months after such repayment either insolvency proceedings shall be commenced or a bankruptcy petition shall be presented against the Borrower or a petition shall be presented to a competent Court for an order for the winding-up of the Borrower or the Borrower (being a Company) shall commence to be wound up voluntarily the Lenders shall be at liberty and notwithstanding as before mentioned to continue to retain such security or any part thereof for and during such further period as the Lenders in its absolute discretion shall determine.

(L)    This Guarantee and agreement shall be operative and binding upon every signatory thereof notwithstanding the non-execution thereof by any other proposed signatory or signatories, and possession of this instrument by the Lenders shall be conclusive evidence against the undersigned and each of them that this instrument was not delivered in escrow or pursuant to any agreement that it should not be effective until any conditions precedent or subsequent had been complied with, unless at the time of receipt of this Guarantee by the Lenders each signatory thereof obtains from the Lenders a letter setting out the terms and conditions under which this Guarantee was delivered and the conditions, if any, to be observed before it becomes effective.

(M)    The Guarantee must not be considered as wholly or partially satisfied by the payment or liquidation at any time or times of any sum or sums of money for the time being due or remaining unpaid to the Lenders, and all dividends, compositions proceeds, or security valued and payments received by the Lenders from the Borrower or from others or from estates shall be regarded for all purposes as payments in gross without any right on the part of the undersigned to claim in reduction of the liability under this Guarantee the benefit of any such dividends, compositions, proceeds or payments or any securities held by the Lenders or proceeds thereof, and the undersigned shall have no right to be subrogated in any rights of the Lenders until the Lenders shall have received payment in full of the debts and liabilities secured hereunder.

(N)    This Guarantee covers all agreements between the parties hereto relative to this Guarantee and assignment and postponement, and none of the parties shall be bound by any representation or promise made by any person relative thereto which is not embodied herein.

(O)    This Guarantee and agreement shall extend to and inure to the benefit of the Lenders and its successors and assigns, and every reference herein to the undersigned or to each of them or to any of them, is a reference to and shall be construed as including the undersigned and the heirs, executors, administrators, legal representatives, successors and assigns of the undersigned or of each of them or of any of them, as the case may be, to and upon all of whom this Guarantee and agreement shall extend and be binding.

(P)    This Guarantee is in addition to and not in substitution for any other guarantee, by whomsoever given, at any time held by the Lenders, and any present or future obligation to the Lenders incurred or arising otherwise than under a guarantee, of the undersigned or any of them or of any other obligant, whether bound with or apart from the Borrower, excepting any guarantee surrendered for cancellation on delivery of this instrument.

(Q)    The terms conditions and effect of this Guarantee shall be subject to and construed in accordance with the Laws of the Cayman Islands for the time being in force and the Cayman Islands shall be the forum for the enforcement thereof but without prejudice to any rights the Lenders may have to follow the assets of the undersigned or any of them (if more than one) wherever such assets may be situate.



**Deed of Guarantee** Page 3

  (R)  This Guarantee is and at all times shall remain the property of the Lenders.

We acknowledge receipt of a copy of this Guarantee which we have read and understood before executing it.

IN WITNESS WHEREOF the parties hereto have hereunto affixed their hands and Seal the day and year first above written.

SIGNED SEALED and DELIVERED as a Deed
On behalf of **MARK MATTHEWS & DAVID HOLDEN**
In the presence of:

.................................................................
M Matthews

.................................................................
D Holden

.................................................................
Name of witness

.................................................................
Signature of witness

SIGNED SEALED and DELIVERED as a Deed
On behalf of **GREEN SAPPHIRE HOLDINGS, INC.**
In the presence of:

.................................................................
Ryan Cicoski - Director/Authorised Signatory

Erin Cicoski.................................................
Name of witness

.................................................................
Signature of witness



# EXHIBIT I

| Breakers Beach Club Loan | Disbursement | |
|---|---|---|
| Loan Amount | $ 2,900,000.00 | |
| Legal Fees | $ 7,231.11 | |
| Net Loan Proceeds | $ 2,892,768.89 | |
| Disbursements | | |
| Alpha Carta | $ 2,000,000.00 | |
| Salazar | $ 750,000.00 | |
| Global Capital Partners | $ 142,768.89 | Balance of $250,000 was from Access Management Loan |
| SubTotal | $ 2,892,768.89 | |

**EXHIBIT J**

Loan Settlement Agreement

This Loan Settlement Agreement ("**Agreement**") is made by and between Alpha Carta, Ltd. ("**Lender**") and Proton Green LLC, a Wyoming limited liability company ("**Borrower**") as of September __, 2023 (the "**Effective Date**").

Whereas, Lender, directly and as successor in interest, has made a loan to Borrower in the original aggregate amount of Nine Million Six Hundred Sixty-Seven Thousand Three Hundred Fifteen and 15/100 Dollars ($9,667,315.15) (the "**Loan**").

Whereas, the Loan is evidenced by (i) Second Amended and Restated Promissory Convertible Note, dated as of February 18, 2022, made by Borrower in favor of Kips Bay Select LP in the principal amount of $3,513,469.00 (as amended and as assigned to Lender, the "**Kips Bay Note**"), which amended and restated the Amended and Restated Promissory Convertible Note, dated as of December 23, 2021, made by the Borrower in favor of Kips Bay Select LP in the principal amount of $3,513,469.00, which amended and restated the Promissory Convertible Note, dated as of September 21, 2021, made by the Borrower in favor of Kips Bay Select LP in the principal amount of $2,692,308.00; (ii) the Amended and Restated Promissory Convertible Note, dated as of February 18, 2022, made by the Borrower in favor of Lender in the principal amount of $1,846,153.84, (as amended, the "**December Note**"), which amended and restated the Promissory Convertible Note, dated as of December 23, 2021, made by the Borrower in favor of Lender in the principal amount of $1,846,153.84; and (iii) the Amended and Restated Promissory Convertible Note, dated as of February 18, 2022, made by the Borrower in favor of Lender in the principal amount of $4,307,692.31 (as amended, the "**January Note**"), which amended and restated the Promissory Convertible Note, dated as of January 11, 2022, made by the Borrower in favor of Lender in the principal amount of $4,307,692.31 (all of such notes collectively, as amended, the "**Notes**") and secured by that certain Leasehold Deed of Trust and Fixture Filing dated as of _____, 2021 and recorded as document number 2021 – 006949 with the Recorder of Deeds of Apache County, Arizona on August 9, 2021 and rerecorded dated January 30, 2022 as document number 2022 – 01394 on February 22, 2022 ("**Leasehold Deed of Trust**") and that certain Security Agreement dated as of December 23, 2021 ("**Security Agreement**"), as amended by that certain Amendment Agreement, dated as of April 7, 2022, by and among Kips Bay Select LP, Lender and the Borrower (the "**Second Amendment**"), and that certain Letter from Lender to the Borrower dated February 1, 2023 and as agreed to in an Affidavit Regarding Loan Documents, dated February 1, 2023, by the Borrower ("**Affidavit**").

Whereas, the Loan is in default as numerous Events of Default have occurred, and the Borrower has acknowledged such Events of Default.

Whereas, Borrower and Lender have entered into that certain Forbearance Agreement dated as of June 20, 2023 (the "**Forbearance Agreement**").

Whereas, Borrower has made the initial payment as required under the Forbearance Agreement in the amount of Three Million and 00/10 Dollars ($3,000,000), but such payment was not made on a timely basis.

Whereas, Borrower has made the second payment as required under the Forbearance Agreement in the amount of Two Million and 00/10 Dollars ($2,000,000), but such payment was not made on a timely basis.

Whereas, Borrower has not complied with the terms of the Forbearance Agreement by, among other events, not tendering to Lender the deed in lieu of foreclosure for the Leasehold Deed of Trust.

Whereas, Borrower and Lender wish to resolve and settle any differences between them.

Now, therefore, Borrower and Lender agree as follows:

1.     Indebtedness under the Loan. The Parties hereby acknowledge that as of July 31, 2023,[1] the amount due and payable under the Loan, including all interest, fees, costs and expenses arising thereunder or relating thereto is in the amount of Twenty-Six Million Eight Hundred Fifty-One Thousand One Hundred Eighty-Five and 72/100 Dollars ($26,851,185.72) (the "**Remaining Indebtedness**"), and that such amount is not subject to any Borrower's claims, offsets, demands, damages, suits, assertions, cross-complaints, causes of action or debts of any kind or nature whatsoever, whether known or unknown, and whenever or howsoever arising, that can be asserted to reduce or eliminate the Borrower's liability to repay the Remaining Indebtedness or seek any affirmative relief or damages of any kind and or nature (collectively, the "**Offsets**") from Lender or its Affiliates (defined below). To the extent such Offsets exist, they are fully, forever and irrevocably waived and released by Borrower.

2.     Payment by Borrower.

Borrower shall pay Lender (the "**Settlement Consideration**") an amount equal to [Twenty-Two Million and 00/100 Dollars] as follows:

a.  Buyer shall pay Lender the sum of Five Million and 00/100 Dollars ($5,000,000.00) payable on the Effective Date concurrently with the execution of this Agreement (the "**Cash Portion**").

b.  On the Effective Date, Borrower shall grant to Lender a five percent (5%) overriding royalty interest (the "**ORRI**") pursuant to a conveyance document in the form as set forth on Exhibit A (the "**ORRI Conveyance**"), which ORRI shall terminate upon the receipt by Seller of [Sixteen Million and 00/100 Dollars ($16,000,000)][2] under the ORRI Conveyance.  The ORRI Conveyance shall be duly recorded in the appropriate jurisdiction.[3] [It shall be a breach of this paragraph 2(b) if the aggregate total of $17,000,000 is not received by Lender by the __ year anniversary of the Effective Date.]

---

[1] Should this be updated to August 31, 2023 or the Effective Date?

[2] Increase this to capture more of the total amount owed as of the Effective Date?

[3] The current draft of ORRI Conveyance is not in recordable form.

c. All payments shall be made by wire transfer to an account designated by Lender. The Settlement Consideration is in addition to any payment or payments previously made by or on behalf of Borrower.

d. In order to secure Lender's rights hereunder, upon the Effective Date, Borrower shall deliver to Lender a deed in lieu of foreclosure in recordable form and satisfactory to Lender, in its sole discretion, with respect to the leases encumbered by the Leasehold Deed of Trust (the "**Deed in Lieu of Foreclosure**").

3. <u>Satisfaction of the Loan</u>. Lender agrees to accept the Settlement Consideration in full satisfaction of the Loan and the Remaining Indebtedness. Subject to paragraph 7 hereof, Lender agrees that (a) from and after the date of this Agreement, no interest, fees, costs or expenses on the Loan and Remaining Indebtedness shall accrue, and (b) as of the date of the payment of the Settlement Consideration in full (including future payments with respect to the ORRI in accordance with paragraph 2(b) and the ORRI Conveyance), (i) the Loan shall be deemed paid in full by the Borrower, and (ii) Lender shall deliver a recordable release of the Leasehold Deed of Trust.[4]

4. <u>Taxes</u>. Each Party shall be solely responsible for, and is legally bound to make payment of, any taxes determined to be due and owing (including penalties and interest related thereto) by it to any federal, state or local taxing authority as a result of the Settlement Consideration.

5. <u>Protective Covenants</u>. Until the amounts payable under the ORRI Conveyance (and paragraph 2(b) hereof) have been paid in full, Borrower shall not (a) make any changes in the operation of the business of the Borrower, which involves the production of minerals or gases from the leaseholds, or (b) grant any other royalty interests or working interests in the minerals or gases to be extracted from the leaseholds without the prior written consent of Lender. In addition, until the amounts payable under the ORRI Conveyance (and paragraph 2(b) hereof) have been paid in full, Borrower shall maintain the leaseholds in good standing.

6. <u>Mutual Release</u>. The Parties, on behalf of themselves, and on behalf of their predecessors, successors, direct and indirect parent companies, direct and indirect subsidiary companies, companies under common control with any of the foregoing, affiliates and assigns, and its and their past, present and future officers, directors, shareholders, interest holders, members, partners, attorneys, agents, employees, managers, representatives, assigns and successors in interest, and all persons acting by, through, under or in concert with them (collectively and each of them, the "**Affiliates**") hereby release and discharge the other Party and its Affiliates from any and all known or unknown charges, complaints, claims, grievances, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts, penalties, fees and expenses (including Offsets and attorneys' fees and costs actually incurred), of any nature whatsoever, known or unknown, which either Party has, or may have had, against the other Party, whether or not apparent or yet to be

---

[4] I do not believe that there are original, paper Notes, which were originally delivered electronically.

discovered, or which may hereafter develop and for any acts or omissions related to or arising from the Loan (the "**Claims**"); provided, however, that for the avoidance of doubt the foregoing release and discharge excludes any Claims arising out of or relating to (i) any default under or breach of any provision, agreement, obligation or covenant under this Agreement or the ORRI Conveyance, or (ii) the investment and purchase by Green Sapphire Holdings, Inc. ("**Green Sapphire**") of interests in Borrower or any rights or Claims that Green Sapphire may have as a member of Borrower that do not arise out of or relate directly to the Loan (collectively, the "**Excluded Claims**").

This Agreement resolves any Claim or cause of action for relief related to or arising from the Loan that is, or could have been alleged, no matter how characterized, including, without limitation, compensatory damages, damages for breach of contract, bad faith damages, reliance damages, liquidated damages, costs and attorneys' fees.

7. In the event of a default under or breach of any provision, agreement, obligation or covenant under this Agreement or the ORRI Conveyance by Borrower, the settlement and release of the Loan pursuant to this Agreement shall be null and void and no force and effect, the Loan and the indebtedness, including principal and accrued interest, fees and other amounts due under the Loan, shall be deemed reinstated for all purposes, and Lender may apply any payments received to interest, principal, default interest, fees and/or costs as Lender in its sole discretion determines. Until such time as the Settlement Consideration in full (including the full payment of the maximum amount of payments payable with respect to the ORRI in accordance with paragraph 2(b) and the ORRI Conveyance) is received, Lender hereby reserves all rights and remedies available to it at law or equity, including without limitation pursuant to Article IV of the Leasehold Deed of Trust or pursuant to the Notes or any other Security Documents, including, but not limited to (a) taking such steps as may be appropriate to foreclose the lien created by the Leasehold Deed of Trust to secure payment or performance of all or any part of the obligations under the Loan documents, (b) reducing any claim against Borrower to judgment to the fullest extent permitted by the Loan Documents, (c) exercising any and all other rights or remedies afforded by the Notes, Leasehold Deed of Trust, Security Agreement or the other Loan Documents, or at law or in equity or otherwise, including without limitation, seeking the appointment of a receiver, or (d) exercise any and all rights under the ORRI Conveyance and Lender shall not be obligated to release or terminate the ORRI.

In addition to any other rights and remedies available to Lender under the Loan documents, ORRI Conveyance or applicable law upon the occurrence of a default hereunder or under the Loan documents or ORRI Conveyance, Borrower agrees, acknowledges, consents and stipulates that the occurrence of the default constitutes and provides the requisite cause under any applicable law, including the laws of State of Arizona, justifying the immediate recordation of the Deed in Lieu of Foreclosure. Borrower further stipulates and agrees that upon the occurrence of a default, it waives and is estopped from asserting any defenses to the immediate recordation of the Deed in Lieu of Foreclosure.

8. <u>Reinstatement of Indebtedness</u>. If the Settlement Consideration, or any part of the Settlement Consideration (including any amounts payable in accordance with paragraph 2(b) and the ORRI Conveyance), is set aside, rescinded, recovered, or required to be returned by Lender for

any reason, including, without limitation, the bankruptcy, insolvency, or reorganization of any person: (a) the Loan and the indebtedness, including principal and accrued interest, fees and other amounts due under the Loan shall for all purposes be reinstated to the extent of any such amount returned; and (b) in the case of the bankruptcy, receivership or other reorganization of Borrower, the Loan and the indebtedness, including principal and accrued interest, fees and other amounts due under the Loan, shall be reinstated in full for purposes of any claim or defense of Lender in any such proceeding.

9. <u>Governing Law</u>. This Agreement is made and entered into within and shall be governed by, construed, interpreted and enforced in accordance with the laws of the State of Texas, without regard to the principles of conflicts of laws.

10. <u>Entire Agreement</u>. The recitals set forth at the beginning of this Agreement are incorporated by reference and made a part of this Agreement. This Agreement constitutes the entire agreement and understanding of the Parties and supersedes all prior negotiations and/or agreements, proposed or otherwise, written or oral, concerning the subject matter hereof. Furthermore, no modification of this Agreement shall be binding unless in writing and signed by each of the Parties hereto.

11. <u>Counterparts</u>. This Agreement may be executed by the Parties in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

12. <u>Binding Agreement</u>. The Parties intend this Agreement to be legally binding upon and shall inure to the benefit of each of them and their respective successors, assigns, executors, administrators, heirs and estates.

13. <u>Authority to Execute Agreement</u>. Each Party warrants and represents that the person signing this Agreement on its behalf has authority to bind that Party and that the Party's execution of this Agreement is not in violation of any by-law, operating agreements, covenants and/or other restrictions placed upon them by their respective organizational documents or any other agreements with or among their owners. Each Party represents and warrants to the other Party, as to any released Claim, that it is the sole and absolute owner thereof, free and clear of all the rights and interest of any other person therein, and that it has the right and authority to release each such released Claim.

14. <u>Further Assurances</u>. Each party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as the other party may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

<u>[ Signature Page Immediately Follows ]</u>

In witness whereof, the undersigned have executed this Loan Settlement Agreement as of the date first above written.

Alpha Carta, Ltd.

By:_____

Name:_____

Title:_____


Proton Green LLC

By:_____

Name:_____

Title:_____

Exhibit A

**Form of Conveyance of Overriding Royalty Interest**

Effective [ _____ ] (the "Effective Date"), for and in consideration of good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Proton Green LLC, a Wyoming limited liability company ("Assignor") does hereby assign, transfer, grant and convey to Alpha Carta, Ltd.("Assignee"), its successors and assigns, as of the Effective Date at 12:01 a.m. (local time), an overriding royalty interest (the "Overriding Royalty Interest") in and to each of the interests described on Exhibit "A" attached hereto and made a part hereof (the "Interests") equal to five percent (5%), up to Sixteen Million and 00/100 Dollars ($16,000,000.00), of Assignor's right, title and interest in the Interests which were acquired by Assignor by virtue of the assignments and/or agreements set forth on Exhibit "A" attached hereto and by this reference made a part hereof (the "Conveyances"). This Conveyance of Overriding Royalty Interest is subject to the terms and conditions of that certain Loan Settlement Agreement. In the event of a conflict between the terms of this Conveyance of Overriding Royalty Interest and the terms of the Loan Settlement Agreement, the terms of the Loan Settlement Agreement shall control.

Assignor is entitled, through the assignments and agreement identified in Exhibit "A", to a portion of the overriding royalty interest transferred by the instrument identified on Exhibit "B", but Assignor has not acquired record title to that interest. Any record title which Assignor hereafter acquires in a portion of the overriding royalty interest transferred by the instrument identified on Exhibit "B", to which Assignor becomes entitled through the assignments or agreement identified in Exhibit "A", shall be considered an Interest for the purpose of this Conveyance of Overriding Royalty Interest, and the Overriding Royalty Interest herein assigned shall extend to any such subsequently acquired Interest.

The Overriding Royalty Interest shall be paid in accordance with and in the same manner as the terms and provisions of the assignments and conveyances in the chain of title out of which the Overriding Royalty Interest arises. Assignee shall be responsible for and bear all ad valorem, production, and severance taxes chargeable against the Overriding Royalty Interest, provided that all such taxes shall be paid for Assignee by Assignor out of production attributable to Assignee's Overriding Royalty Interest.

If Assignor owns a working interest, or similar interest, in any properties out of which the Interests or Overriding Royalty Interest are derived, Assignor may conduct and carry on, or may contract for, the exploration, development, maintenance and operation of any such properties, in any manner it so desires, without regard to the Overriding Royalty Interest and without any liability to Assignee. In addition, Assignor may transfer and dispose of, and may take or omit to take any other action with respect to, all or any of its Interests from time to time in any such manner. For the avoidance of doubt, (a) Assignor shall have no obligation to conduct any drilling operations or take any other action upon or with respect to any property subject to the Overriding Royalty Interest or lands pooled therewith, or to continue to operate any well or to operate or maintain in force or attempt to maintain in force any lease thereon, including by payment of delay rentals, shut-in royalties, compensatory royalties or other payments or by the drilling of any wells upon any such lease, or in any other manner, and the extent and duration of all operations, as well as the preservation of any such lease by delay rental payments or otherwise, shall be at the sole discretion

of Assignor, and (b) Assignor shall have the right at any time to surrender, abandon or otherwise terminate any such lease in whole or in part without any liability to Assignee.

Assignor shall make all determinations with respect to the exploration, development, maintenance and operation of any property subject to the Overriding Royalty Interest using the same criteria (or criteria less favorable to the property subject to the Overriding Royalty Interest) as it would use were such property not subject to the Overriding Royalty Interest (that is, Assignor shall not favor properties subject to the Overriding Royalty Interest over properties not subject to the Overriding Royalty Interest when allocating Assignor's resources in the exploration, development, maintenance and operation of its properties).

Assignee grants Assignor the right, without further approval by Assignee, to pool the Overriding Royalty Interest, or portions thereof, with other lands or leases to form one or more pooled units. As to each pooled unit so created, the overriding royalty interest assigned to Assignee shall be reduced in accordance with the terms of any applicable lease, pooling agreement or unit agreement.

This Conveyance of Overriding Royalty Interest shall inure to the benefit of and be binding on the parties and their respective heirs, legal representatives, successors and permitted assigns. Except as provided below, Assignee may only transfer or dispose of all or any portion of the Overriding Royalty Interest (a) with the prior written consent of Assignor, which it may withhold in its sole discretion, and (b) after allowing Assignor a preferential purchase right on the following terms. If at any time Assignee desires to transfer or dispose of all or any portion of the Overriding Royalty Interest, Assignee must first give to Assignor written notice thereof stating: (a) the amount of the Overriding Royalty Interest offered by Assignee; (b) the form of consideration (which shall be either cash or a promissory note containing reasonable and customary terms) at which such Overriding Royalty Interest is offered (the "Offered Price"); (c) the name and address of the proposed transferee from which Assignee has a bona fide offer to purchase the Overriding Royalty Interest; (d) the proposed time of closing and payment for the Overriding Royalty Interest; and (e) any other relevant material terms of the proposed sale. Upon receipt of such notice, Assignor will have a right to purchase all or any portion of the offered Overriding Royalty Interest within 30 days of receipt of such notice at a purchase price equal to the Offered Price or such other price as may be agreed upon by Assignor and Assignee.

The restrictions contained in the preceding paragraph shall not apply to Assignee's transfer of the entire ownership of the Overriding Royalty Interest to (1) any member of the immediate family of Assignee (2) any trust or other estate planning entity whose principal beneficiary or beneficiaries are Assignee and/or one or more members of the immediate family of Assignee or (3) an affiliate of or entity under the common control of Assignee; provided that, prior to such transfer, the transferee agrees to be bound in writing by the restrictions on transfer contained herein or in any assignment, conveyance or other instrument or document executed by Assignee in connection with Assignee's purchase of the Overriding Royalty Interest, and that any transfers of interests in such entity holding the Overriding Royalty Interest shall be subject to the same transfer restrictions as the Overriding Royalty Interest. Assignee's heirs, legal representatives, successors and permitted assigns shall be bound by and comply with said transfer restrictions.

**Assignor makes no, and disclaims any, warranty of title or otherwise as to the Overriding Royalty Interest. Assignee accepts the Overriding Royalty Interest without warranty of title or otherwise. Assignor makes no, and disclaims any, warranty of any kind, express or implied, as to the accuracy or completeness of any data, information or estimates provided to Assignee by Assignor. Assignor makes no, and disclaims any, warranty of any kind, express or implied, as to the condition of any equipment, materials or facilities associated with the Interests (or with any properties out of which the Interests or the Overriding Royalty Interest are derived), including without limitation any warranty as to merchantability or fitness for a particular purpose. Assignee acknowledges such disclaimers.**

This Conveyance of Overriding Royalty Interest shall be construed in accordance with, and enforced under, the laws of the State of Texas, without regard to choice of law rules of any jurisdiction.

Assignor and Assignee have executed this Conveyance of Overriding Royalty Interest as of the Effective Date.

| Proton Green LLC, a Wyoming limited liability company | Alpha Carta, Ltd |
|---|---|
| By: _____ Name: _____ | By: _____ Name: _____ |
| Title: _____ | Title: _____ |

**EXHIBIT K**

*Execution Version*

**NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE CONVERTIBLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL SELECTED BY THE HOLDER, IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT, OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES. ANY TRANSFEREE OF THIS NOTE SHOULD CAREFULLY REVIEW THE TERMS OF THIS NOTE. THE PRINCIPAL AMOUNT REPRESENTED BY THIS NOTE AND, ACCORDINGLY, THE SECURITIES ISSUABLE UPON CONVERSION HEREOF MAY BE LESS THAN THE AMOUNTS SET FORTH ON THE FACE HEREOF.**

Reference is hereby made to the Amended and Restated Promissory Convertible Note, dated as of December 23, 2021, made by the Company in favor of Kips Bay Select LP in the principal amount of $3,513,469.00 (as amended, the "**Prior Note**"), which amended and restated the Promissory Convertible Note, dated as of September 21, 2021, made by the Company in favor of Kips Bay Select LP in the principal amount of $2,692,308.00 (the "**Original Note**"). The Company and the Holder (as defined below) hereby agree that the Prior Note (and the Original Note) shall be superseded, amended and restated to read in its entirety as follows:

**PROTON GREEN LLC**

**SECOND AMENDED AND RESTATED**
**PROMISSORY CONVERTIBLE NOTE**

Issuance Date: September 21, 2021            Principal Amount: U.S. $3,513,469.00
Date of Note: February 18, 2022

        **FOR VALUE RECEIVED**, Proton Green LLC (formerly known as Plateau Carbon, LLC) (the "**Company**") pursuant to this Second Amended and Restated Promissory Convertible Note (the "**Note**"), hereby promises to pay to Kips Bay Select LP, its designee or registered assigns (the "**Holder**"), in cash, the principal amount of US $3,513,469.00 (as reduced pursuant to the terms hereof pursuant to redemption, conversion or otherwise, the "**Principal**" or the "**Principal Amount**", after giving effect to a 35% original issue discount) on April 7, 2022 (the "**Maturity Date**"), subject to earlier acceleration, conversion, redemption or otherwise (in each case in accordance with the terms hereof). Certain capitalized terms used herein are defined in Section 26. This Note is issued pursuant to that certain Securities Purchase Agreement dated September 21, 2021, by and among the Company and the Holder (the "**Purchase Agreement**"), and capitalized terms not defined herein will have the meanings set forth in the Purchase Agreement.

