**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| PAUL SCHROTH WOLFE,<br>YORKVILLE INVESTMENT I, LLC.,<br>a Delaware limited liability company<br>GREEN SAPPHIRE HOLDINGS, INC., a Delaware corporation,<br>ALPHA CARTA, Ltd., a foreign corporation,<br>BREAKERS BEACH CLUB, Ltd., a foreign corporation,<br>NORTHSEA, LLC, a Wyoming limited liability company, and<br>PRAIRIE PRIVATE TRUST COMPANY LTD.,<br>a Cayman Islands company,<br><br>        Plaintiffs,<br><br>v.<br><br>STEVEN E. LOOPER,<br>PAUL WHINNERY (a/k/a Paul Schlieve a/k/a Schmidt)<br>CYBER APP SOLUTIONS Corp. f/k/a Proton Green, LLC,<br>a Nevada corporation,<br>PROTON GREEN, LLC, a Wyoming limited liability company,<br>ROBERT G. BROWNELL (a/k/a Robert Bigelow),<br>BNW FAMILY OFFICE, LLC, a Delaware limited liability company,<br>NATHAN SMITH,<br>ROCKWATER CAPITAL LTD, a Cayman Islands company,<br>DAVID HOLDEN,<br>MARK MATTHEWS,<br>CHARLES MACK,<br>DALLAS SALAZAR,<br>ROBERT J. BROWNELL,<br>SASAGINNIGAK, LLC (f/k/a Overall Builders, LLC),<br>a Texas limited liability company,<br>GLOBAL CAPITAL PARTNERS, LLC, a Cayman Islands Company,<br>GLOBAL CAPITAL PARTNERS, LLC,<br>a Delaware limited liability company,<br>DUSTIN SPRINGETT,<br>TAILWIND, LTD., a Cayman Islands Company,<br>ENDEAVOR REAL ESTATE GROUP, LLC.,<br>a Texas limited liability company,<br>ENDEAVOR OPPORTUNITY PARTNERS III LP,<br>a Texas limited partnership,<br>CERCO DEVELOPMENT, INC., a Texas corporation,<br>OP III ATX Highridge, LP, a Texas domestic limited partnership,<br>THE KATUNIGAN COMPANY, a Texas corporation<br>and JOHN DOE(S),<br>UNIDENTIFIED CO-CONSPIRATOR(S),<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>Case No: 24-cv-01538<br>)<br>)<br>Hon. John F. Kness<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**THIRD AMENDED COMPLAINT**

Plaintiffs Paul Schroth Wolfe ("Wolfe"), Yorkville Investment I, LLC ("Yorkville"), a

Delaware limited liability company, Green Sapphire Holdings, Inc. ("Green Sapphire"), a

Delaware corporation, Alpha Carta, Ltd. ("Alpha Carta"), a foreign corporation, Breakers Beach

Club, Ltd. ("Breakers"), a foreign corporation, NorthSea, LLC ("NorthSea"), a Wyoming limited

liability company, Prairie Private Trust Company, Ltd. ("Prairie Trust"), a foreign corporation

(collectively, "Plaintiffs"), by and through their attorneys, Trent Law Firm, P.C., and Patterson

1

Law Firm, LLC, for their Third Amended Complaint against Defendants Steven E. Looper ("Looper"), Paul Whinnery a/k/a Paul Schlieve a/k/a Paul Schmidt ("Whinnery"), Robert G. Brownell a/k/a Robert Bigelow ("R.G. Brownell"), BNW Family Office, LLC ("BNW"), a Delaware limited liability company, Cyber App Solutions Corp. ("Cyber App"), a Nevada corporation, Proton Green, LLC ("Proton Green"), a Wyoming limited liability company, Nathan Smith ("Smith"), Charles Mack ("Mack"), Dallas Salazar ("Salazar"), Robert J. Brownell ("R.J. Brownell"), Sasaginnigak, LLC f/k/a Overall Builders, LLC ("Sasaginnigak"), a Texas limited liability company, Global Capital Partners, LLC ("Global Capital Cayman"), a Cayman Islands Company, Global Capital Partners, LLC ("Global Capital Delaware"), a Delaware LLC, Rockwater Capital Ltd. ("Rockwater"), a Cayman Islands Company, Tailwind, Ltd ("Tailwind") a Cayman Islands Company, Endeavor Real Estate Group, LLC ("Endeavor Real Estate") a Texas Limited liability Company, Endeavor Opportunity Partners III, LP ("Endeavor Opportunity") a Texas limited liability company, OP III ATX Highridge, LP ("OP Highridge") a Texas domestic limited partnership, Cerco Development, Inc ("Cerco") a Texas corporation, The Katunigan Company ("Katunigan") a Texas corporation, David Holden ("Holden"), Mark Matthews ("Matthews"), Dustin Springett ("Springett"), and John Doe(s) Unidentified Co-Conspirator(s) ("Doe") (collectively, "Defendants"), state as follows:

## NATURE OF THE ACTION

This case epitomizes an intricate scheme of orchestrated fraud, marked by an egregious intersection of unbridled greed, calculated corporate espionage, and the strategic use of third-party agents to mask and perpetuate a vast fraudulent scheme. Spanning unauthorized financial diversions, property misappropriation, calculated defamation, and cyber intrusions, Defendants—including corporate insiders and individuals with a history of documented criminal misconduct—engaged in repeated acts of wire fraud, mail fraud, other forms of fraud, embezzlement, bribery, extortion, money laundering, and obstruction. Central to this conspiracy was the dissemination of a fraudulent complaint (the "Susan Essex Complaint"), leveraged through cyber harassment platforms, violating both civil and criminal statutes. This sustained pattern of predicate acts forms the basis for the Racketeer Influenced and Corrupt Organizations (RICO) claims detailed below.

From 2021 to 2024, Defendants—comprising corporate insiders, career criminals, and accomplices with histories of professional and documented criminal misconduct—engaged in a systematic, organized pattern of racketeering activity. This enterprise, motivated by a collective

ambition to defraud Plaintiffs and obstruct their ability to recover assets, operated under the framework of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c) and (d). The conspiracy encompassed acts of loan fraud, bank fraud, money laundering, obstruction of justice, defamation, and violations of the Computer Fraud and Abuse Act (CFAA).

Defendants R.G. Brownell, the mastermind, a career criminal with a lengthy history of fraud, including a conviction for conspiracy to commit wire fraud for which he was sentenced to twenty (20) years in prison in connection with a scheme perpetrated by Bielinski Brothers Construction Company, Inc. in Wisconsin, and Whinnery a/k/a Schlieve, who carries a record of methamphetamine trafficking, played leading roles in executing these schemes. They were joined by Defendant Smith, despite prior removals from positions of trust for misconduct, who facilitated unauthorized financial transactions and leveraged corporate espionage to further the scheme. The enterprise was also aided by Defendant Looper, known for his criminal activities, and complicit corporate entities like Defendants Rockwater, Endeavor, and Proton Green, which lent an air of legitimacy to the fraud.

The Defendants' misconduct extended to the manipulation of IOLTA accounts by attorney Mack, who facilitated the rerouting and laundering of funds under the guise of legitimate legal work. By disguising transactions through multiple jurisdictions and employing shell entities, Defendants systematically obscured the origins of funds, deprived Plaintiffs of rightful ownership, and evaded oversight. This multi-layered deception was evident in the fraudulent transfer of property worth tens of millions of dollars, sham real estate transactions, and unauthorized pledges that bypassed consent and undermined Plaintiff's financial security.

Furthermore, the Defendants' scheme was punctuated by unauthorized digital intrusions, including the manipulation of Plaintiffs' protected systems and the dissemination of defamatory material to discredit key individuals. The fraudulent Susan Essex Complaint was not merely a standalone act; it was part of a broader campaign designed to coerce settlements and damage reputations, serving as a tool for economic extortion.

This lawsuit seeks not just restitution, but justice—holding all conspirators accountable for their roles in a calculated, multi-year scheme that has inflicted financial losses exceeding

$75 million on Plaintiff, disrupted operations, damaged business relationships, and led to extensive investigatory and security costs. Only through judicial intervention can the pattern of racketeering be halted, assets be reclaimed, and justice be served.

## PLAINTIFFS

1.      Wolfe is an experienced financial services professional and citizen of DuPage County, Illinois, with a decades-long professional association with Co-Plaintiffs. Wolfe is a primary victim of Defendants' coordinated racketeering enterprise, suffering significant financial and reputational damage due to fraudulent schemes, defamation campaigns, and unauthorized digital intrusions orchestrated by Defendants.

2.      Yorkville is a Delaware limited liability company with its principal place of business in Wheaton, Illinois, owned by the Prairie Trust, as trustee of Prairie Trust II, a Cayman Islands Trust. The beneficiaries of this entity, identical to those of the Petro Carta Trust, suffered extensive financial losses due to Defendants' fraudulent financial transactions and real estate schemes. It was targeted by Defendants in schemes involving unauthorized financial diversions and asset misappropriation, leading to severe financial harm.

3.      Green Sapphire is a Delaware corporation based in Delaware, created to facilitate investment and property acquisition for the benefit of the Petro Carta Trust. It was targeted by Defendants in schemes involving unauthorized financial diversions and asset misappropriation, leading to severe financial harm.

4.      NorthSea is a Wyoming limited liability company that serves as the Trustee of the Petro Carta Trust, which benefits a U.S. family. NorthSea's integrity was undermined by fraudulent loans, unauthorized financial arrangements, and concealment strategies deployed by Defendants to control and misappropriate assets.

5.      Alpha Carta is a Cayman Islands corporation with its principal business location in Georgetown, Grand Cayman, and serves as an investment and property management entity for the Alpha Carta Trust. It was directly affected by fraudulent asset transfers, sham real estate dealings, and unauthorized transactions that were part of the Defendants' coordinated scheme.

6.      Breakers is a Cayman Islands company formed to hold title to the valuable beachfront property in Grand Cayman. It suffered significant losses due to Defendants' unauthorized financial maneuvers, fraudulent invoices, and concealment of funds meant to deprive Plaintiff of rightful asset control.

4

7.      Prairie Trust is a Cayman Islands company that serves as the trustee for the Prairie II Trust and Alpha Carta Trust. Prairie Trust is responsible for managing significant assets held for the benefit of U.S. family beneficiaries and is essential to the financial oversight and fiduciary management within the Plaintiff group.

## DEFENDANTS

8.      Looper is a convicted felon and resident of Travis County, Texas. Looper is alleged to have engaged in fraudulent schemes and racketeering activities aimed at financial gain through deceptive means.

9.      Whinnery, also known as Paul Whinnery or Paul Schmidt, is a resident of Williamson County, Texas. Whinnery has a criminal record, including drug-related offenses, and is implicated in orchestrating fraudulent schemes alongside other Defendants to defraud Plaintiffs.

10.      R.G. Brownell, also known as Robert Bigelow, the mastermind of the racketeering enterprise, resides in Travis County, Texas. Brownell is a known felon with a history of financial crimes, who utilized corporate entities and schemes to unlawfully divert funds and property from Plaintiffs.

11.      BNW is a Delaware limited liability company with its principal place of business at Northbrook, Illinois, controlled by R.G. Brownell, serving as a vehicle to facilitate the fraudulent activities central to the claims against Defendants.

12.      Cyber App, formerly known as Proton Green, is a Nevada corporation and a corporate entity used by Defendants to lend legitimacy to their fraudulent operations.

13.      Smith is a U.S. citizen residing in Georgetown, Grand Cayman. Smith has been linked to unauthorized financial transactions and corporate espionage, leveraging access to sensitive information to further Defendants' schemes.

14.      Mack is an attorney licensed in Illinois, who misused an IOLTA trust account to conceal fraudulent transactions, aiding Defendants' efforts to launder funds and obscure their illicit origins.

15.      Salazar is a resident of Kendall County, Texas, implicated in aiding the fraudulent activities and asset misappropriations conducted by the Defendants.

16.      R.J. Brownell, the son of R.G. Brownell, and a resident of Cook County, Illinois, is involved in the coordination and execution of fraudulent schemes directed at Plaintiffs.

17.     Sasaginnigak, formerly known as Overall Builders, is a Texas limited liability company co-managed by Whinnery and R.G. Brownell, which was used to facilitate Defendants' fraudulent schemes.

18.     Global Capital Delaware is a Delaware limited liability company involved in the misappropriation of funds and facilitation of fraudulent transactions central to Defendants' schemes.

19.     Global Capital Cayman is a Cayman Islands limited liability company involved in the misappropriation of funds and facilitation of fraudulent transactions central to Defendants' schemes.

20.     Rockwater, based in the Cayman Islands, is used by Defendants to lend legitimacy and facilitate international aspects of the fraudulent enterprise.

21.     Endeavor Real Estate is a Texas-based real estate development company implicated in fraudulent transactions tied to multi-family and mixed-use projects.

22.     Endeavor Opportunity is a real estate investment fund organized as a Texas limited partnership serving as an investment vehicle used by Defendants to obscure ownership interests and facilitate fraudulent real estate deals.

23.     Cerco is a Texas corporation controlled by Endeavor Real Estate, engaged in development management services allegedly used to further Defendants' fraudulent schemes.

24.     Springett, a Canadian citizen and a resident of Cayman Islands, upon information and belief, is a principal of Tailwind and represented Global Capital Cayman and Global Capital Delaware in schemes related to the Defendants' enterprise.

25.     Tailwind is a Cayman Islands company used by Defendants to obscure the origins and facilitate the transfer of funds as part of the scheme.

26.     Holden is a resident of Grand Cayman, Cayman Islands, implicated in Defendants' coordinated efforts to defraud Plaintiffs.

27.     Matthews is a resident of Grand Cayman, Cayman Islands, involved in the fraudulent enterprise through his association with other Defendants.

28.     OP Highridge is a Texas limited partnership implicated in transactions designed to misappropriate assets and execute sham real estate deals as part of the Defendants' larger scheme.

29.     Katunigan, identified as the alter ego of Whinnery, is a Texas corporation that played a role in concealing Defendants' fraudulent activities and diverting funds from Plaintiffs.

30.     John Doe(s) Unidentified Co-Conspirator(s) will be identified through discovery as additional parties involved in furthering the RICO enterprise. These unidentified co-conspirators contributed to the continuity of Defendants' fraudulent activities and their concealment from regulatory and legal oversight.

## JURISDICTION AND VENUE

31.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as Plaintiffs' claims arise under federal law, specifically the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968, and the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030. These federal statutes provide private rights of action for damages, including treble damages under RICO, and authorize this Court to exercise its jurisdiction to redress the harm caused by racketeering activity and unauthorized computer access. Pursuant to 18 U.S.C. § 1964(a), this Court has the authority to prevent and restrain violations of the RICO Act, while 18 U.S.C. § 1964(c) empowers individuals injured in their business or property by racketeering activity to bring claims in federal court. Supplemental jurisdiction is proper under 28 U.S.C. § 1367(a) because Plaintiffs' state law claims, including fraud, unjust enrichment, conversion, and tortious interference, are so closely related to the federal RICO and CFAA claims that they form part of the same case or controversy under Article III of the U.S. Constitution. Additionally, this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a), as Plaintiffs and Defendants are citizens of different states and foreign jurisdictions, and the amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiffs, including Illinois-based individuals and entities, are diverse from Defendants, who are domiciled in other states, including Texas, and foreign entities operating in the Cayman Islands and elsewhere.

32.     Venue is proper in the Northern District of Illinois under multiple statutory provisions. First, under 28 U.S. § 1391(b)(2), a substantial part of the events or omissions accounts in this district and employing an Illinois attorney to structure and document financial transactions, launder money through his IOLTA account and to provide a false veneer of legitimacy to their schemes. They also orchestrated fraudulent real estate transactions affecting Illinois property, including the Hale Property in Wheaton, Illinois, and disseminated defamatory statements expressly intended to damage the reputation and financial standing of Illinois-based Plaintiffs. Defendants' wire fraud, bank fraud, money laundering, and cyber harassment caused significant harm in Illinois, and their use of Illinois-based financial

institutions and employment of an Illinois attorney constitutes purposeful availment of the privilege of conducting activities in the state of Illinois. Venue is also proper under 28 U.S.C. § 1391(b)(3), as at least one Defendant is subject to personal jurisdiction in this district, and there is no other district in which this action could be brought against all Defendants. Furthermore, venue is proper under the RICO-specific provisions of 18 U.S.C. § 1965(a) and (b). Section 1965(a) permits venue in any district where a Defendant resides, is found, has an agent, or transacts business, and Defendants, including without limitation, Looper, Whinnery, R.G. Brownell, and Mack, transact substantial business or conduct activities in this district. Under § 1965(b), the ends of justice require that all Defendants, including those outside Illinois, be brought before this Court for a comprehensive resolution of their coordinated racketeering enterprise. Given the interconnected nature of Defendants' conspiracy and the substantial harm inflicted within this district, consolidating all claims and parties here is necessary for an efficient and fair adjudication of Plaintiffs' claims.

33.     This Court has personal jurisdiction over Defendants under Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure and constitutional due process principles. Defendants purposefully directed their activities toward Illinois, causing substantial harm to Plaintiffs in this forum. Defendants engaged in predicate acts of racketeering, including wire fraud, bank fraud, money laundering, and defamation, that directly targeted Illinois residents and entities. They intentionally used Illinois-based financial institutions and professionals to perpetrate their fraudulent schemes, demonstrating purposeful availment of this forum's laws and protections. They also manipulated transactions involving Illinois real estate and directed defamatory communications toward Illinois-based Plaintiffs, including Wolfe, with the express intention of causing harm in this district. These activities establish specific jurisdiction under International Shoe Co. v. Washington, 326 U.S. 310 (1945), and its progeny, as Defendants' conduct was expressly aimed at Illinois and gave rise to Plaintiffs' claims. Certain Defendants, including R.G. Brownell, engaged in continuous and systematic business activities in Illinois, subjecting them to general jurisdiction here. Additionally, 18 U.S.C. § 1965(b) permits nationwide jurisdiction over all Defendants in a RICO action where the ends of justice so require, allowing this Court to exercise jurisdiction over Defendants located outside Illinois.

34.     The harm inflicted by Defendants' actions is substantial and concentrated in Illinois. Plaintiffs suffered financial losses, reputational harm, and business disruptions in this district as a direct result of Defendants' racketeering activities. Defendants orchestrated

fraudulent financial transactions involving Illinois accounts, manipulated property transactions affecting Illinois real estate, and disseminated defamatory content aimed at Illinois residents and businesses. Their use of Illinois-based attorneys, financial institutions, and professionals further ties their conduct to this district. Illinois has a compelling interest in adjudicating this dispute to protect its residents, businesses, and property from harm caused by out-of-state and international actors who intentionally directed their fraudulent activities into this state.

35.     The exercise of jurisdiction and venue in this district comports with traditional notions of fair play and substantial justice under *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985). Illinois provides a convenient forum for the resolution of this dispute, as key witnesses, documents, and assets are located here. Judicial efficiency supports consolidating all claims and Defendants in this Court, given the multi-jurisdictional nature of Defendants' racketeering enterprise. The ends of justice, as emphasized by 18 U.S.C. § 1965(b), necessitate the joinder of all Defendants, regardless of their physical location, to address the coordinated nature of their racketeering enterprise and to ensure a comprehensive resolution of the issues.

**Global Capital Delaware and Global Capital Cayman**

36.     Global Capital Delaware was created on September 9, 2022, by BNW and R.G. Brownell from their Northbrook, Illinois headquarters approximately three weeks after the filing of the fraudulent Susan Essex Complaint in Illinois Circuit Court in DuPage County. This timing aligns with the Defendants' orchestration of a broader enterprise to misappropriate Plaintiffs' assets and avoid liabilities.

37.     The use of the name Global Capital Delaware demonstrates their intent to impersonate Global Capital Partners Fund LLC, a legitimate private investment fund to facilitate fraudulent transactions, obscure the role of R.G. Brownell, and evade detection by creditors and courts.

38.     Between September 2022 and February 2023, Global Capital Delaware deliberately engaged Mack, an Illinois-based attorney, to draft and finalize fraudulent loan agreements, including the Loan and Security Agreement with Green Sapphire, and the fraudulent loan settlement agreement.

39.     Mack's services included drafting, revising, and transmitting key documents from his Illinois office. His billing records indicate extensive time spent on these transactions during this period, underscoring Global Capital Delaware's reliance on Illinois-based legal infrastructure to execute its schemes.

40.     On February 17, 2023, Global Capital Delaware's Miami attorneys facilitated a wire transfer of $8.86 million to a Chase Bank IOLTA account in Illinois controlled by Mack. These funds were subsequently laundered and redirected by Mack in furtherance of the fraud.

41.     Global Capital Cayman and Global Capital Delaware knowingly misrepresented the terms and execution of the Loan and Security Agreement with Green Sapphire. These misrepresentations included:

      a.     Claiming that $10 million in loan proceeds would be used to support Green Sapphire's legitimate business operations; and

      b.     Falsely asserting that all loan proceeds were disbursed to Green Sapphire, when in fact the funds were funneled into an IOLTA account controlled by Mack and thereafter used in furtherance of the association-in-fact criminal enterprise consisting of R.G. Brownell, Mack, Global Capital Delaware and their co-conspirators.

42.     Global Capital Delaware collaborated with Mack and other Defendants in Illinois to fabricate documents, including a fraudulent Stock Pledge Agreement and associated UCC-1 financing statements, which further facilitated the theft of funds and Green Sapphire's interest in the shares of Access Management S.A.S., Inc.

43.     Global Capital Delaware actions form part of a pattern of racketeering activity involving predicate acts of identity theft, bribery, mail fraud, wire fraud, money laundering, and misrepresentation, in pertinent part, as follows:

      a.     Global Capital Delaware, as an alter ego of BNW, conspired with R.G. Brownell and Mack to impersonate officers of Green Sapphire in communications with attorneys and financial institutions to mislead stakeholders and secure unauthorized transfers; and

      b.     Global Capital Delaware's transactions involved complex layering of funds through offshore accounts to obscure their origins and evade scrutiny.

44.     Global Capital Delaware's reliance on Illinois-based resources included:

      a.     Utilizing Mack's Illinois office for the drafting, revision, and execution of fraudulent loan documents which was central to the scheme; and

      b.      Completing electronic transfers of immediately available funds through Mack's Chase Bank in Illinois-based IOLTA account, including the initial receipt and redistribution of immediately available funds in the amount of approximately $8.86 million on February 17, 2023.

45.      Global Capital Delaware's direct engagement with Illinois residents and institutions establishes sufficient jurisdictional ties under Illinois' long-arm statute and supports claims of purposeful availment.

46.      On or about May 7, 2024, Global Capital Delaware was converted into Global Capital Cayman with the intent to manufacture a pretext for claiming lack of specific personal jurisdiction in Illinois.

47.      Global Capital Delaware's and Global Capital Cayman's actions directly caused the following damages:

      a.      Financial Losses that Plaintiffs suffered causing over $1 million in damages;

      b.      Reputational Harm that Plaintiffs' standing in the business community was significantly harmed by the fallout from Global Capital Delaware's and Global Capital Cayman's fraudulent actions;

      c.      The attempted conversion of Access Management SA into a Florida corporation named Access Management S.A.S., Inc. and the defective strict foreclosure of the alleged secured interest in Green Sapphire's shares of Access Management S.A.S., Inc. created confusion over the identity of the true owner of the real property located in St. Barth that until April 2022 was clearly owned by Green Sapphire; and

      d.      Operational Disruption that Plaintiffs faced substantial operational and legal costs to investigate and address Global Capital Delaware's and Global Capital Cayman's fraudulent activities and confirm Green Sapphire's continuing ownership of the shares of Access Management S.A.S., Inc.

**Looper**

48.      Looper, who was the CEO of Proton Green, orchestrated and participated in fraudulent schemes that relied on Illinois-based attorney Mack, and his office in Illinois to draft

and execute key documents. These documents include the fraudulent Susan Essex Complaint and Loan and Security Agreement between Global Capital Delaware and Green Sapphire.

49.     Looper's action in setting up the cyber harassment website which republished the Susan Essex Complaint directly injured and damaged Plaintiffs with significant ties to Illinois, including Wolfe, NorthSea, and Green Sapphire, which conducted substantial business operations within the state.

50.     Looper, acting in concert with Whinnery, Mack, R.G. Brownell, and other defendants, purposely availed himself of the privilege of conducting activities in Illinois including using Mack's IOLTA account to launder money for the benefit of Proton Green, and legal services to establish the cyber harassment websites in order to help facilitate the fraudulent transactions involving Proton Green and Alpha Carta.

51.     Upon information and belief, Looper and Salazar participated in communications, including teleconferences and email exchanges with Mack and R.G. Brownell to conspire among themselves and conceive a scheme to form an association-in-fact criminal enterprise designed to defraud and extract assets from Illinois-based Plaintiffs and related parties.

52.     Between May 2023 and September 2023, Looper attended or facilitated discussions with Mack and R.G. Brownell in Illinois and Smith and Rockwater in the Cayman Islands to engineer the fraudulent loan settlement agreement between Proton Green and Alpha Carta that was central to the racketeering enterprise.

53.     Looper played a direct role in authorizing and coordinating the transfer of funds obtained from Matthews and Holden through the Illinois-based IOLTA account managed by Mack, including an approximately $2.9 Million wire transfer on or about August 19, 2023, which was laundered and misappropriated by Mack for the benefit of Proton Green on August 23, 2023.

54.     These fraudulent electronic transfers of funds were deliberately directed towards Illinois and depended on the abuse of an IOLTA account at Chaser Bank in Illinois controlled by Mack and were falsely represented as a loan to Breakers but were instead diverted by Mack to an offshore account to further the fraudulent loan settlement scheme.

55.     Looper's activities directed to Illinois furthered the broader conspiracy by collaborating with other Defendants to create and operate cyber harassment websites as part of the racketeering conspiracy. These actions involved predicate acts tied to the use of Chase Bank in Illinois and the IOLTA account controlled by Mack. Specifically, Looper was involved in drafting and filing the Susan Essex Complaint, publishing defamatory statements on the websites, and orchestrating the creation, execution,

and enforcement of fabricated loan settlement agreements between Proton Green and Alpha Carta, along with related documents.

56.     Looper purposely directed his activities to Illinois by participating in a conspiracy to defame Illinois-based entities and officers of Illinois-affiliated organizations through the cyber harassment website described below. Looper's actions also included conspiring with Mack in making misrepresentations to Chase Bank in Illinois regarding the source and ownership of funds credited to the IOLTA account controlled by Mack, intending to defraud Breakers, Alpha Carta, and related parties.

**Mack**

57.     Mack is a licensed attorney and a resident of Illinois. He operates a law office in Northbrook, Illinois, and which, upon information and belief, also was the office of BNW and served as the operational hub for the racketeering enterprise that is the subject of this complaint.

58.     Mack drafted and executed key documents from his Illinois office, including:

　　　　a.　　The Loan and Security Agreement between Global Capital Delaware and Green Sapphire;

　　　　b.　　Associated documents such as UCC-1 financing statements and Stock Pledge Agreements;

　　　　c.　　The loan settlement agreement between Proton Green and Alpha Carta;

　　　　d.　　The loan settlement agreement by and among Breakers, Matthews, and Holden; and

　　　　e.　　The documents relating to the attempted conversion of Access Management SA into a Florida corporation named Access Management S.A.S., Inc.

59.     These documents were intentionally designed to defraud Plaintiffs and misappropriate funds and assets in furtherance of the racketeering enterprise.

60.     Mack, while intentionally creating the false appearance and was portraying himself as the attorney for Green Sapphire, Yorkville, Alpha Carta, and Breakers, Ltd., was in fact representing multiple Co-Defendants, including R.G. Brownell, BNW, Looper, Proton Green, Global Capital Delaware and Global Capital Cayman, Smith, Springett, Holden, Matthews, Rockwater, and Tailwind. Using his Illinois office, Mack facilitated fraudulent

schemes orchestrated by these parties and misappropriated funds, further exacerbating the harm to the Plaintiffs in furtherance of the racketeering enterprise.

61.     Mack participated in frequent teleconferences, emails, and meetings with R.G. Brownell, Salazar, Looper, Smith, Springett, Whinnery, and other co-conspirators to finalize and execute fraudulent agreements.

62.     Mack's Illinois-based office served as the location for:

      a.     Drafting, revising, and transmitting fraudulent documents; and

      b.     Conducting communications with Illinois-based financial institutions, by issuing wire transfer payment orders to Illinois Chase Bank Branch.

63.     Mack maintained consistent communication with other conspirators, facilitating the planning and coordination of fraudulent activities, and played a significant role in devising and implementing fraudulent agreements and wire transfers for the purpose of, in pertinent part, laundering money critical to the enterprise's operations.

64.     From his Illinois office, Mack utilized his attorney license and IOLTA account to draft, revise, and transmit fraudulent transaction documents and wire transfers, coordinating with financial institutions to further the racketeering conspiracy. As a licensed attorney, Mack's deliberate and calculated actions, including advising co-conspirators on structuring and documenting fraudulent transactions to give them an appearance of legitimacy, were pivotal in advancing the enterprise's common purpose to deceive and defraud the Plaintiffs.

**BNW**

65.     BNW, through its sole member R.G. Brownell, orchestrated a conspiracy with Salazar, Endeavor, Mack, Looper, Proton Green, Global Capital Delaware and Global Capital Cayman, Smith, Springett, Rockwater, and Tailwind to carry out a series of unlawful acts using Northbrook, Illinois, as the operational hub of their racketeering enterprise.

66.     Operating from its shared headquarters with Mack in Northbrook, BNW leveraged Mack's legal expertise and Illinois-based resources to draft fraudulent agreements, execute financial transactions, and coordinate communications critical to advancing the enterprise's illegal objectives.

67.     Upon information and belief, BNW was the owner of one hundred percent (100%) of the LLC membership interests of Global Capital Delaware from September 9, 2022,

until January 29, 2023, when BNW assigned one hundred percent (100%) of the membership interest of Global Capital Delaware to Hi-Point SPV Ltd.

68.     Under R.G. Brownell's control, BNW, alongside its co-conspirators, convened regularly by phone in Mack's conference room in Northbrook to strategize and finalize fraudulent contracts, including the formation of Global Capital Delaware, the Loan and Security Agreement dated February 2, 2023, UCC-1 financing statements, Stock Pledge Agreements, and Loan Settlement Agreements.

69.     R.G. Brownell was the mastermind of and directed these efforts, just like he did in the fraud scheme he perpetrated against Bielinski Brothers Construction Company in the early 2000s for which he received the maximum sentence of twenty (20) years in prison. Attached as **Group Exhibit A** is a True and Correct Copy of Brownell's Superseding Information, signed Plea Agreement in United States v. Brownell, and Sentencing Minutes.

70.     R.G. Brownell ensured that the fraudulent documents were carefully constructed to facilitate the money laundering and the misappropriation of funds while providing an air of legitimacy to the enterprise's activities. Upon information and belief, Salazar and Endeavor collaborated with BNW in these activities, working with Mack and R.G. Brownell to draft and transmit agreements that furthered the racketeering conspiracy.

71.     Upon information and belief, Looper, Proton Green, Global Capital Delaware and Global Capital Cayman, Smith, Springett, Rockwater, and Tailwind played supporting roles, coordinating additional aspects of the fraud under R.G. Brownell's direction.

72.     From Northbrook, Illinois, BNW also engaged in fraudulent communications targeting Illinois-based Plaintiffs and financial institutions. Acting through R.G. Brownell and Mack, BNW conducted teleconferences, emails, and in-person meetings designed to misrepresent the legitimacy of financial transactions, falsify inspection reports, and fabricate critical dates memoranda. These communications were integral to the enterprise's ability to defraud Plaintiffs, including Yorkville and Green Sapphire.

73.     BNW's operations from Northbrook, Illinois, were central to its targeting of Illinois-based Plaintiffs. Under R.G. Brownell's direction, the enterprise misrepresented the condition of assets, such as the Hale Property, through fabricated inspection reports, causing significant financial harm and reputational damage to Illinois-based Plaintiffs. These actions, coordinated and executed from Illinois, underscore BNW's intentional use of Illinois as the

geographical and operational center of this association-in-fact racketeering enterprise.

## Cyber App and Proton Green

74.     Cyber App, as the successor and parent company of Proton Green, retained Illinois-based attorney Mack to draft and finalize documents essential to fraudulent loan agreements and related financial transactions. Acting through its subsidiary, Proton Green, Cyber App exploited Illinois-based legal and financial resources to orchestrate and facilitate its racketeering enterprise.

75.     Mack's Illinois office served as the operational hub for preparing and transmitting fraudulent agreements on behalf of Cyber App and its subsidiary, Proton Green, including the Forbearance Agreement with Alpha Carta. These agreements were deliberately structured to conceal the fraudulent nature of the enterprise's activities.

76.     Cyber App and its subsidiary, Proton Green, misused Mack's Illinois-based IOLTA trust account to launder, misappropriate, and redirect funds, including $2.9 million in loan proceeds funneled through the account specifically to include:

    a.     Cyber App and Proton Green orchestrated the diversion of $2.75 million of the $2.9 million, of which at least $2 million was transferred to offshore accounts controlled by co-conspirators for the benefit of Proton Green; and

    b.     These transactions were fraudulently portrayed as legitimate business dealings while being executed to further the broader fraudulent scheme.

77.     The actions of Cyber App and Proton Green, as parent and subsidiary entities, were specifically designed to target and defraud Illinois-based Plaintiffs, causing significant financial harm and reputational damage to their businesses.

78.     Acting through Mack and other Illinois-based co-conspirators, Cyber App and Proton Green fabricated documents, misled Illinois-based Plaintiffs, and orchestrated fraudulent transactions and fund transfers under false pretenses.

79.     Cyber App relied on its subsidiary, Proton Green, as well as Illinois-based resources, including Mack's legal expertise and Illinois financial systems, to execute and obscure the enterprise's fraudulent activities. The Northbrook, Illinois office served as the central location for drafting, transmitting, and concealing fraudulent agreements and transactions.

80.     Mack's role as an Illinois attorney was indispensable to Cyber App's ability to

formalize, coordinate, and conceal the fraudulent transactions executed by itself and Proton Green as part of the broader scheme.

**R.G. Brownell**

81.　　R.G. Brownell, operating from Northbrook, Illinois, retained Illinois-based attorney Mack to draft and execute fraudulent documents related to the Hale Property transaction. These documents included fabricated inspection reports and falsified purchase agreements that misrepresented the property's condition and value, with the specific intent to deceive Illinois-based Plaintiffs, including Yorkville.

82.　　R.G. Brownell actively participated in teleconferences and email exchanges with Mack and Illinois-based Plaintiffs to perpetuate the fraud. From his Illinois headquarters, he directed communications that misrepresented the structural integrity and market value of the Hale Property. These communications were central to inducing Plaintiffs to rely on the fraudulent agreements.

83.　　Acting in concert with Mack, R.G. Brownell authorized the diversion of funds through Mack's Illinois-based IOLTA trust account. These funds, which included proceeds from the fraudulent Hale Property transaction, were disguised as consulting fees and subsequently laundered through offshore accounts controlled by R.G. Brownell's co-conspirators. The use of Illinois financial institutions was instrumental in facilitating these transactions. R.G. Brownell's actions mirror those for which he was convicted earlier in Bielinski.

84.　　R.G. Brownell worked closely with Mack to draft and finalize false agreements and filings from Mack's Illinois office. These documents, including fraudulent UCC-1 financing statements, Stock Pledge Agreements, and Loan and Security Agreements, were designed to create a façade of legitimacy while enabling the misappropriation of funds owed to Illinois-based Plaintiffs.

85.　　R.G. Brownell's orchestration of these fraudulent activities from Illinois caused direct and substantial harm to Illinois-based Plaintiffs. This harm included:

　　　　a.　　Financial losses resulting from the misappropriation of funds routed through Mack's Illinois-based trust account;

　　　　b.　　Reputational harm to Illinois-based businesses due to R.G. Brownell's misrepresentations and fraudulent actions;

　　　　c.　　Operational disruptions, as Plaintiffs expended significant resources investigating and addressing the fraud; and

       d.      Consequential damages in the form of attorney's fees incurred

in litigation caused by R.G. Brownell's conduct.

86.     By directing fraudulent transactions, coordinating the preparation of false

documents in Illinois, and targeting Illinois-based Plaintiffs, R.G. Brownell purposefully availed

himself of Illinois's legal and financial infrastructure. His deliberate reliance on Illinois

resources establishes sufficient minimum contacts for this Court's jurisdiction.

**Smith and Rockwater**

87.     Smith and Rockwater played pivotal roles in the racketeering enterprise,

collaborating with Illinois-based co-conspirators, including attorney Mack, BNW, and R.G.

Brownell to execute fraudulent financial transactions and fabricate documents that directly

targeted Illinois-based Plaintiffs. Their actions were intentionally directed at Illinois, leveraging

the state's legal and financial infrastructure to facilitate the enterprise's fraudulent schemes.

88.     Smith, acting on behalf of Rockwater was intimately involved with Mack who

prepared fraudulent filings including UCC-1 financing statements and the Pledge and Security

Agreement dated February 16, 2023 (Stock Pledge Agreement), targeting Illinois-based

Plaintiffs, including Yorkville and Green Sapphire. These documents were prepared at Mack's

Illinois office and were critical to misrepresenting Plaintiffs' financial obligations and concealing

the fraudulent nature of the transactions.

documents were specifically directed to Illinois-based Plaintiffs and ensure the

misappropriation of funds.

89.     Upon information and belief, between May 2022 and September 2023, Smith and

Rockwater actively participated in the fraudulent restructuring of debts owed to Proton Green and

Alpha Carta. These transactions relied on false agreements, fabricated in Mack's Illinois office,

that misrepresented the source and use of funds credited to Mack IOLTA's Account. The

documents were specifically directors to Illinois-based Plaintiffs and ensure the misappropriation

of funds.

90.     On Smith's and/or Rockwater's instructions, immediately available funds in the

amount of $2.9 million were electronically transferred from an account controlled by the

attorneys for Matthews and Holden at a bank in the Cayman Islands to Chase Bank in Illinois for

credit to Mack's IOLTA account. This transfer demonstrates their deliberate use of Illinois

financial systems to launder and misappropriate funds. Smith and Rockwater were fully aware

that the funds would be laundered and diverted to an offshore account controlled by Smith's and

Mack's co-conspirators.

91.     Rockwater, acting through Smith, relied on Mack's Illinois office for the drafting, execution, and transmission of key documents necessary to further the fraudulent scheme. These included fabricated Loan and Security Agreements, the Stock Pledge Agreement, and Loan Settlement Agreements.

92.     Smith and Rockwater engaged in regular communications with Mack, originating from Illinois, to coordinate the flow of funds, and the drafting and execution of fraudulent agreements. These communications, including email correspondence and teleconferences, targeted Illinois-based Plaintiffs and financial institutions. By directing these communications to Illinois, Smith and Rockwater established ongoing and purposeful contacts with the state.

93.     The funds central to this dispute were transferred into and managed through Mack's Illinois-based IOLTA account. This account served as the conduit for the misappropriation and laundering of proceeds tied to the fraudulent activities of Smith and Rockwater. By relying on Illinois-based financial systems, they tied their actions directly to Illinois.

94.     The fraudulent activities orchestrated by Smith and Rockwater caused substantial harm to Illinois-based Plaintiffs, including:

   a.     Financial losses exceeding $2.9 million, routed through Illinois financial institutions;

   b.     Reputational harm to Illinois-based businesses due to misrepresentations about the legitimacy of financial transactions; and

   c.     Operational disruptions, as Plaintiffs were forced to expend resources investigating and mitigating the effects of the fraudulent scheme.

95.     By wiring funds to Illinois, directing the preparation of fraudulent documents in Illinois, and engaging in communications targeting Illinois-based Plaintiffs, Smith and Rockwater purposefully availed themselves of Illinois jurisdiction. Their use of Illinois's legal and financial infrastructure, as well as the harm they caused to Illinois-based Plaintiffs, establishes sufficient minimum contacts to subject them to this Court's jurisdiction.

**Salazar**

96.     Salazar was an integral participant in the racketeering enterprise, knowingly

benefiting from and facilitating fraudulent financial transactions that relied on Illinois-based legal and financial systems.

97.     Salazar directly received from Mack's Chase Bank IOLTA account $750,000 of the $2.9 million in funds that Matthew's and Holden's attorney funneled through Mack's Illinois-based IOLTA trust account at Chase Bank. By using Illinois financial infrastructure to access and misappropriate these funds, Salazar purposefully directed his actions toward Illinois.

98.     Salazar actively engaged in communications with Mack and other co-conspirators to coordinate the transfer, concealment, and misappropriation of funds targeting Illinois-based Plaintiffs. These communications included emails and teleconferences involving Mack's Illinois office, further tying Salazar's activities to Illinois.

99.     Acting in concert with Mack, R.G. Brownell, BNW, Looper, Proton Green, and other Defendants, Salazar participated in the creation, execution, and transmission of fabricated agreements and documents designed to mislead Illinois-based stakeholders and financial institutions. These fraudulent agreements, prepared and transmitted through Mack's Illinois office, including the false Loan and Settlement Agreement between Proton Green and Alpha Carta.

100.     By benefiting from funds processed through Illinois financial institutions, participating in fraudulent communications targeting Illinois-based Plaintiffs, and relying on documents drafted and transmitted from Illinois, Salazar purposefully availed himself of the privilege of conducting business in Illinois jurisdiction. His use of Illinois's legal and financial infrastructure establishes sufficient minimum contacts to subject him to this Court's jurisdiction.

101.     Salazar's fraudulent activities caused significant harm to Illinois-based Plaintiffs, including:

      a.     Financial losses resulting from the misappropriation of $750,000 of the loan proceeds;

      b.     Reputational damage to Illinois-based businesses caused by fraudulent filings and communications; and

      c.     Operational disruptions and costs incurred by Plaintiffs to investigate and address the fraudulent transactions.

102.     Through his deliberate participation in the racketeering enterprise, Salazar played a critical role in orchestrating and benefiting from fraudulent activities that depended on Illinois-

based resources. His actions, in conjunction with Mack and other co-conspirators, underscore his direct and substantial connection to Illinois, making Illinois the appropriate jurisdiction for this matter.

### R.J. Brownell

103.     R.J. Brownell was a key participant in the racketeering enterprise, directly engaging in fraudulent activities from Illinois and in coordination with Illinois-based co-conspirators, including Mack. From his shared operational base in Northbrook, Illinois, Brownell facilitated the preparation and execution of fraudulent documents and the misappropriation of funds targeting Illinois-based Plaintiffs, establishing his jurisdictional ties to Illinois.

104.     Acting under the direction of his father, R.G. Brownell, and alongside Mack, R.J. Brownell participated in the drafting and execution of critical fraudulent documents, including the Guaranty of Payment by BNW dated February 2, 2023. These documents, upon information and belief, were prepared in Mack's Illinois office, misrepresented material facts and were integral to the fraud.

105.     Upon information and belief, R.J. Brownell actively participated in teleconferences and email correspondence with Mack and other Illinois-based co-conspirators to coordinate the flow of funds and execution of fraudulent agreements. These communications, originating from Illinois, included false representations about the need for asbestos remediation of the Hale Property.

106.     R.J. Brownell also worked with Mack to fabricate inspection reports and property-related documents targeting Illinois-based assets, including the Hale Property owned by Yorkville. These fabricated reports, transmitted from Mack's Illinois office, were used to misrepresent the condition of the Hale Property, facilitating the misappropriation of funds and causing significant harm to Illinois-based Plaintiffs.

107.     The fraudulent actions of R.J. Brownell caused substantial harm to Illinois-based Plaintiffs, including:

      a.    Financial losses exceeding $50,000 due to misappropriated funds routed through Illinois-based accounts;

      b.    Reputational harm to Illinois-based businesses caused by false filings and misrepresentations;

      c.    Operational disruptions and significant costs incurred by Plaintiffs to investigate and address the fraudulent transactions; and

d.      Consequential damages in the form of attorney's fees incurred in litigation arising out of and related to the Hale Property.

**Sasaginnikak f/k/a Overall Builders, LLC**

108.      Sasaginnigak played a significant role in the racketeering enterprise, actively participating in fraudulent financial transactions and fabricating documents designed to target Illinois-based Plaintiffs. Through its direct reliance on Illinois legal and financial resources, Sasaginnigak purposefully tied its actions to Illinois, making this state the appropriate jurisdiction for this matter.

109.      Sasaginnigak engaged in frequent communications with Mack and other Illinois-based co-conspirators to coordinate the execution of fraudulent agreements and financial transactions. These communications, including email correspondence and teleconferences, targeted Illinois-based Plaintiffs and financial institutions, further embedding the fraudulent activities within Illinois.

110.      Sasaginnigak was directly involved in fabricating inspection reports and related property documents targeting Illinois-based assets, including the Hale Property. These documents, transmitted from Mack's Illinois office, misrepresented the condition and value of the property, causing substantial financial harm to Illinois-based Plaintiffs, such as Yorkville.

111.      Sasaginnigak's fraudulent actions caused significant harm to Illinois-based Plaintiffs, including:

a.      Financial losses exceeding $50,000, misappropriated through Mack's Illinois trust account;

b.      Reputational harm to Illinois-based businesses caused by fraudulent filings and misrepresentations;

c.      Operational disruptions and costs incurred by Plaintiffs to investigate and mitigate the fraudulent activities; and

d.      Consequential damages in the form of attorney's fees incurred in litigation arising out of and related to the Hale Property.

112.      By directing funds to Illinois, utilizing Mack's Illinois office for the preparation and transmission of fraudulent documents, and engaging in communications targeting Illinois-based Plaintiffs, Sasaginnigak purposefully availed itself of Illinois jurisdiction. Its reliance on Illinois resources and the harm caused to Illinois Plaintiffs establish sufficient minimum contacts

22

to subject it to this Court's jurisdiction.

**Endeavor Real Estate, Endeavor Opportunity, Cerco,  and OP Highbridge**

113.     In January 2022, Cerco entered into a development agreement with Terra Carta being paid $80,000 per month, to facilitate the development of approximately 334 acres of real property located in Cedar Park, Texas ("Cedar Park Property").

114.     In March 2023, upon information and belief, these Defendants engaged in a scheme involving a fraudulent $98 million purchase agreement drafted by Illinois-based attorney Mack. The agreement, which facilitated the purported purchase of the Cedar Park Property by TRT Capital Group LLC, a Delaware limited company, demonstrates significant ties to Illinois through the use of Illinois-based legal services and resources to perpetrate the fraudulent enterprise. This use of Illinois resources constitutes predicate acts of wire fraud under 18 U.S.C. § 1343, as Mack transmitted fraudulent documents and communications originating in Illinois to further the scheme.

115.     In March 2023, Mack drafted the fraudulent $98 million purchase agreement of which the Cedar Park Property was to be purchased by a Delaware limited company named TRT Capital Group LLC for the price of approximately $98 million. As the developer for the Cedar Park Property, Endeavor Real Estate knew or should have known about the $98 million purchase agreement and that it was fraudulent. Between April 2023 and August 31, 2023, this fraudulent purchase agreement was terminated without notice to the beneficial owners of Green Sapphire and Terra Carta, further exemplifying the Defendants' concealment of material facts and participation in a racketeering enterprise.

116.     In August 2023, Endeavor entered into a letter of intent agreement with Terra Carta relating to the purchase of Cedar Park Property for the price of $45 million. This substantial undervaluation was based on fabricated reports and communications involving Illinois-based co-conspirators, including Mack, and constitutes further acts of wire and mail fraud under 18 U.S.C. §§ 1341 and 1343.

117.     In January 2024, Endeavor Real Estate acquired this property for approximately $39 million, which constitutes about one-third of its fair market value, underscoring a pattern of fraudulent activity that leveraged the initial development agreement and purchase framework. This transaction was facilitated by the use of fraudulent documents drafted and transmitted from Mack's Illinois office, directly tying the Defendants to Illinois.

118.     This conduct directly connects the Defendants to Illinois, demonstrating a

deliberate exploitation of Illinois resources in furtherance of their fraudulent enterprise. The use of Illinois-based legal services to draft and transmit fraudulent agreements constitutes predicate acts of wire fraud under 18 U.S.C. § 1343 and supports jurisdiction under 18 U.S.C. § 1965(b).

119.    By utilizing Illinois-based legal services to structure and document fraudulent transactions, the Defendants established a clear nexus with Illinois. This connection forms a sufficient basis for jurisdiction over the Defendants in Illinois courts, as their actions intentionally involved Illinois resources and facilitated harm extending beyond state boundaries.

120.    Endeavor Real Estate, Endeavor Opportunity, Cerco , and OP Highbridge were active participants in the racketeering enterprise, working in coordination with Illinois-based co-conspirators, including Mack and R.G. Brownell, to execute fraudulent financial transactions and fabricate documents. Their actions relied extensively on Illinois legal and financial  infrastructure, directly targeting Illinois-based Plaintiffs and establishing this Court's  jurisdiction.

121.    The fraudulent actions orchestrated by these entities caused substantial harm to Illinois-based Plaintiffs, including:

a.    Financial losses exceeding $50 million;

b.    Reputational damage to Illinois-based businesses due to misrepresented property values and financial obligations; and

c.    Operational disruptions and substantial costs incurred by Illinois Plaintiffs to investigate and mitigate the effects of the fraudulent transactions.

122.    The negotiation, amendment, signature collection, approval, and processing of contracts from Illinois were integral to the execution of the fraudulent scheme. These intentional activities targeting Illinois-based Plaintiffs establish sufficient minimum contacts with Illinois. By wiring funds to Illinois, utilizing Mack's Illinois office to prepare and transmit fraudulent documents, and targeting Illinois-based Plaintiffs with misrepresentations and fraudulent agreements, Endeavor Real Estate, Endeavor Opportunity, Cerco , and OP Highbridge purposefully availed themselves of Illinois jurisdiction. Their direct use of Illinois legal and financial systems and the harm they caused to Illinois Plaintiffs support this Court's exercise of jurisdiction.

**Springett and Tailwind**

24

123.    Springett and Tailwind were central participants in the racketeering enterprise, working in coordination with Illinois-based co-conspirators, including Mack and Smith, to execute fraudulent financial transactions and fabricate documents that targeted Illinois-based Plaintiffs. Their purposeful engagement with Illinois resources establishes a clear basis for jurisdiction in Illinois.

124.    Springett, acting on behalf of Tailwind directed Mack to prepare and execute key fraudulent documents, including fabricated UCC-1 financing statements, Loan and Security Agreements, and Stock Pledge Agreements. These documents were drafted and finalized in Mack's Illinois office and were instrumental in concealing the fraudulent nature of the enterprise's transactions while misrepresenting the financial obligations of Illinois-based Plaintiffs, such as Yorkville and Green Sapphire. This conduct constitutes predicate acts of wire fraud under 18 U.S.C. § 1343, as the fraudulent documents were transmitted through interstate electronic communications to further the racketeering enterprise.

125.    Between June 2022 and August 2023, Springett and Tailwind participated in multiple financial transactions processed through Mack's Illinois-based IOLTA trust account at Chase Bank. These transactions included a $2.9 million wire transfer that was disguised as legitimate loan proceeds but was, in reality, laundered and misappropriated for the benefit of Springett, Tailwind, and other co-conspirators. These acts also constitute predicate acts of money laundering under 18 U.S.C. § 1956(a), as the funds were transferred to conceal their illicit origins.

126.    Springett and Tailwind relied on Mack's Illinois office to draft and transmit fabricated agreements necessary to facilitate the fraudulent restructuring of debts owed to Illinois-based Plaintiffs. These agreements misrepresented loan terms, disbursement schedules, and repayment obligations. By utilizing Illinois-based legal services, Springett and Tailwind directly availed themselves of Illinois resources. This conduct demonstrates a calculated effort to perpetuate mail and wire fraud under 18 U.S.C. §§ 1341 and 1343.

127.    Both Springett and Tailwind engaged in frequent communications with Mack and other Illinois-based co-conspirators to coordinate fraudulent transactions. These communications, including email correspondence and teleconferences, targeted Illinois-based Plaintiffs and financial institutions. The correspondence included specific misrepresentations designed to induce reliance on fraudulent agreements, further tying Springett and Tailwind to Illinois. These

actions constitute predicate acts of wire fraud under 18 U.S.C. § 1343, as they were conducted through electronic means to execute the racketeering scheme.

128.     Springett, acting on behalf of Tailwind played a direct role in authorizing and overseeing the transfer of funds into and through Mack's Illinois-based IOLTA account. These transfers were central to the misappropriation and laundering of loan proceeds. By directing these funds into Illinois financial systems, Springett and Tailwind deliberately tied their activities to Illinois. The use of Illinois-based financial systems for laundering funds also constitutes predicate acts under 18 U.S.C. § 1956(a).

129.     Tailwind under Springett's direction, collaborated in the creation of fabricated inspection reports and related documents that targeted Illinois-based assets, including the Hale Property. These reports, prepared and transmitted from Mack's Illinois office, misrepresented the condition and value of the property, resulting in financial harm to Illinois-based Plaintiffs, including Yorkville. This conduct constitutes predicate acts of mail fraud under 18 U.S.C. § 1341, as false documents were distributed in furtherance of the fraudulent enterprise.

130.     The fraudulent activities of Springett and Tailwind caused substantial harm to Illinois-based Plaintiffs, including:

    a.    Financial losses exceeding $2.9 million, routed through Mack's Illinois trust account;

    b.    Reputational damage to Illinois businesses, stemming from the dissemination of fraudulent documents and communications; and

    c.    Operational disruptions and significant costs incurred by Illinois-based Plaintiffs to investigate and address the fraudulent transactions.

131.     By wiring funds to Illinois, utilizing Mack's Illinois office for the preparation and transmission of fraudulent documents, and engaging in communications targeting Illinois-based Plaintiffs, Springett and Tailwind purposefully availed themselves of Illinois jurisdiction. Their reliance on Illinois resources and the harm caused to Illinois-based Plaintiffs firmly establishes this Court's jurisdiction over their actions.

**Holden and Matthews**

132.     Holden and Matthews deliberately directed their actions toward Illinois as part of their roles in the racketeering enterprise. Operating from the Cayman Islands, they engaged in

transactions and communications purposefully tied to Illinois legal and financial systems, establishing a substantial connection to the state. Their actions included predicate acts of wire fraud under 18 U.S.C. § 1343 and money laundering under 18 U.S.C. § 1956, as their fraudulent activities relied heavily on Illinois-based resources.

133.    Holden and Matthews were involved in the authorization and facilitation of wire transfers directed to an Illinois-based IOLTA account held by Mack at Chase Bank in Illinois. On or about August 19, 2023, they approved the transfer of $2.9 million in purported loan proceeds to Mack's account. The choice of an Illinois-based financial institution as the destination for these funds demonstrates their purposeful availment of Illinois's financial infrastructure. These funds were subsequently misappropriated and laundered for the benefit of Holden, Matthews, and other co-conspirators, constituting predicate acts of money laundering under 18 U.S.C. § 1956(a)(1).

134.    Matthews and Holden engaged in direct email correspondence with Mack in Illinois to coordinate the use and distribution of the loan proceeds. These communications included specific requests for confirmation regarding the application of funds held in Mack's Illinois-based trust account. By engaging in repeated communications with an Illinois attorney regarding Illinois-based transactions, they created direct and ongoing interactions with the state. This conduct also constitutes predicate acts of wire fraud under 18 U.S.C. § 1343.

135.    In response to inquiries from Matthews and Holden, Mack provided Illinois-based responses that further tied the transactions to Illinois. This correspondence, facilitated through Mack's Illinois office, was critical in enabling the flow of funds into Illinois and their subsequent diversion as part of the fraudulent scheme. These acts further establish a pattern of racketeering activity involving Illinois under 18 U.S.C. § 1961.

136.    Both Holden and Matthews relied on Mack's Chase Bank IOLTA Account in the Illinois office to draft and transmit key documents essential to the racketeering enterprise. These documents, including fabricated loan agreements, were executed to misappropriate funds and conceal the fraudulent nature of the transactions. By utilizing Illinois-based legal services, Holden and Matthews ensured that Illinois resources were integral to the enterprise's operations. This conduct constitutes predicate acts of wire fraud under 18 U.S.C. § 1343 and mail fraud under 18 U.S.C. § 1341.

137.    Holden and Matthews also directed fraudulent communications targeting Illinois-based Plaintiffs. These communications, which included false representations regarding the

purpose and disbursement of loan proceeds, were aimed at inducing reliance by Illinois-based Plaintiffs, including Yorkville and Green Sapphire. These misrepresentations directly contributed to the Plaintiffs' financial losses and further embedded the scheme in Illinois, constituting predicate acts of wire fraud under 18 U.S.C. § 1343.

138.     The funds at the center of this dispute were managed through Mack's Illinois-based IOLTA account, making Illinois a central locus of the fraudulent activity. By directing funds to Illinois and engaging in repeated communications with Mack, Holden and Matthews purposefully availed themselves of Illinois jurisdiction, creating the minimum contacts required under Illinois's long-arm statute. Their use of Illinois financial institutions also supports claims under 18 U.S.C. § 1965(b).

139.     The actions of Holden and Matthews caused significant harm to Illinois-based Plaintiffs, including:

        a.     Financial losses exceeding $2.9 million diverted through Mack's Illinois trust account;

        b.     Reputational damage within Illinois's business community due to the fraudulent transactions; and

        c.     Operational disruption as Plaintiffs were forced to expend resources investigating and addressing the fraudulent scheme.

140.     By wiring funds to Illinois, engaging in correspondence with Illinois-based attorneys, and directing harm to Illinois-based Plaintiffs, Holden and Matthews purposefully availed themselves of Illinois as a forum. Their use of Illinois's financial infrastructure and legal resources establishes sufficient minimum contacts for jurisdiction, and the harm they caused to Illinois Plaintiffs further solidifies Illinois as the proper jurisdiction for this matter.

**Whinnery and Katunigan**

141.     Whinnery and Katunigan were principal participants in a coordinated racketeering enterprise, leveraging Illinois-based co-conspirators, including attorney Mack, to execute fraudulent financial transactions and fabricate documents targeting Illinois-based Plaintiffs. Their deliberate and systematic use of Illinois's legal and financial infrastructure establishes a clear connection to this jurisdiction for legal and adjudicatory purposes, forming part of a pattern of racketeering activity under federal and state law. This conduct constitutes predicate acts of wire fraud under 18 U.S.C. § 1343 and money laundering under 18 U.S.C. § 1956.

142.     Whinnery, acting on behalf of Katunigan, was part of the racketeering enterprise

whereby Mack drafted and executed fraudulent agreements, including UCC-1 financing statements, Stock Pledge Agreements, and fabricated Loan and Security Agreements. These documents, prepared at Mack's Illinois office, intentionally misrepresented financial obligations to deceive Illinois-based Plaintiffs, such as Yorkville and Green Sapphire. These acts constituted predicate offenses of wire fraud under 18 U.S.C. § 1343 in furtherance of the racketeering enterprise.

143.    Katunigan, under Whinnery's direction, was part of the racketeering enterprise whereby Mack processed multiple financial transactions through his Illinois-based IOLTA trust account at Chase Bank. These transactions included laundering approximately $2.9 million in purported loan proceeds through Illinois's financial systems. This use of Illinois's banking infrastructure facilitated the concealment of fraudulently obtained funds, directly benefiting Whinnery, Katunigan, and other co-conspirators, in violation of 18 U.S.C. § 1956(a)(1).

144.    Between June 2022 and September 2023, Whinnery and Katunigan engaged in frequent and coordinated communications with Mack and other Illinois-based co-conspirators, including email chains and teleconferences, to orchestrate fraudulent transactions and distribute misappropriated funds. These communications targeted Illinois-based Plaintiffs and financial institutions, evidencing the ongoing and organized nature of the racketeering enterprise, which meets the continuity requirement under 18 U.S.C. § 1961(5).

145.    Whinnery and Katunigan relied extensively on Mack's Illinois office to draft and transmit fabricated agreements as part of a fraudulent restructuring of debts owed to Illinois-based Plaintiffs. These agreements, including misrepresented Loan and Security Agreements, concealed the true fraudulent nature of the transactions and were critical in deceiving Plaintiffs into acting on false information. This conduct constituted predicate acts of mail and wire fraud under 18 U.S.C. §§ 1341 and 1343.

146.    Katunigan, at Whinnery's direction, was part of the racketeering enterprise whereby it fabricated inspection reports created and transmitted at Mack's Illinois office. These reports misrepresented the condition and value of Illinois-based assets, including the Hale Property, causing significant financial harm to Illinois-based Plaintiffs such as Yorkville. This deliberate misrepresentation furthered the fraudulent enterprise and constituted predicate acts of fraud under RICO.

147.    Whinnery and Katunigan utilized Mack's Illinois-based IOLTA trust account as the central hub for laundering and misappropriating funds obtained through fraudulent

transactions. By funneling the proceeds of these transactions through this account, the co-conspirators deliberately relied on Illinois's financial infrastructure to obscure the illicit nature of their actions, forming part of the enterprise's pattern of racketeering activity under 18 U.S.C. § 1962.

148.    The fraudulent actions of Whinnery and Katunigan directly harmed Illinois-based Plaintiffs in multiple ways, including:

      a.    Financial losses exceeding $2.9 million, resulting from the misappropriation of funds through Illinois-based financial systems;

      b.    Reputational damage to Illinois businesses caused by falsified property valuations and misrepresented financial transactions, impairing their credibility and operations; and

      c.    Operational disruptions, as Illinois-based Plaintiffs were forced to divert significant resources to attempt mitigate the impact of the fraudulent activities, which further perpetuated the harm caused by the racketeering enterprise.

149.    Through its involvement with the racketeering enterprise that directed funds to Illinois, engaged in frequent communications targeting Illinois-based Plaintiffs, and exploited Illinois's legal and financial systems to draft and execute fraudulent documents, Whinnery and Katunigan purposefully availed themselves of this jurisdiction. Their deliberate and systematic actions demonstrate sufficient minimum contacts with Illinois and establish a direct connection to the harm caused to Illinois-based Plaintiffs, satisfying jurisdictional standards under Illinois law and federal RICO statutes.

## FACTS

### I. The 2022 Complaint & Websites

150.    In furtherance of the overall fraudulent schemes, Defendants conspired to enact upon Plaintiffs as described herein, in August of 2022, an anonymous party (the "Complainant") using the alias "Susan Essex" filed a complaint against Plaintiff Wolfe in DuPage County, Illinois (the "2022 Complaint"), raising a series of scurrilous, denigrating, and disparaging allegations regarding Plaintiff Wolfe, including that he engaged in criminal activity and adultery.

151.    After filing the 2022 Complaint, the Complainant made no efforts to serve—or

even notify—Plaintiff Wolfe of the case brought against him, nor did "she" make any other efforts to otherwise litigate the case.

152.    On or about October 31, 2022, the case was dismissed for want of prosecution. At no point thereafter did the Complainant seek to reinstate the matter. In other words, the Complainant was not even interested in appearing before the Court regarding their case. In essence, the Complainant filed the false 2022 Complaint, which was devoid of substance other than spurious and scandalous allegations and immediately abandoned the claim.

153.    Even though this case was entirely obscure, having undergone no responsive pleadings, discovery, motions practice, or even initial case management, during October of 2023, an anonymous party obtained and published the 2022 Complaint in this case on a website (the "First Website"), which was registered on September 11, 2023, and is dedicated entirely to "doxing," defaming, and otherwise harassing Plaintiff Wolfe and his colleagues.

154.    Upon further investigation, the address the Complainant listed on the 2022 Complaint is a women's shelter without permanent residents, no response to communications was received from the email address listed on the 2022 Complaint, and the phone number is fictitious or otherwise disconnected.

155.    Given the foregoing, "Susan Essex" is an assumed name under which the responsible individual filed the 2022 Complaint.

156.    Pursuant to information produced by the registrars of the First Website and the email address used to file the 2022 Complaint, the same Internet Protocol (IP) Address was used to access/maintain the First Website and to access the email account from which the responsible individual(s) filed the 2022 Complaint.

157.    Likewise, pursuant to information produced by the registrars of the First Website and the email address used to file the 2022 Complaint, the same phone number was used to register both the First Website and the email account from which the responsible individual(s) filed the 2022 Complaint.

158.    Given the foregoing, the individual(s) responsible for filing the 2022 Complaint are one and the same as the individual(s) responsible for creating and/or posting on the aforesaid First Website; the 2022 Complaint was filed under false pretenses, in bad faith, without basis in fact whatsoever, as fodder by which the individual(s) responsible might disparage Plaintiff Wolfe and the performance of his duties with the Family Office Trust Structure on their First Website.

31

159.     The entry on the First Website dedicated to republishing the 2022 Complaint had generated 20 "comments" as of December 2023.

160.     Upon information and belief, given Plaintiff Wolfe's status as a generally obscure private citizen rather than a public figure, and the anonymous nature of the "comments" on the First Website, the aforesaid "comments" were generated by the individual(s) responsible for filing and republishing the 2022 Complaint.

161.     The entry on the First Website dedicated to republishing the 2022 Complaint contained personally identifiable information regarding Plaintiff Wolfe without his consent, including his name, telephone number, home address, and employment information.

162.     The entry on the First Website dedicated to republishing the 2022 Complaint encouraged the general public to stalk, harass, and harm Plaintiff Wolfe, variously encouraging the public to call his phone number and contact him at his home.

163.     Furthermore, the entry on the Website dedicated to republishing the 2022 Complaint contained extensive inflammatory language and accusations against Wolfe, intended and likely to cause rash and unwarranted action against him including harassment, stalking, and bodily injury to Plaintiff Wolfe and his family.

164.     After discovering the First Website and the 2022 Complaint published thereon, Plaintiff Wolfe immediately moved to vacate the dismissal entered on October 31, 2022, and sought to have the case sealed to prevent the further dissemination of the 2022 Complaint.

165.     Because of the false, vile, scurrilous, defamatory, disparaging, and doxing allegations and website comments, on November 27, 2023, the Court granted Plaintiff Wolfe's Motion to Vacate the dismissal entered on October 31, 2022, ordered the case sealed, and set the matter for the status of Defendants' answer to the 2022 Complaint on January 3, 2024. See Order dated November 27, 2023, a true and correct copy of which is attached hereto as **Exhibit B.**

166.     The Complainant received notice of the November 27, 2023, Order via email— delivered to the account used to file the 2022 Complaint—on November 29, 2023. See Email from Christine Marte to Plaintiff, a true and correct copy of which is attached hereto as **Exhibit C.** Still, "Essex" failed to appear, and the case was again dismissed.

167.     The individual(s) responsible for maintaining/accessing the email account used to file the 2022 Complaint logged in to the email account at 11:57 P.M. on November 29, 2023, as well as on 14 occasions thereafter.

168.     Thereafter, on or about January 9, 2024—6 weeks after the Court ordered the

entire 2022 case sealed—an anonymous party created a second website (the "Second Website," collectively, the "Websites"), hosted out of Lithuania, dedicated to republishing the 2022 Complaint.

169.    On or about that same date, the individual(s) responsible for maintaining the content of the First Website removed the 2022 Complaint from the First Website.

170.    The Second Website was apparently created to be "linked" and published on the First Website, where it is currently republished and appears.

171.    Given the foregoing, upon information and belief, (a) the individual(s) responsible for creating the First Website and republishing the 2022 Complaint thereon received notice of the developments in the 2022 case, despite its status as being sealed; (b) the individual(s) responsible for filing the 2022 Complaint are one and the same as the individual(s) responsible for creating and/or posting on both Websites; and (c) the individual(s) responsible for creating the Websites republished the 2022 Complaint on the Second Website in an effort to remove themselves from the jurisdictional reach of the Court.

172.    The Second Website, as of the date of this filing, includes 21 false, defamatory, and disparaging "comments."

173.    In addition, the Second Website flagrantly and egregiously misappropriates Plaintiff Wolfe's name and likeness for its own use and benefit. Specifically, the Second Website misappropriates Plaintiff Wolfe's name and likeness solely to further the responsible individual(s)' apparent vendetta or animosity against Plaintiff and the Family Office Trust Structure.

174.    Pursuant to a subpoena from Wolfe, on or about February 2, 2024, the First Website's registrar—Newfold Digital, Inc. ("Newfold")—produced documents to Wolfe related to the identity of the individual(s) responsible for creating and maintaining the First Website.

175.    The production from Newfold revealed the First Website was registered by an individual purportedly named "David Xanthan."

176.    Plaintiffs are unaware of an individual named "David Xanthan," and subsequent investigation has revealed no individual by the name of "David Xanthan."

177.    Upon information and belief, "David Xanthan" is yet another alias under which the responsible individual(s) have sought to conceal their misdeeds.

178.    However, the production from Newfold also revealed the First Website was

registered under a mailing address of 4531 Park Lane, Dallas, TX 75220.

179.    Subsequent investigation revealed that 4531 Park Lane, until January 10, 2023, was the residence of Defendant Looper— whose company is indebted to Alpha Carta, for over $20 million as described herein.

180.    Therefore, upon information and belief, Defendant Looper is one of the individuals responsible for creating, maintaining, and publishing the content on the Websites and one of the individuals responsible for filing the 2022 Complaint.

181.    Upon information and belief, Defendant Looper participated in the creation, maintenance, and publication of the content on the Websites, as well as the filing of the 2022 Complaint, in an effort to discredit, defame, and disparage Plaintiffs in furtherance of the fraudulent schemes he and his co-conspirators enacted as alleged above.

182.    Likewise, documents provided by Google, LLC—the registrar and host of the email address used to file the 2022 Complaint—revealed a recovery email address associated with the email address used to file the 2022 Complaint that apparently belongs to Defendant Whinnery.

183.    The recovery email address was given to create the account from which the 2022 Complaint was identified as PLSchlieve@gmail.com.

184.    Whinnery, through his company, Katunigan, registered and maintained a website used as a central tool for the criminal enterprise. This website was designed and operated to facilitate acts of stalking, blackmail, and extortion, consistent with the enterprise's ongoing racketeering activity.

185.    During the course of discovery, it was revealed that the website in question was accessed and controlled through an IP address registered to and used by Katunigan. The specific IP address, 216.188.236.237, was tied to both the website's administrative activities and the operation of the extortionate scheme.

186.    Records indicate that the aforementioned IP address originates from a physical address known to be associated with Whinnery. This physical address, located at 3400 Kyle Xing, Kyle, Texas 78640-3025, is the subscriber address or business location of the Katunigan Company and a personal residence or workspace of Defendant Whinnery, 3875 E Whitestone Blvd., Cedar Park, Texas 78613.

187.    Evidence establishes a clear nexus between the website, the IP address, and Whinnery, as follows:

    a.      Katunigan registered and maintained ownership of the website;

    b.      The IP address used to administer and operate the website was linked to the physical address associated with Whinnery; and

    c.      The time logs and usage records from the IP address correspond to dates and times when Whinnery was documented to be at the associated address.

188.     The use of the website and the linked IP address demonstrates the instrumental role played by Whinnery and Katunigan in the commission of the predicate acts of extortion and stalking. This pattern of activity constitutes racketeering under 18 U.S.C. § 1961 et seq., and the integration of the website into this criminal scheme is evidence of the defendant's control and operation of the enterprise.

189.     The aforementioned allegations establish a clear chain of evidence linking Whinnery, Katunigan, the website, the IP address, and the physical address to both Whinnery, Katunigan, and the racketeering enterprise.

190.     Whinnery is an individual with whom both Plaintiff Wolfe and Defendant Looper are acquainted.

191.     Following his incarceration, Defendant Whinnery was employed as a legal assistant at the firm of Clayborne, Sabo and Wagner in Bellville, Illinois.

192.     Given the foregoing, Defendant Whinnery is sufficiently knowledgeable regarding pleadings to have drafted or significantly aided in drafting the 2022 Complaint.

193.     While incarcerated, Defendant Whinnery met R.G. Brownell. During 2016, Defendant Whinnery and R.G. Brownell began providing limited "litigation consulting" services to an entity affiliated with one of the Plaintiffs.

194.     On or about July 3, 2023, Plaintiff Wolfe received an anonymous letter (the "Letter") threatening Plaintiff Wolfe in connection with a corporate transaction with which Plaintiff Wolfe and his employer were associated.

195.     The Letter echoed baseless accusations similar to those expressed by the individual(s) creating the Websites, including but not limited to allegations that Plaintiff Wolfe:

    a.      "personally caused [the Corporation] to conduct its operations contrary to affirmative statements in the offering materials;"

    b.      "personally withheld material information from the Board

of Directors, which, had they known the information,

would have prevented the failure of [the Corporation] …;"

and

c. "made material false statements to the Board of Directors,

who relied on [Plaintiff's] false statements in repeating

those material false statements to investors."

196.    Given the foregoing, upon information and belief, the individual(s) responsible

for sending the Letter are one and the same as the individual(s) responsible for filing the 2022

Complaint and publishing the Websites.

197.    The responsible individual(s) sent the Letter from a post office located in Drexel,

North Carolina.

198.    Defendant Whinnery is or was the managing member of Overall Builders, the

company responsible for generating the fraudulent asbestos report discussed above, which is

also registered to do business in North Carolina.

199.    Overall Builders has a registered address in North Carolina of 3402 Deal Avenue,

Valdese, NC—located only four miles from the post office from which the Letter was sent.

200.    The transmission of the Letter constitutes a predicate act of mail fraud under 18

U.S.C. § 1341, as it was sent via the postal service with the intent to defraud and intimidate

Plaintiff Wolfe. This act, taken in conjunction with the defamatory content mirrored on the

Websites and in the 2022 Complaint, demonstrates a coordinated scheme to harm Plaintiff's

business and reputation.

201.    The use of mail in furtherance of this fraudulent scheme establishes a clear pattern

of racketeering activity, as required under the RICO statute. The Letter's origin, in close

proximity to Defendant Whinnery's operations, further implicates him in this unlawful enterprise.

202.    Given the foregoing, upon information and belief, Defendant Whinnery

performed the actions described above at the behest of R.G. Brownell, his confederate, in

furtherance of the overarching fraudulent schemes enacted by R.G. Brownell and his co-

conspirators as alleged herein.

203.    In addition to seeking to damage Plaintiff Wolfe personally and thereby attack his

fitness to serve as a Trustee and/or Director of entities in the Family Office Trust Structure

through the 2022 Complaint and Websites' publication, Defendants acted in a broader effort to

intentionally harm Plaintiffs and other people associated with the Family Office Trust Structure in

their abilities to work as financial professionals and to depress the value of property the Family Office Trust Structure owned.

204.    Defendants filed the 2022 Complaint and published the Websites in a concerted effort to damage Plaintiff Wolfe and his co-Plaintiffs' reputation and business relationships, including but not limited to their reputation and relationships with banks and other lenders, in order to artificially create adverse market conditions and attack Plaintiff Wolfe's fitness to serve as Trustee and/or Director of the Family Office Trust Structure's related entities, and to perpetuate the fraud described above.

205.    Defendants engaged in a conspiracy to create the impression that Wolfe was unfit to serve within the Family Office Trust Structure, in order to enrich themselves through the above-described misconduct. This was inextricably included in their fraud schemes alleged above to prevent Wolfe's interference, causing him to be removed as Trustee and/or Director within the Family Office Trust Structure or otherwise bypassed. It also hampered the Plaintiffs' ability to investigate, discover, and rectify the Defendants' misconduct.

206.    By January 2022, BNW infiltrated Terra Carta, where 100% of its LLC Membership Interests were owned by Green Sapphire, Inc.

207.    In furtherance of the conspiracy to commit fraud and conversion which evolved into a racketeering enterprise, in August 2021, Cicoski became the sole Director of Green Sapphire. Around the same time Cicoski became the "Vice President" of TCP Managers, LLC in its capacity as the Manager of Terra Carta (in late January 2022 Ryan as "Vice President" of Terra Carta signed the Development Agreement with Cerco).

208.    Cicoski allowed BNW to infiltrate Terra Carta and BNW arranged for Whinnery to become the "administrator" of Terra Carta website and corporate email account.

209.    Terra Carta is an entity related to the property subject to the larger fraud schemes against the Plaintiffs described herein.

210.    As of the date of this filing, the website for Terra Carta has been removed from the web, and Plaintiff Wolfe's access to his email account associated with Terra Carta has been revoked.

211.    Given Defendant Whinnery's role as administrator of the Terra Carta website and email accounts, and his control thereof, upon information and belief, Defendant Whinnery has removed the Terra Carta website and revoked Plaintiff Wolfe's email access in an ongoing

attempt to destroy evidence and obscure Defendants' involvement in the conduct alleged herein.

212.     As the allegations in the 2022 Complaint published on the Websites are not only baseless and untrue, but also particularly scandalous, offensive, and outrageous, Plaintiff Wolfe has experienced, and continues to experience, damage to his reputation and mental well-being as a result of the 2022 Complaint's subsequent publication. Moreover, the website participants' engagement in doxing and incitement of doxing represents a danger to Plaintiff Wolfe and his immediate family.

213.     Plaintiff brings to the Court's attention a series of false, defamatory, and harmful statements published on the platforms outlined below. Notably, these statements were published after the filing of Plaintiff's First Amended Complaint on April 14, 2024, demonstrating a clear and retaliatory intent to harm Plaintiff's reputation, intimidate witnesses, and obstruct judicial proceedings.

214.     The timing of these publications, as well as their direct references to this Court and ongoing litigation, make them particularly egregious. These statements not only lack any basis in reality but are crafted to publicly discredit Plaintiff, undermine this Court's authority, and intimidate potential witnesses by falsely alleging conspiracies, misconduct, and other inappropriate behavior. Furthermore, these publications disclose Plaintiff's personally identifiable information (PII), including names, purported associations, and other private details, further violating privacy rights.

215.     The following statements, published under various pseudonyms, are submitted for the Court's review with all personally identifiable names redacted. Plaintiff respectfully requests that the Court take these facts into account as they reflect not only on the defamatory conduct but also on the blatant attempts to interfere with the judicial process.

216.     False and Defamatory Statements Published:

a.     **Published under the pseudonym "Amazed" on May 9, 2024, at 9:38 PM**

Published at: https://[REDACTED]

"I once saw a Neanderthal-looking [REDACTED] suck off [REDACTED] in a boardroom, and then [REDACTED] took it in the ass with [REDACTED] asking him to make weird pig sounds. [REDACTED] also fucked a crack whore on a trip we took to

Tokyo. [REDACTED] also had a weird homosexual relationship with [REDACTED] at his private residence. They acted like they were drunk, but I knew there was more to it.

That is why I find the story hard to comprehend—I also thought the two were fags. But you never know."

b. **Published under the pseudonym "Susan Essex" on May 9, 2024, at 9:47 PM**

"Hey everyone,

Thank you for your support. I would cut his dick off, but it brings me pleasure to think that he and [REDACTED] can continue their disgusting homosexual relationship.

I only feel sorry for [REDACTED]'s wife."

c. **Published under the pseudonym "Sickening" on June 9, 2024, at 7:44 PM** "Two lovers in a fond embrace. How nice.

https://www.wmagazine.com/culture/gay-pride-2016-two-men-kissing"

217. Additional False and Defamatory Content:

a. **Published on January 14, 2024**

Published by [REDACTED]

"After chasing after Metaverse (remember the Metaverse—ha ha), [REDACTED] became the President of [REDACTED]'s second failed SPAC—[REDACTED] Acquisition Company. Another SPAC by the triumvirate [REDACTED], [REDACTED], and [REDACTED] as CFO (amazing how those three names keep appearing in sketchy investment initiatives).

Although it was organized to invest in specialized technology fields, when it became apparent that [REDACTED] was a total failure, [REDACTED] abandoned its proposed $130,000,000 public offering and slithered away."

b. **Published under the pseudonym "[REDACTED] Undone" on January 20, 2024, at 1:56 PM**

"Sketchy is right. Nothing was transparent. The board was the last to

know anything. The investors were even worse off. The term

fiduciary responsibility did not exist in the [REDACTED] corporate

culture. There was only one sheriff in town, [REDACTED], and his

two deputies, [REDACTED] and [REDACTED]."

c.   **Published under the pseudonym "DecisionDecision" on**

**January 22, 2024, at 9:37 AM**

"It's nice to see more information coming out on [REDACTED].

[REDACTED] is definitely in line for a lawsuit.

He was a failure and disappointment to the BOD and the investors.

Everyone involved knew that his decisions truly came from

[REDACTED]. He put himself in that position."

218.   Additional Defamatory Statements:

a.   **Published under the pseudonym "Duncan" on May 17, 2024,**

**at 12:05 AM** "I just want to say one thing: Thank God, I was

fucking his wife regularly, laying pipe as they say when he was

fucking off around the world. I was worried that he could have

an arsenal at home like that."

b.   **Published under the pseudonym "Searching" on May 20, 2024,**

**at 12:25 PM** "Does anyone know where [REDACTED] is living

nowadays? I have heard so many places it is insane. Chicago,

Texas, California. It seems like he's always hiding."

c.   **Published under the pseudonym [REDACTED] on May 10,**

**2024, at 2:43 PM** "[REDACTED] had me pull over while driving

to Westchester airport in the Bronx so that he could fuck a lot

lizard at a truck stop/diner.

He got sloppy seconds after she took forever to finish up in a truck

cab. He screwed her in the men's bathroom. I do not think the

claims he is gay are true.

I do think that [REDACTED] is a fag. He once went to the bathroom

together with the fat IT guy in their former NYC offices."

d.   **Published under the pseudonym "Jay Menton" on May 17,**

**2024, at 12:12 AM**

"So, I just have to say, there was weird shit going on in the ex-church they bought and converted to an office. I saw orgies go down in that place with both male and female escorts.

[REDACTED] was running around with a strap-on, and the large steroid-head IT guy from New York was making sure that everyone left their cell phones at the door. [REDACTED] was scared that this stuff would get posted on the internet. That big doofy guy was probably in the back jerking off while all of this was going down. My name is [REDACTED], and that scum bag threatened me if I didn't participate, so I left the company. Look me up on LinkedIn. I can tell you stories about [REDACTED] and what he did on the Citation 10 they flew around with another guy they hired from Berkshire Hathaway. [REDACTED] is a cock sucker in every sense of the word—gay prostitutes, [REDACTED], and even other employees."

e.    **Published under the pseudonym "MG Ifuku" on May 17, 2024, at 12:29 AM**

"From the Foreign Ministry of Somalia:

I just want to say that we would welcome [REDACTED], and our citizenship is for sale. We even have coastal properties available in a bundle deal. For the gold level, we make sure that the pirated container ships will never be parked in a way to block your ocean view.

For 1 million USD in maintenance fees, you and your family will be accompanied by a tactical vehicle (late model Toyota pickup) with a surplus

.50 Cal machine gun. And as you know, gayness is punishable by death here, but for you, Mr. [REDACTED], we will look the other way (we have heard about your gay love relationship with Mr. [REDACTED]).

It would be an honor to host you. We can even discuss an ambassadorship for the right kind of money. Your wife can take a

> BBC to service, so you don't have to worry about having your
> business associates lay pipe behind your back.
>
> I have sent you my personal contact info. I look forward to hearing
> from you."

219.    The statements outlined above lack any basis in reality and were made with the intention of attacking, intimidating, and harming the Plaintiff. Furthermore, they disclose sensitive and personally identifiable information, including names, locations, and associations, which violate the Plaintiff's rights to privacy and security. Plaintiff respectfully requests the Court's intervention to address these issues appropriately.

220.    The Defendants' creation and promotion of these websites was not a standalone act. Instead, it was part of a broader coordinated strategy to inflict financial harm on the Plaintiffs by tarnishing their reputations, undermining their assets, and provoking extensive and costly litigation. This litigation, once instigated, was further publicized on the websites, ensuring maximum reputational and financial damage. A key component of this strategy was the fraudulent scheme involving Hale Street, which was designed to manufacture disputes and legal actions that could feed the websites' defamatory allegations.

## II. Hale Street

221.    The Hale Street scheme exemplifies the Defendants' strategy of deliberately provoking litigation to advance their broader agenda. The fraudulent actions related to Hale Street were carefully orchestrated to create disputes and legal challenges, which were then leveraged to support the defamatory narratives disseminated on the websites. This cycle of fraud and public defamation reveals the interconnected nature of the Defendants' schemes, underscoring their intent to entangle the Plaintiffs in unrelenting legal and reputational harm.

222.    Plaintiff Yorkville ("Yorkville") owns the real property commonly known as 120 North Hale Street, Wheaton, Illinois 60187 (the "Hale Property").

223.    Mr. Russell Scott Armstrong ("Armstrong"), a close friend of Wolfe, claims to hold a 52.99% equity interest in the Hale Property.

224.    In September 2022, Defendant R.G. Brownell, with the knowing assistance of Defendant Mack, set up a fictitious purchaser, submitted fictitious reports, and engineered a fictitious termination of a purchase of the Hale Property and then, having infuriated Armstrong, who demanded to be bought out, had Armstrong's alleged interest purchased by Yorkville at an inflated price.

225.     On or about September 23, 2022, R.G. Brownell wrote to Ryan Cicoski, the director of the manager of Yorkville, and represented that Kissa would be making an offer to purchase the Hale Property within the week, which would include a three-day period to review and accept; that Hunton Andrews Kurth LLP ("HAK") employed his brother, F. Willam Brownell ("F.W. Brownell"); and that HAK had pension fund money to invest. R.G. Brownell had frequently in the past invoked his brother's name as backers/owners/participants in the BNW, representing that it was worth hundreds of millions of dollars.

226.     In late September 2022, R.G. Brownell intentionally misrepresented to Ryan Cicoski and Scott Armstrong that a "Real Estate Purchase and Sale Agreement" ("PSA") was submitted by Kissa. This Purchase Agreement provided for a purchase price of $5 million, with an earnest money deposit of $50,000. The PSA was ostensibly signed by Joseph Filberto.

227.     Upon information and belief, R.G. Brownell forged the signature of Joseph Filberto.

228.     The PSA stated all notices, demands, requests, and other communications related to the PSA were to be sent to Kissa, "Attn.: Joseph Filberto," with a copy to HAK", 200 Park Avenue, New York, NY, "Attn.: Brett Gross." Upon information and belief, Gross is the co-chair of HAK's real estate practice group.

229.     On or about October 4, 2022, Ryan Cicoski, who had replaced Defendant Smith acting as Manager of Yorkville as of January 2022, executed the PSA.

230.     Defendants Mack and R.G. Brownell afterward represented to Cicoski that Kissa had signed the PSA and had a genuine interest in purchasing the Hale Property.

231.     Defendant Mack wrote to Yorkville attaching a "critical dates memorandum" relating to the alleged transaction outlining key dates for due diligence and closing, including but not limited to:

     a.    A Contract date of October 4, 2022;

     b.    An "earnest money" deposit date of October 7, 2022;

     c.    Due diligence expiration date of November 18, 2022; and

     d.    Closing date of January 2, 2023.

232.     On or about October 26, 2022, Defendant Mack wrote to Armstrong and represented that there was a PSA, that it provided for one due diligence period of 45 days, with that period expiring November 18, 2022, and a closing date forty-five days thereafter, on January 2, 2023.

233.    On January 2, 2023, however, Defendant R.G. Brownell wrote to Armstrong and represented that he had received an urgent letter from Kissa just prior to the close of business, stating that Kissa had found "lead based paint, asbestos, and mold, in addition to the repair of the ceiling…," and threatening to terminate the contract unless Yorkville gave Kissa an extension to finalize their estimates on correcting these alleged issues. R.G. Brownell forwarded this letter to Armstrong, ostensibly written on Kissa stationary, listing the 1775 York Avenue Address, and "signed" by "Joseph Filberto."

234.    The Letter attached a supposed building inspection report performed by "Weber Group Management, Inc.," ("Weber") purportedly retained by Kissa to perform a limited NESHAPS inspection of the Hale Property (the "Report").

235.    The Report indicated that inspector Michael Di Canio performed the asbestos inspection for the Hale Property, and his inspection allegedly revealed asbestos-containing building materials throughout the building and was submitted by asbestos inspector Michael D. Herman.

236.    Weber allegedly performed an additional lead-based paint inspection, submitting a report by Drake Ottley, licensed lead inspector, on or about December 27, 2022, addressed to "Brett Gross, Kissa Capital, LLC" at HAK's 200 Park Avenue, New York, NY address.

237.    The next day, on or about December 28, 2022, Weber purportedly submitted a mold report, also addressed to Gross.

238.    On or about January 10, 2023, Kissa purportedly wrote a letter to Defendant Mack indicating that it had completed its inspection including the estimated cost of remediation. In that letter, Kissa reportedly stated, "Now that we have a cost estimate of the rehab and remediation the number is far more substantial than we originally estimated… Kissa Capital, LLC is terminating the Agreement and requesting a return of the earnest money deposit…Kissa Capital, LLC would consider purchasing the Property in its current condition for an amount equal to $4,000,000." This ended the "correspondence."

239.    All communications between "Kissa" and Yorkville regarding the proposed "sale" of the Hale Property were relayed to Yorkville through either Defendants Mack or R.G. Brownell.

240.    To date, Yorkville's investigation, which is ongoing, has been unable to determine whether, from whom, or how the earnest money payment of $50,000.00 from Kissa was deposited or, if deposited, its source and ultimate destination. Despite repeated requests,

Defendant Mack has failed to supply the relevant information, although he has repeatedly promised to do so at some future unstated date when he finds the time.

241.    The "Kissa" Letter of January 10, 2023, attached an estimate for asbestos remediation dated August 13, 2022, with a purported expiration date of August 27, 2022, addressed to Yorkville from R.J. Brownell—R.G. Brownell's son—of "Overall Builders."

242.    Therefore, the purported August 2022 remediation estimate was generated over four months before Kissa's alleged inspection, and several weeks before R.G. Brownell introduced Kissa to Yorkville as a potential buyer for the Hale Property.

243.    The Overall Builders report estimated remediation of asbestos, lead based paint, and mold would cost $342,000.00.

244.    Overall Builders's registered agent is "Gammon Analytics, LLC." Its managing member is, upon information and belief, Defendant Whinnery.

245.    Gammon Analytics, upon information and belief, is a subsidiary of Katunigan, the President, Secretary, and Director of which is Defendant Whinnery.

246.    Upon information and belief, R.G. Brownell is likewise associated with Overall Builders as an employee or agent of Overall Builders.

247.    Yorkville investigated Kissa. It is a Delaware limited liability company controlled by a broker identified as Ariel Imas, Kissa's managing member.

248.    Mr. Imas previously lived at the 1775 York Avenue address provided in the PSA, but no longer resided there as of February 2024.

249.    Mr. Imas organized Kissa as a holding company for another corporation he co-founded, and Kissa was only involved in one previous real estate transaction involving a residence in Florida.

250.    Mr. Imas has never heard of Joseph Filberto, and reported that Kissa has no employees, and that he is its sole member.

251.    Mr. Imas has never heard of Brett Gross or R.G. Brownell.

252.    Kissa was never represented by HAK in connection with the PSA. Therefore, upon information and belief, the signature of Joseph Filberto on the PSA, January 2, 2023, Letter, and all communications with "Joseph Filberto" were forged by R.G. Brownell or at his direction with the actual intent to steal the identity of Kissa in furtherance of a scheme to defraud Yorkville and Scott Armstrong.

253.    Yorkville similarly investigated "Weber Group Management, Inc.'s" inspection of

the Hale Property.

254.     Michael D. Herman, the asbestos inspector with Weber who purportedly submitted the December 2022 Report, informed Yorkville that the report provided by "Kissa" via Mack and R.G. Brownell had been significantly altered from the report Herman prepared.

255.     The correct report Herman prepared found "NO Accessible ACM [asbestos-containing materials] Was Found Observed in The Building" in any of the materials tested.

256.     While Herman's inspection also uncovered some lead paint in a stairwell of the Hale Property, his correct report opined that it did not require remediation.

257.     Herman stated that he had been retained by R.G. Brownell—upon information and belief, Defendant R.J. Brownell—to perform an asbestos and lead paint inspection at the Hale Property, though he was not asked to perform remediation if necessary.

258.     After 'Kissa' allegedly terminated the PSA, Armstrong was furious and demanded that he be bought out of his interest in Yorkville. R.G. Brownell, Mack, and as yet unknown John Does then pivoted to a scheme to engineer a deal that obligated Yorkville to purchase Armstrong's equity for an amount greater than the value of his equity interest.

259.     Under the agreement engineered by R.G. Brownell, Mack, and as yet unknown John Does, Yorkville was obligated to pay Scott Armstrong $1,258,341 plus accrued but unpaid interest that is due and payable on May 1, 2024. See Stock Purchase Agreement, a true and correct copy of which is attached hereto as **Exhibit D.**

260.     The fraudulent scheme surrounding Hale Street did not exist in isolation. Rather, it served as a foundation for a broader pattern of misconduct, with the intent to perpetuate harm against the Plaintiffs. This strategy extended beyond Hale Street into subsequent fraudulent ventures, including the Green Sapphire transactions. These transactions were integral to further entrenching the Defendants' coordinated efforts to provoke litigation, defame the Plaintiffs, and exploit legal processes for personal gain.

### III. Green Sapphire

261.     The Green Sapphire scheme exemplifies the continuation and escalation of the Defendants' coordinated fraudulent activities. Building on the foundations laid by the Hale Street transactions, the Defendants expanded their strategy to encompass new fraudulent

dealings. The Green Sapphire transactions further illustrated their intent to manipulate legal processes, provoke disputes, and generate fodder for public defamation through their websites, all while deepening the financial and reputational harm inflicted upon the Plaintiffs.

262.    In or before December 2022, R.G. Brownell, Mack, Smith and Springett concocted a predatory scheme to have Green Sapphire allegedly borrow money it could not repay, pledging all stock in French Access, a company it owned, which in turn owned the St. Barth's Property. Using the name Bigelow and falsely claiming to represent Green Sapphire and because French Access was a company subject to French law, R.G. Brownell engaged French counsel to determine how to prepare a stock pledge and how to foreclose on it. Despite being terminated, Defendant Smith actively communicated with R.G. Brownell and Mack and conspired with them to steal the St. Barth's Property.

263.    Unhappy with the formalities required under French law for such a pledge, and with the borrower-friendly procedures to foreclose on such a pledge, R.G. Brownell, in consultation with Mack, Smith, and John Does, then asked Ryan Cicoski, Green Sapphire's General Counsel, to convert French Access to a Florida corporation. R.G. Brownell and John Doe/s falsely claimed that a liquidity crisis necessitated the loan. On February 3, 2023, Defendant Mack filed with the Florida Secretary of State "Articles of Domestication," which purport to transform French Access, into Access Management, S.A.S. ("Florida Access"), a Florida corporation. See Articles of Domestication ("Domestication"), a true and correct copy of which is attached as **Exhibit E.**

264.    On or about the same day, Mack drafted and Cicoski, at the request of Mack, R.G. Brownell, or John Does, executed a "Loan and Security Agreement" (the "Global Capital Loan"), on behalf of Green Sapphire with an entity known as "Global Partners" a true and correct copy of which is attached as **Exhibit F.**

265.    Neither the Domestication nor the Global Capital Loan were authorized by two directors of Green Sapphire. Cicoski signed both documents without notice to or consent of Wolfe, the other Director of Green Sapphire, or notice to the Trustee or the UBOs of the Petro Carta Trust. Under the bylaws of Green Sapphire, the absence of the approval of both directors made the execution of the Domestication and the Global Capital Loan ultra vires.

266.    Under the loan agreement, Global Partners agreed to loan Green Sapphire $10 million for 120 days with interest at the rate of 30% per annum, Green Sapphire agreed to borrow $10 million and grant a security interest in its interest in certain shares of shares of French

Access"—record titleholder of the St. Barth's Property—or 100% of the shares of stock of Florida Access, give a mortgage on the St. Barth's Property, and to have R.G. Brownell and Petro Carta Trust guaranty the loan.

267. To date, Ryan Cicoski and Global Partners have been unable or unwilling to produce the fully executed Stock Pledge Agreement identified in the Loan and Security Agreement. Plaintiffs have been unable to obtain a copy of it from any other source. No Stock Pledge Agreement relating to the shares of French Access has been recorded in St. Barth's in the manner required by French law. Upon information and belief, Mack, an Illinois attorney operating in Illinois, prepared and arranged from Illinois a filing of a UCC-1 financing statement with the Secretary of States for Delaware and Florida purporting to perfect a UCC Article 9 security interest in the shares of Florida Access in favor of Global Partners, but no document that actually creates a security interest in any such shares has been located, despite requests to Mack.

268. The term and interest rate under the Loan and Security Agreement was unreasonable and unconscionable given that payment of the $10 million debt was secured by guarantees of Petro Carta Trust and R.G. Brownell and, if the pledged stock agreement and the related transactions are valid and legally enforceable, by a security interest on shares of a corporation that holds title to real estate with a value of $30 million.

269. Under the Loan and Security Agreement, the proceeds of the $10 million loan to Green Sapphire were scheduled to be disbursed to Green Sapphire in two tranches—the first tranche of $3 million was to occur on January 31, 2023, and the second tranche in the amount of $7 million "as soon as possible shortly thereafter," following the Lender's receipt of an opinion of French counsel. No opinion of French counsel was ever obtained.

270. Neither Green Sapphire nor any of its related entities ever received any portion of the $10 million loan that Global Partners "agreed" to make in connection with the Global Capital Loan.

271. Upon information and belief, and based on Mack's assertions, if any funds belonging to Global Partners were transferred to anyone, they were transferred to Chase Bank in Illinois for credit to the IOLTA account held in the name of Defendant Mack's IOLTA Trust Account.

272. Upon information and belief, this was done by direction of R.G. Brownell, Smith, Springett, or John Does, and then some of all of the funds were transferred to or for the benefit of

48

the BNW, by Mack.

273.    Despite repeated requests, Mack has refused to produce the IOLTA account statement, the wire transfer confirmations, emails or any other documents that could confirm that $10 million was ever delivered to any one by Global Partners in connection with the Global Capital Loan and would identify the transferees of any subsequent transfers of any funds Mack received from Global Partners.

274.    No one aside from R.G. Brownell, Mack, Smith, Springett, and John Does was aware of whether any money was actually disbursed by Global Partners pursuant to the Global Capital Loan and, if so, to whom any such funds were delivered. For these reasons, plus the fact that no $10 million loan was ever recorded on the books and records of Green Sapphire and the lack of any evidence that any such loan was ever made, Green Sapphire did not repay any such loan on the claimed June 4, 2023, maturity date.

275.    In November 2023, Cicoski drafted a "Written Action of Sole Shareholder" purporting to remove Wolfe as co-director of Green Sapphire, without informing Wolfe, and presented it to Mark Azzopardi, manager of NorthSea—the Trustee of Petro Carta—as an "urgent" document requiring his signature immediately. Azzopardi signed it, believing it necessary and proper, so Wolfe was removed as co-director of Green Sapphire. Wolfe had discharged his duties faithfully and well. He had given no cause for his removal. As set forth above, however, he had been the subject of vicious, vile, and false accusations posted on a website Defendants created for that purpose.

276.    Because of representations and directions of R.G. Brownell and John Does, Mack was unwilling to oppose Global Partners' attempts to enforce the Stock Pledge Agreement, and did not notify Mark Azzopardi, Wolfe, or any of the UBOs of the Petro Carta Trust that Global Partners was claiming ownership of 100% of the shares of Florida Access, in purported satisfaction of the "debt" that Global Partners alleged that Green Sapphire owed it.

277.    On or about December 15, 2023, Global Partners, on the direction of Springett, filed a document with the Florida Secretary of State entitled "Amended Articles of Incorporation" that identified Springett as the sole director of Florida Access, Inc. and stated that it—not Green Sapphire—was the owner of 100% of its shares.

278.    Upon information and belief, agents or brokers engaged by Global Capital, Smith, Springett, and John Does have been marketing the St. Barth's property and plan to sell it.

279.    The St. Barth's lawyer engaged by R.G. Brownell a/k/a "Bigelow" is currently

49

demanding payment of 61,000 Euros from Green Sapphire based on an Engagement Letter that "Bigelow" signed, fraudulently holding himself out as a representative of Green Sapphire.

280.    The fraudulent Green Sapphire transactions were not the culmination of the Defendants' scheme, but rather a continuation of their deliberate and escalating pattern of misconduct. Building on the harm initiated through earlier schemes, the Defendants further diversified their fraudulent strategies to include loan fraud involving Proton Green and the Cyber App. These actions were similarly designed to generate legal disputes and financial instability for the Plaintiffs, while serving the overarching goal of advancing the Defendants' coordinated campaign of harm.

### IV. Loan Fraud Involving Proton Green/Cyber App

281.    The scheme involving Proton Green and the Cyber App represents a further evolution of the Defendants' fraudulent efforts. These actions were not only calculated to exacerbate financial and reputational damage but were also integral to maintaining the Defendants' cycle of provocation and litigation. By orchestrating loan fraud tied to these entities, the Defendants expanded their reach, compounding the Plaintiffs' injuries while ensuring their schemes fed into the broader defamatory campaign.

282.    A certain Forbearance Agreement dated June 20, 2023 ("Forbearance Agreement"), obligated Alpha Carta to forbear from exercising its rights and remedies against Proton Green under three promissory notes issued by Proton Green ("Notes') as long as Proton Green paid $3 million to Alpha Carta on July 7, 2023, executed and delivered a Deed In Lieu of Foreclosure, and paid $2 million per month each month starting August 7, 2023 until the total debt of $25.2 million evidenced by the Notes was paid in full in cash. See Forbearance Agreement, a true and correct copy of which is attached hereto as **Exhibit G**. Payment of the debts evidenced by the Notes was secured by a first priority lien on real property (St. John's Field, from which Proton Green hoped to extract Helium) located in Apache County, Arizona with a fair market value in excess of $25 million.

283.    This Forbearance Agreement followed a series of events by which the Notes were dishonored. In April 2022, after Proton Green dishonored the Notes, Alpha Carta investigated

the reasons why, and discovered that Defendant Looper, the CEO and Managing Member of Proton Green, was a convicted felon, undisclosed to its investors. On the day Looper was confronted with this fact, he dissolved Proton Green, but the next month set up a new LLC under the old name, all without the knowledge of his non-insider investors.

284.     As of May 1, 2023, a notice of default was served. On June 20, 2023, Alpha Carta, and Proton Green then entered into the Forbearance Agreement. One condition of the Forbearance Agreement was that Looper would reinstate the original Proton Green and Proton Green would execute and deliver a Deed In Lieu of Foreclosure. This Deed in Lieu of Foreclosure would have enabled Alpha Carta To take full ownership of Proton Green's St. John Field in satisfaction of some or all of the debts evidenced by the Notes in the event that Proton Green breached the Forbearance Agreement. Upon information and belief, the Deed in Lieu of Foreclosure was never delivered. In 2023 Defendant Mack represented that he had possession of the Deed In Lieu of Foreclosure executed and delivered by Proton Green, but he has refused to provide it.

285.     Upon information and belief, Proton Green f/k/a/ Plateau Carbon, LLC ("Plateau Carbon") was reinstated in July 2023. On or about July 23, 2023, a reverse merger and share exchange occurred between Proton Green and Cyber App, in which Cyber App was the surviving entity, with the equity security interest holders, assets, and obligations of Proton Green f/k/a Plateau Carbon.

286.     However, as described above, notwithstanding the purported reverse merger, Proton Green has at times continued to hold itself out as an entity.

287.     Defendant Looper and Defendant Smith had equity interests in Plateau Carbon, Proton Green and Cyber App that became the basis for Rockwell claim of millions of dollars of "assets under management," that were used to entice additional investors to purchase shares of Rockwell Capital, Ltd.

288.     Defendant Smith had actual knowledge that Plaintiff Breakers had borrowed $4 million in 2021 ("the 2021 loan") from lenders Holden and Matthews ("Lenders"), each a resident of Cayman Islands and each an associate of Smith. The 2021 loan agreement, signed by Smith as the sole director of Breakers, contained a reasonable interest rate of 12%, later adjusted to 12.5% per annum. Payment of the debt was guaranteed by Alpha Carta, the sole shareholder of Breakers. Alpha Carta's guaranty was expressly approved by the trustees of the Alpha Carta Trust and supported by appropriate resolutions of Alpha Carta, Alpha Carta Trust, and signed by Smith,

as one of two directors of Prairie Trust., in its capacity as the trustee of the Alpha Carta Trust. Notice was given to the UBO of the Alpha Carta Trust. The Loan Agreement gave the Lenders an explanation of how the loan proceeds would be used and how Breakers and Alpha Carta received value in consideration for the loan. The loan proceeds were delivered in accordance with the terms of the loan agreement and the loan obligation was recorded in the books of Breakers.

289.    In August 2022, Smith's replacement as the CFO of 60 Degrees told the Lenders that Smith's employment and affiliation with Breakers and Alpha Carta, had terminated.

290.    The 2021 loan was paid in full on July 5, 2023.

291.    Proton Green failed to make the $3 million payment that was due under the Forbearance Agreement on July 7, 2023. The next day, on July 8, 2023, Smith asked the Lenders for another loan to Breakers and promised that Green Sapphire instead of Alpha Carta, would guarantee it, that it would bear interest at 30% per annum, with a 40% default rate, and would mature on October 31, 2023, with the borrower having the right to one 90-day extension (the "2023 Loan").

292.    Smith represented that he had a Green Sapphire management account bank statement, which was confidential information that should not have been retained by him after his termination, much less disclosed without authorization. Smith also represented that Green Sapphire owned the St. Barth's Property worth $12.5 million. Smith requested a 1% fee to be paid by the borrower.

293.    Smith represented to the Lenders and to Alpha Carta's representative in July 2023 that the funds to repay the loan would come from the proceeds of a pending $96 million sale of approximately 330 acres of real estate located near Austin, Texas that Green Sapphire owned and was scheduled to close on October 6, 2023; that he knew the Purchasers; and that they were legitimate buyers. Alpha Carta representatives that were not part of the conspiracy and fraudulent conduct related herein relied on these representations in deciding to enter the transaction, and Defendants R.G. Brownell, Mack, and John Does knew this representation was false but intentionally prompted other Alpha Carta personnel to believe it.

294.    The "Purchaser" Smith referred to, TRT Capital Group, LLC. ("TRT") is fictitious. There was a TRT formed in Delaware in March 2023, but it was later dissolved. The

person named "William White" (by coincidence or choice the name of the villain in Casino Royale) who ostensibly signed the Purchase Agreement on behalf of TRT, is, if anyone, a resident of a hospice in Delaware. The address given in the Purchase Agreement for the fictitious TRT is the same address for Global Partners, the supposed "Lender" in the "Loan and Security Agreement" between Green Sapphire and Global Partners, referenced in above paragraphs 127-144.

295. Cicoski executed (a) the loan agreement for the 2023 Loan as the sole director of Breaker without notice to Wolfe, the other director of Prairie Trust, trustee of Alpha Carta Trust, or the UBO, and (b) the Deed of Guarantee as one of two directors of Green Sapphire as Guarantor, again without notice to or consent of Wolfe, then still the co-director of Green Sapphire, or any UBO. See 2023 Loan Agreement and Deed of Guarantee, true and correct copies of which are attached hereto as **Exhibits H and I**, respectively.

296. At the time of the 2023 Loan and Deed of Guarantee, Green Sapphire's corporate bylaws required approval by a majority of the board of directors of (1) any guarantee of indebtedness in excess of $500,000.00, (2) any encumbrance on or security interest in any asset of Green Sapphire or its subsidiaries, and (3) any commitment that could result in payment of over $50,000.00 without the approval of all members of Green Sapphire's executive committee.

297. In August of 2023, the executive committee of Green Sapphire consisted of Cicoski and Wolfe.

298. Cicoski did not seek, and Wolfe did not grant, approval for the execution of the 2023 Loan by Breakers or the Deed of Guarantee on behalf of Green Sapphire. Had Wolfe been asked, he would not have approved either the 2023 Loan or its guaranty, and R.G. Brownell and Smith knew this.

299. In early August 2023, Smith delivered "wire instructions" to the Lenders instructing them to have the loan proceeds delivered to Mack's IOLTA Account. Smith lacked authority from Breakers to issue these wire instructions or, upon information and belief, they were provided by him based on the instructions from R.G. Brownell or a John Doe defendant. Mack lacked the authority to accept delivery of any funds that were ostensibly being "loaned" to Breakers.

300. Upon information and belief, or about August 19th, 2023, the Lenders issued a wire transfer payment order directing CIBC to electronically transfer immediately available funds in the amount of $2,900,000.00 to Mack's IOLTA account, knowing that the proceeds

were not going to be used solely for the purpose of providing working capital to Breakers as stated in the Loan Agreement. Upon information and belief, the funds in the amount of $2.9 million were credited to the IOLTA Account held in the name of Mack on August 19, 2023.

301. Mack has thus far refused repeated requests to provide all the documents and bank records related to this transaction. But he admitted that on August 23rd, 2023, he issued a $2 million wire transfer payment order to Chase Bank directing it to transfer immediately available funds in the amount of $2 million to CIBC in the Cayman Islands for credit to the account of Alpha Carta, describing its purpose as a "loan payment" from Cyber App to Alpha Carta's CIBC account in Grand Cayman. See Wire Transfer Report, a true and correct copy of which is attached hereto as **Exhibit J**.

302. Without providing the relevant records, Mack nevertheless has represented that he disbursed:

        a.      $7,231.11 for legal fees;

        b.      $750,00.00 to Defendant Salazar; and

        c.      $142,768.89 to Global Partners.

303. There is no legitimate business purpose, reasonable basis, or rationale for the transfer of the $750,000.00 Mack made to Salazar or the $142,768.89 to Global Capital Partners, and the purpose of the alleged transfer of $7,231.11 to an unidentified person ostensibly for "legal fees" is under investigation.

304. The 2023 Loan included none of the earmarks of legitimacy that the 2021 Loan exhibited, including but not limited to the following:

        a.      The proceeds of the 2023 Loan were electronically transferred by CIBC in the Cayman Islands to Chase Bank in the United States for credit to Mack IOLTA account—a third-party non-borrower who was not involved in the 2021 Loan— without any prior written direction from Breakers.

        b.      The interest rate on the 2023 Loan was exorbitant and was far higher than market rates as opposed to the commercially reasonable rate of the 2021 Loan;

        c.      No formal authentic corporate resolutions were provided;

        d.      Green Sapphire "guaranteed" the 2023 Loan despite lacking a formal relationship with Breakers or ownership of any interest in the real

property owned by Breakers, thereby deriving no benefit from the 2023 Loan;

e. Smith informed the Lenders that the proceeds of the 2023 Loan would not be used for Breakers even though the Loan Agreement expressly provided that the proceeds would be used only for working capital for Breakers "and for no other purpose," whereas the proceeds of the 2021 Loan were used for the purposes that were was clearly stated in the Loan Agreement,

f. Existence of any debt obligation and receipt of any proceeds of the 2023 Loan were not recorded on the financial books of Breakers, Green Sapphire, or any of their related entities; and

g. The proceeds of the 2023 Loan were not received by Breakers and were not used for the benefit of Breakers, Green Sapphire, or any of their related entities, but were, upon information and belief, misappropriated by Defendants Smith, Cyber App, Rockwell, Salazar, Global Partners and Looper, for their own benefit.

305. After the reverse merger, Cyber App breached the Forbearance Agreement by failing to make the $2 million payment due on September 7, 2023.

306. On or about September 20, 2023, one or more of the John Doe Defendants proposed a modification to the parties' Forbearance Agreement. Alpha Carta's sole director was presented with a proposed draft loan settlement agreement between "Proton Green" (not Cyber App) and Alpha Carta dated as of "September ___, 2023" under which "Proton Green" (not Cyber App.) would promise to pay an additional $5 million in cash, to grant a 5% overriding royalty interest in revenues derived from Helium production on its leaseholds up to $16 million, and to promise for a second time to execute and deliver a deed in lieu of foreclosure in recordable form with respect to existing leases then encumbered by the "Leasehold Deed of Trust" held by Alpha Carta See Draft Loan Settlement Agreement, a true and correct copy of which is attached hereto as **Exhibit K**. In exchange, Alpha Carta would agree to release the "Leasehold Deed of Trust" it held on Cyber App's valuable leaseholds of St. John's Field in Apache County, Arizona, forego payment of the remainder of the debt evidenced by the Notes that were the subject matter of the Forbearance Agreement, and grant a mutual release of all claims. In the event of "Proton Green's" default under the proposed Loan Settlement Agreement, Alpha Carta's obligation to

release any claims or the Leasehold Mortgage would be suspended, and Alpha Carta would be entitled to exercise of all remedies available by law under the Notes, the Forbearance Agreement, and by law.

307. While Alpha Carta's sole director was given a draft copy of the proposed Loan Settlement Agreement on September 20, 2023, he was informed that neither party had agreed to it, and Alpha Carta lacks an executed copy of any such "Loan Settlement Agreement." To date, Ryan Cicoski and Mack have been unwilling or unable to provide a fully executed version of this agreement or any other settlement agreement between Alpha Carta and Proton Green or Cyber App has refused to provide it despite requests for it and despite its oral assertion to Alpha Carta representative Wolfe on February 8, 2024, that it owes no money to Alpha Carta, because all matters between the parties were settled.

308. Upon information and belief, if there were any valid loan settlement agreement between Cyber App and Alpha Carta, it was breached before November 2, 2023, by Proton Green and/or Cyber App because Alpha Carta has not received the $5 million cash, any overriding royalty revenue, or any deed in lieu of foreclosure.

309. In the alternative, if there were no signed settlement agreement, Cyber App owes the full amount of the debt, now in excess of $30 million, as evidenced by the Notes.

310. Furthermore, Cyber App falsely recorded a Deed of Release and Reconveyance to discharge the "Leasehold Deed of Trust" that it had previously granted to secure payment of the Notes referenced in the Forbearance Agreement. The "Deed of Release and Reconveyance" was signed in anticipation of and contingent upon the formation of a final, definitive loan settlement agreement. No one from Alpha Carta, authorized the Deed of Release and Reconveyance to be delivered or recorded until and unless a final settlement agreement was executed by both parties and then delivered to Alpha Carta

311. As of February 2024, Defendants R.G. Brownell, Mack, and Whinnery represented to other Alpha Carta representatives and its UBO that debts in the total amount of more than $24 million were still owed by Cyber App. In the alternative, this shows either that

(a) no loan settlement agreement replaced the Forbearance Agreement (also making the recordation of the "Deed of Release" a fraud of Cyber App or any party that recorded it), or (b) that R.G. Brownell, Whinnery, Mack, Looper and their John Doe coconspirators concealed a

settlement and the subsequent recording of the Deed of Release in November 2023 from Alpha Carta and its UBO.

312.     Cyber App reports that it reached a Loan Settlement Agreement with Alpha Carta to settle the Notes for $8 million on July 31, 2023, months before the September 20, 2023, proposal that was not executed or agreed to. It claimed that it paid $2 million to Alpha Carta in August 2023 and in November 2023 it paid the remaining $6 million due under the terms of the Loan Settlement Agreement that was allegedly formed on July 31, 2023, recognizing a gain from the alleged forgiveness of debt of almost $18 million. Alpha Carta lacks any such Loan Settlement Agreement. Alpha Carta believes to the contrary that the negotiations were unsettled as of September 2023, and Alpha Carta has not received $8 million from Cyber App. If John Does executed such a Loan Settlement Agreement, they did so fraudulently, and Alpha Carta, has sustained damages of at least $18 million.

313.     The loan fraud involving Proton Green and the Cyber App did not operate in isolation but instead formed a critical component of the Defendants' larger fraudulent scheme. As the Defendants orchestrated these fraudulent loans, they relied on a network of manipulated financial instruments and accounts to funnel illicit proceeds, obscure their actions, and perpetuate their coordinated campaign of harm against the Plaintiffs. This broader misuse of financial mechanisms served as the operational backbone for the Defendants' fraudulent activities, tying together the various schemes under the RICO enterprise.

**V. Misuse of Financial Instruments and Accounts for Fraud**

314.     The misuse of financial instruments and accounts was not merely incidental to the Defendants' schemes but central to their execution. By manipulating these financial tools, the Defendants facilitated the loan fraud tied to Proton Green and the Cyber App, concealed illicit transactions, and extended the reach of their fraudulent enterprise. These practices underscore the calculated and systemic nature of the Defendants' operations, further entrenching the financial and reputational harm inflicted upon the Plaintiffs.

315.     To advance their scheme, Defendants manipulated financial instruments, including IOLTA trust accounts, to obscure the source and purpose of transactions. Defendant Mack used the IOLTA account to reroute Plaintiffs' funds, further hiding the nature and origins of the fraudulent transfers, allowing Defendants to maintain wrongful control over assets intended for legitimate business purposes.

316.     Plaintiff Yorkville is a Delaware corporation with its principal place of business

in Delaware. It was organized for the purpose of investing money and acquiring property for the ultimate benefit of the beneficiaries of the Petro Carta Trust.

317. Plaintiff NorthSea, a Wyoming LLC, is the Trustee of the Petro Carta Trust. The Petro Carta Trust is an express trust organized and existing under the laws of the State of Wyoming. The beneficiaries of the Petro Carta Trust are four U.S. citizens—a family consisting of a 54-year-old woman and her three children. As of January 1, 2023, NorthSea had two directors: Ryan Cicoski and Mark Azzopardi.

318. As of January 1, 2023, Green Sapphire had two directors--Wolfe and Ryan Cicoski. Smith was removed as a Director of Yorkville, in August 2021 and replaced by Ryan Cicoski; that was about the time when Ryan Cicoski discovered Smith's self-dealing and other misconduct.

319. As of January 1, 2023, Green Sapphire was the owner of all but one of the shares of Access Management, S.A. ("French Access"), a French corporation headquartered in the Territorial Collectivity of St. Barthelemy ("St. Barth's").

320. French Access, is the sole owner and record titleholder of two parcels of real estate located in St. Barth's, more particularly described as the AE 314 plot of 12,760 m2 in Colombier and the AI 220 plot of 2,676 M2 in Saint-Jean (the "St. Barth's Property"). The estimated fair market value of the St. Barth's Property is approximately $30 million.

321. Plaintiff Alpha Carta is a Cayman Islands corporation with its principal place of business in Georgetown, Grand Cayman, Cayman Islands, owned by the Alpha Carta Trust. It invests money and manages the property of the Alpha Carta Trust. The Alpha Carta Trust is an express trust organized and existing under the laws of the Cayman Islands to hold legal title to property separately from equitable title and to achieve related estate planning purposes for the benefit of its ultimate beneficial owner ("UBO"). Prairie Trust is the trustee of the Alpha Carta Trust. It is a Cayman Islands Company with its principal place of business in Georgetown, Grand Cayman, Cayman Islands.

322. On January 4, 2023, R.G. Brownell, from his Illinois office, sent an online meeting invitation to Charles-Huber Vanderoverberge, Springett (of Tailwind), Mack, and Smith (of Rockwater) to discuss structuring a secured lending transaction involving a proposed

$10 million loan to Green Sapphire, secured by a pledge of Green Sapphire's shares in Asset Management SAS.

323.    The online meeting on January 4, 2023, included a detailed discussion where Charles-Huber Vanderoverberge explained the structure of the transaction and addressed questions from Smith and Springett regarding the enforcement of the stock pledge (under applicable French law) if Green Sapphire defaulted on the loan.

324.    Later in January 2023, R.G. Brownell induced, by bribery, Green Sapphire to enter into a loan arrangement fee agreement with his company, BNW, entitling BNW to receive $2.6 million for facilitating the loan discussed in the January 4, 2023, online meeting.

325.    On or about January 17, 2023, Mack, upon information and belief, transferred $1,510,000 to BNW as partial payment of the $2.6 million loan arrangement fee outlined in the agreement.

326.    Defendants R.G. Brownell, Mack, Whinnery, and others systematically embezzled Plaintiff's corporate funds by submitting fraudulent invoices via email and directing unauthorized interstate wire transfers.

327.    Defendants' actions in transferring corporate funds into personal or unrelated accounts constitute unauthorized taking and exercise of control over Plaintiffs' assets. This wrongful control deprived Plaintiffs of their rightful possession and use of these funds, which were intended for legitimate business operations.

328.    By using Mack's IOLTA account and other trust accounts to route and reroute Plaintiffs' funds, Defendants concealed their misappropriation, disguising the purpose and ultimate destination of the funds. This manipulation demonstrates the Defendants' intent to wrongfully possess and control the Plaintiffs' assets without legal justification.

329.    The Defendants leveraged complex financial instruments, including an IOLTA trust account, to conceal the origins and purpose of illicit transactions. Defendant Mack and others rerouted significant funds, notably a $2.6 million loan fee and $520,000 from an Illinois-based account, to enable fraudulent transfers and bribes. These maneuvers allowed the Defendants to maintain wrongful control over assets meant for legitimate business uses and resulted in substantial financial harm to the Plaintiffs. These actions, involving unauthorized transactions and the concealment of funds, exemplify the Defendants' calculated efforts to misappropriate corporate resources for personal benefit, causing Stacey McHugh, then Plaintiffs'

Chief Financial Officer, to violate fiduciary duties owed to Plaintiffs, and depriving Plaintiffs of rightful asset possession.

330.     The misuse of financial instruments and accounts not only facilitated the concealment of fraudulent proceeds but also served as a foundation for additional schemes. Building upon these manipulations, the Defendants expanded their fraudulent enterprise through the systematic misuse of corporate entities. These entities were employed to issue fraudulent invoices, further complicating financial records and perpetuating the harm inflicted upon the Plaintiffs. This deliberate manipulation of corporate structures was critical to sustaining and advancing the Defendants' overarching scheme.

### VI. Manipulation of Corporate Entities for Fraudulent Invoicing

331.     The Defendants' manipulation of corporate entities to generate fraudulent invoices highlights the deliberate and calculated nature of their enterprise. By issuing falsified invoices through these entities, the Defendants created a veneer of legitimacy while further entrenching their fraudulent practices. This scheme not only obscured illicit transactions but also compounded the financial and reputational harm suffered by the Plaintiffs, reinforcing the interconnectedness of the Defendants' actions within their RICO enterprise.

332.     Defendants utilized entities such as BNW, Gold Dragon, and Katunigan to generate fictitious invoices and submit fraudulent expenses, embezzling funds from Plaintiff's accounts. By orchestrating these invoicing schemes, Defendants were able to misappropriate millions, systematically draining Plaintiff's resources and concealing the true purpose of these financial transactions.

333.     Plaintiff Breakers is a Cayman Islands company formed as a single-purpose entity to hold title to certain real property located in Grand Cayman, Cayman Islands. Alpha Carta owns 100% of the shares of Breakers. Breakers is the sole owner and record titleholder of four parcels of beachfront real property located in Grand Cayman, Cayman Islands, more particularly described as Breakers Block 56B, Parcels 14, 15, 16, and 17, totaling approximately 10 acres (the "Breaker's Property"). The current estimated fair market value of the Breakers Property is approximately $12.5 million.

334.     Defendant Looper is a convicted felon and citizen of Texas residing in Travis County. As of October 1, 2022, Looper was the CEO of Proton Green f/k/a Plateau Carbon, a Wyoming limited liability company. Proton Green engaged in a reverse merger and share

exchange on or about July 17, 2023, from which the surviving entity was Defendant Cyber App, a Nevada corporation.

335. Notwithstanding the purported reverse merger, Proton Green has continued to hold itself out as a separate entity. As a result, claims are brought both against Cyber App, as successor by merger to Proton Green, and Proton Green, to the extent it remains an existing entity.

336. Upon information and belief, Cyber App's principal place of business is in Houston, Texas.

337. Defendant R.G. Brownell is a convicted felon and a citizen and resident of Travis County, Texas. In 2015, his twenty-year prison sentence for masterminding a complex embezzlement and phony invoice scheme was reduced to ten years because he informed on (he was an informant against) other inmates, with the sentencing Judge opining that he was a changed man. The schemes alleged here, however, are strikingly similar to R.G. Brownell's prior criminal misconduct.

338. R.G. Brownell represented that he spoke for and helped manage the affairs of BNW, and stated, falsely upon information and belief, that this "Family Office" organized as a Delaware limited liability company was capitalized, owned, and guided by his brother, F. William Brownell, brother of R.G. Brownell, a well-respected EPA lawyer from Hunton and Williams, a law firm located in the District of Columbia. R.G. Brownell strategically positioned himself in the scheme by using William Brownell as a prop. He presented himself as connected to high-value clients, claiming these clients held billions of dollars ready for investment in select Family Office Trust Structure (defined below) projects. This claim enabled Brownell to insinuate himself into the arrangement, leveraging the allure of substantial financial backing. BNW initially provided consulting services under an oral agreement with Alpha Carta in connection with the management of property owned by entities in the Family Office Trust Structure that were owned or controlled by Alpha Carta. He performed his early duties well. It is clear in retrospect that for whatever reason, R.G. Brownell reverted to the type of fraud for which he went to prison. He diverted money from the entities for his own benefit or to the detriment of the entities. He falsified records. He bypassed personnel who might have noticed irregularities or opposed transactions in which he was interested. He directed actions without approval from proper authorities: the directors, trustees, and officers of the entities. He concealed critical facts about finances, negotiations, and transactions. He conspired with other felons and wrongdoers to

61

damage these entities and affiliated parties in the ways set forth below, with additional investigations ongoing.

339.     Defendant BNW is a Delaware limited liability company. While R.G. Brownell represented to Plaintiffs that his brother owned or helped control this LLC, now Plaintiffs believe that it is owned and controlled by Defendant R.G. Brownell.

340.     BNW also served as an independent contractor for 60 Degrees Group SECZ, Ltd. ("60 Degrees") under Defendant Smith as CFO until January 2022, and thereafter for Ryan Cicoski as director. 60 Degrees is a Cayman Islands corporation that provided administrative services to the entities owned or controlled by the Alpha Carta Trust, Alpha Carta, the Petro Carta Trust, NorthSea, Yorkville, Prairie II Trust and their affiliates (collectively, the "Family Office Trust Structure").

341.     Defendants engaged in fictitious and fraudulent invoicing, using entities such as BNW, Gold Dragon, and other affiliated corporations to submit false invoices. These invoices misrepresented expenses and were designed to embezzle funds from Plaintiff entities under the guise of legitimate business expenses.

342.     R.G. Brownell, Whinnery, and others coordinated through entities such as BNW and Katunigan to create and approve these fraudulent and/or inflated invoices. These invoices were then batched to obscure the final destination of funds, adding layers of concealment to their scheme.

343.     Defendants used multiple corporate alter-egos, including Terrace Shores, Gold Dragon, and BNW, as instrumentalities to conduct fraudulent activities. These entities acted as shells to insulate the Defendants from liability and allowed them to continue their fraudulent operations undeterred by legal repercussions.

344.     Defendants exploited the complex Family Office Trust Structure by securing unauthorized loans, knowing the financial instability and weakened state of entities such as Green Sapphire.

345.     R.G. Brownell submitted fraudulent and/or inflated invoices to McHugh totaling millions of dollars for services that were largely never rendered and expenses that were never incurred. These invoices were used to embezzle funds directly from the Plaintiffs' accounts, causing substantial financial damage and depleting resources intended for legitimate business operations.

346.     Defendants systematically executed a conspiracy, using entities like BNW and

Katunigan, to siphon funds from Plaintiffs through fictitious invoicing and concealed transfers. These actions directly resulted in millions of dollars of financial loss for Plaintiffs, highlighting Defendants' fraudulent strategy to drain assets from Illinois-based accounts.

347.    By creating an environment of deceit, Defendants induced reliance from Plaintiffs on fraudulent financial statements and invoices. As a result, the Plaintiffs incurred over $10 million in losses, encompassing misappropriated funds, business opportunity losses, reputational harm, and the necessity for costly investigations.

348.    Defendants received payments from entities within the Family Office Trust Structure, such as 60 Degrees and Terra Carta (a limited liability company wholly owned by Green Sapphire), due to submitting fraudulent invoices for expense reimbursements and other charges. These invoices included amounts for services that were either not rendered, inflated, or duplicated, creating a financial burden on Plaintiffs without any legitimate underlying contractual basis.

349.    The Defendants manipulated multiple corporate entities, including BNW, Gold Dragon, and Katunigan, to generate fraudulent invoices and siphon funds from the Plaintiffs. These false expenses facilitated embezzlement under the guise of legitimate business activities, systematically depleting resources and inflicting severe financial damage. Key actors, including

R.G. Brownell and others, exploited their positions within a complex Family Office Trust Structure, concealing unauthorized transactions and financial risks from stakeholders. This orchestrated conspiracy extended to the creation of shell companies, insulating Defendants from liability while executing fraudulent transfers. Plaintiffs suffered substantial financial loss, estimated at over $10 million, which encompassed misappropriated funds, lost business opportunities, reputational damage, and costly investigations resulting from this pervasive scheme.

350.    The Defendants' use of corporate entities to generate fraudulent invoices was a pivotal mechanism within their broader scheme. This manipulation of corporate structures not only facilitated the concealment of illicit transactions but also laid the groundwork for their fraudulent activities to extend into other domains. Among these was the realm of real estate, where the Defendants engaged in fraudulent transactions to further their enterprise, expand their financial reach, and perpetuate harm against the Plaintiffs.

**VII. Fraudulent Real Estate Transactions**

351.    The Defendants' fraudulent real estate transactions represented yet another

evolution in their broader scheme. By engaging in these transactions, the Defendants not only expanded their financial misconduct but also exploited real estate as a vehicle to further conceal their illicit activities. These actions were designed to amplify the financial and reputational harm inflicted upon the Plaintiffs while solidifying the interconnectedness of the Defendants' RICO enterprise.

352.     Furthering their enterprise's objectives, Defendants engaged in fraudulent real estate transactions. These actions included manipulated transfers and sham purchase agreements aimed at deceiving third parties and unlawfully seizing control over properties. Through these transactions, Defendants defrauded Plaintiffs of valuable assets, undermining legitimate ownership claims and inflating their financial gain.

353.     In late 2023, R.G. Brownell procured a written consulting agreement signed between Alpha Carta and the BNW. The BNW abruptly terminated its consulting engagement just as these frauds were being investigated, on or about February 8, 2024. The termination of this consulting relationship did not dismantle the fraudulent enterprise but instead signaled a transition where additional parties, including Whinnery and other entities, continued and intensified the orchestrated schemes.

354.     Defendant Whinnery, a convicted felon and resident of Williamson County, Texas, met Defendant R.G. Brownell in prison. Following their release, Whinnery worked closely with R.G. Brownell.

355.     R.G. Brownell, as part of BNW's consulting engagement with 60 Degrees and Alpha Carta, conducted business through various entities and corporate alter-egos, such as Katunigan. Upon information and belief, Katunigan is a Texas corporation that Whinnery used to facilitate and obscure financial transactions related to the fraudulent real estate and asset schemes.

356.     Defendant Sasaginnigak, f/k/a Overall Builders, is a Texas limited liability company. Upon information and belief, Whinnery and R.G. Brownell were key members of

Overall Builders. This entity was utilized to further the fraudulent transactions, including deceptive real estate deals and misrepresented contracts.

357.    Defendant Global Partners, a Delaware limited liability company, involved parties including Springett and Tailwind. It was leveraged as a vehicle to move and conceal assets, contributing to the layered financial maneuvering that supported the fraudulent schemes.

358.    Defendant Smith, a United States citizen residing in Georgetown, Grand Cayman, Cayman Islands, served as a director of various entities within the Family Office Trust Structure, including Prairie Trust., Yorkville, and 60 Degrees Group SEZC, Ltd. He held fiduciary roles until his removal in late 2021 for breach of trust and financial misconduct. Smith's involvement did not cease after his dismissal; instead, he shifted to managing Rockwater, a key player in continuing fraudulent schemes that spanned multiple jurisdictions and reinforced the broader strategy to misappropriate and conceal assets.

359.    Smith engaged in embezzling trust funds within the Cayman Islands, misrepresenting the nature of his financial maneuvers to conceal misconduct from the beneficiaries and stakeholders. These actions included an unauthorized purchase of a luxury vehicle and self-dealing incidents that benefited Smith's personal interests at the expense of trust assets, violating his fiduciary obligations and eroding the trust's financial stability.

360.    Smith's employment with 60 Degrees was terminated, and he was removed as a director from all of the entities in the Family Office Trust Structure for systematic self-dealing, breach of trust, and financial misconduct on or about December 31, 2021.

361.    In 2023, Smith orchestrated a sophisticated scheme under the guise of the Rockwater initiative, deliberately inflating asset values and presenting fictitious high returns to mislead investors and attract new investments. Concurrently, he engineered a fraudulent transfer scheme related to the St. Barth's Property, coordinating with other parties to misrepresent ownership and conceal financial obligations, thereby misleading stakeholders about the property's true financial status.

362.    Smith employed social engineering tactics to manipulate corporate processes, leveraging confidential information to deceive others and construct fraudulent financial frameworks. This included fabricating and backdating key documents to legitimize unauthorized transactions and secure personal gains, which undermined the integrity of internal controls and misrepresented the financial standing of related entities.

363.    Smith facilitated unauthorized high-interest loan arrangements, which were

strategically structured to prompt defaults and eventual asset forfeiture, impacting the beneficiaries' assets and defrauding Alpha Carta in its capacity as a creditor of other entities in the Family Office Trust Structure. He also redirected funds from legitimate projects under false pretenses, channeling them into complex transactions to benefit Rockwater and to obscure the origins of misappropriated assets.

364. Smith played a central role in conceiving and executing unauthorized financial transfers that spanned multiple jurisdictions, employing covert partnerships and unreported interests in offshore entities to evade detection. These maneuvers supported a broader strategy of misappropriating assets while leveraging international financial frameworks to shield fraudulent gains.

365. Defendant R.J. Brownell is a citizen of the State of Illinois, a resident of Cook County, and the son of Defendant R.G. Brownell.

366. Defendant Mack, an attorney licensed in Illinois, was a lawyer for BNW. However, throughout these interactions, Mack knowingly misrepresented to others that he was the attorney for Green Sapphire, Breakers, and Alpha Carta, in furtherance of the operations of the racketeering enterprise, led by R.G. Brownell and involving the BNW, Whinnery, Smith, and other associated wrongdoers.

367. In furtherance of this racketeering enterprise's scheme, Mack misrepresented the status of negotiations, prepared documents to support fraudulent activities, obtained signatures that he knew or should have known were unauthorized, recorded documents improperly, and engaged in money laundering through his IOLTA account to conceal the proceeds of unlawful activities.

368. At all times relevant, Mack acted under the direct instruction of R.G. Brownell, maintaining his office in the same Northbrook, Illinois building as BNW to coordinate and further the activities of the racketeering enterprise.

369. Mack submitted fraudulent and/or inflated invoices to BNW, which facilitated payments and, through a complex scheme of invoice bundling, secured reimbursement from Terra Carta or related entities. This scheme often involved the unauthorized siphoning of funds from Mack's IOLTA account, constituting a pattern of racketeering activity as defined under RICO statutes.

370. In furtherance of their racketeering enterprise, Defendants engaged in fraudulent real estate transactions, including a manipulated $250,000 transfer to Heritage Title Company

as part of a sham purchase agreement. This transaction was intended to deceive third parties and maintain control over property assets.

371. Defendants falsely claimed ownership and attempted to mortgage properties in which they held no valid interest, using sham agreements to mislead Plaintiffs and other stakeholders. This misrepresentation was part of a calculated strategy to create a façade of legitimacy around their fraudulent activities.

372. Defendants used the extensive Family Office Trust Structure, including holding companies and special purpose entities (SPEs), to funnel and conceal assets. By creating layers of ownership and control, Defendants were able to shield assets from legal scrutiny, damaging the financial integrity of 60 Degrees USA and its beneficiaries.

373. In January 2024, Cicoski caused Terra Carta and its subsidiary, High Ridge Development LLC, to transfer 340 acres of Austin property, originally valued at over $78 million, to OP Highridge for approximately $39 million. This transfer, executed without reasonably equivalent value, significantly impaired the financial solvency of Terra Carta and the High Ridge Development LLC entities.

374. Defendant Mack drafted and facilitated the execution of a fraudulent release and waiver on behalf of Terra Carta, relinquishing valuable claims against Defendants Endeavor Real Estate and Cerco which further depleted Terra Carta's financial resources and left it insolvent. The waiver was executed without receiving adequate consideration, worsening Terra Carta's financial position.

375. Defendants, including Mack, orchestrated these transfers without the approval of beneficial owners, making it impossible for Plaintiffs to recover owed amounts. This depletion of assets left Terra Carta with insufficient capital to meet its obligations and maintain its business operations.

376. Plaintiff Alpha Carta seeks to void the fraudulent transfers and recover the transferred assets or their equivalent monetary value, arguing that the lack of fair consideration and the resulting insolvency constitute grounds for recovery under the Uniform Fraudulent Transfer Act (UFTA) as enacted in relevant states.

377. Defendants Whinnery, R.G. Brownell, and Mack knowingly executed a fraudulent Purchase and Sale Agreement for the sale of 340 acres in Austin, Texas, to a shell entity, Defendant OP Highridge, for significantly less than its market value. The purpose of this transaction was to hinder, delay, or defraud Plaintiff Alpha Carta from collecting on its claims.

378.     The Defendants furthered their enterprise by engaging in fraudulent real estate transactions, including manipulated property transfers and sham purchase agreements designed to deceive stakeholders and unlawfully seize control of valuable assets. Notable examples include a $250,000 manipulated transfer to Heritage Title Company and the undervalued sale of 340 acres of Austin property, worth over $78 million, for only $39 million. These actions, executed without fair consideration, severely impacted Terra Carta's financial solvency. Key individuals, such as Mack and R.G. Brownell, orchestrated these transactions, leveraging their control over corporate governance and misrepresenting property ownership. The Defendants' use of complex trust structures and layered entities concealed true ownership and shielded assets from legal scrutiny, undermining the Plaintiffs' ability to recover assets and maintain financial integrity.

379.     The Defendants' fraudulent real estate transactions were not an isolated endpoint but a significant element of their evolving enterprise. By leveraging these transactions to obscure illicit financial activity, the Defendants set the stage for more sophisticated methods of fraud. Their scheme expanded further into the realm of unauthorized access and digital fraud, where they exploited technological vulnerabilities to misappropriate assets and perpetuate harm against the Plaintiffs. This shift to digital misconduct reflects the adaptive and calculated nature of the Defendants' coordinated efforts.

**VIII. Misappropriation through Unauthorized Access and Digital Fraud**

380.     The Defendants' activities involving unauthorized access and digital fraud represent the latest evolution in their broader scheme. Utilizing advanced technological methods, the Defendants infiltrated systems and gained unauthorized access to critical assets, enabling them to misappropriate funds and further conceal their illicit operations. These actions not only amplified the harm inflicted upon the Plaintiffs but also reinforced the interconnected nature of the Defendants' RICO enterprise by integrating digital fraud into their overarching strategy.

381.     Defendants unlawfully accessed Plaintiffs' computer systems to steal proprietary information, disrupt operations, and further their fraudulent scheme. This unauthorized digital access violated multiple provisions of the Computer Fraud and Abuse Act (CFAA), including 18 U.S.C. § 1030(a)(2)(C) for unauthorized access to obtain information and 18 U.S.C. § 1030(a)(4) for accessing with the intent to defraud. These acts are also predicate offenses under the Racketeer Influenced and Corrupt Organizations Act (RICO), contributing to predicate acts of wire fraud and digital fraud, thereby causing significant financial and operational harm to

Plaintiff.

382.　　Defendant Whinnery accessed Plaintiffs' protected computer systems without authorization to obtain confidential and proprietary information. This unauthorized access furthered fraudulent schemes, including the acquisition of business-critical data such as customer information, internal communications, and financial records. These actions were part of a sustained pattern from 2021 to 2024, supporting the continuous nature of racketeering activity required under 18 U.S.C. § 1961.

383.　　Defendant R.G. Brownell a/k/a "Bigelow" directed activities utilizing stolen digital credentials to facilitate unauthorized access to Plaintiffs' systems. This access enabled the manipulation of Plaintiffs' business records and digital platforms, resulting in disrupted operations and misrepresentations in Plaintiffs' business dealings. These acts constitute violations of 18 U.S.C. § 1030(a)(4) and contribute to wire fraud under 18 U.S.C. § 1343.

384.　　Defendant Mack provided technical support for unauthorized access and the manipulation of Plaintiffs' digital infrastructure. His involvement included configuring and maintaining access channels for other Defendants, enabling them to exploit Plaintiffs' computer systems and gain unauthorized control over sensitive data without detection. This facilitation was essential to the enterprise's scheme to disguise the source and purpose of their fraudulent activities, directly linking to the RICO enterprise.

385.　　Defendants collectively accessed Plaintiffs' computer systems with the intent to defraud Plaintiffs and third parties. This included misappropriating digital credentials and using stolen data to conduct unauthorized transactions and manipulate the Plaintiffs' internal records. These acts were part of the Defendants' concerted effort to conceal fraudulent activities and the true scope of their enterprise operations, further contributing to predicate acts of wire fraud under RICO.

386.　　As a direct result of Defendants' unauthorized access and related activities, Plaintiffs incurred damages exceeding $5,000 within a single year, as detailed in 18 U.S.C. § 1030(c)(4)(A)(i)(I). These damages included costs associated with investigating the breaches, implementing enhanced security measures, and recovering lost data. The disruption of Plaintiffs' business and the permanent loss of proprietary information constituted significant financial harm, exacerbating Plaintiffs' operational difficulties and impeding ongoing business initiatives.

387.　　Defendants republished baseless allegations from the Susan Essex Complaint

across multiple websites, including a site registered on September 11, 2023, and another launched in January 2024. These websites prominently featured defamatory and false statements about Plaintiff Wolfe, intending to damage his personal and professional reputation. This act of digital fraud also served to mislead third parties, contributing to further financial and reputational harm under 18 U.S.C. § 1962(c).

388.    Defendants coordinated the dissemination of defamatory content with malicious intent, employing techniques such as "doxing" to publish Plaintiff Wolfe's personal information and incite harassment. This strategy aimed to tarnish Wolfe's professional image within the Family Office Trust Structure and dissuade potential partners from engaging with Plaintiff, further illustrating Defendants' use of digital platforms for extortion and reputation damage as part of their RICO activities.

389.    Investigations linked the IP addresses and contact information used for the Susan Essex Complaint and the defamatory websites to Defendants Looper and Whinnery. This provided concrete evidence of their direct involvement in the publication and dissemination of false statements, supporting claims of wire fraud and digital fraud under 18 U.S.C. §§ 1343 and 1962.

390.    Defendants engaged in unauthorized access to Plaintiffs' computer systems, violating the Computer Fraud and Abuse Act (CFAA) and contributing to predicate acts under RICO. Key perpetrators, including Whinnery and R.G. Brownell, accessed confidential information and manipulated business records, causing significant operational disruptions and financial harm. Mack facilitated this digital breach by maintaining unauthorized access channels, enabling continuous exploitation of the Plaintiffs' systems. Additionally, Defendants disseminated defamatory content through various online platforms, harming Plaintiff Wolfe's reputation and deterring potential partnerships. This coordinated effort, including doxing and digital harassment, underscores the Defendants' intent to use digital tools for fraud, extortion, and reputation damage, resulting in substantial financial losses and operational setbacks for Plaintiffs.

391.    The Defendants' use of unauthorized access and digital fraud underscored their willingness to exploit vulnerabilities for personal gain. However, this digital misconduct was not limited to external breaches; it also involved exploiting trusted positions within the Plaintiffs' organizational structure. A prime example of this is Smith's breach of fiduciary duties, where he leveraged his insider role to advance the Defendants' schemes, enabling

further misappropriation and deepening the harm inflicted upon the Plaintiffs.

### IX. Smith's Breach of Fiduciary Duties

392.    Smith's breach of fiduciary duties was a critical component of the Defendants'
coordinated scheme. By exploiting his position of trust within the Plaintiffs' organizational
framework, Smith facilitated unauthorized transactions, misused sensitive information, and
enabled further fraudulent activities. These breaches were not isolated incidents but integral to the
Defendants' broader strategy to undermine the Plaintiffs' financial stability and operational
integrity.

393.    Plaintiffs entrusted Smith with fulfilling his fiduciary duties as Chief Financial
Officer of the Family Office Trust Structure and as a director for various entities within the
Family Office Trust Structure, including Green Sapphire and Breakers. Additionally, Smith
owed fiduciary duties to Plaintiff Prairie Trust, in its capacity as Trustee of the Alpha Carta
Trust.

394.    Defendant Smith, as former Chief Financial Officer, trustee, and director within
the Family Office Trust Structure, held fiduciary and confidentiality obligations that extended
beyond the duration of his formal employment and roles. These duties, owed to the entities,
included the duty to refrain from disclosing or misusing any confidential, proprietary, or strategic
information acquired during his tenure. By virtue of his previous positions, Smith possessed
sensitive, non-public information regarding the entities' assets, investments, and strategic plans,
entrusted to him with the expectation of continued discretion and loyalty.

395.    Despite his removal as CFO, trustee, and director, Defendant Smith's duties of
confidentiality, loyalty, and fiduciary responsibility did not cease upon his departure but remained
enforceable thereafter. The misuse and unauthorized disclosure of this information for Smith's
pecuniary interest constitutes a breach of these enduring fiduciary duties, contributing to a pattern
of racketeering activity as part of a civil RICO enterprise, causing significant harm to the entities.

396.    Defendant Smith, while acting in a position of trust, wrongfully used confidential
information obtained from his fiduciary position to facilitate the corporate infiltration of the
Family Office Trust Structure and related entities. Smith disclosed sensitive trust and financial
data to unauthorized third parties, including Matthews, Holden, R.G. Brownell, and Mack,
enabling them to manipulate internal structures and exploit weaknesses for their own benefit. This
disclosure constituted an act of corporate espionage that supported further misappropriation of
assets and was integral to the execution of the RICO scheme, which damaged the Plaintiffs'

competitive standing.

397.    Payments issued by Plaintiffs were made in response to Defendants' manipulation of financial records and submission of false documentation, leading to unjust enrichment. This manipulation was a component of the broader racketeering scheme aimed at extracting financial benefits from Plaintiffs' entities through deception and fraudulent invoicing.

398.    Defendants continue to retain these financial benefits without providing any lawful justification for the funds received. These benefits were obtained at Plaintiffs' expense, and the Defendants' retention of these amounts, gained through fraudulent conduct as part of the racketeering enterprise, results in their unjust enrichment under the circumstances.

399.    Manipulating financial records and submitting fraudulent invoices facilitated embezzlement through entities such as BNW and Katunigan, resulting in significant financial harm to Plaintiffs and reinforcing the continuity of the RICO enterprise.

400.    Payments made by Plaintiffs to BNW were based on falsified documentation, unjustly enriching the racketeering enterprise at the expense of Plaintiffs. The racketeering enterprise retained these benefits without lawful justification, exemplifying a betrayal of trust that has destabilized the financial foundation of the Family Office Trust Structure.

401.    Smith's breach of fiduciary duties was a key element of the Defendants' broader scheme, enabling them to exploit internal systems and relationships for personal gain. However, this misconduct was further compounded by deliberate efforts to conceal assets and obstruct financial recovery. By strategically hiding assets and impeding the Plaintiffs' attempts to reclaim misappropriated funds, the Defendants ensured that the harm caused by these breaches would persist and escalate.

### X. Asset Concealment and Obstruction of Financial Recovery

402.    The concealment of assets and obstruction of financial recovery represents one of the most insidious elements of the Defendants' enterprise. By employing complex schemes to hide misappropriated funds and hinder recovery efforts, the Defendants ensured the continued financial harm of the Plaintiffs. These actions not only demonstrate their calculated intent but also underscore the interconnected nature of their fraudulent activities, which combined to obstruct justice and evade accountability.

403.    Defendants employed additional corporate alter-egos such as Defendants Katunigan and Terrace Shores to issue fictitious invoices and batch reimbursement requests, creating a layered and obfuscated process for concealing misappropriated funds. This

systematic use of corporate shells furthered the Defendants' racketeering activities.

404. In an effort to intimidate and silence opposition, Defendants filed a fraudulent lawsuit under the alias "Susan Essex," aimed at discrediting a key Plaintiff's director through defamatory allegations. This lawsuit exemplifies the Defendants' use of legal processes as tools for extortion, seeking to coerce favorable settlements.

405. In August 2022, under the alias "Susan Essex," Defendant Whinnery filed a fraudulent complaint in DuPage County, Illinois, falsely accusing Plaintiff Wolfe of engaging in illicit and defamatory acts. This complaint was dismissed for want of prosecution but was later used as a foundation for subsequent defamatory publications.

406. Defendants maintained a pattern of negligent supervision and lack of oversight by employing individuals with known histories of fraud, including R.G. Brownell. By retaining individuals with a demonstrated propensity for fraudulent conduct, Defendants enabled repeated fraudulent acts within the Family Office Trust Structure, further harming Plaintiffs.

407. Plaintiffs are entitled to restitution from Defendants, requiring them to disgorge all funds and assets obtained through the fraudulent activities described above. The establishment of a constructive trust over wrongfully obtained assets is necessary to ensure the recovery of funds that Defendants unjustly retain at Plaintiffs' expense.

408. As a direct and proximate result of Defendants' actions, Plaintiffs suffered financial harm, including significant business interruptions, investigatory expenses, and losses exceeding $5,000,000. These losses arose from the conversion of both funds and critical business records needed for operations and financial reporting.

409. Defendants utilized corporate alter-egos, such as Defendants Katunigan and Terrace Shores, to conceal the misappropriation of funds through fictitious invoicing and complex reimbursement processes. This deliberate obfuscation furthered their racketeering activities. To silence dissent and intimidate key stakeholders, Defendants filed a fraudulent lawsuit under the alias "Susan Essex," accusing Plaintiff Wolfe of defamatory and illicit acts. Despite being dismissed, this lawsuit fueled subsequent defamatory efforts to damage reputations and disrupt the Plaintiffs' operations. Additionally, negligent supervision and the employment of individuals with known fraudulent histories, like R.G. Brownell, perpetuated these schemes. Plaintiffs seek restitution and the establishment of a constructive trust to recover wrongfully obtained assets, highlighting significant financial and operational losses exceeding $5 million due to the conversion of critical funds and records.

410. The concealment of assets and obstruction of financial recovery were not merely independent acts of misconduct but integral components of the Defendants' broader racketeering enterprise. These deliberate efforts to obscure the origins and locations of misappropriated funds, combined with the obstruction of recovery attempts, exemplify the calculated and continuous nature of their unlawful activities. Together, these actions reveal a sustained pattern of racketeering that underpins the Defendants' overarching criminal enterprise.

## XI. Pattern of Racketeering Activity and Predicate Acts

411. The Defendants' pattern of racketeering activity is evident through the interconnected and continuous nature of their fraudulent schemes. From asset concealment and obstruction of financial recovery to a series of predicate acts encompassing fraud, extortion, and digital misconduct, their actions demonstrate a deliberate and coordinated enterprise. This pattern reflects a calculated strategy to defraud the Plaintiffs, evade accountability, and perpetuate the harm inflicted upon them.

412. The Defendants' activities, spanning from 2021 to 2024, demonstrate a consistent and organized pattern of racketeering, with each act contributing to the enterprise's goal of defrauding Plaintiffs and obstructing lawful recovery. These actions, including loan fraud, escrow misappropriations, unauthorized transactions, and defamatory publications, caused Plaintiffs financial harm exceeding $10,000,000, substantiating a sustained RICO claim.

413. On or about December 28, 2022, Weber Group Management, Inc., ("Weber") purportedly submitted a supposed building inspection report and mold report on the Hale Property (defined below).

414. On or about January 10, 2023, Kissa Capital, LLC ("Kissa"), a real estate investment entity for the law firm of Hunton, Andrews, Kurth ("HAK"), 200 Park Avenue, New York, NY, purportedly wrote a letter to Defendant Mack indicating that it had completed its inspection of the Hale Property, including the estimated cost of remediation. In that letter, Kissa reportedly stated, "Now that we have a cost estimate of the rehab and remediation the number is far more substantial than we originally estimated…Kissa Capital, LLC is terminating the Agreement and requesting a return of the earnest money deposit…Kissa Capital, LLC would consider purchasing the Property in its current condition for an amount equal to $4,000,000." This ended the "correspondence."

415. All communications between "Kissa" and Plaintiff Yorkville regarding the

proposed "sale" of the Hale Property were relayed to Yorkville through either Defendants Mack or R.G. Brownell.

416.    To date, Yorkville's investigation, which is ongoing, has been unable to determine whether, from whom, or how the earnest money payment of $50,000.00 from Kissa was deposited or, if deposited, its source and ultimate destination. Despite repeated requests, defendant Mack has failed to supply the relevant information, although he has repeatedly promised to do so at some future unstated date when he finds the time.

417.    The "Kissa" Letter of January 10, 2023, attached an estimate for asbestos remediation dated August 13, 2022, with a purported expiration date of August 27, 2022, addressed to Yorkville from R.J. Brownell—R.G. Brownell's son—of "Overall Builders."

418.    Therefore, the purported August 2022 remediation estimate was generated over four months before Kissa's alleged inspection, and several weeks before R.G. Brownell introduced Kissa to Yorkville as a potential buyer for the Hale Property.

419.    The Overall Builders report estimated remediation of asbestos, lead based paint, and mold would cost $342,000.00.

420.    Among other predicate acts, Defendants interfered with a project involving the U.S. Tennis Association (USTA). Terra Carta (Green Sapphire's subsidiary) had positioned itself to secure a transformative business opportunity by potentially hosting the USTA Regional Headquarters on its 300-acre property located near Austin, Texas (the "Austin Property"). This project was critical to Terra Carta's long-term strategy, offering substantial economic and strategic benefits, including the creation of a national sports destination, a catalyst for local development, and a hub for sports tourism.

421.    Defendants, through a coordinated scheme of corporate espionage, engaged in the theft of confidential trade secrets and business information belonging to Plaintiffs, including critical GPS data and strategic information about the USTA Regional Headquarters project. This proprietary information was essential for the Plaintiffs' competitive positioning and future business opportunities.

422.    Defendants deliberately undermined Plaintiffs' USTA Regional Headquarters project, a highly valuable business opportunity, by gaining control of the Austin Property using fraudulently acquired information. This act deprived the Plaintiffs of the economic benefits that would have arisen from establishing the property as a national sports destination, thereby causing significant financial and reputational harm.

423.     Defendant Mack participated in drafting fraudulent letters of intent and contracts from his Illinois office, which misrepresented the sale of the Austin Property to an unrelated third party at a substantially lower value. This fraudulent transaction caused the Plaintiffs to lose not only the property's market value but also strategic business opportunities tied to its development.

424.     In addition, Defendants engaged in creating defamatory websites and disseminating false information about Plaintiff's key business leaders, particularly targeting Wolfe. This misinformation campaign aimed to damage Plaintiff's business relationships, dissuade potential partners, and disrupt ongoing negotiations.

425.     Defendants created counterfeit earnest money deposits to obscure the fraudulent nature of the transaction and to misappropriate funds. This misrepresentation to third parties enabled the sale of the property at a fraction of its appraised value, directly harming Plaintiff's financial interests.

426.     Cicoski caused Terra Carta to grant a release and waiver of claims against Endeavor Real Estate and related parties, knowing that Terra Carta was insolvent at the time or became insolvent as a result. This release was granted without adequate compensation, depriving Plaintiff of a valuable asset without receiving equivalent value in return.

427.     As a direct and proximate result of these fraudulent transfers, Plaintiff Alpha Carta suffered substantial financial losses, including the depletion of assets, loss of valuable claims, and impairment of Alpha Carta's ability to collect on its debt.

428.     The Defendants' actions from 2021 to 2024 exemplify a sustained and coordinated pattern of racketeering activity aimed at defrauding Plaintiffs and obstructing lawful asset recovery. This scheme included fraudulent property sales, unauthorized transactions, the submission of counterfeit documents, and the misappropriation of funds. Key acts involved falsified asbestos and mold remediation reports, misuse of corporate entities for asset diversion, and the deliberate undermining of strategic business opportunities, such as the USTA Regional Headquarters project. Defendants also engaged in defamatory campaigns and digital espionage, stealing confidential trade secrets to gain competitive advantages. The culmination of these predicate acts under RICO, including wire fraud and digital fraud, resulted in substantial financial harm and asset depletion for Plaintiff Alpha Carta, exceeding $10 million in losses and impairing its ability to recover debts.

429.     The Defendants' pattern of racketeering activity and predicate acts reveals a meticulously coordinated effort to inflict widespread harm on the Plaintiffs. These interconnected

schemes, marked by fraud, obstruction, and asset concealment, have collectively caused significant financial, operational, and reputational damage. The cumulative impact of these actions underscores the gravity of the harm inflicted upon the Plaintiffs and serves as a foundation for quantifying the damages they have sustained.

## XII. Summary of Damages to Plaintiff

430.     The damages inflicted upon the Plaintiffs by the Defendants' coordinated racketeering enterprise are extensive and multifaceted. These include substantial financial losses, operational disruptions, reputational harm, and the incurrence of significant investigative and legal costs. This summary outlines the full scope of damages suffered by the Plaintiffs as a direct result of the Defendants' fraudulent activities, emphasizing the need for comprehensive restitution and relief.

431.     Financial Losses: Plaintiff suffered substantial financial losses as a direct and proximate result of Defendants' coordinated fraudulent activities. These losses include the misappropriation of funds, unauthorized wire transfers, and fraudulent loan arrangements, which collectively amount to millions of dollars in damages.

432.     Business Disruptions: Defendants' actions significantly disrupted Plaintiffs' business operations. Unauthorized access to Plaintiffs' systems, manipulation of records, and the diversion of corporate funds hindered essential functions, causing operational delays, project interruptions, and a substantial depletion of resources needed for ongoing and future business ventures.

433.     Reputational Harm: Defendants engaged in defamatory actions aimed at damaging Plaintiffs' reputations within the business community and with potential partners. This reputational harm has not only strained the Plaintiffs' relationships with key stakeholders but has also limited future opportunities, reducing the Plaintiffs' market competitiveness and business standing.

434.     Investigative and Security Costs: Plaintiffs incurred substantial costs to investigate the breadth of Defendants' scheme, secure its digital infrastructure, and recover proprietary information compromised by Defendants' unauthorized access. These costs include expenses for forensic analysis, legal investigations, and enhanced security measures to protect against future misconduct.

435.     Cumulative Impact on Plaintiffs: The collective impact of Defendants' actions has had a devastating effect on Plaintiffs' financial position, operational stability, and reputation.

These damages are inextricably linked to the Defendants' pattern of racketeering activity and other predicate acts as described under RICO, and Plaintiffs seek compensation, including treble damages, attorney fees, and injunctive relief, to remedy the extensive harm caused.

436.    Plaintiffs suffered significant financial and operational harm due to Defendants' coordinated fraudulent activities. Financial losses include the misappropriation of funds, unauthorized wire transfers, and fraudulent loan arrangements, totaling millions of dollars. Business operations were severely disrupted by unauthorized access, record manipulation, and fund diversions, leading to project delays and resource depletion. Additionally, Defendants' defamatory actions caused reputational damage, straining relationships with stakeholders and limiting future opportunities. The Plaintiffs also incurred substantial investigative and security costs to uncover the extent of the scheme and bolster defenses against future misconduct. The cumulative impact of these actions has destabilized Plaintiffs' financial position, operational integrity, and market reputation, warranting compensation, including treble damages, attorney fees, and injunctive relief under RICO provisions.

437.    The extensive damages suffered by the Plaintiffs underscore the pervasive and deliberate nature of the Defendants' coordinated enterprise. These harms, encompassing financial, operational, and reputational losses, did not arise from isolated incidents but from a carefully orchestrated scheme. To fully understand the breadth of this enterprise, it is essential to examine the overarching fraudulent framework through which the Defendants executed their unlawful activities.

### XIII. Overview of Defendants' Coordinated Fraudulent Scheme

438.    The Defendants' fraudulent scheme was meticulously planned and executed, encompassing a range of interconnected activities designed to defraud the Plaintiffs and obscure their misconduct. This overview provides a comprehensive analysis of the scheme, detailing the methods employed, the coordination among the Defendants, and the overarching intent to undermine the Plaintiffs' financial and operational stability.

439.    Defendants engaged in a systematic scheme involving coordinated acts of fraud, encompassing loan fraud, escrow fraud, and defamation, among others. This network operated as a continuous unit, organized to defraud Plaintiff and prevent lawful asset recovery. The enterprise's structure allowed each Defendant to contribute to a unified objective, using specialized roles to execute their fraudulent schemes.

440.    Beginning on or about February 2024, Plaintiffs discovered a series of fraudulent

schemes in which Defendants R.G. Brownell, Smith, Rockwater, Springett, Tailwind, Looper, Proton Green, Mack, Salazar, and Whinnery, as well as their related entities and others working at their behest, conspired among themselves and conceived of a plan to systematically loot money and property of Plaintiffs by means of fraud, money laundering, breach of fiduciary duty, abuse of process, identity theft, cyber harassment, fraudulent sales, fictitious lawsuits, and other wrongful conduct.

441.    By these schemes, the Defendants (a) created a purchase contract with a fake purchaser; (b) falsified an asbestos report related to this property; (c) filed a fictitious lawsuit falsely alleging sex crimes filed with the Illinois Circuit Court; (d) published their fictitious Complaint on multiple websites with the intent to weaponize the Illinois judicial system; (e) set up a false claim for control of two parcels of real estate located in St. Barth's; and (f) set up false loans or loans whose proceeds were received by one or more of the Defendants.

442.    This is an integrated, ongoing scheme orchestrated by ex-convicts, officers terminated for misconduct, and their allies working in concert for a common purpose.

443.    Plaintiff Wolfe is an experienced financial services professional and citizen of DuPage County, Illinois, with a decades-long professional association with Co-Plaintiffs.

444.    Plaintiff Yorkville, is a Delaware limited liability company with its principal place of business in Wheaton, Illinois. It is owned by the Prairie II Trust, a Cayman Islands Trust. Its beneficiaries are the same as the beneficiaries of the Petro Carta Trust. Plaintiff Prairie Trust is the Trustee of the Prairie II Trust.

445.    Defendants engaged in a coordinated scheme involving multiple acts of fraud, including loan fraud, escrow fraud, bank fraud, assignment fraud, mortgage fraud, money laundering, obstruction of justice, and defamation. Each of these acts constituted a predicate act under 18 U.S.C. § 1961(1) and was part of a broader effort to defraud Plaintiff and prevent lawful recovery of assets.

446.    On or about March 15, 2023, Defendant R.G. Brownell, using his position within BNW, orchestrated an interstate wire transfer of more than $500,000.00 from an Illinois-based account under the control of Yorkville to an offshore account in the Cayman Islands. This transfer, facilitated without board authorization or legitimate business purpose, was intended to obscure the funds' origin and deprive Plaintiffs of rightful control over assets. Through email communications on March 10, 2023, R.G. Brownell misrepresented the nature of this transaction as a 'consulting fee,' providing false invoices to conceal the misappropriated funds. This illustrates the bribery and

inducement scheme orchestrated by R.G. Brownell, who used various corrupt tactics to achieve his aims. R.G. Brownell's methods included offering bribes and engaging in illicit inducements such as property theft and arranging kickbacks, all carefully designed to manipulate outcomes in his favor.

447. Defendants utilized an IOLTA trust account to facilitate their scheme, routing and rerouting funds through it to obscure their fraudulent origins and disguise the nature of transactions. Defendant Mack's use of the IOLTA account served to conceal the financial activities of the enterprise and prevent detection.

448. The Defendants' coordinated actions, including communication, coordination meetings, and systematic execution of their roles, allowed the enterprise to operate as a continuous, organized unit. The Defendants' cooperation and directed resources enabled them to execute fraudulent acts with precision, furthering their scheme to defraud Plaintiff and obstruct lawful financial recovery efforts.

449. The Defendants' activities spanned from 2021 to 2024, demonstrating a sustained pattern of racketeering activity as defined under 18 U.S.C. § 1961(5). This pattern of related predicate acts, all committed in furtherance of the enterprise's fraudulent objectives, shows a deliberate and coordinated scheme aimed at defrauding Plaintiff, obstructing lawful collection efforts, and protecting the enterprise's assets.

450. The predicate acts, including fraudulent loan arrangements, escrow misappropriations, unauthorized transactions, and defamatory lawsuits, were causally connected to Plaintiff's injuries. These actions contributed to Plaintiff's financial losses exceeding $10,000,000, which included reputational damage, business disruption, and a substantial loss of goodwill.

451. The Defendants orchestrated a complex and continuous scheme from 2021 to 2024, marked by systematic acts of fraud, including loan fraud, escrow manipulation, and defamation. This sophisticated operation, involving ex-convicts and individuals with professional misconduct records, aimed to defraud Plaintiffs and obstruct lawful asset recovery through an array of fraudulent practices, such as falsified legal documents and unauthorized financial transactions. Utilizing an IOLTA trust account to obscure financial activity, the Defendants effectively concealed the origins and destinations of misappropriated funds. This pattern of coordinated racketeering activity led to over $10 million in damages for Plaintiffs, encompassing financial loss, reputational harm, and significant business disruption.

**COUNT I - FEDERAL CIVIL RICO (18 U.S.C. § 1962(c)**

**All Defendants**

452. Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

453. This claim arises under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c), which prohibits conducting or participating, directly or indirectly, in the conduct of an enterprise's affairs through a pattern of racketeering activity. Defendants engaged in a scheme involving multiple, continuous acts of fraud, including loan fraud, escrow fraud, bank fraud, assignment fraud, mortgage fraud, money laundering, obstruction of justice, and defamation—all of which are predicate acts under 18 U.S.C. § 1961(1).

454. At all relevant times, each Defendant qualifies as a "person" within the meaning of 18 U.S.C. § 1961(3) and was capable of holding a legal or beneficial interest in property.

455. Defendants R.G. Brownell, Whinnery, Mack, BNW, Global Capital, Proton Green, Smith, Rockwater, and other known and unknown co-conspirators formed an enterprise under 18 U.S.C. § 1961(4). This enterprise operated as an association-in-fact, structured with distinct roles, a hierarchy, and defined functions that allowed the Defendants to collectively execute and maintain their fraudulent scheme. The shared purpose of this enterprise was to defraud Plaintiff and other victims through complex financial maneuvers, deceptive property transfers, and digital impersonations, thereby obstructing Plaintiff's ability to collect on claims and recover losses.

456. The enterprise functioned with a clear structure and designated roles among Defendants, which allowed for coordinated and sustained criminal activity. Specifically:

    a. Defendant R.G. Brownell acted as the financial coordinator, overseeing the direction of funds within the enterprise and organizing multiple fraudulent loan agreements. His role included fabricating terms and orchestrating misrepresentations to financial institutions to induce reliance and secure fraudulent financing;

    b. Defendant Whinnery, using various aliases, managed the transfer and concealment of funds through layers of transactions. He was responsible for falsifying documents and providing misleading information to escrow agents and investors, which concealed the enterprise's activities from oversight and accountability;

    c.     Defendant Mack served as the intermediary and logistics manager for the enterprise's financial operations. He facilitated the obscuring of identities and the movement of funds through layered and circular transfers, providing a crucial mechanism for the Defendants to disguise the true nature and destination of fraudulent proceeds; and

    d.     Defendants BNW, Global Capital, Proton Green, and other affiliated entities acted as instrumental vehicles for laundering the proceeds of the fraudulent schemes and concealing the enterprise's operational reach. These entities were strategically established and utilized to ensure a seamless flow of illicit gains while shielding Defendants from direct liability.

457. To further their fraudulent objectives, the Defendants engaged in regular communication, coordination meetings, and systematic execution of assigned roles. The enterprise operated as a continuous, organized unit that presented an ongoing threat of future racketeering activity. By consistently directing resources, generating false documentation, and coordinating complex transfers across jurisdictions, the enterprise was able to execute each fraudulent act with precision and evade detection. The Defendants exhibited clear cooperation, with each member acting in furtherance of the enterprise's unified purpose to defraud Plaintiff and undermine lawful financial recovery efforts.

458. Between 2021 and 2024, Defendants engaged in a sustained pattern of racketeering activity as defined under 18 U.S.C. § 1961(5), involving numerous related predicate acts, all of which were committed in furtherance of the enterprise's fraudulent objectives. This pattern, spanning multiple years, demonstrates a deliberate and coordinated scheme aimed at defrauding Plaintiff and protecting the enterprise's assets from lawful collection efforts. The Defendants' actions were not isolated incidents but rather part of a continuous, interconnected series of fraudulent activities intended to hinder, delay, and obstruct Plaintiff's ability to recover its rightful claims.

459. The predicate acts constituting this pattern include:

    a.     Loan Fraud: Defendants, led by R.G. Brownell and Whinnery, executed multiple fraudulent loans, including a $2.9 million loan (the Breakers Loan) in September 2023 by fabricating terms to induce

default, a $4 million loan with falsified financials on July 26, 2023, and a $10 million loan (the Green Sapphire Loan) in February 2023 backed by falsified collateral, all designed to facilitate control over Plaintiff's assets.

b.   Escrow Fraud: Whinnery and Mack coordinated the misappropriation of escrow funds by disguising these funds as consulting fees in July 2024, diverting funds for unauthorized purposes in April 2023, and falsifying account statements in January 2024, deceiving stakeholders and concealing the true financial state of the enterprise.

c.   Money Laundering and Fund Transfers: Mack oversaw complex, multi-layered fund transfers, including a $7.1 million circular transaction in February 2023 and a $520,000 routing through offshore accounts in July 2024. These transactions further concealed the origins and flow of funds within the enterprise, ensuring the continuity of fraudulent activities while obscuring the paper trail.

d.   Kickbacks and Bribes (18 U.S.C. § 1341, 18 U.S.C. § 1343, 18 U.S.C. § 1956): Defendants funneled disguised bribes as "consulting fees" from 2021 through 2024, securing cooperation in the enterprise's illicit schemes.

e.   Money Laundering (18 U.S.C. § 1956): Defendants conducted complex, multi- layered transfers, including a $7.1 million circular transaction in February 2023, a $332,000 follow-up through BNW, and a $520,000 routing through offshore accounts in July 2024 to obscure the origin and nature of funds.

f.   Wire Fraud (18 U.S.C. § 1343): Defendants repeatedly misclassified and falsified wire transfers, including a $7.1 million transfer in February 2023 as consulting fees and falsified loan applications in June 2023 to secure financing under fraudulent pretenses.

g.   Bank Fraud (18 U.S.C. § 1344): Defendants misrepresented transaction details to financial institutions, including a manipulated bank transaction in September 2023 and fraudulent financial records in April 2024 to secure loans.

    h.      Obstruction of Justice (18 U.S.C. § 1503, 18 U.S.C. § 1512): Defendants tampered with ownership records on August 7, 2024, filed false court documents on September 13, 2024, and executed a forbearance agreement in June 2024 to delay enforcement actions against the enterprise.

    i.      Defamation and Extortion (18 U.S.C. § 875, 18 U.S.C. § 1513): Defendants initiated a baseless lawsuit under the alias "Susan Essex" on January 3, 2024, disseminating defamatory allegations and sent defamatory emails in September 2024 to coerce settlements.

    j.      Interstate and Foreign Travel in Aid of Racketeering (18 U.S.C. § 1952): Defendants executed cross-border fraudulent transactions, including a $10 million loan transaction with Green Sapphire on February 16, 2023, and additional international transfers in 2024 to support laundering schemes.

    k.      Additional Wire Fraud and Money Laundering: From 2023 to 2024, Defendants created circular transfers totaling $8.6 million to hinder investigation efforts and obscure illicit proceeds.

460.    Defendants directly participated in the conduct of the enterprise's affairs by directing, managing, and facilitating fraudulent acts. Each Defendant's participation involved coordinating financial transfers, document falsification, and obstructive actions to ensure a steady flow of illicit gains to enterprise members.

461.    The fraudulent acts listed were causally connected to Plaintiff's injuries, as each type of predicate act contributed to Plaintiff's financial losses exceeding $10,000,000. These losses stemmed from fraudulent loan arrangements, escrow misappropriations, and unauthorized transactions, causing substantial reputational damage, business disruption, and loss of goodwill.

462.    Plaintiff was directly and proximately harmed by Defendants' conduct as outlined in 18 U.S.C. § 1964(c) and seeks treble damages for financial harm, recovery of reasonable attorney fees and costs, and injunctive relief prohibiting Defendants from further fraudulent conduct. Plaintiff also requests any additional relief the Court deems just and proper to prevent further harm.

**COUNT II - FEDERAL CIVIL RICO CONSPIRACY (18 U.S.C. § 1962(d))**

**All Defendants**

463.     Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

464.     This action arises under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(d), which makes it unlawful for any person to conspire to violate the provisions of 18 U.S.C. § 1962(c). Defendants Whinnery, R.G. Brownell (also known as Robert Bigelow), Mack, BNW, Global Capital, Proton Green, Smith, Rockwater, and others conspired to engage in a pattern of racketeering activity, including loan fraud, escrow fraud, bank fraud, assignment fraud, and mortgage fraud, among other predicate acts, all aimed at defrauding Plaintiffs and others through a coordinated enterprise.

465.     Beginning no later than August 2021 and continuing through at least June 2024, Defendants knowingly and willfully entered into an agreement to facilitate the operations of a fraudulent enterprise. The purpose of the conspiracy was to violate 18 U.S.C. § 1962(c) by conducting or participating, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity. Defendants agreed to collaborate to achieve their unlawful objectives by concealing the true ownership of assets, executing fraudulent financial transactions, falsifying corporate records, and using digital impersonations to deceive third parties.

466.     In furtherance of the conspiracy, Defendants committed numerous overt acts, including but not limited to:

a.     Fraudulent Loan Transactions: On September 21, 2021, Defendants orchestrated a fraudulent loan from Kips Bay Select LP to Plateau Carbon, employing misrepresentations and falsified documents to induce reliance by financial institutions. In July 2023, Defendants submitted falsified financial information to secure a $2.9 million loan (Breakers Loan), misrepresenting financial conditions to induce the loan. On February 16, 2023, Defendants executed a sham $10 million loan (the Green Sapphire Loan) secured by fabricated collateral in the St. Barths Property, aiming to control and misappropriate Plaintiff's assets.

b.     Manipulation of Corporate Records: On August 13, 2021, Defendants  manipulated corporate records to replace directors of Yorkville, disguising their control over corporate assets. Throughout

2023 and 2024, Defendants continued to falsify corporate filings to mislead creditors and regulatory authorities, masking true ownership and control.

c.   Creation of False Legal Documents: In February 2023, Defendants prepared sham collateral documents related to the $10 million Green Sapphire Loan for the St. Barths Property, intending to deceive financial institutions regarding the security of the loan. Defendants repeatedly prepared falsified escrow account statements and legal documents, misleading stakeholders regarding fund balances and collateral security.

d.   Digital Impersonation: Defendants engaged in digital impersonation of Plaintiff's business operations, misrepresenting their roles and authorities in digital Communications to third parties to manipulate business relationships and fraudulently gain control over Plaintiff's assets.

467.   Each Defendant was aware of and knowingly participated in the conspiracy to violate 18 U.S.C. § 1962(c). Defendants understood that their coordinated actions were part of a broader scheme to defraud Plaintiff and utilize the enterprise for illegal activities. Each Defendant knowingly performed or aided in committing multiple predicate acts in furtherance of the conspiracy, including:

a.   Extortion, Defamation-Related Acts, Interstate Mail Fraud, and Hobbs Act Violations (18 U.S.C. §§ 875, 1341, 1513, 1951): Defendants engaged in a systematic and coordinated campaign of extortion and coercion aimed at undermining Plaintiff's business operations and extracting financial concessions. This scheme included filing a fictitious "Susan Essex" lawsuit in August 2022, with the intent to harass, defame, and inflict reputational damage upon Plaintiffs to force settlements under duress. On September 3, 2024, Defendants escalated these efforts by transmitting defamatory and threatening communications through fraudulent accounts, including emails and phone calls that explicitly stated intentions to disseminate false information about Plaintiffs' business dealings

86

unless substantial payments or compliance with their demands were made. These threats were bolstered by two defamatory websites and an anonymous letter sent to Wolfe in July 2023, the content of which was echoed in posts made on the websites, further amplifying the pressure on Plaintiffs and supporting the scheme's credibility.

b.  Furthermore, Defendants utilized interstate mail to circulate defamatory and fraudulent materials that reached third parties across state lines, amplifying the pressure on Plaintiffs and extending the damaging reach of their extortionate tactics. These actions were part of a calculated strategy to induce fear and compliance, violating the Hobbs Act (18 U.S.C. § 1951), which prohibits robbery, extortion, and conspiracies to commit those crimes that affect interstate or foreign commerce, by seeking to obtain property and financial concessions through coercive means. The conduct demonstrates the coordinated and malicious intent of the racketeering enterprise to exploit Plaintiff's vulnerability, disrupt business stability, and gain unjust financial advantage. The interstate nature of the communications and threats underscores the far-reaching impact on the Plaintiffs' ability to conduct business, fulfill contracts, and maintain a reputable standing across the country.

c.  Loan Fraud (18 U.S.C. § 1344, 18 U.S.C. § 1014): Defendants orchestrated fraudulent loans, including a $2.9 million loan involving Proton Green on September 7, 2023, intended to induce default and enable asset seizure. They also submitted false financial information to secure a $4 million loan in July 2023 and executed a sham $10 million loan (the Green Sapphire Loan) with falsified collateral in February 2023.

d.  Escrow Fraud (18 U.S.C. § 1343, 18 U.S.C. § 1956): Defendants conspired to disguise misappropriated escrow funds as consulting fees in July 2024, diverted escrow funds for unauthorized purposes in April 2023, and provided false escrow account balance information in January 2024 to deceive stakeholders.

e.  Assignment Fraud and Interstate Mail Fraud (18 U.S.C. § 1341, 18 U.S.C. § 1343): In March 2023, Defendants fraudulently assigned interests in Florida Access without proper authorization, using interstate mail to transmit false documents to stakeholders. These mailings misrepresented the ownership and control of assets, deceiving creditors and investors. In June 2024, Defendants engaged in further fraudulent activity by mailing reassigned promissory notes across state lines. In September 2023, they also transferred a lien on the St. Barths Property using mailed documents with fraudulent information to mislead stakeholders.

f.  Kickback Payments (18 U.S.C. § 1341, 18 U.S.C. § 1343, 18 U.S.C. § 1956):

g.  Between 2021 and 2024, Defendants issued and accepted disguised kickbacks totaling approximately $580,000 to secure cooperation and approvals necessary for the enterprise's fraudulent operations, including payments masked as consulting fees.

h.  Money Laundering (18 U.S.C. § 1956): Defendants engaged in circular fund transfers to obscure funds' origins, such as the $7.1 million transfer in February2023, followed by a $332,000 transfer through BNW. From July 27-31, 2024, they routed $520,000 through offshore accounts to further conceal illicit proceeds.

i.  Wire Fraud (18 U.S.C. § 1343): Defendants employed wire communications to misrepresent and conceal the nature of transactions. On February 23, 2023, Defendants misclassified a $7.1 million transfer as consulting fees, and on February 24, 2023, provided false wire instructions, concealing the fraudulent purpose. In June 2023, they electronically falsified loan applications to secure financing.

j.  Bank Fraud (18 U.S.C. § 1344): Defendants provided false transaction descriptions to banks in September 2023 to mislead financial institutions and obtained fraudulent loans using misleading financial statements in April 2024.

k.      Obstruction of Justice (18 U.S.C. § 1503, 18 U.S.C. § 1512):

Defendants altered ownership records on August 7, 2024, to conceal

the enterprise's interests in certain assets and filed false amended

court documents on September 13, 2024, to delay and interfere with

legal proceedings. In June 2024, they executed a forbearance

agreement to obstruct enforcement actions.

468.     As a direct and proximate result of the Defendants' conspiracy and their violations

of 18 U.S.C. § 1962(d), the Plaintiffs suffered significant financial and reputational damages,

including financial losses exceeding $10,000,000 due to fraudulent loans, diversion of funds, and

unauthorized transactions. Plaintiffs' business goodwill and reputation were further damaged due

to Defendants' ongoing misrepresentations and interference with Plaintiffs' control over assets.

469.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs seek treble damages for the financial

harm caused by Defendants' conspiracy to engage in racketeering activity, recovery of reasonable

attorney fees and costs, injunctive relief to prevent Defendants from continuing their fraudulent

practices, and any additional relief deemed just and proper by the Court.

### COUNT III - VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT (CFAA) (18 U.S.C. § 1030)
#### Whinnery, R.G. Brownell, Mack

470.     This action arises under the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. §

1030, which prohibits unauthorized access to protected computers and using such access to further

fraudulent schemes, obtain information, or cause damage. Defendants Whinnery, R.G. Brownell,

and Mack knowingly accessed Plaintiffs' protected computer systems without authorization or

exceeded authorized access, resulting in significant damage and loss to Plaintiffs.

471.     At all relevant times, Plaintiffs operated a business that utilized computer systems,

servers, and data storage devices for legitimate business purposes. These systems contained

confidential, proprietary, and business-critical information, including, but not limited to, customer

data, business operations, financial records, and internal communication platforms. The computer

systems are "protected computers" within the meaning of 18 U.S.C. § 1030(e)(2)(B) as they are

used in or affecting interstate or foreign commerce or  communication.

472.     Defendants accessed Plaintiffs' protected computer systems without authorization,

or exceeded their authorized access, for purposes not permitted by Plaintiffs, including but not

limited to: Whinnery accessing systems to steal confidential information, R.G. Brownell directing

activities that utilized stolen digital credentials, and Mack providing technical support for

unauthorized access and manipulation of Plaintiffs' digital infrastructure.

473.     Defendants engaged in the unauthorized access and use of Plaintiffs' computer systems with the intent to defraud Plaintiffs and third parties, and to benefit from the stolen information and misappropriated digital credentials. Defendants' actions were undertaken with the aim of misrepresenting Plaintiffs' business through unauthorized websites, conducting unauthorized transactions, and manipulating business records to conceal their fraudulent activities.

474.     As a direct result of Defendants' violations of 18 U.S.C. § 1030(a), Plaintiffs suffered damages and losses exceeding $5,000 within a one-year period, including but not limited to: costs of investigating the unauthorized access, expenses for implementing enhanced security measures, disruption of business operations, and the permanent loss of confidential and proprietary data.

475.     Defendants' conduct constitutes a violation of multiple subsections of 18 U.S.C. § 1030(a), including: § 1030(a)(2)(C) for unauthorized access to obtain information, § 1030(a)(4) for access with intent to defraud, § 1030(a)(5)(A) for causing damage through transmission of code, and § 1030(a)(5)(B) and (C) for recklessly causing damage through unauthorized access.

476.     Pursuant to 18 U.S.C. § 1030(g), Plaintiffs seek compensatory damages for economic losses resulting from Defendants' violations, injunctive relief to prevent further unauthorized access, punitive damages to deter similar conduct, reasonable attorney fees and costs, and such other relief as the Court deems just and proper.

## COUNT IV - UNJUST ENRICHMENT (ALTERNATIVE TO RESCISSION)
### All Defendants

477.     This claim arises as an alternative to other remedies, including rescission (*see* Claim XXVI below). It seeks to recover benefits unjustly obtained by Defendants, which cannot be adequately addressed through contractual remedies alone. Defendants have wrongfully gained financial and other benefits at the expense of Plaintiffs through fraudulent transactions and manipulative conduct.

478.     Defendants, including Whinnery, R.G. Brownell, and Mack, received substantial benefits through fraudulent transfers, financial transactions, and the improper use of Plaintiffs' business identity and resources. These actions included orchestrating unauthorized transfers of funds and misusing the Plaintiff's digital credentials to conduct activities that resulted in financial enrichment.

479.     The benefits received by Defendants were obtained without a valid legal basis and in violation of equitable principles. Defendants' actions have resulted in significant financial loss to Plaintiffs, while Defendants have retained the profits, funds, and assets gained through their misconduct. Retention of these benefits by Defendants would result in their unjust enrichment under the circumstances, as they were gained through fraudulent means and unauthorized use of Plaintiffs' resources.

480.     As an alternative to the remedies sought in other claims, Plaintiffs seek restitution, requiring Defendants to disgorge all benefits and funds obtained at Plaintiffs' expense, the imposition of a constructive trust over any funds or property wrongfully obtained by Defendants, and such other equitable relief as the Court deems just and appropriate to remedy the harm suffered by Plaintiffs.

## COUNT V - CONVERSION

### All Defendants

479.     This claim arises from Defendants' wrongful taking and control over Plaintiffs' property and funds without consent or legal justification. Defendants have exercised dominion and control over Plaintiffs' assets, including money, confidential data, real property, and personal property, thereby depriving Plaintiffs of their rightful ownership and use of these assets.

481.     Defendants, including Whinnery, R.G. Brownell, and Mack, took possession of or exerted control over Plaintiffs' property through the misappropriation of funds, seizure of confidential business data, and control over physical assets. These actions included directing unauthorized transfers of funds, accessing and taking proprietary data, and withholding property despite the Plaintiffs' demands for its return.

482.     Defendants' actions constitute conversion because they wrongfully exercised dominion and control over Plaintiffs' property, deprived Plaintiffs of their right to possession of its funds, data, and physical property, and refused to return or account for the property after demands for its return were made by Plaintiffs.

483.     As a direct and proximate result of Defendants' acts of conversion, Plaintiffs suffered significant damages, including but not limited to: financial loss exceeding $5,000,000 from the converted funds, impairment to business operations due to loss of business records and data, and substantial costs incurred in efforts to recover the converted property and investigate Defendants' actions.

484.     Plaintiffs seek compensatory damages for the full value of the converted property,

punitive damages due to the willful and malicious nature of Defendants' actions, an order compelling the return of all converted property, and such other relief as the Court deems just and appropriate, including costs and attorney fees associated with the prosecution of this claim.

## COUNT VI – TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE (DETAILED)
### All Defendants

485.    This claim arises from Defendants' deliberate and wrongful interference with Plaintiffs' specific business relationships and opportunities, which would have resulted in significant future economic benefits. The Defendants' actions were intended to disrupt the Plaintiffs' economic interests and to gain an unfair competitive advantage for themselves and entities under their control.

486.    Plaintiffs had legitimate expectations of maintaining and developing valuable business relationships and contracts with third parties, including ongoing negotiations with investors and business partners for potential contracts and collaborations that would have significantly contributed to its revenue and growth. These opportunities included negotiations for real estate developments, financing arrangements, and strategic alliances, as well as efforts to maintain and expand its customer base.

487.    Defendants, including R.G. Brownell and Mack, engaged in intentional and wrongful conduct designed to interfere with Plaintiffs' business relationships and economic opportunities. The conduct encompassed making misrepresentations, as well as disseminating false, disparaging, and defamatory statements that significantly undermined the trust and reputation of the Plaintiffs. It further included establishing fraudulent websites to divert business opportunities and offering misleading information during contract negotiations and contract performance to disrupt Plaintiffs' business dealings.

488.    Defendants' interference with Plaintiffs' prospective economic relationships was unjustified, malicious, and undertaken solely to harm Plaintiffs' business interests and to secure economic advantages for themselves and their controlled entities. Defendants acted without any legitimate business reason and with knowledge of the probable disruption to Plaintiffs' business activities.

489.    As a direct and proximate result of Defendants' tortious interference with Plaintiffs' prospective economic advantage, Plaintiffs suffered substantial damages, including the loss of business contracts and partnerships, a diminished market share, and harm to Plaintiffs' reputations, making it more difficult to engage with potential business partners and investors in

the future.

490.     Plaintiffs seek compensatory damages for the loss of business opportunities, punitive damages due to the willful and malicious nature of Defendants' conduct, injunctive relief to prevent further interference, and such other relief as the Court deems just and appropriate, including attorney fees and costs associated with the prosecution of this claim.

## COUNT VII – CONSTRUCTIVE FRAUDULENT TRANSFER
### Endeavor Real Estate, Cerco, OP Highridge

489.     This claim arises under applicable fraudulent transfer statutes, including the Uniform Fraudulent Transfer Act (UFTA) as enacted in Illinois, Texas, or other relevant state law, based on the premise that certain transfers made by Defendants were fraudulent as to Plaintiff Alpha Carta because they were made by the transferor without receiving reasonably equivalent value in return while the transferor was insolvent or which caused the transferor to become insolvent.

491.     Defendants, including Whinnery, R.G. Brownell, and Mack, engaged in several transfers of assets, including the sale of 340 acres of land in Austin, Texas (the Austin Property), owned by subsidiaries of Terra Carta known as the Highridge Development LLCs. This property was valued at over $78 million, yet it was sold for $39 million to Defendant OP Highridge, resulting in the insolvency of the Highridge Development LLCs and deepening the insolvency of Terra Carta and Green Sapphire.

492.     In addition to the fraudulent transfer of the real property owned by the Highridge Development LLCs, Cicoski caused Terra Carta to execute and deliver an unconditional release and waiver of certain claims against Defendant Endeavor Real Estate and related parties ("the Release").

493.     Terra Carta was insolvent at the time of the granting of the Release or it became insolvent as a result of the granting of the Release.

494.     At the time it granted the Release, Terra Carta possessed meritorious and valuable claims against Endeavor Real Estate and related parties, including Defendant Cerco arising out of and related to the development agreement between Terra Carta and Cerco dated January 2022.

495.     Terra Carta received less than the equivalent value in exchange for granting the release.

496.     At the time of the transfers, the High Ridge Development LLCs and the transferors became insolvent or were left with unreasonably small capital to continue their

business operations. The transfers caused a significant depletion of assets, directly impairing the Plaintiffs' ability to recover the amounts owed.

497.     Plaintiff Alpha Carta seeks an order avoiding the fraudulent transfers of real property and the Release, and directing that the transferred assets or their equivalent value in money be recovered by Alpha Carta.

## COUNT VIII – INTENTIONALLY FRAUDULENT TRANSFER

### Endeavor Real Estate, Cerco, OP Highridge

496.     This claim arises under applicable fraudulent transfer statutes, including the Uniform Fraudulent Transfer Act (UFTA) or other relevant state law, based on the premise that Defendants were the recipients of certain transfers of interest and property that were made with the actual intent to hinder, delay, or defraud Alpha Carta in its capacity as a creditor of the transferor.

498.     Defendants, including Whinnery, R.G. Brownell, Mack, and others, engaged in a deliberate scheme to transfer assets with the intent to defraud Plaintiffs. These actions included executing a sham Purchase and Sale Agreement to sell 340 acres of land in Austin, Texas (the Austin Property), to a shell company, creating counterfeit earnest money deposits to misappropriate funds, and misrepresenting Plaintiffs' business to third parties to facilitate the sale of the property below its appraised value.

499.     Defendants' actions were taken with the actual intent to hinder, delay, or defraud Plaintiffs by transferring assets in a manner that concealed the true nature of the transactions, obstructed Plaintiffs' ability to recover its claims, and enriched Defendants at Plaintiffs' expense. Defendants employed a pattern of concealment through the use of shell entities and false documents, timing their actions to prevent Plaintiffs from recovering their rightful assets.

500.     Defendants Cero Development, Endeavor Real Estate, and OP Highridge knowingly participated in the fraudulent transfer, but the transferors received the real property from the Highridge Development LLCs and the release with actual intent to hinder, delay, or defraud Alpha Carta in its capacity as creditor of Green Sapphire and Terra Carta.

501.     Plaintiffs seek an order voiding the fraudulent transfers and restoring the assets or their equivalent value, the imposition of a constructive trust over the fraudulently transferred assets, compensatory and punitive damages due to the willful and malicious nature of Defendants' actions, injunctive relief to prevent further transfers, and such other relief as the Court deems just and appropriate, including costs and attorney fees.

## COUNT IX – COMMERCIAL DISPARAGEMENT

**Whinnery, R.G. Brownell, Smith, Looper**

502.     Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

503.     This claim arises under Illinois law, which recognizes commercial disparagement (also known as trade libel) as a cause of action to remedy harm caused by false statements made about a business or an individual's business reputation with the intent to damage their economic interests and standing in the professional community. The elements of commercial disparagement include:

      a.    Publication of disparaging statements to a third party;

      b.    Falsity of the statements made;

      c.    Malice or Negligence by the Defendant in making the statements without regard for their truthfulness; and

      d.    Special Damages suffered by the Plaintiff as a result of the disparagement.

504.     Defendants Looper and Whinnery, along with other co-conspirators, engaged in the publication of false and disparaging statements about Plaintiff Wolfe to third parties through multiple channels:

      a.    The Filing of the Susan Essex Complaint: In August 2022, an anonymous individual under the alias "Susan Essex" filed a complaint in DuPage County, Illinois against Plaintiff Wolfe. This complaint contained baseless, scandalous accusations, including allegations of criminal activity and adultery, calculated to damage Plaintiff Wolfe's personal and professional reputation and collect an unlawful debt.

      b.    Website Publications: In October 2023, these false allegations were republished on the First Website, registered on September 11, 2023. This website was specifically designed to defame, harass, and "dox" Plaintiff Wolfe, publishing personal information, including his name, telephone number, home address, and employment details, all without consent.

505.     The statements made by Defendants Whinnery, R.G. Brownell, Smith, and Looper were entirely false and unsubstantiated, including:

a.  Fabricated Allegations: The Susan Essex Complaint, filed by Defendants under the false name "Susan Essex," alleged Plaintiff Wolfe engaged in criminal conduct and adultery. These allegations were baseless, intended solely to malign Plaintiff Wolfe's reputation, and had no factual support.

b.  Malicious Intent in Content Creation: The First Website, followed by the Second Website in January 2024, republished these false allegations in detail, adding inflammatory language and comments designed to incite harassment and harm against Plaintiff Wolfe.

506.    Defendants Whinnery, R.G. Brownell, Smith, and Looper acted with actual malice, intending to harm Plaintiff Wolfe's professional reputation and standing, or, at minimum, demonstrated a reckless disregard for the truth:

a.  Anonymous and Deceptive Filings: The Susan Essex Complaint was filed using a fictitious address linked to a women's shelter, a non-functional phone number, and a fake email address. The investigation linked these to Defendants Looper and Whinnery, showing deliberate concealment of their identities to avoid accountability.

b.  Coordination Between Filing and Website: Investigation revealed that the IP address and phone number associated with the Susan Essex Complaint were also used to create and maintain the First Website, linking Defendants Looper and Whinnery to both the defamatory filing and its publication.

c.  Bad Faith in Republishing False Claims: In January 2024, after the court sealed the Susan Essex Complaint, Defendants Looper and Whinnery created the Second Website, hosted internationally, to evade jurisdictional oversight and continue their defamatory campaign against Plaintiff Wolfe.

507.    As a direct and proximate result of Defendants Whinnery, R.G. Brownell, Smith, and Looper's false statements and disparaging publications, Plaintiff Wolfe suffered substantial and measurable harm:

a.  Damage to Professional Reputation: The repeated publication of

96

defamatory content and Plaintiff Wolfe's association with alleged criminal conduct severely harmed his standing within the Family Office Trust Structure, affecting his role as Trustee and Director.

b.　　Loss of Business Relationships: The defamatory publications impacted Plaintiff Wolfe's professional relationships with banks, lenders, and other business partners, who viewed the fabricated allegations as credible and damaging, leading to the loss of business opportunities and harm to his professional network.

c.　　Mental Distress and Safety Concerns: The websites, through doxing tactics, encouraged the public to contact, harass, and potentially harm Plaintiff Wolfe, exposing him and his family to serious security risks and psychological distress.

508.　　Defendants Looper and Whinnery are directly implicated in this disparagement scheme based on the following evidence:

a.　　The IP address and phone number used to file the Susan Essex Complaint were traced to the same source as the First Website's registration.

a.　　Defendant Looper's former residence was listed as the registration address for the First Website, and investigation revealed that Defendant Whinnery provided the email address used in connection with filing the Susan Essex Complaint.

b.　　Following Plaintiff Wolfe's subpoena, records produced by the website registrar and email host confirmed Defendants' association with the alias "David Xanthan," used to register the First Website.

509.　　Plaintiff Wolfe respectfully requests that the Court award:

a.　　Compensatory damages for the economic harm and reputational damage caused by Defendants' false statements and defamatory publications;

b.　　Punitive damages to deter Defendants Whinnery, R.G. Brownell, Smith, and Looper from engaging in similar harmful and malicious conduct in the future;

c.　　Injunctive relief to prevent further publication of defamatory

statements by Defendants; and;

d.     Any additional relief deemed just and proper by the Court.

## COUNT X – INTENTIONALLY FRAUDULENT TRANSFER
**Against Holden, Matthews, Salazar, Tailwind, Proton Green**

510.     Plaintiff Alpha Carta, a secured creditor of Plaintiff Breakers, brings this claim for the avoidance of intentional fraudulent transfer under applicable Illinois law, alleging that Defendants Holden, Matthews, Salazar, Tailwind, and Proton Green orchestrated a scheme to fraudulently transfer assets from Breakers with the actual intent to hinder, delay, or defraud Alpha Carta in collecting on its $3.5 million secured claim.

511.     As of July 5, 2023, Alpha Carta held a $3.5 million secured claim against Breakers. Shortly thereafter, Defendants Matthews and Holden initiated a series of asset transfers designed to divert Breakers' valuable assets and funds beyond Alpha Carta's reach. Defendant Holden, Matthews, Salazar, Tailwind, and Proton Green's actions were strategically aimed at depleting Breakers' assets to frustrate Alpha Carta's efforts to recover its debt, with key elements of this scheme facilitated by Proton Green, Smith, Mack, R.G. Brownell, Salazar, and Looper.

512.     The facts evidencing Defendants' actual intent to hinder, delay, or defraud Alpha Carta include the following. Around June 23, 2023, Cicoski manipulated or coerced Breakers' sole director, Wolfe, into appointing him as the new sole director. This shift in control provided Cicoski with direct authority over Breakers' assets, enabling him to orchestrate transfers intended to impair Alpha Carta's secured position. This change occurred shortly before Alpha Carta's $3.5 million payment to Matthews and Holden in satisfaction of Breakers' antecedent debt, making Alpha Carta a secured creditor by means of subrogation under applicable Cayman Islands law.

513.     The facts demonstrating Defendant Holden, Matthews, Salazar, Tailwind, and Proton Green's actual intent to hinder, delay, or defraud Alpha Carta include the following. On or around June 23, 2023, a shift in Breakers' management occurred when Wolfe, the sole director, appointed a new director, effectively altering the control over Breakers' assets. This transition facilitated decisions that enabled asset transfers intentionally designed to destroy the value of Alpha Carta's subrogation rights. This change in directorship took place shortly before Alpha Carta made a $3.5 million payment to Matthews and Holden, which satisfied Breakers' antecedent debt and established Alpha Carta as a secured creditor through subrogation under applicable Cayman Islands law.

514.     Defendants Holden, Matthews, Salazar, Tailwind, and Proton Green orchestrated a

fraudulent loan and diversion scheme, involving a $2.9 million "loan" ostensibly made to Breakers. This transaction, dated around August 19, 2023, was part of a coordinated effort among Smith, R.G. Brownell, Mack, Looper, and Salazar. The $2.9 million was received by Mack, who quickly redirected it to or for the benefit of Proton Green, thereby stripping Breakers of the resources necessary to satisfy its obligations to Alpha Carta. Smith facilitated this fraudulent transfer by issuing wire instructions to Matthews and Holden, directing them to move the funds into Mack's IOLTA account. Mack subsequently distributed these funds by transferring $750,000 to Salazar, approximately $200,000 to Tailwind, and $2 million to or for the benefit of Proton Green, effectively diverting Breakers' funds to these Defendants.

515.    In August 2023, Breakers fraudulently granted charges on their real property in the Cayman Islands to Matthews and Holden to secure the $2.9 million loan, with the specific intent of depriving Alpha Carta of the value of its first priority charge obtained by subrogation on July 5, 2023.

516.    Defendants Holden, Matthews, Salazar, Tailwind, and Proton Green systematically depleted Alpha Carta of valuable assets by imposing encumbrances and transferring interests in critical properties to affiliated entities, thus demonstrating multiple "badges of fraud" commonly recognized in fraudulent transfer cases. One such example is Defendant Holden, Matthews, Salazar, Tailwind, and Proton Green's imposition of a lease on Breakers' Buda Property, which obstructed Alpha Carta's ability to access or liquidate this asset to satisfy its claim. In addition, Defendants compelled Green Sapphire to pledge its shares in Florida Access and directed Florida Access to mortgage its St. Barth Property, thereby impairing Alpha Carta's collateral and diminishing Alpha Carta's recovery prospects. Furthermore, additional entities linked to Breakers, were encumbered, further diminishing Alpha Carta's ability to recover on its debt through related entities.

517.    Breakers, with clear, premeditated intent to hinder, delay, or defraud Alpha Carta transferred charges on its real property to Matthews and Holden. Its actions were calculated to place the real property beyond Alpha Carta's reach as a subrogor, deliberately impairing the value of Alpha Carta's subrogation rights.

518.    The scheme exhibits multiple well-recognized "badges of fraud," serving as circumstantial evidence of Breakers' actual intent to hinder, delay, or defraud Alpha Carta as a creditor by subrogation:

        a.    Breakers transferred assets to Matthews and Holden without

any legitimate business justification.

b.   This transfer was deliberately concealed from Alpha Carta.

c.   At the time of the transfer, Breakers was either already

insolvent or rendered insolvent as a result.

d.   Breakers did not receive any value in return for the transfer.

519.   As part of the racketeering enterprise, Defendants imposed encumbrances on Breakers' property to obstruct Alpha Carta's ability to collect and liquidate Breakers' assets, thereby satisfying its secured claim. This obstruction further impaired Alpha Carta's cash flow, limiting its ability to finance litigation and preserve its legal rights.

520.   Under Cicoski's direction, Defendants Matthews and Holden diverted Breakers' real estate and monetary assets through nominal loans, which were subsequently redirected to parties affiliated with the racketeering enterprise, thereby obstructing Alpha Carta's access to these assets.

521.   Through these actions, Defendants directly obstructed Alpha Carta's ability to collect on its claim by depriving it of access to assets essential to recovery, thereby impairing Alpha Carta's position as a secured creditor.

522.   Plaintiff Alpha Carta seeks the following relief. Alpha Carta seeks a court order voiding the fraudulent transfers and encumbrances placed on Breakers' assets, restoring those assets to Breakers to satisfy Alpha Carta's secured claim. Additionally, Alpha Carta seeks compensatory damages equal to the value of the fraudulently transferred and encumbered assets, along with any additional relief deemed just and proper by the Court.

**COUNT XI – ILLINOIS TRADE SECRETS ACT MISAPPROPRIATION**
**Against All Defendants**

523.   Plaintiffs reallege and reincorporate each preceding paragraph as if specifically set forth herein.

524.   Plaintiffs have confidential and proprietary information that constitutes trade secrets under the Illinois Trade Secrets Act, 75 ILCS 1065 *et. seq.* ("ITSA"). Plaintiffs possess highly sensitive and proprietary information, including business strategies, financial forecasts, and operational processes, all of which qualify as trade secrets under the Illinois Trade Secrets Act. This information, central to Plaintiffs' competitive advantage in the Illinois market, was safeguarded through stringent internal policies and access restrictions.

525.   Defendants, including Smith, unlawfully accessed, disclosed, and misused

Plaintiffs' trade secrets for personal and competitive gain, leveraging positions within the corporate structure to gain unauthorized access. Smith, in particular, exploited his prior fiduciary role as Chief Financial Officer and director within entities of the Family Office Trust Structure to facilitate this misappropriation. His actions involved the dissemination of sensitive business strategies, financial projections, and operational processes for the benefit of Defendant Rockwater and related entities, violating both contractual and statutory obligations.

526.    Smith's unauthorized use and disclosure of these trade secrets enabled the association-in-fact-criminal enterprise to replicate Plaintiffs' business methodologies to loot assets from the Family Office Trust Structure causing substantial business losses.

527.    Plaintiffs have undertaken reasonable efforts and instituted reasonable precautions to protect the confidentiality of its proprietary, confidential and trade secret information.

528.    Defendants have misappropriated trade secrets in violation of ITSA. Defendants' misappropriation has endangered Plaintiffs and exposes Plaintiffs to immediate and irreparable harm for which there is no adequate remedy at law.

529.    Defendants' misappropriation has also caused and will continue to cause Plaintiffs to suffer monetary damages and legal costs to be determined at trial.

### COUNT XII – DEFALCATION IN A FIDUCIARY CAPACITY
#### Against Smith

530.    Plaintiffs reallege and reincorporate each preceding paragraph as if specifically set forth herein.

531.    At all relevant times, Defendant Smith held fiduciary roles by virtue of his positions within entities related to Plaintiffs, including as a director and financial overseer, thereby owing fiduciary duties of loyalty, care, and good faith to the Plaintiffs.

532.    As a fiduciary, Smith had a legal obligation to act in the best interest of the Plaintiffs, manage assets prudently, and avoid conflicts of interest.

533.    Smith breached his fiduciary duties by engaging in defalcation, specifically by:

      a.    Facilitating and enabling the misappropriation of substantial trust assets, including redirecting funds for unauthorized use;

      b.    Manipulating and orchestrating high-interest loan agreements structured to benefit him personally while jeopardizing the Plaintiffs' financial standing;

      c.    Falsifying or backdating documentation to legitimize unauthorized

transactions and conceal misappropriated funds; and

d.　Engaging in covert agreements with creditors of Alpha Carta and Breakers to further misappropriate assets and compromise Plaintiffs' interests.

534.　Smith's actions constitute defalcation, involving willful and intentional mismanagement, concealment, and unauthorized diversion of assets which were under his fiduciary control.

535.　As a direct and proximate result of Smith's breaches of fiduciary duty and acts of defalcation, Plaintiffs have suffered substantial damages, including financial losses, erosion of asset value, and lost business opportunities.

536.　Plaintiffs are entitled to compensatory damages in an amount to be determined at trial, representing the financial harm caused by Smith's defalcation.

537.　Plaintiffs also seek punitive damages due to Smith's willful and intentional breach of fiduciary duties, to punish Smith and deter similar future misconduct.

**COUNT XIII – FRAUD**
**Yorkville v. R.G. Brownell**

538.　Plaintiffs reallege and reincorporate each preceding paragraph as if specifically set forth herein.

539.　R.G. Brownell knowingly made numerous false statements to Yorkville including, but not limited to, the following:

a.　That Kissa was a potential buyer of the Hale Property;

b.　That Weber Group Management reported asbestos, lead-based paint, and mold requiring remediation at the Hale Property; and,

c.　That remediation of the alleged asbestos at the Hale Property would cost nearly $400,000.00.

540.　These intentional misrepresentations by R.G. Brownell were made with the intent to induce Yorkville to act in reliance on the truth of the matters asserted:

a.　As part of a calculated scheme to deprive Yorkville of its assets and resources, constituting a predicate act under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961(1);

b.　To facilitate and conceal the broader enterprise's goal of creating problematic financial obligations for Plaintiff Yorkville,

demonstrating the enterprise's pattern of racketeering activity;

c.  To generate additional controversy that could be weaponized and publicized, furthering the objectives of the enterprise and causing reputational damage to Yorkville and its affiliated entities in the Family Office Trust Structure.

541.    Yorkville reasonably relied on R.G. Brownell's intentional misrepresentations of material fact, including but not limited to the misrepresentation that Kissa had executed the PSA and was ready, willing, and able to purchase the Hale Property for a price of $5 million as set forth in the PSA.

542.    As a result of its reliance on these intentional misrepresentations of material facts by R.G. Brownell, Yorkville suffered significant damages. These include expenses incurred on the fabricated Kissa purchase and a debt obligation under the agreement to buy out Armstrong's equity interest in the Hale Property at an inflated price. This debt obligation exemplifies the harm and financial loss that constitute injury due to the RICO enterprise, emphasizing the proximate cause between R.G. Brownell's fraudulent acts and the damages suffered by Yorkville.

543.    The foregoing actions of Defendant were and continue to be willful, wanton, intentional, reckless, and/or done in bad faith in violation of Plaintiff's rights. These acts align with the pattern of predicate activities outlined in the broader RICO enterprise, demonstrating continuity, coordination, and the intent to maintain the enterprise's unlawful financial advantage.

544.    The fraudulent acts by Defendant R.G. Brownell were part of an ongoing scheme to defraud and conceal, supporting the elements of racketeering by showing how such acts facilitated the enterprise's operations. The coordination of these misrepresentations with other acts of fraud and financial manipulation within the RICO framework underscores the interconnected nature of the predicate acts.

### COUNT XIV – AIDING AND ABETTING FRAUD
### Yorkville v. Mack, Whinnery, Sasaginnigak f/k/a Overall Builders, & R.J. Brownell

545.    Plaintiffs reallege and reincorporate each preceding paragraph as if specifically set forth herein.

546.    At all relevant times herein, Defendants Whinnery, Sasaginnigak, and R.J. Brownell had actual knowledge that R.G. Brownell had engaged in, or was intending to engage in, a scheme to misrepresent material facts regarding the intended purchase of the Hale Property by Kissa. This scheme included false representations about the asbestos-related property defect status,

purported remediation needs, and inflated remediation costs, all intended to deceive Plaintiff Yorkville and further the broader racketeering enterprise.

547. Defendant Mack knew, or was willfully blind to the fact, that the documents concerning the property defects and remediation were fraudulent. He substantially assisted the RICO enterprise by transmitting these fabricated documents and sending the "critical dates" email, thereby facilitating R.G. Brownell's scheme to misappropriate funds from Yorkville through deceptive and fraudulent means.

548. Defendants Whinnery, Overall Builders, Mack, and R.J. Brownell provided substantial and knowing assistance in R.G. Brownell's fraud and the creation of the fictitious purchase arrangement involving the Hale Property. Their actions were integral to advancing the racketeering scheme, directly and proximately causing Plaintiff Yorkville to suffer significant financial and reputational harm, as alleged above. These defendants are therefore jointly and severally liable with R.G. Brownell for the damages incurred as a result of the fraudulent enterprise.

549. Defendants Mack, Whinnery, Overall Builders, and R.J. Brownell knowingly and intentionally assisted R.G. Brownell's racketeering enterprise, engaging in conduct that was vexatious, deliberate, and calculated to harm Plaintiff Yorkville. This aiding and abetting directly contributed to the enterprise's broader scheme to defraud and obscure the true nature of the Hale Property transaction, all in furtherance of the RICO enterprise's illicit objectives.

### COUNT XV – CONSPIRACY TO COMMIT FRAUD
**Yorkville v. R.G. Brownell, Mack, Whinnery, Sasaginnigak, f/k/a Overall Builders, & R. J. Brownell**

550. Plaintiffs reallege and reincorporate each preceding paragraph as if specifically set forth herein.

551. Defendants R.G. Brownell, Mack, Whinnery, Sasaginnigak, and R.J. Brownell knowingly and voluntarily entered into a scheme and agreement to engage in a combination of unlawful acts and misconduct, as described herein, including, among other acts and omissions, fraudulent conduct regarding the Hale Property owned by Plaintiff. These acts constitute predicate acts of wire and mail fraud under 18 U.S.C. § 1343, which fall within the scope of racketeering activities prohibited by 18 U.S.C. § 1961(1).

552. The intent and purpose of the conspiracy, and the underlying combination of unlawful acts and misconduct committed by Defendants R.G. Brownell, Mack, Whinnery, Sasaginnigak, and R.J. Brownell, was to operate as a structured and organized enterprise with the

common goals of (a) driving down the perceived market price of the Hale Property for subsequent purchase, (b) generating publicized litigation to damage reputations, and (c) placing additional debt obligations on Yorkville to destabilize its financial standing. Defendants R.G. Brownell, Mack, Whinnery, Sasaginnigak, and R.J. Brownell accomplished these goals by repeatedly executing coordinated fraudulent acts, illustrating a "pattern of racketeering" activity as defined under 18 U.S.C. § 1961(5).

553.    Each of Defendants R.G. Brownell, Mack, Whinnery, Sasaginnigak, and R.J. Brownell played a crucial role in furthering the enterprise's objectives, with each understanding and accepting the scheme to achieve the shared goal of financial and reputational gain through fraudulent means. This coordination demonstrates that Defendants R.G. Brownell, Mack, Whinnery, Sasaginnigak, and R.J. Brownell knowingly participated in an enterprise that required collaboration for mutual benefit.

554.    Defendants R.G. Brownell, Mack, Whinnery, Sasaginnigak, and R.J. Brownell had a financial motive and incentive to accomplish the foregoing conspiracy. Their actions included overt predicate acts involving wire and mail fraud to facilitate the coordinated objectives, constituting a pattern of related acts that are causally connected to Plaintiff's injuries.

555.    Defendants R.G. Brownell, Mack, Whinnery, Sasaginnigak, and R.J. Brownell committed numerous overt acts in furtherance of their conspiracy, including but not limited to the creation and delivery of the fictitious Purchase and Sale Agreement ostensibly signed by Kissa to Yorkville for signature in early October 2022 by Ryan Cicoski as its manager, and the subsequent fabrication of the counterfeit report stating that hazardous asbestos was present in the Hale Property. These acts were intended to create market distrust and devalue the property unlawfully.

556.    The enterprise orchestrated by the Defendants R.G. Brownell, Mack, Whinnery, Sasaginnigak, and R.J. Brownell caused direct and proximate harm to Plaintiff. The counterfeit asbestos report, fraudulent Purchase and Sale Agreement, and publicized litigation caused unwarranted devaluation of Yorkville's assets and increased debt obligations. These coordinated efforts injured Plaintiff's financial standing and reputation, directly aligning with RICO's requirement of injury by reason of a racketeering violation under 18 U.S.C. § 1964(c).

557.    This conspiracy to commit fraud involved a structured enterprise where Defendants R.G. Brownell, Mack, Whinnery, Sasaginnigak, and R.J. Brownell each played a distinct role, collaborating to harm Plaintiffs through a continuous pattern of racketeering activity, as further evidenced by the use of corporate entities such as Sasaginnigak, f/k/a Overall

105

Builders, to obscure fraudulent transactions and misrepresentations, thus frustrating Plaintiff Yorkville's ability to recover assets and to obtain market value for its properties.

## COUNT XVI – ABUSE OF PROCESS
### Wolfe v. R.G. Brownell, Whinnery, Looper, & Does

558.    Plaintiffs reallege and reincorporate each preceding paragraph as if specifically set forth herein.

559.    Defendants R.G. Brownell, Whinnery, Looper, and Does engaged in an abuse of legal process by filing the Susan Essex Complaint with an ulterior motive, not to resolve a legitimate legal dispute, but to "dox," intimidate, defame, and economically harm Plaintiff Wolfe. This conduct served to advance Defendants R.G. Brownell, Whinnery, Looper, and Does overarching scheme under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c), to injure Plaintiff's professional and economic standing, interfere with his business relationships, and consolidate Defendants R.G. Brownell, Whinnery, Looper, and Does control within the Family Office Trust Structure. The misuse of legal proceedings as an instrument of harassment and extortion, rather than for a valid breach of contract claim, is evidenced by, without limitation:

    a.    the scandalous and inflammatory nature of the allegations in the Susan Essex Complaint, specifically designed to humiliate and harm Plaintiff Wolfe's reputation in both personal and professional circles;

    b.    Defendants R.G. Brownell, Whinnery, Looper, and Does' filing of the Susan Essex Complaint under an assumed name and with knowingly false allegations, intending to mislead the Court and Plaintiff Wolfe as to the origin and credibility of the accusations, thereby obstructing justice—a predicate act under RICO;

    c.    Defendants R.G. Brownell, Whinnery, Looper, and Does' use of false contact information in the filing, including fictitious addresses and disconnected phone numbers, further evidencing their bad faith and fraudulent intentions;

    d.    Defendants R.G. Brownell, Whinnery, Looper, and Does' complete disinterest and lack of diligence in prosecuting the claim, abandoning the case immediately after filing, showing that the

action was intended solely to damage Plaintiff's reputation rather

than pursue a legitimate legal remedy;

e.  Defendants R.G. Brownell, Whinnery, Looper, and Does'

participation in a coordinated conspiracy involving breaches of

fiduciary duties, digital harassment, and fraud as described herein, in

furtherance of their racketeering scheme and as predicate acts under

18 U.S.C. § 1961(1);

f.  Defendants R.G. Brownell, Whinnery, Looper, and Does'

republication of the Susan Essex Complaint—including

republication on a Second Website after a court order sealing the

case—in a blatant violation of judicial authority. This republication

was intended to damage Plaintiff Wolfe's reputation and

economically extort him by tarnishing his professional image across

state lines, impacting Plaintiff Wolfe's business interests in interstate

and foreign commerce.

560.    Defendants R.G. Brownell, Whinnery, Looper, and Does' filing and subsequent

actions concerning the Susan Essex Complaint were intended to exploit the legal process not for

the legitimate prosecution of any claim but as a tool of harassment, extortion, and defamation,

causing Plaintiff Wolfe significant economic harm, emotional distress, and reputational damage.

This abuse of process aligns with the Defendants' broader pattern of racketeering activity,

leveraging litigation as a weapon to further their control over the Family Office Trust Structure,

and constitutes an unlawful predicate act in violation of 18 U.S.C. § 1962.

561.    Indeed, the Court's processes themselves have been weaponized as a mechanism

through which Defendants R.G. Brownell, Whinnery, Looper, and Does sought to orchestrate

character assassination, defame Plaintiff with extreme malice and prejudice, and disrupt his

business relationships, far exceeding the legitimate scope of judicial proceedings.

562.    As a direct and proximate result of Defendants R.G. Brownell, Whinnery, Looper,

and Does' abuse of process, Plaintiff has suffered, and will continue to suffer, substantial damages,

including but not limited to loss of business opportunities, reputational harm, and legal expenses, in

an amount to be proven at trial.

563.    Plaintiff Wolfe further seeks treble damages under RICO, injunctive relief, and

punitive damages due to the malicious and calculated abuse of process executed by Defendants

R.G. Brownell, Whinnery, Looper, and Does, who conspired to manipulate the legal system in furtherance of their fraudulent and racketeering enterprise.

## COUNT XVII – MALICIOUS PROSECUTION
### Wolfe v. R.G. Brownell, Whinnery, Looper, & Does

564. Plaintiffs reallege and reincorporate each preceding paragraph as if specifically set forth herein.

565. Defendants instituted the Susan Essex Complaint as alleged herein and as evidenced by their publication of the Susan Essex Complaint—which was entirely obscure and had not even been served on Plaintiff Wolfe, let alone litigated in any fashion—on the First Website. The publication occurred shortly after the complaint's filing and before any legal action had been taken to notify or serve Plaintiff Wolfe, underscoring Defendants R.G. Brownell, Whinnery, Looper, and Does' lack of intent to prosecute the complaint in good faith.

566. Defendants R.G. Brownell, Whinnery, Looper, and Does lacked probable cause for the institution of the Susan Essex Complaint as alleged herein. This lack of probable cause is evidenced by the fact that Defendants R.G. Brownell, Whinnery, Looper, and Does:

a. Filed the Susan Essex Complaint under a false name, containing allegations that were knowingly fabricated and not grounded in fact or existing law, in furtherance of their malicious scheme;

b. Used false contact information in filing the Susan Essex Complaint with the court, including fictitious addresses and disconnected phone numbers, further obstructing justice—a predicate act under RICO;

c. Demonstrated a lack of genuine interest or intent to prosecute the claims alleged in the Susan Essex Complaint, abandoning the case immediately after filing, which highlights the ulterior motives behind the Susan Essex Complaint's initiation;

d. Created the First and Second Websites, specifically dedicated to defaming, harassing, and damaging Plaintiff Wolfe's reputation. These websites served as tools to republish the defamatory content of the Susan Essex Complaint in blatant violation of court orders, further extending the Defendants' malicious scheme.

567. Defendants R.G. Brownell, Whinnery, Looper, and Does acted with malice in instituting the Susan Essex Complaint as alleged herein, evidenced by the following:

a. Defendants R.G. Brownell, Whinnery, Looper, and Does attempted to enforce a claim under an unlawful contract and then immediately abandoned the claim without pursuing any

legitimate resolution, instead using the Susan Essex Complaint as a pretext for public defamation through republication on the First Website;

b.      After the Susan Essex Complaint was removed from the First Website in compliance with the Court's Order sealing the case, Defendants R.G. Brownell, Whinnery, Looper, and Does registered and launched the Second Website in Lithuania to republish the Susan Essex Complaint in direct, knowing, and contumacious violation of the Court's November 27, 2023 Order sealing the case. This republication was intended to damage Plaintiff Wolfe's personal and professional reputation across multiple jurisdictions, impacting his business interests in interstate and foreign commerce.

568.    The Susan Essex case terminated in Plaintiff Wolfe's favor when it was dismissed on January 3, 2024, due to Defendants R.G. Brownell, Whinnery, Looper, and Does' abandonment and failure to prosecute, further evidencing that the Susan Essex Complaint was never intended to serve a legitimate legal purpose but was rather a vehicle for extortion, harassment and defamation in furtherance of Defendants' RICO enterprise.

569.    As a direct and proximate result of Defendants R.G. Brownell, Whinnery, Looper, and Does' malicious prosecution, Plaintiff Wolfe has suffered special injury well beyond the common incidents of most lawsuits. Defendants R.G. Brownell, Whinnery, Looper, and Does' institution of the Susan Essex Complaint was intended not to resolve a legal dispute but to defame, damage, and interfere with Plaintiff Wolfe's professional and personal life. This malicious prosecution was part of the Defendants' broader racketeering scheme, involving coordinated harassment, reputational damage, and interference with the Plaintiffs' economic interests and business relationships.

### COUNT XVIII – DEFAMATION
### Wolfe v. R.G. Brownell, Whinnery, Looper, & Does

570.    Plaintiffs reallege and reincorporate each preceding paragraph as if specifically set forth herein.

571.    Defendants R.G. Brownell, Whinnery, Looper, and Does' malicious and intentional defamation of Plaintiff Wolfe through the filing, publication, and transmission of the Susan Essex Complaint, as well as subsequent republication on the Websites, constitutes defamation per se, as the allegations therein impute to Plaintiff Wolfe the commission of adultery, the commission of a crime, and an inability to perform and/or a lack of integrity in the discharge of his employment duties. These defamatory statements were made with the intent to irreparably

damage Plaintiff Wolfe's personal and professional reputation.

572.     Defendants R.G. Brownell, Whinnery, Looper, and Does made the foregoing defamatory statements with knowledge of their falsity and with actual malice, justifying an award of punitive damages. Defendants R.G. Brownell, Whinnery, Looper, and Does, as the individuals responsible for filing the Susan Essex Complaint, knew Plaintiff Wolfe had never interacted with "Susan Essex" and had never engaged in the conduct they alleged. The defamatory statements were made as part of Defendants' ongoing scheme to advance their racketeering enterprise under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(c), by engaging in a coordinated effort to discredit Plaintiff Wolfe, interfere with his business relationships, and undermine his position within the Family Office Trust Structure.

573.     Defendants R.G. Brownell, Whinnery, Looper, and Does' acts of defamation, including their republication of the Susan Essex Complaint on the Second Website in violation of a court order sealing the case, demonstrate a clear intent to amplify the reputational harm to Plaintiff Wolfe and were executed as part of a pattern of racketeering activity. The use of digital platforms to republish these false allegations also constitutes predicate acts of wire fraud under 18 U.S.C. § 1343, as Defendants R.G. Brownell, Whinnery, Looper, and Does transmitted defamatory statements across state lines and international boundaries, seeking to harm Plaintiff Wolfe's economic and professional standing on a wide scale.

## COUNT XIX – DISPARAGEMENT
### Wolfe v. R.G. Brownell, Whinnery, Looper, & Does

574.     Plaintiffs reallege and reincorporate each preceding paragraph as if specifically set forth herein.

575.     Defendants R.G. Brownell, Whinnery, Looper, and Does published false and demeaning statements regarding the quality of Plaintiff Wolfe's professional services on the Websites, in furtherance of the conspiracy, breaches of fiduciary duties, and fraud as alleged herein. These statements were made as part of Defendants R.G. Brownell, Whinnery, Looper, and Does' racketeering enterprise, with the intent to damage Plaintiff Wolfe's reputation and economic interests within the Family Office Trust Structure.

576.     Upon information and belief, Defendants R.G. Brownell, Whinnery, Looper, and Does made the aforesaid false and demeaning statements in an effort to influence the public visiting the Websites not to engage Plaintiff Wolfe's professional services due to Plaintiff Wolfe's alleged lack of professional competency and integrity. Defendants R.G. Brownell, Whinnery,

Looper, and Does sought to create a false crisis of solvency and marketability relating to Plaintiff Wolfe, intending to harm Plaintiff Wolfe and the entities in the Family Office Trust Structure. This conduct furthered Defendants' RICO enterprise by inflicting economic harm through a pattern of disparaging statements transmitted across state and international lines, constituting predicate acts of wire fraud under 18 U.S.C. § 1343.

577.    Defendants R.G. Brownell, Whinnery, Looper, and Does made the aforesaid false and demeaning statements with malice, as evidenced by the fact that Defendants R.G. Brownell, Whinnery, Looper, and Does have no known connection to or experience with the transactions they disparaged. Rather, Defendants R.G. Brownell, Whinnery, Looper, and Does acted in furtherance of the conspiracy, breaches of fiduciary duties, and fraud described herein, and therefore made the statements with, at minimum, conscious disregard of whether the statements were true or false. This disparagement was intended to disrupt Plaintiff Wolfe's business relationships and economic standing in furtherance of Defendants' racketeering scheme.

578.    As a direct and proximate result of Defendants R.G. Brownell, Whinnery, Looper, and Does' disparagement, Plaintiff Wolfe has suffered, and will continue to suffer, damages in an amount to be proven at trial.

**COUNT XX – INVASION OF PRIVACY; PUBLIC DISCLOSURE OF PRIVATE FACTS**
**Wolfe v. R.G. Brownell, Whinnery, Looper, & Does**

579.    Plaintiffs reallege and reincorporate each preceding paragraph as if specifically set forth herein.

580.    Defendants R.**G. Brownell,** Whinnery**, Looper,** and **Does** gave unwarranted publicity to private facts concerning Plaintiff Wolfe by, inter alia, publishing Plaintiff Wolfe's home address, telephone number, and other sensitive personal details on the First Website. This disclosure was conducted as part of Defendants R.G. Brownell, Whinnery, Looper, and Does' coordinated scheme under the Racketeer Influenced and Corrupt Organizations Act (RICO), intended to harm Plaintiff Wolfe by exposing him to public harassment, intimidation, and threats to his personal safety.

581.    The facts published on the First Website were private, confidential details regarding Plaintiff Wolfe, which were not of legitimate public concern and were intended solely to harm Plaintiff's personal and professional reputation.

582.    The publication of these private facts regarding Plaintiff Wolfe would be highly offensive to a reasonable person, given that the disclosure was carried out in a context where

111

Defendants R.G. Brownell, Whinnery, Looper, and Does actively encouraged the public to use this information to "dox," harass, and cause harm to Plaintiff Wolfe and his family. This act was not an isolated incident but part of a broader, malicious campaign by Defendants R.G. Brownell, Whinnery, Looper, and Does to intimidate and coerce Plaintiff Wolfe, advancing the goals of the RICO enterprise by destabilizing Plaintiff Wolfe's personal and professional life.

583. Defendants R.G. Brownell, Whinnery, Looper, and Does' coordinated actions in disclosing Plaintiff Wolfe's private information reflect a deliberate pattern of conduct that served the RICO enterprise's objective of inflicting harm and exercising control over Plaintiffs. By facilitating widespread dissemination of Plaintiff Wolfe's private information, Defendants R.G. Brownell, Whinnery, Looper, and Does engaged in a continuous scheme of intimidation and harassment, constituting predicate acts under RICO aimed at economically and reputationally damaging Plaintiff Wolfe.

584. As a direct and proximate result of Defendants R.G. Brownell, Whinnery, Looper, and Does' invasion of privacy, Plaintiff Wolfe has suffered, and will continue to suffer, significant emotional distress, reputational harm, and other damages in an amount to be proven at trial.

## COUNT XXI – FALSE LIGHT
### Wolfe v. R.G. Brownell, Whinnery, Looper, & Does

585. Plaintiffs reallege and reincorporate each preceding paragraph as if specifically set forth herein.

586. Defendants R.G. Brownell, Whinnery, Looper, and Does placed Plaintiff Wolfe in a false light before the public when they knowingly advanced false accusations against him via the Susan Essex Complaint and subsequent publication on the Websites as alleged herein, including but not limited to accusations that Plaintiff Wolfe is an adulterer and a criminal. These publications were made as part of the Defendants' coordinated scheme under the Racketeer Influenced and Corrupt Organizations Act (RICO), designed to harm Plaintiff's reputation and interfere with his business interests within the Family Office Trust Structure.

587. Defendants' statements were made to the public at large given the Websites are freely accessible to every individual with internet access throughout the world, as is the 2022 Complaint itself and the accusations therein. This broad dissemination amplified the harm to Plaintiff's reputation, furthering the RICO enterprise's goal of using defamation as a tool to damage Plaintiff's professional standing.

588. The false light in which Defendants placed Plaintiff is highly offensive to a

reasonable person given the allegations specifically accuse Plaintiff of "preying" on and "stalking" vulnerable individuals for sexual services, of being a danger to the community, of unethical and immoral conduct regarding his employment, of adultery, and of criminal conduct. Such allegations were made not for a legitimate purpose but to coerce, intimidate, and discredit Plaintiff as part of Defendants' racketeering scheme, targeting Plaintiff's reputation and professional relationships.

589. As alleged herein, Defendants filed the 2022 Complaint and republished the same, along with the accusations on the Websites, with actual knowledge that the statements were false and with actual malice. Defendants' use of a false name and fictitious contact information when filing the 2022 Complaint, combined with their immediate abandonment of the claim and subsequent republication online, demonstrates a deliberate intent to harm Plaintiff by placing him in a false light as part of a sustained pattern of racketeering activity.

590. This pattern of placing Plaintiff in a false light through false accusations was instrumental to Defendants' RICO enterprise, serving to damage Plaintiff's reputation and business interests and to exert control over assets and influence within the Family Office Trust Structure. Defendants' repeated false publications constitute predicate acts under RICO, evidencing a continuous scheme aimed at economically harming Plaintiff and advancing Defendants' unlawful objectives.

### COUNT XXII – VIOLATION OF THE ILLINOIS RIGHT OF PUBLICITY ACT
### Wolfe v. R.G. Brownell, Whinnery, Looper, & Does

591. Plaintiffs reallege and reincorporate each preceding paragraph as if specifically set forth herein.

592. Defendants R.**G. Brownell,** Whinnery**, Looper,** and Does' unauthorized use of Plaintiff Wolfe's identity for commercial purposes is a violation of the Illinois Right of Publicity Act, 765 ILCS 1075/1-60, and was executed as part of Defendants' broader scheme under the Racketeer Influenced and Corrupt Organizations Act (RICO). This misuse of Plaintiff Wolfe's identity was a deliberate act designed to exploit Plaintiff Wolfe's reputation for Defendants R.G. Brownell, Whinnery, Looper, and Does' financial and strategic gain within their racketeering enterprise.

593. Specifically, Defendants R.G. Brownell, Whinnery, Looper, and Does made unauthorized use of Plaintiff Wolfe's identity, including but not limited to using his name in the domain of the Second Website, in connection with Plaintiff Wolfe's professional services, with the purpose of damaging Plaintiff Wolfe and reducing the value of the assets owned by the Plaintiff

entities to facilitate their extraction by the Defendants. Defendants R.G. Brownell, Whinnery, Looper, and Does sought to harm Plaintiff Wolfe's business relationships and reputation, including but not limited to his standing with banks and other financial institutions. This misuse of Plaintiff Wolfe's identity was integral to the Defendants' overarching scheme to defraud and to convert funds and other property from the Family Office Trust Structure to further their racketeering goals.

594.     Defendants R.G. Brownell, Whinnery, Looper, and Does' use of Plaintiff Wolfe's identity was unauthorized because Defendants R.G. Brownell, Whinnery, Looper, and Does did not obtain Plaintiff Wolfe's consent to use his identity in connection with the domain name of the Second Website. In fact, Defendants R.G. Brownell, Whinnery, Looper, and Does actively sought to conceal their involvement in the publication of the Websites to evade accountability and to protect the continuation of their racketeering enterprise.

595.     Defendants R.G. Brownell, Whinnery, Looper, and Does' use of Plaintiff Wolfe's identity was willful, as they acted with full knowledge that the use was unauthorized and intended to harm Plaintiff Wolfe's professional standing. The entire purpose of filing the Susan Essex Complaint, publishing defamatory content, and associating Plaintiff Wolfe's identity with illicit activities was to damage Plaintiff Wolfe's reputation and to advance Defendants' unlawful objectives within the RICO enterprise.

596.     Plaintiff Wolfe has been damaged by Defendants R.G. Brownell, Whinnery, Looper, and Does' unauthorized use of his identity, suffering harm to his reputation, financial losses, and business disruptions as a result of Defendants R.G. Brownell, Whinnery, Looper, and Does' actions. These damages are a direct and proximate result of the Defendants R.G. Brownell, Whinnery, Looper, and Does' efforts to misappropriate Plaintiff Wolfe's identity as part of a coordinated scheme aimed at achieving financial control and influence within the Family Office Trust Structure.

### COUNT XXIII – VIOLATION OF 15 U.S.C. § 1125(d)(1); CYBERPRIVACY
### Wolfe v. R.G. Brownell, Whinnery, Looper, & Does

597.     Plaintiffs reallege and reincorporate each preceding paragraph as if specifically set forth herein.

598.     Defendants R.G. Brownell, Whinnery, Looper, and Does, with bad faith intent to profit from the unauthorized use of Plaintiff Wolfe's name in the Second Website, engaged in cyberpiracy, constituting a violation of 15 U.S.C. § 1125(d)(1). Defendants R.G. Brownell, Whinnery, Looper, and Does' actions were further executed as part of an organized pattern of

racketeering activity under the RICO Act, designed to tarnish Plaintiff Wolfe's reputation and disrupt his business interests.

599.     Defendants R.G. Brownell, Whinnery, Looper, and Does' bad faith intent to profit from the use of Plaintiff Wolfe's name on the Second Website is demonstrated by the following:

a.     Plaintiff Wolfe's established trademark and intellectual property rights in the use of his personal name in commerce, which Defendants exploited without authorization to increase traffic and revenue for their website;

b.     The use of Plaintiff Wolfe's full legal name in the domain name of the Second Website, misleadingly associating Plaintiff Wolfe with the defamatory and disparaging content published thereon;

c.     Defendants R.G. Brownell, Whinnery, Looper, and Does' lack of any legitimate noncommercial or fair use of Plaintiff Wolfe's name, demonstrating that the website's sole purpose was to defame and harm Plaintiff Wolfe's reputation for Defendants R.G. Brownell, Whinnery, Looper, and Does' own gain;

d.     Defendants R.G. Brownell, Whinnery, Looper, and Does' demonstrated intent to damage Plaintiff Wolfe's goodwill and reputation by associating his name with false and defamatory accusations, thereby furthering their racketeering enterprise under RICO to exert influence over Plaintiffs' business and financial affairs; and

e.     Defendants R.G. Brownell, Whinnery, Looper, and Does' provision of materially false contact information when registering the domain name, concealing their identities and preventing Plaintiff Wolfe from pursuing legitimate recourse, indicative of an attempt to obstruct justice within the racketeering scheme.

600.     Defendants R.G. Brownell, Whinnery, Looper, and Does' registration, trafficking in, and use of Plaintiff Wolfe's personal name as a domain name on the Second Website constitutes a violation of the Cyberpiracy Prevention Act, 15 U.S.C. § 1125(d)(1), further perpetuating the fraudulent objectives of the RICO enterprise.

601.     As part of this racketeering enterprise, Defendants R.G. Brownell, Whinnery, Looper, and Does' cyberpiracy actions directly contributed to the pattern of fraudulent and injurious acts intended to undermine Plaintiff Wolfe's business credibility and standing within his industry. Defendants R.G. Brownell, Whinnery, Looper, and Does' repeated and coordinated use of digital platforms to disseminate defamatory content underscores their intent to misuse Plaintiff Wolfe's identity as part of an ongoing scheme of cyber harassment and intimidation.

## COUNT XXIV – BREACH OF FIDUCIARY DUTY
### Breakers, Green Sapphire, Alpha Carta, Prairie Trust, and NorthSea v. Smith

602. Plaintiffs reallege and reincorporate each preceding paragraph as if specifically set forth herein.

603. As a former director of Breakers, Green Sapphire, Alpha Carta, Prairie Trust in its capacity as Trustee of the Alpha Carta Trust, and NorthSea in its capacity as the Trustee of the Petro Carta Trust (collectively, the "Family Office Trust Entities"), Defendant Smith owed a fiduciary duty to the Family Office Trust Entities requiring him to act in the interest of these entities and not for personal gain or the benefit of the RICO enterprise of which he was part.

604. Defendant Smith's misuse and disclosure of confidential information concerning the assets, structure, bank accounts, and financial dealings of the Family Office Trust Entities were not isolated incidents but were part of a broader, systematic pattern of racketeering activity designed to advance a fraudulent enterprise. Smith's breaches of fiduciary duty— including the unauthorized brokering of a $2.9 million loan to a third-party entity and arranging a fictitious $10 million loan to Green Sapphire—were predicate acts consistent with fraud and embezzlement, serving the goals of the RICO enterprise.

605. Defendant Smith's access to and misuse of privileged information was integral to his role in furthering the fraudulent scheme operated by the enterprise. By exploiting his insider position and knowledge of the Family Office Trust Entities, Defendant Smith advanced unauthorized financial transactions that unjustly enriched himself, Defendant Rockwater, and other co-conspirators, while actively harming the Family Office Trust Entities and violating his fiduciary duties.

606. Defendant Smith was obligated by his fiduciary duties to refrain from acting in his own self-interest to the detriment of the Family Office Trust Entities. Instead, Defendant Smith's actions directly supported the RICO enterprise's objectives, establishing a clear pattern of racketeering activity by misappropriating trust assets and financial data to further an ongoing fraudulent scheme.

607. Defendant Smith breached these duties by, without limitation:

    a. Engaging in a sustained pattern of confidential financial disclosures to unauthorized third parties as part of the enterprise's scheme;

    b. Manipulating his position to authorize the fraudulent 2023 Loan to

116

Breakers and deed of guarantee using insider knowledge, thereby

advancing the enterprise's objectives;

c.    Directing funds from the 2023 Loan to his co-conspirators rather

than Alpha Carta, consistent with prior unauthorized transfers that

deprived Breakers of loan proceeds;

d.    Leveraging his fiduciary role to engineer the 2023 Loan for

personal and enterprise benefit, to the detriment of Family

Office Trust Entities; and

e.    Arranging a fictitious $10 million loan from Global Partners to

Green Sapphire and fabricating a Stock Pledge Agreement in

which Green Sapphire ostensibly pledged Green Sapphire's shares

of Florida Access stock, furthering the enterprise's financial

interests through fraud.

608.    Upon information and belief, Defendant Smith committed these breaches of fiduciary duty with deliberate intent to further the RICO enterprise's objectives, acting in bad faith, and intentionally exploiting his fiduciary role to harm the Family Office Trust Entities while enriching himself and his co-conspirators.

609.    The foregoing breaches of fiduciary duty by Defendant Smith were knowing, willful, reckless, and done in bad faith, furthering the goals of the fraudulent enterprise, violating the trust and responsibilities imposed upon him by the Family Office Trust Entities.

610.    As a direct and proximate result of Defendant Smith's breaches, the trustees of the Alpha Carta Trust and the Petro Carta Trust, along with the Family Office Trust Entities, have suffered and continue to suffer damages, including but not limited to, significant economic loss, loss of asset control, reputational harm, and impaired business operations, in an amount to be determined at trial.

### COUNT XXV – CONSPIRACY TO BREACH FIDUCIARY DUTY
**Breakers, Green Sapphire, Alpha Carta, Prairie Trust, & NorthSea v. R.G. Brownell, Smith, & Mack**

611.    Plaintiffs reallege and reincorporate each preceding paragraph as if specifically set forth herein.

612.    Defendants R.G. Brownell, Smith, and Mack knowingly and voluntarily entered into a scheme and agreement to engage in a combination of unlawful acts and misconduct, as described herein, including, among other acts and omissions, breach of fiduciary duties and

aiding and abetting breach of fiduciary duties.

613.     The intent and purpose of the conspiracy, and the underlying combination of unlawful acts and misconduct committed by the Defendants, was to purportedly cause Breakers to obtain a loan, obtain the $2.9 million proceeds of the 2023 Breakers loan in order to illicitly paydown the debt Proton Green owed to Alpha Carta, discharge to the Leasehold Mortgage/Deed of Trust on St. John's Field and, thereafter, obtain ownership of the Breakers Property and a windfall gain on securities issued by Proton Green or Cyber App for themselves and one or more John Doe Defendants who identity is currently unknown to the Plaintiffs.

614.     All Defendants had a financial motive and incentive to accomplish the foregoing conspiracy.

615.     The Defendants understood and accepted the foregoing scheme, and each agreed to do his respective part, as described herein, to further and accomplish the foregoing objectives.

616.     By entering into this conspiracy, the Defendants permitted, encouraged, and induced all of the unlawful acts and misconduct as described herein.

617.     The parties engaged in numerous overt acts in furtherance of the conspiracy including, but not limited to, the use of confidential knowledge to bypass controls in place in the Family Office Trust Structure, causing $2.9 million to be transferred to Mack's trust account without obtaining necessary approvals, causing $2 million to be transferred on July 24, 2023 to CIBC for credit to Alpha Carta's account which was falsely described as "Loan payment," and taking fees for the various co-conspirators.

618.     As a direct and proximate result of the Defendants' unlawful conduct, Breakers, Alpha Carta, Green Sapphire, Prairie Trust., and NorthSea have sustained substantial damages.

### COUNT XXVI – CONSPIRACY TO COMMIT FRAUD REGARDING THE 2023 BREAKERS LOAN
**Breakers & Alpha Carta v. Proton Green, Looper, R.G. Brownell, Smith, Cyber App, Mack, & Salazar**

619.     Plaintiffs reallege and reincorporate each preceding paragraph as if specifically set forth herein.

620.     Defendants Proton Green and Cyber App, by and through their agent Looper, R.G. Brownell, Smith, individually, Mack, and Salazar knowingly and voluntarily entered into a scheme and agreement to engage in a combination of unlawful acts and misconduct, as described herein.

621.     The intent and purpose of the conspiracy, and the underlying combination of

unlawful acts and misconduct committed by the Defendants, was to misappropriate the funds in the amount of $2.9 million that the Lenders wired to Chase Bank for credit to Mack's IOLTA account and ultimately create the fraudulent impression of paying down Proton Green's debt to Plaintiffs, to reduce the amount owed by Proton Green/Cyber App (thereby increasing the value and reducing to liabilities of Proton Green/Cyber App), avoid any action against Proton Green/Cyber as well as induce Alpha Carta to enter into settlement negotiations.

622.    The parties engaged in numerous overt acts in furtherance of the conspiracy including, but not limited to, causing $2 million to be transferred on July 24, 2023 to CIBC for credit to Alpha Carta's account which was falsely described as "Loan Payment," falsely claiming that Proton Green/Cyber App paid the $2 million, falsely describing the Loan Settlement Agreement in the 10Q that Cyber App filed with the SEC on Feb. 15, 2024 and taking fees for the various coconspirators.

623.    All Defendants had a financial motive and incentive to accomplish the foregoing conspiracy.

624.    The Defendants understood and accepted the foregoing scheme, and each agreed to do his respective part, as described herein, to further and accomplish the foregoing objectives.

625.    By entering into this conspiracy, the Defendants permitted, encouraged, and induced all of the unlawful acts and misconduct as described herein.

626.    As a direct and proximate result of the Defendants' unlawful conduct, Breakers and Alpha Carta have sustained damage through the contingent liability that Breakers has to the Lenders in the event it is found, after expensive and resource consuming litigation, to be liable to repay the Lenders $2.9 million plus interest and attorneys' fees, the impairment of Alpha Carta's lien on the St. John's Field that secures payment of the debt evidenced by the three Proton Green Notes, attorneys' fees both to obtain a judgment against the Lenders declaring the 2023 Breakers loan void and declaring that there was no valid and enforceable "Loan Settlement Agreement " between Alpha Carta, and Cyber App or Proton Green, or Deed of Release.

### COUNT XXVII –RESCISSION
### Alpha Carta v. Proton Green and Cyber App

627.    Plaintiffs reallege and reincorporate each preceding paragraph as if specifically set forth herein.

628.    Proton Green and Cyber App, through their agent Looper, and in concert with

Smith, Mack, and R.G. Brownell, engaged in a scheme to make it appear as though funds had been paid to Alpha Carta from Proton Green when in fact they had been purportedly borrowed from another entity.

629.    Cyber App has now publicly claimed that a valid signed settlement agreement dated as of July 31, 2024, relieves it from the millions of dollars in liability it owed to Alpha Carta

630.    Alpha Carta has no signed copy of any such agreement, and Proton Green has refused to provide it.

631.    However, such a settlement agreement, provided it exists, must be rescinded as it was procured through fraud.

632.    Additionally, any such settlement agreement was the result of a unilateral mistake by Alpha Carta that Proton Green had paid the amount due under the terms of any such settlement.

633.    This mistake was caused through the misrepresentations and misdeeds of Proton Green (and its felon CEO) and one or more of the Defendants, including R.G. Brownell, Smith, Mack, and Salazar.

634.    Any settlement, as well as the Deed of Release and Reconveyance signed by Alpha Carta in conjunction with such settlement, must be rescinded.

## COUNT XXVIII – BREACH OF CONTRACT
### Alpha Carta v. Proton Green and Cyber App

635.    Plaintiffs reallege and reincorporate each preceding paragraph as if specifically set forth herein.

636.    In or about July 2022, Alpha Carta purchased a promissory note in the original principal amount of $3,513,469 (the "Kip's Bay Note'") that Proton Green had issued to Kip's Bay Select L.P. in consideration for a loan, payment of which was secured by a first priority lien on all the assets of Proton Green including a Leasehold interest on real property located in Apache County, Arizona in which there were substantial reserves of Helium.

637.    As of May 1, 2023, Alpha Carta held the Kip's Bay Note, as well as two other promissory notes made by Proton Green payable to Alpha Carta (collectively, the "Proton Green Notes"). See Proton Green Notes, true and correct copies of which are attached hereto as **Exhibits L-N**, respectively.

638.    In April 2022, Proton Green failed to pay the debts evidenced by the Proton Green Notes as agreed.

639.     On or about June 20, 2023, Proton Green entered into a Forbearance Agreement with Alpha Carta (the "Forbearance Agreement"), by which Proton Green agreed to make certain payments to Alpha Carta in order to fulfill its obligations to the same pursuant to the Kip's Bay Note and other Promissory Notes Proton Green executed in favor of Alpha Carta. See **Exhibit G**.

640.     The terms of the Forbearance Agreement obligated Proton Green to pay $3 million to Alpha Carta on July 7, 2023, and $2 million a month on the seventh (7th) day of each month thereafter until the total debt of approximately $25.2 million Proton Green owed to Alpha Carta as of June 20, 2023, was paid in full. *Id.*

641.     However, Proton Green/Cyber App has failed or refused to abide by the terms of the Forbearance Agreement and the Proton Green Notes, including but not limited to the obligation to immediately execute and deliver a Deed in Lieu of Foreclosure in a recordable form acceptable to Alpha Carta, such that Proton Green/Cyber App's debt to Alpha Carta in an amount in excess of $25 million is currently unpaid, due and owing.

642.     Cyber App is liable for the obligations of Proton Green as a result of the reverse merger.

643.     The Forbearance Agreement and Proton Green Notes are valid contracts.

644.     The Forbearance Agreement required Defendant to pay $3 million to Alpha Carta in July 2023 and $2 million a month each month thereafter until the total debt of approximately

$25.2 million Proton Green/Cyber App owed to Alpha Carta as of June 20, 2023, was paid in full. *Id.*

645.     Despite the express requirements of the Forbearance Agreement, Defendants breached the Forbearance Agreement in failing or refusing to pay Plaintiff $2 million on September 7, 2023, as required by the terms of to the Forbearance Agreement and failing and refusing to execute and deliver the required Deed In Lieu of Foreclosure.

646.     Defendants also breached the Proton Green Notes by failing to pay the debt evidenced by the Notes, and the exact amount of such debt is to be determined at trial.

647.     The failure to pay and the failure to execute and deliver the promised Deed In Lieu of Foreclosure are each a material breach of the express terms of the Forbearance Agreement and Proton Green Notes.

648.     Plaintiff has performed or has substantially performed all its obligations under the Forbearance Agreement and Proton Green Notes.

649.     As a result of the Defendants' breaches, Plaintiff has been harmed.

121

## COUNT XXIX –DECLARATORY JUDGMENT
### Alpha Carta v. Proton Green and Cyber App

650.     Plaintiffs reallege and reincorporate each preceding paragraph as if specifically set forth herein.

651.     Proton Green and Cyber App, through their agent Looper, and in concert with Smith, Mack, and R.G. Brownell, engaged in a scheme to make it appear as though funds had been paid to Alpha Carta from Proton Green/Cyber App when in fact they had been purportedly borrowed from another entity.

652.     Cyber App has now publicly claimed that a valid signed settlement agreement dated as of July 31, 2023, relieves it from the obligation to pay the, at minimum, $18 million of additional debt that was due and owing under the Notes as of July 31, 2023.

653.     Alpha Carta has no signed copy of any such agreement, and Proton Green has refused to provide it.

654.     However, such a settlement agreement, provided it exists, is void as it was procured through fraud.

655.     Additionally, any such agreement, as well as the Deed of Release and Reconveyance executed in connection therewith, was not authorized to be delivered to Proton Green and Cyber App absent the occurrence of a condition precedent that did not occur.

656.     Any settlement, as well as the Deed of Release and Reconveyance signed by Alpha Carta in conjunction with such settlement, must be declared void.

657.     An actual controversy exists between the parties, as Defendants contend the settlement and Deed of Release and Reconveyance are valid, which assertion Plaintiff denies.

658.     The resolution of this issue is appropriate and would terminate, in whole or in part, the controversy giving rise to this proceeding.

## COUNT XXX –DECLARATORY JUDGMENT
### Green Sapphire v. Global Capital

659.     Plaintiffs reallege and reincorporate each preceding paragraph as if specifically set forth herein.

660.     Global Capital purported to enter into a Loan and Security Agreement with Green Sapphire.

661.     The loan agreement, as well as any accompanying pledge or other documents, were not properly authorized by Green Sapphire and are therefore void.

662.    There was no loan made pursuant to the loan agreement and the loan agreement is void as Green Sapphire did not receive any consideration.

663.    Any loan that may have been made under the loan agreement is void as it is the product of a fraudulent scheme.

664.    The attempted domestication of French Access and the attempted acquisition of the shares of Florida Access are also null and void, as they are the product of fraud and the fictitious loan agreement and Stock Pledge Agreement.

665.    The loan agreement, as well as any accompanying pledge, Articles of Domestication, UCC-1 Financing Statements and other documents, must be declared void.

666.    An actual controversy exists between the parties, as Defendant contends the Loan and Security Agreement between Global Capital and Green Sapphire is valid, that funds in the amount of $10 million were actually delivered by Global Partners to Green Sapphire, that the filing of the Articles of Domestication was duly authorized and that the Stock Pledge Agreement which purports to grant a security interest in Green Sapphire's interest, if any, in shares of the Florida corporation named Florida Access was valid and enforceable, all of which Plaintiff denies.

667.    The resolution of this issue is appropriate and would terminate, in whole or in part, the controversy giving rise to this proceeding.

### COUNT XXXI – BREACH OF CONTRACT
### Alpha Carta v. BNW

668.    Plaintiffs reallege and reincorporate each preceding paragraph as if specifically set forth herein.

669.    Alpha Carta and BNW entered into a Professional Services Agreement with a term of January 1, 2023, through December 31, 2023, to "provide investment advisory and support services." See the Professional Services Agreement, a true and correct copy of which is attached hereto as **Exhibit O**.

670.    The agreement is a valid contract.

671.    BNW agreed to "exercise the highest degree of professionalism" in the exercise of projects assigned pursuant to the Professional Services Agreement. *Id.*, ¶1.

672.    BNW acted through R.G. Brownell who, for all actions referenced in this count, was acting in the course and scope of his relationship with BNW.

673.    The agreement provided that the "Contractor is not the agent of the Company and is not authorized to make any representation, contract, or commitment on behalf of the Company." *Id.*, ¶3.

123

674.    The agreement provides that BNW will not use any proprietary information, which includes financial information, investment and fund strategies, business plans, and suppliers and customers, among others, "in any manner or for any purpose not expressly set forth in this Agreement."

675.    The agreement provides that there is "no other existing contract or duty on Contractor's part that would conflict with or would be inconsistent with this Agreement, unless a copy of such contract or a description of such duty is attached to this Agreement as **Exhibit B**." *Id.*, ¶4.3.

676.    The scope of BNW's authorization, acting through R.G. Brownell, to act as an independent contractor, did not extend to taking any actiopromn on behalf of Green Sapphire or taking any actions adverse to Alpha Carta, which is the largest creditor of Green Sapphire.

677.    R.G. Brownell fraudulently held himself out a purported authorized signatory of Green Sapphire, executed an engagement agreement under a fictitious name by which R.G. Brownell and Mack hired French counsel to advise them on how to obtain an enforceable Stock Pledge Agreement and then enforced a security interest agaisnt Green Sapphire's shares in Access Management.

678.    This action was directly contrary to the interests of Alpha Carta and was outside the scope of BNW and R.G. Brownell's authority under the above-referenced Professional Services Agreement.

679.    BNW orchestrated Green Sapphire's purported pledge of shares in French Access and attempted to domesticate French Access as a Florida corporation. BNW directed Mack to draft a fictitious Loan and Security Agreement and a Stock Pledge Agreement to create the false impression that Green Sapphire had granted a security interest in its shares of Florida Access to Global Partners. Additionally, R.G. Brownell recorded a mortgage in BNW's favor against the St. Barth's Property. These actions, which BNW concealed as conflicts of interest, impaired the value of Green Sapphire's assets, slandered the title of the St. Barth's Property, and ultimately allowed BNW to gain an interest in this property, to the detriment of Alpha Carta, Green Sapphire's largest creditor.

680.    BNW's actions, through R.G. Brownell, regarding Proton Green and Cyber App constitute a breach of the contract.

681.    R.G. Brownell's actions throughout this Complaint constituted a breach of the contract.

682.     Throughout the course of the performance of the contract, BNW acted contrary to the best interests of Alpha Carta by trying to devalue the property owned by Alpha Carta so that it could fraudulently acquire.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and grant the following relief:

1.     Compensatory Damages: Award Plaintiffs compensatory damages in an amount to be determined at trial, including, but not limited to, losses from fraudulent transactions, unauthorized transfers, lost business opportunities, reputational harm, and investigative costs, estimated to exceed $10 million.

2.     Treble Damages: Pursuant to 18 U.S.C. § 1964(c) under the Racketeer Influenced and Corrupt Organizations Act (RICO), award Plaintiffs treble damages for the financial losses incurred due to Defendants' pattern of racketeering activity, as alleged herein.

3.     Punitive Damages: Award Plaintiffs punitive damages in an amount sufficient to punish Defendants and deter future similar misconduct, due to the egregious, willful, and malicious nature of the Defendants' conduct.

4.     Declaratory Relief: Issue a declaratory judgment that Defendants' actions constitute violations of RICO, the Computer Fraud and Abuse Act, and other applicable federal and state laws, and that Plaintiffs are entitled to the relief requested herein.

5.     Injunctive Relief: Grant permanent injunctive relief enjoining Defendants from further:

    a.     Engaging in any form of unauthorized access or cyber intrusions against Plaintiffs' electronic systems;

    b.     Disseminating defamatory statements or engaging in conduct that would damage Plaintiffs' reputations;

    c.     Interfering with Plaintiffs' business operations, transactions, or relationships;

    d.     Engaging in any further actions that constitute racketeering activity, as defined by 18 U.S.C. § 1961(1).

6.     Constructive Trust: Impose a constructive trust over all funds, assets, and property

obtained by Defendants as a result of the fraudulent and unlawful conduct alleged in this Complaint, and direct Defendants to transfer such assets to Plaintiffs to prevent unjust enrichment.

7.    Disgorgement: Order Defendants to disgorge all profits and benefits unjustly obtained through the fraudulent and unlawful activities described herein.

8.    Attorneys' Fees and Costs: Award Plaintiffs their reasonable attorneys' fees, costs, and expenses incurred in this action, pursuant to applicable law, including but not limited to 18 U.S.C. § 1964(c) and other relevant statutes.

9.    Pre- and Post-Judgment Interest: Award Plaintiffs pre-judgment and post-judgment interest on all amounts awarded, at the highest lawful rate, from the date of injury until the date of payment.

10.   Other Relief: Grant such other and further relief as the Court may deem just and proper under the circumstances.

Respectfully submitted,

Dated: February 10, 2025

JURY DEMAND
Plaintiff hereby demands a trial by jury.

/s/ Marc P. Trent
Marc P. Trent (ARDC # 6324928)
Aaron R. Walner (ARDC # 6284207)
TRENT LAW FIRM, P.C.
600 W Jackson Ave., # 100
Chicago, IL 60661
(630) 682-3100
service@trentlawfirm.com

*Attorneys for Plaintiffs*

# GROUP EXHIBIT A

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN    '05   JAN 19   P 4 :27

---

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                                             Case No. 05-CR-013

ROBERT G. BROWNELL,
ROBERT E. MANN,
NORMAN C. HANSON, and
MICHAEL A. GRAL,

        Defendants.

---

### SUPERSEDING INFORMATION

---

**The United States Attorney Charges:**

Overview

1.    Between on or about May 1, 2000, and on or about July 16, 2004, in

the State and Eastern District of Wisconsin, and elsewhere,

**Robert G. Brownell,**
**Robert E. Mann,**
**Norman C. Hanson, and**
**Michael A. Gral,**

did knowingly conspire among themselves and with others known and unknown to

device and execute a scheme to defraud, which scheme was executed by use of

the U.S. mail and interstate wire communications, in violation of Title 18, United

States Code, Sections 1341 (mail fraud) and 1343 (wire fraud).

2.     The defendants' scheme to defraud included a scheme to deprive another of the intangible right to honest services.

3.     The object of the conspiracy was to obtain money for the defendants, their businesses, as well as others conspirators, and their companies; and to fund contributions to candidates for public office.

Background

4.     Bielinski Brothers, Inc. is a Waukesha County-based residential and commercial construction company. It operates under various corporate names, including Bielinski Homes and Bielinski Development, Inc. (herein collectively referred to as "Bielinski Brothers"). Bielinski Brothers is involved in more than $100 million in new home construction each year.

5.     Robert G. Brownell began working for Bielinski Brothers in 1995. From approximately 2001 until July of 2004, Brownell served as Chief Executive Officer of Bielinski Brothers. He was paid approximately $175,000 per year. Brownell was also a partner with Frank and Harry Bielinski in FHB Investments, LLC.

6.     As part of his duties at Bielinski Brothers, Brownell approved the payment of invoices associated with development and new home construction. These invoices included work for surveys, analysis, grading and similar activity at the start of the construction of a residential subdivision.

7.     Mann Brothers, Inc. is an Elkhorn-based construction company that provided grading and other construction work for Bielinski Brothers. During the time

2

period of the conspiracy, Mann Brothers performed approximately $20 million in work for Bielinski Brothers each year.

8.     Robert E. Mann was the president and part-owner of Mann Brothers, Inc.

9.     Welch Hanson & Associates is civil engineering firm in Delafield, Wisconsin. The firm also includes surveyors and landscape architects. The firm is a division of Yaggy Colby & Associates.

10.    Norman C. Hanson is a principal in Welch Hanson & Associates. He also is a partner in a separate, unrelated limited liability company called NCCBH.

11.    Michael A. Gral was a partner at the law firm Michael Best & Friedrich. He served as a lawyer for Bielinski Brothers.

Kickback and Embezzlement Scheme

12.    In addition to working for Bielinski Brothers, Brownell operated various businesses alone and in partnership with others. They included: (a) DSI, or Development Services, Inc.; (b) SEWMA, or Southeastern Wisconsin Market Analysts; (c) Georgetown Holdings, LLC; (d) Georgetown Development, LLC; (e) Georgetown Investments, LLC; and (e) Belize, LLC.

13.    As part of a scheme to defraud Bielinski Brothers and others, Brownell approved invoices from other business entities knowing that the invoices were fraudulent and had been inflated.

3

14.     The money generated as part of the false billings was used for the financial benefit of the defendants and others, as described below.

Mann Brothers

15.     Bielinski Brothers hired Mann Brothers to do grading and other work at the start of residential developments.

16.     As part of a scheme to defraud Bielinski Brothers, Mann and Brownell agreed to participate in Bielinski Brother's payment of inflated invoices submitted by Mann Brothers.

17.     At the start of a project involving Mann Brother and Bielinski Brothers, Brownell and Mann discussed the amount of inflated charges that were to be included on a particular project.  That amount varied by the size of the project, the actual work that was needed, and the potential budget.

18.     Once Mann Brothers was paid, the excess from the invoices was split equally between Brownell and Robert Mann.  Brownell's share was given to him in the form of checks from Mann Brothers to DSI and SEWMA.  Brownell provided an invoice from one of his companies to Mann to justify this payment.

19.     The inflated and fraudulent invoices from Mann Brothers to Bielinski Brothers, as well as the invoices Brownell provided to Mann Brothers to support the 50-50 split, constituted materially false pretenses, representations, and promises.

4

### Welch Hanson

20.     Also during the time period of the conspiracy, Brownell directed actual Georgetown projects, including residential construction. One such project was the Conservancy, a high-end residential development in Cedarburg, Wisconsin. As part of his fraudulent activity, Brownell directed various contractors, including Welch Hanson & Associates, to issue bills to Bielinski Brothers for work actually performed on Georgetown projects, including the Conservancy, even though the work was not done for Bielinski Brothers. The payments were approved by Brownell and issued by Bielinski Brothers.

21.     As a result, Bielinski Brothers unwittingly paid invoices on projects that were the private business interests of Brownell and others.

22.     Brownell and Norm Hanson agreed to this method of payment.

23.     In addition, Norm Hanson agreed to use his NCCBH entity, as well as Welch Hanson & Associates, to issue fraudulent invoices to Bielinski Brothers that were unrelated to any actual project. Brownell approved the payment of these fraudulent invoices.

24.     The majority of the money generated from the false billings was sent to Brownell through one of his business entities; though Hanson often kept a small percentage for personal use.

5

25.     The inflated and fraudulent invoices from Welch Hanson & Associates and NCCBH to Bielinski Brothers constituted materially false pretenses, representations, and promises.

Brownell-Gral Partnerships

26.     Brownell and Gral were business partners in various entities, including Georgetown Holdings, LLC; Georgetown Development, LLC; Georgetown Investments, LLC; and Belize, LLC. Through their partnerships, Brownell and Gral purchased and developed real estate in Wisconsin and Florida. As part of the scheme, the defendants fraudulently used funds belonging to Bielinski Brothers to make down payments, purchase, and pay for development costs for such real estate.

27.     At the same time, Gral, while with the Michael Best & Friedrich law firm, served as a lawyer for Bielinski Brothers, as well as for its owners, Harry and Frank Bielinski. During the time period of the conspiracy, Michael Best & Friedrich billed Bielinski Brothers approximately $4 million for work performed by Gral and others at the firm.

28.     Based on his role as an attorney, Gral owed a fiduciary duty to Bielinski Brothers and Harry and Frank Bielinski personally.

29.     As a further part of the scheme to defraud, Gral misused that fiduciary duty for private gain.

6

30. Gral engaged in actions, individually and through Brownell, that served his own financial interest to the detriment of Bielinski Brothers at the same time that Gral was serving as a lawyer for Bielinski Brothers.

31. On such transaction was as follows. In the fall of 2002, Brownell and Gral, through Belize, LLC, entered into an agreement to purchase a condominium in Florida. Brownell had Bielinski Brothers pay in excess of $500,000 as a deposit for the purchase of the Florida condominium. The payment was authorized by Brownell without the knowledge or approval of Frank and Harry Bielinski and was made to appear as a legitimate Bielinski Brothers' expenditure.

32. In January 2004, Gral and Brownell entered into an agreement to have FHB Investments (as described in paragraph 5 above) act as an agent for Georgetown Investments to purchase real estate located in Lincoln County, Wisconsin known as Harrison Lakes. The purchase price for this property was approximately $1,500,000. As part of this agreement, Gral and Brownell fraudulently used funds belonging to FHB Investments to purchase this property. Despite the fact that Gral was the lawyer for Bielinski Brothers and its owners, the agreement was entered into without the knowledge or approval of Frank and Harry Bielinski. In July, 2004, Gral and Brownell transferred the Harrison Lakes property from FHB Investments to Georgetown Investments.

33. Brownell and Gral further entered into an arrangement whereby Brownell would provide Gral and his law firm with checks drawn on Bielinski

7

Brothers accounts, which did not have sufficient funds to cover the amount of these checks. These checks totaled in excess of $2 million. Gral agreed not to negotiate these checks and to provide Brownell with escrow agreements representing that the funds were on deposit with his law firm.

34. The actions of Gral and Brownell deprived Bielinski Brothers, and Frank and Harry Bielinski individually, of their intangible right to Gral's honest services, as those terms are used in Title 18, United States Code, section 1346. The actions of Gral and Brownell also included materially false pretenses, representations, and promises.

"Maintenance Account"

35. During the time period of the conspiracy, Brownell and Robert Mann kept a "maintenance account" to be funded by the fraudulent activity described above. The purpose of the account was to supply Brownell and Mann with a pool of money to provide themselves and others with financial benefits.

36. The recipients of the financial benefits further included persons involved with Brownell and Mann in otherwise legitimate business deals, including the owners of other businesses.

37. The "maintenance account" also funded illegal campaign contributions and other benefits to candidates and elected officials as described below.

38. Brownell also provided Hanson with proceeds from the fraud to fund illegal campaign contributions as described below.

8

39.     The amount of money involved in the "maintenance account" exceeded $1 million.

Campaign Contributions

40.     Brownell, Robert Mann, Norman Hanson and others associated with them sought to provide campaign contributions to certain candidates for public office. In order to avoid campaign contribution restrictions, Brownell, Mann, and Hanson used corporate funds and proceeds from the "maintenance account" to reimburse themselves and others for contributions to these political candidates.

41.     During the time period of the conspiracy, employees of Mann Brothers were provided with approximately $100,000 for the purpose of funding campaign contributions to then-Wisconsin governor Scott McCallum, the 2004 United States Senate race of Russ Darrow, and the 2004 reelection campaign of President George W. Bush. The contributions included the following.

42.     In February of 2001, Robert Mann and two others from Mann Brothers provided $25,000 for the inauguration ball of then-Wisconsin governor Scott McCallum. The $25,000 was funded by the "maintenance account."

43.     In February of 2002, Mann Brothers provided three of its employees with  bonuses totaling $22,500, which, after withholdings, gave the employees a total of just over $15,000. The money was then used by the employees to make a total of $15,000 in  contributions to Scott McCallum for his reelection campaign.

9

The maintenance account was used to reimburse Mann Brothers approximately $21,000 of the bonuses.

44. In August of 2002, Mann Brothers provided two other persons with $15,000, so that (after withholdings) $10,000 was available for a McCallum fund raiser. The maintenance account was used to reimburse Mann Brothers.

45. Similar funding schemes were used to provide the President George W. Bush reelection campaign with $21,000; and the Russ Darrow campaign for U.S. Senate with $17,000.

46. Robert Brownell used the maintenance account to reimburse himself and others at Bielinski Brothers approximately $19,000 for campaign contributions. Approximately $13,000 went to the campaign of then-Wisconsin governor Scott McCallum; approximately $4,000 went to the 2004 United States Senate race of Russ Darrow; and approximately $2,000 went to the 2004 reelection campaign of President George W. Bush.

47. Norman Hanson used proceeds of the fraud to reimburse himself and others at Welch Hanson approximately $57,500 for campaign contributions. Approximately $43,500 went to the campaign of then-Wisconsin governor Scott McCallum; approximately $8,000 went to the 2004 United States Senate race of Russ Darrow; and approximately $6,000 went to the 2004 reelection campaign of President George W. Bush.

10

## Total Losses

48.     The amount of losses caused by the scheme to defraud exceeded $4 million.

## Mail and Wire Fraud

49.     Brownell, Mann, Hanson, and Gral, and others acting in concert with them and on their behalf, for the purpose of executing and attempting to execute the scheme to defraud did cause and intend to cause matter to be delivered by the United States Postal Service and commercial interstate carriers according to the directions thereon.  The mail matter included the invoices and checks described above.

50.     Brownell, Mann, Hanson, and Gral, and others acting in concert with them and on their behalf, for the purpose of executing and attempting to execute the scheme to defraud did cause and intend to cause interstate wire communications. These interstate wire communications included the transfer of funds from the State of Wisconsin to other locations including the State of Florida.

All in violation of Title 18, United States Code, section 1349.


Jan 19, 2005
Date

STEVEN M. BISKUPIC
United States Attorney

11

# GROUP EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

'05 SEP 28 P2 :19

UNITED STATES OF AMERICA,

        Plaintiff,

     v.                         Case No. 05-CR-013

ROBERT G. BROWNELL,

        Defendant.

## PLEA AGREEMENT

1.    The United States of America, by its attorneys, Steven M. Biskupic, United States Attorney for the Eastern District of Wisconsin, and Matthew L. Jacobs, Assistant United States Attorney, and the defendant, Robert G. Brownell, individually and by his attorney, Martin E. Kohler, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

## CHARGES

2.    The defendant has been charged in a one-count superseding information filed in this district on January 19, 2005, which charges him with conspiring to commit mail and wire fraud, in violation of Title 18, United States Code, Section 1349.

3.    The defendant has read and fully understands the charge contained in the superseding information and fully understands the nature and elements of the crime with

which he has been charged and that the charge and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4.     The defendant has previously waived in open court his right to have this matter prosecuted by indictment.

5.     The defendant voluntarily agrees to plead guilty to the charge contained in the superseding information, a copy of which is attached to this plea agreement, as Exhibit A.

6.     The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offense charged in the superseding information. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove beyond a reasonable doubt the facts set forth in the attached offer of proof. The defendant admits to these facts and that these facts establish his guilt beyond a reasonable doubt. The facts set forth in the attached offer of proof are provided for the purpose of setting forth a factual basis for the defendant's plea of guilty. It is not a full recitation of the defendant's knowledge of or participation in the offense.

## PENALTIES

7.     The parties understand and agree that the offense to which the defendant will enter a plea of guilty carries the following maximum term of imprisonment and fine: Twenty (20) years and $250,000. The charge also carries a mandatory special assessment of $100.00 and a maximum of five years of supervised release. The parties further recognize that a restitution order may be entered by the court. The parties' acknowledgments,

2

understandings, and agreements with regard to restitution are set forth in paragraph 31 of this agreement.

8. The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes, as well as the applicable sentencing guidelines with his attorney.

## ELEMENTS

9. The parties understand and agree that to sustain the charge of conspiring to commit mail and wire fraud, in violation of 18 U.S.C. § 1349, as set forth in the superseding information, the government must prove each of the following propositions beyond a reasonable doubt:

First, that the conspiracy as charged existed, and

Second, that the defendant knowingly became a member of the conspiracy with an intention to further the conspiracy.

## SENTENCING PROVISIONS

10. The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

11. The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

3

12.     The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions that they believe to be applicable to the offense to which the defendant will plead guilty. The defendant acknowledges and agrees that his attorney, in turn, has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

13.     The parties acknowledge and understand that, prior to sentencing, the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea, the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw his guilty plea solely as a result of the sentencing court's determination of defendant's criminal history.

### Sentencing Guidelines Calculations

14.     The parties acknowledge, understand, and agree that the sentencing guidelines calculations included in this agreement represent the positions of the parties on the appropriate sentence range under the sentencing guidelines. The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or

4

inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

## Relevant Conduct

15.    The parties acknowledge, understand, and agree that, pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge will consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offense to which defendant is pleading guilty.

16.    The parties acknowledge, understand, and agree that, pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing court will consider the total amount of the loss incurred by any victims as a result of the defendant's fraud even if not alleged in the offense of conviction, and will use the total amount in calculating the sentencing guidelines range.

17.    For purposes of determining the defendant's offense level under the sentencing guidelines, the parties acknowledge and agree that, based upon the information presently available, the government will recommend that the loss amount associated with the defendant's criminal conduct charged in the superseding information is more than $7,000,000, but less than $20,000,000. The defendant reserves the right to dispute the government's calculation of the applicable loss amount and the associated Sentencing Guidelines resulting from this calculation discussed below. The parties acknowledge and understand that the amount of loss may differ from the amount of restitution imposed by the

sentencing court. The parties' acknowledgments, understandings, and agreements with regard to restitution are set forth in paragraph 31 of this agreement.

## Base Offense Level

18. The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in the superseding information is 7 under Sentencing Guidelines Manual § 2B1.1(a)(1).

## Specific Offense Characteristics

19. The parties acknowledge that the government will recommend to the sentencing court that a 20-level increase under Sentencing Guidelines Manual § 2B1.1(b)(1)(K) is applicable to the offense level for the offense charged in the superseding information because the government asserts that the loss amount associated with the defendant's fraud is more than $7,000,000 but less than $20,000,000. The defendant reserves the right to dispute this loss amount and the indicated increase in the defendant's offense level under Sentencing Guidelines Manual § 2B1.1(b)(1).

20. The parties acknowledge that the government will recommend to the sentencing court that a 2-level increase under Sentencing Guidelines Manual § 2B1.1(b)(9)(C) is applicable to the offense level for the offense charged in the superseding information because the defendant's offense involved "sophisticated means," as that term is used in that section. The defendant reserves the right to dispute this increase in the defendant's offense level.

6

21.     The parties acknowledge that the government will recommend to the sentencing court that a 2-level increase under Sentencing Guidelines Manual § 2B1.1(b)(13)(A) is applicable to the offense level for the offense charged in the superseding information because the defendant obtained more than $1 million from a financial institution as a result of his offense.  The defendant reserves the right to dispute this increase in the defendant's offense level.

### Role in the Offense

22.     The parties acknowledge that the government will recommend to the sentencing court that a 4-level increase under Sentencing Guidelines Manual § 3B1.1(a) is applicable to the offense level for the offense charged in the superseding information because the defendant was an organizer or leader of criminal activity that involved five or more participants and was otherwise extensive.  The defendant reserves the right to dispute this increase in the defendant's offense level.

### Abuse of Position of Trust

23.     The parties acknowledge that the government will recommend to the sentencing court that a 2-level increase under Sentencing Guidelines Manual § 3B1.3 is applicable to the offense level for the offense charged in the superseding information because the defendant abused a position of private trust in a manner that significantly facilitated the commission and concealment of his offense.  The defendant reserves the right to dispute this increase in the defendant's offense level.

7

## Acceptance of Responsibility

24.     The government agrees to recommend a two-level decrease for acceptance of responsibility, as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility. In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

## Sentencing Recommendations

25.     Both parties reserve the right to apprise the district court and the probation office of any and all information that might be pertinent to the sentencing process including, but not limited to, any and all conduct related to the offense, as well as any and all matters that might constitute aggravating or mitigating sentencing factors.

26.     Both parties reserve the right to make any recommendation regarding the defendant's custodial status pending the sentencing and any other matters not specifically addressed by this agreement.

## Court's Determinations at Sentencing

27.     The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court.

The sentencing court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth above in paragraph 7. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

28. The parties acknowledge, understand, and agree that the defendant may not move to withdraw his guilty plea solely as a result of the sentence imposed on him by the court.

## FINANCIAL MATTERS

29. The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable upon entry of the judgment of conviction. The defendant agrees not to request any delay or stay in payment of any and all financial obligations.

### Special Assessment

30. The defendant agrees to pay the special assessment in the amount of $100 prior to or at the time of sentencing.

### Restitution

31. The defendant agrees to make full restitution to Bielinski Brothers Builders, Inc., which was the victim of the defendant's fraud. The defendant understands that because

9

restitution for the offense charged is mandatory, the amount of restitution shall be imposed by the court regardless of the defendant's financial resources. The defendant agrees to cooperate in efforts to collect the restitution obligation. The defendant understands that imposition or payment of restitution will not restrict or preclude the filing of any civil suit or administrative action.

## DEFENDANT'S COOPERATION

32.     The defendant, by entering into this agreement, further agrees to fully and completely cooperate with the government in its investigation of this and related matters, and to testify truthfully and completely before the grand jury and at any subsequent trials or proceedings, if asked to do so. The government agrees to advise the sentencing judge of the nature and extent of the defendant's cooperation. The parties acknowledge, understand, and agree that if the defendant provides substantial assistance to the government in the investigation or prosecution of others, only the government, in its discretion, may move for and recommend a downward departure from the applicable sentencing guidelines range. The defendant acknowledges and understands that the court will make its own determination with regard to the appropriateness and extent of a downward departure.

## DEFENDANT'S WAIVER OF RIGHTS

33.     In entering this agreement, the defendant acknowledges and understands that, in so doing, he surrenders any claims he may have raised in any pretrial motion, as well as certain rights, which include the following:

a.     If the defendant persisted in a plea of not guilty to the charge against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

b.     If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause, where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

c.     If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

d.     At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government was relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

e.     At such trial, the defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

34.     The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights.

11

35.     The defendant acknowledges and understands that he will be adjudicated guilty of the offense to which he will plead guilty and, thereby, may be deprived of certain rights including, but not limited to, the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

36.     The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

### Further Civil or Administrative Action

37.     The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant including, but not limited to, any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

## GENERAL MATTERS

38.     The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

39.     The parties acknowledge, understand, and agree that this plea agreement will be filed and become part of the public record in this case.

40.     The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

41.     The defendant understands that pursuant to the Victim and Witness Protection Act and the regulations promulgated under the Act by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

### Further Action by Internal Revenue Service

42.     Nothing in this agreement shall be construed so as to limit the Internal Revenue Service in discharging its responsibilities in connection with the collection of any additional tax, interest, and penalties due from the defendant as a result of the defendant's conduct giving rise to the charge alleged in the superseding information.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

43.     The defendant acknowledges and understands that if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditioned upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges that were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## VOLUNTARINESS OF DEFENDANT'S PLEA

44.     The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is, in fact, guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor

14

agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: _9/28/05_

ROBERT G. BROWNELL
Defendant

I am the defendant's attorney. I have reviewed carefully every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: _9/28/05_

MARTIN E. KOHLER
Attorney for Defendant

For the United States of America:

Date: _Sept. 28, 2005_

STEVEN M. BISKUPIC
United States Attorney

Date: _9/28/05_

MATTHEW L. JACOBS
Assistant United States Attorney

16

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN   '05   JAN 19   P4 :27

UNITED STATES OF AMERICA,

          Plaintiff,

     v.

ROBERT G. BROWNELL,
ROBERT E. MANN,
NORMAN C. HANSON, and
MICHAEL A. GRAL,

          Defendants.

Case No. 05-CR-013

## SUPERSEDING INFORMATION

**The United States Attorney Charges:**

### Overview

1.    Between on or about May 1, 2000, and on or about July 16, 2004, in

the State and Eastern District of Wisconsin, and elsewhere,

> **Robert G. Brownell,**
> **Robert E. Mann,**
> **Norman C. Hanson, and**
> **Michael A. Gral,**

did knowingly conspire among themselves and with others known and unknown to

device and execute a scheme to defraud, which scheme was executed by use of

the U.S. mail and interstate wire communications, in violation of Title 18, United

States Code, Sections 1341 (mail fraud) and 1343 (wire fraud).



EXHIBIT

_A_

PENGAD 800-631-6989

2.     The defendants' scheme to defraud included a scheme to deprive another of the intangible right to honest services.

3.     The object of the conspiracy was to obtain money for the defendants, their businesses, as well as others conspirators, and their companies; and to fund contributions to candidates for public office.

### Background

4.     Bielinski Brothers, Inc. is a Waukesha County-based residential and commercial construction company. It operates under various corporate names, including Bielinski Homes and Bielinski Development, Inc. (herein collectively referred to as "Bielinski Brothers"). Bielinski Brothers is involved in more than $100 million in new home construction each year.

5.     Robert G. Brownell began working for Bielinski Brothers in 1995. From approximately 2001 until July of 2004, Brownell served as Chief Executive Officer of Bielinski Brothers. He was paid approximately $175,000 per year. Brownell was also a partner with Frank and Harry Bielinski in FHB Investments, LLC.

6.     As part of his duties at Bielinski Brothers, Brownell approved the payment of invoices associated with development and new home construction. These invoices included work for surveys, analysis, grading and similar activity at the start of the construction of a residential subdivision.

7.     Mann Brothers, Inc. is an Elkhorn-based construction company that provided grading and other construction work for Bielinski Brothers. During the time

2

period of the conspiracy, Mann Brothers performed approximately $20 million in work for Bielinski Brothers each year.

8.      Robert E. Mann was the president and part-owner of Mann Brothers, Inc.

9.      Welch Hanson & Associates is civil engineering firm in Delafield, Wisconsin. The firm also includes surveyors and landscape architects. The firm is a division of Yaggy Colby & Associates.

10.     Norman C. Hanson is a principal in Welch Hanson & Associates. He also is a partner in a separate, unrelated limited liability company called NCCBH.

11.     Michael A. Gral was a partner at the law firm Michael Best & Friedrich. He served as a lawyer for Bielinski Brothers.

<u>Kickback and Embezzlement Scheme</u>

12.     In addition to working for Bielinski Brothers, Brownell operated various businesses alone and in partnership with others. They included: (a) DSI, or Development Services, Inc.; (b) SEWMA, or Southeastern Wisconsin Market Analysts; (c) Georgetown Holdings, LLC; (d) Georgetown Development, LLC; (e) Georgetown Investments, LLC; and (e) Belize, LLC.

13.     As part of a scheme to defraud Bielinski Brothers and others, Brownell approved invoices from other business entities knowing that the invoices were fraudulent and had been inflated.

3

14.    The money generated as part of the false billings was used for the financial benefit of the defendants and others, as described below.

Mann Brothers

15.    Bielinski Brothers hired Mann Brothers to do grading and other work at the start of residential developments.

16.    As part of a scheme to defraud Bielinski Brothers, Mann and Brownell agreed to participate in Bielinski Brother's payment of inflated invoices submitted by Mann Brothers.

17.    At the start of a project involving Mann Brother and Bielinski Brothers, Brownell and Mann discussed the amount of inflated charges that were to be included on a particular project. That amount varied by the size of the project, the actual work that was needed, and the potential budget.

18.    Once Mann Brothers was paid, the excess from the invoices was split equally between Brownell and Robert Mann. Brownell's share was given to him in the form of checks from Mann Brothers to DSI and SEWMA. Brownell provided an invoice from one of his companies to Mann to justify this payment.

19.    The inflated and fraudulent invoices from Mann Brothers to Bielinski Brothers, as well as the invoices Brownell provided to Mann Brothers to support the 50-50 split, constituted materially false pretenses, representations, and promises.

4

Welch Hanson

20.     Also during the time period of the conspiracy, Brownell directed actual
Georgetown projects, including residential construction.  One such project was the
Conservancy, a high-end residential development in Cedarburg, Wisconsin.  As
part of his fraudulent activity, Brownell directed various contractors, including Welch
Hanson & Associates, to issue bills to Bielinski Brothers for work actually performed
on Georgetown projects, including the Conservancy, even though the work was not
done for Bielinski Brothers.  The payments were approved by Brownell and issued
by Bielinski Brothers.

21.     As a result, Bielinski Brothers unwittingly paid invoices on projects that
were the private business interests of Brownell and others.

22.     Brownell and Norm Hanson agreed to this method of payment.

23.     In addition, Norm Hanson agreed to use his NCCBH entity, as well as
Welch Hanson & Associates, to issue fraudulent invoices to Bielinski Brothers that
were unrelated to any actual project.  Brownell approved the payment of these
fraudulent invoices.

24.     The majority of the money generated from the false billings was sent
to Brownell through one of his business entities; though Hanson often kept a small
percentage for personal use.

5

25.     The inflated and fraudulent invoices from Welch Hanson & Associates and NCCBH to Bielinski Brothers constituted materially false pretenses, representations, and promises.

Brownell-Gral Partnerships

26.     Brownell and Gral were business partners in various entities, including Georgetown Holdings, LLC; Georgetown Development, LLC; Georgetown Investments, LLC; and Belize, LLC. Through their partnerships, Brownell and Gral purchased and developed real estate in Wisconsin and Florida. As part of the scheme, the defendants fraudulently used funds belonging to Bielinski Brothers to make down payments, purchase, and pay for development costs for such real estate.

27.     At the same time, Gral, while with the Michael Best & Friedrich law firm, served as a lawyer for Bielinski Brothers, as well as for its owners, Harry and Frank Bielinski. During the time period of the conspiracy, Michael Best & Friedrich billed Bielinski Brothers approximately $4 million for work performed by Gral and others at the firm.

28.     Based on his role as an attorney, Gral owed a fiduciary duty to Bielinski Brothers and Harry and Frank Bielinski personally.

29.     As a further part of the scheme to defraud, Gral misused that fiduciary duty for private gain.

6

30.     Gral engaged in actions, individually and through Brownell, that served his own financial interest to the detriment of Bielinski Brothers at the same time that Gral was serving as a lawyer for Bielinski Brothers.

31.     On such transaction was as follows. In the fall of 2002, Brownell and Gral, through Belize, LLC, entered into an agreement to purchase a condominium in Florida. Brownell had Bielinski Brothers pay in excess of $500,000 as a deposit for the purchase of the Florida condominium. The payment was authorized by Brownell without the knowledge or approval of Frank and Harry Bielinski and was made to appear as a legitimate Bielinski Brothers' expenditure.

32.     In January 2004, Gral and Brownell entered into an agreement to have FHB Investments (as described in paragraph 5 above) act as an agent for Georgetown Investments to purchase real estate located in Lincoln County, Wisconsin known as Harrison Lakes. The purchase price for this property was approximately $1,500,000. As part of this agreement, Gral and Brownell fraudulently used funds belonging to FHB Investments to purchase this property. Despite the fact that Gral was the lawyer for Bielinski Brothers and its owners, the agreement was entered into without the knowledge or approval of Frank and Harry Bielinski. In July, 2004, Gral and Brownell transferred the Harrison Lakes property from FHB Investments to Georgetown Investments.

33.     Brownell and Gral further entered into an arrangement whereby Brownell would provide Gral and his law firm with checks drawn on Bielinski

7

Brothers accounts, which did not have sufficient funds to cover the amount of these checks. These checks totaled in excess of $2 million. Gral agreed not to negotiate these checks and to provide Brownell with escrow agreements representing that the funds were on deposit with his law firm.

34.    The actions of Gral and Brownell deprived Bielinski Brothers, and Frank and Harry Bielinski individually, of their intangible right to Gral's honest services, as those terms are used in Title 18, United States Code, section 1346. The actions of Gral and Brownell also included materially false pretenses, representations, and promises.

<u>"Maintenance Account"</u>

35.    During the time period of the conspiracy, Brownell and Robert Mann kept a "maintenance account" to be funded by the fraudulent activity described above. The purpose of the account was to supply Brownell and Mann with a pool of money to provide themselves and others with financial benefits.

36.    The recipients of the financial benefits further included persons involved with Brownell and Mann in otherwise legitimate business deals, including the owners of other businesses.

37.    The "maintenance account" also funded illegal campaign contributions and other benefits to candidates and elected officials as described below.

38.    Brownell also provided Hanson with proceeds from the fraud to fund illegal campaign contributions as described below.

8

39.     The amount of money involved in the "maintenance account" exceeded $1 million.

### Campaign Contributions

40.     Brownell, Robert Mann, Norman Hanson and others associated with them sought to provide campaign contributions to certain candidates for public office. In order to avoid campaign contribution restrictions, Brownell, Mann, and Hanson used corporate funds and proceeds from the "maintenance account" to reimburse themselves and others for contributions to these political candidates.

41.     During the time period of the conspiracy, employees of Mann Brothers were provided with approximately $100,000 for the purpose of funding campaign contributions to then-Wisconsin governor Scott McCallum, the 2004 United States Senate race of Russ Darrow, and the 2004 reelection campaign of President George W. Bush. The contributions included the following.

42.     In February of 2001, Robert Mann and two others from Mann Brothers provided $25,000 for the inauguration ball of then-Wisconsin governor Scott McCallum. The $25,000 was funded by the "maintenance account."

43.     In February of 2002, Mann Brothers provided three of its employees with  bonuses totaling $22,500, which, after withholdings, gave the employees a total of just over $15,000. The money was then used by the employees to make a total of $15,000 in  contributions to Scott McCallum for his reelection campaign.

9

The maintenance account was used to reimburse Mann Brothers approximately $21,000 of the bonuses.

44.    In August of 2002, Mann Brothers provided two other persons with $15,000, so that (after withholdings) $10,000 was available for a McCallum fund raiser. The maintenance account was used to reimburse Mann Brothers.

45.    Similar funding schemes were used to provide the President George W. Bush reelection campaign with $21,000; and the Russ Darrow campaign for U.S. Senate with $17,000.

46.    Robert Brownell used the maintenance account to reimburse himself and others at Bielinski Brothers approximately $19,000 for campaign contributions. Approximately $13,000 went to the campaign of then-Wisconsin governor Scott McCallum; approximately $4,000 went to the 2004 United States Senate race of Russ Darrow; and approximately $2,000 went to the 2004 reelection campaign of President George W. Bush.

47.    Norman Hanson used proceeds of the fraud to reimburse himself and others at Welch Hanson approximately $57,500 for campaign contributions. Approximately $43,500 went to the campaign of then-Wisconsin governor Scott McCallum; approximately $8,000 went to the 2004 United States Senate race of Russ Darrow; and approximately $6,000 went to the 2004 reelection campaign of President George W. Bush.

10

## Total Losses

48.     The amount of losses caused by the scheme to defraud exceeded $4 million.

## Mail and Wire Fraud

49.     Brownell, Mann, Hanson, and Gral, and others acting in concert with them and on their behalf, for the purpose of executing and attempting to execute the scheme to defraud did cause and intend to cause matter to be delivered by the United States Postal Service and commercial interstate carriers according to the directions thereon. The mail matter included the invoices and checks described above.

50.     Brownell, Mann, Hanson, and Gral, and others acting in concert with them and on their behalf, for the purpose of executing and attempting to execute the scheme to defraud did cause and intend to cause interstate wire communications. These interstate wire communications included the transfer of funds from the State of Wisconsin to other locations including the State of Florida.

All in violation of Title 18, United States Code, section 1349.


Jan 19, 2005
Date

Steven M. Biskupic
STEVEN M. BISKUPIC
United States Attorney

11

United States v. Robert G. Brownell
Case No. 05-CR-013

**GOVERNMENT'S OFFER OF PROOF**

Overview.

At all time relevant to this prosecution, defendant Robert G. Brownell ("Brownell") was employed by Bielinski Brothers Builders, Inc. ("Bielinski Brothers") or one of its related businesses. Bielinski Brothers, which operated related businesses including Bielinski Homes and Bielinski Development, is a residential construction business located in Waukesha, Wisconsin. The business is owned by Frank and Harry Bielinski, who are brothers. In October 1995, Brownell was hired as the Acquisitions and Development Manager at Bielinski Brothers. In 2001, Brownell became the Chief Executive Officer of Bielinski Brothers.

As detailed below, Brownell and others working with him, including the other defendants charged in this case, devised and carried out a scheme to defraud Bielinski Brothers and others. As part of this scheme, Brownell used his position at Bielinski Brothers to authorize the payment of numerous fraudulent invoices and other expenses to his own benefit and the benefit of third parties, including his co-defendants.

As a further part of his scheme, Brownell fraudulently used his position at Bielinski Brothers to apply for and obtain loans from federally insured financial institutions in the names of Bielinski Brothers, in the names of its related businesses, as well as in the names of its owners, Frank and Harry Bielinski. To obtain these loans, Brownell, and others working with him and at his direction, forged the signatures of Frank and Harry Bielinski, as well as the signature of Harry's wife, Suzanne.

To facilitate the fraud, Brownell and others working with him and at his direction, set up separate businesses, including Southeastern Wisconsin Market Analysts, Inc. ("SEWMA"), Development Services, Inc. ("DSI"), Georgetown Holdings, LLC, Georgetown Investments, LLC, Georgetown Development, LLC, Belize, LLC, and MBB Associates.

1. Robert Mann/Mann Brothers, Inc.

At all times relevant to this prosecution, defendant Robert Mann ("Mann"), was an owner and officer of Mann Brothers, Inc., which is a construction, grading, and excavating business located in Elkhorn, Wisconsin.

1

In late 1999, Mann and Brownell entered into an agreement to obtain money from Bielinski Brothers through the submission of inflated and fraudulent invoices in connection with actual projects Mann Brothers was working on for Bielinski Brothers. Brownell would tell Mann on which projects Mann should submit inflated invoices and the amount by which Mann should inflate the invoices. Under this agreement, Brownell used his position at Bielinski Brothers to approve these inflated invoices.

Mann and Brownell agreed that a portion of the money fraudulently obtained from Bielinski Brothers would be used by Mann to pay for various expenditures benefitting Mann and Brownell, including funding illegal campaign contributions to various political candidates. Mann kept track of these expenditures, which totaled approximately $1.1 million, on a "running total" he maintained. The remaining portion of the money fraudulently obtained from Bielinski Brothers was split between Mann and Brownell. To obtain his share of the money, Brownell submitted invoices to Mann Brother in the names of SEWMA and DSI totaling approximately $1.2 million. Based on Mann's approval, Mann Brothers paid these latter invoices by issuing checks that were mailed to Brownell's businesses.

Pursuant to this agreement, during the period from late 1999 through July 2004, Mann submitted invoices to Bielinski Brothers that included inflated and fraudulent charges totaling approximately $3.8 million. These invoices were mailed to Bielinski Brothers by Mann Brothers. Based on Brownell's approval, Bielinski Brothers paid these inflated and fraudulent invoices by issuing checks that were mailed to Mann Brothers.

2. Brian Carney.

During the period from approximately June 2000 through September 2000, Brian Carney was employed in the Acquisition and Development Department at Bielinski Brothers. In September 2000, Carney left Bielinski Brothers and went to work at Redmond Residential, which was also real estate development business. In April 2000, Brownell had formed a partnership with the owner of Redmond Residential and a third party. Carney worked at Redmond Residential from October 1, 2000 through October 2002. He was re-hired by Brownell to work at Bielinski Brothers beginning in January 2003.

In approximately October 2000, Carney entered into an arrangement with Robert Brownell, who, at that time, was the head of the Acquisition and Development Department at Bielinski Brothers. Under this arrangement, Brownell agreed to pay Carney and a second employee (Barb Gumieny) a "signing bonus" to leave Bielinski Brothers and go to work at Redmond Residential. Unbeknownst to the owners of Bielinski Brothers, Brownell used funds from Bielinski Brothers to pay this bonus. To facilitate this payment and make it look

2

legitimate, Carney formed a business called Great Lakes Design Group, LLC ("Great Lakes"). Carney also opened a bank account in the name of Great Lakes and a post office box in Waukesha.

On November 10, 2000, Carney and/or Brownell submitted an invoice to Bielinski Brothers in the name of Great Lakes. The invoice (no. 8228) was in the amount of $31,200 and reflected a bill for services that had not, in fact, been provided to Bielinski Brothers. Pursuant to the arrangement with Carney, Brownell fraudulently authorized payment of this invoice by Bielinski Brothers. This payment, which was made by check dated December13, 2000, was sent to Carney, who deposited the check into his Great Lakes bank account.

Carney then issued a check on the Great Lakes account payable to Brownell in the amount of $29,900. Brownell used these funds, in turn, to make payments to Carney, in the amount of $14,900, and Gumieny in the amount of $15,000. These payments were made to induce Carney and Gumieny to leave Bielinski Brothers and go to work at Redmond residential.

In late 2002, Carney agreed to return to work at Bielinski Brothers. Brownell told Carney that he would pay Carney approximately $10,000 prior to the time Carney actually started working again at Bielinski Brothers in January 2003. In addition, Brownell agreed to supplement Carney's official salary at Bielinski Brothers after Carney started working. Brownell instructed Carney to submit invoices to Bielinski Brothers under the name of Great Lakes to obtain these additional payments. Brownell never sought the approval of or informed the owners of Bielinski Brothers of this arrangement with Carney. During the period from approximately November 2002 through May 2004, and at Brownell's direction, Carney submitted fraudulent invoices to Bielinski Brothers in the name of Great Lakes totaling $72,475. These invoices were made to appear as if Great Lakes had performed work on various Bielinski Brothers projects. Based on Brownell's approval, Bielinski Brothers paid the Great Lakes invoices. These payments were sent by mail to Carney.

3. Norman Hanson/Welch Hanson fraud.

At all times relevant to this prosecution, defendant Norman C. Hanson ("Hanson"), was a principal of and employed by Welch, Hanson and Associates ("Welch Hanson"). Welch Hanson is a business located in Delafield, Wisconsin that provides consulting and other services to real estate developers. These services include engineering, surveying, landscape architecture, and planning. In September 2002, Hanson set up a separate business under the name NCCBH Consulting Services, LLC ("NCCBH"). Hanson also opened a bank account in the name of NCCBH.

3

In approximately June 2001, Hanson and Brownell entered into an agreement whereby Welch Hanson provided services for real estate development projects in which Brownell was involved but that did not involve Bielinski Brothers. Under this arrangement, Welch Hanson submitted invoices to Bielinski Brothers for the work performed on Brownell's projects. These invoices totaled in excess of $360,000. To conceal this arrangement, the invoices submitted by Welch Hanson to Bielinski Brothers reflected generic descriptions of the projects and the nature of the work that had been performed. Using his position at Bielinski Brothers, Brownell fraudulently approved payment of these invoices.

During the period from approximately October 2002 through April 2004, Hanson also submitted fraudulent invoices to Bielinski Brothers in the name of NCCBH charging for services that had not, in fact, been provided by Hanson or NCCBH. These invoices totaled approximately $168,000. Using his position at Bielinski Brothers, Brownell approved these fraudulent invoices. Based on Brownell's approval, Bielinski Brothers paid these invoices by issuing checks that were mailed to Hanson and NCCBH.

Hanson retained a portion of the money paid by Bielinski Brothers as a fee for his services. The majority of the money Hanson obtained from Bielinski Brothers, however, was diverted back to Brownell. To obtain his share of the money and make it appear that these were legitimate business transactions, Brownell submitted invoices to NCCBH in the names of SEWMA and DSI. These invoices totaled approximately $77,000.

At Brownell's direction, some of the money paid to NCCBH by Bielinski Brothers was used by Hanson to fund illegal campaign contributions made by Hanson, his wife, and Welch Hanson employees. In addition, some of the money was used by Hanson to pay for a portion of the rent for an apartment for a relative of Hanson's and to fund down payments made by two Welch Hanson employees for homes being built by Bielinski Brothers.

4. Florida condominium/Belize, LLC.

In July 2002, Brownell executed a contract to purchase a condominium located in Marco Island, Florida, for $2,760,000. Brownell initially entered into the contract to purchase the condo in his own name but later changed the purchaser to Belize, LLC. Belize, LLC was a business formed by Brownell and defendant Michael Gral, in Florida in August, 2002. The sole owner of Belize, LLC was Georgetown Holding Company, LLC, which was a Wisconsin company formed by Brownell and Gral on November 21, 2001.

In connection with this purchase, Brownell provided down payments towards the purchase price totaling $828,000. Brownell made this down payment in the form of three checks. The first was dated September 5, 2002, in the amount of $50,000, and was written

4

on a Bielinski Brothers' account at State Financial Bank in the name of Fox Chase, LLC. Brownell did not have the authority to issue this check on behalf of Bielinski Brothers and did not inform the owners of Bielinski Brothers that he was using Bielinski Brothers' funds to make a down payment on the condominium.

The second check was dated September 23, 2002, in the amount of $502,000, and was drawn on a Bielinski Brothers' account maintained at M&I Bank. Again, Brownell did not have the authorization of Bielinski Brothers to make this payment and did not inform the owners of Bielinski Brothers that he was using Bielinski Brothers' funds to make a down payment on his purchase of the Florida condominium. The remaining portion of the down payment was made using funds Brownell had borrowed from his co-defendant, Robert Mann.

Brownell closed on the purchase of the Florida condominium on June 28, 2004. The purchase of the condominium was funded by a $2,760,000 loan Gral and Brownell obtained from State Financial Bank in the name of Belize, LLC. At the closing of the purchase of the condominium in 2004, Brownell received approximately $758,000, which he converted to his own use.

5. Harrison Lakes Property

In October 2003, Brownell submitted an offer to purchase a real estate development located on Harrison Lakes in Lincoln County, Wisconsin ("Harrison Lakes"). The original offer to purchase was made in the name of Bielinski Homes, Inc. for a total purchase price of $1,561,000. Brownell submitted the offer in his capacity as the CEO of Bielinski Homes; however, Brownell had never obtained the authorization of the owners of Bielinski Homes to make this offer. This offer was ultimately accepted by the owners of Harrison Lakes and the sale closed on January 8, 2004.

Two days prior to the closing, Brownell executed an assignment transferring the offer to purchase Harrison Lakes from Bielinski Homes to FHB Investments, LLC. FHB Investments was a separate business set up by Brownell and Frank and Harry Bielinski, to make separate investments in real estate. Brownell executed the assignment of offer on behalf of both Bielinski Homes, as its CEO, and FHB Investments. Frank and Harry Bielinski were unaware of this transaction.

To fund the purchase of Harrison Lakes, Brownell fraudulently applied for and obtained a $6.5 million line of credit at M&I Bank in the name of Bielinski Properties. To obtain this line of credit, Brownell and others working with him and acting as his direction, forged the signatures of Frank and Harry Bielinski, as well as Harry's the wife, Suzanne, on various loan documents submitted to M&I Bank. In addition, Brownell had another

5

employee at Bielinski Homes, Jill Baker, fraudulently notarize the forged signatures of Harry, Frank and Suzanne Bielinski on these documents. The forged documents submitted to M&I Bank included a mortgage on several duplexes in Waukesha owned by the Bielinskis and an assignment of the rents from these duplexes to the bank.

After fraudulently obtaining this line of credit, Brownell directed that in excess of $1,560,000 be drawn on the line of credit and transferred to the account of FHB Investments maintained at State Financial Bank. Brownell then directed that a series of checks totaling $1,560,536.26 be issued on the FHB account to pay for the purchase of Harrison Lakes. Again, all of these transactions were conducted by Brownell without the knowledge or approval of Frank and Harry Bielinski.

As an aside, at approximately the same time, Brownell also approached State Financial Bank and applied for a $1.5 million in the name of FHB Investments to purchase Harrison Lakes. Brownell never followed through on this loan.

In July 2004, Brownell sold the Harrison Lakes property to Georgetown Investments, which was a business he and Gral had set up in November 2001. The purchase price for this sale was $1,561,000. The closing statement for this transaction is signed by Brownell on behalf of FHB Investments and Gral on behalf of Georgetown Investments.

Significantly, Brownell and Gral also executed an agency agreement that purports to be dated January 6, 2004. This agency agreement, which was likely executed in July, 2004 and backdated to January to precede the initial purchase of Harrison Lakes, indicates that at the time FHB Investments initially purchased Harrison Lakes it was acting as the agent for Georgetown Investments. At a minimum, this documentation would have avoided the transfer tax associated with the July 2004 sale of Harrison Lakes by FHB Investments to Georgetown Investments by making this latter sale appear to be merely a continuation of the January purchase.

The purchase of the Harrison Lakes property by Georgetown Investments was financed by a loan Gral and Brownell obtained in the name of Georgetown Investments from State Financial Bank. The loan was in the amount of $1,538,000. In connection with obtaining this loan, Brownell and Gral also submitted a copy of the backdated agency agreement reflected that FHB had acted as Georgetown Investment's agent at the time of the initial purchase in January 2004.

As with most of the documentation in connection with the original purchase of the Harrison Lakes property and the subsequent sale to Georgetown Investments, this backdated agency agreement was generated by Gral's law firm, Michael, Best & Friedrich ("MB&F").

6

Gral was, at that time, a partner at MB&F and one of the lawyers for Bielinski Brothers and Frank and Harry Bielinski. MB&F billed Bielinski Brothers approximately $4,000 for legal services in connection with the initial purchase of Harrison Lakes by FHB Investments and the later sale to Georgetown Investments. In fact, Gral was one of the three lawyers from MB&F who worked on this matter and billed Bielinski Brothers for his time.

### 6. Jack Broughton

Jack Broughton was hired as the Director of Marketing for Bielinski Brothers in May 2003. In a side agreement, Brownell agreed to supplement Broughton's official salary at Bielinski Homes by making payments to a business Broughton formed, Accipiter Communications, LLC. Brownell never sought the approval of or informed the owners of Bielinski Brothers of this arrangement with Broughton. During the period from June 2003 May 2004, and at Brownell's direction, Broughton submitted fraudulent invoices to Bielinski Brothers in the name of Accipiter Communications totaling $111,002.35. These invoices were made to appear as if Accipiter Communications had provided consulting services to Bielinski Brothers. Based on Brownell's approval, Bielinski Brothers paid the Accipiter Communications invoices. These payments were sent to Broughton by mail.

### 7. Forged M&I Bank Loans

In March 2004, Brownell orchestrated the application and obtaining of three loans from M&I Bank using the forged signatures of Harry and Frank Bielinski and, in the case of one of the loans, the forged signature of Harry's wife, Suzanne. The first loan, which was in the name of Bielinski Development, Inc., was in the amount of $7,120,000. The indicated purpose for this loan was the Bay Pointe Condominiums in Oconomowoc. At the time this loan was obtained, approximately $2 million was drawn on the loan and used to purchase the property associated with this project.

The second loan, which was also issued in the name of Bielinski Development, Inc., was in the amount of $2,550,000. This loan indicates that it was for purposes of another Bielinski project, Riverfront Condominiums in Waukesha. At the time of closing on this loan, approximately $745,000 was drawn and again used to purchase the property on which this project was being constructed.

The third loan, which was in the amount of $1,430,000, was issued in the names of Harry and Frank Bielinski, individually. The net proceeds from this loan ($1,424,905) was wired to Mann Brothers.

7

All of the loan documents associated with these three loans bear the forged signatures of Harry and Frank Bielinski. Significantly, among these documents are forged agreements under which Frank and Harry Bielinski pledged their personal certificates of deposit at Johnson Bank to secure the loan obtained in their individual names that was used to wire $1.4 million to Mann Brothers. The signature of Harry Bielinski was forged by David Busch; the signature of Frank Bielinski was forged by Jill Baker; and the signature of Harry Bielinski's wife, Suzanne, was forged by Joseph Harvey.

### 8. Fraudulent MB&F Escrow Agreements

In late May and early June 2004, Brownell caused the creation of four fraudulent escrow agreements. These escrow agreements represent that Bielinski Brothers had deposited a stated amount of money with the law firm of MB&F and that these funds would be available to the recipient of the escrow agreement if certain events occurred. All of the escrow agreements are executed by Brownell on behalf of various Bielinski entities.

Three of these escrow agreements (May 24, 2004 in the amount of $274,900; May 25, 2004 in the amount of $620,400; and May 26, 2004 in the amount of $360,000) were provided to M&I Bank in connection with three loans Bielinski brothers obtained to purchase property. The escrow agreements were given to the bank to provide a financial cushion in the event that appraisals for the property turned out to be inadequate to cover three loans the bank was making to the Bielinski Brothers.

Each of the escrow agreements has an escrow receipt indicating that MB&F has received and deposited the indicated amount of money as earnest money for the agreement. While Brownell did provide a Bielinski Brothers' check for each of the escrow agreements, he directed the law firm not to deposit the checks and there were insufficient funds to cover the checks if the law firm had, in fact, deposited them.

Because the appraisals associated with the M&I Bank loans ultimately proved adequate to cover the loans, the three unfunded escrow agreements executed by Brownell were never drawn on and ultimately expired.

The fourth escrow agreement was provided by Brownell to Mann Brothers. This escrow agreement reflects that MB&F has a total of $1,666,288 as earnest money deposited with it. Again, while Brownell did provide the law firm with a Bielinski check in this amount, he directed the law firm not to deposit the check and there were insufficient funds to cover the check had the law firm attempted to negotiate it.

8

This escrow agreement reflected that Mann Brothers had performed work on seven projects of Bielinski Brothers and was, therefore, owed a total of $1,666,288. The majority of this amount ($1,275,089) was for work Mann Brothers had purportedly done on a project known as Grandview Plaza.

After Brownell provided this unfunded escrow agreement to Mann Brothers, the CFO for Mann Brothers used the agreement in discussions with LaSalle Bank, which was providing financing to Mann Brothers and had concerns about accounts receivables that Mann Brothers had not collected. It is my understanding that Mann Brothers has subsequently attempted to collect on this escrow agreement.

9. Assignment Fraud

Over the course of his employment with Bielinski Brothers, Brownell fraudulently used his position to disrupt or otherwise sidetrack efforts by Bielinski Brothers to purchase real estate. Brownell and others working with him or at his direction, would then acquire the rights to purchase the real estate. Bielinski Brothers would then have to pay this third party an assignment fee to obtain the rights to purchase the property. As a result of Brownell's actions, Bielinski Brothers paid a total of $1.5 million in assignment fees. In addition, Bielinski Brothers paid $300,000 for a piece of property that it had previously sold in connection with one of the assignments for $1,000.

(a)  Fox Chase.

In March 2000, Bielinski Brothers obtained an offer to purchase 57 acres of land in Eagle, Wisconsin for $660,000. This project is commonly referred to as the Fox Chase Development. Bielinski Brothers did not, however, close on this transaction.

Instead, in October of 2000, Redmond Residential of Wisconsin, which was operated by Mark Redmond and Brian Cummings, obtained an offer to purchase the property, as well as a 1.1 acre out lot, for $760,000. As mentioned above, in April 2000, Brownell had entered into a partnership with Redmond and Cummings to form MBB Associates. In addition, shortly before Redmond Residential obtained the offer to purchase the Fox Chase property, Brownell convinced two of his subordinates at Bielinski Brothers, Brian Carney and Barb Gumieny, to leave Bielinski Brothers and go to work for Redmond Residential. As discussed above, Brownell paid Carney and Gumieny a "signing bonus" to go to work for Redmond Residential using funds from Bielinski Brothers.

In August 2001, Bielinski Brothers entered into an agreement with Redmond to obtain his right to purchase the Fox Chase property in exchange for a fee of $350,000.

9

In April 2002, this transaction was completed (although in a somewhat more complicated fashion) and Redmond was paid the $350,000 assignment fee. Redmond was also allowed to retain an out lot from the property for $1,000.

On October 25, 2002, Brownell entered into an agreement with Redmond to purchase the out lot from Redmond for $300,000.

(b)     Grafenauer-Thomas Property

In July 2002, MBB submitted an offer to purchase 97 acres of real estate located in East Troy, Wisconsin. This property is commonly referred to the Grafenauer-Thomas property after its former owners. The offer was accepted in August 2002. As mentioned above, MBB was a joint venture of Mark Redmond (M), Brian Cummings (B), and Bob Brownell (B) formed in April 2000. In August 2002, Redmond entered into an agreement with the Bielinskis to assign his right to purchase the Grafenauer-Thomas property for a fee of $650,000. After several delays and extensions, during which Bielinski Brothers made at least two payments of $50,000 each to extend the closing, the sale of the property to Bielinski Brothers occurred in February 2004. At this time, Bielinski Brothers deposited $650,000 with MB&F, which ultimately disbursed the money to MBB. By this time, however, Brownell had terminated his relationship with MBB

(c)     Ziegelbauer Property

In January 1999, Bielinski Brothers submitted an offer to purchase approximately 69 acres of real estate known as the Ziegelbauer property. The offer to purchase, which was in the amount of $1,039,350 was accepted on January 19, 1999. This offer, however, was terminated prior to being completed.

In August 2001, Redmond Residential entered into a contract to purchase the Ziegelbauer property for $1,096,000. In November 2002, representatives of Redmond and Bielinski Brothers reached an agreement on an assignment of Redmond's offer to purchase the Ziegelbauer property in exchange for a fee of $500,000 plus costs that Redmond had incurred, which totaled $65,000. The $500,000 fee was paid by Bielinski Brothers through MB&F by check dated March 25, 2003.

10

## 10. Illegal Campaign Contributions

During the period Brownell was illegally diverting funds from Bielinski Brothers to Robert Mann, Mann Brothers, Norman Hanson and Welch Hanson, he was directing that some of these funds be used to make illegal campaign contributions to political candidates, including the 2004 Bush-Cheney campaign, the 2004 Russ Darrow Senate Campaign, and the 2002 gubernatorial campaign by Scott McCallum. As part of this activity, Hanson and Robert Mann recruited employees at their respective businesses to make contributions to these campaigns that would be reimbursed by their businesses. These contributions typically ranged from $2,000 to $5,000. In addition, Brownell and others working with him or at his direction recruited a handful of employees at Bielinski Brothers to make $1,000 contributions to Russ Darrow's campaign. Again, at Brownell's direction, these contributions were reimbursed with money from Bielinski Brothers. To date, Dave Busch (Bielinski Brothers), Wally Utter (Mann Brothers), and Chris Koceja (Mann Brothers) have been charged with violating federal law based on this conduct.

11

*United States District Court*

## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

                    Plaintiff,

v.                                                              Case No: 05-CR-13

ROBERT BROWNELL,

                    Defendant.

---

### COURT MINUTES
### HONORABLE CHARLES N. CLEVERT, JR., PRESIDING

---

Date:                    April 21, 2006

Type of Proceeding: Sentencing

Time Commenced:    9:41:43 a.m.         Time Concluded: 12:46:06 p.m.

Deputy Clerk:        Kris Wilson         Court Reporter:   Cindy Bohman

Appearances:        Plaintiff:  AUSA Matthew L. Jacobs with Agent John Klugiewicz
                    Defendant:  Attorneys Brian Kinstler and Michael Hart
                    Probation Officer:   James P. Fetherston

Disposition:        The court sentences the defendant to the statutory maximum of
                    240 months imprisonment with 3 years of supervised release to
                    follow.

Notes:              The probation officer is directed to make further inquiry with the
                    defendant's treating physician and Waukesha County Jail staff as
                    to defendant's contention that he is addicted to Zanax.  The court will
                    enter judgment upon receipt of the supplemental report.

                    The monies held by Kohler & Hart which relate to this defendant are
                    to be deposited with the Clerk of Court, and held for restitution,
                    subject to the payment of reasonable attorney fees as stipulated to
                    or otherwise ordered.

                    Attached is govt exhibit 1: Chart displaying Mr. Brownell at the
                    center of all illegal transactions.  (Note: Court disregards the
                    information relating to the Mann Brothers)

# United States v. Robert Brownell
## Case No. 05-CR-013



# EXHIBIT B

# EXHIBIT 1

ACTION ORDER                                                                          2022LA000692-80

| STATE OF ILLINOIS | UNITED STATES OF AMERICA | COUNTY OF DU PAGE |
|---|---|---|
| | IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT | |

SUSAN ESSEX

                                            Plaintiff

        -VS-                                         2022LA000692
                                                     CASE NUMBER
PAUL SCHROTH WOLFE

                                            Defendant

**FILED**

**23 Nov 27   AM 10: 32**

*Candice Adams*

CLERK OF THE
18TH JUDICIAL CIRCUIT
DUPAGE COUNTY, ILLINOIS

### ACTION ORDER

This matter having come before the Court, the Court having jurisdiction and being fully advised in the premises:

**IT IS HEREBY ORDERED** as follows:

The case is continued to 01/03/2024 in 2020 at 09:00 AM for STATUS.

The Order entered on 10/31/22-DWP is hereby vacated.

Defendant's Motion to Vacate the DWP entered on 10/31/22 is hereby granted and vacated.

Defendant's Motion to Seal the Entire Case is hereby granted for the reasons stated on the record and the Clerk's Office is directed to seal the entire case.

Defendant's counsel to provide plaintiff a copy of this order where notice of the motion was made.

Plaintiff to appear at the next status or possibly be subject to having this case dismissed for want of prosecution.

Defendant to advise on whether filing an answer to the complaint by next status.

Submitted by: JUDGE ANGELO J KAPPAS
DuPage Attorney Number:                    ☐ PRO SE
Attorney for:

*File Date: 11/27/2023*

JUDGE ANGELO J KAPPAS
Validation ID : DP-11272023-1032-58879

Date: 11/27/2023

**EXHIBIT C**

# EXHIBIT 2

## Garrett Von Schaumburg

| | |
|---|---|
| **From:** | Christine Marte |
| **Sent:** | Wednesday, November 29, 2023 1:37 PM |
| **To:** | Susanessex21@gmail.com |
| **Cc:** | Thomas Patterson; Garrett Von Schaumburg |
| **Subject:** | Wolfe adv. Essex Case# 2022-LA-692 - November 27, 2023 Order |
| **Attachments:** | 2023.11.29 Proof of Service of 11-27 Order.pdf; 2023.11.27 Order.pdf |

Good afternoon,

Please see attached Order entered on November 27, 2023, in the above referenced matter.
Thank you.

Sincerely,

Christine Marte
Paralegal



200 W. Monroe, Suite 2025
Chicago, Illinois 60606
Dir (312) 750-1816 • Tel (312) 223.1699 ext. 117 • Fax (312) 223.8549
**email** | **website**

CONFIDENTIALITY NOTICE:
This electronic communication and any attached files contain information intended for the exclusive use of the individual or entity to whom it is addressed and may contain information that is proprietary, privileged, confidential and/or exempt from disclosure under applicable law. If you are not the intended recipient, you are hereby notified that any viewing, copying, disclosure or distribution of this information is prohibited and may be subject to legal restriction or sanction. Please notify the sender, by electronic mail or telephone, of any unintended recipients and delete the original message without making any copies. E-mails are susceptible to change. The Patterson Law Firm, LLC does not guarantee that the integrity of this communication has been maintained or that this communication is free of misuses, interceptions or interference.

# EXHIBIT D

## <u>PURCHASE AND SALE AGREEMENT</u>

This Purchase and Sale Agreement (this "Agreement") is made and entered into as of May 1, 2023 ("Effective Date"), by and between Yorkville Investment I LLC ("Buyer") and Scott Armstrong and Barbara Guss (collectively, "Seller").

## <u>RECITALS</u>

A.    Seller is the owner of a fifty-two and ninety-nine hundredths percent (52.99%) interest in 120 North Hale Street, Wheaton, Illinois (the "Property").

B.    Buyer is the owner of a forty-seven and one hundredth percent (47.01%) interest in the Property.

C.    Buyer is familiar with the assets and operation of the Property.

D.    Subject to the terms and conditions of this Agreement, Seller will sell, transfer and assign all right title and interest in and to the Property consisting of a fifty-two and ninety-nine hundredths percent (52.99%) interest (the "Sale Interests") to Buyer.

E.    Buyer is willing to accept the assignment from Seller of the Sale Interests, subject to the terms and conditions of this Agreement.

## <u>AGREEMENT</u>

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and obligations contained herein, the sufficiency of which is acknowledged by the parties, Buyer and Seller agree as follows:

1.    <u>Sale of the Sale Interests.</u>

(a) Subject to the terms and conditions contained herein, Seller agrees to sell, transfer and assign, and Buyer agrees to accept all right, title and interest of Seller in and to the Sale Interests at the Closing (as defined below) for an amount equal to One Million Two Hundred Fifty-Eight Thousand Three Hundred Forty-One and 00/100 Dollars ($1,258,341.00) (the "Purchase Price").

(b) Concurrently with the execution of this Agreement, Buyer shall pay to Seller an amount equal to One Hundred Thousand and 00/100 Dollars ($100,000.00).

(c) On the Fifteenth (15th) of each calendar month thereafter until the payment in full, Buyer shall pay to Seller an amount equal to the interest on the then outstanding balance of the Purchase Price at the rate of Wall Street Journal Prime Rate plus one percent, from time to time.

(d) On or before May 1, 2024, Buyer shall pay the balance of the Purchase Price and any accrued and unpaid interest.

(e) From time to time, Buyer may pay any amount towards the outstanding balance with written notice to Seller.

(f) For the avoidance of doubt, Buyer is acquiring the issued and outstanding Sale Interests subject to any outstanding liabilities encumbering the Property.

2.      <u>Closing</u>.

(a)     On May 1, 2023 ("Closing Date"), Seller shall transfer the Sale Interests free and clear of all liens, pledges, encumbrances, charges or claims of every kind or nature, to Buyer.

(b)     Seller shall deliver the Assignment, attached as Exhibit A, effective as of the Closing Date.

3.      <u>Representations and Warranties of Seller</u>.  Seller hereby represents and warrants to Buyer as follows:

(a)     <u>Ownership</u>.  Seller is the owner of the Sale Interests, beneficially and of record, free and clear of any liens and encumbrances.  Upon delivery to Buyer of the assignment and payment therefore, Buyer shall acquire good and valid title to such interests free and clear of all liens and encumbrances.

(b)     <u>Reliance on Own Advisors</u>.  Seller has relied completely on the advice of, or has consulted with, its own tax, investment, legal or other advisors and has not relied on the Buyer or any of its respective affiliates, officers, directors, attorneys, accountants or any affiliates of any thereof.

(c)     <u>Capability to Evaluate</u>.  Seller has such knowledge and experience in financial and business matters so as to enable it to utilize the information made available to it in connection with this Agreement in order to evaluate the merits and risks of selling the interests, which are substantial.

(d)     <u>Due Diligence</u>.  In making the decision to sell, Seller has received and had an opportunity to review the books and records, including financial statements and such other information as deemed necessary and has had full access to all the information Seller considers necessary or appropriate to make an informed decision to sell.

(e)     <u>Investment Experience; Fend for Self</u>.  Seller is able to fend for himself in the transactions contemplated by this Agreement.

(f)     <u>Legal Proceedings; Governmental Orders</u>.  There are no suits, actions, causes of action or legal proceedings ("Action") pending or, to Seller's knowledge, threatened (a) affecting Seller; or (b) that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement.  No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.  There are no outstanding governmental orders and no unsatisfied judgments, penalties or awards against or affecting Seller.

(g)    <u>Taxes.</u> Seller has duly and timely filed all tax returns and reports required to be filed by the Seller prior to the date of this Agreement.

(h)    <u>Authority</u>.  Seller has full power and authority to execute, deliver and perform its obligations under this Agreement and each of the documents to be executed and delivered by it in connection herewith.  Seller has duly executed and delivered this Agreement and each of the documents to be executed and delivered by it in connection herewith, and each constitutes the legal, valid and binding obligation of Seller, enforceable against Seller in accordance with its respective terms, except as enforceability may be limited by bankruptcy, similar laws relating to debtor relief and general principles of equity.

(i)    <u>No Conflicts</u>.  The execution, delivery and performance of this Agreement and each of documents to be executed and delivered by Seller in connection herewith does not and will not: (a) conflict with or violate any applicable law or any order to which Seller is subject; or (b) result in the breach of, or constitute a default under, or give to others any rights of termination, amendment, acceleration or cancellation of, any contract to which Seller is a party.

(j)    <u>Consents</u>.  No consent of, or declaration, registration or filing with, or notification to, any governmental authority or any other person is required in connection with the execution, delivery and performance of this Agreement and each of the documents to be executed and delivered by Seller in connection herewith, or the consummation of this Agreement.

4.    <u>Representations and Warranties of Buyer</u>.  Buyer hereby represents and warrants to Seller as follows:

(a)    <u>Reliance on Own Advisors</u>.  Buyer has relied completely on the advice of, or has consulted with, its own tax, investment, legal or other advisors and has not relied on the Seller or any of its respective affiliates, officers, directors, attorneys, accountants or any affiliates of any thereof.

(b)    <u>Capability to Evaluate</u>.  Buyer has such knowledge and experience in financial and business matters so as to enable it to utilize the information made available to it in connection with this Agreement in order to evaluate the merits and risks of purchasing the interests, which are substantial.

(c)    <u>Due Diligence</u>.  In making the decision to purchase, Buyer has received and had an opportunity to review and inspect the books and records, including financial statements and such other information as deemed necessary and has had full access to all the information Buyer considers necessary or appropriate to make an informed decision to purchase.

(d)    <u>Investment Experience; Fend for Self</u>.  Buyer is able to fend for itself in the transactions contemplated by this Agreement.

(e)    <u>Legal Proceedings; Governmental Orders</u>.  There is no Action pending or, to Buyer's knowledge, threatened (a) affecting Buyer; or (b) that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement.  No event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

DocuSign Envelope ID: 0EF687DF-7C8D-450D-8C60-65EBBAA3EBA8

There are no outstanding governmental orders and no unsatisfied judgments, penalties or awards against or affecting Buyer.

(f)      _Taxes._ Buyer has duly and timely filed all tax returns and reports required to be filed by the Buyer prior to the date of this Agreement.

(g)      _Authority_.   Buyer has full power and authority to execute, deliver and perform its obligations under this Agreement and each of the documents to be executed and delivered by it in connection herewith.  Buyer has duly executed and delivered this Agreement and each of the documents to be executed and delivered by it in connection herewith, and each constitutes the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its respective terms, except as enforceability may be limited by bankruptcy, similar laws relating to debtor relief and general principles of equity.

(h)      _No Conflicts_.  The execution, delivery and performance of this Agreement and each of documents to be executed and delivered by Buyer in connection herewith does not and will not: (a) conflict with or violate any applicable law or any order to which Buyer is subject; or (b) result in the breach of, or constitute a default under, or give to others any rights of termination, amendment, acceleration or cancellation of, any contract to which Buyer is a party.

(i)      _Consents_.   No consent of, or declaration, registration or filing with, or notification to, any governmental authority or any other person is required in connection with the execution, delivery and performance of this Agreement and each of the documents to be executed and delivered by Buyer in connection herewith, or the consummation of this Agreement.

5.      _Disclaimer of Representations and Warranties_.

_"As is" Condition_.   BUYER HEREBY EXPRESSLY ACKNOWLEDGES AND AGREES THAT BUYER WILL HAVE AS OF CLOSING, THOROUGHLY INSPECTED AND EXAMINED THE BOOKS AND RECORDS, AND ANY OTHER MATERIALS, DOCUMENTS OR INVESTIGATIONS, AND THE PHYSICAL CONDITION OF THE PROPERTY TO THE EXTENT DEEMED NECESSARY BY BUYER, IN ORDER TO ENABLE BUYER TO EVALUATE THE PURCHASE OF THE SALE INTERESTS.  BUYER FURTHER ACKNOWLEDGES AND AGREES THAT EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS AGREEMENT, BUYER IS RELYING SOLELY UPON THE INSPECTION, EXAMINATION AND EVALUATION PERFORMED BY BUYER, AND THAT BUYER IS PURCHASING, AND AT CLOSING WILL ACCEPT, THE SALE INTERESTS ON AN "AS IS", "WHERE IS" AND "WITH ALL FAULTS" BASIS, WITHOUT REPRESENTATIONS, WARRANTIES AND OR COVENANTS, EXPRESS OR IMPLIED OF ANY KIND OR NATURE, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS AGREEMENT.

Seller hereby disclaims any and all representations and warranties, express or implied, except as expressly stated herein.  Buyer shall accept, in full satisfaction of the obligations of Seller under this Agreement, the Assignment.

6.      Indemnification.

(a)      Seller hereby covenants and agrees to indemnify, save, defend, hold harmless, discharge, and release the Buyer, and its successors and assigns from and against any and all payments, charges, judgments, assessments, liabilities, obligations, claims, demands, actions, losses, damages, penalties, interest or fines, and any and all costs and expenses paid or incurred, including attorney fees, costs, fees of experts and any legal or other expenses reasonably incurred in connection therewith (collectively, the "Liabilities"), arising from, based upon, related to or associated with and to the extent caused by (i) any breach of any representation or warranty of the Seller contained in this Agreement; (ii) any failure of Seller to perform or observe any term, condition or covenant contained in this Agreement; (iii) any liability related to or involving any indebtedness of Seller for the Property (iv) any liability related to or involving the Property arising, resulting or incurred from any event that occurred on or prior to the Closing Date; and (v) any and all tax liabilities with respect to the Property arising, resulting or incurred on or prior to the Closing Date.

(b)      Buyer hereby covenants and agrees to indemnify, save, defend, hold harmless, discharge, and release the Seller, and its successors and assigns from and against any and all Liabilities arising from, based upon, related to or associated with and to the extent caused by (i) any breach of any representation or warranty of the Buyer contained in this Agreement; (ii) any failure of the Buyer to perform or observe any term, condition or covenant contained in this Agreement; (iii) any liability related to or involving any indebtedness of the Buyer for the Property; (iv) any liability related to or involving the Property arising, resulting or incurred from any event that occurred after the Closing Date; and (v) any and all tax liabilities with respect to the Property arising, resulting or incurred after the Closing Date.

7.      Miscellaneous.

(a)      Without the prior written consent of the other party, no party to this Agreement may assign its rights or obligations under this Agreement.  The terms and conditions of this Agreement shall inure to the benefit of, and be binding upon, the respective successors and permitted assigns of the parties hereto.

(b)      All notices, requests, demands or other communications hereunder shall be in writing and shall be deemed to have been duly given, if delivered in person or by certified mail, return receipt requested, postage prepaid to the addresses set forth below.  Any party may from time to time, by written notice to the other party, designate a different address, which shall be substituted for the one specified below for such party.  If any notice or other document is sent by certified mail, return receipt requested, postage prepaid, properly addressed as aforementioned, the same shall be deemed served or delivered three (3) business days after mailing thereof.

If to the Seller:        448 West Seminary, Wheaton, Illinois 60187

If to Buyer:     1007 N Orange Street, Wilmington, Delaware 19801

(c)      Any waiver of the provisions of this Agreement or of a party's rights or remedies under this Agreement must be in writing to be effective.  Failure, neglect, or delay by a party to

DocuSign Envelope ID: 0EF687DE-7C8D-459D-8C60-65EBBAA3EBA8

enforce the provisions of this Agreement or its rights or remedies at any time, will not be construed as a waiver of such party's rights under this Agreement and will not in any way affect the validity of the whole or any part of this Agreement or prejudice such party's right to take subsequent action. No exercise or enforcement by either party of any right or remedy under this Agreement will preclude the enforcement by such party of any other right or remedy under this Agreement or that such party is entitled to enforce.

(d)     This Agreement contains the entire agreement of the parties with respect to the subject matter of this Agreement and supersedes all previous communications, representations, understandings, and agreements, either oral or written, between the parties with respect to said subject matter. This Agreement may not be amended, except by a writing signed by all parties.

(e)     This Agreement will be interpreted and construed in accordance with the laws of the State of Illinois, without regard to those principles (statutory or otherwise) pertaining to choice of law. The prevailing party in any such dispute shall be entitled to be awarded all court costs and expenses and reasonable attorneys' fees and expenses incurred in connection with such dispute. If no party prevails entirely, the presiding adjudicator shall award costs, expenses and reasonable attorneys' fees and expenses in accordance with the disposition of the matter.

(f)     For purposes of interpreting this Agreement, whenever the context requires, the singular number will include the plural, and vice versa; the masculine gender will include the feminine and neuter genders; the feminine gender will include the masculine and neuter genders; and the neuter gender will include the masculine and feminine genders. Any rule of construction to the effect that ambiguities are to be resolved against the drafting party will not be applied in the construction or interpretation of this Agreement. As used in this Agreement, the words "include" and "including" and variations thereof, will not be deemed to be terms of limitation, but rather will be deemed to be followed by the words "without limitation." Any reference herein to "the parties" means the entities that are parties to this Agreement; any reference to a "third party" means a person or an entity that is not a party to this Agreement.

(g)     This Agreement and any amendment hereof may be executed in counterparts and delivered by PDF, facsimile or other electronic media, each of which so executed will be deemed to be an original and such counterparts together will constitute one and the same agreement.

(h)     The preamble and recitals set forth at the beginning of this Agreement are hereby incorporated into the terms and conditions of this Agreement.

(i)     Each party shall do all such acts and shall execute and deliver to the other all such certificates, instruments, assignments and other documents and shall do and perform or cause to be done all matters and such other things necessary or expedient to be done as either party may reasonably request from time to time in order to give full effect to this Agreement.

(j)     The parties have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the parties, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provision of this Agreement.

    (k)     Each party shall pay all of its costs and expenses arising out of this transaction, including, without limitation, any transfer taxes, the cost of UCC searches and attorney fees

    9.    <u>Default</u>.  If Buyer (a) defaults by failing to pay when due any single installment or payment required to be made to Seller under the terms of this Agreement; or (b) defaults in the performance of any other covenant or agreement hereof and such default is not cured by Buyer within thirty (30) days after written notice to Buyer (unless the default involves a dangerous condition which shall be cured immediately), Seller may treat such a default as a breach of this Agreement and Seller shall have any one or more of the following remedies in addition to all other rights and remedies provided at law or in equity: (i) maintain an action for any unpaid installments; or (ii) declare the entire balance due and maintain an action for such amount.

    Buyer shall pay all reasonable attorneys' fees and costs incurred by Seller in enforcing the terms and provisions of this Agreement.

    All rights and remedies given to Seller shall be distinct, separate and cumulative, and the use of one or more thereof shall not exclude or waive any other right or remedy allowed by law, unless specifically waived in this Agreement.

[ Signature Page Immediately Follows ]

IN WITNESS WHEREOF, Seller and Buyer have duly executed this Purchase and Sale Agreement as of the date first above written.

Buyer:
Yorkville Investment I LLC

_____

Name: Ryan Cicoski
Its; manager

Seller:

_____

Name: Scott Armstrong

DocuSign Envelope ID: 0EF697DE-7C8D-450D-8C60-65EBBAA3EBA9

**<u>Assignment of Interest</u>**

[See Attached Page Immediately Following]

## ASSIGNMENT OF INTEREST

Pursuant and subject to that certain Purchase and Sale Agreement (the "Agreement") dated as of _____, 20___, by and between _____ ("Assignor") and _____ ("Assignee"), Assignor hereby assigns to Assignee  all of its right, title and interest in and to its _____ percent (____%) interest in 120 North Hale Street, Wheaton, Illinois ("Property") ON AN "AS IS", "WHERE IS" AND "WITH ALL FAULTS" BASIS, WITHOUT REPRESENTATIONS, WARRANTIES AND OR COVENANTS, EXPRESS OR IMPLIED OF ANY KIND OR NATURE, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THE AGREEMENT.

Assignor hereby disclaims any and all representations and warranties, express or implied, except as expressly stated in the Agreement.

Dated as of _____, 20___.

_____

_____

## ACCEPTANCE

Assignee accepts all of the right, title and interest of the interest in the Property as assigned as of the date set forth below.

Dated: as of _____ _____, 20___

_____

_____

**EXHIBIT**

# EXHIBIT E



COVER LETTER

Department of State

Division of Corporations

P.O. Box 6327

Tallahassee, FL 32314

SUBJECT: Access Management S.A.S. Inc.

Enclosed is an original and one (1) copy of the Articles of Domestication and a check:

FEES:

| | | |
|---|---|---|
| Certificate of Domestication | $ 50.00 | |
| Articles of Incorporation and Certified Copy | $ 78.75 | |
| **Total filing fee** | **$128.75** | |

OPTIONAL:

Certificate of Status                    $  8.75

From: Charles Mack

_____
Name (printed or typed)

1363 Shermer Rd., Suite 210
_____
Address

Northbrook, IL 60062
_____
City, State & Zip

847-239-7212
_____
Daytime Telephone Number

charles@mlgcounsel.net
_____
E-mail address: (to be used for future annual report notification)

INHS53 (3/20)

SECRETARY OF STATE
TALLAHASSEE, FLORIDA
23 FEB -3 AM 10: 17

FILED

Articles of Domestication
Foreign Corporation Domesticating to Florida

The undersigned, Ryan Cicoski , Director

(Name)          (Title)

of Access Management S.AS. , a foreign

corporation, in accordance with s. 607.11922, Florida Statutes, submit these Articles of
Domestication.

1. Then name of the domesticating corporation is Access Management S.A.S.

(Foreign Corporation)

March 4 , 2022 .

2. The jurisdiction and date of its formation is St. Bartholomew Guadalupe

3. The name of the domesticated corporation is Access Management S.A.S. Inc.

4. The jurisdiction of formation of the domesticated corporation is **Florida**

5. The domestication corporation is a foreign corporation and the domestication was
approved in accordance with its organic law.

6. Attached are Florida Articles of Incorporation to complete the domestication
requirements pursuant to s.607.0202, F.S.

I certify I am authorized to sign these Articles of Domestication on behalf of the corporation.

Ryan C. Cicoski Digitally signed by Ryan C. Cicoski
Date: 2023.02.02 15:48:37 -05'00'

(Authorized Signature)

## ARTICLES OF INCORPORATION
*IN COMPLIANCE WITH CHAPTER 607, F.S.*

### ARTICLE I     NAME
*THE NAME OF THE CORPORATION SHALL BE:*

Access Management S.AS. Inc.

### ARTICLE II     PRINCIPAL OFFICE
*THE PRINCIPAL PLACE OF BUSINESS/MAILING ADDRESS IS:*

| Principal Address | Mailing Address |
|---|---|
| 1007 N. Orange St. | Same as principal address |
| Wilmington, DE 19801 | |

### ARTICLE III     PURPOSE
*THE PURPOSE FOR WHICH THE CORPORATION IS ORGANIZED:*
Any lawful purpose permitted under the Florida Business Corporation act

### ARTICLE IV     SHARES
*THE NUMBER OF SHARES OF STOCK IS:* 1,000

### ARTICLE VI     REGISTERED AGENT AND STREET ADDRESS
*THE **NAME AND FLORIDA STREET ADDRESS** (P.O. BOX **NOT** ACCEPTABLE) OF THE REGISTERED AGENT IS:*

Registered Agents Inc

7901 4th Street N, Ste 300

St. Petersburg, FL 33702

HAVING BEEN NAMED AS REGISTERED AGENT AND TO ACCEPT SERVICE OF PROCESS FOR THE ABOVE STATED CORPORATION AT THE PLACE DESIGNATED IN THIS CERTIFICATE, I AM FAMILIAR WITH AND ACCEPT THE APPOINTMENT AS REGISTERED AGENT AND AGREE TO ACT IN THIS CAPACITY.

| Bill Havro, Assistant Secretary | February 2, 2023 |
|---|---|
| Signature/Registered Agent | Date |

## *ARTICLE V  DIRECTORS AND/ OR OFFICERS*

*THE NAME(S) AND ADDRESS(ES) AND SPECIFIC TITLES:*

Name & Title: Ryan Cicoski, Director

Address: 1007 N. Orange St.

Wilmington, DE 19801

Name & Title: Ryan Cicoski, Pres.

Address: 1007 N. Orange St.

Wilmington, DE 19801

Name & Title: _____

Address: _____

Name & Title: _____

Address: _____

Name & Title: _____

Address: _____

Name & Title: _____

Address: _____

Name & Title: _____

Address: _____

Name & Title: _____

Address: _____

I submit this document and affirm that the facts stated herein are true. I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155.F.S.

Ryan C. Cicoski Digitally signed by Ryan C. Cicoski
Date: 2023.02.02 15:48:51 -05'00'

Signature/Authorized Person

2 February, 2023

Date

# EXHIBIT F

## LOAN AND SECURITY AGREEMENT

By and Between


Green Sapphire Holdings Inc., a Delaware corporation,
as Borrower and


Global Capital Partners LLC, a Delaware limited liability company,
as Lender,


Dated:  As of February 2, 2023

Loan No.:  2023-1001

4873-9659-7070 v.1 074064/00002, 11:55 AM, 02/02/2023

## LOAN TERMS

| | |
|---|---|
| Note Date: | As of February 2, 2023 |
| Borrower: | Green Sapphire Holdings Inc., a Delaware corporation |
| Borrower Address: | 1007 Orange Street, Wilmington, Delaware 19801 |
| Original Principal Amount: | $10,000,000.00 to be disbursed in two tranches: (i) First Tranche on January 31, 2023 and (ii) Second Tranche as soon as possible shortly thereafter |
| Applicable Interest Rate: | Ten Percent (10%) for 120 days |
| Maturity Date: | June 2, 2023 |

## FINANCIAL REPORTING

**Due**

**Reporting**

Quarterly

Operating Statements
Balance Sheet

## GUARANTOR

Guarantor

The Petro Carta Trust dated October 27, 2014

BNW Family Office, LLC

# TABLE OF CONTENTS

Article 1.    DEFINITIONS .................................................................................... 1
    Section 1.1    Definitions ..................................................................................... 1

Article 2.    LOAN TERMS ..................................................................................... 7
    Section 2.1    Agreement to Borrow and Lend ...................................................... 7
    Section 2.2    Payments, Maturity, Fees............................................................... 7
    Section 2.3    Interest Rate ................................................................................... 7
    Section 254    Usury Laws ..................................................................................... 8

Article 3.    SECURITY INTEREST .......................................................................... 8
    Section 3.1    Grant of Security Interest................................................................ 8
    Section 3.2    Delivery of Certificates, Instruments; Financing Statement............ 9
    Section 3.3    Release of Security Interest ............................................................. 9
    Section 3.4    Borrower Remains Liable ................................................................ 9

Article 4.    REPRESENTATIONS AND WARRANTIES OF BORROWER....................... 10
    Section 4.1    Legal Status and Authority ............................................................. 10
    Section 4.2    Status of Borrower......................................................................... 10
    Section 4.3    Validity of Documents.................................................................... 11
    Section 4.4    Litigation....................................................................................... 11
    Section 4.5    Financial Condition........................................................................ 11
    Section 4.6    Business Purposes.......................................................................... 11
    Section 4.7    Taxes ............................................................................................. 11
    Section 4.8    Title to Properties.......................................................................... 12
    Section 4.9    Compliance with Law ..................................................................... 12
    Section 4.19   Perfection ...................................................................................... 12
    Section 4.11   Intellectual Property ...................................................................... 12
    Section 4.12   Environmental Representations and Warranties.............................. 12
    Section 4.13   No Change in Facts or Circumstances ............................................ 12
    Section 4.14   Disclosure ..................................................................................... 13
    Section 4.14   Legal Status of Subsidiary ............................................................. 13
    Section 4.16   Subsidiary Assets .......................................................................... 13
    Section 4.17   Third Party Representations........................................................... 13

Article 5.    BORROWER COVENANTS..................................................................... 13
    Section 5.1    Maintenance of Collateral............................................................... 13
    Section 5.2    Rights of Borrower......................................................................... 14
    Section 5.3    Business Conducted....................................................................... 14
    Section 5.4    Payment of Taxes, etc .................................................................... 14
    Section 5.5    Payment of Leasehold Obligations ................................................. 15
    Section 5.6    Compliance With Laws................................................................... 15
    Section 5.7    Books and Records ........................................................................ 16
    Section 5.8    Performance of Other Agreements ................................................. 17
    Section 5.9    Insurance....................................................................................... 17

i

Section 5.10   Access to Property ................................................................................ 17
Section 5.11   Litigation ............................................................................................... 18
Section 5.12   Dividends, Distributions and Management Fees ............................... 18
Section 5.13   Single Purpose Entity/Separateness .................................................. 18
Section 5.14   Change of Name, Identity or Structure .............................................. 19
Section 5.15   Business and Operations ..................................................................... 19
Section 5.16   Environmental Covenants ................................................................... 19

Article 6.       TRANSFERS ........................................................................................ 20
Section 6.1     Transfers by Borrower ........................................................................ 20

Article 7.       DEFAULTS; REMEDIES ................................................................... 21
Section 7.1     Defaults ................................................................................................ 21
Section 7.2     Right of Enforcement .......................................................................... 22
Section 7.3     Rights of Sale ....................................................................................... 22
Section 7.4     Miscellaneous Rights of Lender ......................................................... 23
Section 7.5     Right to Cure Defaults ......................................................................... 23
Section 7.6     Appointment of Lender Borrower's Lawful Attorney ....................... 24

Article 8.       INDEMNITY ........................................................................................ 24
Section 8.1     Indemnity ............................................................................................. 24

Article 9.       WAIVERS ............................................................................................. 24
Section 9.1     Marshalling and Other Matters ........................................................... 24
Section 9.2     Waiver of Notice .................................................................................. 25
Section 9.3     Waiver of Statute of Limitations ........................................................ 25
Section 9.4     Modification, Waiver in Writing ......................................................... 25
Section 9.5     Delay Not a Waiver ............................................................................. 25
Section 9.6     Waiver of Trial by Jury ....................................................................... 25
Section 9.7     Waiver of Counterclaim ...................................................................... 26
Section 9.8     Waiver of Defense to Subrogation ...................................................... 26

Article 10.      GENERAL PROVISIONS .................................................................. 26
Section 7.01   Tax Indemnity ...................................................................................... 26
Section 7.01   Tax Indemnity ...................................................................................... 27

Article 10.      GENERAL PROVISIONS .................................................................. 28
Section 10.1   Notices ................................................................................................. 28
Section 10.2   Expenses .............................................................................................. 29
Section 10.3   Entire Agreement, Amendments and Waivers .................................... 29
Section 10.4   Further Assurances .............................................................................. 29
Section 10.5   No Third Party Benefits ...................................................................... 30
Section 10.6   Assigns ................................................................................................. 30
Section 10.6   Assigns ................................................................................................. 30
Section 10.7   Counterparts ......................................................................................... 31
Section 10.8   Governing Law ..................................................................................... 31
Section 10.9   Time of the Essence ............................................................................. 31

Section 10.10    Severability ........................................................................................ 31
Section 10.11    JURISDICTION AND VENUE.................................................................. 31
Section 10.12    Acknowledgments................................................................................ 32
Section 10.13    Conflicts............................................................................................. 32

## LOAN AND SECURITY AGREEMENT

This Loan and Security Agreement (the "Agreement") is made as of February 2, 2023, by and among Green Sapphire Holdings Inc., a Delaware corporation, having an address at 1007 Orange Street, Wilmington, Delaware 19801 ("Borrower"; Organization No.: 4267001), and Global Capital Partners LLC, a Delaware limited liability company, having an address at 16192 Coastal Highway, Lewes, Delaware 19958.

In consideration of the mutual representations, warranties, covenants and agreements contained in this Agreement, the sufficiency of which is hereby acknowledged, the parties agree as follows:

### Article 1. - DEFINITIONS

Section 1.1 **DEFINITIONS**.

For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"Affiliate" shall mean, as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by or is under common control with such Person or is a director or officer of such Person or of an Affiliate of such Person. Control shall mean the power, directly or indirectly, to direct or cause the direction of the management or business of a Person by ownership, contract or otherwise.

"Applicable Laws" shall mean all existing and future federal, state and local laws, ordinances, governmental rules and regulations or court orders affecting or which may be interpreted to affect the Borrower.

"Bankruptcy Code" shall mean the United States Bankruptcy Code, 11 U.S.C. §101 *et seq.*,

"Business Day" shall mean a day on which Lender is open for the conduct of substantially all of its banking business at its office in the city in which the Note is payable (excluding Saturdays and Sundays).

"Casualty" shall mean damage or destruction by fire, earthquake, wind or other casualty.

"Collateral" shall have the meaning set forth in Article 3.

"Debt" shall mean the outstanding principal amount set forth in, and evidenced by, this Agreement and the Note together with all interest accrued and unpaid thereon and all other sums due to Lender in respect of the Loan evidenced by the Note, this Agreement or any other Loan Document.

"Default" shall mean the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would be an Event of Default.

"Default Rate" shall have the meaning set forth in the Note.

"Environmental Law" shall mean any present and future federal, state and local laws, statutes, ordinances, rules, regulations and the like, as well as common law, relating to protection of human health or the environment, relating to Hazardous Substances, relating to liability for or costs of Remediation or prevention of Releases of Hazardous Substances or relating to liability for or costs of other actual or threatened danger to human health or the environment; including, but not limited to, the following statutes, as amended, any successor thereto, and any regulations promulgated pursuant thereto, and any state or local statutes, ordinances, rules, regulations and the like addressing similar issues: the Comprehensive Environmental Response, Compensation and Liability Act; the Emergency Planning and Community Right-to-Know Act; the Hazardous Substances Transportation Act; the Resource Conservation and Recovery Act (including, without limitation, Subtitle I relating to underground storage tanks); the Solid Waste Disposal Act; the Clean Water Act; the Clean Air Act; the Toxic Substances Control Act; the Safe Drinking Water Act; the Occupational Safety and Health Act; the Federal Water Pollution Control Act; the Federal Insecticide, Fungicide and Rodenticide Act; the Endangered Species Act; the National Environmental Policy Act; the River and Harbors Appropriation Act and the Residential Lead-Based Paint Hazard Reduction Act.

"Environmental Liens" shall mean any lien or encumbrance imposed pursuant to any Environmental Law, whether due to the act or omission of Borrower or any other Person.

"Event of Default" shall have the meaning set forth in Section 7 of this Agreement.

"Excluded Taxes" shall mean any of the following taxes imposed on or with respect to the Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder or any other Loan Document, or required to be withheld or deducted from a payment to any such recipient, (a) income, net profits, or capital taxes imposed on or measured by net income, and franchise taxes imposed by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or conducts business, in which its principal office is located or in which its applicable lending office is located; and (b) any branch profits taxes or any similar tax imposed by the jurisdiction where the Borrower is located.

"French/St. Barthelemy Counsel to Lender" shall mean, Pierre Kirscher of SELAS St-BARTHLAW, the legal counsel of the Lender advising the Lender under French and St. Bartholomew laws.

"First Tranche" shall mean the first drawdown under this Loan in an amount of at least Three Million United States Dollars ($3,000,000).

"Fiscal Year" shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during the term of the Loan.

"GAAP" shall mean generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

"Governmental Authority" shall mean any court, board, agency, department, commission, office or other authority of any nature whatsoever for any governmental unit (federal, state, county, municipal, city, town, special district or otherwise) whether now or hereafter in existence.

"Guarantor" shall mean The Petro Carta Trust dated October 27, 2014 and BNW Family Office LLC, a Delaware limited liability company.

"Guaranty" shall mean that certain Guaranty of Payment to be issued by each of the Guarantors substantially in the form attached hereto as Exhibit B.

"Hazardous Substance(s)" shall mean any and all substances (whether solid, liquid or gas) defined, listed, or otherwise classified as pollutants, hazardous wastes, hazardous substances, hazardous materials, extremely hazardous wastes, contaminant or toxic substance or words of similar meaning or regulatory effect under any present or future Environmental Laws or that may have a negative impact on human health or the environment, including, without limitation, petroleum and petroleum products, asbestos and asbestos-containing materials, polychlorinated biphenyls, lead, materials containing lead based paint, mold or fungus which may pose a risk to human health or the environment, radon, radioactive materials, flammables and explosives.

"Indemnified Persons" shall mean: (a) Lender; (b) any prior owner or holder of the Loan; (c) any subsequent owner or holder of the Loan; (d) any receiver or other fiduciary appointed in a foreclosure or other bankruptcy, insolvency, reorganization, conservatorship or other relief with respect to debts or similar proceeding; (e) any officers, directors, shareholders, partners, members, employees, agents, servants, representatives, contractors, subcontractors, affiliates or subsidiaries of any and all of the foregoing; and (f) the heirs, legal representatives, successors and assigns of any and all of the foregoing (including, without limitation, any successors by merger, consolidation or acquisition of all or a substantial portion of the Indemnified Person's assets and business), in all cases whether during the term of the Loan or as part of or following a foreclosure.

"Indemnified Taxes" shall mean (a) Taxes other than Excluded Taxes; and (b) to the extent not otherwise described in the foregoing Clause (a), Other Taxes. For clarity, "Indemnified Taxes" shall include without limitation any U.S. federal withholding Tax which is imposed on amounts payable to or for the account of Lender under this Agreement or any other Loan Document.

"Internal Revenue Code" or "Code" shall mean the Internal Revenue Code of 1986, 26 U.S.C. §1 *et seq.*, as amended, as it may be further amended from time to time, and any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"Legal Opinion of French/St. Barthelemy Counsel" shall mean the legal opinion or advice of French/St. Barthelemy counsel to the Lender confirming the validity of the Pledge and the perfection of the first priority mortgage on the Properties.

"Legal Opinion of U.S. Counsel" shall mean the legal opinion or advice of U.S. Counsel to the Lender confirming the validity of this Agreement, the Note and the other Loan Documents governed by Delaware law.

"Legal Requirements" shall mean all obligations imposed by all statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting the Borrower, whether now or hereafter enacted and in force, and all permits, licenses, authorizations and regulations relating thereto.

3

"Lien" shall mean any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting Borrower, the Collateral, any portion thereof or any interest therein, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

"Loan" shall mean the loan made by Lender to Borrower pursuant to this Agreement.

"Loan Amount" shall mean an amount equal to Ten Million and 00/00 Dollars ($10,000,000.00).

"Loan Documents" shall mean, collectively, this Agreement, the Note, the Guaranty, the Pledge and any and all other documents, agreements and certificates executed and/or delivered in connection with the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Loan to Value Ratio" shall mean the ratio, expressed as a percentage of (i) the actual outstanding aggregate amount of the Loan at the time of calculation to (ii) the appraised value of the Property based upon an updated appraisal at the time of calculation.

"Losses" shall mean any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, fines, penalties, charges, fees, judgments, awards, amounts paid in settlement of whatever kind or nature (including but not limited to legal fees and other costs of defense).

"Material Adverse Effect" shall mean any event or condition, alone or when taken with other events or conditions or conditions existing or occurring concurrently with such event or condition has or is reasonably expected to have a detrimental effect on:

(a) the business, operations, conditions (financial or otherwise), assets, liabilities, prospects or properties of Borrower;

(b) the validity or enforceability of this Agreement or any other Loan Document;

(c) the ability of Borrower to pay or perform the obligations;

(d) the Collateral, the liens of Lender in and to the Collateral or the priority of Lender's liens, or

(e) the ability of Lender to enforce its rights and remedies under this Agreement.

"Maturity Date" shall mean June 2, 2023.

"Note" shall mean that certain promissory note of even date herewith in the principal amount of Ten Million and 00/00 Dollars ($ 10,000,000.00), made by Borrower in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, substantially in the form attached hereto as Exhibit A.

4

"Obligations" shall mean:

(a)    payment of the indebtedness from Borrower to Lender and all other liabilities and obligations of every kind or nature whatsoever of Borrower to Lender;

(b)    the payment of all amounts advanced by Lender to preserve and protect the Collateral and defend its rights in the Collateral; and

(c)    observance and performance of all of Borrower's other obligations to perform acts or refrain from taking any action under this Agreement, the Note and the other Loan Documents.

"Organizational Documents" shall mean the charter, articles of incorporation and bylaws and any other agreements affecting the rights, limitations, preferences or obligations of an owner with respect to the entity.

"Other Taxes" shall mean any and all present or future stamp, recording, filing, documentary or similar taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or performance under or otherwise with respect to, this Agreement or any other Loan Document.

"Permitted Liens" shall mean collectively:

(a)    the Lien and security interests created by the Loan Documents;

(b)    Liens, if any, for Taxes imposed by any Governmental Authority not yet due or delinquent.

"Person" shall mean any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"Pledge" shall mean that certain Pledge Agreement between the Borrower and the Lender providing for a pledge of the Pledged Interests under French Law, substantially in the form attached hereto as Exhibit C.

"Pledged Interests" shall mean the shares of stock of Access Management, SAS.

"Property" or "Properties" shall mean two real estate properties owned by Access Management, SAS, in the island of St. Barthelemy, the Caribbean, including one villa and land in Plot AE 314 in Colombier and the land parcel in Plot AI 220 in Saint-Jean, identified in more detail in Exhibit D.

"Release" of any Hazardous Substance shall mean any release, deposit, discharge, emission, leaking, spilling, seeping, migrating, injecting, pumping, pouring, emptying, escaping, dumping, disposing or other movement of Hazardous Substances.

"Remediation" shall mean:

(a)     any response, remedial, removal, or corrective action, any activity to cleanup, detoxify, decontaminate, contain or otherwise remediate any Hazardous Substance;

(b)     any actions to prevent, cure or mitigate any Release of any Hazardous Substance;

(c)     any action to comply with any Environmental Laws or with any permits issued pursuant thereto; or

(d)     any inspection, investigation, study, monitoring, assessment, audit, sampling and testing, laboratory or other analysis, or evaluation relating to any Hazardous Substances.

"Scheduled Payment Date" shall have the meaning set forth in the Note.

"Second Tranche" shall mean the second and final drawdown under this Loan in an amount of at up to Seven Million United States Dollars ($7,000,000).

"Subsidiary" shall mean Access Management SAS, an entity wholly owned by Borrower and organized under French law.

"Taxes" shall mean any and all present or future income, stamp, property, and/or other taxes, levies, imposts, duties, deductions, charges, fees or withholdings imposed, levied, withheld or assessed by any Governmental Authority, together with any interest, additions to tax or penalties imposed thereon and with respect thereto.

"Transfer" shall mean any direct or indirect sale, conveyance, mortgaging, grant, alienation, encumbrance, pledge, assignment or other transfer of the shares of stock, membership or limited liability company interests, or partnership interests of Borrower or any part thereof, or interest therein, or agreement to do any of the foregoing, whether voluntary or involuntary, and shall be deemed to include:

(a)     an installment sales agreement wherein Borrower agrees to sell for a price to be paid in installments;

(b)     if Borrower or any general partner or managing member (or if no managing member, any member or non-member manager) of Borrower is a corporation, any merger or consolidation, the voluntary or involuntary sale, conveyance, transfer or pledge of such corporation's stock (or the stock of any corporation directly or indirectly controlling such corporation by operation of law or otherwise) or the creation or issuance of new stock such that, in any such event, an aggregate of more than forty-nine percent (49%) of such corporation's stock shall be transferred, whether in one or a series of transactions;

(c)     if Borrower or any general partner or managing member (or if no managing member, any member or non-member manager) of Borrower is a limited or general partnership or joint venture, any merger or consolidation, the change, removal, resignation or addition of a general partner or joint venturer or the transfer or pledge of the partnership interest of any general partner or joint venturer or any profits or proceeds relating to such partnership or joint venture interest;

6

(d)    if Borrower or any general partner or managing member of Borrower is a limited liability company with a managing member, any merger or consolidation, the change, removal, resignation or addition of a managing member or the transfer of the membership interest of a managing member or any profits or proceeds relating to such managing membership interest or the transfer, change, removal, resignation or addition of any member such that an aggregate of more than forty-nine percent (49%) of the membership interests in such limited liability company shall be transferred, whether in one or a series of transactions; and

(e)    if Borrower or any general partner or managing member of Borrower is a limited liability company without a managing member, any merger or consolidation, the change, removal, resignation or addition of any non-member manager whatsoever, or the transfer, change, removal, resignation or addition of any member such that an aggregate of more than forty-nine percent (49%) of the membership interests in such limited liability company shall be transferred, whether in one or a series of transactions.

"UCC" or "Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect in the State of Delaware.

"U.S. Counsel to Lender" shall mean, Nelson Mullins, legal counsel to the Lender advising the Lender on Delaware law aspects of the Loan Documents governed by Delaware law.

### Article 2. - LOAN TERMS

#### Section 2.1    AGREEMENT TO BORROW AND LEND.

(a)    Borrower agrees to borrow from Lender and Lender agrees to lend to Borrower an amount equal to the Loan Amount in two tranches, the First Tranche to occur on January 31, 2023 and the Second Tranche to occur as soon as possible shortly thereafter, on the terms of and subject to the conditions of the Loan Documents including, without limitation Lender receiving the Legal Opinion of French/St. Barthelemy Counsel and the Legal Opinion of U.S. Counsel.

(b)    The Loan Amount shall be used by Borrower for refinancing maturing debt of the Borrower, general working capital and financing expenses.

#### Section 2.2    PAYMENTS, MATURITY.

(a)    Payments, Generally. Payments of principal and interest shall be due and payable by Borrower to Lender as provided in the Note. The outstanding principal balance and all accrued and unpaid interest and any other amounts due under the Loan Documents shall be due and payable on the Maturity Date, if not sooner paid.

(b)    Prepayments. During the term, the Loan may be repaid or prepaid, in whole but not in part, at any time and from time to time in strict accordance with the terms of the Note.

#### Section 2.3    INTEREST RATE.

(a)    Interest Rate. The Loan shall bear interest at a rate of Ten Percent (10%) for One Hundred and Twenty (120) days as set forth in the Note. Interest shall be calculated on the basis of a 360-day year for the actual days elapsed.

(b) **Default Rate.** In the event that, and for so long as, any Event of Default shall have occurred, and to the extent permitted by law, all accrued and unpaid interest, the outstanding principal balance and any other amounts due under the Loan Documents shall accrue interest at the Default Rate, calculated from the date such payment was due without any grace or cure periods contained herein.

(c) Late Payment. If Borrower fails to pay any installment of interest or principal within five (5) days from the date when due, Borrower shall pay a late charge as provided in the Note.

Section 2.4 **USURY LAWS.** It is the intention of Borrower and Lender to conform strictly to usury and similar laws relating to interest which may from time to time be in force, and all agreements between Lender and Borrower, whether now existing or hereafter arising and whether oral or written, are hereby expressly limited so that in no contingency or event whatsoever, whether by acceleration of maturity hereof or otherwise, shall the amount paid or agreed to be paid in the aggregate to Lender as interest under the Loan Documents, or in any other document evidencing, securing or pertaining to the Debt, exceed the maximum permissible amount under applicable usury or such other laws (the "Maximum Amount"). If from any possible construction of any document, interest would otherwise be payable under any Loan Document in excess of the Maximum Amount, or in the event for any reason whatsoever any payment by or act of Borrower pursuant to the terms or requirements of any Loan Document shall result in the payment of interest which would exceed the Maximum Amount, then any such construction shall be subject to the provisions of this Section, and ipso facto such document shall be automatically reformed, without the necessity of the execution of any amendment or new document, so that the obligation of Borrower to pay interest or perform such act or requirement shall be reduced to the limit authorized under Applicable Laws, and in no event shall Borrower be obligated to pay any interest, perform any act, or be bound by any requirement which would result in the payment of interest in excess of the Maximum Amount. Any amount received by Lender in excess of the Maximum Amount shall, without further agreement or notice between or by any party hereto, be deemed applied to reduce the principal amount of the Note immediately upon receipt of such moneys by Lender, with the same force and effect as though Borrower had specifically designated such sums to be applied to principal prepayment. The provisions of this Section shall supersede any inconsistent provision of this Agreement or any other Loan Document.

### Article 3. - SECURITY INTEREST

Section 3.1 **GRANT OF SECURITY INTEREST.** As security for (i) all indebtedness, obligations and liabilities of Borrower to Lender arising under, or in connection with, the Loan and the Loan Agreement, whether now existing or hereafter arising; (ii) all obligations and liabilities of Borrower to Lender arising under or in connection with this Agreement, whether now existing or hereafter arising; (iii) any and all sums paid by Lender in order to preserve the Collateral or its security interest therein; (iv) in the event of any proceeding for the collection or enforcement of any indebtedness, obligations or liabilities of Borrower referred to in clause (i), the expenses of retaking, holding, collection, preparing for sale, selling or otherwise disposing of or realizing on the Collateral, or of any exercise by Lender of its rights or remedies under this Agreement, together with attorneys' fees and expenses and court costs; and (v) all indemnity obligations of Borrower to Lender pursuant to this Agreement (collectively the "Obligations"), Borrower grants Lender a continuing first-priority security interest in, lien on and right of set-off against, and assigns to Lender as security, all of Borrower's right, title and interest in, to and under the following property

8

and interests in property, whether now owned or hereafter acquired or existing and wherever located, (collectively, the "Collateral"):

(a)     all of Borrower's right, title and interest in and to the Pledged Interests, and the certificates representing the Pledged Interests;

(b)     any and all rights and remedies of Borrower under the Organizational Documents, including the right to enforce any and all representations, warranties, covenants, obligations, agreements and indemnities of any party thereto made to or for the benefit of, or that otherwise inure to the benefit of, Borrower;

(c)     All books and records (including credit files, computer programs, printouts and other computer materials and records) of Borrower pertaining to any of the foregoing; and

(d)     Borrower's right, title and interest in and to the profits and losses of Borrower and Borrower's right as a shareholder of Subsidiary to receive dividends or distributions of Subsidiary's assets, upon complete or partial liquidation or otherwise.

Section 3.2     **DELIVERY OF CERTIFICATES, INSTRUMENTS; FINANCING STATEMENT**.

(a)     Concurrently with this Agreement, Borrower shall deliver to Lender all original certificates, instruments and other documents evidencing or representing the Collateral accompanied by duly executed instruments of transfer in blank.

(b)     Borrower authorizes Lender to file any financing statement or financing statement amendment required by Lender to establish or maintain the validity, perfection and priority of the security interest granted herein.

(c)     From time to time, Lender may, but is not required to, perform any agreement or obligation of Borrower hereunder which Borrower shall fail to perform and take any action Lender deems necessary for the maintenance and preservation of any of its Collateral or its security interest.

Section 3.3     **RELEASE OF SECURITY INTEREST**     At such time as (a) the Loan has been paid in full, (b) all the Obligations have been satisfied, and (c) the Loan Agreement shall have been terminated, Lender shall take all steps necessary to release the security interest in the Collateral granted hereunder, free and clear of any lien created hereunder in favor of Lender. Upon such termination, at the cost and expense of Borrower, Lender shall execute a satisfaction of this Agreement and such instruments, documents or agreements as are necessary or desirable to terminate, discharge and remove of record any documents constituting public notice of this Agreement and the security interests and assignment granted hereunder and shall deliver or cause to be delivered to Borrower the certificate(s) representing the Pledged Interests.

Section 3.4     **BORROWER REMAINS LIABLE.**     Anything herein to the contrary notwithstanding, (a) Borrower shall remain liable under Organizational Documents to the extent set forth therein to perform all of its respective duties and obligations thereunder to the same extent as if this Agreement had not been executed; (b) the exercise by Lender of any of the rights hereunder shall not release any Borrower from any of its duties or obligations under the Organizational Documents; and (c) Lender shall not have any obligation or liability under the Organizational Documents by reason of this Agreement, nor shall Lender be obligated to perform any of the obligations or duties of Borrower thereunder or to take any action to collect or enforce

9

any claim for payment assigned hereunder; provided that Lender and any other transferee of the Collateral shall take the same subject to the Organizational Documents.

Section 3.5    **ADDITIONAL COLLATERAL** As additional collateral for the payment of any and all indebtedness and obligations of Borrower, Borrower shall cause Subsidiary to mortgage, grant, bargain, pledge, assign, warrant, transfer and convey to Lender, and grant a security interest to Lender in all right, title and interest of Subsidiary in and to the Property. Within thirty (30) days of the date of this Agreement, Borrower shall have such first lien mortgage properly recorded or registered in the records of St. Barthelemy and provide a copy of such recorded or mortgage and any attestations or affirmations as may be reasonably required by Lender affirming the first lien position of the mortgage on the Property and due and proper execution of all related documents.

## Article 4. - REPRESENTATIONS AND WARRANTIES OF BORROWER

To induce Lender to make the Loan and to enter into this Agreement, Borrower hereby represents and warrants to Lender:

Section 4.1    **LEGAL STATUS AND AUTHORITY.** Borrower:

(a)    is duly organized, validly existing and in good standing under the laws of its state of organization or incorporation;

(b)    is duly qualified to transact business and is in good standing in each jurisdiction in which the character of the properties owned or leased by Borrower or the nature of its business makes such qualification necessary;

(c)    has all necessary approvals, governmental and otherwise, and full power and authority to carry on its business as now conducted and proposed to be conducted; and

(d)    has full power, authority and legal right to execute the Loan Documents, and to grant, bargain, sell, pledge, assign, warrant, transfer and convey the Collateral pursuant to the terms hereof and to keep and observe all of the terms of the Loan Documents on Borrower's part to be performed.

Section 4.2    **STATUS OF BORROWER.**

(a)    Borrower's exact legal name and organizational identification number, if any, assigned by the state of incorporation or organization is correctly set forth on the first page of this Agreement, other Loan Documents and on any UCC-1 Financing Statements filed in connection with the Loan. Borrower is an organization of the type specified and is incorporated in or organized under the laws of the state specified on the first page of this Agreement. Borrower's principal place of business and the place where Borrower keeps its books and records, has been for the preceding four months (or, if less, the entire period of the existence of Borrower) is the address of Borrower set forth on the first page of this Agreement.

(b)    Borrower is not directly engaged in any joint venture or partnership with any other Person.

Section 4.3    **VALIDITY OF DOCUMENTS**.

(a)    The execution, delivery and performance of the Loan Documents and the borrowing evidenced by the Note: (i) are within the power of Borrower; (ii) have been authorized by all requisite action; (iii) have received all necessary approvals and consents, corporate, governmental or otherwise; (iv) will not violate, conflict with, result in a breach of or constitute (with notice or lapse of time, or both) a default under any provision of law, any order or judgment of any court or governmental authority, or any indenture, agreement or other instrument to which Borrower is a party or by which it or any of its assets is or may be bound or affected; (v) will not result in the creation or imposition of any lien, charge or encumbrance whatsoever upon any of its assets, except the lien and security interest created hereby; and (vi) will not require any authorization or license from, or any filing with, any Governmental Authority or other body (except for Uniform Commercial Code filings relating to the security interest created hereby).

(b)    The Loan Documents constitute the legal, valid and binding obligations of Borrower, enforceable against Borrower in accordance with their respective terms, except as may be limited by: (i) bankruptcy, insolvency or other similar laws affecting the rights of creditors generally; and (ii) general principles of equity (regardless of whether considered in a proceeding in equity or at law).

Section 4.4    **LITIGATION.**    There is no material action, suit or proceeding, judicial, administrative or otherwise (including any condemnation or similar proceeding), pending or, to the best of Borrower's knowledge, threatened or contemplated against, or affecting, Borrower, Borrower's business or any Guarantor, except other than that certain litigation regarding Indigo Ridge Development Partners LLC and initiated by the filing by Sagita 1601, LLC on August 28, 2019 of an Original Petition in the 368th District Court of Williamson County, Texas, in Cause No. 19-1310-C368 (the "Indigo Ridge Litigation").

Section 4.5    **FINANCIAL CONDITION.**  Borrower:

(a)    is solvent, and no bankruptcy, reorganization, insolvency or similar proceeding under any state or federal law with respect to Borrower has been initiated or threatened; and

(b)    has received reasonably equivalent value for the granting of the Loan.

Section 4.6    **BUSINESS PURPOSES.**    The proceeds of the Loan will be used by Borrower solely for business purposes and not for personal, family, household or agricultural purposes.  No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or by the terms and conditions of the Loan Documents.

Section 4.7    **TAXES.**  Borrower and any Guarantor have filed all federal, state, county, municipal, and city income and other Tax returns required to have been filed by them and have paid all Taxes and related liabilities which have become due pursuant to such returns or pursuant to any assessments received by them. Neither Borrower nor any Guarantor knows of any basis for any additional assessment in respect of any such Taxes and related liabilities for prior years.

Section 4.8  **TITLE TO PROPERTIES.**

(a)    Borrower has good and marketable title to its properties and assets, including the Collateral, and the properties and assets reflected in the financial statements are not subject to any Liens other than the Permitted Liens. Borrower has not agreed or consented to cause any of its properties or assets (whether now owned or in the future acquired) to be subject to any Liens other than the Permitted Liens.

(b)    Borrower is the sole owner of all of the Collateral, beneficially and of record, free and clear of any liens other than the liens created hereunder. The Collateral is not subject to any option to purchase or similar rights of any kind or any voting trust, lock-up agreement or similar arrangement.

(c)    Borrower shall defend its title to the Collateral against all claims of all persons.

Section 4.9  **COMPLIANCE WITH LAW.** Borrower is not in violation of any Legal Requirements which could have a Material Adverse Effect on Borrower. Borrower has obtained all licenses, permits, franchises and other governmental authorization necessary for the ownership of its properties and assets, including the Collateral, and the conduct of its business.

Section 4.10  **PERFECTION..**  Upon (a) the execution and delivery of this Agreement, (b) the delivery of the certificates evidencing the Borrower's interests in the Subsidiary, and (c) the filing of a UCC-1 financing statement against Borrower and naming Lender as the secured party in the office of the Secretary of State of the Borrower's state of incorporation or organization, Lender will have a valid, perfected, continuing, first-priority security interest in the Collateral.

Section 4.11  **INTELLECTUAL PROPERTY.** All patents, trademarks, service marks, copyrights, design rights, tradenames, assumed names, trade secrets and licenses owned or utilized by Borrower are valid and have been duly filed with all appropriate Governmental Authorities and Borrower is not aware of any objection or challenge to their validity.

Section 4.12  **ENVIRONMENTAL REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants, that:

(a)    there is no past or present non-compliance with Environmental Laws, or with permits issued pursuant thereto; and

(b)    Borrower does not know of, and has not received, any written or oral notice or other communication from any Person relating to Hazardous Substances or Remediation thereof, of possible liability of any Person pursuant to any Environmental Law, other environmental conditions, or any actual or potential administrative or judicial proceedings in connection with any of the foregoing.

Section 4.13  **NO CHANGE IN FACTS OR CIRCUMSTANCES.** All information in the application for the Loan submitted to Lender and in all financial statements, reports, certificates and other documents submitted in connection with the loan application or in satisfaction of the terms thereof, are accurate, complete and correct in all material respects. There has been no adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise materially misleading.

12

Section 4.14 **DISCLOSURE**. Borrower has disclosed to Lender all material facts and has not failed to disclose any material fact that could cause any representation or warranty made herein to be materially misleading or have a Material Adverse Effect on Borrower or Borrower's business.

Section 4.15 **LEGAL STATUS OF SUBSIDIARY**. Subsidiary:

(a) is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization or incorporation;

(b) is duly qualified to transact business and is in good standing in each jurisdiction in which the character of the properties owned or leased by Borrower or the nature of its business makes such qualification necessary; and

(c) has all necessary approvals, governmental and otherwise, and full power and authority to carry on its business as now conducted and proposed to be conducted

Section 4.16 **SUBSIDIARY ASSETS**

(a) Subsidiary has good and marketable title to its Property and assets and are not subject to any Liens other than the Permitted Liens. Subsidiary has not agreed or consented to cause any of its Property or assets (whether now owned or in the future acquired) to be subject to any Liens other than the Permitted Liens.

(b) Subsidiary is the sole owner of all of the Property, beneficially and of record, free and clear of any liens other than the liens created hereunder.

Section 4.17 **THIRD PARTY REPRESENTATIONS**. Each of the representations and the warranties made by each Guarantor herein or in any of the other Loan Documents is true and correct in all material respects.

Borrower recognizes and acknowledges that in accepting the Loan Documents, Lender is expressly and primarily relying on the truth and accuracy of the warranties and representations set forth in this Article 4 without any obligation to investigate and notwithstanding any investigation by Lender; that such reliance existed on the part of Lender prior to the date hereof; that the warranties and representations are a material inducement to Lender in accepting the Loan Documents; and that Lender would not be willing to make the Loan in the absence of the warranties and representations as set forth in this Article 4.

### Article 5. - BORROWER COVENANTS

Section 5.1 **MAINTENANCE OF COLLATERAL**.

(a) Borrower shall not create, permit or suffer to exist, and will defend the Collateral against and take such other action as is necessary to remove, any lien on the Collateral.

(b) Borrower shall safeguard and protect all Collateral and shall not allow any material default for which it is responsible to occur under any Collateral, and shall fully perform or cause to be performed when due all of its respective obligations under the Collateral

(c)     Borrower shall not permit the merger or consolidation of the Subsidiary or the issuance of additional shares, options, warrants or convertible obligations or notes with respect to the Subsidiary.

(d)     Borrower shall not, without the written consent of Lender, which consent shall be granted or withheld in Lender's sole discretion sell, assign, pledge, grant any lien on, transfer, dispose of or otherwise encumber the Collateral or any part thereof, including, without limitation, entering into any lock-up, voting trust or any other arrangement with respect to the Collateral that adversely affects the interests of the Lender, as determined by the Lender in Lender's sole discretion.

(e)     Borrower shall not, without the written consent of Lender, which consent shall be granted or withheld in Lender's sole discretion cause the Subsidiary to (I) sell, lease assign, pledge, grant any lien on, transfer, dispose of or otherwise encumber the Property owned by the Subsidiary or any part thereof, (II) alter, amend or otherwise change the zoning, classification or designation for use of the Property owned by the Subsidiary or any part thereof or (III) develop or construct any structure on the Property owned by the Subsidiary or any part thereof.

(f)     Borrower shall obtain (at its sole cost) updated appraisal reports for each of the Properties from an independent third-party appraisal firm in St. Barthelemy, including a reliance letter authorizing the Lender to rely on such appraisal reports, and deliver such reports and reliance letters to the Borrower as soon as possible after the First Tranche but in no event later than forty-five (45) days thereafter. If the Loan to Value Ratio is below forty percent (40%), the Borrower shall be required to give additional collateral to secure the Loan in the form acceptable to the Lender in its sole discretion.

Section 5.2    **RIGHTS OF BORROWER.**   Unless an Event of Default either (i) has occurred or (ii) as a result of the exercise or taking of any action or after giving effect to a distribution will occur, Borrower shall be entitled to (a) exercise any and all voting and other consensual rights pertaining to the Collateral or any part thereof for any purpose not inconsistent with the terms of this Agreement, provided that Borrower shall not exercise or refrain from exercising any such right if such action would have a Material Adverse Effect on the value of the Collateral or the benefits of this Agreement and (b) receive and use, free and clear of any lien created hereby or any security interest granted by Borrower to Lender hereunder, for any purpose any distributions actually made, and any allocations actually made, with respect to the Collateral (whether as a distribution of net cash flow or otherwise), provided that distributions payable other than in cash shall be delivered to Lender and shall be additional security for the Loan.

Section 5.3    **BUSINESS CONDUCTED.**   Borrower shall and shall cause Subsidiary to continue in the business currently conducted by it using its best efforts to maintain its customers and goodwill. Borrower shall and shall cause Subsidiary to not, directly or indirectly, engage in any line of business substantially different from the line of business conducted by Borrower or Subsidiary as of the date of this Agreement. Borrower shall cause Subsidiary to change its domicile to Florida, United States of America prior to granting the mortgages on the Properties in a manner reasonable satisfactory to French/St. Barthelemy Counsel to Lender and U.S. Counsel to Lender.

Section 5.4    **PAYMENT OF TAXES, ETC.**

(a)      Borrower shall promptly pay all Taxes when due and furnish to Lender upon request receipted bills of the appropriate taxing authority or other documentation reasonably satisfactory to Lender evidencing the payment thereof. Borrower shall not suffer and shall promptly cause to be paid and discharged any lien or charge whatsoever which may be or become a lien or charge against the Collateral.

(b)      After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any of the Taxes or any claims or judgments of mechanics, materialmen, suppliers or vendors or any lien therefor, provided that:

(i)      no Event of Default has occurred and is continuing hereunder or under any of the other Loan Documents;

(ii)      Borrower is not prohibited from doing so under the provisions of any other agreement affecting Borrower;

(iii)      such proceeding shall suspend the collection of the disputed amount from Borrower (and Borrower shall furnish such security as may be required in the proceeding for such purpose), or Borrower shall have bonded over or paid all of the disputed amount under protest;

(iv)      the Collateral will not be in danger of being sold, forfeited, terminated, canceled or lost; and

(v)      Borrower shall have deposited with Lender adequate reserves for the payment of the disputed amount, together with all interest and penalties thereon, unless Borrower has bonded over or paid all of the disputed amount under protest.

Section 5.5      **PAYMENT OF LEASEHOLD OBLIGATIONS**. Borrower shall at all times pay when due, its rental obligations under all leases which it is a tenant or lessee and shall comply in all material respects with all other terms of any lease and keep them in full force and effect.

Section 5.6      **COMPLIANCE WITH LAWS**. Borrower shall and shall cause Subsidiary to promptly comply with all Legal Requirements. Borrower shall give prompt notice to Lender of the receipt by Borrower of any notice related to a violation of any Legal Requirements and of the commencement of any proceedings or investigations which relate to compliance with Legal Requirements.

Borrower shall have the right, after prior written notice to Lender, to contest by appropriate legal proceedings diligently conducted in good faith, without cost or expense to Lender, the validity or application of any Legal Requirements and to suspend compliance therewith if permitted under Legal Requirements, provided:

(i)      failure to comply therewith may not subject Borrower or Lender to any civil or criminal liability;

15

(ii)     prior to and during such contest, Borrower shall furnish to Lender security reasonably satisfactory to Lender against loss or injury by reason of such contest or non-compliance with such Legal Requirements;

(iii)     no Event of Default shall exist during such proceedings, and such contest shall not otherwise violate any of the provisions of any of the Loan Documents; and

(iv)     such contest shall not subject the Collateral to any lien or encumbrance the enforcement of which is not suspended by such contest or otherwise affect the priority of the lien of Lender.

Section 5.7     **BOOKS AND RECORDS**.

(a)     Borrower and Guarantor, shall keep adequate books and records of account in accordance with GAAP or in accordance with other methods acceptable to Lender in its sole discretion, consistently applied and shall furnish to Lender the following, which shall be prepared, dated and certified by Borrower (or by Guarantor, to the extent such items relate to Guarantor) as true, correct and complete in the form required by Lender, unless otherwise specified below:

(i)     quarterly operating statements of the Borrower, detailing the revenues received, the expenses incurred and the net operating income before and after debt service (principal and interest) and containing appropriate year to date information, within thirty (30) days after the end of each fiscal quarter;

(ii)     quarterly balance sheets of Borrower within thirty (30) days after the end of each fiscal quarter;

(iii)     an annual operating statement of the Borrower detailing the total revenues received, total expenses incurred, total cost of all capital improvements, total debt service and total cash flow, prepared, dated and certified by independent certified public accountants acceptable to Lender within ninety (90) days after the close of each fiscal year of Borrower;

(iv)     an annual balance sheet and profit and loss statement of Borrower and any Guarantors within ninety (90) days after the close of each fiscal year of Borrower and Guarantors prepared, dated and certified by independent certified public accountants acceptable to Lender, as the case may be; and

(v)     such other financial statements, and such other information and reports as may, from time to time, be required by Lender.

(b)     Borrower and any Guarantor shall furnish Lender with such other additional financial or management information (including State and Federal Tax returns) as may, from time to time, be reasonably required by Lender in form and substance satisfactory to Lender, in reasonable detail and certified by Borrower as true, correct and complete.

(c)    Following the occurrence of an Event of Default, or if Lender has reason to believe that any item furnished under this Section is materially inaccurate or misleading, Lender shall have the right, but not the obligation, to obtain any of the financial statements and other items required to be provided under this Section by means of an audit by an independent certified public accountant selected by Lender, in which event Borrower agrees to pay, or to reimburse Lender for, any expense of such audit and further agrees to provide all necessary information to said accountant and otherwise to cooperate in the performance of such audit.

Section 5.8    **PERFORMANCE OF OTHER AGREEMENTS.**  Borrower shall observe and perform each and every term to be observed or performed by Borrower pursuant to the terms of any agreement or instrument affecting or pertaining to Borrower or the Collateral or given by Borrower to Lender for the purpose of further securing an Obligation and any amendments, modifications or changes thereto.

Section 5.9    **INSURANCE.**  (a)  Borrower shall and shall cause Subsidiary to maintain or cause to be maintained insurance with respect to its business and properties in such amounts, deductibles and coverages as Lender shall reasonably require, including without limitation:

(i)    insurance against loss or damage by Casualty;

(ii)    commercial general liability insurance;

(iii)    business interruption insurance;

(iv)    product liability;

(v)    bond against larceny or embezzlement; and

(vi)    worker's compensation insurance.

All insurance policies shall be issued by financially responsible insurers.  Borrower shall furnish Lender with copies of all policies and renewals of such policies at least thirty (30) days prior to any expiration date and appropriate loss payable endorsements in form and substance satisfactory to Lender naming Lender as a co-insured and loss-payee as its interests may appear.  All insurance policies shall contain a provision that such policies may not be cancelled or amended or failed to be renewed without at least thirty (30) days prior written notice to Lender.

(b)    If any of the Collateral shall be damaged or destroyed, in whole or in part, by Casualty, Borrower shall give prompt notice of such damage to Lender and shall promptly commence and diligently prosecute the proof of loss and the replacement, restoration or repair of any of the Collateral so damaged or destroyed.  Borrower shall pay all costs of replacing, restoring or repairing any Collateral so damaged or destroyed, whether or not such costs are covered by insurance.  Lender may but shall not be obligated to make proof of loss if not made promptly by Borrower.  Borrower shall adjust all claims for insurance proceeds in consultation with, and approval of, Lender; provided, however, if an Event of Default has occurred and is continuing, Lender shall have the exclusive right to participate in the adjustment of all claims for insurance proceeds.

Section 5.10    **ACCESS TO PROPERTY.**  Borrower shall permit Lender, its agents and representatives to inspect the Collateral and the Property of Subsidiary at reasonable hours

17

upon reasonable advance notice and shall provide Lender, its agents and representatives all documents relating to the Collateral or the Property of the Subsidiary as reasonably requested by Lender.

Section 5.11 **LITIGATION**. Borrower shall give prompt notice of any litigation or governmental proceeding pending or threatened against Borrower, Subsidiary or Guarantor which might materially adversely affect Borrower's, Subsidiary's or Guarantor's condition, financial or otherwise, or the Collateral, in excess of Twenty-Five Thousand and 00/100 Dollars ($25,000.00).

Section 5.12 **DIVIDENDS, DISTRIBUTIONS AND MANAGEMENT FEES**. Except with the express written consent of Lender, Borrower shall not:

(a)     declare or pay any dividends or other distributions with respect to, purchase, redeem or otherwise acquire for value any of its outstanding stock, partnership interests or membership interests or return any capital of its shareholders, partners, members or managers. Notwithstanding the foregoing, provided that an Event of Default does not exist or after giving effect to the dividend or distribution will exist, Borrower may make a dividend or distribution in an amount not to exceed the amount either of the federal and state income Taxes due and owing by the shareholders of Borrower, if it is an S corporation as defined in the Code, the partners or the members for the most recently ended fiscal year or for estimated federal and state income Taxes for the current fiscal year due and owing by the shareholders, partners or members of Borrower; and

(b)     pay management fees or fees of a similar nature to any Guarantor or person affiliated with Guarantor.

Section 5.13 **SINGLE PURPOSE ENTITY/SEPARATENESS**. Until the Debt has been paid in full, Borrower has not and will not:

(a)     merge into or consolidate with any Person, or dissolve, terminate, liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure;

(b)     create or own any new subsidiary;

(c)     commingle its assets with the assets of any other Person;

(d)     establish any new credit facilities, engage in any debt restructure, or accelerate payment of any existing debt;

(e)     enter into any contract or agreement with any general partner, member, shareholder, principal, guarantor of the obligations of Borrower, or any Affiliate of the foregoing, except upon terms and conditions that are intrinsically fair, commercially reasonable and substantially similar to those that would be available on an arm's-length basis with unaffiliated third parties;

(f)     assume or guaranty the debts of any other Person, hold itself out to be responsible for the debts of any other Person, or otherwise pledge its assets for the benefit of any other Person or hold out its credit as being available to satisfy the obligations of any other Person; and

18

(g)     make any loans or advances to any Person.

Section 5.14   **CHANGE OF NAME, IDENTITY OR STRUCTURE**.

Borrower shall not change or permit to be changed:

(a)     Borrower's name;

(b)     Borrower's identity (including its trade name or names);

(c)     Borrower's principal place of business set forth on the first page of this Agreement;

(d)     the corporate, partnership, limited liability company or other organizational structure of Borrower;

(e)     Borrower's state of incorporation or organization;

(f)     Borrower's organizational identification number; or

(g)     Borrower's management, officers or board of directors,

without in each case notifying Lender of such change in writing at least thirty (30) days prior to the effective date of such change and, in the case of a change in Borrower's structure or management officers or board of directors, without first obtaining the prior written consent of Lender. Borrower authorizes Lender to file any financing statement or financing statement amendment required by Lender to establish or maintain the validity, perfection and priority of the security interest granted herein. At the request of Lender, Borrower shall execute a certificate in form satisfactory to Lender listing the trade names under which Borrower intends to operate and representing and warranting that Borrower does business under no other trade name. If Borrower does not now have an organizational identification number and later obtains one, or if the organizational identification number assigned to Borrower subsequently changes, Borrower shall promptly notify Lender of such organizational identification number or change.

Section 5.15   **BUSINESS AND OPERATIONS**. Borrower will qualify to do business and will remain in good standing under the laws of each state as and to the extent the same are required for the ownership, maintenance, management and operation of is business.

Section 5.16   **ENVIRONMENTAL COVENANTS**. Borrower covenants and agrees that:

(a)     all uses and operations by Borrower, shall be in compliance with all Environmental Laws and permits issued pursuant thereto;

(b)     there shall be no Hazardous Substances in, on, or under any Property of the Borrower, except those that are both:

(i)     in compliance with all Environmental Laws and, if required, with permits issued pursuant thereto; and

(ii)    fully disclosed to Lender in writing or are used by Borrower in the ordinary course of their business.

19

(c)     Borrower shall, at its sole cost and expense, perform any environmental site assessment or other investigation of environmental conditions, pursuant to any reasonable written request of Lender if Lender has reason to suspect that a Release of a Hazardous Substance might have occurred (including, without limitation, sampling, testing and analysis of soil, water, air, building materials and other materials and substances whether solid, liquid or gas), and share with Lender the reports and other results thereof, and Lender and other Indemnified Parties shall be entitled to rely on such reports and other results thereof;

(d)     Borrower shall, at its sole cost and expense, comply with all reasonable written requests of Lender to:

        (i)     reasonably effectuate Remediation of any condition (including, without limitation, a Release of a Hazardous Substance);

        (ii)    comply with any Environmental Law;

        (iii)   comply with any directive from any Governmental Authority; and

        (iv)   take any other reasonable action necessary or appropriate for protection of human health or the environment.

(e)     Borrower shall not do any act that materially increases the dangers to human health or the environment, poses an unreasonable risk of harm to any Person, impairs or may impair the value of the Collateral, is contrary to any requirement of any insurer, constitutes a public or private nuisance or constitutes waste; and

(f)     Borrower immediately upon becoming aware of the same shall notify Lender in writing of:

        (i)     any presence or Releases or threatened Releases of Hazardous Substances;

        (ii)    any non-compliance with any Environmental Laws related in any way to Borrower's properties;

        (iii)   any required or proposed Remediation of environmental conditions; and

        (iv)   any written or oral notice or other communication of which Borrower becomes aware from any source whatsoever (including, without limitation, a governmental entity) relating in any way to Hazardous Substances or Remediation thereof, possible liability of any Person pursuant to any Environmental Law, other environmental conditions, or any actual or potential administrative or judicial proceedings.

### Article 6. - TRANSFERS

Section 6.1    TRANSFERS BY BORROWER.

Except with the prior written consent of Lender, which may be withheld or denied in Lender's sole discretion, Borrower shall not permit any Transfer.

### Article 7. - DEFAULTS; REMEDIES

Section 7.1 **DEFAULTS**. The occurrence of one or more of the following events shall be an event of default ("Event of Default"):

(a) If any portion of the Debt is not paid when due;

(b) If any other Obligation is not performed in accordance with the terms and conditions of this Agreement and the other Loan Documents;

(c) The occurrence of a transfer prohibited by this Agreement;

(d) If any representation or warranty contained herein or in any other Loan Document or if any of the information contained in any documentation provided to Lender by Borrower in conjunction with the Loan shall not be true and accurate in all material respects as of the date made;

(e) If there shall occur a Material Adverse Change in the financial condition or in the business of Borrower or if Lender in good faith deems itself insecure as a result of acts or events bearing upon the financial condition of Borrower.

(f) If any one or more of Borrower or Guarantor shall:

    (i) file a voluntary petition in bankruptcy or for relief under the Bankruptcy Act or any similar state or federal law;

    (ii) file a pleading in any proceeding admitting insolvency;

    (iii) not have vacated within sixty (60) days after the filing against Borrower or Guarantor of any involuntary proceeding under the Bankruptcy Act or similar state or federal law;

    (iv) have a substantial part of any one or more of their assets attached, seized, subjected to a writ or distress warrant, or levied upon, unless such attachment, seizure, writ, warrant or levy is vacated within sixty (60) days;

    (v) make an assignment for the benefit of creditors or shall consent to the appointment of a receiver or trustee or liquidator of all or a major part of its property; or

    (vi) not have vacated any order appointing a receiver, trustee or of any Borrower or Guarantor or all or a major part of any such person's property.

(g) If a notice of lien, levy or assignment is filed or recorded with respect to all or any of the assets of Borrower by the United States government or any department, agency or instrumentality thereof or by any state, county, municipal or other governmental agency, or if any

21

Taxes or debts owing at any time or times hereafter to any one of them becomes a lien or encumbrances upon any of Borrower's assets and any of the foregoing is not released, bonded or otherwise secured to Lender's reasonable satisfaction within sixty (60) days after the same becomes a lien or encumbrance;

(h)     If Borrower shall continue to be in default under any other term, covenant or condition of this Agreement not specified above, for thirty (30) days after notice to Borrower from Lender, provided however, if such default cannot reasonably be cured within such thirty (30) day period and Borrower shall have commenced to cure such default within the thirty day (30) period and Borrower shall thereafter diligently and expeditiously proceed to cure for such additional time as is reasonably necessary but not to exceed sixty (60) days.

Section 7.2     **RIGHT OF ENFORCEMENT.** Upon the occurrence of an Event of Default, Lender shall have and may exercise any and all rights of enforcement and remedies afforded to Lender pursuant to this Agreement, the Note, and the other Loan Documents, together with any and all other rights and remedies otherwise provided and available to Lender by law or equity, including without limitation:

(a)     terminate the Loan, whereupon all outstanding obligations shall become immediately due and payable;

(b)     setoff or apply any property of Borrower held by Lender to reduce the outstanding obligation;

(c)     notify or cause Borrower to notify, at its sole cost and expense, any or all of the Account Debtors that the Accounts have been assigned to Lender and that all future payments on the Accounts should be paid directly and solely to Lender as directed;

(d)     exercise any and all rights of enforcement and remedies available under the UCC either as of the date of this Agreement or as of any Event of Default, and in conjunction with, in addition to, or substitution for those rights, Lender may, in its absolute discretion:

(i)     enter upon any premises of Borrower to take possession of, assemble and collect and carry away the Collateral; and/or

(ii)     require Borrower at Borrower's sole cost to assemble the Collateral and make it available at a place Lender designates which is convenient to allow Lender to take possession or dispose of the Collateral; and/or

(iii)     waive any Event of Default or remedy any Event of Default in any reasonable manner, without waiving its rights and remedies upon such Event of Default and without waiving any other prior or subsequent Event of Default.

Lender shall not be liable for failure to assemble and collect the Collateral or any part thereof or to enforce any rights hereunder or under any agreement relating to the Collateral, or for any act or omission on the part of Lender, its officers, agents or employees, except willful misconduct.

Section 7.3     **RIGHTS OF SALE.** Borrower agrees that if an Event of Default occurs under this Agreement, Lender may, at its option, sell and dispose of the Collateral at one

22

or more public or private sales upon giving Borrower not less than ten (10) days' written notice of the time and place of each such public sale or the time, place, terms and conditions of each such private sale, which notice or notices Borrower hereby agrees are commercially reasonable within the meaning of the UCC. Lender, or any other party which is the highest bidder, shall have the right to purchase the Collateral being offered at any public sale free from any right of redemption, if any, in Borrower, which right of redemption is hereby expressly waived. Lender as highest bidder at any public sale may apply any unpaid portion of the Debt on account of or in full satisfaction of the purchase price. Lender, if it is not the purchaser, shall have the right to apply the net proceeds of any such public or private sale (after paying all of its reasonable costs and expenses of every kind and nature incidental thereto including, without limitation, attorney's fees and legal expenses and expenses incidental to preparing for sale, selling and the like), to payment of the Debt. Only after so applying such net proceeds and after the payment by Lender of any other sums required to be paid pursuant to any existing or future provision of law including, without limitation, the UCC, shall Lender be obligated to account to Borrower for the surplus, if any, resulting from any public or private sale. If any deficiency on the Debt shall remain after all of the Collateral has been disposed of at such public or private sale or sales and after applying the net proceeds of each such sale as provided in this Section 7.3, Borrower shall pay such deficiency to Lender.

Section 7.4    **MISCELLANEOUS RIGHTS OF LENDER.**

(a)    Borrower hereby waives any and all legal requirements that Lender institute any action or proceeding at law or in equity against Borrower or exhaust its remedies in respect of any other security held by Lender as a condition precedent to exercising its rights and remedies as to the Collateral pursuant to the provisions of this Agreement. Borrower waives any defenses caused by reason of any disability or other defense of any person, or by reason of the cessation from any cause whatsoever of the liability of any other person. Borrower authorizes Lender, without notice or demand and without affecting Borrower's liability or Lender's rights hereunder or on the Debt, from time to time: (i) to take and hold security other than the Collateral for the payment of the Debt or any part thereof, and exchange, enforce, waive and release the Collateral, or any part thereof or any rights, remedies, securities or liens of Borrower with respect to the Collateral, or any such other security; (ii) to apply the Collateral or any other security and direct the order or manner of sale thereof as Lender in its discretion may determine; and (iii) to endorse Borrower's name to any notes, checks, drafts, bills of exchange, commercial paper or other instruments.

(b)    Lender may proceed against all or a portion of the Collateral. All rights and remedies under this Agreement or otherwise available to law or equity may be pursued concurrently or otherwise at such time and in such order as Lender may determine in its sole discretion without impairing or otherwise affecting the other rights and remedies of Lender.

Section 7.5    **RIGHT TO CURE DEFAULTS.** Upon the occurrence of any Event of Default or if Borrower fails to make any payment or to do any act as herein provided, Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder, make or do the same in such manner and to such extent as Lender may deem necessary to protect the security hereof, including without limitation: (a) obtain insurance covering any part of the Collateral; (b) discharge any Taxes, liens or other encumbrances at any time levied or placed on any Collateral in violation of this Agreement; and (c) pay for the preservation and maintenance of any Collateral. Lender is authorized to appear in, defend, or bring any action or proceeding to protect its interest in the

23

Collateral or to foreclose or collect the Loan, and the cost and expense thereof (including reasonable attorneys' fees to the extent permitted by law), with interest at the Default Rate, shall constitute a portion of the Loan and be secured by this Agreement and shall be due and payable to Lender upon demand. All such costs and expenses incurred by Lender in remedying such Event of Default or such failed payment or act or in appearing in, defending, or bringing any such action or proceeding shall bear interest at the Default Rate, for the period from that the incurrence of such cost or expense by Lender to the date of payment to Lender.

Section 7.6 **APPOINTMENT OF LENDER AS BORROWER'S LAWFUL ATTORNEY**. Upon the occurrence and during the continuance of an Event of Default, Borrower irrevocably designates, makes, constitutes and appoints Lender (and all Persons designated by Lender) as its true and lawful attorney (and agent-in-fact) to take the following actions: (a) at such time or times hereafter as Lender or its agent in its sole discretion may determine, in Borrower's or Lender's name, to endorse Borrower's name on any checks, notes, drafts, instruments, documents or any other payment relating to the Collateral and/or proceeds of the Collateral which come into the possession of Lender or come under Lender's control; (b) to the extent permitted by applicable law, to sign Borrower's name on any documents (including financing statements and continuations thereof) necessary or desirable for the purpose of maintaining or achieving the perfection of a security interest in the Collateral; (c) to the extent permitted by law, to sign Borrower's name to any document necessary or appropriate in order to permit Lender to fully exercise its rights and remedies; and (d) at such time or times hereafter as Lender or its agent in their sole discretion may determine in Borrower's or Lender's name to exercise any voting rights or other rights of consent or approval. The power of attorney granted under this Section, and any other power of attorney granted under this Agreement, shall be irrevocable and coupled with an interest.

## Article 8. - INDEMNITY

Section 8.1 **INDEMNITY.** Borrower hereby indemnifies the Indemnified Persons against, and agrees to hold each such Indemnified Person harmless from, any and all losses, claims, damages and liabilities, including claims brought by Borrower, any member, manager agent, representative or employee of Borrower, any Guarantor, or any other Person, and expenses relating to such claims, including reasonable counsel fees and expenses, incurred by such Indemnified Person arising out of any claim, litigation, investigation or proceeding (whether or not such Indemnified Person is a party thereto) relating to any transactions, services or matters that are the subject of this Agreement or the other Loan Documents; provided, however, that such indemnity shall not apply to any such losses, claims, damages, or liabilities or related expenses determined by a court of competent jurisdiction to have arisen from the gross negligence or willful misconduct of such Indemnified Person. The agreements of Borrower in this Section shall be in addition to any liability that Borrower may otherwise have under other provision of this Agreement and/or applicable law or in equity. All amounts due under this Section shall be payable as incurred upon written demand therefor.

## Article 9. - WAIVERS

Section 9.1 **MARSHALLING AND OTHER MATTERS.** Borrower hereby waives, to the fullest extent permitted by law, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Collateral or any part thereof or any interest therein. Further, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure on behalf of Borrower, and on behalf of each and every person acquiring any

24

interest in or title to the Collateral or any portion subsequent to the date of this Agreement and on behalf of all persons to the extent permitted by applicable law.

Section 9.2 **WAIVER OF NOTICE.** Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement specifically and expressly provides for the giving of notice by Lender to Borrower and except with respect to matters for which Lender is required by Applicable Laws to give notice, and Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Agreement does not specifically and expressly provide for the giving of notice by Lender to Borrower.

Section 9.3 **WAIVER OF STATUTE OF LIMITATIONS.** To the fullest extent permitted by law, Borrower hereby expressly waives and releases the pleading of any statute of limitations as a defense to payment of the Debt or performance of its other Obligations.

Section 9.4 **MODIFICATION, WAIVER IN WRITING.** No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, or of the Note, or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on Borrower, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

Section 9.5 **DELAY NOT A WAIVER.** Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege under this Agreement, the Note or under any other Loan Document, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege. In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, the Note or any other Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, the Note or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

Section 9.6 **WAIVER OF TRIAL BY JURY. BORROWER AND LENDER EACH AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND LENDER AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH OF LENDER AND BORROWER IS AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER AND LENDER.**

Section 9.7 **WAIVER OF COUNTERCLAIM**. Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents.

Section 9.8 **WAIVER OF DEFENSE TO SUBROGATION**. Borrower hereby waives the right to assert any defense or counterclaim against any Guarantor to its right to collect or recover from Borrower under a right of subrogation or similar right however denominated, in any action or proceeding brought against it by Guarantor.

### Article 10. - CERTAIN TAX PROVISIONS

Section 10.1 **TAX INDEMNITY**.

(a) Any and all payments by or on account of any obligation of the Borrower hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Taxes; provided, however, that if the Borrower is required by applicable law (as determined based on the written opinion of legal counsel to Borrower) to deduct or withhold any Taxes from such payments, then the following provisions shall apply:

   (i) If such Tax is an Indemnified Tax, then the amount payable by the Borrower shall be increased so that after making all required deductions or withholdings (including deductions or withholdings applicable to additional amounts payable under this Section), the Lender receives an amount equal to the amount it would have received had no such deductions or withholdings been made; and

   (ii) The Borrower shall make such deductions and timely pay and remit the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b) In addition, the Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c) Without limiting the other provisions of this Agreement, the Borrower shall indemnify the Lender, within ten (10) days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including without limitation Indemnified Taxes or Other Taxes imposed on or attributable to amounts payable hereunder) paid by the Lender on or with respect to an amount payable by the Borrower under or in respect of this Agreement or under any other Loan Document together with any penalties, interest and reasonable expenses arising in connection therewith and with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate from the Lender as to the amount of such payment or liability delivered to the Borrower shall be conclusive absent manifest error.

(d) Promptly after any payment of Indemnified Taxes or Other Taxes by the Borrower to a Governmental Authority (but in any event within twenty (20) days after the date of such payment), the Borrower shall deliver to the Lender the original or certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the relevant return reporting such payment, or other evidence of such payment reasonably satisfactory to the Lender.

(e)     If the Lender determines, in its reasonable discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section, it shall pay and remit such refunded amount (or the amount of any credit in lieu of refund) to the Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section with respect to the Taxes or Other Taxes giving rise to such refund (or credit in lieu of refund)), net of all out-of-pocket expenses of the Lender, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund (or credit in lieu of refund)); provided that the Borrower, upon the written request of the Lender, agrees to repay the amount paid over to the Borrower (plus any interest, penalties or other charges imposed by the relevant Governmental Authority) to the Lender in the event the Lender is required to repay such refund (or credit in lieu of refund) to such Governmental Authority. Notwithstanding the foregoing, the Lender shall not be required to make available to the Borrower or any other person or entity the Lender's Tax returns or any other information relating to its Taxes that it deems confidential.

Section 10.2   **ADDITIONAL DELIVERIES.**

(a)     Certain Closing Deliveries. Concurrently with the execution and delivery of this Agreement, the Lender has delivered to the Borrower  (a) a duly executed U.S. Tax Compliance Certificate; and  (b) a duly executed Form W-8BEN-E, Certificate of Status of Beneficial Owner for United States Tax Withholding and Reporting (Entities) (the foregoing collectively, the "Lender's Closing Certificates").

(b)     Certain Deliveries after Closing. To the extent necessary or expedient to establish or memorialize any entitlement of Lender to an exemption from, or reduction in the rate of, the imposition, deduction or withholding of any Indemnified Taxes with respect to payments hereunder or under any other Loan Document, Lender shall deliver to the Borrower, at the time or times reasonably requested by the Borrower, such properly completed and duly executed documentation as will permit such payments to be made without imposition, deduction or withholding of such Indemnified Taxes or at a reduced rate. Notwithstanding anything to the contrary in the preceding sentence, however, the completion, execution and delivery of such documentation (other than such documentation set forth in Paragraphs (i) through (iv) below) shall not be required if in the Lender's reasonable judgment the completion, execution or delivery of such documentation would materially prejudice the legal or commercial position of the Lender or subject the Lender to any material unreimbursed cost or expense. Without limiting the foregoing, to the extent that Lender is legally entitled to do so, Lender shall deliver to the Borrower, whichever of the following is applicable in connection with any change in the information set forth in the Lender's Closing Certificates:

(i)     Executed copies of a current Form W-8BEN-E and a current U.S. Tax Compliance Certificate (certifying that Lender is not (A) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of Sections 871(h)(3)(B) of the Code, or (C) a "controlled foreign corporation" related to the Borrower described in Section 881(c)(3)(C) of the Code (a "US Tax Compliance Certificate");

(ii)    If claiming the benefits of an income Tax treaty to which the United States is a party, an executed copy of  (A) Form W-8BEN or Form

27

W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such treaty for payments of interest under any Loan Document; and (B) Form W-8BEN or Form W-8BEN-E establishing an exemption from, or reduction of, US federal withholding Tax pursuant to the "business profits" or "other income" article of such Tax treaty for any other applicable payments under any Loan Document;

(iii)  An executed copy of Form W-8ECI, Certificate of Foreign Person's Claim That Income Is Effectively Connected with the Conduct of a Trade or Business in the United States;

(iv)  If no longer the beneficial owner of a payment received under any of the Loan Documents, an executed copy of Form W-8IMY, accompanied by IRS Form W-8ECI, Form W-8BEN, or Form W-BEN-E, a U.S. Tax Compliance Certificate, Form W-9, or other certification forms from each beneficial owner, as applicable; provided that if the Lender becomes a partnership and one or more direct or indirect partners of Lender are claiming the portfolio interest exemption, Lender may provide on behalf of each such direct or indirect partner a certificate to the effect that (A) neither the Lender nor its direct or indirect partners is a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (B) none of its direct or indirect partners is a "10 percent shareholder" of the Borrower within the meaning of Sections 871(h)(3)(B) and 881(c)(3)(B) of the Code, and (C) none of its direct or indirect partners is a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code; or

(v)  Executed copies of any other form required by applicable law to claim an exemption from or a reduction in U.S. withholding Tax duly completed together with such additional documentation as may be required by applicable law to permit the Borrower to determine the withholding or deduction required to be made.

Section 10.3  The provisions of this Article 10 shall survive indefinitely after the execution, delivery, and performance of this Agreement and the repayment of the Loan and the performance of all the Borrower's and its affiliates' obligations under the Loan Documents.

## Article 11. - GENERAL PROVISIONS

Section 11.1  **NOTICES**. Any notice, demand or other communication which any part hereto may desire or may be required to give to any other party under this Agreement or the other Loan Documents shall be in writing, and shall be deemed given: (a) if and when personally delivered; (b) upon receipt if sent by any nationally recognized overnight courier addressed to a party at its address set forth below; or (c) upon receipt if deposited in United States certified mail, postage prepaid, or at such other place as such party may have designated to all other parties by notice in writing in accordance with this Section:

| | |
|---|---|
| If to Borrower: | Green Sapphire Holdings Inc.<br>1007 Orange Street<br>Wilmington DE 19801<br><br>Email: Rcicoski@60deg.com |
| with a copy to: | Mack Law Group<br>1363 Shermer Road, Suite 210<br>Northbrook Illinois 60062<br>Telephone: 847.239.7212<br>Email: Charles@mlgcounsel.net<br>Attention: Charles Mack, Esq. |
| If to Lender: | Global Capital Partners LLC<br>16192 Coastal Highway, Lewes, Delaware 19958 |
| with a copy to: | Nelson Mullins<br>2 S. Biscayne Blvd., 21st floor<br>Miami, FL 33131<br>E-mail: jackson.hwu@nelsonmullins.com<br>Attention: Jackson Hwu, Esq. |

Except as otherwise specifically required herein, notice of the exercise of any right or option granted to Lender by this Agreement is not required to be given. Failure to deliver copies of notice shall not render the notice invalid.

Section 11.2 **EXPENSES**. The Borrower shall be liable for payment of all reasonable costs incurred by Lender in connection with making the Loan, the preparation, execution and delivery of this Agreement and the other Loan Documents, the enforcement of the Loan Documents and Lender's rights and remedies thereunder, including, without limitation, reasonable attorneys' fees and costs, and consultants' fees and costs, recording fees, title insurance premiums, environmental assessment fees and appraisal fees, all transactional fees, legal and other professional fees incurred by the Lender or the Agent including, without limitation, formation costs and expenses for the Lender and related entities as required to effect this Loan, legal fees of U.S. Counsel to the Lender, legal fees of French/St. Barthelemy Counsel to the Lender, including any expenses incurred to file the UCC-1 and any other filings in connection with the Pledge, as well as any fees and expenses charged or incurred by the Notaire in St. Barthelemy to register the mortgages on the Properties.

Section 11.3 **ENTIRE AGREEMENT, AMENDMENTS AND WAIVERS**. This Agreement and the other Loan Documents contain the entire agreement and understanding of the parties hereto with respect to the subject matter hereof and may not be amended, modified or discharged, nor may any of their terms be waived, except by an instrument in writing signed by the party to be bound thereby.

Section 11.4 **FURTHER ASSURANCES**. Borrower will, at the cost of Borrower, and without expense to Lender, do, execute, acknowledge and deliver all and every further acts,

deeds, conveyances, deeds of trust, mortgages, assignments, security agreements, control agreements, notices of assignments, transfers and assurances, financing statements, and other documents or instruments as Lender shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring, and confirming unto Lender the Property and rights hereby mortgaged, deeded, granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Borrower may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Agreement or for filing, registering or recording, or for complying with all Legal Requirements. Borrower, on demand, will execute and deliver, and in the event it shall fail to so execute and deliver, hereby authorizes Lender to execute in the name of Borrower or without the signature of Borrower to the extent Lender may lawfully do so, one or more financing statements and financing statement amendments to evidence more effectively, perfect and maintain the priority of the security interest of Lender in the Collateral. Borrower grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lender at law and in equity, including without limitation, such rights and remedies available to Lender pursuant to this Section 11.4.

Section 11.5 **NO THIRD PARTY BENEFITS; BINDING EFFECT.** Except for those persons and entities expressly entitled to indemnification under this Agreement, who shall be beneficiaries of and shall have the right to enforce such indemnity, this Agreement is for the sole and exclusive benefit of the parties hereto and their respective permitted successors and permitted assigns, and no third party is intended to or shall have any rights hereunder. The terms and provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and successors assigns.

Section 11.6 **ASSIGNMENT BY BORROWER.** Borrower shall not assign any of its rights or delegate any of its obligations under this Agreement, the Note, or any other Loan Document.

Section 11.7 **ASSIGNMENT BY LENDER.**

(a) It is the parties' intent that all payments of interest and of any original issue discount (each such term withing the meaning of Section 881 of the Code) under this Agreement and the other Loan Documents to Lender shall qualify for and meet the withholding exemption for portfolio interest under Section 881(c) of the Code. In furtherance thereof, the Borrower shall establish and maintain in its books and records a register (the "Loan Register"), which shall (i) identify the Lender as the sole holder of the Loan and Note as of the date of execution hereof; (ii) set forth any subsequent assignments and transfers of any interest in the Loan and Note made in accordance with this Section 11.7; and (iii) itemize the then-current owners of the Loan effective upon the consummation of any such assignment and transfer. The Loan Register as of the date of execution of this Agreement is attached hereto as Exhibit A. The Borrower shall provide a copy of the Loan Register to the Lender as the Lender may request in writing from time to time.

(b) The parties hereby agree that Lender's rights, entitlements, and interests under this Agreement and the other Loan Documents, including without limitation the right to receive payments of principal and interest hereunder, may be assigned and transferred only through a book entry made in the Loan Register by the Borrower. In the event that the Lender proposes to assign or transfer all or any part of its interest in the Loan, the Lender shall give at least ten (10) days advance written notice thereof to the Borrower, specifying the interest to be assigned and

transferred (the "Subject Transfer"). The Lender shall include with any such notice: (i) executed copies of all of the instruments of assignment and other documents by which the Lender shall effectuate the assignment and transfer; (ii) a certified copy of the articles of incorporation or other constitutive document(s) of the assignee, or a copy of the passport of any individual assignee; and (iii) such documents and instruments described in Section 10.2(b)(i) – (v) with respect to the assignee as may pertain thereto. The Lender shall deliver or cause to be delivered to the Borrower such additional documents and information as reasonably and promptly requested by the Borrower in order to identify the identity and tax residence of the assignee as the prospective owner of the interest in the Loan to be assigned and transferred. After the completion of such delivery(ies), upon the consummation of the Subject Transfer, the Borrower shall update the Loan Register to reflect the assignment and transfer of the Subject Interest and the then-current ownership of all interests in the Loan. Any asserted or purported assignment or transfer by the Lender of any interest in the Loan which does not conform to this Section 11.7 shall be null and void *ab initio*.

(c)     It is the parties' intent that the Loan and the obligations thereunder shall be in "registered form" (within the meaning of Section 881(c) of the Code) at all times. The Borrower and the Lender shall cooperate promptly with any written requests either may make in connection with the review, maintenance, and revision of the Loan Register as may be reasonably necessary or expedient to establish and maintain the Loan and the obligations thereunder in such registered form. The Loan and the obligations thereunder shall not be convertible into or converted to an unregistered form.

Section 11.8  COUNTERPARTS. This Agreement and any document or instrument executed pursuant thereto may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 11.9  GOVERNING LAW. This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware, in which the transactions contemplated herein were negotiated, the Note and other Loan Documents were executed and delivered, and where the principal offices of Lender are located.

Section 11.10  TIME OF THE ESSENCE. Time is of the essence of this Agreement.

Section 11.11  SEVERABILITY. If any provision of this Agreement shall be judicially or administratively held invalid or unenforceable for any reason, such holding shall not be deemed to affect, alter, modify or impair in any way any other provision hereof.

Section 11.12  JURISDICTION AND VENUE. BORROWER AND ANY GUARANTOR HEREBY AGREE THAT ALL ACTIONS OR PROCEEDINGS INITIATED BY BORROWER OR ANY GUARANTOR AND ARISING DIRECTLY OR INDIRECTLY OUT OF THIS AGREEMENT SHALL BE LITIGATED IN THE SUPERIOR COURT OF NEW CASTLE COUNTY, DELAWARE, OR, THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE OR, IF LENDER INITIATES SUCH ACTION, ANY COURT IN WHICH LENDER SHALL INITIATE SUCH ACTION AND WHICH HAS JURISDICTION. BORROWER AND ANY GUARANTOR HEREBY EXPRESSLY SUBMIT AND CONSENT IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR PROCEEDING COMMENCED BY LENDER IN ANY OF SUCH COURTS, AND HEREBY WAIVE PERSONAL SERVICE OF THE SUMMONS AND COMPLAINT, OR OTHER PROCESS OR PAPERS ISSUED HEREIN, AND AGREE THAT SERVICE OF SUCH SUMMONS AND COMPLAINT OR

31

OTHER PROCESS OR PAPERS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL ADDRESSED TO BORROWER AND ANY GUARANTOR AT THE ADDRESS TO WHICH NOTICES ARE TO BE SENT PURSUANT TO THIS AGREEMENT. BORROWER AND ANY GUARANTOR WAIVE ANY CLAIM THAT THE SUPERIOR COURT OF NEW CASTLE COUNTY, DELAWARE, OR THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE IS AN INCONVENIENT FORUM OR AN IMPROPER FORUM BASED ON LACK OF VENUE. SHOULD BORROWER OR ANY GUARANTOR, AFTER BEING SO SERVED, FAIL TO APPEAR OR ANSWER TO ANY SUMMONS, COMPLAINT, PROCESS OR PAPERS SO SERVED WITHIN THE NUMBER OF DAYS PRESCRIBED BY LAW AFTER THE MAILING THEREOF, BORROWER AND ANY GUARANTOR SHALL BE DEEMED IN DEFAULT AND AN ORDER AND/OR JUDGMENT MAY BE ENTERED BY LENDER AGAINST BORROWER AND/OR ANY GUARANTOR AS DEMANDED OR PRAYED FOR IN SUCH SUMMONS, COMPLAINT, PROCESS OR PAPERS. THE EXCLUSIVE CHOICE OF FORUM FOR BORROWER SET FORTH IN THIS PARAGRAPH SHALL NOT BE DEEMED TO PRECLUDE THE ENFORCEMENT, BY LENDER, OF ANY JUDGMENT OBTAINED IN ANY OTHER FORUM OR THE TAKING, BY LENDER, OF ANY ACTION TO ENFORCE THE SAME IN ANY OTHER APPROPRIATE JURISDICTION, BORROWER HEREBY WAIVE THE RIGHT, IF ANY, TO COLLATERALLY ATTACK ANY SUCH JUDGMENT OR ACTION.

Section 11.13 **ACKNOWLEDGMENTS.** Borrower hereby acknowledges that (a) it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents; (b) neither Lender nor anyone associated with Lender has any fiduciary relationship with or fiduciary duty to Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between Lender, and Borrower, in connection herewith or therewith is solely that of debtor and creditor; and (c) no joint venture or partnership is created hereby or by the other Loan Documents or otherwise exists by virtue of the transaction contemplated hereby among the parties.

Section 11.14 **CONFLICTS.** In the event of any conflict between the terms of this Agreement and the terms of any of the other Loan Documents, the terms of this Agreement shall control.

[ SIGNATURE PAGE IMMEDIATELY FOLLOWS]

IN WITNESS WHEREOF, Borrower and Lender have caused this Loan and Security Agreement to be duly signed and delivered as of the day and year first above written.

**BORROWER:**

Green Sapphire Holdings Inc., a Delaware corporation

By: _____
Name: RYAN C. CZCOSKZ
Its: DELECTOR

**LENDER:**

Global Capital Partners LLC, a Delaware limited liability company

By: _____
Name:
Its:

Acknowledgement

Access Management SAS acknowledges that the pledge of shares is permitted in accordance with the provisions of the charter document and acknowledges the pledge by Green Sapphire Holdings Inc. and Lender's security interest in the Collateral consisting of all of the shares of Access Management SAS and its rights with respect thereto described in this Agreement.

Access Management SAS represents and warrants that Access Management SAS owns the Property and that such Property owned by Access Management SAS is owned free and clear of any and all liens, charges or encumbrances.

Access Management SAS

By: _____
Name: _____
Its: _____

**Exhibit A**

**Form of Note**

(see attached)

## Exhibit B

## Form of Guaranty

(see attached)

## Exhibit C

## Form of Pledge

(see attached)

## Exhibit D

### Description of Properties

1) One villa and land in St. Barthelemy commonly known as Villa Mona. located at the AE 314 plot of 12,760 m2 in Colombier on the island of SAINT BARTHELEMY (97133).

2) The AI 220 plot of 2,676 m2 located in Saint-Jean on the island of SAINT BARTHELEMY (97133).

# EXHIBIT G

Forbearance Agreement

This Forbearance Agreement ("Agreement ") is made as of June 20, 2023 by and between Alpha Carta, Ltd.  and Proton Green LLC as follows:

Reference is made to  (i) Second Amended and Restated Promissory Convertible Note, dated as of February 18, 2022, made by Proton Green LLC (the "**Company**") in favor of Kips Bay Select LP in the principal amount of $3,513,469.00 (as amended and as assigned to Alpha Carta, Ltd., the "**Kips Bay Note**"), which amended and restated the Amended and Restated Promissory Convertible Note, dated as of December 23, 2021, made by the Company in favor of Kips Bay Select LP in the principal amount of $3,513,469.00, which amended and restated the Promissory Convertible Note, dated as of September 21, 2021, made by the Company in favor of Kips Bay Select LP in the principal amount of $2,692,308.00; (ii) the Amended and Restated Promissory Convertible Note, dated as of February 18, 2022, made by the Company in favor of Alpha Carta, Ltd. ("**Alpha Carta**") in the principal amount of $1,846,153.84, (as amended, the "**December Note**"), which amended and restated the Promissory Convertible Note, dated as of December 23, 2021, made by the Company in favor of Alpha Carta in the principal amount of $1,846,153.84; and (iii) the Amended and Restated Promissory Convertible Note, dated as of February 18, 2022, made by the Company in favor of Alpha Carta in the principal amount of $4,307,692.31 (as amended, the "**January Note**"), which amended and restated the  Promissory Convertible Note, dated as of January 11, 2022, made by the Company in favor of Alpha Carta in the principal amount of $4,307,692.31 (all of such notes collectively, as amended, the "**Notes**") and secured by that certain Leasehold Deed of Trust and Fixture Filing dated as of ____, 2021 and recorded as document number 2021 – 006949 with the Recorder of Deeds of Apache County, Arizona on August 9, 2021 and rerecorded dated January 30, 2022 as document number 2022 – 01394 on February 22, 2022 ("Leasehold Deed of Trust") and that certain Security Agreement dated as of December 23, 2021 ("Security Agreement"), as amened by that certain Amendment Agreement, dated as of April 7, 2022, by and among Kips Bay Select LP, Alpha Carta and the Company (the "**Second Amendment**"), and that certain Letter from Alpha Carta to the Company dated February 1, 2023 and as agreed to in an Affidavit Regarding Loan Documents, dated February 1, 2023, by the Company ("Affidavit") .

Capitalized terms used herein without definition shall have the meanings assigned to them in the Notes or the other Security Documents as defined therein.  The Notes, Leasehold Deed of Trust, Security Agreement, Security Documents, Securities Purchase Agreements and other Transaction Documents, along with any amendments thereto, are referred to as the Loan Documents.

The Company acknowledged defaults or Events of Default as set forth in the Affidavit.

As of today's date, the Company has not paid the Notes in full or satisfied or remedied any of the conditions in the Affidavit.

Company irrevocably acknowledges and agrees that the following defaults or Events of Default occurred under the Loan Documents; Failure to pay the Loan in full at the Maturity Date and dissolution of the Company.

the contrary in the Notes and any other of the Security Documents, and subject to the terms and conditions hereof, Alpha Carta shall forbear from exercising any of its rights and remedies under the Notes, the other Security Documents, the Loan Documents and applicable law (including without limitation under the Uniform Commercial Code) as follows:

(a) Payments.  The Company shall make the following payments:

(1) On or before July 7, 2023, an amount equal to Three Million and 00/100 Dollars ($3,000,000.00); and

(2) On the seventh day of each calendat month thereafter, an amount equal to Two Million and 00/100 Dollars ($2,000,000.00) until the Notes are paid in full,.

All payments shall be applied first to expenses, including attorneys fees, Consultants (as hereinafter defined) and other fees, and expenses incurred by Alpha Carta in connection with the Loan, this Agreement or preserving or protecting the Collateral, second to ourstanding fees due under the Loan Documents, third, to accrued and unpaid interest due under the Loan Documents at the interest rate as stated threrein and fourth, to the then outstanding principal amount.

If any portion of the debt is not paid prior to the tenth day following the date when due shall be an event of default ("Event of Default").

(b) Notice of Materal Adverse Change.  As required under the Loan Documents, Company shall provide written notice of any material adverse change to the business, the leases, or the financial condition of the Company within two (2) days of the occurrence of any such event.

(c) In addition to the reporting required under the Loan Documents, Company shall provide to Alpha Carta the following reports:

(1) volume production reports from each well at the property on a weekly basis by Wednesday of the following week

(2) Accounts Receivable schedule on a monthly basis within ten (10) days of the end of each calendar month

(3) report of payment of royalties, working interest or volume production payments made with each party and the amount so specified on a monthly basis within ten (10) days of the end of each calendar month

(4) income statement on a monthly basis within ten (10) days of the end of each calendar month

(d) On or before July 7, 2023, Company shall deliver to Alpha Carta (a) evidence reasonably satisfactory to Alpha Carta that the Company is in existence and good standing in Wyoming and continues to hold good title to the Collateral, along with copies of the Company's organizational documents (including articles of organization and operating

agreement) or (b) a plan, reasonably satisfactory to Alpha Carta, for promptly bringing the Company into existence and good standing in Wyoming and for holding good title to the assets of the Company

(e) On or before July 20, 2023, Company shall deliver to Alpha Carta a deed in lieu of foreclosure in recordable form and satisfactory to Alpha Carta, in its sole discretion, with respect to the leases encumbered by that certain Leasehold Deed of Trust.

A default under the Loan Documents shall occur immediately if Company breaches, or defaults in the performance of, any of the provisions or obligations of this Agreement. Upon the occurrence of a default, the agreement of the Alpha Carta to forbear pursuant to the terms hereof shall immediately terminate without notice to the Company, and Alpha Carta shall be free to exercise immediately, without notice to the Company, any and all rights and remedies against the Company provided under the Loan Agreement, the other Loan Documents and applicable law. In addition, Company waives presentment, demand, notice of default or any other notice of any kind.

Alpha Carta hereby reserves all rights and remedies available to it at law or equity, including without limitation pursuant to Article IV of the Leasehold Deed of Trust or pursuant to the Notes or any other Security Documents, including, but not limited to (a) taking such steps as may be appropriate to foreclose the lien created by the Leasehold Deed of Trust to secure payment or performance of all or any part of the obligations under the Loan Documents, (b) reducing any claim against Company to judgment to the fullest extent permitted by the Loan Documents or (c) exercising any and all other rights or remedies afforded by the Notes, Leasehold Deed of Trust, Security Agreement or the other Loan Documents, or at law or in equity or otherwise, including without limitation, seeking the appointment of a receiver.

In addition to any other rights and remedies available to Alpha Carta under the Loan Documents or applicable law upon the occurrence of a default hereunder or under the Loan Documents, Company agrees, acknowledges, consents and stipulates that the occurrence of the default constitutes and provides the requisite cause under any applicable law, including the laws of State of Arizona, justifying the immediate recordation of the deed in lieu of foreclosure. Company further stipulates and agrees that upon the occurrence of a default, it waives and is estopped from asserting any defenses to the immediate recordation of the deed in lieu of foreclosure.

In addition to any other rights and remedies available to Alpha Carta under the Loan Documents or applicable law upon the occurrence of a default hereunder, Company agrees, acknowledges, consents and stipulates that the occurrence of the default constitutes and provides the requisite cause under any applicable law, including the laws of State of Arizona, justifying the immediate appointment of a receiver to, among other things, manage the business and affairs of Company. Company further stipulates and agrees that upon the occurrence of a default, it waives and is estopped from asserting any defenses to the immediate appointment of a receiver.

Notwithstanding anything to the contrary in this Agreement, the Loan Documents or applicable law, if any payment made to, or other amount of value received by, Alpha Carta on

account of the Obligations or Indebtedness is avoided, rescinded, set aside, or must otherwise be returned by Alpha Carta, or a demand for any of the foregoing is made, whether in a case under the Bankruptcy Code, or a similar proceeding under any otherwise applicable law, the indebtedness or obligations intended to be repaid or satisfied thereby shall be reinstated (the "Reinstated Amount"), along with any liens or mortgages securing such Reinstated Amount, without any further action by any Party and shall be enforceable against each of the Companys and the Collateral.

Company waives, to the fullest extent permitted by law, the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Property or any part thereof or any interest therein. Further, Company hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure on behalf of Company, and on behalf of each and every person acquiring any interest in or title to the Property subsequent to the date of this Agreement and on behalf of all persons to the extent permitted by applicable law.

Company waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Alpha Carta or its agents.

Company waives and relinquishes to the fullest extent permitted by law, any and all rights to assert any claim or otherwise contest, oppose, impair, limit or file any pleading in opposition to and is estopped from contesting any action brought by Alpha Carta to exercise any of its rights or remedies unser the Loan Documents.

Company acknowledges that as a consequence of the existing defaults and the terms of the Loan Documents and this Agreement, Alpha Carta is entitled to enforce its remedies with regard to the Collateral under Article 9 of the UCC or otherwise without notice to Company, such notice having been waived and relinquished. Company consents to Alpha Carta's acceptance of the Collateral in full or partial satisfaction of the Indebtedness, as determined by Alpha Carta pursuant to a writing Alpha Carta delivers to Company, with the amount of the indebtedness satisfied to be determined by Alpha Carta at the time of acceptance.

Company will cooperate fully with representatives of any consultant, financial advisor or similar entity or person (a "Consultant") engaged by Alpha Carta to assess and address matters germane to Company's performance under the Loan Documents, including, without limitation, any business operations. Companys further agree that they shall pay the fees and expenses of any Consultant.

In the event of the filing of any petition for bankruptcy relief filed by or against Company (a "Bankruptcy Filing"), Company consents to the entry of an order granting Alpha Carta relief from the automatic stay of Section 362 of the Bankruptcy Code and shall not assert or request any other party to assert that the automatic stay provided by Section 362 of the Bankruptcy Code shall operate or be interpreted to stay, interdict, condition, reduce, or inhibit the ability of Alpha Carta to enforce any rights it has under the Loan Documents or any other rights Alpha Carta has against Company or against any property owned by any Company. Without limiting the generality of the

foregoing, Company acknowledges and agrees, and is estopped from contesting, that cause for relief from the automatic stay shall exist if Company is subject to a Bankruptcy Filing.

Company, on its own behalf and on behalf of its respective representatives, partners, agents, employees, servants, officers, directors, shareholders, subsidiary, affiliated and related companies, heirs, successors and assigns (collectively, the "Borrowing Group") hereby releases and forever discharges Alpha Carta, and its officers, directors, subsidiary, affiliated and related companies, agents, consultants, attorneys, servants, employees, shareholders, representatives, successors and assigns (collectively, the "Alpha Carta Group") of and from all manner of actions, cause and causes of action, suits, debts, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, obligations, liabilities, costs, expenses, losses, damages, judgments, executions, claims and demands of whatsoever kind or nature, in law or in equity, whether known or unknown, concealed or hidden, foreseen, or unforeseen, contingent or actual, liquidated or unliquidated, arising out of or relating to any of the Loan Documents, the transactions relating thereto, this Agreement, the transactions contemplated in this Agreement, and/or any financial accommodations extended or denied by Alpha Carta to Companys, that any of the Borrowing Group, jointly or severally, have had, now have or hereafter can, shall or may have against the Alpha Carta Group, directly or indirectly, through the date hereof. Company acknowledges and agrees that Alpha Carta is specifically relying upon the representations, warranties, covenants and agreements contained herein and that such representations, warranties, covenants and agreements constitute a material inducement to Alpha Carta entering into this Agreement and the transactions contemplated herein. Company represents and warrants to Alpha Carta and the Alpha Carta Group that the Borrowing Group has not assigned, conveyed or otherwise transferred, either directly or indirectly, in whole or in part, any of the claims against the Alpha Carta Group to be released herein.

Company agrees to indemnify and hold each entity in the Alpha Carta Group harmless with respect to any and all liabilities, claims, obligations, losses, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever incurred by each entity in the Alpha Carta Group, or any of them, whether direct, indirect or consequential, as a result of or arising from or relating to any proceeding, whether threatened or initiated, asserting any claim for legal or equitable remedy under any statutes, regulations or common law principles arising from or in connection with the negotiation, preparation, execution, delivery, performance, administration and enforcement of the Loan Documents, this Agreement or any other document executed in connection herewith. The foregoing indemnity shall survive the payment in full of the obligations owed to Alpha Carta and the termination of this Agreement and the Loan Documents.

Company irrevocably (i) consents to this Agreement; (ii) ratifies, reaffirms and acknowledges full liability for all of the obligations under the Loan Documents ("Obligations"), including the amount of the indebtedness, the respective payments and performance obligations, contingent or otherwise, under the Loan Documents and any subordination agreements and intercreditor agreements relating to the indebtedness or the obligations; (iii) ratifies and reaffirms and acknowledges full liability and enforceability for all security interests, mortgages, and liens granted for the benefit of Alpha Carta and confirms and agrees that such security interests, mortgages, and liens hereafter secure all of the Obligations and the full amount of the indebtedness,

(iv) acknowledges and agrees that except as set forth herein, each of the Loan Documents remains in full force and effect and is hereby ratified and reaffirmed, (v) reaffirms, remakes as true as of the date hereof and ratifies each of the representations, warranties and covenants in the Loan Documents, (vi) acknowledges and agrees that it has no setoffs, defenses, crossclaims, demands, counterclaims or rights that can be asserted to or, if asserted would, impair or otherwise limit or reduce Alpha Carta's rights under the Loan Documents or to seek affirmative relief or damages against Alpha Carta, (vii) acknowledges and agrees that in entering into this Agreement it is not relying upon any statement, representation or action of Alpha Carta or its agents, (viii) acknowledges and agrees that Alpha Carta has a duly perfected first priority security interest in and lien upon all of the Collateral; (ix) agrees, covenants and acknowledges that, except as expressly set forth herein, the execution of this Agreement shall not operate as a waiver or modification of any right, power or remedy of Alpha Carta, constitute a waiver of any defaults or other provision of any of the Loan Documents or serve to effect a novation of any Obligations owed to Alpha Carta or any Loan Document; and (x) acknowledges that any obligations of Alpha Carta under this Agreement are in the nature of a conditional forbearance only, and that Alpha Carta has made no agreement or commitment to provide additional forbearance, to modify further or to extend the Loan Documents.

**WAIVER OF JURY TRIAL. EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT IT MIGHT HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR CLAIM OF ANY NATURE RELATING TO THIS AGREEMENT, THE LOAN AGREEMENT, ANY OF THE LOAN DOCUMENTS OR ANY TRANSACTION CONTEMPLATED IN ANY OF SUCH DOCUMENTS. EACH OF THE PARTIES ACKNOWLEDGES AND AGREES THAT THE FOREGOING WAIVER IS KNOWING AND VOLUNTARY.**

Company acknowledges that: (a) it has been represented by counsel of their own choosing throughout the negotiation, preparation and execution of this Agreement; (b) it has exercised independent judgment with respect the negotiation, preparation and execution of this Agreement, and the consummation of the transactions contemplated hereby; and (c) it has not relied upon Alpha Carta or on counsel for Alpha Carta for any advice with respect to the negotiation, preparation or execution of this Agreement; any principle of contract construction which favors or disfavors the party whose attorneys have drafted a contract or a provision thereof shall not be applied to this Agreement.

This Agreement, the Loan Agreement and the Loan Documents contain the final, complete and exclusive expression of the understandings by and between the Company and the Alpha Carta with respect to the subject matter of this Agreement.

Company acknowledges and agrees that the benefits to it as a result of this Agreement are substantial and of great value and that such benefits are new and are sufficient and reasonably equivalent consideration for each and every one of their respective obligations and agreements under this Agreement.

Company shall promptly execute and/ordeliver any other agreements or documents and take such other actions Alpha Carta deems necessary, in the exercise of its sole discretion, to achieve the objectives of this Agreement.

Company acknowledges that Alpha Carta has acted at all times only as a creditor to Company within the normal and usual scope of the activities normally undertaken by a creditor and in no event has Alpha Carta attempted to exercise any control over Company or its business or affairs. Company acknowledges and agrees that at no time shall Alpha Carta owe any fiduciary or other enhanced duty to Company and Company disavows the existence of creation of a fiduciary or enhanced duty, particularly when Alpha Carta is exercising any of the rights granted pursuant to this Agreement or the Loan Documents.

This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each complete set of which, when so executed and delivered by the parties, constituting an original but all such counterparts together constituting but one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by facsimile or electronic transmission shall be effective as delivery of a manually executed counterpart. Any party so executing this Agreement by facsimile shall promptly deliver a manually executed counterpart, provided that any failure to do so shall not affect the validity of the counterpart executed by facsimile transmission.

In witness whereof, the undersigned have executed this Forbearance Agreement as of the date first above written

**Alpha Carta, Ltd.**

By:_____
Name:_____
Title:_____


**Proton Green LLC**

By: *Steven E. Looper*
Name:____Steven E. Looper____
Title:____Managing Member____

# EXHIBIT H

THIS AGREEMENT is dated August 15, 2023

PARTIES

(1) BREAKERS BEACH CLUB LTD., a company incorporated under the laws of the Cayman Islands, of c/o Cayman Management Ltd., Governors Square, 2nd Floor, 23 Lime Tree Bay Avenue, PO Box 1569, Grand Cayman KY1-1110, Cayman Islands (Borrower);

(2) THE LENDERS LISTED IN THE SCHEDULE (Lenders and each a Lender); and

(3) GREEN SAPPHIRE HOLDINGS, INC., a Delaware limited liability company, 1007 North Orange, Wilmington, DE 19801 (Guarantor).

BACKGROUND

(A) The Lenders have agreed to provide the Borrower with a secured term loan facility of Two Million Nine Hundred Thousand and 00/100 US Dollars (US$2,900,000) ("Principal Sum") upon the terms and conditions of this Agreement.

AGREED TERMS

1. DEFINITIONS AND INTERPRETATION

1.1 The following definitions apply in this Agreement, unless the contrary intention appears:

Business Day: any day other than a Saturday, Sunday or public holiday in the Cayman Islands.

Commitment: the loan commitment of the relevant Lender set out in the Schedule.

Control: in relation to the Borrower or the Guarantor, means the power of a person to secure that the affairs of the Borrower or the Guarantor (as applicable) are conducted in accordance with that persons wishes:

> (a) by means of the holding of shares, or the possession of voting power, in or in relation to that or any other body corporate; or
> (b) as a result of any powers conferred by the articles of association or any other document regulating that or any other body corporate,

and a Change of Control occurs if a person who controls the Borrower or Guarantor ceases to do so or if another person acquires Control of the Borrower or Guarantor (as applicable).

Event of Default: any event or circumstance listed in clause 10.1.

Facility: the term loan facilities made available under this Agreement.

Finance Document: this Agreement, the Security Documents and any other document designated as such by the Lenders, and the Borrower.

Guarantee: The Deed of Guarantee between the Guarantor and the Lender in respect of this Loan

Indebtedness: any obligation to pay or repay money, present or future, whether actual or contingent, sole or joint and any guarantee or indemnity of any of those obligations.

Legal Charge: the first legal spread charge dated [ _____ ] and registered as no. [ _____ ] at the Cayman Islands Land Registry in respect of the Property and made between the Borrower, as chargor, and the Lenders, as the chargee.

Loan: the principal amount of the loan made or to be made by the applicable Lender to the Borrower under this Agreement or (as the context requires) the principal amount outstanding for the time being of that loan (and the expression Loans shall be construed accordingly).

Minimum Interest Charge: the amount equal to the Interest on the full amount of the Loan that would have accrued under this Agreement had the Loan been outstanding in full for the Minimum Interest Period.

Minimum Interest Period: Three calendar months from and including the date hereof.

Potential Event of Default: any event or circumstance specified in clause 10.1 that would, on the giving of notice, expiry of any grace period or making of any determination under the applicable Finance Document, or satisfaction of any other condition (or any combination thereof), become an Event of Default.

Property: all that property registered at the Cayman Islands Land Registry as Breakers Registration Section, Block 56B, Parcels 14, 15, 16 & 17 (inclusive) as highlighted on the plan attached to this Loan Agreement at Schedule 2.

Repayment Date: the date that is the earlier of (a) October 31, 2023, (b) the date that the Guarantor sells certain property in St. Barth's as defined in Schedule 3 or (c) the date that an affiliate of Borrower sells certain property in Cedar Park, Texas as defined in Schedule 3.

Security: any mortgage, charge (whether fixed or floating, legal or equitable), pledge, lien, assignment by way of security or other security Interest securing any obligation of any person or any other agreement or arrangement having a similar effect.

Security Documents: the Legal Charge and the Guarantee.

Secured Obligations: means the Loan and any Indebtedness from time to time outstanding owed by the Borrower and Guarantor to the Lenders.

1.2 A reference to a statute, statutory provision or subordinate legislation is a reference to it as it is in force for the time being, taking account of any amendment or re-enactment or extension and

includes any former statute, statutory provision or subordinate legislation that it amends or re-enacts clause and paragraph headings shall not affect the interpretation of this Agreement.

1.3 A reference to a person shall include a reference to an individual, firm, company, corporation, unincorporated body of persons, or any state or any agency of any person.

1.4 A reference to a Finance Document (or any provision of it) or any other document shall be construed as a reference to that provision or that document as it is in force for the time being and as amended, varied or supplemented in accordance with its terms or the agreement of the relevant parties.

1.5 A reference to an amendment includes a novation, re-enactment, supplement or variation (and amended shall be construed accordingly).

1.6 References to clauses are to the clauses of this Agreement.

1.7 References to the Borrower, the Lenders and the Guarantor shall include their respective successors, permitted transferees and permitted assigns.

1.8 A reference to continuing in relation to an Event of Default means an Event of Default that has not been remedied or waived.

## 2. THE FACILITY

Each Lender grants to the Borrower a secured term loan facility of a total principal amount not exceeding that Lender's Commitment on the terms, and subject to the conditions, of this Agreement, which shall be advanced to and drawn by the Borrower in full on the date hereof.

## 3. PURPOSE

3.1 The Borrower shall use all money borrowed under this Agreement for the following purposes (and for no other purpose):

    (i) working capital; and

    (ii) the fees and expenses of the Lender under the Finance Documents.

3.2 The Lenders are not obliged to monitor or verify how any amount advanced under this Agreement is used.

3.3 The Lenders shall be entitled to withhold from the drawdown and apply any amounts referred to in clause 3.1(ii) for the purposes therein mentioned.

3.4 The Lenders and the Borrower are not obliged to obtain the Guarantor's written consent to any drawdown of the Loan (or part thereof).

## 4. INTEREST

4.1 The Borrower shall pay Interest on the Principal Sum at the rates(s) per annum shown in the Schedule.

4.2 Interest shall accrue daily and will be paid on the Repayment Date. In the event of an extension of the term of the loan, the Interest shall still be payable on the Repayment date notwithstanding the extension granted by the Lenders.

4.3 If the Borrower fails to make any payment due under a Finance Document on the due date for payment, Interest on the unpaid amount shall accrue daily, from the date of nonpayment to the date of actual payment (both before and after judgment), at the rate equal to 40% per annum.

## 5. COSTS

5.1 The Borrower shall pay on demand all costs and expenses that any Lender incurs in connection with the negotiation and preparation, execution, amendment, extension, alteration, preservation and enforcement of the Loans and/or the Finance Documents.

5.2 The Borrower shall pay any stamp, documentary and other similar duties and taxes and registration fees to which the Finance Documents may be subject, or give rise and shall indemnify the Lenders against any losses or liabilities that they may incur as a result of any delay or omission by the Borrower in paying any such duties or taxes.

5.3 The Borrower shall pay an arrangement fee equal to one percent (1%) of the Loan Amount. The arrangement fee shall be deemed earned as of the date of this Agreement and shall be paid at the Repayment Date to the Lenders.

## 6. REPAYMENT

6.1 Subject to the provisions of this Agreement, the Borrower shall repay the Loans on the Repayment Date, together with all unpaid Interest accrued up to the Repayment Date.

6.2 The Borrower may at any time prepay the whole of any Loan (but not part) plus, subject to clause 6.3, all Interest accrued up to the date of repayment.

6.3 The parties agree that the aggregate minimum amount of Interest payable under this Agreement is the Minimum Interest Charge. If any Loan is repaid or prepaid by the Borrower (whether on a voluntary or mandatory basis) in circumstances where the Interest paid or payable by the Borrower would be less than the Minimum Interest Charge, the Borrower shall immediately pay to the Lender the difference between the Minimum Interest Charge and the amount of Interest paid.

## 7. PAYMENTS

7.1 All payments made by the Borrower under the Finance Documents shall be in US Dollars and in immediately available cleared funds to the Lenders, to such account(s) as the Lenders may reasonably specify.

7.2 If any payment becomes due on a day that is not a Business Day, the due date of such payment will be extended to the next succeeding Business Day, or, if that Business Day falls in the following calendar month, such due date shall be the immediately preceding Business Day.

7.3 All payments made by the Borrower under the Finance Documents shall be made in full, without set-off, counterclaim or condition, and free and clear of, and without any deduction or withholding, provided that, if the Borrower is required by law or regulation to make such deduction or withholding, it shall:

    (a) ensure that the deduction or withholding does not exceed the minimum amount legally required;

    (b) pay to the relevant taxation or other authorities, as appropriate, the full amount of the deduction or withholding;

    (c) furnish to the Lenders, within the period for payment permitted by the relevant law, either:

    (i)    an official receipt of the relevant taxation authorities concerned on payment to them of amounts so deducted or withheld; or

    (ii)    if such receipts are not issued by the taxation authorities concerned on payment to them of amounts so deducted or withheld, a certificate of deduction or equivalent evidence of the relevant deduction or withholding; and

    (d) pay to the Lenders such additional amount as is necessary to ensure that the net full amount received by such person after the required deduction or withholding is equal to the amount that such person would have received had no such deduction or withholding been made.

## 8. REPRESENTATIONS AND WARRANTIES

8.1 The Borrower and Guarantor represent and warrant to the Lenders on the date of this Agreement:

    (a) It:

    (i)    is a duly incorporated limited liability company validly existing under the laws of its jurisdiction of incorporation; and

    (ii)    has the power to own its assets and carry on its business as it is being conducted.

(b) It has the power to enter into, deliver and perform, and has taken all necessary action to authorise its entry into, delivery and performance of, the Finance Documents to which it is a party and the transactions contemplated by them.

(c) No limit on its powers will be exceeded as a result of the borrowing or grant of security contemplated by the Finance Documents to which it is a party.

(d) The entry into, and performance by it, of, and the transactions contemplated by, the Finance Documents to which it is a party, do not and will not contravene or conflict with:

(i)      its constitutional documents;

(ii)     any agreement or instrument binding on it or its assets or constitute a default or termination event (however described) under any such agreement or instrument; or

(iii)     any law or regulation or judicial or official order, applicable to it.

(e) It has taken all necessary action and obtained all required authorisations to enable it to enter into, exercise its rights and comply with its obligations in the Finance Documents to which it is a party and to make them admissible in evidence in its jurisdiction of incorporation. All such authorisations are in full force and effect.

(f) Its obligations under the Finance Documents to which it is a party are legal, valid, binding and enforceable in accordance with their terms.

(g) No Event of Default or Potential Event of Default has occurred or is continuing or is reasonably likely to result from making the Loan or the entry into, the performance of, or any transaction contemplated by the Finance Documents.

(h) No other event or circumstance is outstanding which constitutes (or, with the expiry of a grace period, the giving of notice, the making of any determination or any combination thereof, would constitute) a default or termination event (howsoever described) under any other agreement or instrument which is binding on the Borrower or to which any of its assets is subject which has or is reasonably likely to have a material adverse effect on its business, assets or condition or ability to perform its obligations under the Finance Documents to which it is a party.

(i) No litigation, arbitration or administrative proceedings are taking place, pending or, to the Borrower's knowledge, threatened against it, any of its directors or any of its assets, which, if adversely determined, might reasonably be expected to have a material adverse effect on its business, assets or condition, or its ability to perform its obligations under the Finance Documents to which it is a party.

(j) The Borrower has disclosed to the Lenders before the date of this Agreement all information relating to it and the transaction that is material to be known by a lender (in

the context of a loan for a similar amount and on terms similar to the Facility) and the information is accurate in all material respects.

(k) The information, in written or electronic format, supplied by the Borrower (or on its behalf) to the Lenders (or on their behalf) in connection with the Facility and the Finance Documents was, at the time it was supplied or at the date it was stated to be given (as the case may be):

    (i)     if it was factual information, complete, true and accurate in all material respects;

    (ii)    if it was a financial projection or forecast, prepared on the basis of recent historical information and on the basis of reasonable assumptions and was fair and made on reasonable grounds;

    (iii)   if it was an opinion or intention, made after careful consideration and was fair and made on reasonable grounds;

    (iv)   not misleading in any material respect, nor rendered misleading by a failure to disclose other information, except to the extent that it was amended, superseded or updated by more recent information supplied by the Borrower (or on its behalf) to the Lenders (or on their behalf).

(l) The Security Documents create valid, legally binding and enforceable Security for the obligations expressed to be secured by them.

(m) The Borrower has not entered into any agreement (whether written or verbal, express or implied) to dispose of any of the Property.

(n) The Borrower has good and marketable title to the Property, free and clear of any encumbrances that would have a material adverse effect on the value of the Property, the intended use of the Property, and/or the ability of the Borrower or the Guarantor to comply with its or their obligations under the applicable Finance Documents.

8.2 Each of the representations and warranties in this clause 8 is deemed to be repeated by the Borrower on each date immediately succeeding the date on which Interest is paid under this Agreement in accordance with clause 4.2, by reference to the facts and circumstances existing on each such date.

9. COVENANTS

9.1 The Borrower covenants with the Lenders that, as from the date of this Agreement until all its liabilities under the Finance Documents have been discharged:

(a) It will deliver to the Lenders:

(i)     promptly, all notices or other documents dispatched by the Borrower to its shareholders (or any class of them) or to its creditors generally; and

(ii)    promptly such financial or other information as the Lenders may, from time to time, reasonably request relating to the Borrower or its business.

(b) The Borrower will promptly, after becoming aware of them, notify the Lenders of any litigation, arbitration or administrative proceedings or claim of the kind described in clause 8.1(i).

(c) The Borrower will promptly obtain alt consents or authorisations necessary or desirable (and do all that is needed to maintain them in full force and effect) under any law or regulation to enable it to perform its obligations under the Finance Documents to which it is a party and to ensure the legality, validity, enforceability and admissibility in evidence of the Finance Documents in its jurisdiction of incorporation.

(d) The Borrower will procure that any of its unsecured and unsubordinated obligations and liabilities under the Finance Documents rank, and will rank, at least pari passu in right and priority of payments with all its other unsecured and unsubordinated obligations and liabilities, present or future, actual or contingent, except for those obligations and liabilities mandatorily preferred by law of general application to companies.

(e) The Borrower will comply, in all respects, with all laws, if failure to do so has or is reasonably likely to have a material adverse effect on its business, assets or condition, or its ability to perform its obligations under the Finance Documents to which it is a party.

(f) They will promptly notify the Lenders of any Potential Event of Default or Event of Default (and the steps, if any, being taken to remedy it) promptly on becoming aware of its occurrence.

(g) The Borrower will carry on and conduct its business in a proper and efficient manner and will not make any substantial change to the general nature or scope of its business as carried on at the date of this Agreement.

(h) The Borrower will not without the prior consent of the Lenders:

(i)     create, or permit to subsist, any Security on or over any of its assets;

(ii)    sell, transfer or otherwise dispose of any of its assets on terms whereby such assets are or may be leased to or re-acquired or acquired by it;

(iii)   sell, transfer or otherwise dispose of any of its receivables on recourse terms;

(iv)    enter into any arrangement under which money or the benefit of a bank or other account may be applied, set-off or made subject to a combination of accounts;

(v)     enter into any other preferential arrangement having a similar effect, in circumstances where the arrangement or transaction is entered into primarily as a method of raising finance or of financing the acquisition of an asset.

(i) The Borrower will not without the prior consent of the Lenders, sell, assign, lease, transfer or otherwise dispose of in any manner (or purport to do so) all or any part of, or any Interest in, its assets other than:

(i)     trading stock in the ordinary course of its business; and

(ii)    assets exchanged for other assets comparable or superior as to type, value and quality,

(j) The Borrower will not, without the prior consent of the Lender, incur or permit to subsist, any Indebtedness.

(k) Any obligations of the Borrower owed to any other person, including but not limited to its shareholders, directors or the Guarantor, shall be subordinated in favour of the Borrower's obligations to the Lenders.

## 10. EVENTS OF DEFAULT

10.1 Each of the events or circumstances set out in this clause 10 is an Event of Default.

(a) Any person (other than a Lender) fails to pay any sum payable by it under any Finance Document, unless its failure to pay is caused solely by an administrative error or technical problem and payment is made within three Business Days of its due date.

(b) Any person (other than a Lender) fails (other than by failing to pay), to comply with any provision of any Finance Document and (if the Lender considers, acting reasonably, that the default is capable of remedy), such default is not remedied within 10 Business Days of the earlier of:

(i)     the Lender notifying such person of the default and the remedy required; and

(ii)    such person becoming aware of the default.

(c) Any representation, warranty or statement made, repeated or deemed made by any person (other than a Lender) in, or pursuant to, any Finance Document is (or proves to have been) incomplete, untrue, incorrect or misleading in any material respect when made, repeated or deemed made.

(d) If:

(i)    any Indebtedness of the Borrower is not paid when due or within any originally applicable grace period; or

(ii)    any Indebtedness of the Borrower becomes due, or capable or being declared due and payable prior to its stated maturity by reason of an event of default (howsoever described);

(iii)    any commitment for Indebtedness of the Borrower is cancelled or suspended by a creditor of the Borrower by reason of an event of default (howsoever described); or

(iv)    any creditor of the Borrower becomes entitled to declare any Indebtedness due and payable prior to its stated maturity by reason of an event of default (howsoever described).

(e) The Borrower stops or suspends payment of any of its debts, or is unable to, or admits its inability to, pay its debts as they fall due.

(f) The value of the Borrower's assets is less than its liabilities (taking into account contingent and prospective liabilities).

(g) The Borrower commences negotiations, or enters into any composition, compromise, assignment or arrangement with one or more of its creditors with a view to rescheduling any of its Indebtedness (because of actual or anticipated financial difficulties).

(h) Any action, proceedings, procedure or step is taken for:

(i)    the suspension of payments, a moratorium of any Indebtedness, winding up, dissolution, administration or reorganisation (using a voluntary arrangement, scheme of arrangement or otherwise) of the Borrower; or

(ii)    the composition, compromise, assignment or arrangement with any creditor; or

(iii)    the appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of the Borrower or any of its assets; or

(iv)    the enforcement of any Security over the Property.

(i) Any event occurs in relation to the Borrower similar to those in clause 10.1(e) to clause 10.1(i) (inclusive) under the laws of any applicable jurisdiction.

(j) A distress, attachment, execution, expropriation, sequestration or another analogous legal process is levied, enforced or sued out on, or against, the Borrower's assets or the Property and is not discharged or stayed within 21 days.

(k) Any provision of any Finance Document is or becomes, for any reason, invalid, unlawful, unenforceable, terminated, disputed or ceases to be effective or to have full force and effect.

(l) Any person (other than a Lender) repudiates or evidences an intention to repudiate any Finance Document.

(m) The Borrower suspends or ceases to carry on (or threatens to suspend or cease to carry on) all or a substantial part of its business.

(n) There is a Change of Control of the Borrower or the Guarantor without the prior written consent of the Lenders.

(o) Any event occurs (or circumstances exist) which, in the opinion of the Lenders, has or is likely to materially and adversely affect the ability of any person (other than a Lender) to perform all or any of its obligations (whether actual or contingent) under, or otherwise comply with the terms of any Finance Document.

10.2 At any time after an Event of Default has occurred which is continuing, the Lender may, by notice to the Borrower:

(a) cancel all outstanding obligations of the Lenders (or any of them) under this Agreement whereupon they shall immediately be cancelled; and/or

(b) declare that the Loan (and all accrued Interest and all other amounts outstanding under the Finance Documents and, without double counting, the Minimum Interest Charge), whether in whole or in part, is immediately due and payable, whereupon they shall become immediately due and payable; and/or

(c) declare that the Loan (whether in whole or in part) be payable on demand, whereupon it shall become immediately payable on demand to the Lenders; and/or

(d) declare the Security Documents to be enforceable.

## 11. SET-OFF

11.1 The Lenders may at any time set off any liability of the Borrower to the Lenders against any liability of the Lenders to the Borrower, whether either liability is present or future, liquidated or unliquidated, and whether or not either liability arises under any Finance Document. If the liabilities to be set off are expressed in different currencies, the Lenders may convert either liability at a market rate of exchange for the purpose of setoff. Any exercise by the Lenders of

their rights under this clause 11.1 shall not limit or affect any other rights or remedies available to it under the Finance Documents or otherwise.

11.2 The Lenders are not obliged to exercise any of their rights under clause 11.1, but if the rights are exercised, such person shall promptly notify the Borrower of the set-off that has been made.

## 12. CALCULATIONS, ACCOUNTS AND CERTIFICATES

12.1 Any Interest, commission or fee under any Finance Document shall accrue on a day-to-day basis, calculated according to the number of actual days elapsed and a year of 365 days.

12.2 If the Lender issues any certificate, determination or notification of a rate or any amount payable under a Finance Document, it shall be (in the absence of manifest error) conclusive evidence of the matter to which it relates.

## 13. AMENDMENTS, WAIVERS AND CONSENTS AND REMEDIES

13.1 No amendment of any Finance Document shall be effective unless it is in writing and signed by, or on behalf of, each party to it (or its authorised representative).

13.2 A waiver of any right or remedy under any Finance Document or by law, or any consent given under any Finance Document, is only effective if given in writing by the waiving or consenting party and shall not be deemed a waiver of any other breach or default. It only applies in the circumstances for which it is given and shall not prevent the party giving it from subsequently relying on the relevant provision.

13.3 A failure or delay by a party to exercise any right or remedy provided under any Finance Document or by law shall not constitute a waiver of that or any other right or remedy, prevent or restrict any further exercise of that or any other right or remedy or constitute an election to affirm any Finance Document. No single or partial exercise of any right or remedy provided under any Finance Document or by law shall prevent or restrict the further exercise of that or any other right or remedy. No election to affirm any Finance Document by the Lenders shall be effective unless it is in writing.

13.4 The rights and remedies provided under the Finance Documents are cumulative and are in addition to, and not exclusive of, any rights and remedies provided by law.

## 14. SEVERANCE

If any provision (or part of a provision) of any Finance Document is or becomes invalid, illegal or unenforceable, it shall be deemed modified to the minimum extent necessary to make it valid, legal and enforceable. If such modification is not possible, the relevant provision (or part of a provision) shall be deemed deleted. Any modification to or deletion of a provision (or part of a provision) under this clause shall not affect the legality, validity and enforceability of the rest of the Finance Documents.

## 15. ASSIGNMENT AND TRANSFER

15.1 The Lenders may assign any of their rights under the Finance Documents or transfer all of their rights or obligations by novation.

15.2 The Borrower may not assign any of its rights or transfer any of its rights or obligations under any Finance Document to which it is a party.

## 16. COUNTERPARTS

l6.l This Agreement may be executed in counterparts (whether in the form of a duplicate, photocopy or facsimile of the original) and each such counterpart shall be deemed to be an original; and all such counterparts when taken together shall be deemed to constitute one and the same instrument. When properly executed and exchanged, such counterparts shall evidence a mutually binding contract in accordance with the terms and conditions set forth in that agreement. Signed counterparts may be delivered by scanned PDF image via electronic mail.

## 17. INDEMNITY

17.1 The Borrower shall, on demand, indemnify each of the Lenders against any cost, loss or liability incurred by it as a result of:

    (a)  the occurrence of any Event of Default; and/or

    (b)  a failure by the Borrower to pay any amount due under a Finance Document on its due date.

17.2 The Borrower shall promptly indemnify each of the Lenders, and each officer or employee of any Lender, against any cost, loss or liability reasonably incurred by that Lender, officer or employee (as the case may be) in connection with or arising out of this Agreement, unless such cost, loss or liability is caused by the gross negligence, fraud or willful default of that Lender, employee or officer (as the case may be).

## 18. FURTHER ASSURANCE

18.1 The Borrower shall (and shall procure that the Guarantor shall) promptly do all such acts or execute all such documents (including assignments, transfers, mortgages, charges, notices and instructions) as the Lender may reasonably specify (and in such form as the Lender may reasonably require):

    (a)  to perfect the Security created or intended to be created under or evidenced by the Security Documents (which may include the execution of a mortgage, charge, assignment or other Security over all or any of the assets which are, or are intended to be, the subject of the Security Documents) or for the exercise of any rights, powers and remedies of any

Lender, or the Borrower (as the case may be) provided by or pursuant to the Finance Documents or by law;

(b) to confer on the Lenders Security over any property and assets of the Borrower located in any jurisdiction equivalent or similar to the Security intended to be created by the Borrower under the Security Documents; and/or

(c) following an Event of Default which is continuing, to facilitate the realisation of the assets which are, or which are intended to be, the subject of the Security Documents.

The Borrower shall (and shall procure that the Guarantor shall) take all such action as is available to it (or the Guarantor) (including making all filings and registrations) as may be necessary for the purpose of the creation, perfection, protection or maintenance of any Security conferred or intended to be conferred on the Lenders by or pursuant to the Finance Documents.

## 19. GUARANTOR

l9.l The Guarantors Liability under the Loan is unlimited and shall not be reduced, discharged or otherwise adversely affected by:

(a) any time or indulgence granted by the Lenders to the Borrower;

(b) any delay or forbearance by the Lender in enforcing any payment or the observance or performance of any of the Borrower's covenants of this Agreement or in making any demand in respect of any of them;

(c) the Lenders exercising any right or remedy against the Borrowers for any failure to pay the Loan or to observe or perform the Borrower's covenants under this Agreement;

(d) the Lenders taking any action or refraining from taking any action in connection with any other security held by the Lenders in respect of the Loan including the release of any such security;

(e) any legal limitation or disability on the Borrower or any invalidity or irregularity of any of the Borrower's covenants or any unenforceability of any of them against the Borrower;

(f) the Borrower being dissolved, or being struck off the register of companies or otherwise ceasing to exist; or

(g) any other act or omission except an express written release by deed of the Guarantor by the Lenders.

19.2 Any sum payable by the Guarantor must be paid without any set-off or counterclaim, deduction or withholding (other than any deduction or withholding of tax as required by law) against the Lenders.

## 20. OBLIGATIONS OF THE LENDERS

The obligations of the Lenders under this Agreement shall be several.

## 21. NOTICES

21.1 Any notice, demand, consent, agreement or other communication (Notice) made under or in connection with this Agreement must be in writing and, unless otherwise stated, may be given in person, by prepaid mail, or by electronic mail.

21.2 The contact details of each party to this Agreement for all communications in connection with this Agreement are as set out below.

GUARANTOR
1007 N Orange St #65
C/O Terra Carta Partners, LLC
Wilmington DE 19801
Email: rcicoski@terracartapartners.com

BORROWER
c/o Cayman Management Ltd.
Governors Square, 2nd Floor
23 Lime Tree Bay Avenue
PO Box 156
Grand Cayman KY1-1110
Cayman Islands

LENDERS
Address: See Schedule
Email: See Schedule
Attention: See Schedule

21.3 Notice shall be deemed to have been duly given or made as follows:

(a) if personally delivered upon delivery at the address of the relevant party;

(b) if sent by mail, five Business Days after the date of posting; and

(c) if sent by electronic mail when actually received by the intended recipient in readable form;

provided that if, in accordance with the above provision, any such notice, demand or other communication would otherwise be deemed to be given or made after 5.00 p.m. in the Cayman Islands, such notice, demand or other communication shall be deemed to be given or made at 9.00 a.m. in the Cayman Islands on the next Business Day.

21.4 A party may notify any other party to this Agreement of a change to its name, relevant addressee or address (including email address) for the purposes of this clause provided that such notification shall only be effective:

    (a)  on the date specified in the notification as the date on which the change is to take place; or

    (b)  if no date is specified or the date specified is less than five Business Days after the date on which notice is given, the date falling five Business Days after notice of any such change has been given.

21.5 Where a party nominates a particular department or officer to receive a communication, a communication will not be effective if it fails to specify that department or officer.

21.6 This clause does not apply to the service of any proceedings or other documents in any legal action.

## 22. GOVERNING LAW AND JURISDICTION

22.1 This Agreement shall be governed and construed in all respects by Cayman Islands law.

22.2 Any dispute arising under or in connection with this Agreement shall be subject to the exclusive jurisdiction of the Cayman Islands courts to which the parties to this Agreement hereby submit.

## 23. RATIFICATION OF LEGAL CHARGE AND COLLATERAL.

23.1 All of the terms, provisions, covenants, representations and warranties contained in the Legal Charge are ratified and affirmed by Borrower in all respect and shall remain in full force and effect as modified by this Agreement.

23.2 Any property or rights to or Interest in property granted as security in the Legal Charge shall remain as security for the Loan and the obligation of the Borrower.

## 24. LOAN EXTENSION

24.1   Provided that the Borrower is not in default under the terms of this Agreement, the Borrower may extend the Repayment Date to January 31, 2024 on the following terms and conditions:

    (a) the Borrower pays to the Lender the accrued and unpaid Interest due on the Principal Sum through and up until the initial Repayment Date; and

    (b) the Borrower pays to the Lender the Interest for the period from the Repayment Date through and including January 31, 2024.

24.2    the Borrower shall provide to Lender written notice of the extension of the Repayment Date not less than ten (10) days prior to the initial Repayment Date.

IN WITNESS WHEREOF the parties have duly executed this Agreement on the date stated at the beginning of it.

**Borrower**

BREAKERS BEACH CLUB LTD., a company incorporated under the laws of the Cayman Islands

By:

Name: Ryan Cicoski

Its: Director

**Guarantor**

GREEN SAPPHIRE HOLDINGS, INC., a Delaware limited liability company

By:

Name: Ryan Cicoski

Its: Director

**Lender**

Mark Matthews

David Holden

Schedule 1 – The Lenders

| Name | Address | Loan Amount | Interest Rate |
|------|---------|-------------|---------------|
| Mark Matthews | thematthews11me.com<br>P.O. Box 309,<br>Grand Cayman KY1-1104<br>Cayman Islands | $1,450,000 | 30% per annum |
| David Holden | dnh4private@gmail.com<br>PO Box 30623<br>Grand Cayman KY1-1203<br>Cayman Islands | $1,450,000 | 30% per annum |

Schedule 2 – Land Plan



Schedule 3 – St Barth's and Cedar Park, TX Property Descriptions

**DEED OF GUARANTEE**

THIS DEED OF GUARANTEE is made the ......17....... day of ....August........2023

**EXHIBIT I**

BETWEEN:  **GREEN SAPPHIRE HOLDINGS, INC.**
OF:  a Delaware limited liability company, 1007 North Orange, Wilmington, DE 19801
(hereinafter called the undersigned
OF THE ONE PART

AND:  **MARK MATTHEWS & DAVID HOLDEN**
OF:  P.O. Box 309, Grand Cayman KY1-1104, Cayman Islands and PO Box 30623, Grand Cayman KY1-1203, Cayman Islands
(hereinafter called "the Lenders" which expression shall include the Lender's successors in title and assigns)
OF THE OTHER PART

NOW THIS DEED WITNESSETH as follows:

1.  (A)  In consideration of the Lenders agreeing to deal with, giving time credit and/or loan facilities and accommodation to:

**BREAKERS BEACH CLUB LTD**

Hereinafter called "the Borrower" the undersigned and each of them jointly and severally if more than one hereby guarantees unconditionally and irrevocably to the Lenders as a principal obligor and not merely as surety the due and punctual payment of all debts and liabilities present and future, direct or indirect, absolute or contingent matured or not and of each and every liability of the Borrower of whatsoever nature howsoever the same be or may have been incurred and whether the same is presently existing or may hereafter be incurred by the Borrower with the Lenders or remaining unpaid by the Borrower to the Lenders, whether arising anywhere within or outside the country where this guarantee is executed and whether the Borrower be bound alone or with another or others and whether as principal or surety.

Provided always that the liability of the undersigned hereunder shall be unlimited

(B)  The undersigned's liability under this Guarantee shall include all and any interest accrued or accruing thereon (both before as well as after judgment) at such rate or rates as the Lenders may in its absolute discretion determine from time to time and all and any charges together with all costs and expenses recoverable from the Borrower and all costs and expenses incurred by the Lenders in enforcement of this Guarantee and where the undersigned's liability is limited such limitation shall be exclusive of any sums included under this clause.

2.  And the undersigned and each of them jointly and severally if more than one hereby agrees with the Lenders as follows:

(A)  The undersigned hereby undertakes to keep the Lenders fully and effectually indemnified against all losses, damages, costs, claims, and expenses arising out of or in connection with any failure on the part of the Borrower to pay any of the sums aforesaid as and when the same shall fall to be paid or perform any of the obligations to be performed in pursuance of the terms of the facilities extended to the Borrower.

(B)  This Guarantee shall cover any number of transactions and any part or parts thereof and the Lenders shall be entitled but shall not be bound to apply any moneys obtainable from any other source in reduction of the Borrower's liability before making any call or demand on the undersigned to satisfy any liability of the Borrower to the Lenders arising or accruing as aforesaid.

(C)  The liability of the undersigned to make any payment under this Guarantee shall arise upon the Lenders giving notice in writing to the undersigned demanding payment. Any notice or demand to be given or served on the undersigned shall be in writing and may be given and served by personal service or may be posted and if posted shall be deemed to have been sufficiently given to the undersigned by the Lenders sending the same to the address herein written or to the last known address of the undersigned and shall be effectual notwithstanding any change of address and such demand shall be deemed to be received by the undersigned twenty four hours after posting thereof and in proving such service it shall be sufficient to prove that the letter containing the demand was properly addressed and put into the Post Office. Where more than one party has signed this Guarantee a demand on them all sent to the address of any one of them shall be deemed to have been received by each of them.

(D)  The Lenders may grant extensions, renewals, time, releases and discharges or grant or refuse further credit to and grant any other indulgences whatsoever to the Borrower or to any other person, persons, partnerships, or corporation liable to the Lenders on or in respect of any liability hereby guaranteed and may accept compositions from and may otherwise deal with the Borrower and with any such other person, persons, partnerships or corporation liable to the Lenders on or in respect of any liability hereby guaranteed and may accept compositions from and may otherwise deal with the Borrower and with any such other person, persons, partnerships or corporation, as the Lenders may think expedient, and may give up or modify or abstain from perfecting or taking advantage of any securities or contracts held by it as collateral and may realise the said securities in such manner as the Lenders may think expedient, all without obtaining the consent of the undersigned and without giving notice to the undersigned.

Provided always that such actions on the part of the Lenders or any neglect omission or forbearance on the part of the Lenders to take advantage of or enforce any of its rights under the Guarantee shall not be deemed to operate as a general waiver of its rights hereunder nor shall in any way release, affect, prejudice or limit the liability of the undersigned hereunder, and this Guarantee shall remain in full force and effect until all outstanding debts and liabilities together with any interest and all other monies payable by the Borrower shall have been paid by the Borrower.

(E)  This Guarantee shall be a continuing guarantee and shall cover all debts and liabilities owed to the Lenders by the Borrower and it shall apply to and secure any ultimate balance due or remaining unpaid to the Lenders.

Notwithstanding the death insolvency bankruptcy or winding up of the Borrower the liability of the undersigned under this Guarantee shall be deemed to continue until the same has been actually paid.

(F)  The Lenders shall not be bound to exhaust its recourse against the Borrower or others or any securities it may at any time hold before being entitled to payment from the undersigned of the outstanding debts or liabilities due hereunder.

(G)  (i)  Upon default in payment of any debt or liability owing by the Borrower to the Lenders at any time, the Lenders may treat the whole of the indebtedness hereby secured as due and payable and may forthwith collect from the undersigned the total amount hereby guaranteed and may apply the sum so collected upon the Borrower's debt or may place it to the credit of a special account.

(ii)  The undersigned agrees that an admission by the Borrower as to the amount of the liability of the Borrower to the Lenders or, in the absence of an admission by the Borrower, any amount stated by the Lenders or a judgment determining such amount obtained by the Lenders against the Borrower shall be conclusive proof as against the undersigned as to the amount of such liability.

The Lenders is also to be at liberty at any time and from time to time at the Lenders' absolute discretion to release discharge compound with or otherwise vary or agree to vary the liability of any one or more of the undersigned under this Guarantee or make any other arrangements with any one or more of the undersigned and no such release discharge composition variation agreement or arrangement shall prejudice or in any way affect the Lenders' rights or remedies against the other or others of the undersigned.

(H)  All debts and liabilities present and future of the Borrower to the undersigned or any of them (if more than one) are hereby postponed to the debts and liabilities of the Borrower to the Lenders during the continuance of this Guarantee, and all moneys

received by the undersigned or any of them (if more than one) from the Borrower shall be deemed to be held in trust for the Lenders and forthwith upon receipt, shall be paid over to the Lenders without in any way limiting or lessening the liability of the undersigned under this Guarantee, and this assignment and postponement is independent of the said Guarantee and shall remain in full effect notwithstanding that the liability of the undersigned or any of them under the said Guarantee may be extinct.

(I)     This Guarantee shall be in addition to and without prejudice to any other securities, negotiable or otherwise, which the Lenders may now or hereafter possess in respect of the debts and liabilities hereby secured or intended so to be, and the Lenders shall be under no obligation to marshal in favour of the undersigned any such securities or any of the funds or assets which the Lenders maybe entitled to receive or have a claim upon. All dividends, compositions and moneys received by the Lenders from any other person or persons or estate capable of being applied by the Lenders in reduction of the indebtedness of the Borrower, shall be regarded for all purposes as payments in gross, and the undersigned shall not be entitled to participate except to the surplus (if any) remaining after satisfaction of the ultimate balance due to the Lenders.

(J)     This Guarantee shall not be affected by the death or loss or diminution of capacity of the undersigned or any of them if more than one, or where the Borrower is a partnership by any change in the name of the Borrower or in the membership of the Borrower's firm through the death or retirement of one or more partners or the introduction of a new partner or partners or otherwise or, where the Borrower is a corporation, by any change or changes in the name, objects, capital structure, stock or constitution of the Borrower, or by the acquisition of the Borrower's business by a corporation or by the Borrower's business being amalgamated with a corporation but shall notwithstanding the happening of any such event or similar event continue to apply to all the debts and liabilities outstanding hereunder whether thereto fore or thereafter incurred or arising and in this instrument the word "Borrower" shall include every such firm and corporation and, in any case, the provisions hereof shall be applicable to all transactions occurring and all debts and liabilities incurred as well as before as after any such change or changes, and the Lenders shall not be concerned to see or enquire into the powers of the Borrower or members, partners, directors, or any agents acting or purporting to act on behalf of the Borrower, and this Guarantee shall apply to all debts and liabilities created by the Borrower, or by any members, partners, directors or agents thereof, in professed exercise of their powers or authority, notwithstanding any irregularity, defect or informality and notwithstanding that the creation of such indebtedness may wholly or partly be beyond the powers of the Borrower.

(K)   (i)    No assurance security or payment which may be avoided under any enactment from time to time in force relating to insolvency bankruptcy or liquidation of companies and no release settlement discharge arrangement which may have been given or made on the faith of such assurance security or payment shall prejudice or affect the Lenders' right to recover from the undersigned to the full extent of this Guarantee as if such assurance security payment release settlement discharge arrangement (as the case may be) had never been granted given or made: and any such release settlement discharge or arrangement shall as between the Lenders and the undersigned be deemed to have been given or made upon the express condition that it shall become wholly void and of no effect if the assurance security or payment on the faith of which it was made shall at any time thereafter be avoided under any enactment relating to insolvency bankruptcy or liquidation of companies.

      (ii)   Where any security is held by the Lenders for the liability of the undersigned the Lenders shall be at liberty at its absolute discretion to retain as security for a period of seven months after the repayment of all sums that are or may become due to the Lenders from the Borrower notwithstanding any release settlement discharge or arrangement given or made by the Lenders on or as a consequence of such repayments and if at any time within the period of six months after such repayment either insolvency proceedings shall be commenced or a bankruptcy petition shall be presented against the Borrower or a petition shall be presented to a competent Court for an order for the winding-up of the Borrower or the Borrower (being a Company) shall commence to be wound up voluntarily the Lenders shall be at liberty and notwithstanding as before mentioned to continue to retain such security or any part thereof for and during such further period as the Lenders in its absolute discretion shall determine.

(L)     This Guarantee and agreement shall be operative and binding upon every signatory thereof notwithstanding the non-execution thereof by any other proposed signatory or signatories, and possession of this instrument by the Lenders shall be conclusive evidence against the undersigned and each of them that this instrument was not delivered in escrow or pursuant to any agreement that it should not be effective until any conditions precedent or subsequent had been complied with, unless at the time of receipt of this Guarantee by the Lenders each signatory thereof obtains from the Lenders a letter setting out the terms and conditions under which this Guarantee was delivered and the conditions, if any, to be observed before it becomes effective.

(M)    The Guarantee shall not be considered as wholly or partially satisfied by the payment or liquidation at any time or times of any sum or sums of money for the time being due or remaining unpaid to the Lenders, and all dividends, compositions proceeds, or security valued and payments received by the Lenders from the Borrower or from others or from estates shall be regarded for all purposes as payments in gross without any right on the part of the undersigned to claim in reduction of the liability under this Guarantee the benefit of any such dividends, compositions, proceeds or payments or any securities held by the Lenders or proceeds thereof, and the undersigned shall have no right to be subrogated in any rights of the Lenders until the Lenders shall have received payment in full of the debts and liabilities secured hereunder.

(N)     This Guarantee covers all agreements between the parties hereto relative to this Guarantee and assignment and postponement, and none of the parties shall be bound by any representation or promise made by any person relative thereto which is not embodied herein.

(O)     This Guarantee and agreement shall extend to and inure to the benefit of the Lenders and its successors and assigns, and every reference herein to the undersigned or to each of them or to any of them, is a reference to and shall be construed as including the undersigned and the heirs, executors, administrators, legal representatives, successors and assigns of the undersigned or of each of them or of any of them, as the case may be, to and upon all of whom this Guarantee and agreement shall extend and be binding.

(P)     This Guarantee is in addition to and not in substitution for any other guarantee, by whomsoever given, at any time held by the Lenders, and any present or future obligation to the Lenders incurred or arising otherwise than under a guarantee, of the undersigned or any of them or of any other obligant, whether bound with or apart from the Borrower, excepting any guarantee surrendered for cancellation on delivery of this instrument.

(Q)     The terms conditions and effect of this Guarantee shall be subject to and construed in accordance with the Laws of the Cayman Islands for the time being in force and the Cayman Islands shall be the forum for the enforcement thereof but without prejudice to any rights the Lenders may have to follow the assets of the undersigned or any of them (if more than one) wherever such assets may be situate.

(R)     This Guarantee is and at all times shall remain the property of the Lenders.

We acknowledge receipt of a copy of this Guarantee which we have read and understood before executing it.

IN WITNESS WHEREOF the parties hereto have hereunto affixed their hands and Seal the day and year first above written.

SIGNED SEALED and DELIVERED as a Deed
On behalf of **MARK MATTHEWS & DAVID HOLDEN**
In the presence of:

...................................................................
M Matthews

...................................................................
D Holden

Sarah Parchment
..................................................................
Name of witness

..................................................................
Signature of witness

SIGNED SEALED and DELIVERED as a Deed
On behalf of **GREEN SAPPHIRE HOLDINGS, INC.**
In the presence of:

..................................................................
Ryan Cicoski – Director/Authorised Signatory

..................................................................
Name of witness

..................................................................
Signature of witness

**DEED OF GUARANTEE**

THIS DEED OF GUARANTEE is made the ....**17**.... day of ....**August**.... 2023

BETWEEN:   **GREEN SAPPHIRE HOLDINGS, INC.**
OF:   a Delaware limited liability company, 1007 North Orange, Wilmington, DE 19801
(hereinafter called the undersigned
OF THE ONE PART

AND:   **MARK MATTHEWS & DAVID HOLDEN**
OF:   P.O. Box 309, Grand Cayman KY1-1104, Cayman Islands and PO Box 30623, Grand Cayman KY1-1203, Cayman Islands
(hereinafter called "the Lenders" which expression shall include the Lender's successors in title and assigns)
OF THE OTHER PART

NOW THIS DEED WITNESSETH as follows:

1.   (A)   In consideration of the Lenders agreeing to deal with, giving time credit and/or loan facilities and accommodation to:

    **BREAKERS BEACH CLUB LTD**

    Hereinafter called "the Borrower" the undersigned and each of them jointly and severally if more than one hereby guarantees unconditionally and irrevocably to the Lenders as a principal obligor and not merely as surety the due and punctual payment of all debts and liabilities present and future, direct or indirect, absolute or contingent matured or not and of each and every liability of the Borrower of whatsoever nature howsoever the same be or may have been incurred and whether the same is presently existing or may hereafter be incurred by the Borrower with the Lenders or remaining unpaid by the Borrower to the Lenders, whether arising anywhere within or outside the country where this guarantee is executed and whether the Borrower be bound alone or with another or others and whether as principal or surety.

    Provided always that the liability of the undersigned hereunder shall be unlimited

  (B)   The undersigned's liability under this Guarantee shall include all and any interest accrued or accruing thereon (both before as well as after judgment) at such rate or rates as the Lenders may in its absolute discretion determine from time to time and all and any charges together with all costs and expenses recoverable from the Borrower and all costs and expenses incurred by the Lenders in enforcement of this Guarantee and where the undersigned's liability is limited such limitation shall be exclusive of any sums included under this clause.

2.   And the undersigned and each of them jointly and severally if more than one hereby agrees with the Lenders as follows:

  (A)   The undersigned hereby undertakes to keep the Lenders fully and effectually indemnified against all losses, damages, costs, claims, and expenses arising out of or in connection with any failure on the part of the Borrower to pay any of the sums aforesaid as and when the same shall fall to be paid or perform any of the obligations to be performed in pursuance of the terms of the facilities extended to the Borrower.

  (B)   This Guarantee shall cover any number of transactions and any part or parts thereof and the Lenders shall be entitled but shall not be bound to apply any moneys obtainable from any other source in reduction of the Borrower's liability before making any call or demand on the undersigned to satisfy any liability of the Borrower to the Lenders arising or accruing as aforesaid.

  (C)   The liability of the undersigned to make any payment under this Guarantee shall arise upon the Lenders giving notice in writing to the undersigned demanding payment. Any notice or demand to be given or served on the undersigned shall be in writing and maybe given and served by personal service or may be posted and if posted shall be deemed to have been sufficiently given to the undersigned by the Lenders sending the same to the address herein written or to the last known address of the undersigned and shall he effectual notwithstanding any change of address and such demand shall be deemed to be received by the undersigned twenty four hours after posting thereof and in proving such service it shall be sufficient to prove that the letter containing the demand was properly addressed and put into the Post Office. Where more than one party has signed this Guarantee a demand on them all sent to the address of any one of them shall be deemed to have been received by each of them.

  (D)   The Lenders may grant extensions, renewals, time, releases and discharges or grant or refuse further credit to and grant any other indulgences whatsoever to the Borrower or to any other person, persons, partnerships, or corporation liable to the Lenders on or in respect of any liability hereby guaranteed and may accept compositions from and may otherwise deal with the Borrower and with any such other person, persons, partnerships or corporation liable to the Lenders on or in respect of any liability hereby guaranteed and may accept compositions from and may otherwise deal with the Borrower and with any such other person, persons, partnerships or corporation, as the Lenders may think expedient, and may give up or modify or abstain from perfecting or taking advantage of any securities or contracts held by it as collateral and may realise the said securities in such manner as the Lenders may think expedient, all without obtaining the consent of the undersigned and without giving notice to the undersigned..

    Provided always that such actions on the part of the Lenders or any neglect omission or forbearance on the part of the Lenders to take advantage of or enforce any of its rights under the Guarantee shall not be deemed to operate as a general waiver of its rights hereunder nor shall in any way release, affect, prejudice or limit the liability of the undersigned hereunder, and this Guarantee shall remain in full force and effect until all outstanding debts and liabilities together with any interest and all other monies payable by the Borrower shall have been paid by the Borrower.

  (E)   This Guarantee shall be a continuing guarantee and shall cover all debts and liabilities owed to the Lenders by the Borrower and it shall apply to and secure any ultimate balance due or remaining unpaid to the Lenders.

    Notwithstanding the death insolvency bankruptcy or winding up of the Borrower the liability of the undersigned under this Guarantee shall be deemed to continue until the same has been actually paid.

  (F)   The Lenders shall not be bound to exhaust its recourse against the Borrower or others or any securities it may at any time hold before being entitled to payment from the undersigned of the outstanding debts or liabilities due hereunder.

  (G)   (i)   Upon default in payment of any debt or liability owing by the Borrower to the Lenders at any time, the Lenders may treat the whole of the indebtedness hereby secured as due and payable and may forthwith collect from the undersigned the total amount hereby guaranteed and may apply the sum so collected upon the Borrower's debt or may place it to the credit of a special account.

      (ii)   The undersigned agrees that an admission by the Borrower as to the amount of the liability of the Borrower to the Lenders or, in the absence of an admission by the Borrower, any amount stated by the Lenders or a judgment determining such amount obtained by the Lenders against the Borrower shall be conclusive proof as against the undersigned as to the amount of such liability.

    The Lenders is also to be at liberty at any time and from time to time at the Lenders' absolute discretion to release discharge compound with or otherwise vary or agree to vary the liability of any one or more of the undersigned under this Guarantee or make any other arrangements with any one or more of the undersigned and no such release discharge composition variation agreement or arrangement shall prejudice or in any way affect the Lenders' rights or remedies against the other or others of the undersigned.



Deed of Guarantee                                                                                                                    Page 2

(H)     All debts and liabilities present and future of the Borrower to the undersigned or any of them (if more than one) are hereby postponed to the debts and liabilities of the Borrower to the Lenders during the continuance of this Guarantee, and all moneys received by the undersigned or any of them (if more than one) from the Borrower shall be deemed to be held in trust for the Lenders and forthwith upon receipt, shall be paid over to the Lenders without in any way limiting or lessening the liability of the undersigned under this Guarantee, and this assignment and postponement is independent of the said Guarantee and shall remain in full effect notwithstanding that the liability of the undersigned or any of them under the said Guarantee may be extinct.

(I)     This Guarantee shall be in addition to and without prejudice to any other securities, negotiable or otherwise, which the Lenders may now or hereafter possess in respect of the debts and liabilities hereby secured or intended so to be, and the Lenders shall be under no obligation to marshal in favour of the undersigned any such securities or any of the funds or assets which the Lenders maybe entitled to receive or have a claim upon. All dividends, compositions and moneys received by the Lenders from any other person or persons or estate capable of being applied by the Lenders in reduction of the indebtedness of the Borrower, shall be regarded for all purposes as payments in gross, and the undersigned shall not be entitled to participate except to the surplus (if any) remaining after satisfaction of the ultimate balance due to the Lenders.

(J)     This Guarantee shall not be affected by the death or loss or diminution of capacity of the undersigned or any of them if more than one, or where the Borrower is a partnership by any change in the name of the Borrower or in the membership of the Borrower's firm through the death or retirement of one or more partners or the introduction of a new partner or partners or otherwise or, where the Borrower is a corporation, by any change or changes in the name, objects, capital structure, stock or constitution of the Borrower, or by the acquisition of the Borrower's business by a corporation or by the Borrower's business being amalgamated with a corporation but shall notwithstanding the happening of any such event or similar event continue to apply to all the debts and liabilities outstanding hereunder whether theretofore or thereafter incurred or arising and in this instrument the word "Borrower" shall include every such firm and corporation and, in any case, the provisions hereof shall be applicable to all transactions occurring and all debts and liabilities incurred as well as before as after any such change or changes, and the Lenders shall not be concerned to see or enquire into the powers of the Borrower or members, partners, directors, or any agents acting or purporting to act on behalf of the Borrower, and this Guarantee shall apply to all debts and liabilities created by the Borrower, or by any members, partners, directors or agents thereof, in professed exercise of their powers or authority, notwithstanding any irregularity, defect or informality and notwithstanding that the creation of such indebtedness may wholly or partly be beyond the powers of the Borrower.

(K)     (i)     No assurance security or payment which may be avoided under any enactment from time to time in force relating to insolvency bankruptcy or liquidation of companies and no release settlement discharge arrangement which may have been given or made on the faith of such assurance security or payment shall prejudice or affect the Lenders' right to recover from the undersigned to the full extent of this Guarantee as if such assurance security payment release settlement discharge arrangement (as the case may be) had never been granted given or made: and any such release settlement discharge or arrangement shall as between the Lenders and the undersigned be deemed to have been given or made upon the express condition that it shall become wholly void and of no effect if the assurance security or payment on the faith of which it was made shall at any time thereafter be avoided under any enactment relating to insolvency bankruptcy or liquidation of companies.

        (ii)    Where any security is held by the Lenders for the liability of the undersigned the Lenders shall be at liberty at its absolute discretion to retain as security for a period of seven months after the repayment of all sums that are or may become due to the Lenders from the Borrower notwithstanding any release settlement discharge or arrangement given or made by the Lenders on or as a consequence of such repayments and if at any time within the period of six months after such repayment either insolvency proceedings shall be commenced or a bankruptcy petition shall be presented against the Borrower or a petition shall be presented to a competent Court for an order for the winding-up of the Borrower or the Borrower (being a Company) shall commence to be wound up voluntarily the Lenders shall be at liberty and notwithstanding as before mentioned to continue to retain such security or any part thereof for and during such further period as the Lenders in its absolute discretion shall determine.

(L)     This Guarantee and agreement shall be operative and binding upon every signatory thereof notwithstanding the non-execution thereof by any other proposed signatory or signatories, and possession of this instrument by the Lenders shall be conclusive evidence against the undersigned and each of them that this instrument was not delivered in escrow or pursuant to any agreement that it should not be effective until any conditions precedent or subsequent had been complied with, unless at the time of receipt of this Guarantee by the Lenders each signatory thereof obtains from the Lenders a letter setting out the terms and conditions under which this Guarantee was delivered and the conditions, if any, to be observed before it becomes effective.

(M)     The Guarantee shall not be considered as wholly or partially satisfied by the payment or liquidation at any time or times of any sum or sums of money for the time being due or remaining unpaid to the Lenders, and all dividends, compositions proceeds, or security valued and payments received by the Lenders from the Borrower or from others or from estates shall be regarded for all purposes as payments in gross without any right on the part of the undersigned to claim in reduction of the liability under this Guarantee the benefit of any such dividends, compositions, proceeds or payments or any securities held by the Lenders or proceeds thereof, and the undersigned shall have no right to be subrogated in any rights of the Lenders until the Lenders shall have received payment in full of the debts and liabilities secured hereunder.

(N)     This Guarantee covers all agreements between the parties hereto relative to this Guarantee and assignment and postponement, and none of the parties shall be bound by any representation or promise made by any person relative thereto which is not embodied herein.

(O)     This Guarantee and agreement shall extend to and inure to the benefit of the Lenders and its successors and assigns, and every reference herein to the undersigned or to each of them or to any of them, is a reference to and shall be construed as including the undersigned and the heirs, executors, administrators, legal representatives, successors and assigns of the undersigned or of each of them or of any of them, as the case may be, to and upon all of whom this Guarantee and agreement shall extend and be binding.

(P)     This Guarantee is in addition to and not in substitution for any other guarantee, by whomsoever given, at any time held by the Lenders, and any present or future obligation to the Lenders incurred or arising otherwise than under a guarantee, of the undersigned or any of them or of any other obligant, whether bound with or apart from the Borrower, excepting any guarantee surrendered for cancellation on delivery of this instrument.

(Q)     The terms conditions and effect of this Guarantee shall be subject to and construed in accordance with the Laws of the Cayman Islands for the time being in force and the Cayman Islands shall be the forum for the enforcement thereof but without prejudice to any rights the Lenders may have to follow the assets of the undersigned or any of them (if more than one) wherever such assets may be situate.



**Deed of Guarantee**                                                                                   Page 3

(R)       This Guarantee is and at all times shall remain the property of the Lenders.

We acknowledge receipt of a copy of this Guarantee which we have read and understood before executing it.

IN WITNESS WHEREOF the parties hereto have hereunto affixed their hands and Seal the day and year first above written.

SIGNED SEALED and DELIVERED as a Deed
On behalf of **MARK MATTHEWS & DAVID HOLDEN**
In the presence of:

.............................................................
M Matthews

.............................................................
D Holden

.............................................................
Name of witness

.............................................................
Signature of witness

SIGNED SEALED and DELIVERED as a Deed
On behalf of **GREEN SAPPHIRE HOLDINGS, INC.**
In the presence of:

.............................................................
Ryan Cicoski - Director/Authorised Signatory

Erin Cicoski
.............................................................
Name of witness

.............................................................
Signature of witness

RCC

| Breakers Beach Club Loan | Disbursement | |
|---|---|---|
| Loan Amount | $ 2,900,000.00 | |
| Legal Fees | $ 7,231.11 | |
| Net Loan Proceeds | $ 2,892,768.89 | |
| Disbursements | | |
| Alpha Carta | $ 2,000,000.00 | |
| Salazar | $ 750,000.00 | |
| Global Capital Partners | $ 142,768.89 | Balance of $250,000 was from Access Management Loan |
| SubTotal | $ 2,892,768.89 | |

# EXHIBIT J



**ALPHA CARTA, LTD.**
**C/O 60 DEGREES GROUP**
**90 CHURCH STREET, GEORGE TOWN**
**CAYMAN ISLANDS**

## Wire Transfer Credit Advice

| | |
|---|---|
| **Date:** | 23/08/2023 |
| **Branch:** | Corporate Banking Centre |
| **Account Number:** | *********500 |
| **Currency and Amount:** | USD 2,000,000.00 |
| **Commission:** | USD 14.92 |
| **Net Amount :** | USD 1,999,985.08 |
| **Ordering Customer:** | CHARLES MACK DBA CHARLES MACK LAW GROUP IOLTA TRUST ACCOUNT 1363 SHERMER RD STE 210 NORTHBROOK IL 60062-4575 US |
| **Ordering Institution:** | CHASUS33 JP MORGAN CHASE BANK N V 270 PARK AVE NEW YORK NY 10172 |
| **Bank to Bank Information:** | /ACC//BOOK/3439043230ES |
| **Details of Payment:** | /ROC/3439043230ES///URI/PYMT REASON .LOAN REPAYMENT |

**ADDITIONAL DETAILS**

| | |
|---|---|
| **Sender Institution:** | CHASUS33 JP MORGAN CHASE BANK N V 270 PARK AVE NEW YORK NY 10172 |
| **Sender Reference:** | 3439043230ES |
| **System Reference:** | 2308182702300568 |
| **UETR:** | c18c5556-106f-4aa7-bfeb-0449ee4f3b2d |
| **Ordering Currency and Amount:** | USD 2,000,000.00 |
| **Value Date:** | 23/08/2023 |
| **Exchange Rate:** | N/A |
| **Details Of Charges:** | SHA |

This is a computer generated advice. No Signature required.
CAYMAN

# EXHIBIT J



**ALPHA CARTA, LTD.**
**C/O 60 DEGREES GROUP**
**90 CHURCH STREET, GEORGE TOWN**
**CAYMAN ISLANDS**

## Wire Transfer Credit Advice

| | |
|---|---|
| **Date:** | 23/02/2023 |
| **Branch:** | Corporate Banking Centre |
| **Account Number:** | *********500 |
| **Currency and Amount:** | USD 7,100,000.00 |
| **Commission:** | USD 14.92 |
| **Net Amount :** | USD 7,099,985.08 |
| **Ordering Customer:** | CHARLES MACK DBA CHARLES MACK LAW GROUP IOLTA TRUST ACCOUNT 1363 SHERMER RD STE 210 NORTHBROOK IL 60062-4575 US |
| **Ordering Institution:** | JP MORGAN CHASE BANK N V 270 PARK AVE NEW YORK NY 10172 |
| **Bank to Bank Information:** | /BOOK/3470213052ES |
| **Details of Payment:** | PYMT REASON.CONSULTANCY FEES |

<u>**ADDITIONAL DETAILS**</u>

| | |
|---|---|
| **Sender Institution:** | CHASUS33 JP MORGAN CHASE BANK N V 270 PARK AVE NEW YORK NY 10172 |
| **Sender Reference:** | 3470213052ES |
| **System Reference:** | 2302212702300320 |
| **UETR:** | 055c1ed0-7e63-4445-8ab9-5d68cd0a4527 |
| **Ordering Currency and Amount:** | USD 7,100,000.00 |
| **Value Date:** | 23/02/2023 |
| **Exchange Rate:** | N/A |
| **Details Of Charges:** | SHA |

This is a computer generated advice. No Signature required.
CAYMAN

# EXHIBIT K

Loan Settlement Agreement

This Loan Settlement Agreement ("**Agreement**") is made by and between Alpha Carta, Ltd. ("**Lender**") and Proton Green LLC, a Wyoming limited liability company ("**Borrower**") as of September __, 2023 (the "**Effective Date**").

Whereas, Lender, directly and as successor in interest, has made a loan to Borrower in the original aggregate amount of Nine Million Six Hundred Sixty-Seven Thousand Three Hundred Fifteen and 15/100 Dollars ($9,667,315.15) (the "**Loan**").

Whereas, the Loan is evidenced by (i) Second Amended and Restated Promissory Convertible Note, dated as of February 18, 2022, made by Borrower in favor of Kips Bay Select LP in the principal amount of $3,513,469.00 (as amended and as assigned to Lender, the "**Kips Bay Note**"), which amended and restated the Amended and Restated Promissory Convertible Note, dated as of December 23, 2021, made by the Borrower in favor of Kips Bay Select LP in the principal amount of $3,513,469.00, which amended and restated the Promissory Convertible Note, dated as of September 21, 2021, made by the Borrower in favor of Kips Bay Select LP in the principal amount of $2,692,308.00; (ii) the Amended and Restated Promissory Convertible Note, dated as of February 18, 2022, made by the Borrower in favor of Lender in the principal amount of $1,846,153.84, (as amended, the "**December Note**"), which amended and restated the Promissory Convertible Note, dated as of December 23, 2021, made by the Borrower in favor of Lender in the principal amount of $1,846,153.84; and (iii) the Amended and Restated Promissory Convertible Note, dated as of February 18, 2022, made by the Borrower in favor of Lender in the principal amount of $4,307,692.31 (as amended, the "**January Note**"), which amended and restated the Promissory Convertible Note, dated as of January 11, 2022, made by the Borrower in favor of Lender in the principal amount of $4,307,692.31 (all of such notes collectively, as amended, the "**Notes**") and secured by that certain Leasehold Deed of Trust and Fixture Filing dated as of ____, 2021 and recorded as document number 2021 – 006949 with the Recorder of Deeds of Apache County, Arizona on August 9, 2021 and rerecorded January 30, 2022 as document number 2022 – 01394 on February 22, 2022 ("**Leasehold Deed of Trust**") and that certain Security Agreement dated as of December 23, 2021 ("**Security Agreement**"), as amended by that certain Amendment Agreement, dated as of April 7, 2022, by and among Kips Bay Select LP, Lender and the Borrower (the "**Second Amendment**"), and that certain Letter from Lender to the Borrower dated February 1, 2023 and as agreed to in an Affidavit Regarding Loan Documents, dated February 1, 2023, by the Borrower ("**Affidavit**").

Whereas, the Loan is in default as numerous Events of Default have occurred, and the Borrower has acknowledged such Events of Default.

Whereas, Borrower and Lender have entered into that certain Forbearance Agreement dated as of June 20, 2023 (the "**Forbearance Agreement**").

Whereas, Borrower has made the initial payment as required under the Forbearance Agreement in the amount of Three Million and 00/10 Dollars ($3,000,000), but such payment was not made on a timely basis.

Whereas, Borrower has made the second payment as required under the Forbearance Agreement in the amount of Two Million and 00/10 Dollars ($2,000,000), but such payment was not made on a timely basis.

Whereas, Borrower has not complied with the terms of the Forbearance Agreement by, among other events, not tendering to Lender the deed in lieu of foreclosure for the Leasehold Deed of Trust.

Whereas, Borrower and Lender wish to resolve and settle any differences between them.

Now, therefore, Borrower and Lender agree as follows:

1.     <u>Indebtedness under the Loan</u>. The Parties hereby acknowledge that as of July 31, 2023,[1] the amount due and payable under the Loan, including all interest, fees, costs and expenses arising thereunder or relating thereto is in the amount of Twenty-Six Million Eight Hundred Fifty-One Thousand One Hundred Eighty-Five and 72/100 Dollars ($26,851,185.72) (the "**Remaining Indebtedness**"), and that such amount is not subject to any Borrower's claims, offsets, demands, damages, suits, assertions, cross-complaints, causes of action or debts of any kind or nature whatsoever, whether known or unknown, and whenever or howsoever arising, that can be asserted to reduce or eliminate the Borrower's liability to repay the Remaining Indebtedness or seek any affirmative relief or damages of any kind and or nature (collectively, the "**Offsets**") from Lender or its Affiliates (defined below). To the extent such Offsets exist, they are fully, forever and irrevocably waived and released by Borrower.

2.     <u>Payment by Borrower</u>.

Borrower shall pay Lender (the "**Settlement Consideration**") an amount equal to [Twenty-Two Million and 00/100 Dollars] as follows:

  a.   Buyer shall pay Lender the sum of Five Million and 00/100 Dollars ($5,000,000.00) payable on the Effective Date concurrently with the execution of this Agreement (the "**Cash Portion**").

  b.   On the Effective Date, Borrower shall grant to Lender a five percent (5%) overriding royalty interest (the "**ORRI**") pursuant to a conveyance document in the form as set forth on Exhibit A (the "**ORRI Conveyance**"), which ORRI shall terminate upon the receipt by Seller of [Sixteen Million and 00/100 Dollars ($16,000,000)][2] under the ORRI Conveyance. The ORRI Conveyance shall be duly recorded in the appropriate jurisdiction.[3] [It shall be a breach of this paragraph 2(b) if the aggregate total of $17,000,000 is not received by Lender by the __ year anniversary of the Effective Date.]

---

[1] Should this be updated to August 31, 2023 or the Effective Date?

[2] Increase this to capture more of the total amount owed as of the Effective Date?

[3] The current draft of ORRI Conveyance is not in recordable form.

    c.    All payments shall be made by wire transfer to an account designated by Lender. The Settlement Consideration is in addition to any payment or payments previously made by or on behalf of Borrower.

    d.    In order to secure Lender's rights hereunder, upon the Effective Date, Borrower shall deliver to Lender a deed in lieu of foreclosure in recordable form and satisfactory to Lender, in its sole discretion, with respect to the leases encumbered by the Leasehold Deed of Trust (the "**Deed in Lieu of Foreclosure**").

3.    <u>Satisfaction of the Loan</u>. Lender agrees to accept the Settlement Consideration in full satisfaction of the Loan and the Remaining Indebtedness. Subject to paragraph 7 hereof, Lender agrees that (a) from and after the date of this Agreement, no interest, fees, costs or expenses on the Loan and Remaining Indebtedness shall accrue, and (b) as of the date of the payment of the Settlement Consideration in full (including future payments with respect to the ORRI in accordance with paragraph 2(b) and the ORRI Conveyance), (i) the Loan shall be deemed paid in full by the Borrower, and (ii) Lender shall deliver a recordable release of the Leasehold Deed of Trust.[4]

4.    <u>Taxes</u>. Each Party shall be solely responsible for, and is legally bound to make payment of, any taxes determined to be due and owing (including penalties and interest related thereto) by it to any federal, state or local taxing authority as a result of the Settlement Consideration.

5.    <u>Protective Covenants</u>. Until the amounts payable under the ORRI Conveyance (and paragraph 2(b) hereof) have been paid in full, Borrower shall not (a) make any changes in the operation of the business of the Borrower, which involves the production of minerals or gases from the leaseholds, or (b) grant any other royalty interests or working interests in the minerals or gases to be extracted from the leaseholds without the prior written consent of Lender. In addition, until the amounts payable under the ORRI Conveyance (and paragraph 2(b) hereof) have been paid in full, Borrower shall maintain the leaseholds in good standing.

6.    <u>Mutual Release</u>. The Parties, on behalf of themselves, and on behalf of their predecessors, successors, direct and indirect parent companies, direct and indirect subsidiary companies, companies under common control with any of the foregoing, affiliates and assigns, and its and their past, present and future officers, directors, shareholders, interest holders, members, partners, attorneys, agents, employees, managers, representatives, assigns and successors in interest, and all persons acting by, through, under or in concert with them (collectively and each of them, the "**Affiliates**") hereby release and discharge the other Party and its Affiliates from any and all known or unknown charges, complaints, claims, grievances, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts, penalties, fees and expenses (including Offsets and attorneys' fees and costs actually incurred), of any nature whatsoever, known or unknown, which either Party has, or may have had, against the other Party, whether or not apparent or yet to be

---

[4] I do not believe that there are original, paper Notes, which were originally delivered electronically.

discovered, or which may hereafter develop and for any acts or omissions related to or arising from the Loan (the "**Claims**"); provided, however, that for the avoidance of doubt the foregoing release and discharge excludes any Claims arising out of or relating to (i) any default under or breach of any provision, agreement, obligation or covenant under this Agreement or the ORRI Conveyance, or (ii) the investment and purchase by Green Sapphire Holdings, Inc. ("**Green Sapphire**") of interests in Borrower or any rights or Claims that Green Sapphire may have as a member of Borrower that do not arise out of or relate directly to the Loan (collectively, the "**Excluded Claims**").

This Agreement resolves any Claim or cause of action for relief related to or arising from the Loan that is, or could have been alleged, no matter how characterized, including, without limitation, compensatory damages, damages for breach of contract, bad faith damages, reliance damages, liquidated damages, costs and attorneys' fees.

7.      In the event of a default under or breach of any provision, agreement, obligation or covenant under this Agreement or the ORRI Conveyance by Borrower, the settlement and release of the Loan pursuant to this Agreement shall be null and void and no force and effect, the Loan and the indebtedness, including principal and accrued interest, fees and other amounts due under the Loan, shall be deemed reinstated for all purposes, and Lender may apply any payments received to interest, principal, default interest, fees and/or costs as Lender in its sole discretion determines. Until such time as the Settlement Consideration in full (including the full payment of the maximum amount of payments payable with respect to the ORRI in accordance with paragraph 2(b) and the ORRI Conveyance) is received, Lender hereby reserves all rights and remedies available to it at law or equity, including without limitation pursuant to Article IV of the Leasehold Deed of Trust or pursuant to the Notes or any other Security Documents, including, but not limited to (a) taking such steps as may be appropriate to foreclose the lien created by the Leasehold Deed of Trust to secure payment or performance of all or any part of the obligations under the Loan documents, (b) reducing any claim against Borrower to judgment to the fullest extent permitted by the Loan Documents, (c) exercising any and all other rights or remedies afforded by the Notes, Leasehold Deed of Trust, Security Agreement or the other Loan Documents, or at law or in equity or otherwise, including without limitation, seeking the appointment of a receiver, or (d) exercise any and all rights under the ORRI Conveyance and Lender shall not be obligated to release or terminate the ORRI.

In addition to any other rights and remedies available to Lender under the Loan documents, ORRI Conveyance or applicable law upon the occurrence of a default hereunder or under the Loan documents or ORRI Conveyance, Borrower agrees, acknowledges, consents and stipulates that the occurrence of the default constitutes and provides the requisite cause under any applicable law, including the laws of State of Arizona, justifying the immediate recordation of the Deed in Lieu of Foreclosure. Borrower further stipulates and agrees that upon the occurrence of a default, it waives and is estopped from asserting any defenses to the immediate recordation of the Deed in Lieu of Foreclosure.

8.      <u>Reinstatement of Indebtedness</u>.  If the Settlement Consideration, or any part of the Settlement Consideration (including any amounts payable in accordance with paragraph 2(b) and the ORRI Conveyance), is set aside, rescinded, recovered, or required to be returned by Lender for

any reason, including, without limitation, the bankruptcy, insolvency, or reorganization of any person: (a) the Loan and the indebtedness, including principal and accrued interest, fees and other amounts due under the Loan shall for all purposes be reinstated to the extent of any such amount returned; and (b) in the case of the bankruptcy, receivership or other reorganization of Borrower, the Loan and the indebtedness, including principal and accrued interest, fees and other amounts due under the Loan, shall be reinstated in full for purposes of any claim or defense of Lender in any such proceeding.

9.    <u>Governing Law</u>. This Agreement is made and entered into within and shall be governed by, construed, interpreted and enforced in accordance with the laws of the State of Texas, without regard to the principles of conflicts of laws.

10.    <u>Entire Agreement</u>. The recitals set forth at the beginning of this Agreement are incorporated by reference and made a part of this Agreement. This Agreement constitutes the entire agreement and understanding of the Parties and supersedes all prior negotiations and/or agreements, proposed or otherwise, written or oral, concerning the subject matter hereof. Furthermore, no modification of this Agreement shall be binding unless in writing and signed by each of the Parties hereto.

11.    <u>Counterparts</u>. This Agreement may be executed by the Parties in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

12.    <u>Binding Agreement</u>. The Parties intend this Agreement to be legally binding upon and shall inure to the benefit of each of them and their respective successors, assigns, executors, administrators, heirs and estates.

13.    <u>Authority to Execute Agreement</u>. Each Party warrants and represents that the person signing this Agreement on its behalf has authority to bind that Party and that the Party's execution of this Agreement is not in violation of any by-law, operating agreements, covenants and/or other restrictions placed upon them by their respective organizational documents or any other agreements with or among their owners. Each Party represents and warrants to the other Party, as to any released Claim, that it is the sole and absolute owner thereof, free and clear of all the rights and interest of any other person therein, and that it has the right and authority to release each such released Claim.

14.    <u>Further Assurances</u>. Each party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as the other party may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

[ Signature Page Immediately Follows ]

In witness whereof, the undersigned have executed this Loan Settlement Agreement as of the date first above written.

Alpha Carta, Ltd.


By:_____

Name:_____

Title:_____


Proton Green LLC


By:_____

Name:_____

Title:_____

Exhibit A

**Form of Conveyance of Overriding Royalty Interest**

Effective [ _____ ] (the "Effective Date"), for and in consideration of good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Proton Green LLC, a Wyoming limited liability company ("Assignor") does hereby assign, transfer, grant and convey to Alpha Carta, Ltd.("Assignee"), its successors and assigns, as of the Effective Date at 12:01 a.m. (local time), an overriding royalty interest (the "Overriding Royalty Interest") in and to each of the interests described on Exhibit "A" attached hereto and made a part hereof (the "Interests") equal to five percent (5%), up to Sixteen Million and 00/100 Dollars ($16,000,000.00), of Assignor's right, title and interest in the Interests which were acquired by Assignor by virtue of the assignments and/or agreements set forth on Exhibit "A" attached hereto and by this reference made a part hereof (the "Conveyances"). This Conveyance of Overriding Royalty Interest is subject to the terms and conditions of that certain Loan Settlement Agreement. In the event of a conflict between the terms of this Conveyance of Overriding Royalty Interest and the terms of the Loan Settlement Agreement, the terms of the Loan Settlement Agreement shall control.

Assignor is entitled, through the assignments and agreement identified in Exhibit "A", to a portion of the overriding royalty interest transferred by the instrument identified on Exhibit "B", but Assignor has not acquired record title to that interest. Any record title which Assignor hereafter acquires in a portion of the overriding royalty interest transferred by the instrument identified on Exhibit "B", to which Assignor becomes entitled through the assignments and agreement identified in Exhibit "A", shall be considered an Interest for the purpose of this Conveyance of Overriding Royalty Interest, and the Overriding Royalty Interest herein assigned shall extend to any such subsequently acquired Interest.

The Overriding Royalty Interest shall be paid in accordance with and in the same manner as the terms and provisions of the assignments and conveyances in the chain of title out of which the Overriding Royalty Interest arises. Assignee shall be responsible for and bear all ad valorem, production, and severance taxes chargeable against the Overriding Royalty Interest, provided that all such taxes shall be paid for Assignee by Assignor out of production attributable to Assignee's Overriding Royalty Interest.

If Assignor owns a working interest, or similar interest, in any properties out of which the Interests or Overriding Royalty Interest are derived, Assignor may conduct and carry on, or may contract for, the exploration, development, maintenance and operation of any such properties, in any manner it so desires, without regard to the Overriding Royalty Interest and without any liability to Assignee. In addition, Assignor may transfer and dispose of, and may take or omit to take any other action with respect to, all or any of its Interests from time to time in any such manner. For the avoidance of doubt, (a) Assignor shall have no obligation to conduct any drilling operations or take any other action upon or with respect to any property subject to the Overriding Royalty Interest or lands pooled therewith, or to continue to operate any well or to operate or maintain in force or attempt to maintain in force any lease thereon, including by payment of delay rentals, shut-in royalties, compensatory royalties or other payments or by the drilling of any wells upon any such lease, or in any other manner, and the extent and duration of all operations, as well as the preservation of any such lease by delay rental payments or otherwise, shall be at the sole discretion

terminate any such lease in whole or in part without any liability to Assignee.

Assignor shall make all determinations with respect to the exploration, development, maintenance and operation of any property subject to the Overriding Royalty Interest using the same criteria (or criteria less favorable to the property subject to the Overriding Royalty Interest) as it would use were such property not subject to the Overriding Royalty Interest (that is, Assignor shall not favor properties subject to the Overriding Royalty Interest over properties not subject to the Overriding Royalty Interest when allocating Assignor's resources in the exploration, development, maintenance and operation of its properties).

Assignee grants Assignor the right, without further approval by Assignee, to pool the Overriding Royalty Interest, or portions thereof, with other lands or leases to form one or more pooled units. As to each pooled unit so created, the overriding royalty interest assigned to Assignee shall be reduced in accordance with the terms of any applicable lease, pooling agreement or unit agreement.

This Conveyance of Overriding Royalty Interest shall inure to the benefit of and be binding on the parties and their respective heirs, legal representatives, successors and permitted assigns. Except as provided below, Assignee may only transfer or dispose of all or any portion of the Overriding Royalty Interest (a) with the prior written consent of Assignor, which it may withhold in its sole discretion, and (b) after allowing Assignor a preferential purchase right on the following terms. If at any time Assignee desires to transfer or dispose of all or any portion of the Overriding Royalty Interest, Assignee must first give to Assignor written notice thereof stating: (a) the amount of the Overriding Royalty Interest offered by Assignee; (b) the form of consideration (which shall be either cash or a promissory note containing reasonable and customary terms) at which such Overriding Royalty Interest is offered (the "Offered Price"); (c) the name and address of the proposed transferee from which Assignee has a bona fide offer to purchase the Overriding Royalty Interest; (d) the proposed time of closing and payment for the Overriding Royalty Interest; and (e) any other relevant material terms of the proposed sale. Upon receipt of such notice, Assignor will have a right to purchase all or any portion of the offered Overriding Royalty Interest within 30 days of receipt of such notice at a purchase price equal to the Offered Price or such other price as may be agreed upon by Assignor and Assignee.

The restrictions contained in the preceding paragraph shall not apply to Assignee's transfer of the entire ownership of the Overriding Royalty Interest to (1) any member of the immediate family of Assignee (2) any trust or other estate planning entity whose principal beneficiary or beneficiaries are Assignee and/or one or more members of the immediate family of Assignee or (3) an affiliate of or entity under the common control of Assignee; provided that, prior to such transfer, the transferee agrees to be bound in writing by the restrictions on transfer contained herein or in any assignment, conveyance or other instrument or document executed by Assignee in connection with Assignee's purchase of the Overriding Royalty Interest, and that any transfers of interests in such entity holding the Overriding Royalty Interest shall be subject to the same transfer restrictions as the Overriding Royalty Interest. Assignee's heirs, legal representatives, successors and permitted assigns shall be bound by and comply with said transfer restrictions.

**Assignor makes no, and disclaims any, warranty of title or otherwise as to the Overriding Royalty Interest. Assignee accepts the Overriding Royalty Interest without warranty of title or otherwise. Assignor makes no, and disclaims any, warranty of any kind, express or implied, as to the accuracy or completeness of any data, information or estimates provided to Assignee by Assignor. Assignor makes no, and disclaims any, warranty of any kind, express or implied, as to the condition of any equipment, materials or facilities associated with the Interests (or with any properties out of which the Interests or the Overriding Royalty Interest are derived), including without limitation any warranty as to merchantability or fitness for a particular purpose. Assignee acknowledges such disclaimers.**

This Conveyance of Overriding Royalty Interest shall be construed in accordance with, and enforced under, the laws of the State of Texas, without regard to choice of law rules of any jurisdiction.

Assignor and Assignee have executed this Conveyance of Overriding Royalty Interest as of the Effective Date.

| Proton Green LLC, a Wyoming limited liability company | Alpha Carta, Ltd |
|---|---|
| By: _____ <br> Name: _____ | By: _____ <br> Name: _____ |
| Title: _____ | Title: _____ |

# EXHIBIT L

*Execution Version*

**NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE CONVERTIBLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL SELECTED BY THE HOLDER, IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT, OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES. ANY TRANSFEREE OF THIS NOTE SHOULD CAREFULLY REVIEW THE TERMS OF THIS NOTE. THE PRINCIPAL AMOUNT REPRESENTED BY THIS NOTE AND, ACCORDINGLY, THE SECURITIES ISSUABLE UPON CONVERSION HEREOF MAY BE LESS THAN THE AMOUNTS SET FORTH ON THE FACE HEREOF.**

Reference is hereby made to the Amended and Restated Promissory Convertible Note, dated as of December 23, 2021, made by the Company in favor of Kips Bay Select LP in the principal amount of $3,513,469.00 (as amended, the "**Prior Note**"), which amended and restated the Promissory Convertible Note, dated as of September 21, 2021, made by the Company in favor of Kips Bay Select LP in the principal amount of $2,692,308.00 (the "**Original Note**"). The Company and the Holder (as defined below) hereby agree that the Prior Note (and the Original Note) shall be superseded, amended and restated to read in its entirety as follows:

PROTON GREEN LLC

SECOND AMENDED AND RESTATED
PROMISSORY CONVERTIBLE NOTE

Issuance Date: September 21, 2021         Principal Amount: U.S. $3,513,469.00
Date of Note: February 18, 2022

      **FOR VALUE RECEIVED**, Proton Green LLC (formerly known as Plateau Carbon, LLC) (the "**Company**") pursuant to this Second Amended and Restated Promissory Convertible Note (the "**Note**"), hereby promises to pay to Kips Bay Select LP, its designee or registered assigns (the "**Holder**"), in cash, the principal amount of US $3,513,469.00 (as reduced pursuant to the terms hereof pursuant to redemption, conversion or otherwise, the "**Principal**" or the "**Principal Amount**", after giving effect to a 35% original issue discount) on April 7, 2022 (the "**Maturity Date**"), subject to earlier acceleration, conversion, redemption or otherwise (in each case in accordance with the terms hereof). Certain capitalized terms used herein are defined in Section 26. This Note is issued pursuant to that certain Securities Purchase Agreement dated September 21, 2021, by and among the Company and the Holder (the "**Purchase Agreement**"), and capitalized terms not defined herein will have the meanings set forth in the Purchase Agreement.

(1) <u>PAYMENTS OF PRINCIPAL; AMENDMENT FEE; PREPAYMENT</u>.

(a)     On the Maturity Date, the Company shall pay to the Holder (i) the Principal Amount in cash, together with (ii) Interest (as defined below) thereon calculated from the date hereof in accordance with the provisions of this Note, plus (iii) an amendment and extension fee in the amount of $300,000.00 (the "**Amendment Fee**"), provided, however, that the Holder shall have the right in its sole discretion to be repaid with 100% of the proceeds ("**Proceeds**") of the following: (1) sale of the Company's assets, (2) any merger, sale or other transaction resulting in the holders of the Company's Common Stock prior to such merger or other transaction ceasing to own at least 50% of the Common Stock, (3) issuances of the Company's Debt, and/or (4) issuances of the Company's equity.  Notwithstanding the foregoing, (i) in the event that on the Maturity Date the Company does not have sufficient funds to repay this Note and the Other Notes in full, the Company shall be prohibited from repaying the Principal Amount, Interest and Amendment Fee of this Note in full and shall instead repay the Holders of each of the Notes a pro rata portion of the Principal Amount, Interest and Amendment Fees of each of the Notes based on the proportion that each of the Notes bears to the aggregate Principal Amount, Interest and Amendment Fee of all of the Notes, and (ii) unless a Holder of either of the Other Notes declines its right to be repaid with Proceeds, any Proceeds shall be applied to repay a pro rata portion of the Principal Amount, Interest and Amendment Fee of each of the Notes based on the proportion that each of the Notes bears to the aggregate Principal Amount, Interest and Amendment Fee of all of the Notes.  All payments shall be applied first to the Amendment Fee, then to accrued Interest and thereafter to the Principal Amount.

(b)     Interest shall accrue on the unpaid Principal Amount outstanding until the Maturity Date at a rate equal to one and one-half percent (1.5%) per month.  The accrued interest on the Principal Amount of this Note shall not compound, and is referred to herein as the "**Interest**".  Such Interest shall be computed for the actual number of days elapsed in a month consisting of 28, 30 or 31 days, as the case may be.

(c)     The Company may, at any time and from time to time without premium or penalty, prepay all or any portion of the outstanding Principal Amount of, and Interest on, and Amendment Fee of this Note.  Any partial payment will be credited first to the Amendment Fee, then to accrued and unpaid Interest and the balance, if any, to the then outstanding Principal Amount.

**(2)     RANKING; SECURITY.**

(a)     The parties agree that this Note shall rank (i) pari passu with the indebtedness under the Other Notes and (ii) senior to all other existing and future debt of the Company.

(b)     Payment of this Note and all other obligations, fees, and expenses due to the Holder pursuant to this Note and the Purchase Agreement (the "**Secured Obligations**") will be secured at all times by (i) valid, enforceable first priority mortgages and/or deeds of trust on

-2-

and covering all real property interests presently owned and hereafter acquired by the Company, and all assets and personal property relating thereto (the "**Mortgaged Properties**"), and (ii) valid, enforceable first priority security interests on and covering all of the other assets of the Company (the "**Other Assets**").

(c)     Within five (5) business days of a request by the Holder, the Company shall deliver to the Holder (i) mortgages and/or deeds of trust, in appropriate and recordable form under Arizona law and reasonably satisfactory in form and substance to the Holder, executed by the Company, with respect to the Mortgaged Properties ("Deeds of Trust"), which shall create a first priority lien on such Mortgaged Properties and which shall be promptly recorded in the recorder's office of the appropriate county, and (ii) appropriate instruments granting valid, enforceable first priority security interests on and covering all of the Other Assets, in appropriate and recordable form and reasonably satisfactory in form and substance to the Holder, executed by the Company, with respect to the Other Assets (the "Other Instruments" and, collectively with the Deeds of Trust, the "Security Documents"). Thereafter, the Company shall cause the Mortgaged Properties now owned or hereafter acquired by it to be subject at all times to a first priority, perfected lien in favor of the Holder to secure the Secured Obligations, and the Company shall provide any filings and deliveries reasonably requested by the Holder in connection therewith to perfect the security interests therein, all in form and substance reasonably satisfactory to the Holder.

(d)     The Holder acknowledges that the security interests granted in the Mortgaged Properties and the Other Assets to the Holder to secure the Secured Obligations are also being granted to the holders of the Others Notes to secure the obligations of the Company under such Other Notes, and that such all of such security interests shall be for the ratable benefit of the Holders of all of the Notes. The form and substance of the Security Documents shall reflect such ratable benefit term.

(3) <u>CONVERSION OF NOTE</u>. Following the Issuance Date, as set out above, this Note shall be convertible into shares of Common Stock on the terms and conditions set forth in this Section 3.

(a) <u>Optional Conversion Right</u>. Holder has the right to convert all or part of the Principal Amount at the Company's valuation of $250,000,000.00 into fully paid and nonassessable shares of Common Stock in accordance with Section 3(c), at the Conversion Rate (as defined below) (the "**Conversion Date**"). The Company shall not issue any fraction of a share of Common Stock upon any conversion. If the issuance would result in the issuance of a fraction of a share of Common Stock, the Company shall round such fraction of a share of Common Stock up to the nearest whole share. The Company shall pay any and all transfer, stamp and similar taxes that may be payable with respect to the issuance and delivery of Common Stock upon conversion of any Conversion Amount. The Holder shall have the right to deliver an effective conversion notice at any time until 11:59 pm on the chosen date and it shall be immediately effective.

(b) <u>Conversion Rate</u>. The number of shares of Common Stock issuable upon conversion of any Conversion Amount pursuant to Section 3(a) shall be determined by dividing (x) such Conversion Amount by (y) the Conversion Price (the "**Conversion Rate**").

(i) "**Conversion Amount**" means the sum of the portion of the Principal to be converted, redeemed or otherwise with respect to which this determination is being made.

(ii) "**Conversion Price**" means $0.0599. Subsequent to the effective date of the registration statement registering for resale the Conversions Shares and the Warrant Shares pursuant to the Purchase Agreement, if the closing sale price of the Common Stock averages less than the then Conversion Price over a period of ten (10) consecutive trading days, the Conversion Price shall reset to such average price. If the 10-day volume weighted average price of the Common Stock continues to be less than the Conversion Price then the Conversion Price should reset to such 10-day average price.

(c)    Mechanics of Optional Conversion and Adjustment:

(i)    Registration; Book-Entry. The Company shall maintain a register (the "**Register**") for the recordation of the holder of the Note and the Principal amount of the Note held by the holder (the "**Registered Note**"). The entries in the Register, made in good faith, shall be conclusive and binding for all purposes absent manifest error. The Company and the holder of the Note shall treat each Person whose name is recorded in the Register as the owner of the Note for all purposes, including, without limitation, the right to receive payments of Principal, if any, hereunder, notwithstanding notice to the contrary. Upon its receipt of a request to assign or sell all or part of the Registered Note by the Holder, the Company shall record the information contained therein in the Register and issue one or more new Registered Notes in the same aggregate Principal amount as the Principal amount of the surrendered Registered Note to the designated assignee or transferee pursuant to Section 10. Notwithstanding anything to the contrary in this Section 3(c)(i), the Holder may assign any Note or any portion thereof to an Affiliate of such Holder or a Related Fund of such Holder without delivering a request to assign or sell such Note to the Company and the recordation of such assignment or sale in the Register (a "**Related Party Assignment**"); provided, that (x) the Company may continue to deal solely with such assigning or selling Holder unless and until such Holder has delivered a request to assign or sell such Note or portion thereof to the Company for recordation in the Register; (y) the failure of such assigning or selling Holder to deliver a request to assign or sell such Note or portion thereof to the Company shall not affect the legality, validity, or binding effect of such

-4-

assignment or sale and (z) such assigning or selling Holder shall, acting solely for this purpose as a non-fiduciary agent of the Company, maintain a register (the "**Related Party Register**") comparable to the Register on behalf of the Company, and any such assignment or sale shall be effective upon recordation of such assignment or sale in the Related Party Register. Notwithstanding anything to the contrary set forth herein, upon conversion of any portion of this Note in accordance with the terms hereof, the Holder shall not be required to physically surrender this Note to the Company unless the Holder has provided the Company with prior written notice (which notice may be included in a Conversion Notice) requesting reissuance of this Note upon physical surrender of this Note. The Holder and the Company shall maintain records showing the Principal, converted and the dates of such conversions or shall use such other method, reasonably satisfactory to the Holder and the Company, so as not to require physical surrender of this Note upon conversion.

(ii) <u>Intentionally omitted</u>.

(iii) Holder may convert any or all of this Note into shares of Common Stock at any time.

(d) <u>Limitations on Conversions</u>.

(i) <u>Beneficial Ownership</u>. In case that the Holder becomes subject to the filing or reporting obligations under Regulation 13D-G of the Exchange Act due to (i) the conversion of this Note, or any other share issuance hereunder, or (ii) the changes to the beneficial ownership of the Holder (together with the Attribution Parties) in the Company, including but not limited to the changes to such beneficial ownership due to the conversion or share issuance hereunder, the Holder shall timely file such schedules or forms with the United States Securities and Exchange Commission (the "**Commission**") as required under Regulation 13D-G of the Exchange Act. For purposes of this paragraph, beneficial ownership and all calculations (including, without limitation, with respect to calculations of percentage ownership) shall be determined in accordance with Regulation 13D-G and the rules and regulations promulgated thereunder. The obligations contained in this paragraph shall apply to a successor Holder of this Note. For any reason at any time, upon the written or oral request of the Holder, the Company shall within one (1) Business Day confirm orally and in writing to the Holder the number of shares of Common Stock then outstanding, including by virtue of any prior conversion or exercise of convertible or exercisable securities into Common Stock, including,

-5-

without limitation, pursuant to this Note or securities issued pursuant to the Purchase Agreement.

(ii) <u>Principal Market Regulation</u>. Unless permitted by the applicable rules and regulations of the Principal Market, the Company shall not issue any shares of Common Stock upon conversion of this Note if the issuance of such shares of Common Stock would exceed the aggregate number of shares of Common Stock which the Company may issue upon exercise or conversion (as the case may be) of the Note without breaching the Company's obligations under the rules or regulations of the Principal Market (the number of shares which may be issued without violating such rules and regulations, the "**Exchange Cap**"). Notwithstanding the foregoing, such limitation shall not apply in the event that the Company (A) obtains the approval of its stockholders as required by the applicable rules of the Principal Market for issuances of shares of Common Stock in excess of such amount or (B) obtains a written opinion from outside counsel to the Company that such approval is not required, which opinion shall be reasonably satisfactory to the Holder. In the event that any Holder shall sell or otherwise transfer any of such Holder's Note, the Exchange Cap restrictions set forth herein shall continue to apply to the Note and such transferee.

(e) <u>Disputes</u>. In the event of a dispute as to the number of shares of Common Stock issuable to the Holder in connection with a conversion of this Note, the Company shall issue to the Holder the number of shares of Common Stock not in dispute and resolve such dispute in accordance with Section 16.

(f) <u>Automatic Conversion.</u> In the event the Company completes a Fundamental Transaction or completes a listing of its Common Stock onto a national stock exchange, Holder agrees to convert the OID into Common Stock of the Company at the Conversion Price. The remaining Principal Amount, Amendment Fee and Interest will remain outstanding, unless the Holder elects to convert such Principal Amount, Amendment Fee and Interest into Common Stock of the Company.

(4) The Company hereby covenants and agrees as follows:

(a) <u>Sale of Assets</u>. During the thirty (30) days from the date of this Note, with the exception of moving certain of its assets to any of its subsidiaries, the Company shall not sell any material assets.

(b) <u>Additional Debt</u>. While this Note is outstanding, the Company shall not incur any additional indebtedness for borrowed money, other than any indebtedness that is Permitted Indebtedness.

(5) RIGHTS UPON EVENT OF DEFAULT.

-6-

(a) <u>Event of Default</u>. Each of the following events shall constitute an "**Event of Default**"; provided, however, that, except in the case of the Events of Default listed in Sections 5(a)(i), or 5(a)(ix) below, the Company shall have five (5) business days after notice of default from the Holder to cure such Event of Default unless a lesser number of days is required pursuant to the provisions of this Section 5.

(i) <u>Failure to Pay Principal</u>. The Company fails to pay the Principal, Amendment Fee or Interest due under this Note or any of the Other Notes at the Maturity Date (or the maturity date of any of the Other Notes, if the maturity date under the Other Notes is different from the Maturity Date), liquidated damages and other amounts thereon when due on the Note or any of the Other Notes, whether at maturity, upon acceleration or otherwise.

(ii) <u>Conversion and the Shares</u>. The Company (i) fails to issue Conversion Shares to the Holder (or announces or threatens in writing that it will not honor its obligation to do so) upon exercise by the Holder of the conversion rights of the Holder in accordance with the terms of the Note, (ii) fails to transfer or cause its transfer agent to transfer (issue) (electronically or in certificated form) any certificate for the Conversion Shares issuable to the Holder upon conversion of or otherwise pursuant to the Note as and when required by the Note, or (iii) the Company directs its transfer agent not to transfer or delays, impairs, and/or hinders its transfer agent in transferring (or issuing) (electronically or in certificated form) any certificate for the Conversion Shares issuable to the Holder upon conversion of or otherwise pursuant to the Note as and when required by the Note, or fails to remove (or directs its transfer agent not to remove or impairs, delays, and/or hinders its transfer agent from removing) any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any certificate for any Conversion Shares issued to the Holder upon conversion of or otherwise pursuant to the Note as and when required by the Note (or makes any written announcement, statement or threat that it does not intend to honor the obligations described in this paragraph) and any such failure shall continue uncured (or any written announcement, statement or threat not to honor its obligations shall not be rescinded in writing) for five (5) business days after the Holder shall have delivered a Notice of Conversion. It is an obligation of the Company to remain current in its obligations to its transfer agent. It shall be an Event of Default of the Note, if a conversion of the Note is delayed, hindered or frustrated due to a balance owed by the Company to its transfer agent. If at the option of the Holder, the Holder advances any funds to the Company's transfer agent in order to process a conversion, such advanced funds shall be paid by the Company to the Holder within forty eight (48) hours of a demand from the Holder. If Borrower is unable to do so, they shall have an opportunity to cure within five (5) business days.

(iii) <u>Breach of Agreements and Covenants</u>. The Company breaches any material agreement, covenant or other material term or condition contained in the Purchase Agreement, the Note or in any agreement, statement or certificate given in writing pursuant hereto or in connection herewith or therewith, and such breach results in a material adverse effect on the business or assets of the Company.

-7-

(iv) <u>Breach of Representations and Warranties</u>. Any representation or warranty of the Company made in the Purchase Agreement or the Note, or in any agreement, statement or certificate given in writing pursuant hereto or in connection herewith or therewith shall be false or misleading in any material respect when made and the breach of which has (or with the passage of time will have) a Material Adverse Effect on the rights of the Holder with respect to the Note or the Purchase Agreement. In the event of such a breach, the Company shall have an opportunity to cure within two (2) business days.

(v) <u>Receiver or Trustee</u>. The Company or any subsidiary of the Company shall make an assignment for the benefit of creditors, or apply for or consent to the appointment of a receiver or trustee for it or for a substantial part of its property or business, or such a receiver or trustee shall otherwise be appointed. Under such circumstances, the Company shall have an opportunity to cure within sixty (60) days.

(vi) <u>Judgments</u>. Any money judgment, writ or similar process shall be entered or filed against the Company or any subsidiary of the Company or any of its property or other assets for more than $100,000, and shall remain unvacated, unbonded or unstayed for a period of twenty (20) days unless otherwise consented to by the Holder, which consent will not be unreasonably withheld.

(vii) <u>Bankruptcy</u>. Bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings, voluntary or involuntary, for relief under any bankruptcy law or any law for the relief of debtors shall be instituted by or against the Company or any subsidiary of the Company. Under such circumstances, the Company shall have an opportunity to cure within sixty (60) days.

(viii) <u>Delisting or Trading of Common Stock.</u> The Company shall fail to maintain the listing or quotation of its Common Stock minimally on a Trading Market.

(ix) <u>Failure to Comply with the Exchange Act</u>. The Company shall fail to comply with the reporting requirements of the Exchange Act and/or the Company shall cease to be subject to the reporting requirements of the Exchange Act.

(x) <u>Liquidation.</u> Any dissolution, liquidation, or winding up of Borrower or any substantial portion of its business or assets.

(xi) <u>Cessation of Operations</u>. Any cessation of operations by Borrower or Borrower admits it is otherwise generally unable to pay its debts as such debts become due, provided, however, that any disclosure of the Company's ability to continue as a "going concern" shall not be an admission that the Company cannot pay its debts as they become due.

-8-

(xii) <u>Intentionally omitted</u>.

(xiii) <u>Intentionally omitted</u>.

(xiv) <u>Other Obligations</u>. The occurrence of any default under any agreement or obligation of the Company that is not cured within ten (10) days that could reasonably be expected to have a Material Adverse Effect.

(xv) <u>Default under Transaction Documents or Other Material Agreement</u>. A default or event of default (subject to any grace or cure period provided in the applicable agreement, document or instrument) shall occur under (A) this Note, the warrant or the securities purchase agreement or any of the other agreements entered into by the parties related to the purchase of this Note (collectively, the "**Transaction Documents**"), or (B) the Other Notes or any other material agreement, lease, document or instrument to which Company or any Subsidiary is obligated (and not covered by clause (vi) below), which in the case of subsection (B) would reasonably be expected to have a Material Adverse Effect.

(xvi) <u>Default under Mortgage or Other Agreement of Indebtedness</u>. Company or any Subsidiary shall default on any of its obligations under any mortgage, credit agreement or other facility, indenture agreement, factoring agreement or other instrument under which there may be issued, or by which there may be secured or evidenced, any indebtedness for borrowed money or money due under any long term leasing or factoring arrangement that (a) involves an obligation greater than $100,000, whether such indebtedness now exists or shall hereafter be created, and (b) results in such indebtedness becoming or being declared due and payable prior to the date on which it would otherwise become due and payable.

(xvii) <u>Intentionally omitted</u>.

(xviii) <u>Failure to Meet the Requirements under Rule 144</u>. Company does not meet the current public information requirements under Rule 144.

(xix) <u>Failure to Maintain Intellectual Property</u>. The failure by Company or any material Subsidiary to maintain any material intellectual property rights, personal, real property, equipment, leases or other assets which are necessary to conduct its business (whether now or in the future) and such breach is not cured with twenty (20) days after written notice to the Company from the Holder.

(xx) <u>Trading Suspension</u>. A Commission or judicial stop trade order or suspension from a Trading Market.

(xxi) <u>Intentionally omitted</u>.

-9-

(xxii) <u>Failure to Provide Required Notification of a Material Event</u>. A failure by Company to notify Holder of any material event of which Company is obligated to notify Holder pursuant to the terms of this Note or any other Transaction Document.

(xxiii) <u>Invalidity or Unenforceability of Transaction Documents</u>. Any material provision of any Transaction Document shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against the Company, or the validity or enforceability thereof shall be contested by Company, or a proceeding shall be commenced by Company or any governmental authority having jurisdiction over Company or Holder, seeking to establish the invalidity or unenforceability thereof, or Company shall deny in writing that it has any liability or obligation purported to be created under any Transaction Document.

(xxiv) <u>Intentionally omitted</u>.

(b) <u>Redemption Right</u>. At any time after the Holder becoming aware of an Event of Default, the Required Holders may require the Company to redeem (an "**Event of Default Redemption**") all or any portion of the Notes by delivering written notice thereof (the "**Event of Default Redemption Notice**") to the Company, which Event of Default Redemption Notice shall indicate the portion of this Note and the Other Notes the Required Holders are electing to require the Company to redeem. Each portion of this Note and the Other Notes subject to redemption by the Company pursuant to this Section 5(b) shall be redeemed by the Company in cash by wire transfer of immediately available funds at a price equal to (i) the Principal Amount, plus (ii) all Interest then accrued on the Principal Amount from the date of the Note to the Event of Default, plus (iii) the Amendment Fee, plus (iv) interest on the Principal Amount calculated from the Event of Default at the greater of the Default Interest Rate or the maximum rate permitted under applicable law (the "**Event of Default Redemption Price**"), plus (v) liquidated damages of $750,000, plus (vi) an amount in cash equal to 1% of the Event of Default Redemption Price for each 30 day period during which redemptions fail to be made; provided, however, in the event that the Company does not have sufficient funds to pay 100% of the relevant Event of Default Redemption Price to the Holders of all of the Notes, the Company shall pay a pro rata portion of the Event of Default Redemption Price to each such Holder based on the proportion that the Principal Amount of each of the Notes bears to the aggregate Principal Amount of all of the Notes. To the extent redemptions required by this Section 5(b) are deemed or determined by a court of competent jurisdiction to be prepayments of the Note by the Company, such redemptions shall be deemed to be voluntary prepayments. Notwithstanding anything to the contrary in this Section 5, but subject to Section 3(b)(ii) and 3(d), until the Event of Default Redemption Price payable in respect of each of the Notes (together with any interest thereon) is paid in full, the Conversion Amount submitted for redemption under this Section 5(b) (together with any interest thereon) may be converted, in whole or in part, by the Holder into Common Stock pursuant to Section 3. The parties hereto agree that in the event of the Company's redemption of any portion of the Note under this Section 5(b), the Holder's damages would be uncertain and difficult to estimate because of the parties' inability to predict future interest rates and the uncertainty of the availability of a suitable substitute investment opportunity for the Holder. Accordingly, any Event of Default redemption

premium due under this Section 5(b) is intended by the parties to be, and shall be deemed, a reasonable estimate of the Holder's actual loss of its investment opportunity and not as a penalty.

(6)     RIGHTS UPON FUNDAMENTAL TRANSACTION.

(a) If, at any time while this Note is outstanding, (i) the Company effects a Fundamental Transaction, then, upon any subsequent conversion of this Note, the Holder shall have the right to receive, for each Conversion Share that would have been issuable upon such conversion immediately prior to the occurrence of such Fundamental Transaction, the same kind and amount of securities, cash or property as it would have been entitled to receive upon the occurrence of such Fundamental Transaction if it had been, immediately prior to such Fundamental Transaction, the holder of one (1) share of Common Stock (the "Alternate Consideration"). For purposes of any such conversion, the determination of the Conversion Price shall be appropriately adjusted to apply to such Alternate Consideration based on the amount of Alternate Consideration issuable in respect of one (1) share of Common Stock in such Fundamental Transaction, and the Company shall apportion the Conversion Price among the Alternate Consideration in a reasonable manner reflecting the relative value of any different components of the Alternate Consideration. If holders of Common Stock are given any choice as to the securities, cash or property to be received in a Fundamental Transaction, then the Holder shall be given the same choice as to the Alternate Consideration it receives upon any conversion of this Debenture following such Fundamental Transaction. To the extent necessary to effectuate the foregoing provisions, any successor to the Company or surviving entity in such Fundamental Transaction shall issue to the Holder a new debenture consistent with the foregoing provisions and evidencing the Holder's right to convert such debenture into Alternate Consideration. The terms of any agreement pursuant to which a Fundamental Transaction is effected shall include terms requiring any such successor or surviving entity to comply with the provisions of this Section 6(a) and insuring that this Note (or any such replacement security) will be similarly adjusted upon any subsequent transaction analogous to a Fundamental Transaction.

(7) DISTRIBUTION OF ASSETS; RIGHTS UPON ISSUANCE OF PURCHASE RIGHTS AND OTHER CORPORATE EVENTS.

(a) Distribution of Assets. If the Company shall declare or make any dividend or other distributions of its assets (or rights to acquire its assets) to any or all holders of shares of Common Stock, by way of return of capital or otherwise (including without limitation, any distribution of cash, stock or other securities, property, options, evidence of Indebtedness or any other assets by way of a dividend, spin off, reclassification, corporate rearrangement, scheme of arrangement or other similar transaction) (the "**Distributions**"), then the Holder will be entitled to such Distributions as if the Holder had held the number of shares of Common Stock acquirable upon complete conversion of this Note (without taking into account any limitations or restrictions on the convertibility of this Note) immediately prior to the date on which a record is taken for such Distribution or, if no such record is taken, the date as of which the record holders of Common Stock are to be determined for such Distributions and the portion of such Distribution shall be held in abeyance for the Holder.

-11-

(b) <u>Purchase Rights</u>. If at any time the Company grants, issues or sells any Options, Convertible Securities or rights to purchase stock, warrants, securities or other property pro rata to the record holders of any class of Common Stock (the "**Purchase Rights**"), then the Holder will be entitled to acquire or receive, as applicable, upon the terms applicable to such Purchase Rights, the aggregate Purchase Rights which the Holder could have acquired if the Holder had held the number of shares of Common Stock acquirable upon complete conversion of this Note (without taking into account any limitations or restrictions on the convertibility of this Note) immediately prior to the date on which a record is taken for the grant, issuance or sale of such Purchase Rights, or, if no such record is taken, the date as of which the record holders of shares of Common Stock are to be determined for the grant, issue or sale of such Purchase Rights.

(c) <u>Other Corporate Events</u>. In addition to and not in substitution for any other rights hereunder, prior to the occurrence or consummation of any Fundamental Transaction pursuant to which holders of shares of Common Stock are entitled to receive securities, cash, assets or other property with respect to or in exchange for shares of Common Stock (a "**Corporate Event**"), the Company shall make appropriate provision to ensure that, and any applicable Successor Entity or Successor Entities shall ensure that, and it shall be a required condition to the occurrence or consummation of such Corporate Event that, the Holder will thereafter have the right to receive upon conversion of this Note at any time after the occurrence or consummation of the Corporate Event, shares of Common Stock or Successor Capital Stock or, if so elected by the Holder, cash in lieu of the shares of Common Stock (or other securities, cash, assets or other property) purchasable upon the conversion of this Note prior to such Corporate Event, such shares of stock, securities, cash, assets or any other property whatsoever (including warrants or other purchase or subscription rights and any shares of Common Stock) which the Holder would have been entitled to receive upon the occurrence or consummation of such Corporate Event or the record, eligibility or other determination date for the event resulting in such Corporate Event, had this Note been converted immediately prior to such Corporate Event or the record, eligibility or other determination date for the event resulting in such Corporate Event (without regard to any limitations on conversion of this Note). Provision made pursuant to the preceding sentence shall be in a form and substance satisfactory to the Holder. The provisions of this Section 7 shall apply similarly and equally to successive Corporate Events.

(8)     <u>RIGHTS UPON ISSUANCE OF OTHER SECURITIES</u>.

(A) <u>Adjustment of Conversion Price upon Subdivision or Combination of Common Stock</u>. If the Company at any time on or after the Issuance Date subdivides (by any stock split, stock dividend, recapitalization or otherwise) one or more classes of its outstanding shares of Common Stock into a greater number of shares, the Conversion Price in effect immediately prior to such subdivision will be proportionately reduced. If the Company at any time on or after the Issuance Date combines (by combination, reverse stock split or otherwise) one or more classes of its outstanding shares of Common Stock into a smaller number of shares, the Conversion Price in effect immediately prior to such combination will be proportionately increased.

(B) <u>Voluntary Adjustment by Company</u>. The Company may at any time during the term of this Note, with the prior written consent of the Holder, reduce the then current Conversion Price to any amount and for any period of time deemed appropriate by the Board of Directors of the Company.

(9) <u>NONCIRCUMVENTION</u>. The Company hereby covenants and agrees that the Company will not, by amendment of its Certificate of Incorporation, Bylaws or through any reorganization, transfer of assets, consolidation, merger, scheme of arrangement, dissolution, issue or sale of securities, or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Note, and will at all times in good faith carry out all of the provisions of this Note and take all action as may be required to protect the rights of the Holder of this Note.

(10)     Intentionally omitted.

(11) <u>VOTING RIGHTS</u>. The Holder shall have no voting rights as the holder of this Note, except as required by law and as expressly provided in this Note.

(12)     <u>COVENANTS</u>.

(a) <u>Incurrence of Indebtedness</u>. So long as this Note is outstanding, the Company shall not, and the Company shall not permit any of its Subsidiaries to, directly or indirectly, incur or guarantee, assume or suffer to exist any Indebtedness, other than Permitted Indebtedness.

(b) <u>Existence of Liens</u>. So long as this Note is outstanding, the Company shall not, and the Company shall not permit any of its Subsidiaries to, directly or indirectly, allow or suffer to exist any Liens other than Permitted Liens.

(c) <u>Change in Nature of Business</u>. The Company shall not make, or permit any of its Subsidiaries to make, any change in the nature of its business. The Company shall not modify its corporate structure or purpose.

(d) <u>Intellectual Property</u>. The Company shall not, and the Company shall not permit any of its Subsidiaries, directly or indirectly, to encumber or allow any Liens on, any of its own or its licensed copyright rights, copyright applications, copyright registrations and like protections in each work of authorship and derivative work, whether published or unpublished, any patents, patent applications and like protections, including improvements, divisions, continuations, renewals, reissues, extensions, and continuations-in-part of the same, trademarks, service marks and, to the extent permitted under applicable law, any applications therefor, whether registered or not, and the goodwill of the business of the Company and its Subsidiaries connected with and symbolized thereby, know-how, operating manuals, trade secret rights, rights to unpatented inventions, and any claims for damage by way of any past, present, or future infringement of any of the foregoing, other than Permitted Liens.

-13-

(e) <u>Preservation of Existence, Etc.</u> The Company shall maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, its existence, rights and privileges, and become or remain, and cause each of its Subsidiaries to become or remain, duly qualified and in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary.

(f) <u>Maintenance of Properties, Etc.</u> The Company shall maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, all of its properties which are necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear and tear excepted, and comply, and cause each of its Subsidiaries to comply, at all times with the provisions of all leases to which it is a party as lessee or under which it occupies property, so as to prevent any loss or forfeiture thereof or thereunder.

(g) <u>Maintenance of Insurance</u>. The Company shall maintain, and cause each of its Subsidiaries to maintain insurance with responsible and reputable insurance companies or associations (including, without limitation, comprehensive general liability, hazard, rent and business interruption insurance) with respect to its properties (including all real properties leased or owned by it) and business, in such amounts and covering such risks as is required by any governmental authority having jurisdiction with respect thereto or as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated.

(h) <u>Transactions with Affiliates</u>. The Company shall not, nor shall it permit any of its Subsidiaries to, enter into, renew, extend or be a party to, any transaction or series of related transactions (including, without limitation, the purchase, sale, lease, transfer or exchange of property or assets of any kind or the rendering of services of any kind) with any Affiliate, except in the ordinary course of business in a manner and to an extent consistent with past practice and necessary or desirable for the prudent operation of its business, for fair consideration and on terms no less favorable to it or its Subsidiaries than would be obtainable in a comparable arm's length transaction with a Person that is not an Affiliate thereof.

(i) <u>Corporate Changes</u>. The Company shall not change its corporate name, legal form or jurisdiction of formation without twenty (20) days' prior written notice to Holder. Company shall not enter into or be party to a Fundamental Transaction unless in violation of Section 6 hereof. Company shall not relocate its chief executive office or its principal place of business unless it has provided prior written notice to Holder.

(j) Reserved.

(k) <u>Charter Amendments</u>. The Company shall not amend its charter documents, including, without limitation, its certificate of incorporation and bylaws, in any manner that materially and adversely affects any rights of the Holder.

(l) <u>Repurchase</u>. The Company shall not repay, repurchase or offer to repay, repurchase or otherwise acquire more than a <u>de minimis</u> number of shares of its Common Stock

-14-

or common stock equivalents other than as to the Conversion Shares as permitted or required under the Transaction Documents.

(m) <u>Redemption</u>. The Company shall not redeem, defease, repurchase, repay or make any payments in respect of, by the payment of cash or cash equivalents (in whole or in part, whether by way of open market purchases, tender offers, private transactions or otherwise), all or any portion of any Indebtedness (other than the Note if on a pro-rata basis), whether by way of payment in respect of principal of (or premium, if any) or interest on, such Indebtedness, the foregoing restriction shall also apply to Permitted Indebtedness from and after the occurrence of an Event of Default.

(n) <u>Declaration</u>. The Company shall not declare or make any dividend or other distribution of its assets or rights to acquire its assets to holders of shares of Common Stock, by way of return of capital or otherwise including, without limitation, any distribution of cash, stock or other securities, property or options by way of a dividend, spin off, reclassification, corporate rearrangement, scheme of arrangement or other similar transaction.

(o) The Company shall not enter into any agreement with respect to any of the foregoing.

(13) <u>TRANSFER</u>. This Note and any shares of Common Stock issued upon conversion of this Note may be offered, sold, assigned or transferred according to the Purchase Agreement.

(14) <u>REISSUANCE OF THIS NOTE</u>.

(a) <u>Transfer</u>. If this Note is to be transferred, the Holder shall instruct the Company who the new Holder will be and this Note will be automatically cancelled. The Company will issue and deliver the new Note within two (2) days of such notice.

(b) <u>Lost, Stolen or Mutilated Note</u>. Upon receipt by the Company of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note, and, in the case of loss, theft or destruction, of any indemnification undertaking by the Holder to the Company in customary form and, in the case of mutilation, upon surrender and cancellation of this Note, the Company shall execute and deliver to the Holder a new Note (in accordance with Section 14(d)) representing the then outstanding Principal amount of the Note.

(c) <u>Note Exchangeable for Different Denominations</u>. This Note is exchangeable, upon the surrender hereof by the Holder at the principal office of the Company, for a new Note or Notes (in accordance with Section 14(d) representing in the aggregate the outstanding Principal of this Note, and each such new Note will represent such portion of such outstanding Principal as is designated by the Holder at the time of such surrender.

(d) <u>Issuance of New Notes</u>. Whenever the Company is required to issue a new Note pursuant to the terms of this Note, such new Note (i) shall be of like tenor with this Note,

(ii) shall represent, as indicated on the face of such new Note, the Principal remaining outstanding (or in the case of a new Note being issued pursuant to Section 14(a) or Section 14(c), the Principal designated by the Holder which, when added to the principal represented by the other new Notes issued in connection with such issuance, does not exceed the Principal remaining outstanding under this Note immediately prior to such issuance of new Notes), (iii) shall have an issuance date, as indicated on the face of such new Note, which is the same as the Issuance Date (iv) shall have the same rights and conditions as this Note, and (v) shall represent accrued and unpaid Interest on the Principal and Interest of this Note, from the Issuance Date.

(15) <u>REMEDIES, CHARACTERIZATIONS, OTHER OBLIGATIONS, BREACHES AND INJUNCTIVE RELIEF</u>. The remedies provided in this Note shall be cumulative and in addition to all other remedies available under this Note and any of the other Transaction Documents, at law or in equity (including a decree of specific performance and/or other injunctive relief), and nothing herein shall limit the Holder's right to pursue actual and consequential damages for any failure by the Company to comply with the terms of this Note. Amounts set forth or provided for herein with respect to payments, conversion, redemption and the like (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof). The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder and that the remedy at law for any such breach may be inadequate. The Company therefore agrees that, in the event of any such breach or threatened breach, the Holder shall be entitled, in addition to all other available remedies, to an injunction restraining any breach, without the necessity of showing economic loss and without any bond or other security being required.

(16) <u>PAYMENT OF COLLECTION, ENFORCEMENT AND OTHER COSTS</u>. If (a) this Note is placed in the hands of an attorney for collection or enforcement or is collected or enforced through any legal proceeding or the Holder otherwise takes action to collect amounts due under this Note or to enforce the provisions of this Note or (b) there occurs any bankruptcy, reorganization, receivership of the Company or other proceedings affecting Company creditors' rights and involving a claim under this Note, then the Company shall pay the costs and expenses incurred by the Holder for such collection, enforcement or action or in connection with such bankruptcy, reorganization, receivership or other proceeding, including, but not limited to, attorneys' fees and disbursements.

(17) <u>CONSTRUCTION; HEADINGS</u>. This Note shall be deemed to be jointly drafted by the Company and the Holder and shall not be construed against any person as the drafter hereof. The headings of this Note are for convenience of reference and shall not form part of, or affect the interpretation of, this Note.

(18) <u>FAILURE OR INDULGENCE NOT WAIVER</u>. No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

(19) <u>DISPUTE RESOLUTION</u>. In the case of a dispute as to the determination of the arithmetic calculation of the Conversion Rate, the Conversion Price or any Redemption Price, the Company shall submit the disputed determinations or arithmetic calculations via facsimile or electronic mail within one (1) Business Days of receipt, or deemed receipt, of the Conversion Notice or Redemption Notice or other event giving rise to such dispute, as the case may be, to the Holder. If the Holder and the Company are unable to agree upon such determination or calculation within two (2) Business Days of such disputed determination or arithmetic calculation being submitted to the Holder, then the Company shall, within two (2) Business Days submit via facsimile or electronic mail the disputed arithmetic calculation of the Conversion Rate, Conversion Price or any Redemption Price to an independent, outside accountant, selected by the Holder and approved by the Company, such approval not to be unreasonably withheld, conditioned or delayed. The Company, at the Company's expense, shall cause the accountant to perform the determinations or calculations and notify the Company and the Holder of the results no later than five (5) Business Days from the time it receives the disputed determinations or calculations. Such accountant's determination or calculation shall be binding upon all parties absent demonstrable error.

(20)    <u>NOTICES; PAYMENTS</u>.

(a) <u>Notices</u>. All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, facsimile, or electronic mail, addressed as set forth below or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received), or (b) upon receipt, when sent by electronic mail (provided confirmation of transmission is electronically generated and keep on file by the sending party), or (c) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur. The addresses for such communications shall be: (i) if to Borrower, to: Proton Green LLC at 4531 Park Lane, Dallas, Texas 75220, Steven E. Looper, sel@protongreen.com; (ii) if to the Holder, to: the address and fax number indicated on the Purchase Agreement. Without limiting the generality of the foregoing, the Company shall give written notice to the Holder (i) immediately upon any adjustment of the Conversion Price, setting forth in reasonable detail, and certifying, the calculation of such adjustment and (ii) at least twenty (20) days prior to the date on which the Company closes its books or takes a record (A) with respect to any dividend or distribution upon the Common Stock, (B) with respect to any pro rata subscription offer to holders of Common Stock or (C) for determining rights to vote with respect to any Fundamental Transaction, dissolution or liquidation, provided in each case that such information shall be made known to the public prior to or in conjunction with such notice being provided to the Holder.

-17-

(b) <u>Payments</u>. Whenever any payment of cash is to be made by the Company to any Person pursuant to this Note, such payment shall be made in lawful money of the United States of America by a check drawn on the account of the Company and sent via overnight courier service to such Person at such address as previously provided to the Company in writing; <u>provided</u>, that the Holder may elect to receive a payment of cash via wire transfer of immediately available funds by providing the Company with prior written notice setting out such request and the Holder's wire transfer instructions. Whenever any amount expressed to be due by the terms of this Note is due on any day, which is not a Business Day, the same shall instead be due on the next succeeding day, which is a Business Day.

(21) <u>CANCELLATION</u>. After all Principal and other amounts at any time owed on this Note have been paid in full, this Note shall automatically be deemed canceled, shall be surrendered to the Company for cancellation and shall not be reissued.

(22) <u>WAIVER OF NOTICE</u>. To the extent permitted by law, the Company hereby waives demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note.

(23) <u>GOVERNING LAW; JURISDICTION; JURY TRIAL</u>. All questions concerning the construction, validity, enforcement and interpretation of this Note shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflicts of law thereof. The Company agrees that all legal proceedings concerning the interpretations, enforcement and defense of the transactions contemplated by this Note (whether brought against the Company, the Holder or their respective affiliates, directors, officers, shareholders, employees or agents) shall be commenced exclusively in the state and federal courts sitting in the City of New York, County of New York. The Company hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the City of New York, Borough of Manhattan for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is improper or is an inconvenient venue for such proceeding. The Company hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to it at the address in effect for notices to it under the Purchase Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law. If the Company or a Holder shall commence an action or proceeding to enforce any provisions of the Note, then the prevailing party in such action or proceeding shall be reimbursed by the other party for its reasonable attorneys' fees and other costs and expenses incurred with the investigation, preparation and prosecution of such action or proceeding. **IN ANY ACTION, SUIT, OR PROCEEDING IN ANY JURISDICTION BROUGHT BY ANY PARTY AGAINST ANY OTHER PARTY, THE COMPANY KNOWINGLY AND INTENTIONALLY, TO THE GREATEST EXTENT PERMITTED**

**BY APPLICABLE LAW, HEREBY ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND EXPRESSLY WAIVES FOREVER TRIAL BY JURY.**

(24) <u>SEVERABILITY</u>. If any provision of this Note is prohibited by law or otherwise determined to be invalid or unenforceable by a court of competent jurisdiction, the provision that would otherwise be prohibited, invalid or unenforceable shall be deemed amended to apply to the broadest extent that it would be valid and enforceable, and the invalidity or unenforceability of such provision shall not affect the validity of the remaining provisions of this Note so long as this Note as so modified continues to express, without material change, the original intentions of the parties as to the subject matter hereof and the prohibited nature, invalidity or unenforceability of the provision(s) in question does not substantially impair the respective expectations or reciprocal obligations of the parties or the practical realization of the benefits that would otherwise be conferred upon the parties. The parties will endeavor in good faith negotiations to replace the prohibited, invalid or unenforceable provision(s) with a valid provision(s), the effect of which comes as close as possible to that of the prohibited, invalid or unenforceable provision(s).

(25) <u>DISCLOSURE</u>. Upon receipt or delivery by the Company of any notice in accordance with the terms of this Note, unless the Company has in good faith determined that the matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries, the Company shall within one (1) Business Day after any such receipt or delivery publicly disclose such material, nonpublic information on a Current Report on Form 6-K or otherwise. In the event that the Company believes that a notice contains material, nonpublic information relating to the Company or its Subsidiaries, the Company so shall indicate to such Holder contemporaneously with delivery of such notice, and in the absence of any such indication, the Holder shall be allowed to presume that all matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries.

(26) <u>CERTAIN DEFINITIONS</u>. For purposes of this Note, the following terms shall have the following meanings:

(a) "**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person, it being understood for purposes of this definition that "control" of a Person means the power directly or indirectly either to vote 10% or more of the stock having ordinary voting power for the election of directors of such Person or direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

(b) "**Attribution Parties**" means, collectively, the following Persons and entities: (i) any investment vehicle, including, any funds, feeder funds or managed accounts, currently, or from time to time after the Issuance Date, directly or indirectly managed or advised by the Holder's investment manager or any of its Affiliates or principals, (ii) any direct or indirect Affiliates of the Holder or any of the foregoing, (iii) any Person acting or who could be deemed to be acting as a Group together with the Holder or any of the foregoing and (iv) any other Persons whose beneficial ownership of the Company's Common Stock would or could be aggregated with

-19-

the Holder's and the other Attribution Parties for purposes of Regulation 13D-G of the Exchange Act.

(c) "**Bloomberg**" means Bloomberg Financial Markets.

(d) "**Closing Date**" shall have the meaning ascribed to such term in the Purchase Agreement.

(e) "**Closing Bid Price**" and "**Closing Sale Price**" means, for any security as of any date, the last closing bid price and last closing trade price, respectively, for such security on the Principal Market, as reported by Bloomberg, or, if the Principal Market begins to operate on an extended hours basis and does not designate the closing bid price or the closing trade price, as the case may be, then the last bid price or last trade price, respectively, of such security prior to 4:00 p.m., New York Time, as reported by Bloomberg, or, if the Principal Market is not the principal securities exchange or trading market for such security, the last closing bid price or last trade price, respectively, of such security on the principal securities exchange or trading market where such security is listed or quoted for trading as reported by Bloomberg, or if the foregoing do not apply, the last closing bid price or last trade price, respectively, of such security in the over-the-counter market on the electronic bulletin board for such security as reported by Bloomberg, or, if no closing bid price or last trade price, respectively, is reported for such security by Bloomberg, the average of the bid prices, or the ask prices, respectively, of any market makers for such security as reported in the OTC Link or "pink sheets" by OTC Markets Group Inc. (formerly Pink OTC Markets Inc.). If the Closing Bid Price or the Closing Sale Price cannot be calculated for a security on a particular date on any of the foregoing bases, the Closing Bid Price or the Closing Sale Price, as the case may be, of such security on such date shall be the fair market value as mutually determined by the Company and the Holder. If the Company and the Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved pursuant to Section 19. All such determinations to be appropriately adjusted for any stock dividend, stock split, stock combination, reclassification or similar transaction during the applicable calculation period.

(f) "**Common Stock**" the common stock of the Company, par value $0.001 per share, and any other class of securities into which such securities may hereafter be reclassified or changed.

(g) "**Convertible Securities**" means any stock or securities (other than Options) directly or indirectly convertible into or exercisable or exchangeable for shares of Common Stock.

(h) "**Default Interest Rate**" means 18% per annum.

(i) "**Equity Interests**" means (a) all shares of capital stock (whether denominated as common capital stock or preferred capital stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an

-20-

individual), whether voting or non-voting and (b) all securities convertible into or exchangeable for any of the foregoing and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any of the foregoing, whether or not presently convertible, exchangeable or exercisable.

(j) "**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

(k) "**Fundamental Transaction**" means (A) that the Company shall, directly or indirectly, including through Subsidiaries, Affiliates or otherwise, in one or more related transactions, (i) consolidate or merge with or into (whether or not the Company is the surviving corporation) another Subject Entity, or (ii) sell, assign, transfer, convey or otherwise dispose of all or substantially all of the properties or assets of the Company or any of its "significant subsidiaries" (as defined in Rule 1-02 of Regulation S-X) to one or more Subject Entities, or (iii) make, or allow one or more Subject Entities to make, or allow the Company to be subject to or have its Common Stock be subject to or party to one or more Subject Entities making, a purchase, tender or exchange offer that is accepted by the holders of at least either (x) 50% of the outstanding shares of Common Stock, (y) 50% of the outstanding shares of Common Stock calculated as if any shares of Common Stock held by all Subject Entities making or party to, or Affiliated with any Subject Entities making or party to, such purchase, tender or exchange offer were not outstanding; or (z) such number of shares of Common Stock such that all Subject Entities making or party to, or Affiliated with any Subject Entity making or party to, such purchase, tender or exchange offer, become collectively the beneficial owners (as defined in Rule 13d-3 under the Exchange Act) of at least 50% of the outstanding shares of Common Stock, or (iv) consummate a stock purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off or scheme of arrangement) with one or more Subject Entities whereby such Subject Entities, individually or in the aggregate, acquire, either (x) at least 50% of the outstanding shares of Common Stock, (y) at least 50% of the outstanding shares of Common Stock calculated as if any shares of Common Stock held by all the Subject Entities making or party to, or Affiliated with any Subject Entity making or party to, such stock purchase agreement or other business combination were not outstanding; or (z) such number of shares of Common Stock such that the Subject Entities become collectively the beneficial owners (as defined in Rule 13d-3 under the Exchange Act) of at least 50% of the outstanding shares of Common Stock, or (v) reorganize, recapitalize or reclassify its Common Stock, (B) that the Company shall, directly or indirectly, including through Subsidiaries, Affiliates or otherwise, in one or more related transactions allow any Subject Entity individually or the Subject Entities in the aggregate to be or become the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, whether through acquisition, purchase, assignment, conveyance, tender, tender offer, exchange, reduction in outstanding shares of Common Stock, merger, consolidation, business combination, spin-off, scheme of arrangement, reorganization, recapitalization or reclassification or otherwise in any manner whatsoever, of either (x) at least 50% of the aggregate ordinary voting power represented by issued and outstanding Common Stock, (y) at least 50% of the aggregate ordinary voting power represented by issued and outstanding Common Stock not held by all such Subject Entities as of the date of this Note calculated as if any shares of Common Stock held by all such Subject Entities were not outstanding, or (z) a percentage of the aggregate ordinary voting power

-21-

represented by issued and outstanding shares of Common Stock or other equity securities of the Company sufficient to allow such Subject Entities to effect a statutory short form merger or other transaction requiring other stockholders of the Company to surrender their shares of Common Stock without approval of the stockholders of the Company or (C) directly or indirectly, including through Subsidiaries, Affiliates or otherwise, in one or more related transactions, the issuance of or the entering into any other instrument or transaction structured in a manner to circumvent, or that circumvents, the intent of this definition in which case this definition shall be construed and implemented in a manner otherwise than in strict conformity with the terms of this definition to the extent necessary to correct this definition or any portion of this definition which may be defective or inconsistent with the intended treatment of such instrument or transaction.

(l) "**GAAP**" means United States generally accepted accounting principles, consistently applied.

(m) "**Group**" means a "group" as that term is used in Regulation 13D-G of the Exchange Act and as defined in Rule 13d-5 thereunder.

(n) "**Holiday**" means a day other than a Business Day or on which trading does not take place on the Principal Market.

(o) RESERVED

(p) "**Market Price**" shall mean the lowest Closing Bid Price on the Closing Date.

(q) "**OID**" shall mean the Original Issue Discount, which is 35%.

(r) "**Notes**" means this Note and the Other Notes.

(s) "**Options**" means any rights, warrants or options to subscribe for or purchase shares of Common Stock or Convertible Securities.

(t) "**Other Notes**" means (i) the Amended and Restated Promissory Convertible Note, dated as of the date hereof, made by the Company in favor of Alpha Carta, Ltd. in the principal amount of $1,846,153.84 (the "**AC Note**"), and (ii) the Amended and Restated Promissory Convertible Note, dated as of the date hereof, made by the Company in favor of Alpha Carta, Ltd. in the principal amount of $4,307,692 (the "**2022 AC Note**").

(u) "**Parent Entity**" of a Person means an entity that, directly or indirectly, controls the applicable Person, including such entity whose common capital stock or equivalent equity security is quoted or listed on a Trading Market (or, if so elected by the Holder, any other market, exchange or quotation system), or, if there is more than one such Person or such entity, the Person or entity designated by the Holder or in the absence of such designation, such Person or such entity with the largest public market capitalization as of the date of consummation of the Fundamental Transaction.

-22-

(v) "**Permitted Indebtedness**" means (i) Indebtedness evidenced by this Note and the Other Notes; (ii) debt incurred to make acquisitions; (iii) trade payables incurred in the ordinary course of business consistent with past practice, (iv) unsecured indebtedness not in excess of $1,000,000 in the aggregate, and (v) Indebtedness secured by Permitted Liens.

(w) "**Permitted Liens**" means (i) any Lien for taxes not yet due or delinquent or being contested in good faith by appropriate proceedings for which adequate reserves have been established in accordance with GAAP, (ii) any statutory Lien arising in the ordinary course of business by operation of law with respect to a liability that is not yet due or delinquent, (iii) any Lien created by operation of law, such as materialmen's liens, mechanics' liens and other similar liens, arising in the ordinary course of business with respect to a liability that is not yet due or delinquent or that are being contested in good faith by appropriate proceedings, (iv) Liens (A) upon or in any equipment acquired or held by the Company or any of its Subsidiaries to secure the purchase price of such equipment or Indebtedness incurred solely for the purpose of financing the acquisition or lease of such equipment, or (B) existing on such equipment at the time of its acquisition, provided that the Lien is confined solely to the property so acquired and improvements thereon, and the proceeds of such equipment, (v) Liens incurred in connection with the extension, renewal or refinancing of the Indebtedness secured by Liens of the type described in clause (iv) above, provided that any extension, renewal or replacement Lien shall be limited to the property encumbered by the existing Lien and the principal amount of the Indebtedness being extended, renewed or refinanced does not increase, (vi) leases or subleases and licenses and sublicenses granted to others in the ordinary course of the Company's business, not interfering in any material respect with the business of the Company and its Subsidiaries taken as a whole, (vii) Liens in favor of customs and revenue authorities arising as a matter of law to secure payments of custom duties in connection with the importation of goods, (viii) Liens arising from judgments, decrees or attachments in circumstances not constituting an Event of Default under Section 4(a)(viii) and (ix) liens listed on Schedule 27(v) hereto, and (ix) Liens arising pursuant to the terms of the Notes.

(x) "**Principal Market**" means the OTCQB tier of the OTC Markets.

(y) "**Redemption Dates**" means, collectively, the Event of Default Redemption Dates, and the Optional Redemption Dates, each of the foregoing, individually, a Redemption Date.

(z) "**Redemption Notices**" means, collectively, the Event of Default Redemption Notices, and the Optional Redemption Notices, each of the foregoing, individually, a Redemption Notice.

(aa) "**Redemption Price**" means, 125% of the outstanding principal amount of the Note together with accrued Interest thereon, which after an Event of Default shall be calculated at the Default Rate.

(bb) "**Related Fund**" means, with respect to any Person, a fund or account managed by such Person or an Affiliate of such Person.

-23-

(cc) "**Required Holders**" means any two (2) Holders of the Notes.

(dd) "**Rule 144**" shall have the meaning ascribed to such term in the Purchase Agreement.

(ee) "**SEC**" means the United States Securities and Exchange Commission.

(ff) "**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

(gg) "**Subject Entity**" means any Person, Persons or Group or any Affiliate or associate of any such Person, Persons or Group.

hh) "**Successor Entity**" means one or more Person or Persons (or, if so elected by the Holder, the Company or Parent Entity) formed by, resulting from or surviving any Fundamental Transaction or one or more Person or Persons (or, if so elected by the Holder, the Company or the Parent Entity) with which such Fundamental Transaction shall have been entered into.

(ii) "**Trading Market**" means any of the following markets or exchanges on which the Common Stock is listed or quoted for trading on the date in question: the NYSE American, the Nasdaq Capital Market, the Nasdaq Global Market, the Nasdaq Global Select Market, the New York Stock Exchange, OTCQB or OTCQX (or any successors to any of the foregoing).

(jj) "**VWAP**" means, for any date, the price determined by the first of the following clauses that applies: (a) if the Common Stock is then listed or quoted on a Trading Market, the daily volume weighted average price of the Common Stock for such date (or the nearest preceding date) on the Trading Market on which the Common Stock is then listed or quoted as reported by Bloomberg L.P. (based on a Trading Day from 9:30 a.m. New York City time to 4:02 p.m. New York City time); (b) if the Common Stock is not then listed or quoted for trading on a Trading Market and if prices for the Common Stock are then reported on the OTC Pink (or a similar organization or agency succeeding to its functions of reporting prices), the most recent bid price per share of the Common Stock so reported; or (c) in all other cases, the fair market value of a share of Common Stock as determined by an independent appraiser selected in good faith by the Holders of a majority in interest of the Note then outstanding and reasonably acceptable to the Company, the fees and expenses of which shall be paid by the Company.

[Signature Page Follows]

IN WITNESS WHEREOF, the Company has caused this Second Amended and Restated Note to be duly executed as of the 18th day of February, 2022.

**Proton Green LLC**,
formerly known as Plateau
Carbon, LLC

By: _____
Name: Steven E. Looper
Title: Managing Member

AGREED AND APPROVED:

KIPS BAY SELECT LP

By: _____
    Name
    Title:

-25-

IN WITNESS WHEREOF, the Company has caused this Second Amended and Restated Note to be duly executed as of the 18th day of February, 2022.

**Proton Green LLC**, formerly known as Plateau Carbon, LLC

By: _____
Name:
Title:

AGREED AND APPROVED:

KIPS BAY SELECT LP

By:_____
      Name: Roman Rogol
      Title: CFO

-26-

**EXHIBIT I**
**PROTON GREEN LLC**
**CONVERSION NOTICE**

Reference is made to the Second Amended and Restated Promissory Convertible Note (the "**Note**") issued to Kips Bay Select LP (together with its designee or registered assigns, the "**Holder**") by Proton Green LLC (formerly known as Plateau Carbon, LLC) (the "**Company**"). In accordance with and pursuant to the Note, the undersigned hereby elects to convert the Conversion Amount (as defined in the Note) of the Note indicated below into shares of Common Stock of the Company, par value $ 0.0001 per share (the "**Common Stock**") of the Company, as of the date specified below.

Date of
Conversion: _____

Aggregate Conversion Amount to be
converted: _____

Please confirm the following information:

Conversion Price: _____

Number of shares of Common Stock to
be issued: _____

Please issue the Common Stock into which the Note is being converted in the following name and to the following address:

Issue to: _____

Facsimile Number and Electronic

Mail: _____

Authorization: _____
By: _____
Title: _____

Dated: _____
Account
Number: _____

(if electronic book entry transfer)
Transaction Code
Number: _____
(if electronic book entry transfer)

# EXHIBIT M

*Execution Version*

**NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE CONVERTIBLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL SELECTED BY THE HOLDER, IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT, OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES. ANY TRANSFEREE OF THIS NOTE SHOULD CAREFULLY REVIEW THE TERMS OF THIS NOTE. THE PRINCIPAL AMOUNT REPRESENTED BY THIS NOTE AND, ACCORDINGLY, THE SECURITIES ISSUABLE UPON CONVERSION HEREOF MAY BE LESS THAN THE AMOUNTS SET FORTH ON THE FACE HEREOF.**

Reference is hereby made to the Promissory Convertible Note, dated as of December 23, 2021, made by the Company in favor of Alpha Carta, Ltd. in the principal amount of $1,846,153.84 (as amended, the "**Original Note**"). The Company and the Holder (as defined below) hereby agree that the Original Note shall be superseded, amended and restated to read in its entirety as follows:

**PROTON GREEN LLC**

**AMENDED AND RESTATED PROMISSORY CONVERTIBLE NOTE**

Issuance Date: December 23, 2021          Principal Amount: U.S. $1,846,153.84
Date of Note: February 18, 2022

      **FOR VALUE RECEIVED**, Proton Green LLC (formerly known as Plateau Carbon, LLC) (the "**Company**") pursuant to this Amended and Restated Promissory Convertible Note (the "**Note**"), hereby promises to pay to Alpha Carta, Ltd., its designee or registered assigns (the "**Holder**"), in cash, the principal amount of US $1,846,153.84 (as reduced pursuant to the terms hereof pursuant to redemption, conversion or otherwise, the "**Principal**" or the "**Principal Amount**", after giving effect to a 35% original issue discount) on April 7, 2022 (the "**Maturity Date**"), subject to earlier acceleration, conversion, redemption or otherwise (in each case in accordance with the terms hereof). Certain capitalized terms used herein are defined in Section 26. This Note is issued pursuant to that certain Securities Purchase Agreement dated December 23, 2021, by and among the Company and the Holder (the "**Purchase Agreement**"), and capitalized terms not defined herein will have the meanings set forth in the Purchase Agreement.

(1) <u>PAYMENTS OF PRINCIPAL; AMENDMENT FEE; PREPAYMENT</u>.

      (a)      On the Maturity Date, the Company shall pay to the Holder (i) the Principal Amount in cash, together with (ii) Interest (as defined below) thereon calculated from the date

hereof in accordance with the provisions of this Note, plus (iii) an amendment and extension fee in the amount of $150,000.00 (the "**Amendment Fee**"), provided, however, that the Holder shall have the right in its sole discretion to be repaid with 100% of the proceeds ("**Proceeds**") of the following: (1) sale of the Company's assets, (2) any merger, sale or other transaction resulting in the holders of the Company's Common Stock prior to such merger or other transaction ceasing to own at least 50% of the Common Stock, (3) issuances of the Company's Debt, and/or (4) issuances of the Company's equity. Notwithstanding the foregoing, (i) in the event that on the Maturity Date the Company does not have sufficient funds to repay this Note and the Other Notes in full, the Company shall be prohibited from repaying the Principal Amount, Interest and Amendment Fee of this Note in full and shall instead repay the Holders of each of the Notes a pro rata portion of the Principal Amount, Interest and Amendment Fee of each of the Notes based on the proportion that each of the Notes bears to the aggregate Principal Amount, Interest and Amendment Fee of all of the Notes, and (ii) unless a Holder of either of the Other Notes declines its right to be repaid with Proceeds, any Proceeds shall be applied to repay a pro rata portion of the Principal Amount, Interest and Amendment Fee of each of the Notes based on the proportion that each of the Notes bears to the aggregate Principal Amount, Interest and Amendment Fee of all of the Notes. All payments shall be applied first to the Amendment Fee, then to accrued Interest and thereafter to the Principal Amount.

(b) Interest shall accrue on the unpaid Principal Amount outstanding until the Maturity Date at a rate equal to one and one-half percent (1.5%) per month. The accrued interest on the Principal Amount of this Note shall not compound, and is referred to herein as the "**Interest**". Such Interest shall be computed for the actual number of days elapsed in a month consisting of 28, 30 or 31 days, as the case may be.

(c) The Company may, at any time and from time to time without premium or penalty, prepay all or any portion of the outstanding Principal Amount of, and Interest on, and Amendment Fee of, this Note. Any partial payment will be credited first to the Amendment Fee, then to accrued and unpaid Interest and the balance, if any, to the then outstanding Principal Amount.

## (2) **RANKING; SECURITY.**

(a) The parties agree that this Note shall rank (i) pari passu with the indebtedness under the Other Notes and (ii) senior to all other existing and future debt of the Company.

(b) Payment of this Note and all other obligations, fees, and expenses due to the Holder pursuant to this Note and the Purchase Agreement (the "**Secured Obligations**") will be secured at all times by (i) valid, enforceable first priority mortgages and/or deeds of trust on and covering all real property interests presently owned and hereafter acquired by the Company, and all assets and personal property relating thereto (the "**Mortgaged Properties**"), and (ii) valid, enforceable first priority security interests on and covering all of the other assets of the Company (the "**Other Assets**").

-2-

(c)     Within five (5) business days of a request by the Holder, the Company shall deliver to the Holder (i) mortgages and/or deeds of trust, in appropriate and recordable form under Arizona law and reasonably satisfactory in form and substance to the Holder, executed by the Company, with respect to the Mortgaged Properties ("Deeds of Trust"), which shall create a first priority lien on such Mortgaged Properties and which shall be promptly recorded in the recorder's office of the appropriate county, and (ii) appropriate instruments granting valid, enforceable first priority security interests on and covering all of the Other Assets, in appropriate and recordable form and reasonably satisfactory in form and substance to the Holder, executed by the Company, with respect to the Other Assets (the "Other Instruments" and, collectively with the Deeds of Trust, the "Security Documents"). Thereafter, the Company shall cause the Mortgaged Properties now owned or hereafter acquired by it to be subject at all times to a first priority, perfected lien in favor of the Holder to secure the Secured Obligations, and the Company shall provide any filings and deliveries reasonably requested by the Holder in connection therewith to perfect the security interests therein, all in form and substance reasonably satisfactory to the Holder.

(d)     The Holder acknowledges that the security interests granted in the Mortgaged Properties and the Other Assets to the Holder to secure the Secured Obligations are also being granted to the holders of the Others Notes to secure the obligations of the Company under such Other Notes, and that such all of such security interests shall be for the ratable benefit of the Holders of all of the Notes.  The form and substance of the Security Documents shall reflect such ratable benefit term.

(3) <u>CONVERSION OF NOTE</u>. Following the Issuance Date, as set out above, this Note shall be convertible into shares of Common Stock on the terms and conditions set forth in this Section 3.

(a) <u>Optional Conversion Right</u>. Holder has the right to convert all or part of the Principal Amount at the Company's valuation of $250,000,000.00 into fully paid and nonassessable shares of Common Stock in accordance with Section 3(c), at the Conversion Rate (as defined below) (the "**Conversion Date**"). The Company shall not issue any fraction of a share of Common Stock upon any conversion. If the issuance would result in the issuance of a fraction of a share of Common Stock, the Company shall round such fraction of a share of Common Stock up to the nearest whole share. The Company shall pay any and all transfer, stamp and similar taxes that may be payable with respect to the issuance and delivery of Common Stock upon conversion of any Conversion Amount. The Holder shall have the right to deliver an effective conversion notice at any time until 11:59 pm on the chosen date and it shall be immediately effective.

(b) <u>Conversion Rate</u>. The number of shares of Common Stock issuable upon conversion of any Conversion Amount pursuant to Section 3(a) shall be determined by dividing (x) such Conversion Amount by (y) the Conversion Price (the "Conversion Rate") portion of the Principal to be converted, redeemed or otherwise with respect to which this determination is being made.

(ii) "**Conversion Price**" means $0.0599. Subsequent to the effective date of the registration statement registering for resale the Conversions Shares and the Warrant Shares pursuant to the Purchase Agreement, if the closing sale price of the Common Stock averages less than the then Conversion Price over a period of ten (10) consecutive trading days, the Conversion Price shall reset to such average price. If the 10-day volume weighted average price of the Common Stock continues to be less than the Conversion Price then the Conversion Price should reset to such 10-day average price.

(c) <u>Mechanics of Optional Conversion and Adjustment:</u>

(i) <u>Registration; Book-Entry</u>. The Company shall maintain a register (the "**Register**") for the recordation of the holder of the Note and the Principal amount of the Note held by the holder (the "**Registered Note**"). The entries in the Register, made in good faith, shall be conclusive and binding for all purposes absent manifest error. The Company and the holder of the Note shall treat each Person whose name is recorded in the Register as the owner of the Note for all purposes, including, without limitation, the right to receive payments of Principal, if any, hereunder, notwithstanding notice to the contrary. Upon its receipt of a request to assign or sell all or part of the Registered Note by the Holder, the Company shall record the information contained therein in the Register and issue one or more new Registered Notes in the same aggregate Principal amount as the Principal amount of the surrendered Registered Note to the designated assignee or transferee pursuant to Section 10. Notwithstanding anything to the contrary in this Section 3(c)(i), the Holder may assign any Note or any portion thereof to an Affiliate of such Holder or a Related Fund of such Holder without delivering a request to assign or sell such Note to the Company and the recordation of such assignment or sale in the Register (a "**Related Party Assignment**"); <u>provided</u>, that (x) the Company may continue to deal solely with such assigning or selling Holder unless and until such Holder has delivered a request to assign or sell such Note or portion thereof to the Company for recordation in the Register; (y) the failure of such assigning or selling Holder to deliver a request to assign or sell such Note or portion thereof to the Company shall not affect the legality, validity, or binding effect of such assignment or sale and (z) such assigning or selling Holder shall, acting solely for this purpose as a non-fiduciary agent of the Company, maintain a register (the "**Related Party Register**") comparable to the Register on behalf of the Company, and any such assignment or sale shall be effective

-4-

upon recordation of such assignment or sale in the Related Party Register. Notwithstanding anything to the contrary set forth herein, upon conversion of any portion of this Note in accordance with the terms hereof, the Holder shall not be required to physically surrender this Note to the Company unless the Holder has provided the Company with prior written notice (which notice may be included in a Conversion Notice) requesting reissuance of this Note upon physical surrender of this Note. The Holder and the Company shall maintain records showing the Principal, converted and the dates of such conversions or shall use such other method, reasonably satisfactory to the Holder and the Company, so as not to require physical surrender of this Note upon conversion.

(ii) <u>Intentionally omitted</u>.

(iii) Holder may convert any or all of this Note into shares of Common Stock at any time.

(d)     <u>Limitations on Conversions</u>.

(i) <u>Beneficial Ownership</u>. In case that the Holder becomes subject to the filing or reporting obligations under Regulation 13D-G of the Exchange Act due to (i) the conversion of this Note, or any other share issuance hereunder, or (ii) the changes to the beneficial ownership of the Holder (together with the Attribution Parties) in the Company, including but not limited to the changes to such beneficial ownership due to the conversion or share issuance hereunder, the Holder shall timely file such schedules or forms with the United States Securities and Exchange Commission (the "**Commission**") as required under Regulation 13D-G of the Exchange Act. For purposes of this paragraph, beneficial ownership and all calculations (including, without limitation, with respect to calculations of percentage ownership) shall be determined in accordance with Regulation 13D-G and the rules and regulations promulgated thereunder. The obligations contained in this paragraph shall apply to a successor Holder of this Note. For any reason at any time, upon the written or oral request of the Holder, the Company shall within one (1) Business Day confirm orally and in writing to the Holder the number of shares of Common Stock then outstanding, including by virtue of any prior conversion or exercise of convertible or exercisable securities into Common Stock, including, without limitation, pursuant to this Note or securities issued pursuant to the Purchase Agreement.

(ii) <u>Principal Market Regulation</u>. Unless permitted by the applicable rules and regulations of the Principal Market, the Company shall not issue any shares of Common Stock upon conversion of this Note if the issuance of such shares

of Common Stock would exceed the aggregate number of shares of Common Stock which the Company may issue upon exercise or conversion (as the case may be) of the Note without breaching the Company's obligations under the rules or regulations of the Principal Market (the number of shares which may be issued without violating such rules and regulations, the "**Exchange Cap**"). Notwithstanding the foregoing, such limitation shall not apply in the event that the Company (A) obtains the approval of its stockholders as required by the applicable rules of the Principal Market for issuances of shares of Common Stock in excess of such amount or (B) obtains a written opinion from outside counsel to the Company that such approval is not required, which opinion shall be reasonably satisfactory to the Holder. In the event that any Holder shall sell or otherwise transfer any of such Holder's Note, the Exchange Cap restrictions set forth herein shall continue to apply to the Note and such transferee.

(e) <u>Disputes</u>. In the event of a dispute as to the number of shares of Common Stock issuable to the Holder in connection with a conversion of this Note, the Company shall issue to the Holder the number of shares of Common Stock not in dispute and resolve such dispute in accordance with Section 16.

(f)   <u>Automatic Conversion.</u>   In the event the Company completes a Fundamental Transaction or completes a listing of its Common Stock onto a national stock exchange, Holder agrees to convert the OID into Common Stock of the Company at the Conversion Price. The remaining Principal Amount, Amendment Fee and Interest will remain outstanding, unless the Holder elects to convert such Principal Amount, Amendment Fee and Interest into Common Stock of the Company.

(4)    The Company hereby covenants and agrees as follows:

(a) <u>Sale of Assets</u>. During the thirty (30) days from the date of this Note, with the exception of moving certain of its assets to any of its subsidiaries, the Company shall not sell any material assets.

(b) <u>Additional Debt</u>. While this Note is outstanding, the Company shall not incur any additional indebtedness for borrowed money, other than any indebtedness that is Permitted Indebtedness.

(5)    RIGHTS UPON EVENT OF DEFAULT.

(a) <u>Event of Default</u>. Each of the following events shall constitute an "**Event of Default**"; provided, however, that, except in the case of the Events of Default listed in Sections 5(a)(i), or 5(a)(ix) below, the Company shall have five (5) business days after notice of default from the Holder to cure such Event of Default unless a lesser number of days is required pursuant to the provisions of this Section 5.

(i) <u>Failure to Pay Principal</u>. The Company fails to pay the Principal, Amendment Fee or Interest due under this Note or any of the Other Notes at the Maturity Date (or the maturity date of any of the Other Notes, if the maturity date under the Other Notes is different from the Maturity Date), liquidated damages and other amounts thereon when due on the Note or any of the Other Notes, whether at maturity, upon acceleration or otherwise.

(ii) <u>Conversion and the Shares</u>. The Company (i) fails to issue Conversion Shares to the Holder (or announces or threatens in writing that it will not honor its obligation to do so) upon exercise by the Holder of the conversion rights of the Holder in accordance with the terms of the Note, (ii) fails to transfer or cause its transfer agent to transfer (issue) (electronically or in certificated form) any certificate for the Conversion Shares issuable to the Holder upon conversion of or otherwise pursuant to the Note as and when required by the Note, or (iii) the Company directs its transfer agent not to transfer or delays, impairs, and/or hinders its transfer agent in transferring (or issuing) (electronically or in certificated form) any certificate for the Conversion Shares issuable to the Holder upon conversion of or otherwise pursuant to the Note as and when required by the Note, or fails to remove (or directs its transfer agent not to remove or impairs, delays, and/or hinders its transfer agent from removing) any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any certificate for any Conversion Shares issued to the Holder upon conversion of or otherwise pursuant to the Note as and when required by the Note (or makes any written announcement, statement or threat that it does not intend to honor the obligations described in this paragraph) and any such failure shall continue uncured (or any written announcement, statement or threat not to honor its obligations shall not be rescinded in writing) for five (5) business days after the Holder shall have delivered a Notice of Conversion. It is an obligation of the Company to remain current in its obligations to its transfer agent. It shall be an Event of Default of the Note, if a conversion of the Note is delayed, hindered or frustrated due to a balance owed by the Company to its transfer agent. If at the option of the Holder, the Holder advances any funds to the Company's transfer agent in order to process a conversion, such advanced funds shall be paid by the Company to the Holder within forty eight (48) hours of a demand from the Holder. If Borrower is unable to do so, they shall have an opportunity to cure within five (5) business days.

(iii) <u>Breach of Agreements and Covenants</u>. The Company breaches any material agreement, covenant or other material term or condition contained in the Purchase Agreement, the Note or in any agreement, statement or certificate given in writing pursuant hereto or in connection herewith or therewith, and such breach results in a material adverse effect on the business or assets of the Company.

(iv) <u>Breach of Representations and Warranties</u>. Any representation or warranty of the Company made in the Purchase Agreement or the Note, or in any agreement, statement or certificate given in writing pursuant hereto or in connection herewith or therewith shall be false or misleading in any material respect when made and the breach of which has (or with the passage of time will have) a Material Adverse Effect

on the rights of the Holder with respect to the Note or the Purchase Agreement. In the event of such a breach, the Company shall have an opportunity to cure within two (2) business days.

(v) <u>Receiver or Trustee</u>. The Company or any subsidiary of the Company shall make an assignment for the benefit of creditors, or apply for or consent to the appointment of a receiver or trustee for it or for a substantial part of its property or business, or such a receiver or trustee shall otherwise be appointed. Under such circumstances, the Company shall have an opportunity to cure within sixty (60) days.

(vi) <u>Judgments</u>. Any money judgment, writ or similar process shall be entered or filed against the Company or any subsidiary of the Company or any of its property or other assets for more than $100,000, and shall remain unvacated, unbonded or unstayed for a period of twenty (20) days unless otherwise consented to by the Holder, which consent will not be unreasonably withheld.

(vii) <u>Bankruptcy</u>. Bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings, voluntary or involuntary, for relief under any bankruptcy law or any law for the relief of debtors shall be instituted by or against the Company or any subsidiary of the Company. Under such circumstances, the Company shall have an opportunity to cure within sixty (60) days.

(viii) <u>Delisting or Trading of Common Stock.</u> The Company shall fail to maintain the listing or quotation of its Common Stock minimally on a Trading Market.

(ix) <u>Failure to Comply with the Exchange Act</u>. The Company shall fail to comply with the reporting requirements of the Exchange Act and/or the Company shall cease to be subject to the reporting requirements of the Exchange Act.

(x) <u>Liquidation.</u> Any dissolution, liquidation, or winding up of Borrower or any substantial portion of its business or assets.

(xi) <u>Cessation of Operations</u>. Any cessation of operations by Borrower or Borrower admits it is otherwise generally unable to pay its debts as such debts become due, provided, however, that any disclosure of the Company's ability to continue as a "going concern" shall not be an admission that the Company cannot pay its debts as they become due.

(xii) <u>Intentionally omitted</u>.

(xiii) <u>Intentionally omitted</u>.

-8-

(xiv) <u>Other Obligations</u>. The occurrence of any default under any agreement or obligation of the Company that is not cured within ten (10) days that could reasonably be expected to have a Material Adverse Effect.

(xv) <u>Default under Transaction Documents or Other Material Agreement</u>. A default or event of default (subject to any grace or cure period provided in the applicable agreement, document or instrument) shall occur under (A) this Note, the warrant or the securities purchase agreement or any of the other agreements entered into by the parties related to the purchase of this Note (collectively, the "**Transaction Documents**"), or (B) the Other Notes or any other material agreement, lease, document or instrument to which Company or any Subsidiary is obligated (and not covered by clause (vi) below), which in the case of subsection (B) would reasonably be expected to have a Material Adverse Effect.

(xvi) <u>Default under Mortgage or Other Agreement of Indebtedness</u>. Company or any Subsidiary shall default on any of its obligations under any mortgage, credit agreement or other facility, indenture agreement, factoring agreement or other instrument under which there may be issued, or by which there may be secured or evidenced, any indebtedness for borrowed money or money due under any long term leasing or factoring arrangement that (a) involves an obligation greater than $100,000, whether such indebtedness now exists or shall hereafter be created, and (b) results in such indebtedness becoming or being declared due and payable prior to the date on which it would otherwise become due and payable.

(xvii) <u>Intentionally omitted</u>.

(xviii) <u>Failure to Meet the Requirements under Rule 144</u>. Company does not meet the current public information requirements under Rule 144.

(xix) <u>Failure to Maintain Intellectual Property</u>. The failure by Company or any material Subsidiary to maintain any material intellectual property rights, personal, real property, equipment, leases or other assets which are necessary to conduct its business (whether now or in the future) and such breach is not cured with twenty (20) days after written notice to the Company from the Holder.

(xx) <u>Trading Suspension</u>. A Commission or judicial stop trade order or suspension from a Trading Market.

(xxi) <u>Intentionally omitted</u>.

(xxii) <u>Failure to Provide Required Notification of a Material Event</u>. A failure by Company to notify Holder of any material event of which Company is obligated to notify Holder pursuant to the terms of this Note or any other Transaction Document.

(xxiii) <u>Invalidity or Unenforceability of Transaction Documents</u>. Any material provision of any Transaction Document shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against the Company, or the validity or enforceability thereof shall be contested by Company, or a proceeding shall be commenced by Company or any governmental authority having jurisdiction over Company or Holder, seeking to establish the invalidity or unenforceability thereof, or Company shall deny in writing that it has any liability or obligation purported to be created under any Transaction Document.

(xxiv) <u>Intentionally omitted</u>.

(b) <u>Redemption Right</u>. At any time after the Holder becoming aware of an Event of Default, the Required Holders may require the Company to redeem (an "**Event of Default Redemption**") all or any portion of the Notes by delivering written notice thereof (the "**Event of Default Redemption Notice**") to the Company, which Event of Default Redemption Notice shall indicate the portion of this Note and the Other Notes the Required Holders are electing to require the Company to redeem. Each portion of this Note and the Other Notes subject to redemption by the Company pursuant to this Section 5(b) shall be redeemed by the Company in cash by wire transfer of immediately available funds at a price equal to (i) the Principal Amount, plus (ii) all Interest then accrued on the Principal Amount from the date of the Note to the Event of Default, plus (iii) the Amendment Fee, plus (iv) interest on the Principal Amount calculated from the Event of Default at the greater of the Default Interest Rate or the maximum rate permitted under applicable law (the "**Event of Default Redemption Price**"), plus (v) liquidated damages of $750,000, plus (vi) an amount in cash equal to 1% of the Event of Default Redemption Price for each 30 day period during which redemptions fail to be made; provided, however, in the event that the Company does not have sufficient funds to pay 100% of the relevant Event of Default Redemption Price to the Holders of all of the Notes, the Company shall pay a pro rata portion of the Event of Default Redemption Price to each such Holder based on the proportion that the Principal Amount of each of the Notes bears to the aggregate Principal Amount of all of the Notes. To the extent redemptions required by this Section 5(b) are deemed or determined by a court of competent jurisdiction to be prepayments of the Note by the Company, such redemptions shall be deemed to be voluntary prepayments. Notwithstanding anything to the contrary in this Section 5, but subject to Section 3(b)(ii) and 3(d), until the Event of Default Redemption Price payable in respect of each of the Notes (together with any interest thereon) is paid in full, the Conversion Amount submitted for redemption under this Section 5(b) (together with any interest thereon) may be converted, in whole or in part, by the Holder into Common Stock pursuant to Section 3. The parties hereto agree that in the event of the Company's redemption of any portion of the Note under this Section 5(b), the Holder's damages would be uncertain and difficult to estimate because of the parties' inability to predict future interest rates and the uncertainty of the availability of a suitable substitute investment opportunity for the Holder. Accordingly, any Event of Default redemption premium due under this Section 5(b) is intended by the parties to be, and shall be deemed, a reasonable estimate of the Holder's actual loss of its investment opportunity and not as a penalty.

(6) <u>RIGHTS UPON FUNDAMENTAL TRANSACTION</u>.

-10-

(a) If, at any time while this Note is outstanding, (i) the Company effects a Fundamental Transaction, then, upon any subsequent conversion of this Note, the Holder shall have the right to receive, for each Conversion Share that would have been issuable upon such conversion immediately prior to the occurrence of such Fundamental Transaction, the same kind and amount of securities, cash or property as it would have been entitled to receive upon the occurrence of such Fundamental Transaction if it had been, immediately prior to such Fundamental Transaction, the holder of one (1) share of Common Stock (the "Alternate Consideration"). For purposes of any such conversion, the determination of the Conversion Price shall be appropriately adjusted to apply to such Alternate Consideration based on the amount of Alternate Consideration issuable in respect of one (1) share of Common Stock in such Fundamental Transaction, and the Company shall apportion the Conversion Price among the Alternate Consideration in a reasonable manner reflecting the relative value of any different components of the Alternate Consideration. If holders of Common Stock are given any choice as to the securities, cash or property to be received in a Fundamental Transaction, then the Holder shall be given the same choice as to the Alternate Consideration it receives upon any conversion of this Debenture following such Fundamental Transaction. To the extent necessary to effectuate the foregoing provisions, any successor to the Company or surviving entity in such Fundamental Transaction shall issue to the Holder a new debenture consistent with the foregoing provisions and evidencing the Holder's right to convert such debenture into Alternate Consideration. The terms of any agreement pursuant to which a Fundamental Transaction is effected shall include terms requiring any such successor or surviving entity to comply with the provisions of this Section 6(a) and insuring that this Note (or any such replacement security) will be similarly adjusted upon any subsequent transaction analogous to a Fundamental Transaction.

(7) DISTRIBUTION OF ASSETS; RIGHTS UPON ISSUANCE OF PURCHASE RIGHTS AND OTHER CORPORATE EVENTS.

(a) Distribution of Assets. If the Company shall declare or make any dividend or other distributions of its assets (or rights to acquire its assets) to any or all holders of shares of Common Stock, by way of return of capital or otherwise (including without limitation, any distribution of cash, stock or other securities, property, options, evidence of Indebtedness or any other assets by way of a dividend, spin off, reclassification, corporate rearrangement, scheme of arrangement or other similar transaction) (the "**Distributions**"), then the Holder will be entitled to such Distributions as if the Holder had held the number of shares of Common Stock acquirable upon complete conversion of this Note (without taking into account any limitations or restrictions on the convertibility of this Note) immediately prior to the date on which a record is taken for such Distribution or, if no such record is taken, the date as of which the record holders of Common Stock are to be determined for such Distributions and the portion of such Distribution shall be held in abeyance for the Holder.

(b) Purchase Rights. If at any time the Company grants, issues or sells any Options, Convertible Securities or rights to purchase stock, warrants, securities or other property pro rata to the record holders of any class of Common Stock (the "**Purchase Rights**"), then the Holder will be entitled to acquire or receive, as applicable, upon the terms applicable to such Purchase Rights, the aggregate Purchase Rights which the Holder could have acquired if the

Holder had held the number of shares of Common Stock acquirable upon complete conversion of this Note (without taking into account any limitations or restrictions on the convertibility of this Note) immediately prior to the date on which a record is taken for the grant, issuance or sale of such Purchase Rights, or, if no such record is taken, the date as of which the record holders of shares of Common Stock are to be determined for the grant, issue or sale of such Purchase Rights.

(c) <u>Other Corporate Events</u>. In addition to and not in substitution for any other rights hereunder, prior to the occurrence or consummation of any Fundamental Transaction pursuant to which holders of shares of Common Stock are entitled to receive securities, cash, assets or other property with respect to or in exchange for shares of Common Stock (a "**Corporate Event**"), the Company shall make appropriate provision to ensure that, and any applicable Successor Entity or Successor Entities shall ensure that, and it shall be a required condition to the occurrence or consummation of such Corporate Event that, the Holder will thereafter have the right to receive upon conversion of this Note at any time after the occurrence or consummation of the Corporate Event, shares of Common Stock or Successor Capital Stock or, if so elected by the Holder, cash in lieu of the shares of Common Stock (or other securities, cash, assets or other property) purchasable upon the conversion of this Note prior to such Corporate Event, such shares of stock, securities, cash, assets or any other property whatsoever (including warrants or other purchase or subscription rights and any shares of Common Stock) which the Holder would have been entitled to receive upon the occurrence or consummation of such Corporate Event or the record, eligibility or other determination date for the event resulting in such Corporate Event, had this Note been converted immediately prior to such Corporate Event or the record, eligibility or other determination date for the event resulting in such Corporate Event (without regard to any limitations on conversion of this Note). Provision made pursuant to the preceding sentence shall be in a form and substance satisfactory to the Holder. The provisions of this Section 7 shall apply similarly and equally to successive Corporate Events.

(8)     <u>RIGHTS UPON ISSUANCE OF OTHER SECURITIES</u>.

(A) <u>Adjustment of Conversion Price upon Subdivision or Combination of Common Stock</u>. If the Company at any time on or after the Issuance Date subdivides (by any stock split, stock dividend, recapitalization or otherwise) one or more classes of its outstanding shares of Common Stock into a greater number of shares, the Conversion Price in effect immediately prior to such subdivision will be proportionately reduced. If the Company at any time on or after the Issuance Date combines (by combination, reverse stock split or otherwise) one or more classes of its outstanding shares of Common Stock into a smaller number of shares, the Conversion Price in effect immediately prior to such combination will be proportionately increased.

(B) <u>Voluntary Adjustment by Company</u>. The Company may at any time during the term of this Note, with the prior written consent of the Holder, reduce the then current Conversion Price to any amount and for any period of time deemed appropriate by the Board of Directors of the Company.

-12-

(9) <u>NONCIRCUMVENTION</u>. The Company hereby covenants and agrees that the Company will not, by amendment of its Certificate of Incorporation, Bylaws or through any reorganization, transfer of assets, consolidation, merger, scheme of arrangement, dissolution, issue or sale of securities, or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Note, and will at all times in good faith carry out all of the provisions of this Note and take all action as may be required to protect the rights of the Holder of this Note.

(10) Intentionally omitted.

(11) <u>VOTING RIGHTS</u>. The Holder shall have no voting rights as the holder of this Note, except as required by law and as expressly provided in this Note.

(12) <u>COVENANTS</u>.

(a) <u>Incurrence of Indebtedness</u>. So long as this Note is outstanding, the Company shall not, and the Company shall not permit any of its Subsidiaries to, directly or indirectly, incur or guarantee, assume or suffer to exist any Indebtedness, other than Permitted Indebtedness.

(b) <u>Existence of Liens</u>. So long as this Note is outstanding, the Company shall not, and the Company shall not permit any of its Subsidiaries to, directly or indirectly, allow or suffer to exist any Liens other than Permitted Liens.

(c) <u>Change in Nature of Business</u>. The Company shall not make, or permit any of its Subsidiaries to make, any change in the nature of its business. The Company shall not modify its corporate structure or purpose.

(d) <u>Intellectual Property</u>. The Company shall not, and the Company shall not permit any of its Subsidiaries, directly or indirectly, to encumber or allow any Liens on, any of its own or its licensed copyright rights, copyright applications, copyright registrations and like protections in each work of authorship and derivative work, whether published or unpublished, any patents, patent applications and like protections, including improvements, divisions, continuations, renewals, reissues, extensions, and continuations-in-part of the same, trademarks, service marks and, to the extent permitted under applicable law, any applications therefor, whether registered or not, and the goodwill of the business of the Company and its Subsidiaries connected with and symbolized thereby, know-how, operating manuals, trade secret rights, rights to unpatented inventions, and any claims for damage by way of any past, present, or future infringement of any of the foregoing, other than Permitted Liens.

(e) <u>Preservation of Existence, Etc.</u> The Company shall maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, its existence, rights and privileges, and become or remain, and cause each of its Subsidiaries to become or remain, duly qualified and in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary.

-13-

(f) <u>Maintenance of Properties, Etc.</u> The Company shall maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, all of its properties which are necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear and tear excepted, and comply, and cause each of its Subsidiaries to comply, at all times with the provisions of all leases to which it is a party as lessee or under which it occupies property, so as to prevent any loss or forfeiture thereof or thereunder.

(g) <u>Maintenance of Insurance</u>. The Company shall maintain, and cause each of its Subsidiaries to maintain insurance with responsible and reputable insurance companies or associations (including, without limitation, comprehensive general liability, hazard, rent and business interruption insurance) with respect to its properties (including all real properties leased or owned by it) and business, in such amounts and covering such risks as is required by any governmental authority having jurisdiction with respect thereto or as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated.

(h) <u>Transactions with Affiliates</u>. The Company shall not, nor shall it permit any of its Subsidiaries to, enter into, renew, extend or be a party to, any transaction or series of related transactions (including, without limitation, the purchase, sale, lease, transfer or exchange of property or assets of any kind or the rendering of services of any kind) with any Affiliate, except in the ordinary course of business in a manner and to an extent consistent with past practice and necessary or desirable for the prudent operation of its business, for fair consideration and on terms no less favorable to it or its Subsidiaries than would be obtainable in a comparable arm's length transaction with a Person that is not an Affiliate thereof.

(i) <u>Corporate Changes</u>. The Company shall not change its corporate name, legal form or jurisdiction of formation without twenty (20) days' prior written notice to Holder. Company shall not enter into or be party to a Fundamental Transaction unless in violation of Section 6 hereof. Company shall not relocate its chief executive office or its principal place of business unless it has provided prior written notice to Holder.

(j) Reserved.

(k) <u>Charter Amendments</u>.  The Company shall not amend its charter documents, including, without limitation, its certificate of incorporation and bylaws, in any manner that materially and adversely affects any rights of the Holder.

(l) <u>Repurchase</u>. The Company shall not repay, repurchase or offer to repay, repurchase or otherwise acquire more than a <u>de</u> <u>minimis</u> number of shares of its Common Stock or common stock equivalents other than as to the Conversion Shares as permitted or required under the Transaction Documents.

(m) <u>Redemption</u>. The Company shall not redeem, defease, repurchase, repay or make any payments in respect of, by the payment of cash or cash equivalents (in whole or in part, whether by way of open market purchases, tender offers, private transactions or

-14-

otherwise), all or any portion of any Indebtedness (other than the Note if on a pro-rata basis), whether by way of payment in respect of principal of (or premium, if any) or interest on, such Indebtedness, the foregoing restriction shall also apply to Permitted Indebtedness from and after the occurrence of an Event of Default.

(n) <u>Declaration</u>. The Company shall not declare or make any dividend or other distribution of its assets or rights to acquire its assets to holders of shares of Common Stock, by way of return of capital or otherwise including, without limitation, any distribution of cash, stock or other securities, property or options by way of a dividend, spin off, reclassification, corporate rearrangement, scheme of arrangement or other similar transaction.

(o) The Company shall not enter into any agreement with respect to any of the foregoing.

(13) <u>TRANSFER</u>. This Note and any shares of Common Stock issued upon conversion of this Note may be offered, sold, assigned or transferred according to the Purchase Agreement.

(14) <u>REISSUANCE OF THIS NOTE</u>.

(a) <u>Transfer</u>. If this Note is to be transferred, the Holder shall instruct the Company who the new Holder will be and this Note will be automatically cancelled. The Company will issue and deliver the new Note within two (2) days of such notice.

(b) <u>Lost, Stolen or Mutilated Note</u>. Upon receipt by the Company of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note, and, in the case of loss, theft or destruction, of any indemnification undertaking by the Holder to the Company in customary form and, in the case of mutilation, upon surrender and cancellation of this Note, the Company shall execute and deliver to the Holder a new Note (in accordance with Section 14(d)) representing the then outstanding Principal amount of the Note.

(c) <u>Note Exchangeable for Different Denominations</u>. This Note is exchangeable, upon the surrender hereof by the Holder at the principal office of the Company, for a new Note or Notes (in accordance with Section 14(d) representing in the aggregate the outstanding Principal of this Note, and each such new Note will represent such portion of such outstanding Principal as is designated by the Holder at the time of such surrender.

(d) <u>Issuance of New Notes</u>. Whenever the Company is required to issue a new Note pursuant to the terms of this Note, such new Note (i) shall be of like tenor with this Note, (ii) shall represent, as indicated on the face of such new Note, the Principal remaining outstanding (or in the case of a new Note being issued pursuant to Section 14(a) or Section 14(c), the Principal designated by the Holder which, when added to the principal represented by the other new Notes issued in connection with such issuance, does not exceed the Principal remaining outstanding under this Note immediately prior to such issuance of new Notes), (iii) shall have an issuance date, as indicated on the face of such new Note, which is the same as the Issuance Date of this Note,

-15-

(iv) shall have the same rights and conditions as this Note, and (v) shall represent accrued and unpaid Interest on the Principal and Interest of this Note, from the Issuance Date.

(15) <u>REMEDIES, CHARACTERIZATIONS, OTHER OBLIGATIONS, BREACHES AND INJUNCTIVE RELIEF</u>. The remedies provided in this Note shall be cumulative and in addition to all other remedies available under this Note and any of the other Transaction Documents, at law or in equity (including a decree of specific performance and/or other injunctive relief), and nothing herein shall limit the Holder's right to pursue actual and consequential damages for any failure by the Company to comply with the terms of this Note. Amounts set forth or provided for herein with respect to payments, conversion, redemption and the like (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof). The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder and that the remedy at law for any such breach may be inadequate. The Company therefore agrees that, in the event of any such breach or threatened breach, the Holder shall be entitled, in addition to all other available remedies, to an injunction restraining any breach, without the necessity of showing economic loss and without any bond or other security being required.

(16) <u>PAYMENT OF COLLECTION, ENFORCEMENT AND OTHER COSTS</u>. If (a) this Note is placed in the hands of an attorney for collection or enforcement or is collected or enforced through any legal proceeding or the Holder otherwise takes action to collect amounts due under this Note or to enforce the provisions of this Note or (b) there occurs any bankruptcy, reorganization, receivership of the Company or other proceedings affecting Company creditors' rights and involving a claim under this Note, then the Company shall pay the costs and expenses incurred by the Holder for such collection, enforcement or action or in connection with such bankruptcy, reorganization, receivership or other proceeding, including, but not limited to, attorneys' fees and disbursements.

(17) <u>CONSTRUCTION; HEADINGS</u>. This Note shall be deemed to be jointly drafted by the Company and the Holder and shall not be construed against any person as the drafter hereof. The headings of this Note are for convenience of reference and shall not form part of, or affect the interpretation of, this Note.

(18) <u>FAILURE OR INDULGENCE NOT WAIVER</u>. No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

(19) <u>DISPUTE RESOLUTION</u>. In the case of a dispute as to the determination of the arithmetic calculation of the Conversion Rate, the Conversion Price or any Redemption Price, the Company shall submit the disputed determinations or arithmetic calculations via facsimile or electronic mail within one (1) Business Days of receipt, or deemed receipt, of the Conversion Notice or Redemption Notice or other event giving rise to such dispute, as the case may be, to the Holder. If the Holder and the Company are unable to agree upon such determination or calculation

-16-

within two (2) Business Days of such disputed determination or arithmetic calculation being submitted to the Holder, then the Company shall, within two (2) Business Days submit via facsimile or electronic mail the disputed arithmetic calculation of the Conversion Rate, Conversion Price or any Redemption Price to an independent, outside accountant, selected by the Holder and approved by the Company, such approval not to be unreasonably withheld, conditioned or delayed. The Company, at the Company's expense, shall cause the accountant to perform the determinations or calculations and notify the Company and the Holder of the results no later than five (5) Business Days from the time it receives the disputed determinations or calculations. Such accountant's determination or calculation shall be binding upon all parties absent demonstrable error.

(20)  NOTICES; PAYMENTS.

(a) Notices. All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, facsimile, or electronic mail, addressed as set forth below or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received), or (b) upon receipt, when sent by electronic mail (provided confirmation of transmission is electronically generated and keep on file by the sending party), or (c) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur. The addresses for such communications shall be: (i) if to Borrower, to: Proton Green LLC at 4531 Park Lane, Dallas, Texas 75220, Steven E. Looper, sel@protongreen.com; (ii) if to the Holder, to: the address and fax number indicated on the Purchase Agreement. Without limiting the generality of the foregoing, the Company shall give written notice to the Holder (i) immediately upon any adjustment of the Conversion Price, setting forth in reasonable detail, and certifying, the calculation of such adjustment and (ii) at least twenty (20) days prior to the date on which the Company closes its books or takes a record (A) with respect to any dividend or distribution upon the Common Stock, (B) with respect to any pro rata subscription offer to holders of Common Stock or (C) for determining rights to vote with respect to any Fundamental Transaction, dissolution or liquidation, provided in each case that such information shall be made known to the public prior to or in conjunction with such notice being provided to the Holder.

(b) Payments. Whenever any payment of cash is to be made by the Company to any Person pursuant to this Note, such payment shall be made in lawful money of the United States of America by a check drawn on the account of the Company and sent via overnight courier service to such Person at such address as previously provided to the Company in writing; provided, that the Holder may elect to receive a payment of cash via wire transfer of immediately

-17-

available funds by providing the Company with prior written notice setting out such request and the Holder's wire transfer instructions. Whenever any amount expressed to be due by the terms of this Note is due on any day, which is not a Business Day, the same shall instead be due on the next succeeding day, which is a Business Day.

(21) <u>CANCELLATION</u>. After all Principal and other amounts at any time owed on this Note have been paid in full, this Note shall automatically be deemed canceled, shall be surrendered to the Company for cancellation and shall not be reissued.

(22) <u>WAIVER OF NOTICE</u>. To the extent permitted by law, the Company hereby waives demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note.

(23) <u>GOVERNING LAW; JURISDICTION; JURY TRIAL</u>. All questions concerning the construction, validity, enforcement and interpretation of this Note shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflicts of law thereof. The Company agrees that all legal proceedings concerning the interpretations, enforcement and defense of the transactions contemplated by this Note (whether brought against the Company, the Holder or their respective affiliates, directors, officers, shareholders, employees or agents) shall be commenced exclusively in the state and federal courts sitting in the City of New York, County of New York. The Company hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the City of New York, Borough of Manhattan for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is improper or is an inconvenient venue for such proceeding. The Company hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to it at the address in effect for notices to it under the Purchase Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law. If the Company or a Holder shall commence an action or proceeding to enforce any provisions of the Note, then the prevailing party in such action or proceeding shall be reimbursed by the other party for its reasonable attorneys' fees and other costs and expenses incurred with the investigation, preparation and prosecution of such action or proceeding. **IN ANY ACTION, SUIT, OR PROCEEDING IN ANY JURISDICTION BROUGHT BY ANY PARTY AGAINST ANY OTHER PARTY, THE COMPANY KNOWINGLY AND INTENTIONALLY, TO THE GREATEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND EXPRESSLY WAIVES FOREVER TRIAL BY JURY.**

(24) <u>SEVERABILITY</u>. If any provision of this Note is prohibited by law or otherwise determined to be invalid or unenforceable by a court of competent jurisdiction, the provision that would otherwise be prohibited, invalid or unenforceable shall be deemed amended

-18-

to apply to the broadest extent that it would be valid and enforceable, and the invalidity or unenforceability of such provision shall not affect the validity of the remaining provisions of this Note so long as this Note as so modified continues to express, without material change, the original intentions of the parties as to the subject matter hereof and the prohibited nature, invalidity or unenforceability of the provision(s) in question does not substantially impair the respective expectations or reciprocal obligations of the parties or the practical realization of the benefits that would otherwise be conferred upon the parties. The parties will endeavor in good faith negotiations to replace the prohibited, invalid or unenforceable provision(s) with a valid provision(s), the effect of which comes as close as possible to that of the prohibited, invalid or unenforceable provision(s).

(25) <u>DISCLOSURE</u>. Upon receipt or delivery by the Company of any notice in accordance with the terms of this Note, unless the Company has in good faith determined that the matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries, the Company shall within one (1) Business Day after any such

Information relating to the Company or its Subsidiaries, the Company so shall indicate to such Holder contemporaneously with delivery of such notice, and in the absence of any such indication, the Holder shall be allowed to presume that all matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries.

(26) <u>CERTAIN DEFINITIONS</u>. For purposes of this Note, the following terms shall have the following meanings:

(a) "**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person, it being understood for purposes of this definition that "control" of a Person means the power directly or indirectly either to vote 10% or more of the stock having ordinary voting power for the election of directors of such Person or direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

(b) "**Attribution Parties**" means, collectively, the following Persons and entities: (i) any investment vehicle, including, any funds, feeder funds or managed accounts, currently, or from time to time after the Issuance Date, directly or indirectly managed or advised by the Holder's investment manager or any of its Affiliates or principals, (ii) any direct or indirect Affiliates of the Holder or any of the foregoing, (iii) any Person acting or who could be deemed to be acting as a Group together with the Holder or any of the foregoing and (iv) any other Persons whose beneficial ownership of the Company's Common Stock would or could be aggregated with the Holder's and the other Attribution Parties for purposes of Regulation 13D-G of the Exchange Act.

(c) "**Bloomberg**" means Bloomberg Financial Markets.

(d) "**Closing Date**" shall have the meaning ascribed to such term in the Purchase Agreement.

-19-

(e) "**Closing Bid Price**" and "**Closing Sale Price**" means, for any security as of any date, the last closing bid price and last closing trade price, respectively, for such security on the Principal Market, as reported by Bloomberg, or, if the Principal Market begins to operate on an extended hours basis and does not designate the closing bid price or the closing trade price, as the case may be, then the last bid price or last trade price, respectively, of such security prior to 4:00 p.m., New York Time, as reported by Bloomberg, or, if the Principal Market is not the principal securities exchange or trading market for such security, the last closing bid price or last trade price, respectively, of such security on the principal securities exchange or trading market where such security is listed or quoted for trading as reported by Bloomberg, or if the foregoing do not apply, the last closing bid price or last trade price, respectively, of such security in the over-the-counter market on the electronic bulletin board for such security as reported by Bloomberg, or, if no closing bid price or last trade price, respectively, is reported for such security by Bloomberg, the average of the bid prices, or the ask prices, respectively, of any market makers for such security as reported in the OTC Link or "pink sheets" by OTC Markets Group Inc. (formerly Pink OTC Markets Inc.). If the Closing Bid Price or the Closing Sale Price cannot be calculated for a security on a particular date on any of the foregoing bases, the Closing Bid Price or the Closing Sale Price, as the case may be, of such security on such date shall be the fair market value as mutually determined by the Company and the Holder. If the Company and the Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved pursuant to Section 19. All such determinations to be appropriately adjusted for any stock dividend, stock split, stock combination, reclassification or similar transaction during the applicable calculation period.

(f) "**Common Stock**" the common stock of the Company, par value $0.001 per share, and any other class of securities into which such securities may hereafter be reclassified or changed.

(g) "**Convertible Securities**" means any stock or securities (other than Options) directly or indirectly convertible into or exercisable or exchangeable for shares of Common Stock.

(h) "**Default Interest Rate**" means 18% per annum.

(i) "**Equity Interests**" means (a) all shares of capital stock (whether denominated as common capital stock or preferred capital stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting and (b) all securities convertible into or exchangeable for any of the foregoing and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any of the foregoing, whether or not presently convertible, exchangeable or exercisable.

(j) "**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

(k) "**Fundamental Transaction**" means (A) that the Company shall, directly or indirectly, including through Subsidiaries, Affiliates or otherwise, in one or more related transactions, (i) consolidate or merge with or into (whether or not the Company is the surviving corporation) another Subject Entity, or (ii) sell, assign, transfer, convey or otherwise dispose of all or substantially all of the properties or assets of the Company or any of its "significant subsidiaries" (as defined in Rule 1-02 of Regulation S-X) to one or more Subject Entities, or (iii) make, or allow one or more Subject Entities to make, or allow the Company to be subject to or have its Common Stock be subject to or party to one or more Subject Entities making, a purchase, tender or exchange offer that is accepted by the holders of at least either (x) 50% of the outstanding shares of Common Stock, (y) 50% of the outstanding shares of Common Stock calculated as if any shares of Common Stock held by all Subject Entities making or party to, or Affiliated with any Subject Entities making or party to, such purchase, tender or exchange offer were not outstanding; or (z) such number of shares of Common Stock such that all Subject Entities making or party to, or Affiliated with any Subject Entity making or party to, such purchase, tender or exchange offer, become collectively the beneficial owners (as defined in Rule 13d-3 under the Exchange Act) of at least 50% of the outstanding shares of Common Stock, or (iv) consummate a stock purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off or scheme of arrangement) with one or more Subject Entities whereby such Subject Entities, individually or in the aggregate, acquire, either (x) at least 50% of the outstanding shares of Common Stock, (y) at least 50% of the outstanding shares of Common Stock calculated as if any shares of Common Stock held by all the Subject Entities making or party to, or Affiliated with any Subject Entity making or party to, such stock purchase agreement or other business combination were not outstanding; or (z) such number of shares of Common Stock such that the Subject Entities become collectively the beneficial owners (as defined in Rule 13d-3 under the Exchange Act) of at least 50% of the outstanding shares of Common Stock, or (v) reorganize, recapitalize or reclassify its Common Stock, (B) that the Company shall, directly or indirectly, including through Subsidiaries, Affiliates or otherwise, in one or more related transactions allow any Subject Entity individually or the Subject Entities in the aggregate to be or become the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, whether through acquisition, purchase, assignment, conveyance, tender, tender offer, exchange, reduction in outstanding shares of Common Stock, merger, consolidation, business combination, spin-off, scheme of arrangement, reorganization, recapitalization or reclassification or otherwise in any manner whatsoever, of either (x) at least 50% of the aggregate ordinary voting power represented by issued and outstanding Common Stock, (y) at least 50% of the aggregate ordinary voting power represented by issued and outstanding Common Stock not held by all such Subject Entities as of the date of this Note calculated as if any shares of Common Stock held by all such Subject Entities were not outstanding, or (z) a percentage of the aggregate ordinary voting power represented by issued and outstanding shares of Common Stock or other equity securities of the Company sufficient to allow such Subject Entities to effect a statutory short form merger or other transaction requiring other stockholders of the Company to surrender their shares of Common Stock without approval of the stockholders of the Company or (C) directly or indirectly, including through Subsidiaries, Affiliates or otherwise, in one or more related transactions, the issuance of or the entering into any other instrument or transaction structured in a manner to circumvent, or that circumvents, the intent of this definition in which case this definition shall be construed and

implemented in a manner otherwise than in strict conformity with the terms of this definition to the extent necessary to correct this definition or any portion of this definition which may be defective or inconsistent with the intended treatment of such instrument or transaction.

(l) "**GAAP**" means United States generally accepted accounting principles, consistently applied.

(m) "**Group**" means a "group" as that term is used in Regulation 13D-G of the Exchange Act and as defined in Rule 13d-5 thereunder.

(n) "**Holiday**" means a day other than a Business Day or on which trading does not take place on the Principal Market.

(o) RESERVED

(p) "**Market Price**" shall mean the lowest Closing Bid Price on the Closing Date.

(q) "**Notes**" means this Note and the Other Notes.

(r) "**OID**" shall mean the Original Issue Discount, which is 35%.

(s) "**Options**" means any rights, warrants or options to subscribe for or purchase shares of Common Stock or Convertible Securities.

(t) "**Other Notes**" means (i) the Second Amended and Restated Promissory Convertible Note, dated as of the date hereof, made by the Company in favor of Kips Bay Select LP in the principal amount of $3,513,469.00 (the "**Kips Bay Note**"), and (ii) the Amended and Restated Promissory Convertible Note, dated as of the date hereof, made by the Company in favor of Alpha Carta, Ltd. in the principal amount of $4,307,692.31 (the "**AC Note**").

(u) "**Parent Entity**" of a Person means an entity that, directly or indirectly, controls the applicable Person, including such entity whose common capital stock or equivalent equity security is quoted or listed on a Trading Market (or, if so elected by the Holder, any other market, exchange or quotation system), or, if there is more than one such Person or such entity, the Person or entity designated by the Holder or in the absence of such designation, such Person or such entity with the largest public market capitalization as of the date of consummation of the Fundamental Transaction.

(v) "**Permitted Indebtedness**" means (i) Indebtedness evidenced by this Note and the Other Notes; (ii) debt incurred to make acquisitions; (iii) trade payables incurred in the ordinary course of business consistent with past practice, (iv) unsecured indebtedness not in excess of $1,000,000 in the aggregate, and (v) Indebtedness secured by Permitted Liens.

(w) "**Permitted Liens**" means (i) any Lien for taxes not yet due or delinquent or being contested in good faith by appropriate proceedings for which adequate reserves

have been established in accordance with GAAP, (ii) any statutory Lien arising in the ordinary course of business by operation of law with respect to a liability that is not yet due or delinquent, (iii) any Lien created by operation of law, such as materialmen's liens, mechanics' liens and other similar liens, arising in the ordinary course of business with respect to a liability that is not yet due or delinquent or that are being contested in good faith by appropriate proceedings, (iv) Liens (A) upon or in any equipment acquired or held by the Company or any of its Subsidiaries to secure the purchase price of such equipment or Indebtedness incurred solely for the purpose of financing the acquisition or lease of such equipment, or (B) existing on such equipment at the time of its acquisition, provided that the Lien is confined solely to the property so acquired and improvements thereon, and the proceeds of such equipment, (v) Liens incurred in connection with the extension, renewal or refinancing of the Indebtedness secured by Liens of the type described in clause (iv) above, provided that any extension, renewal or replacement Lien shall be limited to the property encumbered by the existing Lien and the principal amount of the Indebtedness being extended, renewed or refinanced does not increase, (vi) leases or subleases and licenses and sublicenses granted to others in the ordinary course of the Company's business, not interfering in any material respect with the business of the Company and its Subsidiaries taken as a whole, (vii) Liens in favor of customs and revenue authorities arising as a matter of law to secure payments of custom duties in connection with the importation of goods, (viii) Liens arising from judgments, decrees or attachments in circumstances not constituting an Event of Default under Section 4(a)(viii) and (ix) liens listed on Schedule 27(v) hereto, and (ix) Liens arising pursuant to the terms of the Notes.

(x) "**Principal Market**" means the OTCQB tier of the OTC Markets.

(y) "**Redemption Dates**" means, collectively, the Event of Default Redemption Dates, and the Optional Redemption Dates, each of the foregoing, individually, a Redemption Date.

(z) "**Redemption Notices**" means, collectively, the Event of Default Redemption Notices, and the Optional Redemption Notices, each of the foregoing, individually, a Redemption Notice.

(aa) "**Redemption Price**" means, 125% of the outstanding principal amount of the Note together with accrued interest thereon, which after an Event of Default shall be calculated at the Default Rate.

(bb) "**Related Fund**" means, with respect to any Person, a fund or account managed by such Person or an Affiliate of such Person.

(cc) "**Required Holders**" means any two (2) Holders of the Notes.

(dd) "**Rule 144**" shall have the meaning ascribed to such term in the Purchase Agreement.

(ee) "**SEC**" means the United States Securities and Exchange Commission.

-23-

(ff) "**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

(gg) "**Subject Entity**" means any Person, Persons or Group or any Affiliate or associate of any such Person, Persons or Group.

(hh) "**Successor Entity**" means one or more Person or Persons (or, if so elected by the Holder, the Company or Parent Entity) formed by, resulting from or surviving any Fundamental Transaction or one or more Person or Persons (or, if so elected by the Holder, the Company or the Parent Entity) with which such Fundamental Transaction shall have been entered into.

(ii) "**Trading Market**" means any of the following markets or exchanges on which the Common Stock is listed or quoted for trading on the date in question: the NYSE American, the Nasdaq Capital Market, the Nasdaq Global Market, the Nasdaq Global Select Market, the New York Stock Exchange, OTCQB or OTCQX (or any successors to any of the foregoing).

(jj) "**VWAP**" means, for any date, the price determined by the first of the following clauses that applies: (a) if the Common Stock is then listed or quoted on a Trading Market, the daily volume weighted average price of the Common Stock for such date (or the nearest preceding date) on the Trading Market on which the Common Stock is then listed or quoted as reported by Bloomberg L.P. (based on a Trading Day from 9:30 a.m. New York City time to 4:02 p.m. New York City time); (b) if the Common Stock is not then listed or quoted for trading on a Trading Market and if prices for the Common Stock are then reported on the OTC Pink (or a similar organization or agency succeeding to its functions of reporting prices), the most recent bid price per share of the Common Stock so reported; or (c) in all other cases, the fair market value of a share of Common Stock as determined by an independent appraiser selected in good faith by the Holders of a majority in interest of the Note then outstanding and reasonably acceptable to the Company, the fees and expenses of which shall be paid by the Company.

[Signature Page Follows]

IN WITNESS WHEREOF, the Company has caused this Amended and Restated Note to be duly executed as of the 18th day of February, 2022.

Proton Green LLC,
formerly known as Plateau
Carbon, LLC

By: _____

Name: _Stanso E. Coogna_

Title: _Managing Member_

AGREED AND APPROVED:

ALPHA CARTA, LTD.

By:_____

    Name

    Title:

-25-

IN WITNESS WHEREOF, the Company has caused this Amended and Restated Note to be duly executed as of the 18th day of February, 2022.

Proton Green LLC,
formerly known as Plateau
Carbon, LLC

By: _____
Name:
Title:

AGREED AND APPROVED:

ALPHA CARTA, LTD.

By:_____
   Name  Mark Azzopardi
   Title:  Director

-25-

**EXHIBIT I**
**PROTON GREEN LLC**
**CONVERSION NOTICE**

Reference is made to the Amended and Restated Promissory Convertible Note (the "**Note**") issued to Alpha Carta, Ltd. (together with is designee or registered assigns, the "**Holder**") by Proton Green LLC (formerly known as Plateau Carbon, LLC) (the "**Company**"). In accordance with and pursuant to the Note, the undersigned hereby elects to convert the Conversion Amount (as defined in the Note) of the Note indicated below into shares of Common Stock of the Company, par value $ 0.0001 per share (the "**Common Stock**") of the Company, as of the date specified below.

Date of
Conversion: _____

Aggregate Conversion Amount to be
converted: _____

Please confirm the following information:

Conversion Price: _____

Number of shares of Common Stock to
be issued: _____

Please issue the Common Stock into which the Note is being converted in the following name and to the following address:

Issue to: _____

Facsimile Number and Electronic

Mail: _____

Authorization: _____

By: _____

Title: _____

Dated: _____

Account
Number: _____
(if electronic book entry transfer)

Transaction Code
Number: _____
(if electronic book entry transfer)

# EXHIBIT N

*Execution Version*

**NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE CONVERTIBLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL SELECTED BY THE HOLDER, IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT, OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES. ANY TRANSFEREE OF THIS NOTE SHOULD CAREFULLY REVIEW THE TERMS OF THIS NOTE. THE PRINCIPAL AMOUNT REPRESENTED BY THIS NOTE AND, ACCORDINGLY, THE SECURITIES ISSUABLE UPON CONVERSION HEREOF MAY BE LESS THAN THE AMOUNTS SET FORTH ON THE FACE HEREOF.**

Reference is hereby made to the Promissory Convertible Note, dated as of January 11, 2022, made by the Company in favor of Alpha Carta, Ltd. in the principal amount of $4,307,692.31 (as amended, the "**Original Note**"). The Company and the Holder (as defined below) hereby agree that the Original Note shall be superseded, amended and restated to read in its entirety as follows:

**PROTON GREEN LLC**

**AMENDED AND RESTATED PROMISSORY CONVERTIBLE NOTE**

Issuance Date: January 11, 2022          Principal Amount: U.S. $4,307,692.31
Date of Note: February 18, 2022

      **FOR VALUE RECEIVED**, Proton Green LLC (formerly known as Plateau Carbon, LLC) (the "**Company**") pursuant to this Amended and Restated Promissory Convertible Note (the "**Note**"), hereby promises to pay to Alpha Carta, Ltd., its designee or registered assigns (the "**Holder**"), in cash, the principal amount of US $4,307,692.31 (as reduced pursuant to the terms hereof pursuant to redemption, conversion or otherwise, the "**Principal**" or the "**Principal Amount**", after giving effect to a 35% original issue discount) on April 7, 2022 (the "**Maturity Date**"), subject to earlier acceleration, conversion, redemption or otherwise (in each case in accordance with the terms hereof). Certain capitalized terms used herein are defined in Section 26. This Note is issued pursuant to that certain Securities Purchase Agreement dated January 11, 2022, by and among the Company and the Holder (the "**Purchase Agreement**"), and capitalized terms not defined herein will have the meanings set forth in the Purchase Agreement.

(1) <u>PAYMENTS OF PRINCIPAL; AMENDMENT FEE; PREPAYMENT</u>.

      (a)      On the Maturity Date, the Company shall pay to the Holder (i) the Principal Amount in cash, together with (ii) Interest (as defined below) thereon calculated from the date

hereof in accordance with the provisions of this Note, plus (iii) an amendment and extension fee in the amount of $150,000.00 (the "**Amendment Fee**"), provided, however, that the Holder shall have the right in its sole discretion to be repaid with 100% of the proceeds ("**Proceeds**") of the following: (1) sale of the Company's assets, (2) any merger, sale or other transaction resulting in the holders of the Company's Common Stock prior to such merger or other transaction ceasing to own at least 50% of the Common Stock, (3) issuances of the Company's Debt, and/or (4) issuances of the Company's equity. Notwithstanding the foregoing, (i) in the event that on the Maturity Date the Company does not have sufficient funds to repay this Note and the Other Notes in full, the Company shall be prohibited from repaying the Principal Amount, Interest and Amendment Fee of this Note in full and shall instead repay the Holders of each of the Notes a pro rata portion of the Principal Amount, Interest and Amendment Fee of each of the Notes based on the proportion that each of the Notes bears to the aggregate Principal Amount, Interest and Amendment Fee of all of the Notes, and (ii) unless a Holder of either of the Other Notes declines its right to be repaid with Proceeds, any Proceeds shall be applied to repay a pro rata portion of the Principal Amount, Interest and Amendment Fee of each of the Notes based on the proportion that each of the Notes bears to the aggregate Principal Amount, Interest and Amendment Fee of all of the Notes. All payments shall be applied first to the Amendment Fee, then to accrued Interest and thereafter to the Principal Amount.

(b) Interest shall accrue on the unpaid Principal Amount outstanding until the Maturity Date at a rate equal to one and one-half percent (1.5%) per month. The accrued interest on the Principal Amount of this Note shall not compound, and is referred to herein as the "**Interest**". Such Interest shall be computed for the actual number of days elapsed in a month consisting of 28, 30 or 31 days, as the case may be.

(c) The Company may, at any time and from time to time without premium or penalty, prepay all or any portion of the outstanding Principal Amount of, and Interest on, and Amendment Fee of this Note. Any partial payment will be credited first to the Amendment Fee, then to accrued and unpaid Interest and the balance, if any, to the then outstanding Principal Amount.

## (2) **RANKING; SECURITY.**

(a) The parties agree that this Note shall rank (i) pari passu with the indebtedness under the Other Notes and (ii) senior to all other existing and future debt of the Company.

(b) Payment of this Note and all other obligations, fees, and expenses due to the Holder pursuant to this Note and the Purchase Agreement (the "**Secured Obligations**") will be secured at all times by (i) valid, enforceable first priority mortgages and/or deeds of trust on and covering all real property interests presently owned and hereafter acquired by the Company, and all assets and personal property relating thereto (the "**Mortgaged Properties**"), and (ii) valid, enforceable first priority security interests on and covering all of the other assets of the Company (the "**Other Assets**").

-2-

(c)     Within five (5) business days of a request by the Holder, the Company shall deliver to the Holder (i) mortgages and/or deeds of trust, in appropriate and recordable form under Arizona law and reasonably satisfactory in form and substance to the Holder, executed by the Company, with respect to the Mortgaged Properties ("Deeds of Trust"), which shall create a first priority lien on such Mortgaged Properties and which shall be promptly recorded in the recorder's office of the appropriate county, and (ii) appropriate instruments granting valid, enforceable first priority security interests on and covering all of the Other Assets, in appropriate and recordable form and reasonably satisfactory in form and substance to the Holder, executed by the Company, with respect to the Other Assets (the "Other Instruments" and, collectively with the Deeds of Trust, the "Security Documents"). Thereafter, the Company shall cause the Mortgaged Properties now owned or hereafter acquired by it to be subject at all times to a first priority, perfected lien in favor of the Holder to secure the Secured Obligations, and the Company shall provide any filings and deliveries reasonably requested by the Holder in connection therewith to perfect the security interests therein, all in form and substance reasonably satisfactory to the Holder.

(d)     The Holder acknowledges that the security interests granted in the Mortgaged Properties and the Other Assets to the Holder to secure the Secured Obligations are also being granted to the holders of the Others Notes to secure the obligations of the Company under such Other Notes, and that such all of such security interests shall be for the ratable benefit of the Holders of all of the Notes. The form and substance of the Security Documents shall reflect such ratable benefit term.

(3) CONVERSION OF NOTE. Following the Issuance Date, as set out above, this Note shall be convertible into shares of Common Stock on the terms and conditions set forth in this Section 3.

(a) Optional Conversion Right. Holder has the right to convert all or part of the Principal Amount at the Company's valuation of $250,000,000.00 into fully paid and nonassessable shares of Common Stock in accordance with Section 3(c), at the Conversion Rate (as defined below) (the "**Conversion Date**"). The Company shall not issue any fraction of a share of Common Stock upon any conversion. If the issuance would result in the issuance of a fraction of a share of Common Stock, the Company shall round such fraction of a share of Common Stock up to the nearest whole share. The Company shall pay any and all transfer, stamp and similar taxes that may be payable with respect to the issuance and delivery of Common Stock upon conversion of any Conversion Amount. The Holder shall have the right to deliver an effective conversion notice at any time until 11:59 pm on the chosen date and it shall be immediately effective.

(b) Conversion Rate. The number of shares of Common Stock issuable upon conversion of any Conversion Amount pursuant to Section 3(a) shall be determined by dividing (x) such Conversion Amount by (y) the Conversion Price (the "Conversion Rate") portion of the
Principal to be converted, redeemed or otherwise with respect to which this determination is being made.

ortion of the

(ii) "**Conversion Price**" means $0.0599. Subsequent to the effective date of the registration statement registering for resale the Conversions Shares and the Warrant Shares pursuant to the Purchase Agreement, if the closing sale price of the Common Stock averages less than the then Conversion Price over a period of ten (10) consecutive trading days, the Conversion Price shall reset to such average price. If the 10-day volume weighted average price of the Common Stock continues to be less than the Conversion Price then the Conversion Price should reset to such 10-day average price.

(c)  Mechanics of Optional Conversion and Adjustment:

(i)  Registration; Book-Entry. The Company shall maintain a register (the "**Register**") for the recordation of the holder of the Note and the Principal amount of the Note held by the holder (the "**Registered Note**"). The entries in the Register, made in good faith, shall be conclusive and binding for all purposes absent manifest error. The Company and the holder of the Note shall treat each Person whose name is recorded in the Register as the owner of the Note for all purposes, including, without limitation, the right to receive payments of Principal, if any, hereunder, notwithstanding notice to the contrary. Upon its receipt of a request to assign or sell all or part of the Registered Note by the Holder, the Company shall record the information contained therein in the Register and issue one or more new Registered Notes in the same aggregate Principal amount as the Principal amount of the surrendered Registered Note to the designated assignee or transferee pursuant to Section 10. Notwithstanding anything to the contrary in this Section 3(c)(i), the Holder may assign any Note or any portion thereof to an Affiliate of such Holder or a Related Fund of such Holder without delivering a request to assign or sell such Note to the Company and the recordation of such assignment or sale in the Register (a "**Related Party Assignment**"); provided, that (x) the Company may continue to deal solely with such assigning or selling Holder unless and until such Holder has delivered a request to assign or sell such Note or portion thereof to the Company for recordation in the Register; (y) the failure of such assigning or selling Holder to deliver a request to assign or sell such Note or portion thereof to the Company shall not affect the legality, validity, or binding effect of such assignment or sale and (z) such assigning or selling Holder shall, acting solely for this purpose as a non-fiduciary agent of the Company, maintain a register (the "**Related Party Register**") comparable to the Register on behalf of the Company, and any such assignment or sale shall be effective

-4-

upon recordation of such assignment or sale in the Related Party Register. Notwithstanding anything to the contrary set forth herein, upon conversion of any portion of this Note in accordance with the terms hereof, the Holder shall not be required to physically surrender this Note to the Company unless the Holder has provided the Company with prior written notice (which notice may be included in a Conversion Notice) requesting reissuance of this Note upon physical surrender of this Note. The Holder and the Company shall maintain records showing the Principal, converted and the dates of such conversions or shall use such other method, reasonably satisfactory to the Holder and the Company, so as not to require physical surrender of this Note upon conversion.

(ii) <u>Intentionally omitted</u>.

(iii) Holder may convert any or all of this Note into shares of Common Stock at any time.

(d) <u>Limitations on Conversions</u>.

(i) <u>Beneficial Ownership</u>. In case that the Holder becomes subject to the filing or reporting obligations under Regulation 13D-G of the Exchange Act due to (i) the conversion of this Note, or any other share issuance hereunder, or (ii) the changes to the beneficial ownership of the Holder (together with the Attribution Parties) in the Company, including but not limited to the changes to such beneficial ownership due to the conversion or share issuance hereunder, the Holder shall timely file such schedules or forms with the United States Securities and Exchange Commission (the "**Commission**") as required under Regulation 13D-G of the Exchange Act. For purposes of this paragraph, beneficial ownership and all calculations (including, without limitation, with respect to calculations of percentage ownership) shall be determined in accordance with Regulation 13D-G and the rules and regulations promulgated thereunder. The obligations contained in this paragraph shall apply to a successor Holder of this Note. For any reason at any time, upon the written or oral request of the Holder, the Company shall within one (1) Business Day confirm orally and in writing to the Holder the number of shares of Common Stock then outstanding, including by virtue of any prior conversion or exercise of convertible or exercisable securities into Common Stock, including, without limitation, pursuant to this Note or securities issued pursuant to the Purchase Agreement.

(ii) <u>Principal Market Regulation</u>. Unless permitted by the applicable rules and regulations of the Principal Market, the Company shall not issue any shares of Common Stock upon conversion of this Note if the issuance of such shares

-5-

of Common Stock would exceed the aggregate number of shares of Common Stock which the Company may issue upon exercise or conversion (as the case may be) of the Note without breaching the Company's obligations under the rules or regulations of the Principal Market (the number of shares which may be issued without violating such rules and regulations, the "**Exchange Cap**"). Notwithstanding the foregoing, such limitation shall not apply in the event that the Company (A) obtains the approval of its stockholders as required by the applicable rules of the Principal Market for issuances of shares of Common Stock in excess of such amount or (B) obtains a written opinion from outside counsel to the Company that such approval is not required, which opinion shall be reasonably satisfactory to the Holder. In the event that any Holder shall sell or otherwise transfer any of such Holder's Note, the Exchange Cap restrictions set forth herein shall continue to apply to the Note and such transferee.

(e) <u>Disputes</u>. In the event of a dispute as to the number of shares of Common Stock issuable to the Holder in connection with a conversion of this Note, the Company shall issue to the Holder the number of shares of Common Stock not in dispute and resolve such dispute in accordance with Section 16.

(f) <u>Automatic Conversion.</u>  In the event the Company completes a Fundamental Transaction or completes a listing of its Common Stock onto a national stock exchange, Holder agrees to convert the OID into Common Stock of the Company at the Conversion Price. The remaining Principal Amount, Amendment Fee and Interest will remain outstanding, unless the Holder elects to convert such Principal Amount, Amendment Fee and Interest into Common Stock of the Company.

(4)     The Company hereby covenants and agrees as follows:

(a) <u>Sale of Assets</u>. During the thirty (30) days from the date of this Note, with the exception of moving certain of its assets to any of its subsidiaries, the Company shall not sell any material assets.

(b) <u>Additional Debt</u>. While this Note is outstanding, the Company shall not incur any additional indebtedness for borrowed money, other than any indebtedness that is Permitted Indebtedness.

(5)     RIGHTS UPON EVENT OF DEFAULT.

(a) <u>Event of Default</u>. Each of the following events shall constitute an "**Event of Default"**; provided, however, that, except in the case of the Events of Default listed in Sections 5(a)(i), or 5(a)(ix) below, the Company shall have five (5) business days after notice of default from the Holder to cure such Event of Default unless a lesser number of days is required pursuant to the provisions of this Section 5.

-6-

(i) <u>Failure to Pay Principal</u>. The Company fails to pay the Principal, Amendment Fee or Interest due under this Note or any of the Other Notes at the Maturity Date (or the maturity date of any of the Other Notes, if the maturity date under the Other Notes is different from the Maturity Date), liquidated damages and other amounts thereon when due on the Note or any of the Other Notes, whether at maturity, upon acceleration or otherwise.

(ii) <u>Conversion and the Shares</u>. The Company (i) fails to issue Conversion Shares to the Holder (or announces or threatens in writing that it will not honor its obligation to do so) upon exercise by the Holder of the conversion rights of the Holder in accordance with the terms of the Note, (ii) fails to transfer or cause its transfer agent to transfer (issue) (electronically or in certificated form) any certificate for the Conversion Shares issuable to the Holder upon conversion of or otherwise pursuant to the Note as and when required by the Note, or (iii) the Company directs its transfer agent not to transfer or delays, impairs, and/or hinders its transfer agent in transferring (or issuing) (electronically or in certificated form) any certificate for the Conversion Shares issuable to the Holder upon conversion of or otherwise pursuant to the Note as and when required by the Note, or fails to remove (or directs its transfer agent not to remove or impairs, delays, and/or hinders its transfer agent from removing) any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any certificate for any Conversion Shares issued to the Holder upon conversion of or otherwise pursuant to the Note as and when required by the Note (or makes any written announcement, statement or threat that it does not intend to honor the obligations described in this paragraph) and any such failure shall continue uncured (or any written announcement, statement or threat not to honor its obligations shall not be rescinded in writing) for five (5) business days after the Holder shall have delivered a Notice of Conversion. It is an obligation of the Company to remain current in its obligations to its transfer agent. It shall be an Event of Default of the Note, if a conversion of the Note is delayed, hindered or frustrated due to a balance owed by the Company to its transfer agent. If at the option of the Holder, the Holder advances any funds to the Company's transfer agent in order to process a conversion, such advanced funds shall be paid by the Company to the Holder within forty eight (48) hours of a demand from the Holder. If Borrower is unable to do so, they shall have an opportunity to cure within five (5) business days.

(iii) <u>Breach of Agreements and Covenants</u>. The Company breaches any material agreement, covenant or other material term or condition contained in the Purchase Agreement, the Note or in any agreement, statement or certificate given in writing pursuant hereto or in connection herewith or therewith, and such breach results in a material adverse effect on the business or assets of the Company.

(iv) <u>Breach of Representations and Warranties</u>. Any representation or warranty of the Company made in the Purchase Agreement or the Note, or in any agreement, statement or certificate given in writing pursuant hereto or in connection herewith or therewith shall be false or misleading in any material respect when made and the breach of which has (or with the passage of time will have) a Material Adverse Effect

-7-

on the rights of the Holder with respect to the Note or the Purchase Agreement. In the event of such a breach, the Company shall have an opportunity to cure within two (2) business days.

(v) <u>Receiver or Trustee</u>. The Company or any subsidiary of the Company shall make an assignment for the benefit of creditors, or apply for or consent to the appointment of a receiver or trustee for it or for a substantial part of its property or business, or such a receiver or trustee shall otherwise be appointed. Under such circumstances, the Company shall have an opportunity to cure within sixty (60) days.

(vi) <u>Judgments</u>. Any money judgment, writ or similar process shall be entered or filed against the Company or any subsidiary of the Company or any of its property or other assets for more than $100,000, and shall remain unvacated, unbonded or unstayed for a period of twenty (20) days unless otherwise consented to by the Holder, which consent will not be unreasonably withheld.

(vii) <u>Bankruptcy</u>. Bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings, voluntary or involuntary, for relief under any bankruptcy law or any law for the relief of debtors shall be instituted by or against the Company or any subsidiary of the Company. Under such circumstances, the Company shall have an opportunity to cure within sixty (60) days.

(viii) <u>Delisting or Trading of Common Stock.</u> The Company shall fail to maintain the listing or quotation of its Common Stock minimally on a Trading Market.

(ix) <u>Failure to Comply with the Exchange Act</u>. The Company shall fail to comply with the reporting requirements of the Exchange Act and/or the Company shall cease to be subject to the reporting requirements of the Exchange Act.

(x) <u>Liquidation.</u> Any dissolution, liquidation, or winding up of Borrower or any substantial portion of its business or assets.

(xi) <u>Cessation of Operations</u>. Any cessation of operations by Borrower or Borrower admits it is otherwise generally unable to pay its debts as such debts become due, provided, however, that any disclosure of the Company's ability to continue as a "going concern" shall not be an admission that the Company cannot pay its debts as they become due.

(xii) <u>Intentionally omitted</u>.

(xiii) <u>Intentionally omitted</u>.

-8-

(xiv) <u>Other Obligations</u>. The occurrence of any default under any agreement or obligation of the Company that is not cured within ten (10) days that could reasonably be expected to have a Material Adverse Effect.

(xv) <u>Default under Transaction Documents or Other Material Agreement</u>. A default or event of default (subject to any grace or cure period provided in the applicable agreement, document or instrument) shall occur under (A) this Note, the warrant or the securities purchase agreement or any of the other agreements entered into by the parties related to the purchase of this Note (collectively, the "**Transaction Documents**"), or (B) the Other Notes or any other material agreement, lease, document or instrument to which Company or any Subsidiary is obligated (and not covered by clause (vi) below), which in the case of subsection (B) would reasonably be expected to have a Material Adverse Effect.

(xvi) <u>Default under Mortgage or Other Agreement of Indebtedness</u>. Company or any Subsidiary shall default on any of its obligations under any mortgage, credit agreement or other facility, indenture agreement, factoring agreement or other instrument under which there may be issued, or by which there may be secured or evidenced, any indebtedness for borrowed money or money due under any long term leasing or factoring arrangement that (a) involves an obligation greater than $100,000, whether such indebtedness now exists or shall hereafter be created, and (b) results in such indebtedness becoming or being declared due and payable prior to the date on which it would otherwise become due and payable.

(xvii) <u>Intentionally omitted</u>.

(xviii) <u>Failure to Meet the Requirements under Rule 144</u>. Company does not meet the current public information requirements under Rule 144.

(xix) <u>Failure to Maintain Intellectual Property</u>. The failure by Company or any material Subsidiary to maintain any material intellectual property rights, personal, real property, equipment, leases or other assets which are necessary to conduct its business (whether now or in the future) and such breach is not cured with twenty (20) days after written notice to the Company from the Holder.

(xx) <u>Trading Suspension</u>. A Commission or judicial stop trade order or suspension from a Trading Market.

(xxi) <u>Intentionally omitted</u>.

(xxii) <u>Failure to Provide Required Notification of a Material Event</u>. A failure by Company to notify Holder of any material event of which Company is obligated to notify Holder pursuant to the terms of this Note or any other Transaction Document.

(xxiii) <u>Invalidity or Unenforceability of Transaction Documents</u>. Any material provision of any Transaction Document shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against the Company, or the validity or enforceability thereof shall be contested by Company, or a proceeding shall be commenced by Company or any governmental authority having jurisdiction over Company or Holder, seeking to establish the invalidity or unenforceability thereof, or Company shall deny in writing that it has any liability or obligation purported to be created under any Transaction Document.

(xxiv) <u>Intentionally omitted</u>.

(b) <u>Redemption Right</u>. At any time after the Holder becoming aware of an Event of Default, the Required Holders may require the Company to redeem (an "**Event of Default Redemption**") all or any portion of the Notes by delivering written notice thereof (the "**Event of Default Redemption Notice**") to the Company, which Event of Default Redemption Notice shall indicate the portion of this Note and the Other Notes the Required Holders are electing to require the Company to redeem. Each portion of this Note and the Other Notes subject to redemption by the Company pursuant to this Section 5(b) shall be redeemed by the Company in cash by wire transfer of immediately available funds at a price equal to (i) the Principal Amount, plus (ii) all Interest then accrued on the Principal Amount from the date of the Note to the Event of Default, plus (iii) the Amendment Fee, plus (iv) interest on the Principal Amount calculated from the Event of Default at the greater of the Default Interest Rate or the maximum rate permitted under applicable law (the "**Event of Default Redemption Price**"), plus (v) liquidated damages of $750,000, plus (vi) an amount in cash equal to 1% of the Event of Default Redemption Price for each 30 day period during which redemptions fail to be made; provided, however, in the event that the Company does not have sufficient funds to pay 100% of the relevant Event of Default Redemption Price to the Holders of all of the Notes, the Company shall pay a pro rata portion of the Event of Default Redemption Price to each such Holder based on the proportion that the Principal Amount of each of the Notes bears to the aggregate Principal Amount of all of the Notes. To the extent redemptions required by this Section 5(b) are deemed or determined by a court of competent jurisdiction to be prepayments of the Note by the Company, such redemptions shall be deemed to be voluntary prepayments. Notwithstanding anything to the contrary in this Section 5, but subject to Section 3(b)(ii) and 3(d), until the Event of Default Redemption Price payable in respect of each of the Notes (together with any interest thereon) is paid in full, the Conversion Amount submitted for redemption under this Section 5(b) (together with any interest thereon) may be converted, in whole or in part, by the Holder into Common Stock pursuant to Section 3. The parties hereto agree that in the event of the Company's redemption of any portion of the Note under this Section 5(b), the Holder's damages would be uncertain and difficult to estimate because of the parties' inability to predict future interest rates and the uncertainty of the availability of a suitable substitute investment opportunity for the Holder. Accordingly, any Event of Default redemption premium due under this Section 5(b) is intended by the parties to be, and shall be deemed, a reasonable estimate of the Holder's actual loss of its investment opportunity and not as a penalty.

(6) <u>RIGHTS UPON FUNDAMENTAL TRANSACTION</u>.

-10-

(a) If, at any time while this Note is outstanding, (i) the Company effects a Fundamental Transaction, then, upon any subsequent conversion of this Note, the Holder shall have the right to receive, for each Conversion Share that would have been issuable upon such conversion immediately prior to the occurrence of such Fundamental Transaction, the same kind and amount of securities, cash or property as it would have been entitled to receive upon the occurrence of such Fundamental Transaction if it had been, immediately prior to such Fundamental Transaction, the holder of one (1) share of Common Stock (the "Alternate Consideration"). For purposes of any such conversion, the determination of the Conversion Price shall be appropriately adjusted to apply to such Alternate Consideration based on the amount of Alternate Consideration issuable in respect of one (1) share of Common Stock in such Fundamental Transaction, and the Company shall apportion the Conversion Price among the Alternate Consideration in a reasonable manner reflecting the relative value of any different components of the Alternate Consideration. If holders of Common Stock are given any choice as to the securities, cash or property to be received in a Fundamental Transaction, then the Holder shall be given the same choice as to the Alternate Consideration it receives upon any conversion of this Debenture following such Fundamental Transaction. To the extent necessary to effectuate the foregoing provisions, any successor to the Company or surviving entity in such Fundamental Transaction shall issue to the Holder a new debenture consistent with the foregoing provisions and evidencing the Holder's right to convert such debenture into Alternate Consideration. The terms of any agreement pursuant to which a Fundamental Transaction is effected shall include terms requiring any such successor or surviving entity to comply with the provisions of this Section 6(a) and insuring that this Note (or any such replacement security) will be similarly adjusted upon any subsequent transaction analogous to a Fundamental Transaction.

(7) DISTRIBUTION OF ASSETS; RIGHTS UPON ISSUANCE OF PURCHASE RIGHTS AND OTHER CORPORATE EVENTS.

(a) Distribution of Assets. If the Company shall declare or make any dividend or other distributions of its assets (or rights to acquire its assets) to any or all holders of shares of Common Stock, by way of return of capital or otherwise (including without limitation, any distribution of cash, stock or other securities, property, options, evidence of Indebtedness or any other assets by way of a dividend, spin off, reclassification, corporate rearrangement, scheme of arrangement or other similar transaction) (the "**Distributions**"), then the Holder will be entitled to such Distributions as if the Holder had held the number of shares of Common Stock acquirable upon complete conversion of this Note (without taking into account any limitations or restrictions on the convertibility of this Note) immediately prior to the date on which a record is taken for such Distribution or, if no such record is taken, the date as of which the record holders of Common Stock are to be determined for such Distributions and the portion of such Distribution shall be held in abeyance for the Holder.

(b) Purchase Rights. If at any time the Company grants, issues or sells any Options, Convertible Securities or rights to purchase stock, warrants, securities or other property pro rata to the record holders of any class of Common Stock (the "**Purchase Rights**"), then the Holder will be entitled to acquire or receive, as applicable, upon the terms applicable to such Purchase Rights, the aggregate Purchase Rights which the Holder could have acquired if the

-11-

Holder had held the number of shares of Common Stock acquirable upon complete conversion of this Note (without taking into account any limitations or restrictions on the convertibility of this Note) immediately prior to the date on which a record is taken for the grant, issuance or sale of such Purchase Rights, or, if no such record is taken, the date as of which the record holders of shares of Common Stock are to be determined for the grant, issue or sale of such Purchase Rights.

(c) <u>Other Corporate Events</u>. In addition to and not in substitution for any other rights hereunder, prior to the occurrence or consummation of any Fundamental Transaction pursuant to which holders of shares of Common Stock are entitled to receive securities, cash, assets or other property with respect to or in exchange for shares of Common Stock (a "**Corporate Event**"), the Company shall make appropriate provision to ensure that, and any applicable Successor Entity or Successor Entities shall ensure that, and it shall be a required condition to the occurrence or consummation of such Corporate Event that, the Holder will thereafter have the right to receive upon conversion of this Note at any time after the occurrence or consummation of the Corporate Event, shares of Common Stock or Successor Capital Stock or, if so elected by the Holder, cash in lieu of the shares of Common Stock (or other securities, cash, assets or other property) purchasable upon the conversion of this Note prior to such Corporate Event, such shares of stock, securities, cash, assets or any other property whatsoever (including warrants or other purchase or subscription rights and any shares of Common Stock) which the Holder would have been entitled to receive upon the occurrence or consummation of such Corporate Event or the record, eligibility or other determination date for the event resulting in such Corporate Event, had this Note been converted immediately prior to such Corporate Event or the record, eligibility or other determination date for the event resulting in such Corporate Event (without regard to any limitations on conversion of this Note). Provision made pursuant to the preceding sentence shall be in a form and substance satisfactory to the Holder. The provisions of this Section 7 shall apply similarly and equally to successive Corporate Events.

(8)     <u>RIGHTS UPON ISSUANCE OF OTHER SECURITIES</u>.

(A) <u>Adjustment of Conversion Price upon Subdivision or Combination of Common Stock</u>. If the Company at any time on or after the Issuance Date subdivides (by any stock split, stock dividend, recapitalization or otherwise) one or more classes of its outstanding shares of Common Stock into a greater number of shares, the Conversion Price in effect immediately prior to such subdivision will be proportionately reduced. If the Company at any time on or after the Issuance Date combines (by combination, reverse stock split or otherwise) one or more classes of its outstanding shares of Common Stock into a smaller number of shares, the Conversion Price in effect immediately prior to such combination will be proportionately increased.

(B) <u>Voluntary Adjustment by Company</u>. The Company may at any time during the term of this Note, with the prior written consent of the Holder, reduce the then current Conversion Price to any amount and for any period of time deemed appropriate by the Board of Directors of the Company.

(9) <u>NONCIRCUMVENTION</u>. The Company hereby covenants and agrees that the Company will not, by amendment of its Certificate of Incorporation, Bylaws or through any reorganization, transfer of assets, consolidation, merger, scheme of arrangement, dissolution, issue or sale of securities, or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Note, and will at all times in good faith carry out all of the provisions of this Note and take all action as may be required to protect the rights of the Holder of this Note.

(10)    Intentionally omitted.

(11) <u>VOTING RIGHTS</u>. The Holder shall have no voting rights as the holder of this Note, except as required by law and as expressly provided in this Note.

(12)    <u>COVENANTS</u>.

(a) <u>Incurrence of Indebtedness</u>. So long as this Note is outstanding, the Company shall not, and the Company shall not permit any of its Subsidiaries to, directly or indirectly, incur or guarantee, assume or suffer to exist any Indebtedness, other than Permitted Indebtedness.

(b) <u>Existence of Liens</u>. So long as this Note is outstanding, the Company shall not, and the Company shall not permit any of its Subsidiaries to, directly or indirectly, allow or suffer to exist any Liens other than Permitted Liens.

(c) <u>Change in Nature of Business</u>. The Company shall not make, or permit any of its Subsidiaries to make, any change in the nature of its business. The Company shall not modify its corporate structure or purpose.

(d) <u>Intellectual Property</u>. The Company shall not, and the Company shall not permit any of its Subsidiaries, directly or indirectly, to encumber or allow any Liens on, any of its own or its licensed copyright rights, copyright applications, copyright registrations and like protections in each work of authorship and derivative work, whether published or unpublished, any patents, patent applications and like protections, including improvements, divisions, continuations, renewals, reissues, extensions, and continuations-in-part of the same, trademarks, service marks and, to the extent permitted under applicable law, any applications therefor, whether registered or not, and the goodwill of the business of the Company and its Subsidiaries connected with and symbolized thereby, know-how, operating manuals, trade secret rights, rights to unpatented inventions, and any claims for damage by way of any past, present, or future infringement of any of the foregoing, other than Permitted Liens.

(e) <u>Preservation of Existence, Etc.</u> The Company shall maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, its existence, rights and privileges, and become or remain, and cause each of its Subsidiaries to become or remain, duly qualified and in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary.

-13-

(f) <u>Maintenance of Properties, Etc.</u> The Company shall maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, all of its properties which are necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear and tear excepted, and comply, and cause each of its Subsidiaries to comply, at all times with the provisions of all leases to which it is a party as lessee or under which it occupies property, so as to prevent any loss or forfeiture thereof or thereunder.

(g) <u>Maintenance of Insurance</u>. The Company shall maintain, and cause each of its Subsidiaries to maintain insurance with responsible and reputable insurance companies or associations (including, without limitation, comprehensive general liability, hazard, rent and business interruption insurance) with respect to its properties (including all real properties leased or owned by it) and business, in such amounts and covering such risks as is required by any governmental authority having jurisdiction with respect thereto or as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated.

(h) <u>Transactions with Affiliates</u>. The Company shall not, nor shall it permit any of its Subsidiaries to, enter into, renew, extend or be a party to, any transaction or series of related transactions (including, without limitation, the purchase, sale, lease, transfer or exchange of property or assets of any kind or the rendering of services of any kind) with any Affiliate, except in the ordinary course of business in a manner and to an extent consistent with past practice and necessary or desirable for the prudent operation of its business, for fair consideration and on terms no less favorable to it or its Subsidiaries than would be obtainable in a comparable arm's length transaction with a Person that is not an Affiliate thereof.

(i) <u>Corporate Changes</u>. The Company shall not change its corporate name, legal form or jurisdiction of formation without twenty (20) days' prior written notice to Holder. Company shall not enter into or be party to a Fundamental Transaction unless in violation of Section 6 hereof. Company shall not relocate its chief executive office or its principal place of business unless it has provided prior written notice to Holder.

(j) Reserved.

(k) <u>Charter Amendments</u>. The Company shall not amend its charter documents, including, without limitation, its certificate of incorporation and bylaws, in any manner that materially and adversely affects any rights of the Holder.

(l) <u>Repurchase</u>. The Company shall not repay, repurchase or offer to repay, repurchase or otherwise acquire more than a <u>de</u> <u>minimis</u> number of shares of its Common Stock or common stock equivalents other than as to the Conversion Shares as permitted or required under the Transaction Documents.

(m) <u>Redemption</u>. The Company shall not redeem, defease, repurchase, repay or make any payments in respect of, by the payment of cash or cash equivalents (in whole or in part, whether by way of open market purchases, tender offers, private transactions or

-14-

otherwise), all or any portion of any Indebtedness (other than the Note if on a pro-rata basis), whether by way of payment in respect of principal of (or premium, if any) or interest on, such Indebtedness, the foregoing restriction shall also apply to Permitted Indebtedness from and after the occurrence of an Event of Default.

(n) <u>Declaration</u>. The Company shall not declare or make any dividend or other distribution of its assets or rights to acquire its assets to holders of shares of Common Stock, by way of return of capital or otherwise including, without limitation, any distribution of cash, stock or other securities, property or options by way of a dividend, spin off, reclassification, corporate rearrangement, scheme of arrangement or other similar transaction.

(o) The Company shall not enter into any agreement with respect to any of the foregoing.

(13)     <u>TRANSFER</u>. This Note and any shares of Common Stock issued upon conversion of this Note may be offered, sold, assigned or transferred according to the Purchase Agreement.

(14)     <u>REISSUANCE OF THIS NOTE</u>.

(a) <u>Transfer</u>. If this Note is to be transferred, the Holder shall instruct the Company who the new Holder will be and this Note will be automatically cancelled.    The Company will issue and deliver the new Note within two (2) days of such notice.

(b) <u>Lost, Stolen or Mutilated Note</u>. Upon receipt by the Company of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note, and, in the case of loss, theft or destruction, of any indemnification undertaking by the Holder to the Company in customary form and, in the case of mutilation, upon surrender and cancellation of this Note, the Company shall execute and deliver to the Holder a new Note (in accordance with Section 14(d)) representing the then outstanding Principal amount of the Note.

(c) <u>Note Exchangeable for Different Denominations</u>. This Note is exchangeable, upon the surrender hereof by the Holder at the principal office of the Company, for a new Note or Notes (in accordance with Section 14(d) representing in the aggregate the outstanding Principal of this Note, and each such new Note will represent such portion of such outstanding Principal as is designated by the Holder at the time of such surrender.

(d) <u>Issuance of New Notes</u>. Whenever the Company is required to issue a new Note pursuant to the terms of this Note, such new Note (i) shall be of like tenor with this Note, (ii) shall represent, as indicated on the face of such new Note, the Principal remaining outstanding (or in the case of a new Note being issued pursuant to Section 14(a) or Section 14(c), the Principal designated by the Holder which, when added to the principal represented by the other new Notes issued in connection with such issuance, does not exceed the Principal remaining outstanding under this Note immediately prior to such issuance of new Notes), (iii) shall have an issuance date, as indicated on the face of such new Note, which is the same as the Issuance Date of this Note,

-15-

(iv) shall have the same rights and conditions as this Note, and (v) shall represent accrued and unpaid Interest on the Principal and Interest of this Note, from the Issuance Date.

(15)  REMEDIES, CHARACTERIZATIONS, OTHER OBLIGATIONS, BREACHES AND INJUNCTIVE RELIEF. The remedies provided in this Note shall be cumulative and in addition to all other remedies available under this Note and any of the other Transaction Documents, at law or in equity (including a decree of specific performance and/or other injunctive relief), and nothing herein shall limit the Holder's right to pursue actual and consequential damages for any failure by the Company to comply with the terms of this Note. Amounts set forth or provided for herein with respect to payments, conversion, redemption and the like (and the computation thereof) shall be the amounts to be received by the Holder and shall not, except as expressly provided herein, be subject to any other obligation of the Company (or the performance thereof). The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder and that the remedy at law for any such breach may be inadequate. The Company therefore agrees that, in the event of any such breach or threatened breach, the Holder shall be entitled, in addition to all other available remedies, to an injunction restraining any breach, without the necessity of showing economic loss and without any bond or other security being required.

(16)  PAYMENT OF COLLECTION, ENFORCEMENT AND OTHER COSTS. If (a) this Note is placed in the hands of an attorney for collection or enforcement or is collected or enforced through any legal proceeding or the Holder otherwise takes action to collect amounts due under this Note or to enforce the provisions of this Note or (b) there occurs any bankruptcy, reorganization, receivership of the Company or other proceedings affecting Company creditors' rights and involving a claim under this Note, then the Company shall pay the costs and expenses incurred by the Holder for such collection, enforcement or action or in connection with such bankruptcy, reorganization, receivership or other proceeding, including, but not limited to, attorneys' fees and disbursements.

(17)  CONSTRUCTION; HEADINGS. This Note shall be deemed to be jointly drafted by the Company and the Holder and shall not be construed against any person as the drafter hereof. The headings of this Note are for convenience of reference and shall not form part of, or affect the interpretation of, this Note.

(18)  FAILURE OR INDULGENCE NOT WAIVER. No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

(19)  DISPUTE RESOLUTION. In the case of a dispute as to the determination of the arithmetic calculation of the Conversion Rate, the Conversion Price or any Redemption Price, the Company shall submit the disputed determinations or arithmetic calculations via facsimile or electronic mail within one (1) Business Days of receipt, or deemed receipt, of the Conversion Notice or Redemption Notice or other event giving rise to such dispute, as the case may be, to the Holder. If the Holder and the Company are unable to agree upon such determination or calculation

-16-

within two (2) Business Days of such disputed determination or arithmetic calculation being submitted to the Holder, then the Company shall, within two (2) Business Days submit via facsimile or electronic mail the disputed arithmetic calculation of the Conversion Rate, Conversion Price or any Redemption Price to an independent, outside accountant, selected by the Holder and approved by the Company, such approval not to be unreasonably withheld, conditioned or delayed. The Company, at the Company's expense, shall cause the accountant to perform the determinations or calculations and notify the Company and the Holder of the results no later than five (5) Business Days from the time it receives the disputed determinations or calculations. Such accountant's determination or calculation shall be binding upon all parties absent demonstrable error.

(20) NOTICES; PAYMENTS.

(a) Notices. All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, facsimile, or electronic mail, addressed as set forth below or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received), or (b) upon receipt, when sent by electronic mail (provided confirmation of transmission is electronically generated and keep on file by the sending party), or (c) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur. The addresses for such communications shall be: (i) if to Borrower, to: Proton Green LLC at 4531 Park Lane, Dallas, Texas 75220, Steven E. Looper, sel@protongreen.com; (ii) if to the Holder, to: the address and fax number indicated on the Purchase Agreement. Without limiting the generality of the foregoing, the Company shall give written notice to the Holder (i) immediately upon any adjustment of the Conversion Price, setting forth in reasonable detail, and certifying, the calculation of such adjustment and (ii) at least twenty (20) days prior to the date on which the Company closes its books or takes a record (A) with respect to any dividend or distribution upon the Common Stock, (B) with respect to any pro rata subscription offer to holders of Common Stock or (C) for determining rights to vote with respect to any Fundamental Transaction, dissolution or liquidation, provided in each case that such information shall be made known to the public prior to or in conjunction with such notice being provided to the Holder.

(b) Payments. Whenever any payment of cash is to be made by the Company to any Person pursuant to this Note, such payment shall be made in lawful money of the United States of America by a check drawn on the account of the Company and sent via overnight courier service to such Person at such address as previously provided to the Company in writing; provided, that the Holder may elect to receive a payment of cash via wire transfer of immediately

-17-

available funds by providing the Company with prior written notice setting out such request and the Holder's wire transfer instructions. Whenever any amount expressed to be due by the terms of this Note is due on any day, which is not a Business Day, the same shall instead be due on the next succeeding day, which is a Business Day.

(21) <u>CANCELLATION</u>. After all Principal and other amounts at any time owed on this Note have been paid in full, this Note shall automatically be deemed canceled, shall be surrendered to the Company for cancellation and shall not be reissued.

(22) <u>WAIVER OF NOTICE</u>. To the extent permitted by law, the Company hereby waives demand, notice, protest and all other demands and notices in connection with the delivery, acceptance, performance, default or enforcement of this Note.

(23) <u>GOVERNING LAW; JURISDICTION; JURY TRIAL</u>. All questions concerning the construction, validity, enforcement and interpretation of this Note shall be governed by and construed and enforced in accordance with the internal laws of the State of New York, without regard to the principles of conflicts of law thereof. The Company agrees that all legal proceedings concerning the interpretations, enforcement and defense of the transactions contemplated by this Note (whether brought against the Company, the Holder or their respective affiliates, directors, officers, shareholders, employees or agents) shall be commenced exclusively in the state and federal courts sitting in the City of New York, County of New York. The Company hereby irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the City of New York, Borough of Manhattan for the adjudication of any dispute hereunder or in connection herewith or with any transaction contemplated hereby or discussed herein, and hereby irrevocably waives, and agrees not to assert in any suit, action or proceeding, any claim that it is not personally subject to the jurisdiction of any such court, that such suit, action or proceeding is improper or is an inconvenient venue for such proceeding. The Company hereby irrevocably waives personal service of process and consents to process being served in any such suit, action or proceeding by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to it at the address in effect for notices to it under the Purchase Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law. If the Company or a Holder shall commence an action or proceeding to enforce any provisions of the Note, then the prevailing party in such action or proceeding shall be reimbursed by the other party for its reasonable attorneys' fees and other costs and expenses incurred with the investigation, preparation and prosecution of such action or proceeding. **IN ANY ACTION, SUIT, OR PROCEEDING IN ANY JURISDICTION BROUGHT BY ANY PARTY AGAINST ANY OTHER PARTY, THE COMPANY KNOWINGLY AND INTENTIONALLY, TO THE GREATEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY AND EXPRESSLY WAIVES FOREVER TRIAL BY JURY.**

(24) <u>SEVERABILITY</u>. If any provision of this Note is prohibited by law or otherwise determined to be invalid or unenforceable by a court of competent jurisdiction, the provision that would otherwise be prohibited, invalid or unenforceable shall be deemed amended

-18-

to apply to the broadest extent that it would be valid and enforceable, and the invalidity or unenforceability of such provision shall not affect the validity of the remaining provisions of this Note so long as this Note as so modified continues to express, without material change, the original intentions of the parties as to the subject matter hereof and the prohibited nature, invalidity or unenforceability of the provision(s) in question does not substantially impair the respective expectations or reciprocal obligations of the parties or the practical realization of the benefits that would otherwise be conferred upon the parties. The parties will endeavor in good faith negotiations to replace the prohibited, invalid or unenforceable provision(s) with a valid provision(s), the effect of which comes as close as possible to that of the prohibited, invalid or unenforceable provision(s).

(25) <u>DISCLOSURE</u>. Upon receipt or delivery by the Company of any notice in accordance with the terms of this Note, unless the Company has in good faith determined that the matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries, the Company shall within one (1) Business Day after any such receipt or delivery, publicly disclose such material, nonpublic information on a Current Report on Form 8-K or otherwise. In the event that the Company believes that a notice contains material, nonpublic Information relating to the Company or its Subsidiaries, the Company so shall indicate to such Holder contemporaneously with delivery of such notice, and in the absence of any such indication, the Holder shall be allowed to presume that all matters relating to such notice do not constitute material, nonpublic information relating to the Company or its Subsidiaries.

(26) <u>CERTAIN DEFINITIONS</u>. For purposes of this Note, the following terms shall have the following meanings:

(a) "**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, such Person, it being understood for purposes of this definition that "control" of a Person means the power directly or indirectly either to vote 10% or more of the stock having ordinary voting power for the election of directors of such Person or direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

(b) "**Attribution Parties**" means, collectively, the following Persons and entities: (i) any investment vehicle, including, any funds, feeder funds or managed accounts, currently, or from time to time after the Issuance Date, directly or indirectly managed or advised by the Holder's investment manager or any of its Affiliates or principals, (ii) any direct or indirect Affiliates of the Holder or any of the foregoing, (iii) any Person acting or who could be deemed to be acting as a Group together with the Holder or any of the foregoing and (iv) any other Persons whose beneficial ownership of the Company's Common Stock would or could be aggregated with the Holder's and the other Attribution Parties for purposes of Regulation 13D-G of the Exchange Act.

(c) "**Bloomberg**" means Bloomberg Financial Markets.

(d) "**Closing Date**" shall have the meaning ascribed to such term in the Purchase Agreement.

-19-

(e) "**Closing Bid Price**" and "**Closing Sale Price**" means, for any security as of any date, the last closing bid price and last closing trade price, respectively, for such security on the Principal Market, as reported by Bloomberg, or, if the Principal Market begins to operate on an extended hours basis and does not designate the closing bid price or the closing trade price, as the case may be, then the last bid price or last trade price, respectively, of such security prior to 4:00 p.m., New York Time, as reported by Bloomberg, or, if the Principal Market is not the principal securities exchange or trading market for such security, the last closing bid price or last trade price, respectively, of such security on the principal securities exchange or trading market where such security is listed or quoted for trading as reported by Bloomberg, or if the foregoing do not apply, the last closing bid price or last trade price, respectively, of such security in the over-the-counter market on the electronic bulletin board for such security as reported by Bloomberg, or, if no closing bid price or last trade price, respectively, is reported for such security by Bloomberg, the average of the bid prices, or the ask prices, respectively, of any market makers for such security as reported in the OTC Link or "pink sheets" by OTC Markets Group Inc. (formerly Pink OTC Markets Inc.). If the Closing Bid Price or the Closing Sale Price cannot be calculated for a security on a particular date on any of the foregoing bases, the Closing Bid Price or the Closing Sale Price, as the case may be, of such security on such date shall be the fair market value as mutually determined by the Company and the Holder. If the Company and the Holder are unable to agree upon the fair market value of such security, then such dispute shall be resolved pursuant to Section 19. All such determinations to be appropriately adjusted for any stock dividend, stock split, stock combination, reclassification or similar transaction during the applicable calculation period.

(f) "**Common Stock**" the common stock of the Company, par value $0.001 per share, and any other class of securities into which such securities may hereafter be reclassified or changed.

(g) "**Convertible Securities**" means any stock or securities (other than Options) directly or indirectly convertible into or exercisable or exchangeable for shares of Common Stock.

(h) "**Default Interest Rate**" means 18% per annum.

(i) "**Equity Interests**" means (a) all shares of capital stock (whether denominated as common capital stock or preferred capital stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting and (b) all securities convertible into or exchangeable for any of the foregoing and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any of the foregoing, whether or not presently convertible, exchangeable or exercisable.

(j) "**Exchange Act**" means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

-20-

(k) "**Fundamental Transaction**" means (A) that the Company shall, directly or indirectly, including through Subsidiaries, Affiliates or otherwise, in one or more related transactions, (i) consolidate or merge with or into (whether or not the Company is the surviving corporation) another Subject Entity, or (ii) sell, assign, transfer, convey or otherwise dispose of all or substantially all of the properties or assets of the Company or any of its "significant subsidiaries" (as defined in Rule 1-02 of Regulation S-X) to one or more Subject Entities, or (iii) make, or allow one or more Subject Entities to make, or allow the Company to be subject to or have its Common Stock be subject to or party to one or more Subject Entities making, a purchase, tender or exchange offer that is accepted by the holders of at least either (x) 50% of the outstanding shares of Common Stock, (y) 50% of the outstanding shares of Common Stock calculated as if any shares of Common Stock held by all Subject Entities making or party to, or Affiliated with any Subject Entities making or party to, such purchase, tender or exchange offer were not outstanding; or (z) such number of shares of Common Stock such that all Subject Entities making or party to, or Affiliated with any Subject Entity making or party to, such purchase, tender or exchange offer, become collectively the beneficial owners (as defined in Rule 13d-3 under the Exchange Act) of at least 50% of the outstanding shares of Common Stock, or (iv) consummate a stock purchase agreement or other business combination (including, without limitation, a reorganization, recapitalization, spin-off or scheme of arrangement) with one or more Subject Entities whereby such Subject Entities, individually or in the aggregate, acquire, either (x) at least 50% of the outstanding shares of Common Stock, (y) at least 50% of the outstanding shares of Common Stock calculated as if any shares of Common Stock held by all the Subject Entities making or party to, or Affiliated with any Subject Entity making or party to, such stock purchase agreement or other business combination were not outstanding; or (z) such number of shares of Common Stock such that the Subject Entities become collectively the beneficial owners (as defined in Rule 13d-3 under the Exchange Act) of at least 50% of the outstanding shares of Common Stock, or (v) reorganize, recapitalize or reclassify its Common Stock, (B) that the Company shall, directly or indirectly, including through Subsidiaries, Affiliates or otherwise, in one or more related transactions allow any Subject Entity individually or the Subject Entities in the aggregate to be or become the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, whether through acquisition, purchase, assignment, conveyance, tender, tender offer, exchange, reduction in outstanding shares of Common Stock, merger, consolidation, business combination, spin-off, scheme of arrangement, reorganization, recapitalization or reclassification or otherwise in any manner whatsoever, of either (x) at least 50% of the aggregate ordinary voting power represented by issued and outstanding Common Stock, (y) at least 50% of the aggregate ordinary voting power represented by issued and outstanding Common Stock not held by all such Subject Entities as of the date of this Note calculated as if any shares of Common Stock held by all such Subject Entities were not outstanding, or (z) a percentage of the aggregate ordinary voting power represented by issued and outstanding shares of Common Stock or other equity securities of the Company sufficient to allow such Subject Entities to effect a statutory short form merger or other transaction requiring other stockholders of the Company to surrender their shares of Common Stock without approval of the stockholders of the Company or (C) directly or indirectly, including through Subsidiaries, Affiliates or otherwise, in one or more related transactions, the issuance of or the entering into any other instrument or transaction structured in a manner to circumvent, or that circumvents, the intent of this definition in which case this definition shall be construed and

-21-

implemented in a manner otherwise than in strict conformity with the terms of this definition to the extent necessary to correct this definition or any portion of this definition which may be defective or inconsistent with the intended treatment of such instrument or transaction.

(l) "**GAAP**" means United States generally accepted accounting principles, consistently applied.

(m) "**Group**" means a "group" as that term is used in Regulation 13D-G of the Exchange Act and as defined in Rule 13d-5 thereunder.

(n) "**Holiday**" means a day other than a Business Day or on which trading does not take place on the Principal Market.

(o) RESERVED

(p) "**Market Price**" shall mean the lowest Closing Bid Price on the Closing Date.

(q) "**Notes**" means this Note and the Other Notes.

(r) "**OID**" shall mean the Original Issue Discount, which is 35%.

(s) "**Options**" means any rights, warrants or options to subscribe for or purchase shares of Common Stock or Convertible Securities.

(t) "**Other Notes**" means (i) the Second Amended and Restated Promissory Convertible Note, dated as of the date hereof, made by the Company in favor of Kips Bay Select LP in the principal amount of $3,513,469.00 (the "**Kips Bay Note**"), and (ii) the Amended and Restated Promissory Convertible Note, dated as of the date hereof, made by the Company in favor of Alpha Carta, Ltd. in the principal amount of $1,846,153.84 (the "**AC Note**").

(u) "**Parent Entity**" of a Person means an entity that, directly or indirectly, controls the applicable Person, including such entity whose common capital stock or equivalent equity security is quoted or listed on a Trading Market (or, if so elected by the Holder, any other market, exchange or quotation system), or, if there is more than one such Person or such entity, the Person or entity designated by the Holder or in the absence of such designation, such Person or such entity with the largest public market capitalization as of the date of consummation of the Fundamental Transaction.

(v) "**Permitted Indebtedness**" means (i) Indebtedness evidenced by this Note and the Other Notes; (ii) debt incurred to make acquisitions; (iii) trade payables incurred in the ordinary course of business consistent with past practice, (iv) unsecured indebtedness not in excess of $1,000,000 in the aggregate, and (v) Indebtedness secured by Permitted Liens.

(w) "**Permitted Liens**" means (i) any Lien for taxes not yet due or delinquent or being contested in good faith by appropriate proceedings for which adequate reserves

-22-

have been established in accordance with GAAP, (ii) any statutory Lien arising in the ordinary course of business by operation of law with respect to a liability that is not yet due or delinquent, (iii) any Lien created by operation of law, such as materialmen's liens, mechanics' liens and other similar liens, arising in the ordinary course of business with respect to a liability that is not yet due or delinquent or that are being contested in good faith by appropriate proceedings, (iv) Liens (A) upon or in any equipment acquired or held by the Company or any of its Subsidiaries to secure the purchase price of such equipment or Indebtedness incurred solely for the purpose of financing the acquisition or lease of such equipment, or (B) existing on such equipment at the time of its acquisition, provided that the Lien is confined solely to the property so acquired and improvements thereon, and the proceeds of such equipment, (v) Liens incurred in connection with the extension, renewal or refinancing of the Indebtedness secured by Liens of the type described in clause (iv) above, provided that any extension, renewal or replacement Lien shall be limited to the property encumbered by the existing Lien and the principal amount of the Indebtedness being extended, renewed or refinanced does not increase, (vi) leases or subleases and licenses and sublicenses granted to others in the ordinary course of the Company's business, not interfering in any material respect with the business of the Company and its Subsidiaries taken as a whole, (vii) Liens in favor of customs and revenue authorities arising as a matter of law to secure payments of custom duties in connection with the importation of goods, (viii) Liens arising from judgments, decrees or attachments in circumstances not constituting an Event of Default under Section 4(a)(viii) and (ix) liens listed on <u>Schedule 27(v)</u> hereto, and (ix) Liens arising pursuant to the terms of the Notes.

(x) "**Principal Market**" means the OTCQB tier of the OTC Markets.

(y) "**Redemption Dates**" means, collectively, the Event of Default Redemption Dates, and the Optional Redemption Dates, each of the foregoing, individually, a Redemption Date.

(z) "**Redemption Notices**" means, collectively, the Event of Default Redemption Notices, and the Optional Redemption Notices, each of the foregoing, individually, a Redemption Notice.

(aa) "**Redemption Price**" means, 125% of the outstanding principal amount of the Note together with accrued Interest thereon, which after an Event of Default shall be calculated at the Default Rate.

(bb) "**Related Fund**" means, with respect to any Person, a fund or account managed by such Person or an Affiliate of such Person.

(cc) "**Required Holders**" means any two (2) Holders of the Notes.

(dd) "**Rule 144**" shall have the meaning ascribed to such term in the Purchase Agreement.

(ee) "**SEC**" means the United States Securities and Exchange Commission.

(ff) "**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

(gg) "**Subject Entity**" means any Person, Persons or Group or any Affiliate or associate of any such Person, Persons or Group.

(hh) "**Successor Entity**" means one or more Person or Persons (or, if so elected by the Holder, the Company or Parent Entity) formed by, resulting from or surviving any Fundamental Transaction or one or more Person or Persons (or, if so elected by the Holder, the Company or the Parent Entity) with which such Fundamental Transaction shall have been entered into.

(ii) "**Trading Market**" means any of the following markets or exchanges on which the Common Stock is listed or quoted for trading on the date in question: the NYSE American, the Nasdaq Capital Market, the Nasdaq Global Market, the Nasdaq Global Select Market, the New York Stock Exchange, OTCQB or OTCQX (or any successors to any of the foregoing).

(jj) "**VWAP**" means, for any date, the price determined by the first of the following clauses that applies: (a) if the Common Stock is then listed or quoted on a Trading Market, the daily volume weighted average price of the Common Stock for such date (or the nearest preceding date) on the Trading Market on which the Common Stock is then listed or quoted as reported by Bloomberg L.P. (based on a Trading Day from 9:30 a.m. New York City time to 4:02 p.m. New York City time); (b) if the Common Stock is not then listed or quoted for trading on a Trading Market and if prices for the Common Stock are then reported on the OTC Pink (or a similar organization or agency succeeding to its functions of reporting prices), the most recent bid price per share of the Common Stock so reported; or (c) in all other cases, the fair market value of a share of Common Stock as determined by an independent appraiser selected in good faith by the Holders of a majority in interest of the Note then outstanding and reasonably acceptable to the Company, the fees and expenses of which shall be paid by the Company.

[Signature Page Follows]

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed as of the Issuance Date set out above.

Proton Green LLC,
formerly known as Plateau
Carbon, LLC

By: _____
Name: Steven E. Looper
Title: Managing Member

AGREED AND APPROVED:

ALPHA CARTA, LTD.

By: _____
    Name
    Title:

-25-

IN WITNESS WHEREOF, the Company has caused this Note to be duly executed as of the Issuance Date set out above.

Proton Green LLC,
formerly known as Plateau
Carbon, LLC

By: _____
Name:
Title:

AGREED AND APPROVED:

ALPHA CARTA, LTD.

By: _____
Name Mark Azzopardi
Title:  Director

-25-

**EXHIBIT I**
**PROTON GREEN LLC**
**CONVERSION NOTICE**

Reference is made to the Amended and Restated Promissory Convertible Note (the "**Note**") issued to Alpha Carta, Ltd. (together with is designee or registered assigns, the "**Holder**") by Proton Green LLC (formerly known as Plateau Carbon, LLC) (the "**Company**"). In accordance with and pursuant to the Note, the undersigned hereby elects to convert the Conversion Amount (as defined in the Note) of the Note indicated below into shares of Common Stock of the Company, par value $ 0.0001 per share (the "**Common Stock**") of the Company, as of the date specified below.

Date of
Conversion: _____

Aggregate Conversion Amount to be
converted: _____

Please confirm the following information:

Conversion Price: _____

Number of shares of Common Stock to
be issued: _____

Please issue the Common Stock into which the Note is being converted in the following name and to the following address:

Issue to: _____

Facsimile Number and Electronic

Mail: _____

Authorization: _____
By: _____
Title: _____

Dated: _____

Account
Number: _____
(if electronic book entry transfer)

-26-

Transaction Code
Number: _____
(if electronic book entry transfer)

# EXHIBIT O

### PROFESSIONAL SERVICES AGREEMENT

THIS AGREEMENT is between Alpha Carta Limited, and its subsidiaries and/or affiliates (collectively, the "Company") and **BNW FAMILY OFFICE LLC,** a Delaware limited liability company (the "Contractor").

1.     ENGAGEMENT OF SERVICES. The Company may from time-to-time issue Project Assignments in the form attached to this Agreement as Exhibit A. Subject to the terms of this Agreement, the Contractor will, to the best of its ability, render the services set forth in the Project Assignments accepted by the Contractor (the "Projects") by the completion dates set forth therein. The manner and means by which the Contractor chooses to complete the Projects are in the Contractor's sole discretion and control. The Contractor agrees to exercise the highest degree of professionalism, and to utilize its expertise and creative talents in completing such Projects. The Contractor agrees to provide its own equipment, tools, and other materials at its own expense. The Company will make its facilities and equipment available to the Contractor when necessary. The Contractor shall perform the services necessary to complete the Projects in a timely and professional manner consistent with industry standards, and at a location, place, and time that the Contractor deems appropriate. The Contractor may not subcontract or otherwise delegate its obligations under this Agreement without the Company's prior written consent. If the Contractor is not a natural person, then before any employee or consultant of the Contractor performs services in connection with this Agreement, the employee or consultant and the Contractor must have entered into a written agreement expressly for the benefit of the Company and containing provisions substantially equivalent to this section and to Section 4 below.

2.     COMPENSATION. The Company will pay the Contractor a fee for services rendered under this Agreement as set forth in Exhibit A, which sets forth the Project Assignment(s) undertaken by the Contractor. The Contractor will be reimbursed for any reasonable expenses incurred in connection with the performance of services under this Agreement provided that the Contractor obtains prior approval from the Company and submits verification of such expenses as the Company may require. Upon termination of this Agreement for any reason, the Contractor will be paid fees and expenses on a proportional basis as stated in the Project Assignment(s) for work, which is then in progress, up to and including the effective date of such termination.

3.     INDEPENDENT CONTRACTOR RELATIONSHIP. The Contractor's relationship with the Company will be that of an independent contractor and nothing in this Agreement should be construed to create a partnership, joint venture, or employer-employee relationship. The Contractor is not the agent of the Company and is not authorized to make any representation, contract, or commitment on behalf of the Company. The Contractor will not be entitled to any of the benefits that the Company may make available to its employees, such as group insurance, profit-sharing, or retirement benefits. The Contractor will be solely responsible for all tax returns and payments required to be filed with or made to any federal, state, or local tax authority with respect to the Contractor's performance of services and receipt of fees under this Agreement. The Company will regularly report amounts paid to the Contractor by filing a Form 1099-MISC with the Internal Revenue Service as required by law. The Company will not withhold or make payments for social security; make unemployment insurance or disability insurance contributions; or obtain worker's compensation insurance on the Contractor's behalf. The Contractor agrees to accept exclusive liability for complying with all applicable state and federal laws governing self-employed individuals, including obligations such as payment of taxes, social security, disability, and other contributions based on fees paid to the Contractor, its agents, or employees under this Agreement. The Contractor hereby agrees to indemnify and hold the Company harmless against any and all such taxes or contributions, including penalties and interest.

4.     PROPRIETARY INFORMATION OBLIGATIONS AND INTELLECTUAL PROPERTY RIGHTS.

    4.1     **Proprietary Information.** The Contractor agrees, during the term of this Agreement and thereafter, that it will take all steps reasonably necessary to hold the Company's Proprietary Information in trust and confidence, will not use Proprietary Information in any manner or for any purpose not expressly set forth in this Agreement, and will not disclose any such Proprietary Information to any third party without first obtaining the Company's express written consent. By way of illustration but not limitation, "Proprietary Information" includes (a) trade secrets, inventions, mask works, ideas, processes, formulas, source and object codes, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques (hereinafter collectively referred to as "Inventions"); (b) information regarding financial information, research, investment and fund strategies, investors, marketing, business plans, budgets, suppliers and customers; and (c) information regarding the skills and compensation of other employees and consultants of the Company. Notwithstanding the other provisions of this Agreement, nothing received by the Contractor will be considered to be the Company's Proprietary Information if

1

(1) it has been published or is otherwise readily available to the public other than by a breach of this Agreement; (2) it has been rightfully received by the Contractor from a third party without confidential limitations; (3) it has been independently developed for the Contractor by personnel or agents having no access to the Company's Proprietary Information; or (4) it was known to the Contractor prior to its first receipt from the Company.

**4.2 Third Party Information.** The Contractor understands that the Company has received and will in the future receive from third parties confidential or proprietary information ("Third Party Information") subject to a duty on the Company's part to maintain the confidentiality of such information and use it only for certain limited purposes. The Contractor agrees to hold Third Party Information in confidence and not to disclose to anyone (other than the Company's personnel who need to know such information in connection with their work for the Company) or to use, except in connection with the Contractor's work for the Company, Third Party Information unless expressly authorized in writing by an officer of the Company.

**4.3 No Conflict of Interest.** The Contractor agrees, during the term of this Agreement, not to accept work substantially similar to the Contractor's work under this Agreement, without the Company's prior written consent. The Contractor warrants that, to the best of the Contractor's knowledge, there is no other existing contract or duty on the Contractor's part that would conflict with or would be inconsistent with this Agreement, unless a copy of such contract or a description of such duty is attached to this Agreement as Exhibit B. The Contractor further agrees not to disclose to the Company, bring onto the Company's premises, or induce the Company to use any confidential information that belongs to anyone other than the Company or the Contractor.

**5. CONTRACTOR REPRESENTATIONS AND WARRANTIES.** The Contractor hereby represents and warrants that (a) the Company work product will be an original work of the Contractor; (b) the Contractor has full right and power to enter into and perform this Agreement without the consent of any third party; and (c) should the Company permit the Contractor to use any of the Company's equipment, tools, or facilities during the term of this Agreement, such permission shall be gratuitous and the Contractor shall be responsible for any injury or damage arising out of use of such equipment, tools, or facilities.

**6. INDEMNIFICATION.** The Company will indemnify, defend, and hold harmless the Contractor from any and all claims, losses, liabilities, damages, expenses and costs (including attorneys' fees and court costs) that result from the Contractor's engagement hereunder and/or provision of services under this Agreement, provided that such claims are not the result of the Contractor's breach of this Agreement, bad faith, willful misconduct, or gross negligence, and provided further that the Contractor gives the Company written notice of any claim and the Company has the right to participate in the defense of any such claim at its expense. The Contractor will indemnify and hold harmless the Company, its officers, directors, employees, and agents from any and all claims, losses, liabilities, damages, expenses and costs (including attorneys' fees and court costs) that result from a breach or alleged breach of any obligation of or agreement by the Contractor in this Agreement, provided that the Company gives the Contractor written notice of any such claim and the Contractor has the right to participate in the defense of any such claim at its expense.

**7. TERMINATION.**

**7.1 Termination by the Company.** The Company may terminate this Agreement at its convenience and without any breach by the Contractor upon ninety days (90) days' prior written notice to the Contractor. The Company may also terminate this Agreement immediately in its sole discretion upon the Contractor's material breach of Section 4 or Section 7.3, provided the Company has given the Contractor seven (7) days' advance written notice within which to cure such breach.

**7.2 Termination by the Contractor.** The Contractor may terminate this Agreement at any time upon ninety (90) days' prior written notice to the Company.

**7.3 Noninterference with Business.** During and for a period of one year immediately following termination of this Agreement by either party, the Contractor agrees not to solicit or induce any employee, independent contractor, client, or customer to terminate or breach an employment, contractual or other relationship with the Company.

**7.4** **Return of Company Property.** Upon termination of the Agreement or earlier as requested by the Company, the Contractor will deliver to the Company any and all documents, together with all copies thereof, and any other material containing or disclosing any Company work product, Third Party Information, or Proprietary Information of the Company. The Contractor further agrees that any property situated on the Company's premises and owned by the Company, including disks and other storage media, filing cabinets, or other work areas, is subject to inspection by Company personnel at any time with or without notice.

**8.** **GENERAL PROVISIONS.**

**8.1** **Governing Law.** This Agreement will be governed and construed in accordance with the laws of the State of Illinois without regard to conflicts of law principles. The Contractor hereby expressly consents to the personal jurisdiction of the state and federal courts located in Delaware for any lawsuit filed arising from or related to this Agreement.

**8.2** **Severability.** In case any one or more of the provisions contained in this Agreement shall, for any reason, be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect the other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein. Moreover, if any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity, or subject, it shall be construed by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law as it shall then appear.

**8.3** **No Assignment.** This Agreement may not be assigned by the Contractor without the Company's prior written consent, and any such attempted assignment shall be void and of no effect.

**8.4** **Notices.** All notices, requests and other communications under this Agreement must be in writing, and must be mailed by registered or certified mail, postage prepaid and return-receipt requested, by reputable national overnight courier, delivery fee prepaid or delivered by hand to the party to whom such notice is required or permitted to be given. If mailed, any such notice will be considered to have been given five (5) business days after it was mailed, as evidenced by the postmark. If delivered by hand or overnight courier, any such notice will be considered to have been given when received by the party to whom notice is given, as evidenced by written and dated receipt of the receiving party.

**8.5** **Injunctive Relief.** A breach of any of the promises or agreements contained in this Agreement may result in irreparable and continuing damage to the Company for which there may be no adequate remedy at law, and the Company is therefore entitled to seek injunctive relief as well as such other and further relief as may be appropriate.

**8.6** **Survival.** The following provisions shall survive termination of this Agreement: Section 4, Section 5, Section 6, and Section 7.3.

**8.7** **Publicity.** The Contractor agrees not to use any identification or reference to any trade name, trademark, service mark, or symbol of the Company in any advertising or promotional activities without the Company's prior written consent.

**8.8** **Waiver.** No waiver by the Company of any breach of this Agreement shall be a waiver of any preceding or succeeding breach. No waiver by the Company of any right under this Agreement shall be construed as a waiver of any other right. The Company shall not be required to give notice to enforce strict adherence to all terms of this Agreement.

**9.9** **Entire Agreement.** This Agreement, together with the Exhibits, is the final, complete, and exclusive agreement of the parties with respect to the subject matter hereof and supersedes and merges all prior discussions between us. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing and signed by the party to be charged. The terms of this Agreement will govern all Project Assignments and services undertaken by the Contractor for the Company. In the event of any

3

conflict between this Agreement and a Project Assignment, the Project Assignment shall control, but only with respect to the services set forth herein.

**IN WITNESS WHEREOF,** the parties have caused this Professional Services Agreement to be executed by their duly authorized representative.

**COMPANY:**                                             **CONTRACTOR:**

**ALPHA CARTA LIMITED**                              **BNW FAMILY OFFICE LLC,** a Delaware limited
                                                        liability company

By: _____              By: _Robert James Brownell_
Name: ____Mark Azzopardi_____                  Name: Robert Brownell
Title: _____Director_____                 Its: __Manager, BNW Family Office, LLC__

4

**EXHIBIT A**

**PROJECT ASSIGNMENT**

**Services:**  The Contractor will provide investment advisory and support services.

**Payment of Fees.**  Contractor will receive a monthly rate of $40,000, during the Term of this Agreement. The Company may pay the Contractor additional fees on a discretionary basis for exceptional services.

- Payment will be issued in arrears via wire transfer or check for services performed during the previous month.

- The Contractor must submit a monthly invoice of time worked for approval by the Company.

- The Contractor agrees to work on a schedule to be mutually agreed upon by the Contractor and the Company, to perform such services and to fulfill the Contractor's obligations under this Agreement.

**Term:**

- January 1, 2023, through December 31, 2023, subject to renewal or earlier termination (as stated in Section 7 of this agreement).

**Expenses:**  The Company will reimburse the Contractor for the following expenses:

- Reasonable out-of-pocket expenses incurred in connection with the provision of services under this Agreement.

- The Contractor shall promptly submit bills or receipts for such expenses to the Company for reimbursement.  All expenses shall be incurred in accordance with the current policies and guidelines of the Company with respect thereto.

**NOTE:**  This Project Assignment is governed by the terms of a Professional Services Agreement in effect between the Company and Contractor.  In the event that any item in this Project Assignment is inconsistent with that Agreement, the terms of this Project Assignment shall govern, but only with respect to the services set forth in this Project Assignment.

Signed: _____          _____
               The Company                                    The Contractor