(1) <u>PAYMENTS OF PRINCIPAL; AMENDMENT FEE; PREPAYMENT</u>.

(a)     On the Maturity Date, the Company shall pay to the Holder (i) the Principal Amount in cash, together with (ii) Interest (as defined below) thereon calculated from the date hereof in accordance with the provisions of this Note, plus (iii) an amendment and extension fee in the amount of $300,000.00 (the "**Amendment Fee**"), provided, however, that the Holder shall have the right in its sole discretion to be repaid with 100% of the proceeds ("**Proceeds**") of the following: (1) sale of the Company's assets, (2) any merger, sale or other transaction resulting in the holders of the Company's Common Stock prior to such merger or other transaction ceasing to own at least 50% of the Common Stock, (3) issuances of the Company's Debt, and/or (4) issuances of the Company's equity. Notwithstanding the foregoing, (i) in the event that on the Maturity Date the Company does not have sufficient funds to repay this Note and the Other Notes in full, the Company shall be prohibited from repaying the Principal Amount, Interest and Amendment Fee of this Note in full and shall instead repay the Holders of each of the Notes a pro rata portion of the Principal Amount, Interest and Amendment Fees of each of the Notes based on the proportion that each of the Notes bears to the aggregate Principal Amount, Interest and Amendment Fee of all of the Notes, and (ii) unless a Holder of either of the Other Notes declines its right to be repaid with Proceeds, any Proceeds shall be applied to repay a pro rata portion of the Principal Amount, Interest and Amendment Fee of each of the Notes based on the proportion that each of the Notes bears to the aggregate Principal Amount, Interest and Amendment Fee of all of the Notes. All payments shall be applied first to the Amendment Fee, then to accrued Interest and thereafter to the Principal Amount.

(b)     Interest shall accrue on the unpaid Principal Amount outstanding until the Maturity Date at a rate equal to one and one-half percent (1.5%) per month. The accrued interest on the Principal Amount of this Note shall not compound, and is referred to herein as the "**Interest**". Such Interest shall be computed for the actual number of days elapsed in a month consisting of 28, 30 or 31 days, as the case may be.

(c)     The Company may, at any time and from time to time without premium or penalty, prepay all or any portion of the outstanding Principal Amount of, and Interest on, and Amendment Fee of this Note. Any partial payment will be credited first to the Amendment Fee, then to accrued and unpaid Interest and the balance, if any, to the then outstanding Principal Amount.

## (2)     **RANKING; SECURITY**.

(a)     The parties agree that this Note shall rank (i) pari passu with the indebtedness under the Other Notes and (ii) senior to all other existing and future debt of the Company.

(b)     Payment of this Note and all other obligations, fees, and expenses due to the Holder pursuant to this Note and the Purchase Agreement (the "**Secured Obligations**") will be secured at all times by (i) valid, enforceable first priority mortgages and/or deeds of trust on

-2-

and covering all real property interests presently owned and hereafter acquired by the Company, and all assets and personal property relating thereto (the "**Mortgaged Properties**"), and (ii) valid, enforceable first priority security interests on and covering all of the other assets of the Company (the "**Other Assets**").

(c)     Within five (5) business days of a request by the Holder, the Company shall deliver to the Holder (i) mortgages and/or deeds of trust, in appropriate and recordable form under Arizona law and reasonably satisfactory in form and substance to the Holder, executed by the Company, with respect to the Mortgaged Properties  ("Deeds of Trust"), which shall create a first priority lien on such Mortgaged Properties and which shall be promptly recorded in the recorder's office of the appropriate county, and (ii) appropriate instruments granting valid, enforceable first priority security interests on and covering all of the Other Assets, in appropriate and recordable form and reasonably satisfactory in form and substance to the Holder, executed by the Company, with respect to the Other Assets (the "Other Instruments" and, collectively with the Deeds of Trust, the "Security Documents").  Thereafter, the Company shall cause the Mortgaged Properties now owned or hereafter acquired by it to be subject at all times to a first priority, perfected lien in favor of the Holder to secure the Secured Obligations, and the Company shall provide any filings and deliveries reasonably requested by the Holder in connection therewith to perfect the security interests therein, all in form and substance reasonably satisfactory to the Holder.

(d)     The Holder acknowledges that the security interests granted in the Mortgaged Properties and the Other Assets to the Holder to secure the Secured Obligations are also being granted to the holders of the Others Notes to secure the obligations of the Company under such Other Notes, and that such all of such security interests shall be for the ratable benefit of the Holders of all of the Notes.  The form and substance of the Security Documents shall reflect such ratable benefit term.

(3) CONVERSION OF NOTE. Following the Issuance Date, as set out above, this Note shall be convertible into shares of Common Stock on the terms and conditions set forth in this Section 3.

(a) Optional Conversion Right. Holder has the right to convert all or part of the Principal Amount at the Company's valuation of $250,000,000.00 into fully paid and nonassessable shares of Common Stock in accordance with Section 3(c), at the Conversion Rate (as defined below) (the "**Conversion Date**"). The Company shall not issue any fraction of a share of Common Stock upon any conversion. If the issuance would result in the issuance of a fraction of a share of Common Stock, the Company shall round such fraction of a share of Common Stock up to the nearest whole share. The Company shall pay any and all transfer, stamp and similar taxes that may be payable with respect to the issuance and delivery of Common Stock upon conversion of any Conversion Amount. The Holder shall have the right to deliver an effective conversion notice at any time until 11:59 pm on the chosen date and it shall be immediately effective.

(b) Conversion Rate. The number of shares of Common Stock issuable upon conversion of any Conversion Amount pursuant to Section 3(a) shall be determined by dividing (x) such Conversion Amount by (y) the Conversion Price (the "**Conversion Rate**").

-3-

(i) "**Conversion Amount**" means the sum of the portion of the Principal to be converted, redeemed or otherwise with respect to which this determination is being made.

(ii) "**Conversion Price**" means $0.0599. Subsequent to the effective date of the registration statement registering for resale the Conversions Shares and the Warrant Shares pursuant to the Purchase Agreement, if the closing sale price of the Common Stock averages less than the then Conversion Price over a period of ten (10) consecutive trading days, the Conversion Price shall reset to such average price. If the 10-day volume weighted average price of the Common Stock continues to be less than the Conversion Price then the Conversion Price should reset to such 10-day average price.

(c) <u>Mechanics of Optional Conversion and Adjustment:</u>

(i) <u>Registration; Book-Entry</u>. The Company shall maintain a register (the "**Register**") for the recordation of the holder of the Note and the Principal amount of the Note held by the holder (the "**Registered Note**"). The entries in the Register, made in good faith, shall be conclusive and binding for all purposes absent manifest error. The Company and the holder of the Note shall treat each Person whose name is recorded in the Register as the owner of the Note for all purposes, including, without limitation, the right to receive payments of Principal, if any, hereunder, notwithstanding notice to the contrary. Upon its receipt of a request to assign or sell all or part of the Registered Note by the Holder, the Company shall record the information contained therein in the Register and issue one or more new Registered Notes in the same aggregate Principal amount as the Principal amount of the surrendered Registered Note to the designated assignee or transferee pursuant to Section 10. Notwithstanding anything to the contrary in this Section 3(c)(i), the Holder may assign any Note or any portion thereof to an Affiliate of such Holder or a Related Fund of such Holder without delivering a request to assign or sell such Note to the Company and the recordation of such assignment or sale in the Register (a "**Related Party Assignment**"); <u>provided</u>, that (x) the Company may continue to deal solely with such assigning or selling Holder unless and until such Holder has delivered a request to assign or sell such Note or portion thereof to the Company for recordation in the Register; (y) the failure of such assigning or selling Holder to deliver a request to assign or sell such Note or portion thereof to the Company shall not affect the legality, validity, or binding effect of such

-4-

assignment or sale and (z) such assigning or selling Holder shall, acting solely for this purpose as a non-fiduciary agent of the Company, maintain a register (the "**Related Party Register**") comparable to the Register on behalf of the Company, and any such assignment or sale shall be effective upon recordation of such assignment or sale in the Related Party Register. Notwithstanding anything to the contrary set forth herein, upon conversion of any portion of this Note in accordance with the terms hereof, the Holder shall not be required to physically surrender this Note to the Company unless the Holder has provided the Company with prior written notice (which notice may be included in a Conversion Notice) requesting reissuance of this Note upon physical surrender of this Note. The Holder and the Company shall maintain records showing the Principal, converted and the dates of such conversions or shall use such other method, reasonably satisfactory to the Holder and the Company, so as not to require physical surrender of this Note upon conversion.

(ii) <u>Intentionally omitted</u>.

(iii) Holder may convert any or all of this Note into shares of Common Stock at any time.

(d) <u>Limitations on Conversions</u>.

(i) <u>Beneficial Ownership</u>. In case that the Holder becomes subject to the filing or reporting obligations under Regulation 13D-G of the Exchange Act due to (i) the conversion of this Note, or any other share issuance hereunder, or (ii) the changes to the beneficial ownership of the Holder (together with the Attribution Parties) in the Company, including but not limited to the changes to such beneficial ownership due to the conversion or share issuance hereunder, the Holder shall timely file such schedules or forms with the United States Securities and Exchange Commission (the "**Commission**") as required under Regulation 13D-G of the Exchange Act. For purposes of this paragraph, beneficial ownership and all calculations (including, without limitation, with respect to calculations of percentage ownership) shall be determined in accordance with Regulation 13D-G and the rules and regulations promulgated thereunder. The obligations contained in this paragraph shall apply to a successor Holder of this Note. For any reason at any time, upon the written or oral request of the Holder, the Company shall within one (1) Business Day confirm orally and in writing to the Holder the number of shares of Common Stock then outstanding, including by virtue of any prior conversion or exercise of convertible or exercisable securities into Common Stock, including,

-5-

without limitation, pursuant to this Note or securities issued pursuant to the Purchase Agreement.

(ii) <u>Principal Market Regulation</u>. Unless permitted by the applicable rules and regulations of the Principal Market, the Company shall not issue any shares of Common Stock upon conversion of this Note if the issuance of such shares of Common Stock would exceed the aggregate number of shares of Common Stock which the Company may issue upon exercise or conversion (as the case may be) of the Note without breaching the Company's obligations under the rules or regulations of the Principal Market (the number of shares which may be issued without violating such rules and regulations, the "**Exchange Cap**"). Notwithstanding the foregoing, such limitation shall not apply in the event that the Company (A) obtains the approval of its stockholders as required by the applicable rules of the Principal Market for issuances of shares of Common Stock in excess of such amount or (B) obtains a written opinion from outside counsel to the Company that such approval is not required, which opinion shall be reasonably satisfactory to the Holder. In the event that any Holder shall sell or otherwise transfer any of such Holder's Note, the Exchange Cap restrictions set forth herein shall continue to apply to the Note and such transferee.

(e) <u>Disputes</u>. In the event of a dispute as to the number of shares of Common Stock issuable to the Holder in connection with a conversion of this Note, the Company shall issue to the Holder the number of shares of Common Stock not in dispute and resolve such dispute in accordance with Section 16.

(f) <u>Automatic Conversion.</u> In the event the Company completes a Fundamental Transaction or completes a listing of its Common Stock onto a national stock exchange, Holder agrees to convert the OID into Common Stock of the Company at the Conversion Price. The remaining Principal Amount, Amendment Fee and Interest will remain outstanding, unless the Holder elects to convert such Principal Amount, Amendment Fee and Interest into Common Stock of the Company.

(4) The Company hereby covenants and agrees as follows:

(a) <u>Sale of Assets</u>. During the thirty (30) days from the date of this Note, with the exception of moving certain of its assets to any of its subsidiaries, the Company shall not sell any material assets.

(b) <u>Additional Debt</u>. While this Note is outstanding, the Company shall not incur any additional indebtedness for borrowed money, other than any indebtedness that is Permitted Indebtedness.

(5) RIGHTS UPON EVENT OF DEFAULT.

-6-

(a) <u>Event of Default</u>. Each of the following events shall constitute an "**Event of Default**"; provided, however, that, except in the case of the Events of Default listed in Sections 5(a)(i), or 5(a)(ix) below, the Company shall have five (5) business days after notice of default from the Holder to cure such Event of Default unless a lesser number of days is required pursuant to the provisions of this Section 5.

(i) <u>Failure to Pay Principal</u>. The Company fails to pay the Principal, Amendment Fee or Interest due under this Note or any of the Other Notes at the Maturity Date (or the maturity date of any of the Other Notes, if the maturity date under the Other Notes is different from the Maturity Date), liquidated damages and other amounts thereon when due on the Note or any of the Other Notes, whether at maturity, upon acceleration or otherwise.

(ii) <u>Conversion and the Shares</u>. The Company (i) fails to issue Conversion Shares to the Holder (or announces or threatens in writing that it will not honor its obligation to do so) upon exercise by the Holder of the conversion rights of the Holder in accordance with the terms of the Note, (ii) fails to transfer or cause its transfer agent to transfer (issue) (electronically or in certificated form) any certificate for the Conversion Shares issuable to the Holder upon conversion of or otherwise pursuant to the Note as and when required by the Note, or (iii) the Company directs its transfer agent not to transfer or delays, impairs, and/or hinders its transfer agent in transferring (or issuing) (electronically or in certificated form) any certificate for the Conversion Shares issuable to the Holder upon conversion of or otherwise pursuant to the Note as and when required by the Note, or fails to remove (or directs its transfer agent not to remove or impairs, delays, and/or hinders its transfer agent from removing) any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any certificate for any Conversion Shares issued to the Holder upon conversion of or otherwise pursuant to the Note as and when required by the Note (or makes any written announcement, statement or threat that it does not intend to honor the obligations described in this paragraph) and any such failure shall continue uncured (or any written announcement, statement or threat not to honor its obligations shall not be rescinded in writing) for five (5) business days after the Holder shall have delivered a Notice of Conversion. It is an obligation of the Company to remain current in its obligations to its transfer agent. It shall be an Event of Default of the Note, if a conversion of the Note is delayed, hindered or frustrated due to a balance owed by the Company to its transfer agent. If at the option of the Holder, the Holder advances any funds to the Company's transfer agent in order to process a conversion, such advanced funds shall be paid by the Company to the Holder within forty eight (48) hours of a demand from the Holder. If Borrower is unable to do so, they shall have an opportunity to cure within five (5) business days.

(iii) <u>Breach of Agreements and Covenants</u>. The Company breaches any material agreement, covenant or other material term or condition contained in the Purchase Agreement, the Note or in any agreement, statement or certificate given in writing pursuant hereto or in connection herewith or therewith, and such breach results in a material adverse effect on the business or assets of the Company.

-7-

(iv) <u>Breach of Representations and Warranties</u>. Any representation or warranty of the Company made in the Purchase Agreement or the Note, or in any agreement, statement or certificate given in writing pursuant hereto or in connection herewith or therewith shall be false or misleading in any material respect when made and the breach of which has (or with the passage of time will have) a Material Adverse Effect on the rights of the Holder with respect to the Note or the Purchase Agreement. In the event of such a breach, the Company shall have an opportunity to cure within two (2) business days.

(v) <u>Receiver or Trustee</u>. The Company or any subsidiary of the Company shall make an assignment for the benefit of creditors, or apply for or consent to the appointment of a receiver or trustee for it or for a substantial part of its property or business, or such a receiver or trustee shall otherwise be appointed. Under such circumstances, the Company shall have an opportunity to cure within sixty (60) days.

(vi) <u>Judgments</u>. Any money judgment, writ or similar process shall be entered or filed against the Company or any subsidiary of the Company or any of its property or other assets for more than $100,000, and shall remain unvacated, unbonded or unstayed for a period of twenty (20) days unless otherwise consented to by the Holder, which consent will not be unreasonably withheld.

(vii) <u>Bankruptcy</u>. Bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings, voluntary or involuntary, for relief under any bankruptcy law or any law for the relief of debtors shall be instituted by or against the Company or any subsidiary of the Company. Under such circumstances, the Company shall have an opportunity to cure within sixty (60) days.

(viii) <u>Delisting or Trading of Common Stock.</u> The Company shall fail to maintain the listing or quotation of its Common Stock minimally on a Trading Market.

(ix) <u>Failure to Comply with the Exchange Act</u>. The Company shall fail to comply with the reporting requirements of the Exchange Act and/or the Company shall cease to be subject to the reporting requirements of the Exchange Act.

(x) <u>Liquidation.</u> Any dissolution, liquidation, or winding up of Borrower or any substantial portion of its business or assets.

(xi) <u>Cessation of Operations</u>. Any cessation of operations by Borrower or Borrower admits it is otherwise generally unable to pay its debts as such debts become due, provided, however, that any disclosure of the Company's ability to continue as a "going concern" shall not be an admission that the Company cannot pay its debts as they become due.

(xii) <u>Intentionally omitted</u>.

(xiii) <u>Intentionally omitted</u>.

(xiv) <u>Other Obligations</u>. The occurrence of any default under any agreement or obligation of the Company that is not cured within ten (10) days that could reasonably be expected to have a Material Adverse Effect.

(xv) <u>Default under Transaction Documents or Other Material Agreement</u>. A default or event of default (subject to any grace or cure period provided in the applicable agreement, document or instrument) shall occur under (A) this Note, the warrant or the securities purchase agreement or any of the other agreements entered into by the parties related to the purchase of this Note (collectively, the "**Transaction Documents**"), or (B) the Other Notes or any other material agreement, lease, document or instrument to which Company or any Subsidiary is obligated (and not covered by clause (vi) below), which in the case of subsection (B) would reasonably be expected to have a Material Adverse Effect.

(xvi) <u>Default under Mortgage or Other Agreement of Indebtedness</u>. Company or any Subsidiary shall default on any of its obligations under any mortgage, credit agreement or other facility, indenture agreement, factoring agreement or other instrument under which there may be issued, or by which there may be secured or evidenced, any indebtedness for borrowed money or money due under any long term leasing or factoring arrangement that (a) involves an obligation greater than $100,000, whether such indebtedness now exists or shall hereafter be created, and (b) results in such indebtedness becoming or being declared due and payable prior to the date on which it would otherwise become due and payable.

(xvii) <u>Intentionally omitted</u>.

(xviii) <u>Failure to Meet the Requirements under Rule 144</u>. Company does not meet the current public information requirements under Rule 144.

(xix) <u>Failure to Maintain Intellectual Property</u>. The failure by Company or any material Subsidiary to maintain any material intellectual property rights, personal, real property, equipment, leases or other assets which are necessary to conduct its business (whether now or in the future) and such breach is not cured with twenty (20) days after written notice to the Company from the Holder.

(xx) <u>Trading Suspension</u>. A Commission or judicial stop trade order or suspension from a Trading Market.

(xxi) <u>Intentionally omitted</u>.

(xxii) <u>Failure to Provide Required Notification of a Material Event</u>. A failure by Company to notify Holder of any material event of which Company is obligated to notify Holder pursuant to the terms of this Note or any other Transaction Document.

(xxiii) <u>Invalidity or Unenforceability of Transaction Documents</u>. Any material provision of any Transaction Document shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against the Company, or the validity or enforceability thereof shall be contested by Company, or a proceeding shall be commenced by Company or any governmental authority having jurisdiction over Company or Holder, seeking to establish the invalidity or unenforceability thereof, or Company shall deny in writing that it has any liability or obligation purported to be created under any Transaction Document.

(xxiv) <u>Intentionally omitted</u>.

(b) <u>Redemption Right</u>. At any time after the Holder becoming aware of an Event of Default, the Required Holders may require the Company to redeem (an "**Event of Default Redemption**") all or any portion of the Notes by delivering written notice thereof (the "**Event of Default Redemption Notice**") to the Company, which Event of Default Redemption Notice shall indicate the portion of this Note and the Other Notes the Required Holders are electing to require the Company to redeem. Each portion of this Note and the Other Notes subject to redemption by the Company pursuant to this Section 5(b) shall be redeemed by the Company in cash by wire transfer of immediately available funds at a price equal to (i) the Principal Amount, plus (ii) all Interest then accrued on the Principal Amount from the date of the Note to the Event of Default, plus (iii) the Amendment Fee, plus (iv) interest on the Principal Amount calculated from the Event of Default at the greater of the Default Interest Rate or the maximum rate permitted under applicable law (the "**Event of Default Redemption Price**"), plus (v) liquidated damages of $750,000, plus (vi) an amount in cash equal to 1% of the Event of Default Redemption Price for each 30 day period during which redemptions fail to be made; provided, however, in the event that the Company does not have sufficient funds to pay 100% of the relevant Event of Default Redemption Price to the Holders of all of the Notes, the Company shall pay a pro rata portion of the Event of Default Redemption Price to each such Holder based on the proportion that the Principal Amount of each of the Notes bears to the aggregate Principal Amount of all of the Notes. To the extent redemptions required by this Section 5(b) are deemed or determined by a court of competent jurisdiction to be prepayments of the Note by the Company, such redemptions shall be deemed to be voluntary prepayments. Notwithstanding anything to the contrary in this Section 5, but subject to Section 3(b)(ii) and 3(d), until the Event of Default Redemption Price payable in respect of each of the Notes (together with any interest thereon) is paid in full, the Conversion Amount submitted for redemption under this Section 5(b) (together with any interest thereon) may be converted, in whole or in part, by the Holder into Common Stock pursuant to Section 3. The parties hereto agree that in the event of the Company's redemption of any portion of the Note under this Section 5(b), the Holder's damages would be uncertain and difficult to estimate because of the parties' inability to predict future interest rates and the uncertainty of the availability of a suitable substitute investment opportunity for the Holder. Accordingly, any Event of Default redemption

-10-

premium due under this Section 5(b) is intended by the parties to be, and shall be deemed, a reasonable estimate of the Holder's actual loss of its investment opportunity and not as a penalty.

(6)    RIGHTS UPON FUNDAMENTAL TRANSACTION.

(a) If, at any time while this Note is outstanding, (i) the Company effects a Fundamental Transaction, then, upon any subsequent conversion of this Note, the Holder shall have the right to receive, for each Conversion Share that would have been issuable upon such conversion immediately prior to the occurrence of such Fundamental Transaction, the same kind and amount of securities, cash or property as it would have been entitled to receive upon the occurrence of such Fundamental Transaction if it had been, immediately prior to such Fundamental Transaction, the holder of one (1) share of Common Stock (the "Alternate Consideration"). For purposes of any such conversion, the determination of the Conversion Price shall be appropriately adjusted to apply to such Alternate Consideration based on the amount of Alternate Consideration issuable in respect of one (1) share of Common Stock in such Fundamental Transaction, and the Company shall apportion the Conversion Price among the Alternate Consideration in a reasonable manner reflecting the relative value of any different components of the Alternate Consideration. If holders of Common Stock are given any choice as to the securities, cash or property to be received in a Fundamental Transaction, then the Holder shall be given the same choice as to the Alternate Consideration it receives upon any conversion of this Debenture following such Fundamental Transaction. To the extent necessary to effectuate the foregoing provisions, any successor to the Company or surviving entity in such Fundamental Transaction shall issue to the Holder a new debenture consistent with the foregoing provisions and evidencing the Holder's right to convert such debenture into Alternate Consideration. The terms of any agreement pursuant to which a Fundamental Transaction is effected shall include terms requiring any such successor or surviving entity to comply with the provisions of this Section 6(a) and insuring that this Note (or any such replacement security) will be similarly adjusted upon any subsequent transaction analogous to a Fundamental Transaction.

(7) DISTRIBUTION OF ASSETS; RIGHTS UPON ISSUANCE OF PURCHASE RIGHTS AND OTHER CORPORATE EVENTS.

(a) Distribution of Assets. If the Company shall declare or make any dividend or other distributions of its assets (or rights to acquire its assets) to any or all holders of shares of Common Stock, by way of return of capital or otherwise (including without limitation, any distribution of cash, stock or other securities, property, options, evidence of Indebtedness or any other assets by way of a dividend, spin off, reclassification, corporate rearrangement, scheme of arrangement or other similar transaction) (the "**Distributions**"), then the Holder will be entitled to such Distributions as if the Holder had held the number of shares of Common Stock acquirable upon complete conversion of this Note (without taking into account any limitations or restrictions on the convertibility of this Note) immediately prior to the date on which a record is taken for such Distribution or, if no such record is taken, the date as of which the record holders of Common Stock are to be determined for such Distributions and the portion of such Distribution shall be held in abeyance for the Holder.

-11-

(b) <u>Purchase Rights</u>. If at any time the Company grants, issues or sells any Options, Convertible Securities or rights to purchase stock, warrants, securities or other property pro rata to the record holders of any class of Common Stock (the "**Purchase Rights**"), then the Holder will be entitled to acquire or receive, as applicable, upon the terms applicable to such Purchase Rights, the aggregate Purchase Rights which the Holder could have acquired if the Holder had held the number of shares of Common Stock acquirable upon complete conversion of this Note (without taking into account any limitations or restrictions on the convertibility of this Note) immediately prior to the date on which a record is taken for the grant, issuance or sale of such Purchase Rights, or, if no such record is taken, the date as of which the record holders of shares of Common Stock are to be determined for the grant, issue or sale of such Purchase Rights.

(c) <u>Other Corporate Events</u>. In addition to and not in substitution for any other rights hereunder, prior to the occurrence or consummation of any Fundamental Transaction pursuant to which holders of shares of Common Stock are entitled to receive securities, cash, assets or other property with respect to or in exchange for shares of Common Stock (a "**Corporate Event**"), the Company shall make appropriate provision to ensure that, and any applicable Successor Entity or Successor Entities shall ensure that, and it shall be a required condition to the occurrence or consummation of such Corporate Event that, the Holder will thereafter have the right to receive upon conversion of this Note at any time after the occurrence or consummation of the Corporate Event, shares of Common Stock or Successor Capital Stock or, if so elected by the Holder, cash in lieu of the shares of Common Stock (or other securities, cash, assets or other property) purchasable upon the conversion of this Note prior to such Corporate Event, such shares of stock, securities, cash, assets or any other property whatsoever (including warrants or other purchase or subscription rights and any shares of Common Stock) which the Holder would have been entitled to receive upon the occurrence or consummation of such Corporate Event or the record, eligibility or other determination date for the event resulting in such Corporate Event, had this Note been converted immediately prior to such Corporate Event or the record, eligibility or other determination date for the event resulting in such Corporate Event (without regard to any limitations on conversion of this Note). Provision made pursuant to the preceding sentence shall be in a form and substance satisfactory to the Holder. The provisions of this Section 7 shall apply similarly and equally to successive Corporate Events.

(8) <u>RIGHTS UPON ISSUANCE OF OTHER SECURITIES</u>.

(A) <u>Adjustment of Conversion Price upon Subdivision or Combination of Common Stock</u>. If the Company at any time on or after the Issuance Date subdivides (by any stock split, stock dividend, recapitalization or otherwise) one or more classes of its outstanding shares of Common Stock into a greater number of shares, the Conversion Price in effect immediately prior to such subdivision will be proportionately reduced. If the Company at any time on or after the Issuance Date combines (by combination, reverse stock split or otherwise) one or more classes of its outstanding shares of Common Stock into a smaller number of shares, the Conversion Price in effect immediately prior to such combination will be proportionately increased.

(B) <u>Voluntary Adjustment by Company</u>. The Company may at any time during the term of this Note, with the prior written consent of the Holder, reduce the then current Conversion Price to any amount and for any period of time deemed appropriate by the Board of Directors of the Company.

(9) <u>NONCIRCUMVENTION</u>. The Company hereby covenants and agrees that the Company will not, by amendment of its Certificate of Incorporation, Bylaws or through any reorganization, transfer of assets, consolidation, merger, scheme of arrangement, dissolution, issue or sale of securities, or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Note, and will at all times in good faith carry out all of the provisions of this Note and take all action as may be required to protect the rights of the Holder of this Note.

(10) Intentionally omitted.

(11) <u>VOTING RIGHTS</u>. The Holder shall have no voting rights as the holder of this Note, except as required by law and as expressly provided in this Note.

(12) <u>COVENANTS</u>.

(a) <u>Incurrence of Indebtedness</u>. So long as this Note is outstanding, the Company shall not, and the Company shall not permit any of its Subsidiaries to, directly or indirectly, incur or guarantee, assume or suffer to exist any Indebtedness, other than Permitted Indebtedness.

(b) <u>Existence of Liens</u>. So long as this Note is outstanding, the Company shall not, and the Company shall not permit any of its Subsidiaries to, directly or indirectly, allow or suffer to exist any Liens other than Permitted Liens.

(c) <u>Change in Nature of Business</u>. The Company shall not make, or permit any of its Subsidiaries to make, any change in the nature of its business. The Company shall not modify its corporate structure or purpose.

(d) <u>Intellectual Property</u>. The Company shall not, and the Company shall not permit any of its Subsidiaries, directly or indirectly, to encumber or allow any Liens on, any of its own or its licensed copyright rights, copyright applications, copyright registrations and like protections in each work of authorship and derivative work, whether published or unpublished, any patents, patent applications and like protections, including improvements, divisions, continuations, renewals, reissues, extensions, and continuations-in-part of the same, trademarks, service marks and, to the extent permitted under applicable law, any applications therefor, whether registered or not, and the goodwill of the business of the Company and its Subsidiaries connected with and symbolized thereby, know-how, operating manuals, trade secret rights, rights to unpatented inventions, and any claims for damage by way of any past, present, or future infringement of any of the foregoing, other than Permitted Liens.

-13-

(e) <u>Preservation of Existence, Etc.</u> The Company shall maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, its existence, rights and privileges, and become or remain, and cause each of its Subsidiaries to become or remain, duly qualified and in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary.

(f) <u>Maintenance of Properties, Etc.</u> The Company shall maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, all of its properties which are necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear and tear excepted, and comply, and cause each of its Subsidiaries to comply, at all times with the provisions of all leases to which it is a party as lessee or under which it occupies property, so as to prevent any loss or forfeiture thereof or thereunder.

(g) <u>Maintenance of Insurance</u>. The Company shall maintain, and cause each of its Subsidiaries to maintain insurance with responsible and reputable insurance companies or associations (including, without limitation, comprehensive general liability, hazard, rent and business interruption insurance) with respect to its properties (including all real properties leased or owned by it) and business, in such amounts and covering such risks as is required by any governmental authority having jurisdiction with respect thereto or as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated.

(h) <u>Transactions with Affiliates</u>. The Company shall not, nor shall it permit any of its Subsidiaries to, enter into, renew, extend or be a party to, any transaction or series of related transactions (including, without limitation, the purchase, sale, lease, transfer or exchange of property or assets of any kind or the rendering of services of any kind) with any Affiliate, except in the ordinary course of business in a manner and to an extent consistent with past practice and necessary or desirable for the prudent operation of its business, for fair consideration and on terms no less favorable to it or its Subsidiaries than would be obtainable in a comparable arm's length transaction with a Person that is not an Affiliate thereof.

(i) <u>Corporate Changes</u>. The Company shall not change its corporate name, legal form or jurisdiction of formation without twenty (20) days' prior written notice to Holder. Company shall not enter into or be party to a Fundamental Transaction unless in violation of Section 6 hereof. Company shall not relocate its chief executive office or its principal place of business unless it has provided prior written notice to Holder.

(j) Reserved.

(k) <u>Charter Amendments</u>. The Company shall not amend its charter documents, including, without limitation, its certificate of incorporation and bylaws, in any manner that materially and adversely affects any rights of the Holder.

(l) <u>Repurchase</u>. The Company shall not repay, repurchase or offer to repay, repurchase or otherwise acquire more than a <u>de minimis</u> number of shares of its Common Stock

-14-

or common stock equivalents other than as to the Conversion Shares as permitted or required under the Transaction Documents.

(m) <u>Redemption</u>. The Company shall not redeem, defease, repurchase, repay or make any payments in respect of, by the payment of cash or cash equivalents (in whole or in part, whether by way of open market purchases, tender offers, private transactions or otherwise), all or any portion of any Indebtedness (other than the Note if on a pro-rata basis), whether by way of payment in respect of principal of (or premium, if any) or interest on, such Indebtedness, the foregoing restriction shall also apply to Permitted Indebtedness from and after the occurrence of an Event of Default.

(n) <u>Declaration</u>. The Company shall not declare or make any dividend or other distribution of its assets or rights to acquire its assets to holders of shares of Common Stock, by way of return of capital or otherwise including, without limitation, any distribution of cash, stock or other securities, property or options by way of a dividend, spin off, reclassification, corporate rearrangement, scheme of arrangement or other similar transaction.

(o) The Company shall not enter into any agreement with respect to any of the foregoing.

(13) <u>TRANSFER</u>. This Note and any shares of Common Stock issued upon conversion of this Note may be offered, sold, assigned or transferred according to the Purchase Agreement.

(14) <u>REISSUANCE OF THIS NOTE</u>.

(a) <u>Transfer</u>. If this Note is to be transferred, the Holder shall instruct the Company who the new Holder will be and this Note will be automatically cancelled. The Company will issue and deliver the new Note within two (2) days of such notice.

(b) <u>Lost, Stolen or Mutilated Note</u>. Upon receipt by the Company of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note, and, in the case of loss, theft or destruction, of any indemnification undertaking by the Holder to the Company in customary form and, in the case of mutilation, upon surrender and cancellation of this Note, the Company shall execute and deliver to the Holder a new Note (in accordance with Section 14(d)) representing the then outstanding Principal amount of the Note.

(c) <u>Note Exchangeable for Different Denominations</u>. This Note is exchangeable, upon the surrender hereof by the Holder at the principal office of the Company, for a new Note or Notes (in accordance with Section 14(d) representing in the aggregate the outstanding Principal of this Note, and each such new Note will represent such portion of such outstanding Principal as is designated by the Holder at the time of such surrender.

(d) <u>Issuance of New Notes</u>. Whenever the Company is required to issue a new Note pursuant to the terms of this Note, such new Note (i) shall be of like tenor with this Note,

-15-

(ii) shall represent, as indicated on the face of such new Note, the Principal remaining outstanding (or in the case of a new Note being issued pursuant to Section 14(a) or Section 14(c), the Principal designated by the Holder which, when added to the principal represented by the other new Notes issued in connection with such issuance, does not exceed the Principal remaining outstanding under this Note immediately prior to such issuance of new Notes), (iii) shall have an issuance date, as indicated on the face of such new Note, which is the same as the Issuance Date of this Note, (iv) shall have the same rights and conditions as this Note, and (v) shall represent accrued and unpaid Interest on the Principal and Interest of this Note, from the Issuance Date.

(15) REMEDIES, CHARACTERIZATIONS, OTHER OBLIGATIONS, BREACHES AND INJUNCTIVE RELIEF. The remedies provided in this Note shall be cumulative and in addition to all other remedies available under this Note and any of the other Transaction Documents, at law or in equity (including a decree of specific performance and/or other injunctive relief), and nothing herein shall limit the Holder's right to pursue actual and consequential damages for any failure by the Company to comply with the terms of this Note. Amounts set forth or provided for herein with respect to payments, conversion, redemption and the like (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof). The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder and that the remedy at law for any such breach may be inadequate. The Company therefore agrees that, in the event of any such breach or threatened breach, the Holder shall be entitled, in addition to all other available remedies, to an injunction restraining any breach, without the necessity of showing economic loss and without any bond or other security being required.

(16) PAYMENT OF COLLECTION, ENFORCEMENT AND OTHER COSTS. If (a) this Note is placed in the hands of an attorney for collection or enforcement or is collected or enforced through any legal proceeding or the Holder otherwise takes action to collect amounts due under this Note or to enforce the provisions of this Note or (b) there occurs any bankruptcy, reorganization, receivership of the Company or other proceedings affecting Company creditors' rights and involving a claim under this Note, then the Company shall pay the costs and expenses incurred by the Holder for such collection, enforcement or action or in connection with such bankruptcy, reorganization, receivership or other proceeding, including, but not limited to, attorneys' fees and disbursements.

(17) CONSTRUCTION; HEADINGS. This Note shall be deemed to be jointly drafted by the Company and the Holder and shall not be construed against any person as the drafter hereof. The headings of this Note are for convenience of reference and shall not form part of, or affect the interpretation of, this Note.

(18) FAILURE OR INDULGENCE NOT WAIVER. No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

-16-

(19) <u>DISPUTE RESOLUTION</u>. In the case of a dispute as to the determination of the arithmetic calculation of the Conversion Rate, the Conversion Price or any Redemption Price, the Company shall submit the disputed determinations or arithmetic calculations via facsimile or electronic mail within one (1) Business Days of receipt, or deemed receipt, of the Conversion Notice or Redemption Notice or other event giving rise to such dispute, as the case may be, to the Holder. If the Holder and the Company are unable to agree upon such determination or calculation within two (2) Business Days of such disputed determination or arithmetic calculation being submitted to the Holder, then the Company shall, within two (2) Business Days submit via facsimile or electronic mail the disputed arithmetic calculation of the Conversion Rate, Conversion Price or any Redemption Price to an independent, outside accountant, selected by the Holder and approved by the Company, such approval not to be unreasonably withheld, conditioned or delayed. The Company, at the Company's expense, shall cause the accountant to perform the determinations or calculations and notify the Company and the Holder of the results no later than five (5) Business Days from the time it receives the disputed determinations or calculations. Such accountant's determination or calculation shall be binding upon all parties absent demonstrable error.

(20)     <u>NOTICES; PAYMENTS</u>.

(a) <u>Notices</u>. All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, facsimile, or electronic mail, addressed as set forth below or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received), or (b) upon receipt, when sent by electronic mail (provided confirmation of transmission is electronically generated and keep on file by the sending party), or (c) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur. The addresses for such communications shall be: (i) if to Borrower, to: Proton Green LLC at 4531 Park Lane, Dallas, Texas 75220, Steven E. Looper, sel@protongreen.com; (ii) if to the Holder, to: the address and fax number indicated on the Purchase Agreement. Without limiting the generality of the foregoing, the Company shall give written notice to the Holder (i) immediately upon any adjustment of the Conversion Price, setting forth in reasonable detail, and certifying, the calculation of such adjustment and (ii) at least twenty (20) days prior to the date on which the Company closes its books or takes a record (A) with respect to any dividend or distribution upon the Common Stock, (B) with respect to any pro rata subscription offer to holders of Common Stock or (C) for determining rights to vote with respect to any Fundamental Transaction, dissolution or liquidation, provided in each case that such information shall be made known to the public prior to or in conjunction with such notice being provided to the Holder.

(b) <u>Payments</u>. Whenever any payment of cash is to be made by the Company to any Person pursuant to this Note, such payment shall be made in lawful money of the United States of America by a check drawn on the account of the Company and sent via overnight courier service to such Person at such address as previously provided to the Company in writing; <u>provided</u>, that the Holder may elect to receive a payment of cash via wire transfer of immediately available funds by providing the Company with prior written notice setting out such request and the Holder's wire transfer instructions. Whenever any amount expressed to be due by the terms of this Note is due on any day, which is not a Business Day, the same shall instead be due on the next succeeding day, which is a Business Day.

(21) <u>CANCELLATION</u>. After all Principal and other amounts at any time owed on this Note have been paid in full, this Note shall automatically be deemed canceled, shall be surrendered to the Company for cancellation and shall not be reissued.

(22) <u>WAIVER OF NOTICE</u>. To the extent permitted by law, the Company hereby waives demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note.

(23) <u>GOVERNING LAW; JURISDICTION; JURY TRIAL</u>. All questions concerning the construction, validity, enforcement and interpretation of this Note shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflicts of law thereof. The Company agrees that all legal proceedings concerning the interpretations, enforcement and defense of the transactions contemplated by this Note (whether brought against the Company, the Holder or their respective affiliates, directors, officers, shareholders, employees or agents) shall be commenced exclusively in the state and federal courts sitting in the City of New York, County of New York. The Company hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the City of New York, Borough of Manhattan for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is improper or is an inconvenient venue for such proceeding. The Company hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to it at the address in effect for notices to it under the Purchase Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law. If the Company or a Holder shall commence an action or proceeding to enforce any provisions of the Note, then the prevailing party in such action or proceeding shall be reimbursed by the other party for its reasonable attorneys' fees and other costs and expenses incurred with the investigation, preparation and prosecution of such action or proceeding. **IN ANY ACTION, SUIT, OR PROCEEDING IN ANY JURISDICTION BROUGHT BY ANY PARTY AGAINST ANY OTHER PARTY, THE COMPANY KNOWINGLY AND INTENTIONALLY, TO THE GREATEST EXTENT PERMITTED**

**BY APPLICABLE LAW, HEREBY ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND EXPRESSLY WAIVES FOREVER TRIAL BY JURY.**

(24) <u>SEVERABILITY</u>. If any provision of this Note is prohibited by law or otherwise determined to be invalid or unenforceable by a court of competent jurisdiction, the provision that would otherwise be prohibited, invalid or unenforceable shall be deemed amended to apply to the broadest extent that it would be valid and enforceable, and the invalidity or unenforceability of such provision shall not affect the validity of the remaining provisions of this Note so long as this Note as so modified continues to express, without material change, the original intentions of the parties as to the subject matter hereof and the prohibited nature, invalidity or unenforceability of the provision(s) in question does not substantially impair the respective expectations or reciprocal obligations of the parties or the practical realization of the benefits that would otherwise be conferred upon the parties. The parties will endeavor in good faith negotiations to replace the prohibited, invalid or unenforceable provision(s) with a valid provision(s), the effect of which comes as close as possible to that of the prohibited, invalid or unenforceable provision(s).

(25) <u>DISCLOSURE</u>. Upon receipt or delivery by the Company of any notice in accordance with the terms of this Note, unless the Company has in good faith determined that the matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries, the Company shall within one (1) Business Day after any such receipt or delivery publicly disclose such material, nonpublic information on a Current Report on Form 6-K or otherwise. In the event that the Company believes that a notice contains material, nonpublic information relating to the Company or its Subsidiaries, the Company so shall indicate to such Holder contemporaneously with delivery of such notice, and in the absence of any such indication, the Holder shall be allowed to presume that all matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries.

(26) <u>CERTAIN DEFINITIONS</u>. For purposes of this Note, the following terms shall have the following meanings:

(a) "**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person, it being understood for purposes of this definition that "control" of a Person means the power directly or indirectly either to vote 10% or more of the stock having ordinary voting power for the election of directors of such Person or direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

(b) "**Attribution Parties**" means, collectively, the following Persons and entities: (i) any investment vehicle, including, any funds, feeder funds or managed accounts, currently, or from time to time after the Issuance Date, directly or indirectly managed or advised by the Holder's investment manager or any of its Affiliates or principals, (ii) any direct or indirect Affiliates of the Holder or any of the foregoing, (iii) any Person acting or who could be deemed to be acting as a Group together with the Holder or any of the foregoing and (iv) any other Persons whose beneficial ownership of the Company's Common Stock would or could be aggregated with

the Holder's and the other Attribution Parties for purposes of Regulation 13D-G of the Exchange Act.

(c) "**Bloomberg**" means Bloomberg Financial Markets.

(d) "**Closing Date**" shall have the meaning ascribed to such term in the Purchase Agreement.

(e) "**Closing Bid Price**" and "**Closing Sale Price**" means, for any security as of any date, the last closing bid price and last closing trade price, respectively, for such security on the Principal Market, as reported by Bloomberg, or, if the Principal Market begins to operate on an extended hours basis and does not designate the closing bid price or the closing trade price, as the case may be, then the last bid price or last trade price, respectively, of such security prior to 4:00 p.m., New York Time, as reported by Bloomberg, or, if the Principal Market is not the principal securities exchange or trading market for such security, the last closing bid price or last trade price, respectively, of such security on the principal securities exchange or trading market where such security is listed or quoted for trading as reported by Bloomberg, or if the foregoing do not apply, the last closing bid price or last trade price, respectively, of such security in the over-the-counter market on the electronic bulletin board for such security as reported by Bloomberg, or, if no closing bid price or last trade price, respectively, is reported for such security by Bloomberg, the average of the bid prices, or the ask prices, respectively, of any market makers for such security as reported in the OTC Link or "pink sheets" by OTC Markets Group Inc. (formerly Pink OTC Markets Inc.). If the Closing Bid Price or the Closing Sale Price cannot be calculated for a security on a particular date on any of the foregoing bases, the Closing Bid Price or the Closing Sale Price, as the case may be, of such security on such date shall be the fair market value as mutually determined by the Company and the Holder. If the Company and the Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved pursuant to Section 19. All such determinations to be appropriately adjusted for any stock dividend, stock split, stock combination, reclassification or similar transaction during the applicable calculation period.

(f) "**Common Stock**" the common stock of the Company, par value $0.001 per share, and any other class of securities into which such securities may hereafter be reclassified or changed.

(g) "**Convertible Securities**" means any stock or securities (other than Options) directly or indirectly convertible into or exercisable or exchangeable for shares of Common Stock.

(h) "**Default Interest Rate**" means 18% per annum.

(i) "**Equity Interests**" means (a) all shares of capital stock (whether denominated as common capital stock or preferred capital stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an

-20-

individual), whether voting or non-voting and (b) all securities convertible into or exchangeable for any of the foregoing and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any of the foregoing, whether or not presently convertible, exchangeable or exercisable.

(j) "**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

(k) "**Fundamental Transaction**" means (A) that the Company shall, directly or indirectly, including through Subsidiaries, Affiliates or otherwise, in one or more related transactions, (i) consolidate or merge with or into (whether or not the Company is the surviving corporation) another Subject Entity, or (ii) sell, assign, transfer, convey or otherwise dispose of all or substantially all of the properties or assets of the Company or any of its "significant subsidiaries" (as defined in Rule 1-02 of Regulation S-X) to one or more Subject Entities, or (iii) make, or allow one or more Subject Entities to make, or allow the Company to be subject to or have its Common Stock be subject to or party to one or more Subject Entities making, a purchase, tender or exchange offer that is accepted by the holders of at least either (x) 50% of the outstanding shares of Common Stock, (y) 50% of the outstanding shares of Common Stock calculated as if any shares of Common Stock held by all Subject Entities making or party to, or Affiliated with any Subject Entities making or party to, such purchase, tender or exchange offer were not outstanding; or (z) such number of shares of Common Stock such that all Subject Entities making or party to, or Affiliated with any Subject Entity making or party to, such purchase, tender or exchange offer, become collectively the beneficial owners (as defined in Rule 13d-3 under the Exchange Act) of at least 50% of the outstanding shares of Common Stock, or (iv) consummate a stock purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off or scheme of arrangement) with one or more Subject Entities whereby such Subject Entities, individually or in the aggregate, acquire, either (x) at least 50% of the outstanding shares of Common Stock, (y) at least 50% of the outstanding shares of Common Stock calculated as if any shares of Common Stock held by all the Subject Entities making or party to, or Affiliated with any Subject Entity making or party to, such stock purchase agreement or other business combination were not outstanding; or (z) such number of shares of Common Stock such that the Subject Entities become collectively the beneficial owners (as defined in Rule 13d-3 under the Exchange Act) of at least 50% of the outstanding shares of Common Stock, or (v) reorganize, recapitalize or reclassify its Common Stock, (B) that the Company shall, directly or indirectly, including through Subsidiaries, Affiliates or otherwise, in one or more related transactions allow any Subject Entity individually or the Subject Entities in the aggregate to be or become the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, whether through acquisition, purchase, assignment, conveyance, tender, tender offer, exchange, reduction in outstanding shares of Common Stock, merger, consolidation, business combination, spin-off, scheme of arrangement, reorganization, recapitalization or reclassification or otherwise in any manner whatsoever, of either (x) at least 50% of the aggregate ordinary voting power represented by issued and outstanding Common Stock, (y) at least 50% of the aggregate ordinary voting power represented by issued and outstanding Common Stock not held by all such Subject Entities as of the date of this Note calculated as if any shares of Common Stock held by all such Subject Entities were not outstanding, or (z) a percentage of the aggregate ordinary voting power

-21-

represented by issued and outstanding shares of Common Stock or other equity securities of the Company sufficient to allow such Subject Entities to effect a statutory short form merger or other transaction requiring other stockholders of the Company to surrender their shares of Common Stock without approval of the stockholders of the Company or (C) directly or indirectly, including through Subsidiaries, Affiliates or otherwise, in one or more related transactions, the issuance of or the entering into any other instrument or transaction structured in a manner to circumvent, or that circumvents, the intent of this definition in which case this definition shall be construed and implemented in a manner otherwise than in strict conformity with the terms of this definition to the extent necessary to correct this definition or any portion of this definition which may be defective or inconsistent with the intended treatment of such instrument or transaction.

(l) "**GAAP**" means United States generally accepted accounting principles, consistently applied.

(m) "**Group**" means a "group" as that term is used in Regulation 13D-G of the Exchange Act and as defined in Rule 13d-5 thereunder.

(n) "**Holiday**" means a day other than a Business Day or on which trading does not take place on the Principal Market.

(o) RESERVED

(p) "**Market Price**" shall mean the lowest Closing Bid Price on the Closing Date.

(q) "**OID**" shall mean the Original Issue Discount, which is 35%.

(r) "**Notes**" means this Note and the Other Notes.

(s) "**Options**" means any rights, warrants or options to subscribe for or purchase shares of Common Stock or Convertible Securities.

(t) "**Other Notes**" means (i) the Amended and Restated Promissory Convertible Note, dated as of the date hereof, made by the Company in favor of Alpha Carta, Ltd. in the principal amount of $1,846,153.84 (the "**AC Note**"), and (ii) the Amended and Restated Promissory Convertible Note, dated as of the date hereof, made by the Company in favor of Alpha Carta, Ltd. in the principal amount of $4,307,692 (the "**2022 AC Note**").

(u) "**Parent Entity**" of a Person means an entity that, directly or indirectly, controls the applicable Person, including such entity whose common capital stock or equivalent equity security is quoted or listed on a Trading Market (or, if so elected by the Holder, any other market, exchange or quotation system), or, if there is more than one such Person or such entity, the Person or entity designated by the Holder or in the absence of such designation, such Person or such entity with the largest public market capitalization as of the date of consummation of the Fundamental Transaction.

-22-

(v) "**Permitted Indebtedness**" means (i) Indebtedness evidenced by this Note and the Other Notes; (ii) debt incurred to make acquisitions; (iii) trade payables incurred in the ordinary course of business consistent with past practice, (iv) unsecured indebtedness not in excess of $1,000,000 in the aggregate, and (v) Indebtedness secured by Permitted Liens.

(w) "**Permitted Liens**" means (i) any Lien for taxes not yet due or delinquent or being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP, (ii) any statutory Lien arising in the ordinary course of business by operation of law with respect to a liability that is not yet due or delinquent, (iii) any Lien created by operation of law, such as materialmen's liens, mechanics' liens and other similar liens, arising in the ordinary course of business with respect to a liability that is not yet due or delinquent or that are being contested in good faith by appropriate proceedings, (iv) Liens (A) upon or in any equipment acquired or held by the Company or any of its Subsidiaries to secure the purchase price of such equipment or Indebtedness incurred solely for the purpose of financing the acquisition or lease of such equipment, or (B) existing on such equipment at the time of its acquisition, provided that the Lien is confined solely to the property so acquired and improvements thereon, and the proceeds of such equipment, (v) Liens incurred in connection with the extension, renewal or refinancing of the Indebtedness secured by Liens of the type described in clause (iv) above, provided that any extension, renewal or replacement Lien shall be limited to the property encumbered by the existing Lien and the principal amount of the Indebtedness being extended, renewed or refinanced does not increase, (vi) leases or subleases and licenses and sublicenses granted to others in the ordinary course of the Company's business, not interfering in any material respect with the business of the Company and its Subsidiaries taken as a whole, (vii) Liens in favor of customs and revenue authorities arising as a matter of law to secure payments of custom duties in connection with the importation of goods, (viii) Liens arising from judgments, decrees or attachments in circumstances not constituting an Event of Default under Section 4(a)(viii) and (ix) liens listed on Schedule 27(v) hereto, and (ix) Liens arising pursuant to the terms of the Notes.

(x) "**Principal Market**" means the OTCQB tier of the OTC Markets.

(y) "**Redemption Dates**" means, collectively, the Event of Default Redemption Dates, and the Optional Redemption Dates, each of the foregoing, individually, a Redemption Date.

(z) "**Redemption Notices**" means, collectively, the Event of Default Redemption Notices, and the Optional Redemption Notices, each of the foregoing, individually, a Redemption Notice.

(aa) "**Redemption Price**" means, 125% of the outstanding principal amount of the Note together with accrued Interest thereon, which after an Event of Default shall be calculated at the Default Rate.

(bb) "**Related Fund**" means, with respect to any Person, a fund or account managed by such Person or an Affiliate of such Person.

(cc) "**Required Holders**" means any two (2) Holders of the Notes.

(dd) "**Rule 144**" shall have the meaning ascribed to such term in the Purchase Agreement.

(ee) "**SEC**" means the United States Securities and Exchange Commission.

(ff) "**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

(gg) "**Subject Entity**" means any Person, Persons or Group or any Affiliate or associate of any such Person, Persons or Group.

hh) "**Successor Entity**" means one or more Person or Persons (or, if so elected by the Holder, the Company or Parent Entity) formed by, resulting from or surviving any Fundamental Transaction or one or more Person or Persons (or, if so elected by the Holder, the Company or the Parent Entity) with which such Fundamental Transaction shall have been entered into.

(ii) "**Trading Market**" means any of the following markets or exchanges on which the Common Stock is listed or quoted for trading on the date in question: the NYSE American, the Nasdaq Capital Market, the Nasdaq Global Market, the Nasdaq Global Select Market, the New York Stock Exchange, OTCQB or OTCQX (or any successors to any of the foregoing).

(jj) "**VWAP**" means, for any date, the price determined by the first of the following clauses that applies: (a) if the Common Stock is then listed or quoted on a Trading Market, the daily volume weighted average price of the Common Stock for such date (or the nearest preceding date) on the Trading Market on which the Common Stock is then listed or quoted as reported by Bloomberg L.P. (based on a Trading Day from 9:30 a.m. New York City time to 4:02 p.m. New York City time); (b) if the Common Stock is not then listed or quoted for trading on a Trading Market and if prices for the Common Stock are then reported on the OTC Pink (or a similar organization or agency succeeding to its functions of reporting prices), the most recent bid price per share of the Common Stock so reported; or (c) in all other cases, the fair market value of a share of Common Stock as determined by an independent appraiser selected in good faith by the Holders of a majority in interest of the Note then outstanding and reasonably acceptable to the Company, the fees and expenses of which shall be paid by the Company.

[Signature Page Follows]

-24-

IN WITNESS WHEREOF, the Company has caused this Second Amended and Restated Note to be duly executed as of the 18th day of February, 2022.

**Proton Green LLC**,
formerly known as Plateau
Carbon, LLC

By: _____
Name: *Steven E. Looper*
Title: *Managing Member*

AGREED AND APPROVED:

KIPS BAY SELECT LP

By:_____
    Name
    Title:

-25-

IN WITNESS WHEREOF, the Company has caused this Second Amended and Restated Note to be duly executed as of the 18th day of February, 2022.

**Proton Green LLC**,
formerly known as Plateau
Carbon, LLC

By: _____
Name:
Title:

AGREED AND APPROVED:

KIPS BAY SELECT LP

By: _____
    Name: Roman Rogol
    Title: CFO

-26-

**EXHIBIT I**
**PROTON GREEN LLC**
**CONVERSION NOTICE**

Reference is made to the Second Amended and Restated Promissory Convertible Note (the "**Note**") issued to Kips Bay Select LP (together with its designee or registered assigns, the "**Holder**") by Proton Green LLC (formerly known as Plateau Carbon, LLC) (the "**Company**"). In accordance with and pursuant to the Note, the undersigned hereby elects to convert the Conversion Amount (as defined in the Note) of the Note indicated below into shares of Common Stock of the Company, par value $ 0.0001 per share (the "**Common Stock**") of the Company, as of the date specified below.

Date of
Conversion: _____

Aggregate Conversion Amount to be
converted: _____

Please confirm the following information:

Conversion Price: _____

Number of shares of Common Stock to
be issued: _____

Please issue the Common Stock into which the Note is being converted in the following name and to the following address:

Issue to: _____

Facsimile Number and Electronic

Mail: _____

Authorization: _____
        By: _____
            Title: _____

Dated: _____
    Account
    Number: _____

-26-

(if electronic book entry transfer)
Transaction Code
Number: _____
(if electronic book entry transfer)

**EXHIBIT L**

*Execution Version*

**NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE CONVERTIBLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL SELECTED BY THE HOLDER, IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT, OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES. ANY TRANSFEREE OF THIS NOTE SHOULD CAREFULLY REVIEW THE TERMS OF THIS NOTE. THE PRINCIPAL AMOUNT REPRESENTED BY THIS NOTE AND, ACCORDINGLY, THE SECURITIES ISSUABLE UPON CONVERSION HEREOF MAY BE LESS THAN THE AMOUNTS SET FORTH ON THE FACE HEREOF.**

Reference is hereby made to the Promissory Convertible Note, dated as of December 23, 2021, made by the Company in favor of Alpha Carta, Ltd. in the principal amount of $1,846,153.84 (as amended, the "**Original Note**"). The Company and the Holder (as defined below) hereby agree that the Original Note shall be superseded, amended and restated to read in its entirety as follows:

**PROTON GREEN LLC**

**AMENDED AND RESTATED PROMISSORY CONVERTIBLE NOTE**

Issuance Date: December 23, 2021          Principal Amount:  U.S. $1,846,153.84
Date of Note: February 18, 2022

       **FOR VALUE RECEIVED**, Proton Green LLC (formerly known as Plateau Carbon, LLC) (the "**Company**") pursuant to this Amended and Restated Promissory Convertible Note (the "**Note**"), hereby promises to pay to Alpha Carta, Ltd., its designee or registered assigns (the "**Holder**"), in cash, the principal amount of US $1,846,153.84 (as reduced pursuant to the terms hereof pursuant to redemption, conversion or otherwise, the "**Principal**" or the "**Principal Amount**", after giving effect to a 35% original issue discount) on April 7, 2022 (the "**Maturity Date**"), subject to earlier acceleration, conversion, redemption or otherwise (in each case in accordance with the terms hereof). Certain capitalized terms used herein are defined in Section 26. This Note is issued pursuant to that certain Securities Purchase Agreement dated December 23, 2021, by and among the Company and the Holder (the "**Purchase Agreement**"), and capitalized terms not defined herein will have the meanings set forth in the Purchase Agreement.

(1) <u>PAYMENTS OF PRINCIPAL; AMENDMENT FEE; PREPAYMENT</u>.

       (a)     On the Maturity Date, the Company shall pay to the Holder (i) the Principal Amount in cash, together with (ii) Interest (as defined below) thereon calculated from the date

hereof in accordance with the provisions of this Note, plus (iii) an amendment and extension fee in the amount of $150,000.00 (the "**Amendment Fee**"), provided, however, that the Holder shall have the right in its sole discretion to be repaid with 100% of the proceeds ("**Proceeds**") of the following: (1) sale of the Company's assets, (2) any merger, sale or other transaction resulting in the holders of the Company's Common Stock prior to such merger or other transaction ceasing to own at least 50% of the Common Stock, (3) issuances of the Company's Debt, and/or (4) issuances of the Company's equity. Notwithstanding the foregoing, (i) in the event that on the Maturity Date the Company does not have sufficient funds to repay this Note and the Other Notes in full, the Company shall be prohibited from repaying the Principal Amount, Interest and Amendment Fee of this Note in full and shall instead repay the Holders of each of the Notes a pro rata portion of the Principal Amount, Interest and Amendment Fee of each of the Notes based on the proportion that each of the Notes bears to the aggregate Principal Amount, Interest and Amendment Fee of all of the Notes, and (ii) unless a Holder of either of the Other Notes declines its right to be repaid with Proceeds, any Proceeds shall be applied to repay a pro rata portion of the Principal Amount, Interest and Amendment Fee of each of the Notes based on the proportion that each of the Notes bears to the aggregate Principal Amount, Interest and Amendment Fee of all of the Notes. All payments shall be applied first to the Amendment Fee, then to accrued Interest and thereafter to the Principal Amount.

(b) Interest shall accrue on the unpaid Principal Amount outstanding until the Maturity Date at a rate equal to one and one-half percent (1.5%) per month. The accrued interest on the Principal Amount of this Note shall not compound, and is referred to herein as the "**Interest**". Such Interest shall be computed for the actual number of days elapsed in a month consisting of 28, 30 or 31 days, as the case may be.

(c) The Company may, at any time and from time to time without premium or penalty, prepay all or any portion of the outstanding Principal Amount of, and Interest on, and Amendment Fee of, this Note. Any partial payment will be credited first to the Amendment Fee, then to accrued and unpaid Interest and the balance, if any, to the then outstanding Principal Amount.

**(2)** **RANKING; SECURITY**.

(a) The parties agree that this Note shall rank (i) pari passu with the indebtedness under the Other Notes and (ii) senior to all other existing and future debt of the Company.

(b) Payment of this Note and all other obligations, fees, and expenses due to the Holder pursuant to this Note and the Purchase Agreement (the "**Secured Obligations**") will be secured at all times by (i) valid, enforceable first priority mortgages and/or deeds of trust on and covering all real property interests presently owned and hereafter acquired by the Company, and all assets and personal property relating thereto (the "**Mortgaged Properties**"), and (ii) valid, enforceable first priority security interests on and covering all of the other assets of the Company (the "**Other Assets**").

-2-

(c)     Within five (5) business days of a request by the Holder, the Company shall deliver to the Holder (i) mortgages and/or deeds of trust, in appropriate and recordable form under Arizona law and reasonably satisfactory in form and substance to the Holder, executed by the Company, with respect to the Mortgaged Properties  ("Deeds of Trust"), which shall create a first priority lien on such Mortgaged Properties and which shall be promptly recorded in the recorder's office of the appropriate county, and (ii) appropriate instruments granting valid, enforceable first priority security interests on and covering all of the Other Assets, in appropriate and recordable form and reasonably satisfactory in form and substance to the Holder, executed by the Company, with respect to the Other Assets (the "Other Instruments" and, collectively with the Deeds of Trust, the "Security Documents").  Thereafter, the Company shall cause the Mortgaged Properties now owned or hereafter acquired by it to be subject at all times to a first priority, perfected lien in favor of the Holder to secure the Secured Obligations, and the Company shall provide any filings and deliveries reasonably requested by the Holder in connection therewith to perfect the security interests therein, all in form and substance reasonably satisfactory to the Holder.

(d)     The Holder acknowledges that the security interests granted in the Mortgaged Properties and the Other Assets to the Holder to secure the Secured Obligations are also being granted to the holders of the Others Notes to secure the obligations of the Company under such Other Notes, and that such all of such security interests shall be for the ratable benefit of the Holders of all of the Notes.  The form and substance of the Security Documents shall reflect such ratable benefit term.

(3) CONVERSION OF NOTE. Following the Issuance Date, as set out above, this Note shall be convertible into shares of Common Stock on the terms and conditions set forth in this Section 3.

(a) Optional Conversion Right. Holder has the right to convert all or part of the Principal Amount at the Company's valuation of $250,000,000.00 into fully paid and nonassessable shares of Common Stock in accordance with Section 3(c), at the Conversion Rate (as defined below) (the "**Conversion Date**"). The Company shall not issue any fraction of a share of Common Stock upon any conversion. If the issuance would result in the issuance of a fraction of a share of Common Stock, the Company shall round such fraction of a share of Common Stock up to the nearest whole share. The Company shall pay any and all transfer, stamp and similar taxes that may be payable with respect to the issuance and delivery of Common Stock upon conversion of any Conversion Amount. The Holder shall have the right to deliver an effective conversion notice at any time until 11:59 pm on the chosen date and it shall be immediately effective.

(b) Conversion Rate. The number of shares of Common Stock issuable upon conversion of any Conversion Amount pursuant to Section 3(a) shall be determined by dividing (x) such Conversion Amount by (y) the Conversion Price (the "**Conversion Rate**").

(i) "**Conversion Amount**" means the sum of the portion of the Principal to be converted, redeemed or otherwise with respect to which this determination is being made.

(ii) "**Conversion Price**" means $0.0599. Subsequent to the effective date of the registration statement registering for resale the Conversions Shares and the Warrant Shares pursuant to the Purchase Agreement, if the closing sale price of the Common Stock averages less than the then Conversion Price over a period of ten (10) consecutive trading days, the Conversion Price shall reset to such average price. If the 10-day volume weighted average price of the Common Stock continues to be less than the Conversion Price then the Conversion Price should reset to such 10-day average price.

(c) <u>Mechanics of Optional Conversion and Adjustment:</u>

(i) <u>Registration; Book-Entry</u>. The Company shall maintain a register (the "**Register**") for the recordation of the holder of the Note and the Principal amount of the Note held by the holder (the "**Registered Note**"). The entries in the Register, made in good faith, shall be conclusive and binding for all purposes absent manifest error. The Company and the holder of the Note shall treat each Person whose name is recorded in the Register as the owner of the Note for all purposes, including, without limitation, the right to receive payments of Principal, if any, hereunder, notwithstanding notice to the contrary. Upon its receipt of a request to assign or sell all or part of the Registered Note by the Holder, the Company shall record the information contained therein in the Register and issue one or more new Registered Notes in the same aggregate Principal amount as the Principal amount of the surrendered Registered Note to the designated assignee or transferee pursuant to Section 10. Notwithstanding anything to the contrary in this Section 3(c)(i), the Holder may assign any Note or any portion thereof to an Affiliate of such Holder or a Related Fund of such Holder without delivering a request to assign or sell such Note to the Company and the recordation of such assignment or sale in the Register (a "**Related Party Assignment**"); <u>provided</u>, that (x) the Company may continue to deal solely with such assigning or selling Holder unless and until such Holder has delivered a request to assign or sell such Note or portion thereof to the Company for recordation in the Register; (y) the failure of such assigning or selling Holder to deliver a request to assign or sell such Note or portion thereof to the Company shall not affect the legality, validity, or binding effect of such assignment or sale and (z) such assigning or selling Holder shall, acting solely for this purpose as a non-fiduciary agent of the Company, maintain a register (the "**Related Party Register**") comparable to the Register on behalf of the Company, and any such assignment or sale shall be effective

-4-

upon recordation of such assignment or sale in the Related Party Register. Notwithstanding anything to the contrary set forth herein, upon conversion of any portion of this Note in accordance with the terms hereof, the Holder shall not be required to physically surrender this Note to the Company unless the Holder has provided the Company with prior written notice (which notice may be included in a Conversion Notice) requesting reissuance of this Note upon physical surrender of this Note. The Holder and the Company shall maintain records showing the Principal, converted and the dates of such conversions or shall use such other method, reasonably satisfactory to the Holder and the Company, so as not to require physical surrender of this Note upon conversion.

(ii) <u>Intentionally omitted</u>.

(iii) Holder may convert any or all of this Note into shares of Common Stock at any time.

(d)    <u>Limitations on Conversions</u>.

(i) <u>Beneficial Ownership</u>. In case that the Holder becomes subject to the filing or reporting obligations under Regulation 13D-G of the Exchange Act due to (i) the conversion of this Note, or any other share issuance hereunder, or (ii) the changes to the beneficial ownership of the Holder (together with the Attribution Parties) in the Company, including but not limited to the changes to such beneficial ownership due to the conversion or share issuance hereunder, the Holder shall timely file such schedules or forms with the United States Securities and Exchange Commission (the "**Commission**") as required under Regulation 13D-G of the Exchange Act. For purposes of this paragraph, beneficial ownership and all calculations (including, without limitation, with respect to calculations of percentage ownership) shall be determined in accordance with Regulation 13D-G and the rules and regulations promulgated thereunder. The obligations contained in this paragraph shall apply to a successor Holder of this Note. For any reason at any time, upon the written or oral request of the Holder, the Company shall within one (1) Business Day confirm orally and in writing to the Holder the number of shares of Common Stock then outstanding, including by virtue of any prior conversion or exercise of convertible or exercisable securities into Common Stock, including, without limitation, pursuant to this Note or securities issued pursuant to the Purchase Agreement.

(ii) <u>Principal Market Regulation</u>. Unless permitted by the applicable rules and regulations of the Principal Market, the Company shall not issue any shares of Common Stock upon conversion of this Note if the issuance of such shares

of Common Stock would exceed the aggregate number of shares of Common Stock which the Company may issue upon exercise or conversion (as the case may be) of the Note without breaching the Company's obligations under the rules or regulations of the Principal Market (the number of shares which may be issued without violating such rules and regulations, the "**Exchange Cap**"). Notwithstanding the foregoing, such limitation shall not apply in the event that the Company (A) obtains the approval of its stockholders as required by the applicable rules of the Principal Market for issuances of shares of Common Stock in excess of such amount or (B) obtains a written opinion from outside counsel to the Company that such approval is not required, which opinion shall be reasonably satisfactory to the Holder. In the event that any Holder shall sell or otherwise transfer any of such Holder's Note, the Exchange Cap restrictions set forth herein shall continue to apply to the Note and such transferee.

(e) <u>Disputes</u>. In the event of a dispute as to the number of shares of Common Stock issuable to the Holder in connection with a conversion of this Note, the Company shall issue to the Holder the number of shares of Common Stock not in dispute and resolve such dispute in accordance with Section 16.

(f) <u>Automatic Conversion.</u> In the event the Company completes a Fundamental Transaction or completes a listing of its Common Stock onto a national stock exchange, Holder agrees to convert the OID into Common Stock of the Company at the Conversion Price. The remaining Principal Amount, Amendment Fee and Interest will remain outstanding, unless the Holder elects to convert such Principal Amount, Amendment Fee and Interest into Common Stock of the Company.

(4)     The Company hereby covenants and agrees as follows:

(a) <u>Sale of Assets</u>. During the thirty (30) days from the date of this Note, with the exception of moving certain of its assets to any of its subsidiaries, the Company shall not sell any material assets.

(b) <u>Additional Debt</u>. While this Note is outstanding, the Company shall not incur any additional indebtedness for borrowed money, other than any indebtedness that is Permitted Indebtedness.

(5)     RIGHTS UPON EVENT OF DEFAULT.

(a) <u>Event of Default</u>. Each of the following events shall constitute an "**Event of Default**"; provided, however, that, except in the case of the Events of Default listed in Sections 5(a)(i), or 5(a)(ix) below, the Company shall have five (5) business days after notice of default from the Holder to cure such Event of Default unless a lesser number of days is required pursuant to the provisions of this Section 5.

(i) <u>Failure to Pay Principal</u>. The Company fails to pay the Principal, Amendment Fee or Interest due under this Note or any of the Other Notes at the Maturity Date (or the maturity date of any of the Other Notes, if the maturity date under the Other Notes is different from the Maturity Date), liquidated damages and other amounts thereon when due on the Note or any of the Other Notes, whether at maturity, upon acceleration or otherwise.

(ii) <u>Conversion and the Shares</u>. The Company (i) fails to issue Conversion Shares to the Holder (or announces or threatens in writing that it will not honor its obligation to do so) upon exercise by the Holder of the conversion rights of the Holder in accordance with the terms of the Note, (ii) fails to transfer or cause its transfer agent to transfer (issue) (electronically or in certificated form) any certificate for the Conversion Shares issuable to the Holder upon conversion of or otherwise pursuant to the Note as and when required by the Note, or (iii) the Company directs its transfer agent not to transfer or delays, impairs, and/or hinders its transfer agent in transferring (or issuing) (electronically or in certificated form) any certificate for the Conversion Shares issuable to the Holder upon conversion of or otherwise pursuant to the Note as and when required by the Note, or fails to remove (or directs its transfer agent not to remove or impairs, delays, and/or hinders its transfer agent from removing) any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any certificate for any Conversion Shares issued to the Holder upon conversion of or otherwise pursuant to the Note as and when required by the Note (or makes any written announcement, statement or threat that it does not intend to honor the obligations described in this paragraph) and any such failure shall continue uncured (or any written announcement, statement or threat not to honor its obligations shall not be rescinded in writing) for five (5) business days after the Holder shall have delivered a Notice of Conversion. It is an obligation of the Company to remain current in its obligations to its transfer agent. It shall be an Event of Default of the Note, if a conversion of the Note is delayed, hindered or frustrated due to a balance owed by the Company to its transfer agent. If at the option of the Holder, the Holder advances any funds to the Company's transfer agent in order to process a conversion, such advanced funds shall be paid by the Company to the Holder within forty eight (48) hours of a demand from the Holder. If Borrower is unable to do so, they shall have an opportunity to cure within five (5) business days.

(iii) <u>Breach of Agreements and Covenants</u>. The Company breaches any material agreement, covenant or other material term or condition contained in the Purchase Agreement, the Note or in any agreement, statement or certificate given in writing pursuant hereto or in connection herewith or therewith, and such breach results in a material adverse effect on the business or assets of the Company.

(iv) <u>Breach of Representations and Warranties</u>. Any representation or warranty of the Company made in the Purchase Agreement or the Note, or in any agreement, statement or certificate given in writing pursuant hereto or in connection herewith or therewith shall be false or misleading in any material respect when made and the breach of which has (or with the passage of time will have) a Material Adverse Effect

-7-

on the rights of the Holder with respect to the Note or the Purchase Agreement. In the event of such a breach, the Company shall have an opportunity to cure within two (2) business days.

(v) <u>Receiver or Trustee</u>. The Company or any subsidiary of the Company shall make an assignment for the benefit of creditors, or apply for or consent to the appointment of a receiver or trustee for it or for a substantial part of its property or business, or such a receiver or trustee shall otherwise be appointed. Under such circumstances, the Company shall have an opportunity to cure within sixty (60) days.

(vi) <u>Judgments</u>. Any money judgment, writ or similar process shall be entered or filed against the Company or any subsidiary of the Company or any of its property or other assets for more than $100,000, and shall remain unvacated, unbonded or unstayed for a period of twenty (20) days unless otherwise consented to by the Holder, which consent will not be unreasonably withheld.

(vii) <u>Bankruptcy</u>. Bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings, voluntary or involuntary, for relief under any bankruptcy law or any law for the relief of debtors shall be instituted by or against the Company or any subsidiary of the Company. Under such circumstances, the Company shall have an opportunity to cure within sixty (60) days.

(viii) <u>Delisting or Trading of Common Stock.</u> The Company shall fail to maintain the listing or quotation of its Common Stock minimally on a Trading Market.

(ix) <u>Failure to Comply with the Exchange Act</u>. The Company shall fail to comply with the reporting requirements of the Exchange Act and/or the Company shall cease to be subject to the reporting requirements of the Exchange Act.

(x) <u>Liquidation.</u> Any dissolution, liquidation, or winding up of Borrower or any substantial portion of its business or assets.

(xi) <u>Cessation of Operations</u>. Any cessation of operations by Borrower or Borrower admits it is otherwise generally unable to pay its debts as such debts become due, provided, however, that any disclosure of the Company's ability to continue as a "going concern" shall not be an admission that the Company cannot pay its debts as they become due.

(xii) <u>Intentionally omitted</u>.

(xiii) <u>Intentionally omitted</u>.

(xiv) <u>Other Obligations</u>. The occurrence of any default under any agreement or obligation of the Company that is not cured within ten (10) days that could reasonably be expected to have a Material Adverse Effect.

(xv) <u>Default under Transaction Documents or Other Material Agreement</u>. A default or event of default (subject to any grace or cure period provided in the applicable agreement, document or instrument) shall occur under (A) this Note, the warrant or the securities purchase agreement or any of the other agreements entered into by the parties related to the purchase of this Note (collectively, the "**Transaction Documents**"), or (B) the Other Notes or any other material agreement, lease, document or instrument to which Company or any Subsidiary is obligated (and not covered by clause (vi) below), which in the case of subsection (B) would reasonably be expected to have a Material Adverse Effect.

(xvi) <u>Default under Mortgage or Other Agreement of Indebtedness</u>. Company or any Subsidiary shall default on any of its obligations under any mortgage, credit agreement or other facility, indenture agreement, factoring agreement or other instrument under which there may be issued, or by which there may be secured or evidenced, any indebtedness for borrowed money or money due under any long term leasing or factoring arrangement that (a) involves an obligation greater than $100,000, whether such indebtedness now exists or shall hereafter be created, and (b) results in such indebtedness becoming or being declared due and payable prior to the date on which it would otherwise become due and payable.

(xvii) <u>Intentionally omitted</u>.

(xviii) <u>Failure to Meet the Requirements under Rule 144</u>. Company does not meet the current public information requirements under Rule 144.

(xix) <u>Failure to Maintain Intellectual Property</u>. The failure by Company or any material Subsidiary to maintain any material intellectual property rights, personal, real property, equipment, leases or other assets which are necessary to conduct its business (whether now or in the future) and such breach is not cured with twenty (20) days after written notice to the Company from the Holder.

(xx) <u>Trading Suspension</u>. A Commission or judicial stop trade order or suspension from a Trading Market.

(xxi) <u>Intentionally omitted</u>.

(xxii) <u>Failure to Provide Required Notification of a Material Event</u>. A failure by Company to notify Holder of any material event of which Company is obligated to notify Holder pursuant to the terms of this Note or any other Transaction Document.

(xxiii) <u>Invalidity or Unenforceability of Transaction Documents</u>. Any material provision of any Transaction Document shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against the Company, or the validity or enforceability thereof shall be contested by Company, or a proceeding shall be commenced by Company or any governmental authority having jurisdiction over Company or Holder, seeking to establish the invalidity or unenforceability thereof, or Company shall deny in writing that it has any liability or obligation purported to be created under any Transaction Document.

(xxiv) <u>Intentionally omitted</u>.

(b) <u>Redemption Right</u>. At any time after the Holder becoming aware of an Event of Default, the Required Holders may require the Company to redeem (an "**Event of Default Redemption**") all or any portion of the Notes by delivering written notice thereof (the "**Event of Default Redemption Notice**") to the Company, which Event of Default Redemption Notice shall indicate the portion of this Note and the Other Notes the Required Holders are electing to require the Company to redeem. Each portion of this Note and the Other Notes subject to redemption by the Company pursuant to this Section 5(b) shall be redeemed by the Company in cash by wire transfer of immediately available funds at a price equal to (i) the Principal Amount, plus (ii) all Interest then accrued on the Principal Amount from the date of the Note to the Event of Default, plus (iii) the Amendment Fee, plus (iv) interest on the Principal Amount calculated from the Event of Default at the greater of the Default Interest Rate or the maximum rate permitted under applicable law (the "**Event of Default Redemption Price**"), plus (v) liquidated damages of $750,000, plus (vi) an amount in cash equal to 1% of the Event of Default Redemption Price for each 30 day period during which redemptions fail to be made; provided, however, in the event that the Company does not have sufficient funds to pay 100% of the relevant Event of Default Redemption Price to the Holders of all of the Notes, the Company shall pay a pro rata portion of the Event of Default Redemption Price to each such Holder based on the proportion that the Principal Amount of each of the Notes bears to the aggregate Principal Amount of all of the Notes. To the extent redemptions required by this Section 5(b) are deemed or determined by a court of competent jurisdiction to be prepayments of the Note by the Company, such redemptions shall be deemed to be voluntary prepayments. Notwithstanding anything to the contrary in this Section 5, but subject to Section 3(b)(ii) and 3(d), until the Event of Default Redemption Price payable in respect of each of the Notes (together with any interest thereon) is paid in full, the Conversion Amount submitted for redemption under this Section 5(b) (together with any interest thereon) may be converted, in whole or in part, by the Holder into Common Stock pursuant to Section 3. The parties hereto agree that in the event of the Company's redemption of any portion of the Note under this Section 5(b), the Holder's damages would be uncertain and difficult to estimate because of the parties' inability to predict future interest rates and the uncertainty of the availability of a suitable substitute investment opportunity for the Holder. Accordingly, any Event of Default redemption premium due under this Section 5(b) is intended by the parties to be, and shall be deemed, a reasonable estimate of the Holder's actual loss of its investment opportunity and not as a penalty.

(6) <u>RIGHTS UPON FUNDAMENTAL TRANSACTION</u>.

-10-

(a) If, at any time while this Note is outstanding, (i) the Company effects a Fundamental Transaction, then, upon any subsequent conversion of this Note, the Holder shall have the right to receive, for each Conversion Share that would have been issuable upon such conversion immediately prior to the occurrence of such Fundamental Transaction, the same kind and amount of securities, cash or property as it would have been entitled to receive upon the occurrence of such Fundamental Transaction if it had been, immediately prior to such Fundamental Transaction, the holder of one (1) share of Common Stock (the "Alternate Consideration"). For purposes of any such conversion, the determination of the Conversion Price shall be appropriately adjusted to apply to such Alternate Consideration based on the amount of Alternate Consideration issuable in respect of one (1) share of Common Stock in such Fundamental Transaction, and the Company shall apportion the Conversion Price among the Alternate Consideration in a reasonable manner reflecting the relative value of any different components of the Alternate Consideration. If holders of Common Stock are given any choice as to the securities, cash or property to be received in a Fundamental Transaction, then the Holder shall be given the same choice as to the Alternate Consideration it receives upon any conversion of this Debenture following such Fundamental Transaction. To the extent necessary to effectuate the foregoing provisions, any successor to the Company or surviving entity in such Fundamental Transaction shall issue to the Holder a new debenture consistent with the foregoing provisions and evidencing the Holder's right to convert such debenture into Alternate Consideration. The terms of any agreement pursuant to which a Fundamental Transaction is effected shall include terms requiring any such successor or surviving entity to comply with the provisions of this Section 6(a) and insuring that this Note (or any such replacement security) will be similarly adjusted upon any subsequent transaction analogous to a Fundamental Transaction.

(7) DISTRIBUTION OF ASSETS; RIGHTS UPON ISSUANCE OF PURCHASE RIGHTS AND OTHER CORPORATE EVENTS.

(a) Distribution of Assets. If the Company shall declare or make any dividend or other distributions of its assets (or rights to acquire its assets) to any or all holders of shares of Common Stock, by way of return of capital or otherwise (including without limitation, any distribution of cash, stock or other securities, property, options, evidence of Indebtedness or any other assets by way of a dividend, spin off, reclassification, corporate rearrangement, scheme of arrangement or other similar transaction) (the "**Distributions**"), then the Holder will be entitled to such Distributions as if the Holder had held the number of shares of Common Stock acquirable upon complete conversion of this Note (without taking into account any limitations or restrictions on the convertibility of this Note) immediately prior to the date on which a record is taken for such Distribution or, if no such record is taken, the date as of which the record holders of Common Stock are to be determined for such Distributions and the portion of such Distribution shall be held in abeyance for the Holder.

(b) Purchase Rights. If at any time the Company grants, issues or sells any Options, Convertible Securities or rights to purchase stock, warrants, securities or other property pro rata to the record holders of any class of Common Stock (the "**Purchase Rights**"), then the Holder will be entitled to acquire or receive, as applicable, upon the terms applicable to such Purchase Rights, the aggregate Purchase Rights which the Holder could have acquired if the

Holder had held the number of shares of Common Stock acquirable upon complete conversion of this Note (without taking into account any limitations or restrictions on the convertibility of this Note) immediately prior to the date on which a record is taken for the grant, issuance or sale of such Purchase Rights, or, if no such record is taken, the date as of which the record holders of shares of Common Stock are to be determined for the grant, issue or sale of such Purchase Rights.

(c) <u>Other Corporate Events</u>. In addition to and not in substitution for any other rights hereunder, prior to the occurrence or consummation of any Fundamental Transaction pursuant to which holders of shares of Common Stock are entitled to receive securities, cash, assets or other property with respect to or in exchange for shares of Common Stock (a "**Corporate Event**"), the Company shall make appropriate provision to ensure that, and any applicable Successor Entity or Successor Entities shall ensure that, and it shall be a required condition to the occurrence or consummation of such Corporate Event that, the Holder will thereafter have the right to receive upon conversion of this Note at any time after the occurrence or consummation of the Corporate Event, shares of Common Stock or Successor Capital Stock or, if so elected by the Holder, cash in lieu of the shares of Common Stock (or other securities, cash, assets or other property) purchasable upon the conversion of this Note prior to such Corporate Event, such shares of stock, securities, cash, assets or any other property whatsoever (including warrants or other purchase or subscription rights and any shares of Common Stock) which the Holder would have been entitled to receive upon the occurrence or consummation of such Corporate Event or the record, eligibility or other determination date for the event resulting in such Corporate Event, had this Note been converted immediately prior to such Corporate Event or the record, eligibility or other determination date for the event resulting in such Corporate Event (without regard to any limitations on conversion of this Note). Provision made pursuant to the preceding sentence shall be in a form and substance satisfactory to the Holder. The provisions of this Section 7 shall apply similarly and equally to successive Corporate Events.

(8) <u>RIGHTS UPON ISSUANCE OF OTHER SECURITIES</u>.

(A) <u>Adjustment of Conversion Price upon Subdivision or Combination of Common Stock</u>. If the Company at any time on or after the Issuance Date subdivides (by any stock split, stock dividend, recapitalization or otherwise) one or more classes of its outstanding shares of Common Stock into a greater number of shares, the Conversion Price in effect immediately prior to such subdivision will be proportionately reduced. If the Company at any time on or after the Issuance Date combines (by combination, reverse stock split or otherwise) one or more classes of its outstanding shares of Common Stock into a smaller number of shares, the Conversion Price in effect immediately prior to such combination will be proportionately increased.

(B) <u>Voluntary Adjustment by Company</u>. The Company may at any time during the term of this Note, with the prior written consent of the Holder, reduce the then current Conversion Price to any amount and for any period of time deemed appropriate by the Board of Directors of the Company.

-12-

(9) <u>NONCIRCUMVENTION</u>. The Company hereby covenants and agrees that the Company will not, by amendment of its Certificate of Incorporation, Bylaws or through any reorganization, transfer of assets, consolidation, merger, scheme of arrangement, dissolution, issue or sale of securities, or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Note, and will at all times in good faith carry out all of the provisions of this Note and take all action as may be required to protect the rights of the Holder of this Note.

(10) Intentionally omitted.

(11) <u>VOTING RIGHTS</u>. The Holder shall have no voting rights as the holder of this Note, except as required by law and as expressly provided in this Note.

(12) <u>COVENANTS</u>.

(a) <u>Incurrence of Indebtedness</u>. So long as this Note is outstanding, the Company shall not, and the Company shall not permit any of its Subsidiaries to, directly or indirectly, incur or guarantee, assume or suffer to exist any Indebtedness, other than Permitted Indebtedness.

(b) <u>Existence of Liens</u>. So long as this Note is outstanding, the Company shall not, and the Company shall not permit any of its Subsidiaries to, directly or indirectly, allow or suffer to exist any Liens other than Permitted Liens.

(c) <u>Change in Nature of Business</u>. The Company shall not make, or permit any of its Subsidiaries to make, any change in the nature of its business. The Company shall not modify its corporate structure or purpose.

(d) <u>Intellectual Property</u>. The Company shall not, and the Company shall not permit any of its Subsidiaries, directly or indirectly, to encumber or allow any Liens on, any of its own or its licensed copyright rights, copyright applications, copyright registrations and like protections in each work of authorship and derivative work, whether published or unpublished, any patents, patent applications and like protections, including improvements, divisions, continuations, renewals, reissues, extensions, and continuations-in-part of the same, trademarks, service marks and, to the extent permitted under applicable law, any applications therefor, whether registered or not, and the goodwill of the business of the Company and its Subsidiaries connected with and symbolized thereby, know-how, operating manuals, trade secret rights, rights to unpatented inventions, and any claims for damage by way of any past, present, or future infringement of any of the foregoing, other than Permitted Liens.

(e) <u>Preservation of Existence, Etc.</u> The Company shall maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, its existence, rights and privileges, and become or remain, and cause each of its Subsidiaries to become or remain, duly qualified and in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary.

-13-

(f) <u>Maintenance of Properties, Etc.</u> The Company shall maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, all of its properties which are necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear and tear excepted, and comply, and cause each of its Subsidiaries to comply, at all times with the provisions of all leases to which it is a party as lessee or under which it occupies property, so as to prevent any loss or forfeiture thereof or thereunder.

(g) <u>Maintenance of Insurance</u>. The Company shall maintain, and cause each of its Subsidiaries to maintain insurance with responsible and reputable insurance companies or associations (including, without limitation, comprehensive general liability, hazard, rent and business interruption insurance) with respect to its properties (including all real properties leased or owned by it) and business, in such amounts and covering such risks as is required by any governmental authority having jurisdiction with respect thereto or as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated.

(h) <u>Transactions with Affiliates</u>. The Company shall not, nor shall it permit any of its Subsidiaries to, enter into, renew, extend or be a party to, any transaction or series of related transactions (including, without limitation, the purchase, sale, lease, transfer or exchange of property or assets of any kind or the rendering of services of any kind) with any Affiliate, except in the ordinary course of business in a manner and to an extent consistent with past practice and necessary or desirable for the prudent operation of its business, for fair consideration and on terms no less favorable to it or its Subsidiaries than would be obtainable in a comparable arm's length transaction with a Person that is not an Affiliate thereof.

(i) <u>Corporate Changes</u>. The Company shall not change its corporate name, legal form or jurisdiction of formation without twenty (20) days' prior written notice to Holder. Company shall not enter into or be party to a Fundamental Transaction unless in violation of Section 6 hereof. Company shall not relocate its chief executive office or its principal place of business unless it has provided prior written notice to Holder.

(j) Reserved.

(k) <u>Charter Amendments</u>.  The Company shall not amend its charter documents, including, without limitation, its certificate of incorporation and bylaws, in any manner that materially and adversely affects any rights of the Holder.

(l) <u>Repurchase</u>. The Company shall not repay, repurchase or offer to repay, repurchase or otherwise acquire more than a <u>de</u> <u>minimis</u> number of shares of its Common Stock or common stock equivalents other than as to the Conversion Shares as permitted or required under the Transaction Documents.

(m) <u>Redemption</u>. The Company shall not redeem, defease, repurchase, repay or make any payments in respect of, by the payment of cash or cash equivalents (in whole or in part, whether by way of open market purchases, tender offers, private transactions or

-14-

otherwise), all or any portion of any Indebtedness (other than the Note if on a pro-rata basis), whether by way of payment in respect of principal of (or premium, if any) or interest on, such Indebtedness, the foregoing restriction shall also apply to Permitted Indebtedness from and after the occurrence of an Event of Default.

(n) <u>Declaration</u>. The Company shall not declare or make any dividend or other distribution of its assets or rights to acquire its assets to holders of shares of Common Stock, by way of return of capital or otherwise including, without limitation, any distribution of cash, stock or other securities, property or options by way of a dividend, spin off, reclassification, corporate rearrangement, scheme of arrangement or other similar transaction.

(o) The Company shall not enter into any agreement with respect to any of the foregoing.

(13)     <u>TRANSFER</u>. This Note and any shares of Common Stock issued upon conversion of this Note may be offered, sold, assigned or transferred according to the Purchase Agreement.

(14)     <u>REISSUANCE OF THIS NOTE</u>.

(a) <u>Transfer</u>. If this Note is to be transferred, the Holder shall instruct the Company who the new Holder will be and this Note will be automatically cancelled.    The Company will issue and deliver the new Note within two (2) days of such notice.

(b) <u>Lost, Stolen or Mutilated Note</u>. Upon receipt by the Company of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note, and, in the case of loss, theft or destruction, of any indemnification undertaking by the Holder to the Company in customary form and, in the case of mutilation, upon surrender and cancellation of this Note, the Company shall execute and deliver to the Holder a new Note (in accordance with Section 14(d)) representing the then outstanding Principal amount of the Note.

(c) <u>Note Exchangeable for Different Denominations</u>. This Note is exchangeable, upon the surrender hereof by the Holder at the principal office of the Company, for a new Note or Notes (in accordance with Section 14(d) representing in the aggregate the outstanding Principal of this Note, and each such new Note will represent such portion of such outstanding Principal as is designated by the Holder at the time of such surrender.

(d) <u>Issuance of New Notes</u>. Whenever the Company is required to issue a new Note pursuant to the terms of this Note, such new Note (i) shall be of like tenor with this Note, (ii) shall represent, as indicated on the face of such new Note, the Principal remaining outstanding (or in the case of a new Note being issued pursuant to Section 14(a) or Section 14(c), the Principal designated by the Holder which, when added to the principal represented by the other new Notes issued in connection with such issuance, does not exceed the Principal remaining outstanding under this Note immediately prior to such issuance of new Notes), (iii) shall have an issuance date, as indicated on the face of such new Note, which is the same as the Issuance Date of this Note,

(iv) shall have the same rights and conditions as this Note, and (v) shall represent accrued and unpaid Interest on the Principal and Interest of this Note, from the Issuance Date.

(15) <u>REMEDIES, CHARACTERIZATIONS, OTHER OBLIGATIONS, BREACHES AND INJUNCTIVE RELIEF</u>. The remedies provided in this Note shall be cumulative and in addition to all other remedies available under this Note and any of the other Transaction Documents, at law or in equity (including a decree of specific performance and/or other injunctive relief), and nothing herein shall limit the Holder's right to pursue actual and consequential damages for any failure by the Company to comply with the terms of this Note. Amounts set forth or provided for herein with respect to payments, conversion, redemption and the like (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof). The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder and that the remedy at law for any such breach may be inadequate. The Company therefore agrees that, in the event of any such breach or threatened breach, the Holder shall be entitled, in addition to all other available remedies, to an injunction restraining any breach, without the necessity of showing economic loss and without any bond or other security being required.

(16) <u>PAYMENT OF COLLECTION, ENFORCEMENT AND OTHER COSTS</u>. If (a) this Note is placed in the hands of an attorney for collection or enforcement or is collected or enforced through any legal proceeding or the Holder otherwise takes action to collect amounts due under this Note or to enforce the provisions of this Note or (b) there occurs any bankruptcy, reorganization, receivership of the Company or other proceedings affecting Company creditors' rights and involving a claim under this Note, then the Company shall pay the costs and expenses incurred by the Holder for such collection, enforcement or action or in connection with such bankruptcy, reorganization, receivership or other proceeding, including, but not limited to, attorneys' fees and disbursements.

(17) <u>CONSTRUCTION; HEADINGS</u>. This Note shall be deemed to be jointly drafted by the Company and the Holder and shall not be construed against any person as the drafter hereof. The headings of this Note are for convenience of reference and shall not form part of, or affect the interpretation of, this Note.

(18) <u>FAILURE OR INDULGENCE NOT WAIVER</u>. No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

(19) <u>DISPUTE RESOLUTION</u>. In the case of a dispute as to the determination of the arithmetic calculation of the Conversion Rate, the Conversion Price or any Redemption Price, the Company shall submit the disputed determinations or arithmetic calculations via facsimile or electronic mail within one (1) Business Days of receipt, or deemed receipt, of the Conversion Notice or Redemption Notice or other event giving rise to such dispute, as the case may be, to the Holder. If the Holder and the Company are unable to agree upon such determination or calculation

-16-

within two (2) Business Days of such disputed determination or arithmetic calculation being submitted to the Holder, then the Company shall, within two (2) Business Days submit via facsimile or electronic mail the disputed arithmetic calculation of the Conversion Rate, Conversion Price or any Redemption Price to an independent, outside accountant, selected by the Holder and approved by the Company, such approval not to be unreasonably withheld, conditioned or delayed. The Company, at the Company's expense, shall cause the accountant to perform the determinations or calculations and notify the Company and the Holder of the results no later than five (5) Business Days from the time it receives the disputed determinations or calculations. Such accountant's determination or calculation shall be binding upon all parties absent demonstrable error.

(20)    NOTICES; PAYMENTS.

(a) Notices. All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, facsimile, or electronic mail, addressed as set forth below or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received), or (b) upon receipt, when sent by electronic mail (provided confirmation of transmission is electronically generated and keep on file by the sending party), or (c) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur. The addresses for such communications shall be: (i) if to Borrower, to: Proton Green LLC at 4531 Park Lane, Dallas, Texas 75220, Steven E. Looper, sel@protongreen.com; (ii) if to the Holder, to: the address and fax number indicated on the Purchase Agreement. Without limiting the generality of the foregoing, the Company shall give written notice to the Holder (i) immediately upon any adjustment of the Conversion Price, setting forth in reasonable detail, and certifying, the calculation of such adjustment and (ii) at least twenty (20) days prior to the date on which the Company closes its books or takes a record (A) with respect to any dividend or distribution upon the Common Stock, (B) with respect to any pro rata subscription offer to holders of Common Stock or (C) for determining rights to vote with respect to any Fundamental Transaction, dissolution or liquidation, provided in each case that such information shall be made known to the public prior to or in conjunction with such notice being provided to the Holder.

(b) Payments. Whenever any payment of cash is to be made by the Company to any Person pursuant to this Note, such payment shall be made in lawful money of the United States of America by a check drawn on the account of the Company and sent via overnight courier service to such Person at such address as previously provided to the Company in writing; provided, that the Holder may elect to receive a payment of cash via wire transfer of immediately

-17-

available funds by providing the Company with prior written notice setting out such request and the Holder's wire transfer instructions. Whenever any amount expressed to be due by the terms of this Note is due on any day, which is not a Business Day, the same shall instead be due on the next succeeding day, which is a Business Day.

(21) <u>CANCELLATION</u>. After all Principal and other amounts at any time owed on this Note have been paid in full, this Note shall automatically be deemed canceled, shall be surrendered to the Company for cancellation and shall not be reissued.

(22) <u>WAIVER OF NOTICE</u>. To the extent permitted by law, the Company hereby waives demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note.

(23) <u>GOVERNING LAW; JURISDICTION; JURY TRIAL</u>. All questions concerning the construction, validity, enforcement and interpretation of this Note shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflicts of law thereof. The Company agrees that all legal proceedings concerning the interpretations, enforcement and defense of the transactions contemplated by this Note (whether brought against the Company, the Holder or their respective affiliates, directors, officers, shareholders, employees or agents) shall be commenced exclusively in the state and federal courts sitting in the City of New York, County of New York. The Company hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the City of New York, Borough of Manhattan for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is improper or is an inconvenient venue for such proceeding. The Company hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to it at the address in effect for notices to it under the Purchase Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law. If the Company or a Holder shall commence an action or proceeding to enforce any provisions of the Note, then the prevailing party in such action or proceeding shall be reimbursed by the other party for its reasonable attorneys' fees and other costs and expenses incurred with the investigation, preparation and prosecution of such action or proceeding. **IN ANY ACTION, SUIT, OR PROCEEDING IN ANY JURISDICTION BROUGHT BY ANY PARTY AGAINST ANY OTHER PARTY, THE COMPANY KNOWINGLY AND INTENTIONALLY, TO THE GREATEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND EXPRESSLY WAIVES FOREVER TRIAL BY JURY.**

(24) <u>SEVERABILITY</u>. If any provision of this Note is prohibited by law or otherwise determined to be invalid or unenforceable by a court of competent jurisdiction, the provision that would otherwise be prohibited, invalid or unenforceable shall be deemed amended

to apply to the broadest extent that it would be valid and enforceable, and the invalidity or unenforceability of such provision shall not affect the validity of the remaining provisions of this Note so long as this Note as so modified continues to express, without material change, the original intentions of the parties as to the subject matter hereof and the prohibited nature, invalidity or unenforceability of the provision(s) in question does not substantially impair the respective expectations or reciprocal obligations of the parties or the practical realization of the benefits that would otherwise be conferred upon the parties. The parties will endeavor in good faith negotiations to replace the prohibited, invalid or unenforceable provision(s) with a valid provision(s), the effect of which comes as close as possible to that of the prohibited, invalid or unenforceable provision(s).

(25) <u>DISCLOSURE</u>. Upon receipt or delivery by the Company of any notice in accordance with the terms of this Note, unless the Company has in good faith determined that the matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries, the Company shall within one (1) Business Day after any such receipt or delivery publicly disclose such material, nonpublic information on a Current Report on Form 6-K or otherwise. In the event that the Company believes that a notice contains material, nonpublic information relating to the Company or its Subsidiaries, the Company so shall indicate to such Holder contemporaneously with delivery of such notice, and in the absence of any such indication, the Holder shall be allowed to presume that all matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries.

(26) <u>CERTAIN DEFINITIONS</u>. For purposes of this Note, the following terms shall have the following meanings:

(a) "**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person, it being understood for purposes of this definition that "control" of a Person means the power directly or indirectly either to vote 10% or more of the stock having ordinary voting power for the election of directors of such Person or direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

(b) "**Attribution Parties**" means, collectively, the following Persons and entities: (i) any investment vehicle, including, any funds, feeder funds or managed accounts, currently, or from time to time after the Issuance Date, directly or indirectly managed or advised by the Holder's investment manager or any of its Affiliates or principals, (ii) any direct or indirect Affiliates of the Holder or any of the foregoing, (iii) any Person acting or who could be deemed to be acting as a Group together with the Holder or any of the foregoing and (iv) any other Persons whose beneficial ownership of the Company's Common Stock would or could be aggregated with the Holder's and the other Attribution Parties for purposes of Regulation 13D-G of the Exchange Act.

(c) "**Bloomberg**" means Bloomberg Financial Markets.

(d) "**Closing Date**" shall have the meaning ascribed to such term in the Purchase Agreement.

-19-

(e) "**Closing Bid Price**" and "**Closing Sale Price**" means, for any security as of any date, the last closing bid price and last closing trade price, respectively, for such security on the Principal Market, as reported by Bloomberg, or, if the Principal Market begins to operate on an extended hours basis and does not designate the closing bid price or the closing trade price, as the case may be, then the last bid price or last trade price, respectively, of such security prior to 4:00 p.m., New York Time, as reported by Bloomberg, or, if the Principal Market is not the principal securities exchange or trading market for such security, the last closing bid price or last trade price, respectively, of such security on the principal securities exchange or trading market where such security is listed or quoted for trading as reported by Bloomberg, or if the foregoing do not apply, the last closing bid price or last trade price, respectively, of such security in the over-the-counter market on the electronic bulletin board for such security as reported by Bloomberg, or, if no closing bid price or last trade price, respectively, is reported for such security by Bloomberg, the average of the bid prices, or the ask prices, respectively, of any market makers for such security as reported in the OTC Link or "pink sheets" by OTC Markets Group Inc. (formerly Pink OTC Markets Inc.). If the Closing Bid Price or the Closing Sale Price cannot be calculated for a security on a particular date on any of the foregoing bases, the Closing Bid Price or the Closing Sale Price, as the case may be, of such security on such date shall be the fair market value as mutually determined by the Company and the Holder. If the Company and the Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved pursuant to Section 19. All such determinations to be appropriately adjusted for any stock dividend, stock split, stock combination, reclassification or similar transaction during the applicable calculation period.

(f) "**Common Stock**" the common stock of the Company, par value $0.001 per share, and any other class of securities into which such securities may hereafter be reclassified or changed.

(g) "**Convertible Securities**" means any stock or securities (other than Options) directly or indirectly convertible into or exercisable or exchangeable for shares of Common Stock.

(h) "**Default Interest Rate**" means 18% per annum.

(i) "**Equity Interests**" means (a) all shares of capital stock (whether denominated as common capital stock or preferred capital stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting and (b) all securities convertible into or exchangeable for any of the foregoing and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any of the foregoing, whether or not presently convertible, exchangeable or exercisable.

(j) "**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

(k) "**Fundamental Transaction**" means (A) that the Company shall, directly or indirectly, including through Subsidiaries, Affiliates or otherwise, in one or more related transactions, (i) consolidate or merge with or into (whether or not the Company is the surviving corporation) another Subject Entity, or (ii) sell, assign, transfer, convey or otherwise dispose of all or substantially all of the properties or assets of the Company or any of its "significant subsidiaries" (as defined in Rule 1-02 of Regulation S-X) to one or more Subject Entities, or (iii) make, or allow one or more Subject Entities to make, or allow the Company to be subject to or have its Common Stock be subject to or party to one or more Subject Entities making, a purchase, tender or exchange offer that is accepted by the holders of at least either (x) 50% of the outstanding shares of Common Stock, (y) 50% of the outstanding shares of Common Stock calculated as if any shares of Common Stock held by all Subject Entities making or party to, or Affiliated with any Subject Entities making or party to, such purchase, tender or exchange offer were not outstanding; or (z) such number of shares of Common Stock such that all Subject Entities making or party to, or Affiliated with any Subject Entity making or party to, such purchase, tender or exchange offer, become collectively the beneficial owners (as defined in Rule 13d-3 under the Exchange Act) of at least 50% of the outstanding shares of Common Stock, or (iv) consummate a stock purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off or scheme of arrangement) with one or more Subject Entities whereby such Subject Entities, individually or in the aggregate, acquire, either (x) at least 50% of the outstanding shares of Common Stock, (y) at least 50% of the outstanding shares of Common Stock calculated as if any shares of Common Stock held by all the Subject Entities making or party to, or Affiliated with any Subject Entity making or party to, such stock purchase agreement or other business combination were not outstanding; or (z) such number of shares of Common Stock such that the Subject Entities become collectively the beneficial owners (as defined in Rule 13d-3 under the Exchange Act) of at least 50% of the outstanding shares of Common Stock, or (v) reorganize, recapitalize or reclassify its Common Stock, (B) that the Company shall, directly or indirectly, including through Subsidiaries, Affiliates or otherwise, in one or more related transactions allow any Subject Entity individually or the Subject Entities in the aggregate to be or become the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, whether through acquisition, purchase, assignment, conveyance, tender, tender offer, exchange, reduction in outstanding shares of Common Stock, merger, consolidation, business combination, spin-off, scheme of arrangement, reorganization, recapitalization or reclassification or otherwise in any manner whatsoever, of either (x) at least 50% of the aggregate ordinary voting power represented by issued and outstanding Common Stock, (y) at least 50% of the aggregate ordinary voting power represented by issued and outstanding Common Stock not held by all such Subject Entities as of the date of this Note calculated as if any shares of Common Stock held by all such Subject Entities were not outstanding, or (z) a percentage of the aggregate ordinary voting power represented by issued and outstanding shares of Common Stock or other equity securities of the Company sufficient to allow such Subject Entities to effect a statutory short form merger or other transaction requiring other stockholders of the Company to surrender their shares of Common Stock without approval of the stockholders of the Company or (C) directly or indirectly, including through Subsidiaries, Affiliates or otherwise, in one or more related transactions, the issuance of or the entering into any other instrument or transaction structured in a manner to circumvent, or that circumvents, the intent of this definition in which case this definition shall be construed and

-21-

implemented in a manner otherwise than in strict conformity with the terms of this definition to the extent necessary to correct this definition or any portion of this definition which may be defective or inconsistent with the intended treatment of such instrument or transaction.

(l) "**GAAP**" means United States generally accepted accounting principles, consistently applied.

(m) "**Group**" means a "group" as that term is used in Regulation 13D-G of the Exchange Act and as defined in Rule 13d-5 thereunder.

(n) "**Holiday**" means a day other than a Business Day or on which trading does not take place on the Principal Market.

(o) RESERVED

(p) "**Market Price**" shall mean the lowest Closing Bid Price on the Closing Date.

(q) "**Notes**" means this Note and the Other Notes.

(r) "**OID**" shall mean the Original Issue Discount, which is 35%.

(s) "**Options**" means any rights, warrants or options to subscribe for or purchase shares of Common Stock or Convertible Securities.

(t) "**Other Notes**" means (i) the Second Amended and Restated Promissory Convertible Note, dated as of the date hereof, made by the Company in favor of Kips Bay Select LP in the principal amount of $3,513,469.00 (the "**Kips Bay Note**"), and (ii) the Amended and Restated Promissory Convertible Note, dated as of the date hereof, made by the Company in favor of Alpha Carta, Ltd. in the principal amount of $4,307,692.31 (the "**AC Note**").

(u) "**Parent Entity**" of a Person means an entity that, directly or indirectly, controls the applicable Person, including such entity whose common capital stock or equivalent equity security is quoted or listed on a Trading Market (or, if so elected by the Holder, any other market, exchange or quotation system), or, if there is more than one such Person or such entity, the Person or entity designated by the Holder or in the absence of such designation, such Person or such entity with the largest public market capitalization as of the date of consummation of the Fundamental Transaction.

(v) "**Permitted Indebtedness**" means (i) Indebtedness evidenced by this Note and the Other Notes; (ii) debt incurred to make acquisitions; (iii) trade payables incurred in the ordinary course of business consistent with past practice, (iv) unsecured indebtedness not in excess of $1,000,000 in the aggregate, and (v) Indebtedness secured by Permitted Liens.

(w) "**Permitted Liens**" means (i) any Lien for taxes not yet due or delinquent or being contested in good faith by appropriate proceedings for which adequate reserves

-22-

have been established in accordance with GAAP, (ii) any statutory Lien arising in the ordinary course of business by operation of law with respect to a liability that is not yet due or delinquent, (iii) any Lien created by operation of law, such as materialmen's liens, mechanics' liens and other similar liens, arising in the ordinary course of business with respect to a liability that is not yet due or delinquent or that are being contested in good faith by appropriate proceedings, (iv) Liens (A) upon or in any equipment acquired or held by the Company or any of its Subsidiaries to secure the purchase price of such equipment or Indebtedness incurred solely for the purpose of financing the acquisition or lease of such equipment, or (B) existing on such equipment at the time of its acquisition, provided that the Lien is confined solely to the property so acquired and improvements thereon, and the proceeds of such equipment, (v) Liens incurred in connection with the extension, renewal or refinancing of the Indebtedness secured by Liens of the type described in clause (iv) above, provided that any extension, renewal or replacement Lien shall be limited to the property encumbered by the existing Lien and the principal amount of the Indebtedness being extended, renewed or refinanced does not increase, (vi) leases or subleases and licenses and sublicenses granted to others in the ordinary course of the Company's business, not interfering in any material respect with the business of the Company and its Subsidiaries taken as a whole, (vii) Liens in favor of customs and revenue authorities arising as a matter of law to secure payments of custom duties in connection with the importation of goods, (viii) Liens arising from judgments, decrees or attachments in circumstances not constituting an Event of Default under Section 4(a)(viii) and (ix) liens listed on Schedule 27(v) hereto, and (ix) Liens arising pursuant to the terms of the Notes.

(x) "**Principal Market**" means the OTCQB tier of the OTC Markets.

(y) "**Redemption Dates**" means, collectively, the Event of Default Redemption Dates, and the Optional Redemption Dates, each of the foregoing, individually, a Redemption Date.

(z) "**Redemption Notices**" means, collectively, the Event of Default Redemption Notices, and the Optional Redemption Notices, each of the foregoing, individually, a Redemption Notice.

(aa) "**Redemption Price**" means, 125% of the outstanding principal amount of the Note together with accrued interest thereon, which after an Event of Default shall be calculated at the Default Rate.

(bb) "**Related Fund**" means, with respect to any Person, a fund or account managed by such Person or an Affiliate of such Person.

(cc) "**Required Holders**" means any two (2) Holders of the Notes.

(dd) "**Rule 144**" shall have the meaning ascribed to such term in the Purchase Agreement.

(ee) "**SEC**" means the United States Securities and Exchange Commission.

-23-

(ff) "**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

(gg) "**Subject Entity**" means any Person, Persons or Group or any Affiliate or associate of any such Person, Persons or Group.

(hh) "**Successor Entity**" means one or more Person or Persons (or, if so elected by the Holder, the Company or Parent Entity) formed by, resulting from or surviving any Fundamental Transaction or one or more Person or Persons (or, if so elected by the Holder, the Company or the Parent Entity) with which such Fundamental Transaction shall have been entered into.

(ii) "**Trading Market**" means any of the following markets or exchanges on which the Common Stock is listed or quoted for trading on the date in question: the NYSE American, the Nasdaq Capital Market, the Nasdaq Global Market, the Nasdaq Global Select Market, the New York Stock Exchange, OTCQB or OTCQX (or any successors to any of the foregoing).

(jj) "**VWAP**" means, for any date, the price determined by the first of the following clauses that applies: (a) if the Common Stock is then listed or quoted on a Trading Market, the daily volume weighted average price of the Common Stock for such date (or the nearest preceding date) on the Trading Market on which the Common Stock is then listed or quoted as reported by Bloomberg L.P. (based on a Trading Day from 9:30 a.m. New York City time to 4:02 p.m. New York City time); (b) if the Common Stock is not then listed or quoted for trading on a Trading Market and if prices for the Common Stock are then reported on the OTC Pink (or a similar organization or agency succeeding to its functions of reporting prices), the most recent bid price per share of the Common Stock so reported; or (c) in all other cases, the fair market value of a share of Common Stock as determined by an independent appraiser selected in good faith by the Holders of a majority in interest of the Note then outstanding and reasonably acceptable to the Company, the fees and expenses of which shall be paid by the Company.

[Signature Page Follows]

IN WITNESS WHEREOF, the Company has caused this Amended and Restated Note to be duly executed as of the 18th day of February, 2022.

Proton Green LLC,
formerly known as Plateau
Carbon, LLC

By: _____

Name: Steven E. Cloyes

Title: Managing Member

AGREED AND APPROVED:

ALPHA CARTA, LTD.

By:_____

Name

Title:

-25-

IN WITNESS WHEREOF, the Company has caused this Amended and Restated Note to be duly executed as of the 18th day of February, 2022.

Proton Green LLC,
formerly known as Plateau
Carbon, LLC

By: _____
Name:
Title:

AGREED AND APPROVED:

ALPHA CARTA, LTD.

By:_____
Name  Mark Azzopardi
Title:  Director

-25-

**EXHIBIT I**
**PROTON GREEN LLC**
**CONVERSION NOTICE**

Reference is made to the Amended and Restated Promissory Convertible Note (the "**Note**") issued to Alpha Carta, Ltd. (together with is designee or registered assigns, the "**Holder**") by Proton Green LLC (formerly known as Plateau Carbon, LLC) (the "**Company**"). In accordance with and pursuant to the Note, the undersigned hereby elects to convert the Conversion Amount (as defined in the Note) of the Note indicated below into shares of Common Stock of the Company, par value $ 0.0001 per share (the "**Common Stock**") of the Company, as of the date specified below.

Date of
Conversion: _____

Aggregate Conversion Amount to be
converted: _____

Please confirm the following information:

Conversion Price: _____

Number of shares of Common Stock to
be issued: _____

Please issue the Common Stock into which the Note is being converted in the following name and to the following address:

Issue to: _____

Facsimile Number and Electronic

Mail: _____

Authorization: _____
By: _____
Title: _____

Dated: _____

Account
Number: _____
(if electronic book entry transfer)

-26-

Transaction Code
Number: _____
(if electronic book entry transfer)

**EXHIBIT M**
*Execution Version*

**NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE CONVERTIBLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL SELECTED BY THE HOLDER, IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT, OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES. ANY TRANSFEREE OF THIS NOTE SHOULD CAREFULLY REVIEW THE TERMS OF THIS NOTE. THE PRINCIPAL AMOUNT REPRESENTED BY THIS NOTE AND, ACCORDINGLY, THE SECURITIES ISSUABLE UPON CONVERSION HEREOF MAY BE LESS THAN THE AMOUNTS SET FORTH ON THE FACE HEREOF.**

Reference is hereby made to the Promissory Convertible Note, dated as of January 11, 2022, made by the Company in favor of Alpha Carta, Ltd. in the principal amount of $4,307,692.31 (as amended, the "**Original Note**"). The Company and the Holder (as defined below) hereby agree that the Original Note shall be superseded, amended and restated to read in its entirety as follows:

**PROTON GREEN LLC**

**AMENDED AND RESTATED PROMISSORY CONVERTIBLE NOTE**

Issuance Date: January 11, 2022          Principal Amount: U.S. $4,307,692.31
Date of Note: February 18, 2022

      **FOR VALUE RECEIVED**, Proton Green LLC (formerly known as Plateau Carbon, LLC) (the "**Company**") pursuant to this Amended and Restated Promissory Convertible Note (the "**Note**"), hereby promises to pay to Alpha Carta, Ltd., its designee or registered assigns (the "**Holder**"), in cash, the principal amount of US $4,307,692.31 (as reduced pursuant to the terms hereof pursuant to redemption, conversion or otherwise, the "**Principal**" or the "**Principal Amount**", after giving effect to a 35% original issue discount) on April 7, 2022 (the "**Maturity Date**"), subject to earlier acceleration, conversion, redemption or otherwise (in each case in accordance with the terms hereof). Certain capitalized terms used herein are defined in Section 26. This Note is issued pursuant to that certain Securities Purchase Agreement dated January 11, 2022, by and among the Company and the Holder (the "**Purchase Agreement**"), and capitalized terms not defined herein will have the meanings set forth in the Purchase Agreement.

(1) <u>PAYMENTS OF PRINCIPAL; AMENDMENT FEE; PREPAYMENT</u>.

      (a)      On the Maturity Date, the Company shall pay to the Holder (i) the Principal Amount in cash, together with (ii) Interest (as defined below) thereon calculated from the date

hereof in accordance with the provisions of this Note, plus (iii) an amendment and extension fee in the amount of $150,000.00 (the "**Amendment Fee**"), provided, however, that the Holder shall have the right in its sole discretion to be repaid with 100% of the proceeds ("**Proceeds**") of the following: (1) sale of the Company's assets, (2) any merger, sale or other transaction resulting in the holders of the Company's Common Stock prior to such merger or other transaction ceasing to own at least 50% of the Common Stock, (3) issuances of the Company's Debt, and/or (4) issuances of the Company's equity. Notwithstanding the foregoing, (i) in the event that on the Maturity Date the Company does not have sufficient funds to repay this Note and the Other Notes in full, the Company shall be prohibited from repaying the Principal Amount, Interest and Amendment Fee of this Note in full and shall instead repay the Holders of each of the Notes a pro rata portion of the Principal Amount, Interest and Amendment Fee of each of the Notes based on the proportion that each of the Notes bears to the aggregate Principal Amount, Interest and Amendment Fee of all of the Notes, and (ii) unless a Holder of either of the Other Notes declines its right to be repaid with Proceeds, any Proceeds shall be applied to repay a pro rata portion of the Principal Amount, Interest and Amendment Fee of each of the Notes based on the proportion that each of the Notes bears to the aggregate Principal Amount, Interest and Amendment Fee of all of the Notes. All payments shall be applied first to the Amendment Fee, then to accrued Interest and thereafter to the Principal Amount.

(b) Interest shall accrue on the unpaid Principal Amount outstanding until the Maturity Date at a rate equal to one and one-half percent (1.5%) per month. The accrued interest on the Principal Amount of this Note shall not compound, and is referred to herein as the "**Interest**". Such Interest shall be computed for the actual number of days elapsed in a month consisting of 28, 30 or 31 days, as the case may be.

(c) The Company may, at any time and from time to time without premium or penalty, prepay all or any portion of the outstanding Principal Amount of, and Interest on, and Amendment Fee of this Note. Any partial payment will be credited first to the Amendment Fee, then to accrued and unpaid Interest and the balance, if any, to the then outstanding Principal Amount.

### (2) RANKING; SECURITY.

(a) The parties agree that this Note shall rank (i) pari passu with the indebtedness under the Other Notes and (ii) senior to all other existing and future debt of the Company.

(b) Payment of this Note and all other obligations, fees, and expenses due to the Holder pursuant to this Note and the Purchase Agreement (the "**Secured Obligations**") will be secured at all times by (i) valid, enforceable first priority mortgages and/or deeds of trust on and covering all real property interests presently owned and hereafter acquired by the Company, and all assets and personal property relating thereto (the "**Mortgaged Properties**"), and (ii) valid, enforceable first priority security interests on and covering all of the other assets of the Company (the "**Other Assets**").

(c) Within five (5) business days of a request by the Holder, the Company shall deliver to the Holder (i) mortgages and/or deeds of trust, in appropriate and recordable form under Arizona law and reasonably satisfactory in form and substance to the Holder, executed by the Company, with respect to the Mortgaged Properties ("Deeds of Trust"), which shall create a first priority lien on such Mortgaged Properties and which shall be promptly recorded in the recorder's office of the appropriate county, and (ii) appropriate instruments granting valid, enforceable first priority security interests on and covering all of the Other Assets, in appropriate and recordable form and reasonably satisfactory in form and substance to the Holder, executed by the Company, with respect to the Other Assets (the "Other Instruments" and, collectively with the Deeds of Trust, the "Security Documents"). Thereafter, the Company shall cause the Mortgaged Properties now owned or hereafter acquired by it to be subject at all times to a first priority, perfected lien in favor of the Holder to secure the Secured Obligations, and the Company shall provide any filings and deliveries reasonably requested by the Holder in connection therewith to perfect the security interests therein, all in form and substance reasonably satisfactory to the Holder.

(d) The Holder acknowledges that the security interests granted in the Mortgaged Properties and the Other Assets to the Holder to secure the Secured Obligations are also being granted to the holders of the Others Notes to secure the obligations of the Company under such Other Notes, and that such all of such security interests shall be for the ratable benefit of the Holders of all of the Notes. The form and substance of the Security Documents shall reflect such ratable benefit term.

(3) CONVERSION OF NOTE. Following the Issuance Date, as set out above, this Note shall be convertible into shares of Common Stock on the terms and conditions set forth in this Section 3.

(a) Optional Conversion Right. Holder has the right to convert all or part of the Principal Amount at the Company's valuation of $250,000,000.00 into fully paid and nonassessable shares of Common Stock in accordance with Section 3(c), at the Conversion Rate (as defined below) (the "**Conversion Date**"). The Company shall not issue any fraction of a share of Common Stock upon any conversion. If the issuance would result in the issuance of a fraction of a share of Common Stock, the Company shall round such fraction of a share of Common Stock up to the nearest whole share. The Company shall pay any and all transfer, stamp and similar taxes that may be payable with respect to the issuance and delivery of Common Stock upon conversion of any Conversion Amount. The Holder shall have the right to deliver an effective conversion notice at any time until 11:59 pm on the chosen date and it shall be immediately effective.

(b) Conversion Rate. The number of shares of Common Stock issuable upon conversion of any Conversion Amount pursuant to Section 3(a) shall be determined by dividing (x) such Conversion Amount by (y) the Conversion Price (the "**Conversion Rate**").

(i) "**Conversion Amount**" means the sum of the portion of the Principal to be converted, redeemed or otherwise with respect to which this determination is being made.

-3-

(ii) "**Conversion Price**" means $0.0599. Subsequent to the effective date of the registration statement registering for resale the Conversions Shares and the Warrant Shares pursuant to the Purchase Agreement, if the closing sale price of the Common Stock averages less than the then Conversion Price over a period of ten (10) consecutive trading days, the Conversion Price shall reset to such average price. If the 10-day volume weighted average price of the Common Stock continues to be less than the Conversion Price then the Conversion Price should reset to such 10-day average price.

(c)    <u>Mechanics of Optional Conversion and Adjustment:</u>

(i)    <u>Registration; Book-Entry</u>. The Company shall maintain a register (the "**Register**") for the recordation of the holder of the Note and the Principal amount of the Note held by the holder (the "**Registered Note**"). The entries in the Register, made in good faith, shall be conclusive and binding for all purposes absent manifest error. The Company and the holder of the Note shall treat each Person whose name is recorded in the Register as the owner of the Note for all purposes, including, without limitation, the right to receive payments of Principal, if any, hereunder, notwithstanding notice to the contrary. Upon its receipt of a request to assign or sell all or part of the Registered Note by the Holder, the Company shall record the information contained therein in the Register and issue one or more new Registered Notes in the same aggregate Principal amount as the Principal amount of the surrendered Registered Note to the designated assignee or transferee pursuant to Section 10. Notwithstanding anything to the contrary in this Section 3(c)(i), the Holder may assign any Note or any portion thereof to an Affiliate of such Holder or a Related Fund of such Holder without delivering a request to assign or sell such Note to the Company and the recordation of such assignment or sale in the Register (a "**Related Party Assignment**"); <u>provided</u>, that (x) the Company may continue to deal solely with such assigning or selling Holder unless and until such Holder has delivered a request to assign or sell such Note or portion thereof to the Company for recordation in the Register; (y) the failure of such assigning or selling Holder to deliver a request to assign or sell such Note or portion thereof to the Company shall not affect the legality, validity, or binding effect of such assignment or sale and (z) such assigning or selling Holder shall, acting solely for this purpose as a non-fiduciary agent of the Company, maintain a register (the "**Related Party Register**") comparable to the Register on behalf of the Company, and any such assignment or sale shall be effective

-4-

upon recordation of such assignment or sale in the Related Party Register. Notwithstanding anything to the contrary set forth herein, upon conversion of any portion of this Note in accordance with the terms hereof, the Holder shall not be required to physically surrender this Note to the Company unless the Holder has provided the Company with prior written notice (which notice may be included in a Conversion Notice) requesting reissuance of this Note upon physical surrender of this Note. The Holder and the Company shall maintain records showing the Principal, converted and the dates of such conversions or shall use such other method, reasonably satisfactory to the Holder and the Company, so as not to require physical surrender of this Note upon conversion.

(ii) <u>Intentionally omitted</u>.

(iii) Holder may convert any or all of this Note into shares of Common Stock at any time.

(d) <u>Limitations on Conversions</u>.

(i) <u>Beneficial Ownership</u>. In case that the Holder becomes subject to the filing or reporting obligations under Regulation 13D-G of the Exchange Act due to (i) the conversion of this Note, or any other share issuance hereunder, or (ii) the changes to the beneficial ownership of the Holder (together with the Attribution Parties) in the Company, including but not limited to the changes to such beneficial ownership due to the conversion or share issuance hereunder, the Holder shall timely file such schedules or forms with the United States Securities and Exchange Commission (the "**Commission**") as required under Regulation 13D-G of the Exchange Act. For purposes of this paragraph, beneficial ownership and all calculations (including, without limitation, with respect to calculations of percentage ownership) shall be determined in accordance with Regulation 13D-G and the rules and regulations promulgated thereunder. The obligations contained in this paragraph shall apply to a successor Holder of this Note. For any reason at any time, upon the written or oral request of the Holder, the Company shall within one (1) Business Day confirm orally and in writing to the Holder the number of shares of Common Stock then outstanding, including by virtue of any prior conversion or exercise of convertible or exercisable securities into Common Stock, including, without limitation, pursuant to this Note or securities issued pursuant to the Purchase Agreement.

(ii) <u>Principal Market Regulation</u>. Unless permitted by the applicable rules and regulations of the Principal Market, the Company shall not issue any shares of Common Stock upon conversion of this Note if the issuance of such shares

of Common Stock would exceed the aggregate number of shares of Common Stock which the Company may issue upon exercise or conversion (as the case may be) of the Note without breaching the Company's obligations under the rules or regulations of the Principal Market (the number of shares which may be issued without violating such rules and regulations, the "**Exchange Cap**"). Notwithstanding the foregoing, such limitation shall not apply in the event that the Company (A) obtains the approval of its stockholders as required by the applicable rules of the Principal Market for issuances of shares of Common Stock in excess of such amount or (B) obtains a written opinion from outside counsel to the Company that such approval is not required, which opinion shall be reasonably satisfactory to the Holder. In the event that any Holder shall sell or otherwise transfer any of such Holder's Note, the Exchange Cap restrictions set forth herein shall continue to apply to the Note and such transferee.

(e) <u>Disputes</u>. In the event of a dispute as to the number of shares of Common Stock issuable to the Holder in connection with a conversion of this Note, the Company shall issue to the Holder the number of shares of Common Stock not in dispute and resolve such dispute in accordance with Section 16.

(f) <u>Automatic Conversion.</u> In the event the Company completes a Fundamental Transaction or completes a listing of its Common Stock onto a national stock exchange, Holder agrees to convert the OID into Common Stock of the Company at the Conversion Price. The remaining Principal Amount, Amendment Fee and Interest will remain outstanding, unless the Holder elects to convert such Principal Amount, Amendment Fee and Interest into Common Stock of the Company.

(4) The Company hereby covenants and agrees as follows:

(a) <u>Sale of Assets</u>. During the thirty (30) days from the date of this Note, with the exception of moving certain of its assets to any of its subsidiaries, the Company shall not sell any material assets.

(b) <u>Additional Debt</u>. While this Note is outstanding, the Company shall not incur any additional indebtedness for borrowed money, other than any indebtedness that is Permitted Indebtedness.

(5) RIGHTS UPON EVENT OF DEFAULT.

(a) <u>Event of Default</u>. Each of the following events shall constitute an "**Event of Default**"; provided, however, that, except in the case of the Events of Default listed in Sections 5(a)(i), or 5(a)(ix) below, the Company shall have five (5) business days after notice of default from the Holder to cure such Event of Default unless a lesser number of days is required pursuant to the provisions of this Section 5.

(i) <u>Failure to Pay Principal</u>. The Company fails to pay the Principal, Amendment Fee or Interest due under this Note or any of the Other Notes at the Maturity Date (or the maturity date of any of the Other Notes, if the maturity date under the Other Notes is different from the Maturity Date), liquidated damages and other amounts thereon when due on the Note or any of the Other Notes, whether at maturity, upon acceleration or otherwise.

(ii) <u>Conversion and the Shares</u>. The Company (i) fails to issue Conversion Shares to the Holder (or announces or threatens in writing that it will not honor its obligation to do so) upon exercise by the Holder of the conversion rights of the Holder in accordance with the terms of the Note, (ii) fails to transfer or cause its transfer agent to transfer (issue) (electronically or in certificated form) any certificate for the Conversion Shares issuable to the Holder upon conversion of or otherwise pursuant to the Note as and when required by the Note, or (iii) the Company directs its transfer agent not to transfer or delays, impairs, and/or hinders its transfer agent in transferring (or issuing) (electronically or in certificated form) any certificate for the Conversion Shares issuable to the Holder upon conversion of or otherwise pursuant to the Note as and when required by the Note, or fails to remove (or directs its transfer agent not to remove or impairs, delays, and/or hinders its transfer agent from removing) any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any certificate for any Conversion Shares issued to the Holder upon conversion of or otherwise pursuant to the Note as and when required by the Note (or makes any written announcement, statement or threat that it does not intend to honor the obligations described in this paragraph) and any such failure shall continue uncured (or any written announcement, statement or threat not to honor its obligations shall not be rescinded in writing) for five (5) business days after the Holder shall have delivered a Notice of Conversion. It is an obligation of the Company to remain current in its obligations to its transfer agent. It shall be an Event of Default of the Note, if a conversion of the Note is delayed, hindered or frustrated due to a balance owed by the Company to its transfer agent. If at the option of the Holder, the Holder advances any funds to the Company's transfer agent in order to process a conversion, such advanced funds shall be paid by the Company to the Holder within forty eight (48) hours of a demand from the Holder. If Borrower is unable to do so, they shall have an opportunity to cure within five (5) business days.

(iii) <u>Breach of Agreements and Covenants</u>. The Company breaches any material agreement, covenant or other material term or condition contained in the Purchase Agreement, the Note or in any agreement, statement or certificate given in writing pursuant hereto or in connection herewith or therewith, and such breach results in a material adverse effect on the business or assets of the Company.

(iv) <u>Breach of Representations and Warranties</u>. Any representation or warranty of the Company made in the Purchase Agreement or the Note, or in any agreement, statement or certificate given in writing pursuant hereto or in connection herewith or therewith shall be false or misleading in any material respect when made and the breach of which has (or with the passage of time will have) a Material Adverse Effect

-7-

on the rights of the Holder with respect to the Note or the Purchase Agreement. In the event of such a breach, the Company shall have an opportunity to cure within two (2) business days.

(v) <u>Receiver or Trustee</u>. The Company or any subsidiary of the Company shall make an assignment for the benefit of creditors, or apply for or consent to the appointment of a receiver or trustee for it or for a substantial part of its property or business, or such a receiver or trustee shall otherwise be appointed. Under such circumstances, the Company shall have an opportunity to cure within sixty (60) days.

(vi) <u>Judgments</u>. Any money judgment, writ or similar process shall be entered or filed against the Company or any subsidiary of the Company or any of its property or other assets for more than $100,000, and shall remain unvacated, unbonded or unstayed for a period of twenty (20) days unless otherwise consented to by the Holder, which consent will not be unreasonably withheld.

(vii) <u>Bankruptcy</u>. Bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings, voluntary or involuntary, for relief under any bankruptcy law or any law for the relief of debtors shall be instituted by or against the Company or any subsidiary of the Company. Under such circumstances, the Company shall have an opportunity to cure within sixty (60) days.

(viii) <u>Delisting or Trading of Common Stock.</u> The Company shall fail to maintain the listing or quotation of its Common Stock minimally on a Trading Market.

(ix) <u>Failure to Comply with the Exchange Act</u>. The Company shall fail to comply with the reporting requirements of the Exchange Act and/or the Company shall cease to be subject to the reporting requirements of the Exchange Act.

(x) <u>Liquidation.</u> Any dissolution, liquidation, or winding up of Borrower or any substantial portion of its business or assets.

(xi) <u>Cessation of Operations</u>. Any cessation of operations by Borrower or Borrower admits it is otherwise generally unable to pay its debts as such debts become due, provided, however, that any disclosure of the Company's ability to continue as a "going concern" shall not be an admission that the Company cannot pay its debts as they become due.

(xii) <u>Intentionally omitted</u>.

(xiii) <u>Intentionally omitted</u>.

(xiv) <u>Other Obligations</u>. The occurrence of any default under any agreement or obligation of the Company that is not cured within ten (10) days that could reasonably be expected to have a Material Adverse Effect.

(xv) <u>Default under Transaction Documents or Other Material Agreement</u>. A default or event of default (subject to any grace or cure period provided in the applicable agreement, document or instrument) shall occur under (A) this Note, the warrant or the securities purchase agreement or any of the other agreements entered into by the parties related to the purchase of this Note (collectively, the "**Transaction Documents**"), or (B) the Other Notes or any other material agreement, lease, document or instrument to which Company or any Subsidiary is obligated (and not covered by clause (vi) below), which in the case of subsection (B) would reasonably be expected to have a Material Adverse Effect.

(xvi) <u>Default under Mortgage or Other Agreement of Indebtedness</u>. Company or any Subsidiary shall default on any of its obligations under any mortgage, credit agreement or other facility, indenture agreement, factoring agreement or other instrument under which there may be issued, or by which there may be secured or evidenced, any indebtedness for borrowed money or money due under any long term leasing or factoring arrangement that (a) involves an obligation greater than $100,000, whether such indebtedness now exists or shall hereafter be created, and (b) results in such indebtedness becoming or being declared due and payable prior to the date on which it would otherwise become due and payable.

(xvii) <u>Intentionally omitted</u>.

(xviii) <u>Failure to Meet the Requirements under Rule 144</u>. Company does not meet the current public information requirements under Rule 144.

(xix) <u>Failure to Maintain Intellectual Property</u>. The failure by Company or any material Subsidiary to maintain any material intellectual property rights, personal, real property, equipment, leases or other assets which are necessary to conduct its business (whether now or in the future) and such breach is not cured with twenty (20) days after written notice to the Company from the Holder.

(xx) <u>Trading Suspension</u>. A Commission or judicial stop trade order or suspension from a Trading Market.

(xxi) <u>Intentionally omitted</u>.

(xxii) <u>Failure to Provide Required Notification of a Material Event</u>. A failure by Company to notify Holder of any material event of which Company is obligated to notify Holder pursuant to the terms of this Note or any other Transaction Document.

(xxiii) <u>Invalidity or Unenforceability of Transaction Documents</u>. Any material provision of any Transaction Document shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against the Company, or the validity or enforceability thereof shall be contested by Company, or a proceeding shall be commenced by Company or any governmental authority having jurisdiction over Company or Holder, seeking to establish the invalidity or unenforceability thereof, or Company shall deny in writing that it has any liability or obligation purported to be created under any Transaction Document.

(xxiv) <u>Intentionally omitted</u>.

(b) <u>Redemption Right</u>. At any time after the Holder becoming aware of an Event of Default, the Required Holders may require the Company to redeem (an "**Event of Default Redemption**") all or any portion of the Notes by delivering written notice thereof (the "**Event of Default Redemption Notice**") to the Company, which Event of Default Redemption Notice shall indicate the portion of this Note and the Other Notes the Required Holders are electing to require the Company to redeem. Each portion of this Note and the Other Notes subject to redemption by the Company pursuant to this Section 5(b) shall be redeemed by the Company in cash by wire transfer of immediately available funds at a price equal to (i) the Principal Amount, plus (ii) all Interest then accrued on the Principal Amount from the date of the Note to the Event of Default, plus (iii) the Amendment Fee, plus (iv) interest on the Principal Amount calculated from the Event of Default at the greater of the Default Interest Rate or the maximum rate permitted under applicable law (the "**Event of Default Redemption Price**"), plus (v) liquidated damages of $750,000, plus (vi) an amount in cash equal to 1% of the Event of Default Redemption Price for each 30 day period during which redemptions fail to be made; provided, however, in the event that the Company does not have sufficient funds to pay 100% of the relevant Event of Default Redemption Price to the Holders of all of the Notes, the Company shall pay a pro rata portion of the Event of Default Redemption Price to each such Holder based on the proportion that the Principal Amount of each of the Notes bears to the aggregate Principal Amount of all of the Notes. To the extent redemptions required by this Section 5(b) are deemed or determined by a court of competent jurisdiction to be prepayments of the Note by the Company, such redemptions shall be deemed to be voluntary prepayments. Notwithstanding anything to the contrary in this Section 5, but subject to Section 3(b)(ii) and 3(d), until the Event of Default Redemption Price payable in respect of each of the Notes (together with any interest thereon) is paid in full, the Conversion Amount submitted for redemption under this Section 5(b) (together with any interest thereon) may be converted, in whole or in part, by the Holder into Common Stock pursuant to Section 3. The parties hereto agree that in the event of the Company's redemption of any portion of the Note under this Section 5(b), the Holder's damages would be uncertain and difficult to estimate because of the parties' inability to predict future interest rates and the uncertainty of the availability of a suitable substitute investment opportunity for the Holder. Accordingly, any Event of Default redemption premium due under this Section 5(b) is intended by the parties to be, and shall be deemed, a reasonable estimate of the Holder's actual loss of its investment opportunity and not as a penalty.

(6)     <u>RIGHTS UPON FUNDAMENTAL TRANSACTION</u>.

-10-

(a) If, at any time while this Note is outstanding, (i) the Company effects a Fundamental Transaction, then, upon any subsequent conversion of this Note, the Holder shall have the right to receive, for each Conversion Share that would have been issuable upon such conversion immediately prior to the occurrence of such Fundamental Transaction, the same kind and amount of securities, cash or property as it would have been entitled to receive upon the occurrence of such Fundamental Transaction if it had been, immediately prior to such Fundamental Transaction, the holder of one (1) share of Common Stock (the "Alternate Consideration"). For purposes of any such conversion, the determination of the Conversion Price shall be appropriately adjusted to apply to such Alternate Consideration based on the amount of Alternate Consideration issuable in respect of one (1) share of Common Stock in such Fundamental Transaction, and the Company shall apportion the Conversion Price among the Alternate Consideration in a reasonable manner reflecting the relative value of any different components of the Alternate Consideration. If holders of Common Stock are given any choice as to the securities, cash or property to be received in a Fundamental Transaction, then the Holder shall be given the same choice as to the Alternate Consideration it receives upon any conversion of this Debenture following such Fundamental Transaction. To the extent necessary to effectuate the foregoing provisions, any successor to the Company or surviving entity in such Fundamental Transaction shall issue to the Holder a new debenture consistent with the foregoing provisions and evidencing the Holder's right to convert such debenture into Alternate Consideration. The terms of any agreement pursuant to which a Fundamental Transaction is effected shall include terms requiring any such successor or surviving entity to comply with the provisions of this Section 6(a) and insuring that this Note (or any such replacement security) will be similarly adjusted upon any subsequent transaction analogous to a Fundamental Transaction.

(7) DISTRIBUTION OF ASSETS; RIGHTS UPON ISSUANCE OF PURCHASE RIGHTS AND OTHER CORPORATE EVENTS.

(a) Distribution of Assets. If the Company shall declare or make any dividend or other distributions of its assets (or rights to acquire its assets) to any or all holders of shares of Common Stock, by way of return of capital or otherwise (including without limitation, any distribution of cash, stock or other securities, property, options, evidence of Indebtedness or any other assets by way of a dividend, spin off, reclassification, corporate rearrangement, scheme of arrangement or other similar transaction) (the "**Distributions**"), then the Holder will be entitled to such Distributions as if the Holder had held the number of shares of Common Stock acquirable upon complete conversion of this Note (without taking into account any limitations or restrictions on the convertibility of this Note) immediately prior to the date on which a record is taken for such Distribution or, if no such record is taken, the date as of which the record holders of Common Stock are to be determined for such Distributions and the portion of such Distribution shall be held in abeyance for the Holder.

(b) Purchase Rights. If at any time the Company grants, issues or sells any Options, Convertible Securities or rights to purchase stock, warrants, securities or other property pro rata to the record holders of any class of Common Stock (the "**Purchase Rights**"), then the Holder will be entitled to acquire or receive, as applicable, upon the terms applicable to such Purchase Rights, the aggregate Purchase Rights which the Holder could have acquired if the

-11-

Holder had held the number of shares of Common Stock acquirable upon complete conversion of this Note (without taking into account any limitations or restrictions on the convertibility of this Note) immediately prior to the date on which a record is taken for the grant, issuance or sale of such Purchase Rights, or, if no such record is taken, the date as of which the record holders of shares of Common Stock are to be determined for the grant, issue or sale of such Purchase Rights.

(c) <u>Other Corporate Events</u>. In addition to and not in substitution for any other rights hereunder, prior to the occurrence or consummation of any Fundamental Transaction pursuant to which holders of shares of Common Stock are entitled to receive securities, cash, assets or other property with respect to or in exchange for shares of Common Stock (a "**Corporate Event**"), the Company shall make appropriate provision to ensure that, and any applicable Successor Entity or Successor Entities shall ensure that, and it shall be a required condition to the occurrence or consummation of such Corporate Event that, the Holder will thereafter have the right to receive upon conversion of this Note at any time after the occurrence or consummation of the Corporate Event, shares of Common Stock or Successor Capital Stock or, if so elected by the Holder, cash in lieu of the shares of Common Stock (or other securities, cash, assets or other property) purchasable upon the conversion of this Note prior to such Corporate Event, such shares of stock, securities, cash, assets or any other property whatsoever (including warrants or other purchase or subscription rights and any shares of Common Stock) which the Holder would have been entitled to receive upon the occurrence or consummation of such Corporate Event or the record, eligibility or other determination date for the event resulting in such Corporate Event, had this Note been converted immediately prior to such Corporate Event or the record, eligibility or other determination date for the event resulting in such Corporate Event (without regard to any limitations on conversion of this Note). Provision made pursuant to the preceding sentence shall be in a form and substance satisfactory to the Holder. The provisions of this Section 7 shall apply similarly and equally to successive Corporate Events.

(8) <u>RIGHTS UPON ISSUANCE OF OTHER SECURITIES</u>.

(A) <u>Adjustment of Conversion Price upon Subdivision or Combination of Common Stock</u>. If the Company at any time on or after the Issuance Date subdivides (by any stock split, stock dividend, recapitalization or otherwise) one or more classes of its outstanding shares of Common Stock into a greater number of shares, the Conversion Price in effect immediately prior to such subdivision will be proportionately reduced. If the Company at any time on or after the Issuance Date combines (by combination, reverse stock split or otherwise) one or more classes of its outstanding shares of Common Stock into a smaller number of shares, the Conversion Price in effect immediately prior to such combination will be proportionately increased.

(B) <u>Voluntary Adjustment by Company</u>. The Company may at any time during the term of this Note, with the prior written consent of the Holder, reduce the then current Conversion Price to any amount and for any period of time deemed appropriate by the Board of Directors of the Company.

(9) <u>NONCIRCUMVENTION</u>. The Company hereby covenants and agrees that the Company will not, by amendment of its Certificate of Incorporation, Bylaws or through any reorganization, transfer of assets, consolidation, merger, scheme of arrangement, dissolution, issue or sale of securities, or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Note, and will at all times in good faith carry out all of the provisions of this Note and take all action as may be required to protect the rights of the Holder of this Note.

(10) Intentionally omitted.

(11) <u>VOTING RIGHTS</u>. The Holder shall have no voting rights as the holder of this Note, except as required by law and as expressly provided in this Note.

(12) <u>COVENANTS</u>.

(a) <u>Incurrence of Indebtedness</u>. So long as this Note is outstanding, the Company shall not, and the Company shall not permit any of its Subsidiaries to, directly or indirectly, incur or guarantee, assume or suffer to exist any Indebtedness, other than Permitted Indebtedness.

(b) <u>Existence of Liens</u>. So long as this Note is outstanding, the Company shall not, and the Company shall not permit any of its Subsidiaries to, directly or indirectly, allow or suffer to exist any Liens other than Permitted Liens.

(c) <u>Change in Nature of Business</u>. The Company shall not make, or permit any of its Subsidiaries to make, any change in the nature of its business. The Company shall not modify its corporate structure or purpose.

(d) <u>Intellectual Property</u>. The Company shall not, and the Company shall not permit any of its Subsidiaries, directly or indirectly, to encumber or allow any Liens on, any of its own or its licensed copyright rights, copyright applications, copyright registrations and like protections in each work of authorship and derivative work, whether published or unpublished, any patents, patent applications and like protections, including improvements, divisions, continuations, renewals, reissues, extensions, and continuations-in-part of the same, trademarks, service marks and, to the extent permitted under applicable law, any applications therefor, whether registered or not, and the goodwill of the business of the Company and its Subsidiaries connected with and symbolized thereby, know-how, operating manuals, trade secret rights, rights to unpatented inventions, and any claims for damage by way of any past, present, or future infringement of any of the foregoing, other than Permitted Liens.

(e) <u>Preservation of Existence, Etc.</u> The Company shall maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, its existence, rights and privileges, and become or remain, and cause each of its Subsidiaries to become or remain, duly qualified and in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary.

-13-

(f) <u>Maintenance of Properties, Etc.</u> The Company shall maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, all of its properties which are necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear and tear excepted, and comply, and cause each of its Subsidiaries to comply, at all times with the provisions of all leases to which it is a party as lessee or under which it occupies property, so as to prevent any loss or forfeiture thereof or thereunder.

(g) <u>Maintenance of Insurance</u>. The Company shall maintain, and cause each of its Subsidiaries to maintain insurance with responsible and reputable insurance companies or associations (including, without limitation, comprehensive general liability, hazard, rent and business interruption insurance) with respect to its properties (including all real properties leased or owned by it) and business, in such amounts and covering such risks as is required by any governmental authority having jurisdiction with respect thereto or as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated.

(h) <u>Transactions with Affiliates</u>. The Company shall not, nor shall it permit any of its Subsidiaries to, enter into, renew, extend or be a party to, any transaction or series of related transactions (including, without limitation, the purchase, sale, lease, transfer or exchange of property or assets of any kind or the rendering of services of any kind) with any Affiliate, except in the ordinary course of business in a manner and to an extent consistent with past practice and necessary or desirable for the prudent operation of its business, for fair consideration and on terms no less favorable to it or its Subsidiaries than would be obtainable in a comparable arm's length transaction with a Person that is not an Affiliate thereof.

(i) <u>Corporate Changes</u>. The Company shall not change its corporate name, legal form or jurisdiction of formation without twenty (20) days' prior written notice to Holder. Company shall not enter into or be party to a Fundamental Transaction unless in violation of Section 6 hereof. Company shall not relocate its chief executive office or its principal place of business unless it has provided prior written notice to Holder.

(j) Reserved.

(k) <u>Charter Amendments</u>.  The Company shall not amend its charter documents, including, without limitation, its certificate of incorporation and bylaws, in any manner that materially and adversely affects any rights of the Holder.

(l) <u>Repurchase</u>. The Company shall not repay, repurchase or offer to repay, repurchase or otherwise acquire more than a <u>de</u> <u>minimis</u> number of shares of its Common Stock or common stock equivalents other than as to the Conversion Shares as permitted or required under the Transaction Documents.

(m) <u>Redemption</u>. The Company shall not redeem, defease, repurchase, repay or make any payments in respect of, by the payment of cash or cash equivalents (in whole or in part, whether by way of open market purchases, tender offers, private transactions or

-14-

otherwise), all or any portion of any Indebtedness (other than the Note if on a pro-rata basis), whether by way of payment in respect of principal of (or premium, if any) or interest on, such Indebtedness, the foregoing restriction shall also apply to Permitted Indebtedness from and after the occurrence of an Event of Default.

(n) <u>Declaration</u>. The Company shall not declare or make any dividend or other distribution of its assets or rights to acquire its assets to holders of shares of Common Stock, by way of return of capital or otherwise including, without limitation, any distribution of cash, stock or other securities, property or options by way of a dividend, spin off, reclassification, corporate rearrangement, scheme of arrangement or other similar transaction.

(o) The Company shall not enter into any agreement with respect to any of the foregoing.

(13)     <u>TRANSFER</u>. This Note and any shares of Common Stock issued upon conversion of this Note may be offered, sold, assigned or transferred according to the Purchase Agreement.

(14)     <u>REISSUANCE OF THIS NOTE</u>.

(a) <u>Transfer</u>. If this Note is to be transferred, the Holder shall instruct the Company who the new Holder will be and this Note will be automatically cancelled. The Company will issue and deliver the new Note within two (2) days of such notice.

(b) <u>Lost, Stolen or Mutilated Note</u>. Upon receipt by the Company of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note, and, in the case of loss, theft or destruction, of any indemnification undertaking by the Holder to the Company in customary form and, in the case of mutilation, upon surrender and cancellation of this Note, the Company shall execute and deliver to the Holder a new Note (in accordance with Section 14(d)) representing the then outstanding Principal amount of the Note.

(c) <u>Note Exchangeable for Different Denominations</u>. This Note is exchangeable, upon the surrender hereof by the Holder at the principal office of the Company, for a new Note or Notes (in accordance with Section 14(d) representing in the aggregate the outstanding Principal of this Note, and each such new Note will represent such portion of such outstanding Principal as is designated by the Holder at the time of such surrender.

(d) <u>Issuance of New Notes</u>. Whenever the Company is required to issue a new Note pursuant to the terms of this Note, such new Note (i) shall be of like tenor with this Note, (ii) shall represent, as indicated on the face of such new Note, the Principal remaining outstanding (or in the case of a new Note being issued pursuant to Section 14(a) or Section 14(c), the Principal designated by the Holder which, when added to the principal represented by the other new Notes issued in connection with such issuance, does not exceed the Principal remaining outstanding under this Note immediately prior to such issuance of new Notes), (iii) shall have an issuance date, as indicated on the face of such new Note, which is the same as the Issuance Date of this Note,

-15-

(iv) shall have the same rights and conditions as this Note, and (v) shall represent accrued and unpaid Interest on the Principal and Interest of this Note, from the Issuance Date.

(15) <u>REMEDIES, CHARACTERIZATIONS, OTHER OBLIGATIONS, BREACHES AND INJUNCTIVE RELIEF</u>. The remedies provided in this Note shall be cumulative and in addition to all other remedies available under this Note and any of the other Transaction Documents, at law or in equity (including a decree of specific performance and/or other injunctive relief), and nothing herein shall limit the Holder's right to pursue actual and consequential damages for any failure by the Company to comply with the terms of this Note. Amounts set forth or provided for herein with respect to payments, conversion, redemption and the like (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof). The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder and that the remedy at law for any such breach may be inadequate. The Company therefore agrees that, in the event of any such breach or threatened breach, the Holder shall be entitled, in addition to all other available remedies, to an injunction restraining any breach, without the necessity of showing economic loss and without any bond or other security being required.

(16) <u>PAYMENT OF COLLECTION, ENFORCEMENT AND OTHER COSTS</u>. If (a) this Note is placed in the hands of an attorney for collection or enforcement or is collected or enforced through any legal proceeding or the Holder otherwise takes action to collect amounts due under this Note or to enforce the provisions of this Note or (b) there occurs any bankruptcy, reorganization, receivership of the Company or other proceedings affecting Company creditors' rights and involving a claim under this Note, then the Company shall pay the costs and expenses incurred by the Holder for such collection, enforcement or action or in connection with such bankruptcy, reorganization, receivership or other proceeding, including, but not limited to, attorneys' fees and disbursements.

(17) <u>CONSTRUCTION; HEADINGS</u>. This Note shall be deemed to be jointly drafted by the Company and the Holder and shall not be construed against any person as the drafter hereof. The headings of this Note are for convenience of reference and shall not form part of, or affect the interpretation of, this Note.

(18) <u>FAILURE OR INDULGENCE NOT WAIVER</u>. No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

(19) <u>DISPUTE RESOLUTION</u>. In the case of a dispute as to the determination of the arithmetic calculation of the Conversion Rate, the Conversion Price or any Redemption Price, the Company shall submit the disputed determinations or arithmetic calculations via facsimile or electronic mail within one (1) Business Days of receipt, or deemed receipt, of the Conversion Notice or Redemption Notice or other event giving rise to such dispute, as the case may be, to the Holder. If the Holder and the Company are unable to agree upon such determination or calculation

-16-

within two (2) Business Days of such disputed determination or arithmetic calculation being submitted to the Holder, then the Company shall, within two (2) Business Days submit via facsimile or electronic mail the disputed arithmetic calculation of the Conversion Rate, Conversion Price or any Redemption Price to an independent, outside accountant, selected by the Holder and approved by the Company, such approval not to be unreasonably withheld, conditioned or delayed. The Company, at the Company's expense, shall cause the accountant to perform the determinations or calculations and notify the Company and the Holder of the results no later than five (5) Business Days from the time it receives the disputed determinations or calculations. Such accountant's determination or calculation shall be binding upon all parties absent demonstrable error.

(20)  NOTICES; PAYMENTS.

(a) Notices. All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, facsimile, or electronic mail, addressed as set forth below or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received), or (b) upon receipt, when sent by electronic mail (provided confirmation of transmission is electronically generated and keep on file by the sending party), or (c) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur. The addresses for such communications shall be: (i) if to Borrower, to: Proton Green LLC at 4531 Park Lane, Dallas, Texas 75220, Steven E. Looper, sel@protongreen.com; (ii) if to the Holder, to: the address and fax number indicated on the Purchase Agreement. Without limiting the generality of the foregoing, the Company shall give written notice to the Holder (i) immediately upon any adjustment of the Conversion Price, setting forth in reasonable detail, and certifying, the calculation of such adjustment and (ii) at least twenty (20) days prior to the date on which the Company closes its books or takes a record (A) with respect to any dividend or distribution upon the Common Stock, (B) with respect to any pro rata subscription offer to holders of Common Stock or (C) for determining rights to vote with respect to any Fundamental Transaction, dissolution or liquidation, provided in each case that such information shall be made known to the public prior to or in conjunction with such notice being provided to the Holder.

(b) Payments. Whenever any payment of cash is to be made by the Company to any Person pursuant to this Note, such payment shall be made in lawful money of the United States of America by a check drawn on the account of the Company and sent via overnight courier service to such Person at such address as previously provided to the Company in writing; provided, that the Holder may elect to receive a payment of cash via wire transfer of immediately

-17-

available funds by providing the Company with prior written notice setting out such request and the Holder's wire transfer instructions. Whenever any amount expressed to be due by the terms of this Note is due on any day, which is not a Business Day, the same shall instead be due on the next succeeding day, which is a Business Day.

(21) <u>CANCELLATION</u>. After all Principal and other amounts at any time owed on this Note have been paid in full, this Note shall automatically be deemed canceled, shall be surrendered to the Company for cancellation and shall not be reissued.

(22) <u>WAIVER OF NOTICE</u>. To the extent permitted by law, the Company hereby waives demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note.

(23) <u>GOVERNING LAW; JURISDICTION; JURY TRIAL</u>. All questions concerning the construction, validity, enforcement and interpretation of this Note shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflicts of law thereof. The Company agrees that all legal proceedings concerning the interpretations, enforcement and defense of the transactions contemplated by this Note (whether brought against the Company, the Holder or their respective affiliates, directors, officers, shareholders, employees or agents) shall be commenced exclusively in the state and federal courts sitting in the City of New York, County of New York. The Company hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the City of New York, Borough of Manhattan for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is improper or is an inconvenient venue for such proceeding. The Company hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to it at the address in effect for notices to it under the Purchase Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law. If the Company or a Holder shall commence an action or proceeding to enforce any provisions of the Note, then the prevailing party in such action or proceeding shall be reimbursed by the other party for its reasonable attorneys' fees and other costs and expenses incurred with the investigation, preparation and prosecution of such action or proceeding. **IN ANY ACTION, SUIT, OR PROCEEDING IN ANY JURISDICTION BROUGHT BY ANY PARTY AGAINST ANY OTHER PARTY, THE COMPANY KNOWINGLY AND INTENTIONALLY, TO THE GREATEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND EXPRESSLY WAIVES FOREVER TRIAL BY JURY.**

(24) <u>SEVERABILITY</u>. If any provision of this Note is prohibited by law or otherwise determined to be invalid or unenforceable by a court of competent jurisdiction, the provision that would otherwise be prohibited, invalid or unenforceable shall be deemed amended

to apply to the broadest extent that it would be valid and enforceable, and the invalidity or unenforceability of such provision shall not affect the validity of the remaining provisions of this Note so long as this Note as so modified continues to express, without material change, the original intentions of the parties as to the subject matter hereof and the prohibited nature, invalidity or unenforceability of the provision(s) in question does not substantially impair the respective expectations or reciprocal obligations of the parties or the practical realization of the benefits that would otherwise be conferred upon the parties. The parties will endeavor in good faith negotiations to replace the prohibited, invalid or unenforceable provision(s) with a valid provision(s), the effect of which comes as close as possible to that of the prohibited, invalid or unenforceable provision(s).

(25) <u>DISCLOSURE</u>. Upon receipt or delivery by the Company of any notice in accordance with the terms of this Note, unless the Company has in good faith determined that the matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries, the Company shall within one (1) Business Day after any such receipt or delivery publicly disclose such material, nonpublic information on a Current Report on Form 6-K or otherwise. In the event that the Company believes that a notice contains material, nonpublic information relating to the Company or its Subsidiaries, the Company so shall indicate to such Holder contemporaneously with delivery of such notice, and in the absence of any such indication, the Holder shall be allowed to presume that all matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries.

(26) <u>CERTAIN DEFINITIONS</u>. For purposes of this Note, the following terms shall have the following meanings:

(a) "**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person, it being understood for purposes of this definition that "control" of a Person means the power directly or indirectly either to vote 10% or more of the stock having ordinary voting power for the election of directors of such Person or direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

(b) "**Attribution Parties**" means, collectively, the following Persons and entities: (i) any investment vehicle, including, any funds, feeder funds or managed accounts, currently, or from time to time after the Issuance Date, directly or indirectly managed or advised by the Holder's investment manager or any of its Affiliates or principals, (ii) any direct or indirect Affiliates of the Holder or any of the foregoing, (iii) any Person acting or who could be deemed to be acting as a Group together with the Holder or any of the foregoing and (iv) any other Persons whose beneficial ownership of the Company's Common Stock would or could be aggregated with the Holder's and the other Attribution Parties for purposes of Regulation 13D-G of the Exchange Act.

(c) "**Bloomberg**" means Bloomberg Financial Markets.

(d) "**Closing Date**" shall have the meaning ascribed to such term in the Purchase Agreement.

-19-

(e) "**Closing Bid Price**" and "**Closing Sale Price**" means, for any security as of any date, the last closing bid price and last closing trade price, respectively, for such security on the Principal Market, as reported by Bloomberg, or, if the Principal Market begins to operate on an extended hours basis and does not designate the closing bid price or the closing trade price, as the case may be, then the last bid price or last trade price, respectively, of such security prior to 4:00 p.m., New York Time, as reported by Bloomberg, or, if the Principal Market is not the principal securities exchange or trading market for such security, the last closing bid price or last trade price, respectively, of such security on the principal securities exchange or trading market where such security is listed or quoted for trading as reported by Bloomberg, or if the foregoing do not apply, the last closing bid price or last trade price, respectively, of such security in the over-the-counter market on the electronic bulletin board for such security as reported by Bloomberg, or, if no closing bid price or last trade price, respectively, is reported for such security by Bloomberg, the average of the bid prices, or the ask prices, respectively, of any market makers for such security as reported in the OTC Link or "pink sheets" by OTC Markets Group Inc. (formerly Pink OTC Markets Inc.). If the Closing Bid Price or the Closing Sale Price cannot be calculated for a security on a particular date on any of the foregoing bases, the Closing Bid Price or the Closing Sale Price, as the case may be, of such security on such date shall be the fair market value as mutually determined by the Company and the Holder. If the Company and the Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved pursuant to Section 19. All such determinations to be appropriately adjusted for any stock dividend, stock split, stock combination, reclassification or similar transaction during the applicable calculation period.

(f) "**Common Stock**" the common stock of the Company, par value $0.001 per share, and any other class of securities into which such securities may hereafter be reclassified or changed.

(g) "**Convertible Securities**" means any stock or securities (other than Options) directly or indirectly convertible into or exercisable or exchangeable for shares of Common Stock.

(h) "**Default Interest Rate**" means 18% per annum.

(i) "**Equity Interests**" means (a) all shares of capital stock (whether denominated as common capital stock or preferred capital stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting and (b) all securities convertible into or exchangeable for any of the foregoing and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any of the foregoing, whether or not presently convertible, exchangeable or exercisable.

(j) "**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

-20-

(k) "**Fundamental Transaction**" means (A) that the Company shall, directly or indirectly, including through Subsidiaries, Affiliates or otherwise, in one or more related transactions, (i) consolidate or merge with or into (whether or not the Company is the surviving corporation) another Subject Entity, or (ii) sell, assign, transfer, convey or otherwise dispose of all or substantially all of the properties or assets of the Company or any of its "significant subsidiaries" (as defined in Rule 1-02 of Regulation S-X) to one or more Subject Entities, or (iii) make, or allow one or more Subject Entities to make, or allow the Company to be subject to or have its Common Stock be subject to or party to one or more Subject Entities making, a purchase, tender or exchange offer that is accepted by the holders of at least either (x) 50% of the outstanding shares of Common Stock, (y) 50% of the outstanding shares of Common Stock calculated as if any shares of Common Stock held by all Subject Entities making or party to, or Affiliated with any Subject Entities making or party to, such purchase, tender or exchange offer were not outstanding; or (z) such number of shares of Common Stock such that all Subject Entities making or party to, or Affiliated with any Subject Entity making or party to, such purchase, tender or exchange offer, become collectively the beneficial owners (as defined in Rule 13d-3 under the Exchange Act) of at least 50% of the outstanding shares of Common Stock, or (iv) consummate a stock purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off or scheme of arrangement) with one or more Subject Entities whereby such Subject Entities, individually or in the aggregate, acquire, either (x) at least 50% of the outstanding shares of Common Stock, (y) at least 50% of the outstanding shares of Common Stock calculated as if any shares of Common Stock held by all the Subject Entities making or party to, or Affiliated with any Subject Entity making or party to, such stock purchase agreement or other business combination were not outstanding; or (z) such number of shares of Common Stock such that the Subject Entities become collectively the beneficial owners (as defined in Rule 13d-3 under the Exchange Act) of at least 50% of the outstanding shares of Common Stock, or (v) reorganize, recapitalize or reclassify its Common Stock, (B) that the Company shall, directly or indirectly, including through Subsidiaries, Affiliates or otherwise, in one or more related transactions allow any Subject Entity individually or the Subject Entities in the aggregate to be or become the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, whether through acquisition, purchase, assignment, conveyance, tender, tender offer, exchange, reduction in outstanding shares of Common Stock, merger, consolidation, business combination, spin-off, scheme of arrangement, reorganization, recapitalization or reclassification or otherwise in any manner whatsoever, of either (x) at least 50% of the aggregate ordinary voting power represented by issued and outstanding Common Stock, (y) at least 50% of the aggregate ordinary voting power represented by issued and outstanding Common Stock not held by all such Subject Entities as of the date of this Note calculated as if any shares of Common Stock held by all such Subject Entities were not outstanding, or (z) a percentage of the aggregate ordinary voting power represented by issued and outstanding shares of Common Stock or other equity securities of the Company sufficient to allow such Subject Entities to effect a statutory short form merger or other transaction requiring other stockholders of the Company to surrender their shares of Common Stock without approval of the stockholders of the Company or (C) directly or indirectly, including through Subsidiaries, Affiliates or otherwise, in one or more related transactions, the issuance of or the entering into any other instrument or transaction structured in a manner to circumvent, or that circumvents, the intent of this definition in which case this definition shall be construed and

-21-

implemented in a manner otherwise than in strict conformity with the terms of this definition to the extent necessary to correct this definition or any portion of this definition which may be defective or inconsistent with the intended treatment of such instrument or transaction.

(l) "**GAAP**" means United States generally accepted accounting principles, consistently applied.

(m) "**Group**" means a "group" as that term is used in Regulation 13D-G of the Exchange Act and as defined in Rule 13d-5 thereunder.

(n) "**Holiday**" means a day other than a Business Day or on which trading does not take place on the Principal Market.

(o) RESERVED

(p) "**Market Price**" shall mean the lowest Closing Bid Price on the Closing Date.

(q) "**Notes**" means this Note and the Other Notes.

(r) "**OID**" shall mean the Original Issue Discount, which is 35%.

(s) "**Options**" means any rights, warrants or options to subscribe for or purchase shares of Common Stock or Convertible Securities.

(t) "**Other Notes**" means (i) the Second Amended and Restated Promissory Convertible Note, dated as of the date hereof, made by the Company in favor of Kips Bay Select LP in the principal amount of $3,513,469.00 (the "**Kips Bay Note**"), and (ii) the Amended and Restated Promissory Convertible Note, dated as of the date hereof, made by the Company in favor of Alpha Carta, Ltd. in the principal amount of $1,846,153.84 (the "**AC Note**").

(u) "**Parent Entity**" of a Person means an entity that, directly or indirectly, controls the applicable Person, including such entity whose common capital stock or equivalent equity security is quoted or listed on a Trading Market (or, if so elected by the Holder, any other market, exchange or quotation system), or, if there is more than one such Person or such entity, the Person or entity designated by the Holder or in the absence of such designation, such Person or such entity with the largest public market capitalization as of the date of consummation of the Fundamental Transaction.

(v) "**Permitted Indebtedness**" means (i) Indebtedness evidenced by this Note and the Other Notes; (ii) debt incurred to make acquisitions; (iii) trade payables incurred in the ordinary course of business consistent with past practice, (iv) unsecured indebtedness not in excess of $1,000,000 in the aggregate, and (v) Indebtedness secured by Permitted Liens.

(w) "**Permitted Liens**" means (i) any Lien for taxes not yet due or delinquent or being contested in good faith by appropriate proceedings for which adequate reserves

have been established in accordance with GAAP, (ii) any statutory Lien arising in the ordinary course of business by operation of law with respect to a liability that is not yet due or delinquent, (iii) any Lien created by operation of law, such as materialmen's liens, mechanics' liens and other similar liens, arising in the ordinary course of business with respect to a liability that is not yet due or delinquent or that are being contested in good faith by appropriate proceedings, (iv) Liens (A) upon or in any equipment acquired or held by the Company or any of its Subsidiaries to secure the purchase price of such equipment or Indebtedness incurred solely for the purpose of financing the acquisition or lease of such equipment, or (B) existing on such equipment at the time of its acquisition, provided that the Lien is confined solely to the property so acquired and improvements thereon, and the proceeds of such equipment, (v) Liens incurred in connection with the extension, renewal or refinancing of the Indebtedness secured by Liens of the type described in clause (iv) above, provided that any extension, renewal or replacement Lien shall be limited to the property encumbered by the existing Lien and the principal amount of the Indebtedness being extended, renewed or refinanced does not increase, (vi) leases or subleases and licenses and sublicenses granted to others in the ordinary course of the Company's business, not interfering in any material respect with the business of the Company and its Subsidiaries taken as a whole, (vii) Liens in favor of customs and revenue authorities arising as a matter of law to secure payments of custom duties in connection with the importation of goods, (viii) Liens arising from judgments, decrees or attachments in circumstances not constituting an Event of Default under Section 4(a)(viii) and (ix) liens listed on Schedule 27(v) hereto, and (ix) Liens arising pursuant to the terms of the Notes.

(x) "**Principal Market**" means the OTCQB tier of the OTC Markets.

(y) "**Redemption Dates**" means, collectively, the Event of Default Redemption Dates, and the Optional Redemption Dates, each of the foregoing, individually, a Redemption Date.

(z) "**Redemption Notices**" means, collectively, the Event of Default Redemption Notices, and the Optional Redemption Notices, each of the foregoing, individually, a Redemption Notice.

(aa) "**Redemption Price**" means, 125% of the outstanding principal amount of the Note together with accrued Interest thereon, which after an Event of Default shall be calculated at the Default Rate.

(bb) "**Related Fund**" means, with respect to any Person, a fund or account managed by such Person or an Affiliate of such Person.

(cc) "**Required Holders**" means any two (2) Holders of the Notes.

(dd) "**Rule 144**" shall have the meaning ascribed to such term in the Purchase Agreement.

(ee) "**SEC**" means the United States Securities and Exchange Commission.

-23-

(ff) "**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

(gg) "**Subject Entity**" means any Person, Persons or Group or any Affiliate or associate of any such Person, Persons or Group.

(hh) "**Successor Entity**" means one or more Person or Persons (or, if so elected by the Holder, the Company or Parent Entity) formed by, resulting from or surviving any Fundamental Transaction or one or more Person or Persons (or, if so elected by the Holder, the Company or the Parent Entity) with which such Fundamental Transaction shall have been entered into.

(ii) "**Trading Market**" means any of the following markets or exchanges on which the Common Stock is listed or quoted for trading on the date in question: the NYSE American, the Nasdaq Capital Market, the Nasdaq Global Market, the Nasdaq Global Select Market, the New York Stock Exchange, OTCQB or OTCQX (or any successors to any of the foregoing).

(jj) "**VWAP**" means, for any date, the price determined by the first of the following clauses that applies: (a) if the Common Stock is then listed or quoted on a Trading Market, the daily volume weighted average price of the Common Stock for such date (or the nearest preceding date) on the Trading Market on which the Common Stock is then listed or quoted as reported by Bloomberg L.P. (based on a Trading Day from 9:30 a.m. New York City time to 4:02 p.m. New York City time); (b) if the Common Stock is not then listed or quoted for trading on a Trading Market and if prices for the Common Stock are then reported on the OTC Pink (or a similar organization or agency succeeding to its functions of reporting prices), the most recent bid price per share of the Common Stock so reported; or (c) in all other cases, the fair market value of a share of Common Stock as determined by an independent appraiser selected in good faith by the Holders of a majority in interest of the Note then outstanding and reasonably acceptable to the Company, the fees and expenses of which shall be paid by the Company.

[Signature Page Follows]

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed as of the Issuance Date set out above.

Proton Green LLC,
formerly known as Plateau
Carbon, LLC

By: _____
Name: Steven E. Cooper
Title: Managing Member

AGREED AND APPROVED:

ALPHA CARTA, LTD.

By:_____
    Name
    Title:

-25-

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed as of the Issuance Date set out above.

Proton Green LLC,
formerly known as Plateau
Carbon, LLC

By: _____
Name:
Title:

AGREED AND APPROVED:

ALPHA CARTA, LTD.

By: _____
    Name Mark Azzopardi
    Title: Director

-25-

**EXHIBIT I**
**PROTON GREEN LLC**
**CONVERSION NOTICE**

Reference is made to the Amended and Restated Promissory Convertible Note (the "**Note**") issued to Alpha Carta, Ltd. (together with is designee or registered assigns, the "**Holder**") by Proton Green LLC (formerly known as Plateau Carbon, LLC) (the "**Company**"). In accordance with and pursuant to the Note, the undersigned hereby elects to convert the Conversion Amount (as defined in the Note) of the Note indicated below into shares of Common Stock of the Company, par value $ 0.0001 per share (the "**Common Stock**") of the Company, as of the date specified below.

Date of
Conversion: _____

Aggregate Conversion Amount to be
converted: _____

Please confirm the following information:

Conversion Price: _____

Number of shares of Common Stock to
be issued: _____

Please issue the Common Stock into which the Note is being converted in the following name and to the following address:

Issue to: _____

Facsimile Number and Electronic

Mail: _____

Authorization: _____
By: _____
Title: _____

Dated: _____

Account
Number: _____
(if electronic book entry transfer)

-26-

Transaction Code
Number: _____
(if electronic book entry transfer)

**EXHIBIT N**

## PROFESSIONAL SERVICES AGREEMENT

**THIS AGREEMENT** is between Alpha Carta Limited, and its subsidiaries and/or affiliates (collectively, the "Company") and **BNW FAMILY OFFICE LLC,** a Delaware limited liability company (the "Contractor").

**1.    ENGAGEMENT OF SERVICES.**  The Company may from time-to-time issue Project Assignments in the form attached to this Agreement as Exhibit A.  Subject to the terms of this Agreement, the Contractor will, to the best of its ability, render the services set forth in the Project Assignments accepted by the Contractor (the "Projects") by the completion dates set forth therein.  The manner and means by which the Contractor chooses to complete the Projects are in the Contractor's sole discretion and control.  The Contractor agrees to exercise the highest degree of professionalism, and to utilize its expertise and creative talents in completing such Projects.  The Contractor agrees to provide its own equipment, tools, and other materials at its own expense.  The Company will make its facilities and equipment available to the Contractor when necessary.  The Contractor shall perform the services necessary to complete the Projects in a timely and professional manner consistent with industry standards, and at a location, place, and time that the Contractor deems appropriate.  The Contractor may not subcontract or otherwise delegate its obligations under this Agreement without the Company's prior written consent.  If the Contractor is not a natural person, then before any employee or consultant of the Contractor performs services in connection with this Agreement, the employee or consultant and the Contractor must have entered into a written agreement expressly for the benefit of the Company and containing provisions substantially equivalent to this section and to Section 4 below.

**2.    COMPENSATION.**  The Company will pay the Contractor a fee for services rendered under this Agreement as set forth in Exhibit A, which sets forth the Project Assignment(s) undertaken by the Contractor.  The Contractor will be reimbursed for any reasonable expenses incurred in connection with the performance of services under this Agreement provided that the Contractor obtains prior approval from the Company and submits verification of such expenses as the Company may require.  Upon termination of this Agreement for any reason, the Contractor will be paid fees and expenses on a proportional basis as stated in the Project Assignment(s) for work, which is then in progress, up to and including the effective date of such termination.

**3.    INDEPENDENT CONTRACTOR RELATIONSHIP.**  The Contractor's relationship with the Company will be that of an independent contractor and nothing in this Agreement should be construed to create a partnership, joint venture, or employer-employee relationship.  The Contractor is not the agent of the Company and is not authorized to make any representation, contract, or commitment on behalf of the Company.  The Contractor will not be entitled to any of the benefits that the Company may make available to its employees, such as group insurance, profit-sharing, or retirement benefits.  The Contractor will be solely responsible for all tax returns and payments required to be filed with or made to any federal, state, or local tax authority with respect to the Contractor's performance of services and receipt of fees under this Agreement.  The Company will regularly report amounts paid to the Contractor by filing a Form 1099-MISC with the Internal Revenue Service as required by law.  The Company will not withhold or make payments for social security; make unemployment insurance or disability insurance contributions; or obtain worker's compensation insurance on the Contractor's behalf.  The Contractor agrees to accept exclusive liability for complying with all applicable state and federal laws governing self-employed individuals, including obligations such as payment of taxes, social security, disability, and other contributions based on fees paid to the Contractor, its agents, or employees under this Agreement.  The Contractor hereby agrees to indemnify and hold the Company harmless against any and all such taxes or contributions, including penalties and interest.

**4.    PROPRIETARY INFORMATION OBLIGATIONS AND INTELLECTUAL PROPERTY RIGHTS.**

**4.1    Proprietary Information.**  The Contractor agrees, during the term of this Agreement and thereafter, that it will take all steps reasonably necessary to hold the Company's Proprietary Information in trust and confidence, will not use Proprietary Information in any manner or for any purpose not expressly set forth in this Agreement, and will not disclose any such Proprietary Information to any third party without first obtaining the Company's express written consent.  By way of illustration but not limitation, "Proprietary Information" includes (a) trade secrets, inventions, mask works, ideas, processes, formulas, source and object codes, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques (hereinafter collectively referred to as "Inventions"); (b) information regarding financial information, research, investment and fund strategies, investors, marketing, business plans, budgets, suppliers and customers; and (c) information regarding the skills and compensation of other employees and consultants of the Company.  Notwithstanding the other provisions of this Agreement, nothing received by the Contractor will be considered to be the Company's Proprietary Information if

1

(1) it has been published or is otherwise readily available to the public other than by a breach of this Agreement; (2) it has been rightfully received by the Contractor from a third party without confidential limitations; (3) it has been independently developed for the Contractor by personnel or agents having no access to the Company's Proprietary Information; or (4) it was known to the Contractor prior to its first receipt from the Company.

        **4.2**     **Third Party Information.**  The Contractor understands that the Company has received and will in the future receive from third parties confidential or proprietary information ("Third Party Information") subject to a duty on the Company's part to maintain the confidentiality of such information and use it only for certain limited purposes.  The Contractor agrees to hold Third Party Information in confidence and not to disclose to anyone (other than the Company's personnel who need to know such information in connection with their work for the Company) or to use, except in connection with the Contractor's work for the Company, Third Party Information unless expressly authorized in writing by an officer of the Company.

        **4.3**     **No Conflict of Interest.**  The Contractor agrees, during the term of this Agreement, not to accept work substantially similar to the Contractor's work under this Agreement, without the Company's prior written consent.  The Contractor warrants that, to the best of the Contractor's knowledge, there is no other existing contract or duty on the Contractor's part that would conflict with or would be inconsistent with this Agreement, unless a copy of such contract or a description of such duty is attached to this Agreement as Exhibit B.  The Contractor further agrees not to disclose to the Company, bring onto the Company's premises, or induce the Company to use any confidential information that belongs to anyone other than the Company or the Contractor.

**5.**     **CONTRACTOR REPRESENTATIONS AND WARRANTIES.**  The Contractor hereby represents and warrants that (a) the Company work product will be an original work of the Contractor; (b)  the Contractor has full right and power to enter into and perform this Agreement without the consent of any third party; and (c) should the Company permit the Contractor to use any of the Company's equipment, tools, or facilities during the term of this Agreement, such permission shall be gratuitous and the Contractor shall be responsible for any injury or damage arising out of use of such equipment, tools, or facilities.

**6.**     **INDEMNIFICATION.**  The Company will indemnify, defend, and hold harmless the Contractor from any and all claims, losses, liabilities, damages, expenses and costs (including attorneys' fees and court costs) that result from the Contractor's engagement hereunder and/or provision of services under this Agreement, provided that such claims are not the result of the Contractor's breach of this Agreement, bad faith, willful misconduct, or gross negligence, and provided further that the Contractor gives the Company written notice of any claim and the Company has the right to participate in the defense of any such claim at its expense.  The Contractor will indemnify and hold harmless the Company, its officers, directors, employees, and agents from any and all claims, losses, liabilities, damages, expenses and costs (including attorneys' fees and court costs) that result from a breach or alleged breach of any obligation of or agreement by the Contractor in this Agreement, provided that the Company gives the Contractor written notice of any such claim and the Contractor has the right to participate in the defense of any such claim at its expense.

**7.**     **TERMINATION.**

        **7.1**     **Termination by the Company.**  The Company may terminate this Agreement at its convenience and without any breach by the Contractor upon ninety days (90) days' prior written notice to the Contractor.  The Company may also terminate this Agreement immediately in its sole discretion upon the Contractor's material breach of Section 4 or Section 7.3, provided the Company has given the Contractor seven (7) days' advance written notice within which to cure such breach.

        **7.2**     **Termination by the Contractor.**  The Contractor may terminate this Agreement at any time upon ninety (90) days' prior written notice to the Company.

        **7.3**     **Noninterference with Business.**  During and for a period of one year immediately following termination of this Agreement by either party, the Contractor agrees not to solicit or induce any employee, independent contractor, client, or customer to terminate or breach an employment, contractual or other relationship with the Company.

**7.4    Return of Company Property.**  Upon termination of the Agreement or earlier as requested by the Company, the Contractor will deliver to the Company any and all documents, together with all copies thereof, and any other material containing or disclosing any Company work product, Third Party Information, or Proprietary Information of the Company.  The Contractor further agrees that any property situated on the Company's premises and owned by the Company, including disks and other storage media, filing cabinets, or other work areas, is subject to inspection by Company personnel at any time with or without notice.

**8.    GENERAL PROVISIONS.**

**8.1    Governing Law.**  This Agreement will be governed and construed in accordance with the laws of the State of Illinois without regard to conflicts of law principles.  The Contractor hereby expressly consents to the personal jurisdiction of the state and federal courts located in Delaware for any lawsuit filed arising from or related to this Agreement.

**8.2    Severability.**  In case any one or more of the provisions contained in this Agreement shall, for any reason, be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect the other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.  Moreover, if any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity, or subject, it shall be construed by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law as it shall then appear.

**8.3    No Assignment.**  This Agreement may not be assigned by the Contractor without the Company's prior written consent, and any such attempted assignment shall be void and of no effect.

**8.4    Notices.**  All notices, requests and other communications under this Agreement must be in writing, and must be mailed by registered or certified mail, postage prepaid and return-receipt requested, by reputable national overnight courier, delivery fee prepaid or delivered by hand to the party to whom such notice is required or permitted to be given.  If mailed, any such notice will be considered to have been given five (5) business days after it was mailed, as evidenced by the postmark.  If delivered by hand or overnight courier, any such notice will be considered to have been given when received by the party to whom notice is given, as evidenced by written and dated receipt of the receiving party.

**8.5    Injunctive Relief.**  A breach of any of the promises or agreements contained in this Agreement may result in irreparable and continuing damage to the Company for which there may be no adequate remedy at law, and the Company is therefore entitled to seek injunctive relief as well as such other and further relief as may be appropriate.

**8.6    Survival.**  The following provisions shall survive termination of this Agreement: Section 4, Section 5, Section 6, and Section 7.3.

**8.7    Publicity.**  The Contractor agrees not to use any identification or reference to any trade name, trademark, service mark, or symbol of the Company in any advertising or promotional activities without the Company's prior written consent.

**8.8    Waiver.**  No waiver by the Company of any breach of this Agreement shall be a waiver of any preceding or succeeding breach.  No waiver by the Company of any right under this Agreement shall be construed as a waiver of any other right.  The Company shall not be required to give notice to enforce strict adherence to all terms of this Agreement.

**9.9    Entire Agreement.**  This Agreement, together with the Exhibits, is the final, complete, and exclusive agreement of the parties with respect to the subject matter hereof and supersedes and merges all prior discussions between us.  No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing and signed by the party to be charged.  The terms of this Agreement will govern all Project Assignments and services undertaken by the Contractor for the Company.  In the event of any

conflict between this Agreement and a Project Assignment, the Project Assignment shall control, but only with respect to the services set forth herein.

**IN WITNESS WHEREOF,** the parties have caused this Professional Services Agreement to be executed by their duly authorized representative.

COMPANY:                                              CONTRACTOR:

**ALPHA CARTA LIMITED**                    **BNW FAMILY OFFICE LLC,** a Delaware limited
                                                             liability company

By: _____

Name: ___Mark Azzopardi___                By: _Robert James Brownell_

Title: ___Director___                            Name: Robert Brownell

                                                             Its: __Manager, BNW Family Office, LLC__

4

EXHIBIT A

**PROJECT ASSIGNMENT**

**Services:**  The Contractor will provide investment advisory and support services.

**Payment of Fees.**  Contractor will receive a monthly rate of $40,000, during the Term of this Agreement. The Company may pay the Contractor additional fees on a discretionary basis for exceptional services.

- Payment will be issued in arrears via wire transfer or check for services performed during the previous month.

- The Contractor must submit a monthly invoice of time worked for approval by the Company.

- The Contractor agrees to work on a schedule to be mutually agreed upon by the Contractor and the Company, to perform such services and to fulfill the Contractor's obligations under this Agreement.

**Term:**

- January 1, 2023, through December 31, 2023, subject to renewal or earlier termination (as stated in Section 7 of this agreement).

**Expenses:**  The Company will reimburse the Contractor for the following expenses:

- Reasonable out-of-pocket expenses incurred in connection with the provision of services under this Agreement.

- The Contractor shall promptly submit bills or receipts for such expenses to the Company for reimbursement.  All expenses shall be incurred in accordance with the current policies and guidelines of the Company with respect thereto.

NOTE:  This Project Assignment is governed by the terms of a Professional Services Agreement in effect between the Company and Contractor.  In the event that any item in this Project Assignment is inconsistent with that Agreement, the terms of this Project Assignment shall govern, but only with respect to the services set forth in this Project Assignment.

Signed:  _____            _____
             The Company                                              The Contractor

**EXHIBIT B**

**CONFLICT DISCLOSURE**

Terra Carta Partners LLC